Sehreen Ladak (Bar No. 307895)
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
(310) 284-5652
sladak@proskauer.com

Robert C. Goodman (Bar No. 111554)
Lauren Kramer Sujeeth (Bar No. 259821)
ROGERS, JOSEPH, O'DONNELL, PC
311 California Street, 10th Floor
San Francisco, CA 94104
(415) 956-2828
rgoodman@rjo.com
lsujeeth@rjo.com

*Attorneys for Defendant Bright Data Ltd.*
*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X Corp.,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>BRIGHT DATA, LTD.<br><br>　　　　　　　Defendant | Case No.  23-cv-03698-WHA<br><br>Time:  November 30, 2023, 8:00 A.M.<br>Court: Courtroom 12<br>Judge: Hon. William Alsup |

## <u>BRIGHT DATA'S MOTION TO DISMISS</u>

1

## **NOTICE OF MOTION**

2      PLEASE TAKE NOTICE that the hearing on Bright Data's Motion to Dismiss will take

3  place on November 30, 2023, at 8:00 a.m.

4      The motion seeks dismissal of X's tortious interference claim (Count II) for lack of

5  personal jurisdiction and for failure to state a claim pursuant to Rules 12(b)(2) and (6).  Bright

6  Data also seek dismissal of X's unjust enrichment claim (Count III) and its breach of contract

7  claim (Count I) to the extent it rests on individual, non-defendant user accounts, and not accounts

8  of Bright Data Ltd. pursuant to Rule 12(b)(6).

9                ## **STATEMENT OF ISSUES TO BE DECIDED**

10      1.    Does the Court lack personal jurisdiction over X's tortious interference claim

11  because (i) the claim does not relate to any contract between Bright Data and X, thus precluding

12  reliance on any forum selection clause; and (ii) X has not alleged any conduct constituting unlawful

13  inducement in or expressly aimed at California?

14      2.    Does X's tortious interference claim fail under Rule 12(b)(6) because X has not

15  alleged (i) the existence and breach of a valid and enforceable third-party contract, or (ii) any

16  conduct that would constitute unlawful inducement of a breach?

17      3.    Does X's unjust enrichment claim fail under Rule 12(b)(6) because X has not

18  alleged (i) a claim arising independent of the X Terms of Use, or (ii) any independent (non-

19  contractual) property right to prevent Bright Data from engaging in public web search?

20      4.    Does X's breach of contract claim fail under Rule 12(b)(6) because Bright Data is

21  not a party to the contract sued upon?

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION. ........................................................................................... 1

II.     FACTUAL BACKGROUND. ......................................................................... 3

III.    THE COURT LACKS PERSONAL JURISDICTION OVER X'S TORTIOUS
        INTERFERENCE CLAIMS. ......................................................................... 5

        A.      Bright Data Did Not Waive Personal Jurisdiction. .................................5

        B.      X Has Not Plausibly Alleged Specific Personal Jurisdiction. ...............8

                1.      X Cannot Base Specific Jurisdiction on X's Own Domicile. .....................9

                2.      X Cannot Base Specific Jurisdiction on the Alleged Existence of
                        Bright Data's Sales Office. .......................................................10

                3.      X Cannot Base Specific Jurisdiction on Bright Data's Sale of
                        General-Purpose Scraping Services. .........................................11

                4.      X Cannot Base Specific Jurisdiction on the Conclusory Allegation
                        that Bright Data "Targeted" X's California Users. ...................12

IV.     X FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE. ....................... 14

        A.      X Fails to Allege Breach of any Valid and Enforceable Third-Party
                Contract. ..................................................................................14

        B.      Offering a Lawful Service is Not Inducement. .......................................17

V.      X FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT. ............................. 18

        A.      The Alleged Conduct is Governed – or Not – By the Terms Under
                Contract Law. ............................................................................19

        B.      X Does Not Have an Independent Property Right to Block Public Web
                Search. ......................................................................................20

VI.     X'S INDIVIDUAL USER ACCOUNT CLAIMS SHOULD BE DISMISSED. ............. 23

VII.    CONCLUSION. ........................................................................................... 25

1

# <u>TABLE OF AUTHORITIES[1]</u>

2

**Page(s)**

3

CASES

4

*Adobe Sys. Inc. v. Nwubah*,

5
   2019 WL 6611096 (N.D. Cal. 2019) ....................................................................12

6

*Androutsakos v. M/V PSARA*,
   2004 WL 1305802 (D. Or. 2004)........................................................................6, 7

7

8

*Artec Grp., Inc. v. Klimov*,
   2017 WL 5625934 (N.D. Cal. 2017) .......................................................................9

9

*Astiana v. Hain Celestial Grp., Inc.*,

10
   783 F.3d 753 (9th Cir. 2015) ................................................................................20

11

*Aviation All. Ins. Risk Retention Grp., Inc. v. Polaris Enter. Grp., Inc.*,
   2017 WL 2799151 (D. Mont. 2017) ........................................................................6

12

13

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
   874 F.3d 1064 (9th Cir. 2017) ................................................................................9

14

*Bell Atl. Corp. v. Twombly*,

15
   550 U.S. 544 (2007)................................................................................................5

16

*Berrett v. Life Ins. Co.*,
   623 F. Supp. 946 (D. Utah 1985)........................................................................7, 8

17

18

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC*,
   28 F. Supp. 3d 1006 (C.D. Cal. 2013) ..................................................................17

19

*BNSF Ry. Co. v. Tyrrell*,

20
   581 U.S. 402 (2017)..............................................................................................10

21

*Bristol-Myers Squibb Co. v. Superior Court*,
   582 U.S. 255 (2017)......................................................................................9, 10, 13

22

*Calder v. Jones*,

23
   465 U.S. 783 (1984)................................................................................................8

24

*Carroll v. J.M. Smucker Co.*,
   2023 WL 4053796 (N.D. Cal. 2023) (Alsup, J.)..............................................11, 14

25

26

27

---

[1] Unless otherwise specified, all emphasis added, initial capitalizations conformed without brackets, and internal citations and quotation marks omitted.

28

*Coal. for ICANN Transparency Inc. v. VeriSign, Inc.*,
   452 F. Supp. 2d 924 (N.D. Cal. 2006) ...................................................................7

*Cole-Parmer Instrument Co. v. Prof. Lab's*,
   2021 WL 3053201 (N.D. Cal. 2021) ......................................................................5

*Cont'l Appliances, Inc. v. Thomas*,
   2012 WL 3646887 (N.D. Cal. 2012) ...................................................................8, 9

*Crabtree v. Dukelow*,
   2010 WL 11565712 (W.D. Mo. 2010) ....................................................................7

*Crowley v. CyberSource Corp.*,
   166 F. Supp. 2d 1263 (N.D. Cal. 2001) .................................................................7

*CZ Servs., Inc. v. Express Scripts Holding Co.*,
   2018 WL 3972030 (N.D. Cal. 2018) ......................................................................6

*Dangaard v. Instagram, LLC*,
   2023 WL 4869234 (N.D. Cal. 2023) (Alsup, J.) ...................................................11

*DFSB Kollective Co. v. Bourne*,
   897 F. Supp. 2d 871 (N.D. Cal. 2012) .................................................................10

*Diversified Metal Distribs., LLC v. AK Steel Corp.*,
   2007 WL 403870 (E.D. Ky. 2007) .........................................................................7

*Dolce Int'l/San Jose, LLC v. San Jose.*,
   2020 WL 5910066 (N.D. Cal. 2020) ....................................................................19

*ESG Cap. Partners, LP v. Stratos*,
   828 F.3d 1023 (9th Cir. 2016) ..............................................................................20

*GemCap Lending I, LLC v. Bateman*,
   2017 WL 8183191 (C.D. Cal. 2017) .......................................................................7

*Genesco, Inc. v. T. Kakiuchi & Co.*,
   815 F.2d 840 (2d Cir. 1987) ...................................................................................6

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) .............................................................................................10

*Green Crush LLC v. Paradise Splash I, Inc.*,
   2018 WL 4940825 (C.D. Cal. 2018) .....................................................................15

*Haley Paint Co. v. E.I. Dupont De Nemours & Co.*,
   775 F. Supp. 2d 790 (D. Md. 2011) ........................................................................5

*Hanson v. Denckla*,
   357 U.S. 235 (1958) .............................................................................................10

*ICC LLC v. WhatsApp Inc.*,
    2013 WL 5230631 (E.D. Va. 2013)......................................................................12

*In re Charles Schwab Corp. Sec. Litig.*,
    257 F.R.D. 534 (N.D. Cal. 2009) (Alsup, J.) ........................................................15

*In re Orange, S.A.*,
    818 F.3d 956 (9th Cir. 2016) ..................................................................................5

*Ingenieria Alimentaria Del Matatipac, S.A. de C.V. v. Ocean Garden Prods. Inc.*,
    320 F. App'x 548 (9th Cir. 2009) ...........................................................................6

*IPSL, LLC v. Coll. of Mount Saint Vincent*,
    383 F. Supp. 3d 1128 (D. Or. 2019) ......................................................................9

*Karlberg European Tanspa, Inc. v. JK-Josef Kratz Vertriebsgeselischaft MbH*,
    699 F. Supp. 669 (N.D. Ill. 1988) ..........................................................................6

*Kendig v. N. Tier Energy LP*,
    2017 WL 6001435 (D. Ariz. 2017).........................................................................6

*Low v. LinkedIn Corp.*,
    900 F. Supp. 2d 1010 (N.D. Cal. 2012) ...............................................................20

*Manetti- Farrow, Inc. v. Gucci Am., Inc.*,
    858 F.2d 509 (9th Cir. 1988) ............................................................................5, 6

*Matrix Warranty Sols., Inc. v. Staunton Grp. LLC*,
    2022 WL 1813606 (N.D. Tex. 2022).....................................................................13

*Matus v. Premium Nutraceuticals, LLC*,
    715 F. App'x 662 (9th Cir. 2018) .........................................................................10

*McBride v. Boughton*,
    123 Cal. App. 4th 379 (2004) ...............................................................................20

*Mediterranean Enters., Inc. v. Ssangyong Corp.*,
    708 F.2d 1458 (9th Cir. 1983) ................................................................................6

*Mishiyev v. Alphabet, Inc.*,
    444 F. Supp. 3d 1154 (N.D. Cal. 2020) (Alsup, J.) ..............................................14

*Monco v. Zoltek Corp.*,
    342 F. Supp. 3d 829 (N.D. Ill. 2018) ....................................................................13

*Morrill v. Scott Fin. Corp.*,
    873 F.3d 1136 (9th Cir. 2017) ..............................................................................10

*Nevada DeAnza Fam. Ltd. P'ship v. Tesoro Re. & Mktg. LLC*,
    474 F. Supp. 3d 1087 (N.D. Cal. 2020) ...............................................................17

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ..................................................................15

*NuboNau, Inc. v. NB Labs, Ltd*,
   2012 WL 843503 (S.D. Cal. 2012) ............................................................10

*Nunes v. Twitter, Inc.*,
   103 Va. Cir. 184 (Cir. Ct. 2019) .................................................................8

*Olney v. Job.com, Inc.*,
   2014 WL 4660851 (E.D. Cal. 2014) ..........................................................16

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
   967 F. Supp. 2d 1347 (N.D. Cal. 2013) .....................................................16

*PainTEQ, LLC v. Omnia Med., LLC*,
   2021 WL 1193259 (M.D. Fla. 2021) ...........................................................7

*Paragon BioTeck, Inc. v. Altaire Pharms., Inc.*,
   2015 WL 4253996 (D. Or. 2015) ...............................................................13

*Picot v. Weston*,
   780 F.3d 1206 (9th Cir. 2015) ........................................................8, 11, 13

*Presidio, Inc. v. Semler*,
   2020 WL 8619101 (D. Del. 2020) ...............................................................7

*Rabin v. Google LLC*,
   2023 WL 4053804 (N.D. Cal. 2023) ..........................................................19

*Ramondetta v. Philips Elecs. Ltd.*,
   2007 WL 4209443 (N.D. Cal. 2007) ............................................................5

*Rentrak Corp. v. Burton*,
   2015 WL 7733971 (D. Or. 2015) ...............................................................13

*Revitch v. DirecTV, LLC*,
   2018 WL 4030550 (N.D. Cal. 2018) ............................................................7

*Reynolds v. Binance Holdings Ltd.*,
   481 F. Supp. 3d 997 (N.D. Cal. 2020) .........................................................5

*Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*,
   2020 WL 2510587 (C.D. Cal. 2020) ..........................................................11

*San Miguel v. HP Inc.*,
   317 F. Supp. 3d 1075 (N.D. Cal. 2018) .....................................................15

*Schentag v. Nebgen*,
   2018 WL 3104092 (S.D.N.Y. 2018) ...........................................................11

*Schulz v. Cisco WebEx, LLC*,
  2014 WL 2115168 (N.D. Cal. 2014) ...................................................................19

*Schwarzenegger v. Fred Martin Motor Co.*,
  374 F.3d 797 (9th Cir. 2004) ...........................................................................5

*Sebastian Int'l, Inc. v. Russolillo*,
  162 F. Supp. 2d 1198 (C.D. Cal. 2001) ........................................................2, 17

*Smith v. Facebook, Inc.*,
  262 F. Supp. 3d 943 (N.D. Cal. 2017) ...........................................................12

*Soil Retention Prods., Inc. v. Brentwood Indus., Inc.*,
  521 F. Supp. 3d 929 (S.D. Cal. 2021) .........................................................14, 15

*St. Andrews Links Ltd. v. Source & Design Int'l (UK) Ltd*,
  2022 WL 11902199 (N.D. Cal. 2022) ...............................................................9

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007) .........................................................................13

*Ticketmaster L.L.C. v. RMG Techs.*,
  2007 WL 2989504 (C.D. Cal. 2007) ...............................................................17

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) ..................................................................................3, 18

*UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*,
  117 F. Supp. 3d 1092 (C.D. Cal. 2015) ...........................................................15

*W. Boxed Meats Distribs., Inc. v. Parker*,
  2017 WL 3034517 (W.D. Wash. 2017) .............................................................7

*Walden v. Fiore*,
  571 U.S. 277 (2014) ......................................................................................9

*Welenco, Inc. v. Corbell*,
  2013 WL 5423100 (E.D. Cal. 2013) ...............................................................6, 8

*Wexler v. AT&T Corp.*,
  211 F. Supp. 3d 500 (E.D.N.Y. 2016) ...............................................................7

*Yan Guo v. Kyani, Inc.*,
  311 F. Supp. 3d 1130 (C.D. Cal. 2018) .............................................................7

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
  901 F.3d 1081 (9th Cir. 2018) ........................................................................6

1

**STATUTES & RULES**

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ............................................................1

Fed. R. Civ. P. 12 ....................................................................................2, 5, 18, 25

**OTHER AUTHORITIES**

Restatement (First) of Restitution § 1 .........................................................................22

Restatement (Second) of Contracts § 4 .......................................................................20

Restatement (Second) of Contracts § 69 ............................................................20, 21, 22

Restatement (Second) of Contracts § 187 ...................................................................22

Restatement (Second) of Torts § 8A ...........................................................................17

Restatement (Second) of Torts § 766 .......................................................................2, 17

Restatement (Third) Of Agency § 2.04 ......................................................................24

Restatement (Third) Of Agency § 6.03 ......................................................................25

## I.       INTRODUCTION.

The public has a right to search public information.  Seems like a basic, even universal, human right.  But X says no.  It says it controls its corner of the Internet.  But this case does not concern any proprietary or confidential information.  Twitter, and now X, bills itself as a public town square, telling users – in the very contracts sued upon – that, by tweeting, they are "directing [X] to disclose [their] information as broadly as possible."  This information is "public by default" and "available for viewing by the **general public**."  X admits that "*the public does not need to be signed in to view [this] content*."  *See* Ex. 2 § 3.1; Ex. 3 at 1.  Nor does X assert any copyright or other property interest in this information.  It is also content X decided not to protect under the Computer Fraud and Abuse Act by putting it behind a log-in screen.  Instead, X seeks to exert control over this **public domain** information through contract.  This case tests the strength of those contracts.

X first sues under contract.  It says that, because Bright Data opened a (now **terminated**) corporate account to advertise its lawful services, Bright Data is contractually prohibited from scraping public data on X's site, even if the account was never used for that purpose.  X also brings a tortious interference claim, asserting that unidentified Bright Data customers, who may or may not have X accounts, used Bright Data's services to scrape this same public data.  This motion focuses primarily on this latter claim, saving the main breach of contract claim for another day.[2]

At its core, this motion is based on a simple proposition:  The mere sale of lawful services that enable third parties across the globe to collect public information from the web is not illegal, and does not subject the service provider to the personal jurisdiction of the Court, even if a third party in California misuses the service in violation of its contracts with others.

A simple example illustrates:  Alice lives in Florida and sells hand-crafted pens on Etsy.  Bob, a California resident, buys a pen and uses it to sign a check that violates his contract with

---

[2] Because the Complaint does not allege Bright Data's account termination, we leave its effect on X's forward-looking claims for subsequent motion practice.  Due to the issue's importance to any injunctive relief claim, however, Bright Data intends to request expedited motion practice on this issue at the November 30, 2023 Case Management Conference.

Chris, another California resident.  Chris sues Alice for tortious interference, claiming Alice knew or should have foreseen the possibility that Bob would use the pen to breach his contract.  But Chris's claim fails both because selling a lawful product is not unlawful inducement, unless Alice was somehow "certain or substantially certain" the pen would be used for illicit purposes, and because the court lacks personal jurisdiction over Alice since she did not engage in any tortious activity in, or expressly aimed at, California.  *See* Restatement (Second) of Torts § 766 cmt. j.

X's tortious interference claim fails for the same reasons.  Bright Data (Alice, in this example) offers lawful proxy and scraping services (the pen) to customers across the globe.  Though not actually alleged, X speculates that some unidentified users of unknown location (hypothetical Bobs) potentially use those services in violation of X's (Chris's) contractual rights.  But even if that were so, there is still no inducement and no tortious conduct in California.  So, there is neither claim nor jurisdiction, regardless of whether X can show a California Bob.

This simple ***legal*** principle compels dismissal of X's tortious interference claim under Rules 12(b)(2) and 12(b)(6).  As to jurisdiction, Bright Data is an Israeli company, so general jurisdiction is lacking.  X seeks to overcome this by asserting that Bright Data once opened an account with a California forum selection clause.  But the forum selection clause does not cover X's tortious interference claim because the claim is premised on a breach of a *third-party* contract, not any alleged contract with Bright Data.  X gets no further by claiming that X is headquartered here.  For personal jurisdiction, only Bright Data's contacts matter, not X's.  And Bright Data's alleged California contacts do not suffice.  The only *conduct* alleged is Bright Data's sale of scraping tools and services to some unidentified customers around the world, including some who may reside in California.  But because the sale of these services is not *ipso facto* an inducement to engage in prohibited scraping, there is no "intentional act" in or aimed at California.

X's tortious interference claim fails on the merits for the same reason.  X does not allege that Bright Data's tools lack any legitimate uses, or that Bright Data knew "with at least substantial certainty" that any *particular* customer would use them for illicit purposes.  *Sebastian Int'l, Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1205 (C.D. Cal. 2001).  That is fatal.  As the Supreme Court

explained last term, "we generally do not think that internet or cell service providers incur culpability merely for providing their services to the public writ large," even if "some bad actors [take] advantage of these platforms." *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). "A contrary holding would effectively hold any sort of communication provider liable for any sort of wrongdoing **merely for knowing** that the wrongdoers were using its services and failing to stop them. *That conclusion would run roughshod over the typical limits on tort liability*." *Id.*

X's claim must be dismissed.[3]

## II.   FACTUAL BACKGROUND.

The Internet is the largest public repository of information ever assembled. It changed our way of life. There is hardly a person in America that does not use it daily to obtain information of interest to them. Though theoretically accessible to anyone with internet access, much of the information is unusable because of its sheer volume. It is a problem of information overload.

Google – the largest scraper on the planet – helped solve part of that problem. Its bots crawl millions of websites, including X's, collecting information about the contents of each page. When users type in a query, Google analyzes its vast databases and points users to the most relevant websites. Google revolutionized the Internet.

Bright Data is also revolutionizing the Internet. Its suite of technologies and services help Fortune 500 companies, academic institutions, and small businesses retrieve and synthesize vast amounts of **public** information. While Google curates a collection of links, Bright Data creates datasets and helps customers create their own. Cmplt. ¶¶ 43-44, 48-51. This is a good thing.

Shortly after Elon Musk purchased Twitter and changed its name to X, however, X sued, seeking to prevent Bright Data and its customers from scraping **public** information users posted to X. X does not claim any copyright or other ownership interest in this information. As X tells users: "You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — **you own your Content**." *See* Ex. 1 § 3. Twitter's Privacy

---

[3] X's unjust enrichment also fails because X alleges the existence of a valid and enforceable contract, not its absence. And X's employee-account-based breach of contract claims also fail because X does not allege Bright Data was a party to or otherwise bound by those contracts.

Policy described this information as "**public by default.**"[4]  Ex. 3 at 1.  Because X "primarily [is] designed to help [users] share information with the world," when users post information, they are "directing [X] to disclose that information as *broadly as possible*," making the information "available for viewing by the **general public**" and for collection by "*Internet search engines*" who have scraped the data.  Ex. 2 § 3.1; Ex. 3 at 3.  Importantly, "*the public does not need to be signed in* to view" this content.  Ex. 2 § 3.1.  That is, a person must have an account to *post* content, *see* Cmplt. ¶ 15, but anyone can *access* information X chooses to make public without an account.

Bright Data helps members of the public access this *public* information.  As the Complaint alleges, Bright Data generally offers three types of services:  datasets, scraping tools, and proxy network services.  Cmplt. ¶¶ 43-44, 48-51, 56-57.  These services, as X admits, can be used for an infinite variety of purposes, most having nothing to do with X.  For example, they can be used to "anonymously" search the web, or to scrape publicly available information on e-commerce sites, such as Amazon, or "other platforms," such as Facebook or Instagram.  *Id.* ¶¶ 6, 50.  X does not allege that any of these uses violates X's rights.

Here, X focuses on a single use case, claiming that Bright Data breached its contract with X by selling datasets with publicly tweeted information, and that it tortiously interfered with X's contracts with unidentified third-parties who used Bright Data's services to scrape X's platform themselves.  But X does not allege that Bright Data, its services, or its customers scraped non-public data or used any X account to scrape this information.  To the contrary, each of Bright Data's services is limited to scraping public information.  *See id.* ¶ 39(c) (use "'the latest data collection techniques to scrape, structure, and analyze **public** web data. '"); ¶ 43, Figure 4 ("Tap into Twitter **public** accounts"); ¶ 49 ("you can start scraping Twitter **public** data using our Web Scraper IDE."); ¶ 51, Figure 7 ("scrape data … from **public** Twitter profiles"); ¶ 57 (use Bright Data's proxy network to "'[g]ather vast amounts of **public** web data.'").

---

[4]  Because X's privacy policy is expressly incorporated into the Terms (which in turn is incorporated into the Complaint), it is properly considered on a motion to dismiss.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III. THE COURT LACKS PERSONAL JURISDICTION OVER X'S TORTIOUS INTERFERENCE CLAIMS.

X bears the burden of demonstrating personal jurisdiction for each separate claim. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004); *Ramondetta v. Philips Elecs. Ltd.*, 2007 WL 4209443, *2 n.3 (N.D. Cal. 2007) (same). For its tortious interference claim, X offers two grounds.[5] *First*, it says its forum selection clause compels jurisdiction. But that clause does not apply to tort claims based on *third-party* contracts. *Second*, it says X is headquartered here, and Bright Data sold its services to customers globally, including in California. But because scraping services are not themselves illegal, that is not enough to establish any tortious act – *i.e.*, unlawful inducement – in or expressly aimed at California.

#### A. *Bright Data Did Not Waive Personal Jurisdiction.*

X invokes the Terms' forum selection clause that requires users to "consent[] to personal jurisdiction in California" for "disputes related to the Terms." Cmplt. ¶ 8. But tortious interference – intentionally inducing a breach of contract between the plaintiff and a ***third party*** – has nothing to do with X's alleged contract with Bright Data. This simple fact precludes X's reliance on its forum selection clause.

Under bedrock Ninth Circuit law, "[w]hether a forum selection clause applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract." *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988); *In re Orange, S.A.*, 818 F.3d 956, 962 (9th Cir. 2016) (clause covering "[a]ny and all" claims "arising out of or relating" to the agreement does not apply to claim that defendant hacked plaintiff's computers because it involved the breach of different agreements and torts that did not require "interpretation" of the contract).[6]

---

[5] Bright Data is bringing a facial challenge to the Complaint. *Cole-Parmer Instrument Co. v. Prof. Lab's*, 2021 WL 3053201, *7 (N.D. Cal. 2021) ("It is the plaintiff's burden to plead allegations" to support personal jurisdiction.); *Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1001, 1005 (N.D. Cal. 2020) (applying *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) to personal jurisdiction allegations); *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 775 F. Supp. 2d 790, 799 (D. Md. 2011) (citing cases). If the Complaint survives a facial challenge, Bright Data will assert any further factual challenge in its Answer, preserving the defense for trial. *See* Fed. R. Civ. P. 12(h)(1)(B)(ii).

[6] *Manetti-Farrow* established a general test that does not depend on the specific text of the clause.

This standard asks whether the alleged tort "*could have been accomplished even if the Agreement did not exist.*"  *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983); *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987) (following *Mediterranean*, and concluding that tortious interference claims do "not arise under or relate to [the parties'] sales agreements"); *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1086 (9th Cir. 2018) (claim must have a "*logical or causal connection* to the agreement").  If the claim "will stand or fall without any reference to the agreements," the forum selection does not apply.  *CZ Servs., Inc. v. Express Scripts Holding Co.*, 2018 WL 3972030, *2 (N.D. Cal. 2018); *Kendig v. N. Tier Energy LP*, 2017 WL 6001435, *4 (D. Ariz. 2017) (distinguishing claims the plaintiff "would have been entitled to pursue" "even if the [parties] had never executed" a contract, and claims that are "*entirely dependent* on the existence" of the contract).

Here, that question has but one answer:  there has been no waiver.  Did other users breach their contracts with X?  If so, look to their agreements, not Bright Data's.  Did Bright Data induce those breaches?  If so, look at the services Bright Data offered under its contracts with third parties, not any alleged contract between Bright Data and X.  If Bright Data never had any contract with X, X's tortious interference allegations would not change one iota.

Because X's tortious interference claim is not "dependent on rights or duties created by the [parties'] agreement[]," Bright Data has not waived its personal jurisdiction defense.  *See Karlberg European Tanspa, Inc. v. JK-Josef Kratz Vertriebsgesellschaft MbH*, 699 F. Supp. 669, 672 (N.D. Ill. 1988); *Aviation All. Ins. Risk Retention Grp., Inc. v. Polaris Enter. Grp., Inc.*, 2017 WL 2799151, *4 (D. Mont. 2017) (arbitration provision inapplicable where claim is "based on interference with *third party contracts*, not the [parties'] Agreement.").[7]

---

*See Androutsakos v. M/V PSARA*, 2004 WL 1305802, *6 (D. Or. 2004) ("the [*Manetti-Farrow*] court announced a more general rule for determining whether a forum selection clause applies …, declar[ing] that a forum selection clause applies to tort claims if resolution of the claims relates to interpretation of the contract."); *Welenco, Inc. v. Corbell*, 2013 WL 5423100, *7 (E.D. Cal. 2013) ("the *Manetti-Farrow* test is not limited to the clause at issue in that case").

[7] *See also Ingenieria Alimentaria Del Matatipac, S.A. de C.V. v. Ocean Garden Prods. Inc.,* 320 F. App'x 548, 549–50 (9th Cir. 2009) ("district court … abused its discretion" in applying forum selection clause to "claims for interference [because they] do not relate to interpretation of the

This conclusion is reinforced by the Term's express language, which limits the scope of the Terms to the user's *own* "use" of the X platform. *See* Ex. 1 at 3-4, 12 ("These Terms of Service ('Terms') govern **your** access to and use of our … 'Services' … and … 'Content'"). Because X's tortious interference claim relates to third-parties' use of the X platform, it is not covered by the Terms. *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016) ("no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to [create a user account] would obligate them to [litigate] literally every possible dispute he or she might have with the service provider [in California]…. Rather, a reasonable person would be expressing, at most, an intent to agree to [litigate] disputes connected in some way to the service agreement."); *Revitch v. DirecTV, LLC*, 2018 WL 4030550, *14 (N.D. Cal. 2018) (same); *Yan Guo v. Kyani, Inc.*, 311 F. Supp. 3d 1130, 1141 (C.D. Cal. 2018) (claims "outside of what … was contemplated by [the] agreement … are not within the scope of the forum selection clause.").

The forum selection clause's limiting language also precludes application to tortious interference claims. The clause only applies to disputes "related to the[] Terms or the Services" provided under contract, **not** any and all disputes among the parties. This does not reach X's tortious interference claim, which relates only to third-party contracts between X and its other

---

contracts"); *Coal. for ICANN Transparency Inc. v. VeriSign, Inc.*, 452 F. Supp. 2d 924, 931-32 (N.D. Cal. 2006) (forum selection clause applying to all claims "relating to" the parties' agreement does not cover tortious interference claims); *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1267–68 (N.D. Cal. 2001) (dispute based on a user privacy policy outside the scope of a forum selection clause found in a separate user participation agreement); *GemCap Lending I, LLC v. Bateman*, 2017 WL 8183191, *5 (C.D. Cal. 2017) (tort claims not covered because plaintiffs "present no argument on how resolution of their tort claims requires interpreting the [parties'] agreements"); *Diversified Metal Distribs., LLC v. AK Steel Corp.*, 2007 WL 403870, *2 (E.D. Ky. 2007) ("Plaintiff's tortious interference claim clearly does not relate to the agreement between the parties, instead, the claim relates to a real estate transaction between the Plaintiff and some outside third party."); *PainTEQ, LLC v. Omnia Med., LLC*, 2021 WL 1193259, *3-4 (M.D. Fla. 2021) (same); *Presidio, Inc. v. Semler*, 2020 WL 8619101, *7 (D. Del. 2020) (same); *Crabtree v. Dukelow*, 2010 WL 11565712, *2 (W.D. Mo. 2010) (same); *W. Boxed Meats Distribs., Inc. v. Parker*, 2017 WL 3034517, *9 (W.D. Wash. 2017) (CFAA and Trade Secrets Act claims not covered because they don't depend on the terms of the agreement); *Androutsakos*, 2004 WL 1305802, *6 ("Because the resolution of plaintiff's claims … does not involve analyzing … whether the parties were in compliance with the contract, the forum selection clause does not apply."); *Berrett v. Life Ins. Co.*, 623 F. Supp. 946, 948-49 (D. Utah 1985) (same).

users and their use or access of the X platform.  *See Berrett*, 623 F. Supp. at 948-49 ("It is highly unlikely that…the parties contemplated that tort claims" involving "tortious acts [] unrelated to the interpretation of the agency agreement" would be covered by the forum selection clause); *Welenco*, 2013 WL 5423100, *7 (forum selection clause does not apply to claim that the defendant "acted in concert" with entities that "improperly accessed" plaintiffs' "computer system" because the claim "arise[s] from the relationship between [the plaintiff and the third parties,] not from the relationship between [the plaintiff and defendant].").

The court's decision in *Nunes v. Twitter, Inc.*, 103 Va. Cir. 184 (Cir. Ct. 2019), is particularly instructive.  There, plaintiffs sued Twitter in Virginia for publishing defamatory statements posted by third-party users.  In rejecting Twitter's argument that, because the "Plaintiff [had] Twitter accounts and [was] therefore subject to the [California forum selection clause]," the court explained that the Terms do "not apply" to plaintiffs' claims because they do not arise out of plaintiffs' "use of twitter."  As the Court noted, the plaintiff would still have a claim even if it "did not have [any] twitter account" at all.  So, too, here.  The existence or non-existence of a Bright Data X account is wholly-irrelevant to X's tortious interference claim.

As such, the forum selection clause does not govern X's tortious interference claim.

### B.    X Has Not Plausibly Alleged Specific Personal Jurisdiction.

X also asserts specific jurisdiction based on minimum contacts, alleging that Bright Data "knowingly directed prohibited conduct to California" because X "has its principal place of business in California," and Bright Data "maintains a sales office," "offers its data sets and scraping tools for sale," and "targeted [X's] users located in California." Cmplt. ¶ 9.  None suffice.

To establish specific jurisdiction, X must show that Bright Data "expressly aimed [its conduct] at the forum state," and that those activities "caus[ed] harm that the defendant [knew was] likely to be suffered in the forum state.  *Cont'l Appliances, Inc. v. Thomas*, 2012 WL 3646887, *2 (N.D. Cal. 2012) (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)); *Picot v. Weston*, 780 F.3d 1206, 1213-14 (9th Cir. 2015) (same).  X's jurisdictional allegations, however, only concern X's connection to California or Bright Data's ***lawful*** conduct.  That is not enough.

1

      1.      ***X Cannot Base Specific Jurisdiction on X's Own Domicile.***

2

      X seeks to establish specific jurisdiction based on the fact that its "principal place of

3

business" is in California. Cmplt. ¶ 9. But "it is the defendant, *not the plaintiff* or third parties,

4

who must create contacts with the forum State." *Walden v. Fiore*, 571 U.S. 277, 290-91 (2014)

5

("mere injury to a forum resident is not [] sufficient" because the "focus" of the jurisdictional

6

inquiry is on **where the "relevant conduct" took place**, not just the fact that the "conduct affected

7

plaintiffs with connections to the forum State."). Because only Bright Data's *connection* to the

8

forum can establish minimum contacts, the location of X's principal place of business is irrelevant.

9

      Nor can X make its domicile relevant by asserting that Bright Data "targeted" X. "[T]he

10

mere fact [the alleged] conduct affected plaintiffs with connections to the forum State [does] not

11

suffice to authorize jurisdiction." *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 265

12

(2017). Following *Bristol-Myers*, the Ninth Circuit overruled its prior precedents deeming

13

"individualized targeting" of a forum plaintiff sufficient for specific jurisdiction. *Axiom Foods,*

14

*Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1070 (9th Cir. 2017). Since then, courts have

15

repeatedly held that "the case law does not support [the] position that a defendant's knowledge of

16

a plaintiff's residence in the forum is enough" for specific jurisdiction. *Cont'l Appliances, Inc.*,

17

2012 WL 3646887, *3; *Artec Grp., Inc. v. Klimov*, 2017 WL 5625934, *4-5 (N.D. Cal. 2017); *St.*

18

*Andrews Links Ltd. v. Source & Design Int'l (UK) Ltd*, 2022 WL 11902199, *3 (N.D. Cal. 2022).

19

      In any event, X's principal place of business does not establish that the challenged conduct

20

was directed to or aimed at California, or that the harm was felt in California. A corporation cannot

21

haul anyone in the world into a California court just because it is headquartered there. "A

22

corporation does not suffer harm in a particular geographic location in the same sense that an

23

individual does." *Cont'l Appliances*, Inc., 2012 WL 3646887, *4. Individuals, of course, are only

24

present in one place at a time, but corporations can operate everywhere. Because a corporation's

25

"injury … would follow [it] wherever it chose to operate," the "effects of the alleged tortious

26

conduct, such as the loss of [customers], are not tied to" plaintiff's home forum. *See IPSL, LLC*

27

*v. Coll. of Mount Saint Vincent*, 383 F. Supp. 3d 1128, 1140 (D. Or. 2019). Because X operates

28

where its users are (for example, making its service available in Timbuktu), the location of the alleged third-party scrapers who breached their contracts with X, not X's headquarters, determines where the harm is felt. *NuboNau, Inc. v. NB Labs, Ltd*, 2012 WL 843503, *6 (S.D. Cal. 2012) ("merely engaging Twitter and Facebook" does not constitute "purposeful direction at California, simply because Twitter and Facebook happen to be based there"); *DFSB Kollective Co. v. Bourne*, 897 F. Supp. 2d 871, 883 (N.D. Cal. 2012) (defendant did not purposefully direct activities at California by "utiliz[ing] accounts on California-headquartered Internet companies Facebook, hi5.com, DeviantArt, and 4Shared to direct traffic to his Websites").

### 2. *X Cannot Base Specific Jurisdiction on the Alleged Existence of Bright Data's Sales Office.*

X's allegation that Bright Data has "a sales office in California" similarly does not establish specific jurisdiction. Cmplt. ¶ 9. Even if true, a sales office only establishes some lawful presence in the forum. But because that is not enough to establish *general* jurisdiction, it fails to establish specific jurisdiction.[8] Otherwise, any defendant with some California presence could be subjected to suit for any claim, eliminating the distinction between specific and general jurisdiction.

The existence of a sales office does not create specific jurisdiction because only the location of Bright Data's alleged *tortious conduct* is relevant. To establish specific jurisdiction, the "*cause of action*" must "arise[] out of" the defendant's contacts with the forum. *See Hanson v. Denckla*, 357 U.S. 235, 250-53 (1958); *Goodyear Dunlop*, 564 U.S. at 923-24 (same). Without "**suit-related**" conduct … create[ing] a substantial connection with the forum State, … specific jurisdiction is lacking regardless of the extent of a defendant's *unconnected* activities in the State." *Matus v. Premium Nutraceuticals, LLC*, 715 F. App'x 662, 662-63 (9th Cir. 2018); *Bristol-Myers*, 582 U.S. at 264 (rejecting "sliding scale" weighing of contacts unrelated to the claim); *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017) ("the claim must be one which arises out of

---

[8] X does not and cannot assert general jurisdiction. Bright Data is an Israeli company. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011); *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 414 (2017) (no general jurisdiction where defendant had over 2,000 miles of railroad track and 2,000 employees in Montana, because the inquiry is whether it is "at home" in the forum, not the "magnitude of the defendant's in-state contacts").

1   or relates to the defendant's forum-related activities").  Because maintaining a sales office is not

2   tortious, it does not create specific jurisdiction.

3           3.      ***X Cannot Base Specific Jurisdiction on Bright Data's Sale of General-***
                    ***Purpose Scraping Services.***

4           Nor can X fill the jurisdictional void by alleging that Bright Data is a global internet

5   company that "offers its data sets and scraping tools for sale in California" and elsewhere.  Cmplt.

6   ¶ 9.   These services are not unlawful, so offering them to customers in California does not

7   constitute *tortious conduct* in or aimed at California.

8           For specific jurisdiction, the court must determine where the allegedly tortious conduct

9   occurred.  *Picot*, 780 F.3d at 1211 ("the ***claim*** must be one which arises out of or relates to the

10  defendant's forum-related activities."); *Schentag v. Nebgen*, 2018 WL 3104092, *16 (S.D.N.Y.

11  2018) (the "analysis necessarily includes consideration of the claims' elements and where the

12  conduct occurred"); *Carroll v. J.M. Smucker Co.*, 2023 WL 4053796, *3 (N.D. Cal. 2023) (Alsup,

13  J.) ("The exact form of our [express aiming] analysis … depends, to a significant degree, on the

14  specific type of tort or other wrongful conduct at issue.").  As this Court explained, "when claims

15  are premised on specific actions alleged to be tortious, the jurisdictional analysis is likewise

16  premised on those specific actions."  *Dangaard v. Instagram, LLC*, 2023 WL 4869234, *3 (N.D.

17  Cal. 2023) (Alsup, J.).  Thus, for a tortious interference claim, it is the location of the defendant's

18  *inducement* that matters.  *Rosenthal & Rosenthal of Cal., Inc. v. Hilco Trading, LLC*, 2020 WL

19  2510587, *4 (C.D. Cal. 2020) (for jurisdictional purposes, the "intentional act" "expressly aimed"

20  at the forum is the "inducing" or "directing" the third-party to breach its contract).

21          Here, X only alleges that Bright Data "marketed and sold scraping tools to X users and

22  account holders" in California.  Cmplt. ¶¶ 9, 74-75.  ***But scraping is not illegal***.  So, the sale of

23  scraping services does not constitute unlawful inducement.  And if the mere sale of scraping

24  services is not an unlawful inducement, then selling those services to California residents is also

25  not tortious conduct in or aimed at California.  That is, X must allege something more than the sale

26  of a lawful service in California to establish personal jurisdiction in California.  X does not do this.

27          Instead, seeking to circumvent this omission, X alleges that Bright Data was "aware" its

28

services **might** be used for unauthorized scraping.  *See* Cmplt. ¶ 73.  But an internet service provider who offers a lawful service globally is not, by that fact alone, subject to tortious interference claims in every jurisdiction where a third-party might improperly use its services.

This principle flows directly from this Court's decision in *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017).   There, the plaintiffs alleged that non-resident healthcare companies improperly sent sensitive medical information to Facebook, which used the information to target unsuspecting users with unwanted advertising.   The court found that, though Facebook's "tracking" was continuous and systematic, and occurred in California, the non-resident healthcare defendants did not "direct [their] activities" at California "even if [they] knew" that their actions allowed Facebook to track users from California.  *Id.* at 951-52.  As the Court explained:

> "Embedded third-party code is ubiquitous, not just in the form of Facebook buttons, but also in the form of videos, ads, analytics services, code libraries, content delivery networks, and myriad other tools. Under Plaintiffs' theory, every website operator that embeds one of these tools could be haled into court where the third-party company resides. Personal jurisdiction cannot reasonably stretch so far."  *Id.*

The same principle applies here.  If merely offering a lawful service globally subjects an internet service provider to jurisdiction based on a third-party's alleged improper forum-conduct, then every internet service provider – including X – would be subject to personal jurisdiction wherever it has a customer.  That is not the law.  *Adobe Sys. Inc. v. Nwubah*, 2019 WL 6611096, *6-7 (N.D. Cal. 2019) (online sale of goods nationally, including to consumers in California, did not "expressly aim" its conduct at California); *ICC LLC v. WhatsApp Inc.*, 2013 WL 5230631, *4 (E.D. Va. 2013) (rejecting argument that "every district in the United States has jurisdiction over WhatsApp, because it has … 200-300 million users").

### 4.    *X Cannot Base Specific Jurisdiction on the Conclusory Allegation that Bright Data "Targeted" X's California Users.*

In its final jurisdictional salvo, X says that specific jurisdiction exists because Bright Data "target[ed] … X Corp.'s users located in California."  Cmplt. ¶ 9.  As an initial matter, even if this sufficed to establish jurisdiction, X's claims for scraping by **non-California** users would need to be dismissed.  Put simply, even under X's argument, any tortious interference claim based on scraping by third-parties located in India, China, Timbuktu – or even Las Vegas – cannot be

brought in this Court.  *See Bristol-Myers*, 582 U.S. at 264-68 (requiring claim-by-claim analysis, and finding jurisdiction for California residents' claims, but not non-resident claims).[9]

But even as to X's California users, X's conclusory allegation of "targeting" does not satisfy its pleading burden.  *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007) ("bare bones assertions of minimum contacts … unsupported by specific factual allegations will not satisfy a plaintiff's pleading burden").  Were it otherwise, a plaintiff could create jurisdiction simply by inserting the word "targeting" in front of otherwise deficient factual allegations.  Putting aside the fact that the word itself is a legal conclusion or conclusory label, it is inherently vague.  What did Bright Data do to "target" California users?  X does not say.  To the extent X simply means that Bright Data sold its scraping services to California customers with an X account, the allegation fails for the reasons already discussed:  Selling a lawful service to customers that happen to have an X account is not unlawful inducement, even if the customer misuses the service.

X gets no further by alleging that Bright Data "used [its] X accounts to discuss and promote their data-scraping products and services."  Cmplt. ¶ 39.  Bright Data's mere use of an X account to advertise its services does not establish that its *content* constitutes tortious inducement (X does not allege it does) or was directed to ***California*** users (X does not allege it was).  Indeed, none of these advertisements or posts even mention California.  Nor do these posts mention *Twitter*.  Rather, they speak generically about Bright Data's scraping tool and services.  If the sale of those services does not constitute "inducement," then neither does advertising about those services.

---

[9] Nor can X avoid this result by claiming that it contracts with third parties in California.  Just as X's domicile is irrelevant, so too is X's place of contracting.  *See Picot*, 780 F.3d at 1215 (no jurisdiction where defendant's "tortious conduct [took place] from his residence in Michigan, without entering California, contacting any person in California, or otherwise reaching out to California"); *Matrix Warranty Sols., Inc. v. Staunton Grp. LLC*, 2022 WL 1813606, *5 (N.D. Tex. 2022) ("mere allegations of tortious interference with a forum resident's contractual rights are not sufficient"); *Monco v. Zoltek Corp.*, 342 F. Supp. 3d 829, 836 (N.D. Ill. 2018) (claim that defendant "intentionally inflicted an injury on an Illinois-connected business relationship based on actions taken outside Illinois does not evidence any suit-specific contacts by [the defendant] with Illinois itself"); *Paragon BioTeck, Inc. v. Altaire Pharms., Inc.*, 2015 WL 4253996, *8 (D. Or. 2015) (no jurisdiction where the "tortious conduct consists of interfering with Paragon's relationship with another out-of-state entity"); *Rentrak Corp. v. Burton*, 2015 WL 7733971, *9 (D. Or. 2015) (no jurisdiction where defendants' activities were done "without entering Oregon, contacting any person in Oregon, or otherwise reaching out to Oregon").

X gets no further by pointing to Bright Data's website explaining how Bright Data's tools can be used to scrape public Twitter information. Just as Twitter posts are not directed to California, neither is Bright Data's website. It is visible to anyone in the world. Nor is Bright Data's website directed toward X's *users*. It may explain that Bright Data's services can be used to scrape public Twitter data, but that does not require a Twitter account. So Bright Data's public statements do not establish unlawful inducement of a third-party breach, let alone inducement directed to California. *Carroll*, 2023 WL 4053796, *3 (no jurisdiction where the "interactive features" of a website were not specifically targeted to California).

## IV.   X FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE.

Even if the Court has jurisdiction, X fails to state a claim for tortious interference. "To state a claim …, a plaintiff must allege: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damages." *Mishiyev v. Alphabet, Inc.*, 444 F. Supp. 3d 1154, 1160–61 (N.D. Cal. 2020) (Alsup, J.). Here, X has not properly pled an underlying breach of its third-party contracts, or that Bright Data induced a breach of them.

### A.   X Fails to Allege Breach of any Valid and Enforceable Third-Party Contract.

While X might be popular, it does not contract with everyone. To allege "defendant's knowledge" of the "existence of a valid [contract] between the plaintiff and a third party," X must "stat[e] which third parties, if any, Plaintiff had a contract with." *Soil Retention Prods., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 960-61 (S.D. Cal. 2021). X never did this.

X does not identify a ***single*** person that engaged in any prohibited scraping activity. Instead, it speculates about the existence of some unknown cadre of shared customers using "automated means" to search X's site and "scraping" data. Cmplt. ¶¶ 74, 76. That is not enough to plead a breach of an underlying contract between X and any third-party scraper. *Mishiyev*, 444 F. Supp. 3d at 1160–61 (dismissing tortious interference claim where plaintiff "fail[ed] to identify any contract between himself and a third party," but merely alleged that he had "many

1   subscribers"); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 552 (N.D. Cal. 2009)

2   (Alsup, J.) (dismissing claim where "the complaint never identifies the parties to the alleged

3   contract"); *Soil Retention Prods., Inc*, 521 F. Supp. 3d at 959-60 (dismissing claim where plaintiff

4   merely "presupposes that Defendant knew of Plaintiff's contracts with third parties and intended

5   to disrupt those contracts").[10]

6          The absence of such allegations stands in stark contrast to X's breach of contract claim,

7   where it at least alleges that Bright Data has an account and scrapes X.  These are necessary

8   allegations.  Indeed, imagine if X alleged that Bright Data scrapes X, but omitted allegations

9   concerning contract formation.  Or imagine if X alleged that Bright Data has a contract but failed

10  to allege the breach.  Either would be fatal to the claim.  Here, because a breach of a third-party

11  contract is a predicate act for its tortious interference claim, it must allege the breach with the same

12  specificity as its breach of contract allegations against Bright Data.  It has not.

13         Even putting identities aside, X does not allege a valid contract between X and any third-

14  party scraper.  At most, X alleges that "customers who purchased Defendant's scraping services

15  and tools used them to … to scrape data from the X platform."  Cmplt. ¶ 76.  But that does not

16  establish a valid contract because it does not show that the third-party had *agreed* to the Terms.

17         There are two main types of internet-based contracts:  clickwrap and browser-wrap.  *See*

18  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014) (distinguishing between

19  them).  Clickwrap contracts arise when a user creates an "account" and clicks "I agree" to the

20  Terms.  Browser-wrap contracts, in contrast, do not involve express acceptance.  Rather, in *limited*

21  circumstances, courts may imply acceptance based on the parties' conduct.  Here, X has not alleged

22  facts demonstrating that any third-party scraper is bound by a clickwrap or browser-wrap.

23         As to clickwrap, X does not allege that any third-party scraper had an X account.  Users of

24  Bright Data's "tools and services" do not need an X account to access X's public website.  Anyone

25

26  _____

    [10] *See also UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, 117 F. Supp. 3d 1092, 1115 (C.D. Cal.
27  2015) (plaintiff "must *identify* the third party"); *Green Crush LLC v. Paradise Splash I, Inc.*, 2018
    WL 4940825, *9 (C.D. Cal. 2018) (dismissing complaint that "failed to plead the identity" of the
28  third-party); *San Miguel v. HP Inc.*, 317 F. Supp. 3d 1075, 1094 (N.D. Cal. 2018) ("plaintiff must
    allege a relationship with 'a *specific*, albeit unnamed' third party.").

1   with a browser can do that.  So, the mere fact a third-party uses Bright Data's services to access X

2   does not supplant the need to allege an X account.  And without an account, there is no clickwrap.

3        Absent clickwrap, X tries its hand at browser-wrap, saying that anyone who visits an X

4   website *implicitly* agrees to "abide by the Terms."  Cmplt. ¶ 72.  But website visitation does not

5   establish a valid and enforceable browser-wrap agreement.  This is so for two reasons.  *First*, X

6   does not allege that any of these unidentified third-party scrapers had notice of the Terms.  *See,*

7   *e.g.*, *Olney v. Job.com, Inc.*, 2014 WL 4660851, *4-6 (E.D. Cal. 2014) ("Without more, Job's

8   allegation that its website contained a hyperlink to the terms is insufficient to demonstrate that

9   TPDs were put on notice of the term's existence or that TPDs assented to them by virtue of their

10  use of the website alone.").  At most, X alleges that "*Defendant* is aware of the Terms and that

11  they govern all users who choose to interact with the X platform."  *Id*. ¶ 73.  But contract formation

12  between X and a *third-party* depends – not on Bright Data's awareness – but on the third-party's.[11]

13       *Second*, any alleged browser-wrap contract fails for *lack of consideration* because X has

14  no legal right to prevent ***anyone*** from searching the public web.  To provide consideration, X must

15  offer its users something that they are not already entitled to.  But Bright Data's scraping tools

16  only permit customers to search *public* information.  *See* Cmplt. ¶ 39(c) (noting that Bright Data's

17  "tools and services" allow customers "to scrape, structure, and analyze ***public*** web data."); ¶ 49

18  ("'you can start scraping Twitter ***public data*** using our Web Scraper IDE.'").  This is information

19  that, even according to X's own Terms, is owned by individual *users,* ***not X***.  *See* Ex. 1 § 3 ("You

20  retain your rights to any Content you submit, post or display on or through the Services.  What's

21

22  ─────────────

    [11] Similarly, the conclusory allegation that Bright Data was "aware" that the Terms "govern all
23  users who interact with the X platform," even if true (it isn't), is not the same as Bright Data's
    awareness that each customer was aware of the Terms.  That is, a tortious interference claim based
24  on a *browser-wrap* claim requires two-levels of knowledge:  the underlying scraper's knowledge
    of the Terms sufficient to bind the third-party scraper, and Bright Data's knowledge that the Third-
25  Party possessed such awareness.  *See Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
    967 F. Supp. 2d 1347, 1364-65 (N.D. Cal. 2013) (dismissing claim, even after repleading to allege
26  specific customers subject to plaintiff's "Universal Terms and Conditions," because plaintiff still
    "failed to allege that [the defendant] knew of the relevant contracts, which is a required element in
27  the claim").  Here, X alleges neither.  Instead, it simply alleges that Bright Data was aware of X's
    *legal position* that any person who has visited X is contractually bound.  That is not enough.
28

yours is yours — **you own your Content**.").  Nor does X assert any *copyright* or other *property* interest that prevents public search.  Because X lacks any legal right to block any third-party from scraping the information that X has chosen to make publicly available, it has not provided any consideration to third-parties when they exercise their God-given right to search the web.  Without consideration, there is no contract and no tortious interference.

### B.    Offering a Lawful Service is Not Inducement.

Even if X had properly alleged the existence of a valid underlying third-party contract, it has not alleged a knowing inducement of a breach.

This is not a case where the defendant's services can only be used for illicit purposes.  *Cf. Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1011-12, 1016 (C.D. Cal. 2013) (involving "single-purpose software products … designed to operate only" with plaintiffs' video game and for "no other purpose than to engage in game play that is expressly prohibited by the EULA and ToU"); *Ticketmaster L.L.C. v. RMG Techs.*, 2007 WL 2989504, *3 (C.D. Cal. 2007) ("The FAC alleges that Defendant made a false promise … each time it used the website").

Because Bright Data's services have countless legitimate purposes, X must allege that Bright Data knew that its customers were "certain or substantially certain" to use these services for illicit purposes.  Restatement (Second) of Torts § 766 cmt. j; *id.* § 8A ("The word 'intent' … denote[s] that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."); *Nevada DeAnza Fam. Ltd. P'ship v. Tesoro Re. & Mktg. LLC*, 474 F. Supp. 3d 1087, 1095 (N.D. Cal. 2020) (dismissing claim where "complaint does not allege [the defendant] knew with substantial certainty that its actions would interfere with the [plaintiff's contract]"); *Sebastian Int'l, Inc*, 162 F. Supp. 2d at 1205 ("Plaintiffs must show that [defendants] knew with at least substantial certainty that a necessary consequence of their actions" would be interference).

Consider a simple hypothetical.  It's 1968.  An electronics manufacturer sells a dual-sided cassette deck that can copy music from one tape to another.  If a consumer uses it for personal reasons, it is perfectly lawful.  If the consumer makes production copies and sells them out of the

back of his car, it isn't.  Because the manufacturer neither intended for the device to be used improperly nor could be "substantially certain" that any particular customer would do so, there is no liability, even if the manufacturer knows that it is likely that someone will misuse it.

On that score, the Supreme Court's recent decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), controls.  There, plaintiffs sued Twitter "for allegedly aiding and abetting ISIS," claiming that ISIS "used defendants' social-media platforms to recruit new terrorists and to raise funds for terrorism," and that Twitter "***knew*** that ISIS was using their platforms but failed to stop it from doing so."  *Id*. at 478.  The Supreme Court dismissed the claim under Rule 12(b)(6).  Expressing concern that "ordinary merchants could become liable for any misuse of their goods and services" by third parties, the Court explained that "the concept of 'helping' in the commission of a … tort … has never been boundless."  *Id*. at 488-89.  As such, internet service providers do not become secondarily liable simply because their services are misused.  As the Court held:

> "***The mere creation of those platforms … is not culpable***.  To be sure, it might be that bad actors like ISIS are able to use platforms like defendants' for illegal – and sometimes terrible – ends.  But the same could be said of cell phones, email, or the internet generally.  Yet, we generally do not think that internet or cell service providers incur culpability merely for providing their services to the public writ large….  The fact that some bad actors took advantage of these platforms is insufficient to state a claim that defendants knowingly gave substantial assistance and thereby aided and abetted those wrongdoers' acts….  [A] contrary holding would effectively hold any sort of communication provider liable for any sort of wrongdoing ***merely for knowing*** that the wrongdoers were using its services and failing to stop them.  ***That conclusion would run roughshod over the typical limits on tort liability***."  *Id*. at 499, 503.

Here, X does not allege Bright Data was "substantially certain" its customers would use its services for illicit purposes.  Considering the many legitimate uses for Bright Data's services, the mere allegation that Bright Data sold scraping services does not satisfy X's burden of pleading "substantial assistance" for a specific "actionable wrong."  *Id.* at 495.  For that reason, its speculation – that there may be some shared customers that use Bright Data's services for improper purposes – does not constitute a plausible allegation of unlawful *inducement*.

## V.    X FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT.

X's unjust enrichment claim must be dismissed because it is derivative of its breach of

1    contract claim.  As such, contract law – not unjust enrichment – supplies the rule of decision.

2           **A.**           **The Alleged Conduct is Governed – or Not – By the Terms Under Contract Law.**

3           X's contract claim precludes its unjust enrichment claim.  A "plaintiff may not plead the

4    existence of an enforceable contract and maintain a quasi-contract claim [such as for unjust

5    enrichment] at the same time, unless the plaintiff has pled facts suggesting that the contract may

6    be unenforceable or invalid."  *Schulz v. Cisco WebEx, LLC*, 2014 WL 2115168, *5 (N.D. Cal.

7    2014)); *see also, e.g.*, *Rabin v. Google LLC*, 2023 WL 4053804, *13 (N.D. Cal. 2023) (same).

8           The logic is simple.  Where the parties enter into a contract establishing their respective

9    benefits and burdens, unjust enrichment law will not undo their bargain or alter its terms.  X seeks

10    to get around this principle by bringing its unjust enrichment claim "in the alternative."  Cmplt. ¶¶

11    79-85.  But a "bald assertion that [an unjust enrichment claim] is pled in the alternative … is

12    insufficient … because it contains no facts that would support the alternative pleading."  *Rabin*,

13    2023 WL 4053804, *13.  To properly plead unjust enrichment in the alternative, the plaintiff must

14    plausibly allege facts rendering the contract invalid or unenforceable.  *Dolce Int'l/San Jose, LLC*

15    *v. San Jose.*, 2020 WL 5910066, *3 (N.D. Cal. 2020) ("Because [Plaintiff] fails to allege that the

16    express contract governing the Parties conduct may be unenforceable or invalid, the Complaint

17    fails to state a claim for unjust enrichment, ***even in the alternative***").  X does not do this.  To the

18    contrary, it asserts that the Terms "constitute a valid and enforceable agreement between X Corp.

19    and each user."  Cmplt. ¶ 72.

20           The failure to plead facts negating the Terms' validity or enforceability is fatal to X's unjust

21    enrichment claims both past and future.  As to past conduct, X alleges that Bright Data is bound

22    by clickwrap – namely, that it affirmatively agreed to X's terms when it opened a corporate

23    account.  Those Terms purport to "govern [X's] ***relationship***" with the user, as well as the user's

24    "access" to or "use" of X.  Ex. 1 § 6.  Applying unjust enrichment to the parties' relationship,

25    therefore, would undermine the parties' contract.  This is not the role of unjust enrichment.

26           The same is true for future conduct claims.  Once X put Bright Data on notice of its claims

27    by filing this suit, Bright Data terminated its accounts and expressly rejected any future "browser-

28

wrap" offer, thus, negating any contract for forward-looking activity.  These facts – if they had been alleged (they were not) – *might* support an assertion that the Terms are invalid and unenforceable.  But that would still not save X's unjust enrichment claims.  *First*, since X has not amended its complaint to include these facts, X cannot rely on them to save its claim.  *Second*, any alleged prohibition on automated scraping requires continued reliance on the Terms, since there is no other source for the prohibition.  The prohibition does not exist in the ether.  Because X would need to allege the Terms are *simultaneously* invalid and still the source of the scraping prohibition, its unjust enrichment claim does not exist independent of contract.

### B.      *X Does Not Have an Independent Property Right to Block Public Web Search.*

Even if the Court overlooks the requirement that X plead the absence of a valid and enforceable contract, X's unjust enrichment claim fails because X does not have an independent property right to prevent Bright Data from searching the public web.  "California does not recognize a stand-alone cause of action for unjust enrichment."  *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1031 (N.D. Cal. 2012).  So, when a party "alleges unjust enrichment," courts "construe the cause of action as a quasi-contract claim seeking restitution."  *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015); *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) (same).  Here, "the only possible premise of [X's] cause of action of unjust enrichment is that [it] is entitled to restitution … on a quasi-contract or assumpsit theory." *McBride v. Boughton*, 123 Cal. App. 4th 379, 387-89 (2004).

Implied-in-law quasi-contracts fall under Section 69(2) of the Restatement.  "An offeree who does any act inconsistent with the ***offeror's ownership of offered property*** is bound in accordance with the offered terms unless they are manifestly unreasonable."  Restatement (Second) of Contracts § 69(2).  This is the modern equivalent of waiving the tort and suing in assumpsit, which applies to situations like shoplifting, theft, and misappropriation of property.  *See id*. § 4 cmt. B.  To state a claim, X must show that (i) it "owns" the public data Bright Data searches or has a non-contractual right to restrict access to it; (ii) Bright Data's public search constitutes an act "inconsistent with" X's ownership; and (iii) it would not be unreasonable to enforce X's

1  browser-wrap restraints.  *Id.* § 69(2).  X has not alleged any element.

2  **X Does Not Own the Internet.**  X cannot use quasi-contract to block public web search,

3  because X does not own the Internet.  It is literally that simple.  X and its users have made certain

4  information publicly available.  Having chosen to make the information public, X cannot claim

5  any independent property interest.  With no independent property right to prevent scraping, X

6  cannot rely on quasi-contract or unjust enrichment to remedy a breach of that non-existent right.[12]

7

8  **Bright Data Has Not Acted Inconsistently with X's (Unalleged) Ownership Interest**.

9  Even if X could identify an ownership interest, Bright Data does not engage in an "act inconsistent"

10  with that interest when it searches the web.  Internet access presupposes the ability to search public

11  websites.  It does not make web surfers beholden to those who publicly post information.  If Taylor

12  Swift posts information about her upcoming concerts on her public Instagram page, she has not

13  formed a quasi-contractual relationship with each of the millions of fans who view that page.  Nor

14  has Instagram entered into a quasi-contractual relationship with those same fans when they view

15  that same web page.  Everyday experience confirms this.  Consider the following:

16  - A person browses a law firm's website to check his adversary's bio.  He is not using the law firm's services; he is viewing the law firm's advertising materials.

17
18  - A person walks down the street and stops to browse a menu posted on an outside window.  He is not using the restaurant's services; he is *viewing* its advertising.

19  - A person clicks on a Google link and is redirected to the New York Times public Instagram page.  That page contains teaser information about the New York Times Cooking section along with a sign-in request to get more information about featured

20

21

22  ---

[12] Even if the Court ultimately concludes that X has an enforceable property right, any claim for "unjust enrichment" prior to the Court's declaration that such a property right exists fails, since a quasi-contractual unjust enrichment claim presupposes an *undisputed* property right. Rest. 2d § 69 cmt. e, illus. 10 ("Under a claim of right made in error but in good faith, A digs a well on B's unused land and takes water therefrom… B notifies A that he will charge A $50 a day for every day on which A takes water from his land.  Even after it is adjudicated that A's right is nonexistent, **A does not accept B's terms by taking water**.").  A simple example illustrates.  Suppose a copyright owner tells a teacher, if you cite my article, you owe me $100, and the teacher says in good faith, "fair use, I owe you nothing."  Copyright may provide a cause of action, but quasi-contract will not enforce the terms of this fictional (non) meeting of the minds.  Here, Bright Data has a reasonable and good faith belief that X has no **non-contractual** property right to block Bright Data from searching the public web.  An unjust enrichment claim, therefore, does not lie.

recipes.  That person is not using Instagram's or the New York Times's services; he is *viewing* the New York Times's Instagram advertising.

The Internet is a "social Contract."  Anyone can connect their servers to the Internet to make their websites available to the public, and anyone else can use their browsers to search those websites.  When they do, neither has become quasi-contractually bound to the other.  They are each simply exercising their God-given freedom.

Nor can X deprive Bright Data of this freedom by asserting that (i) Bright Data "[has] used X Corp.'s service, platform, and computer network without authorization to scrape data from the X platform" and (ii) Bright Data has "receive[d] benefits" from doing so.  Cmplt. ¶¶ 81, 82. Nothing compelled X to connect its servers to the internet or make information freely available without a login or password.  It chose to do so, presumably to attract enough "eyeballs" to make its platform attractive to tweeters and advertisers.  When a street fair vendor displays artwork for all to see and enjoy, any person is free to walk up to the stall and take a gander.  The vendor has no right to say:  "It's mine, you must close your eyes or I'll sue."  Of course, the vendor still holds title to the artwork, and if it is taken, the vendor can sue for conversion.  But here, X does not bring a conversion claim because Bright Data did not take any property owned by X.

Nor does it matter that Bright Data allegedly "receive[d] benefits" from searching the public web.  The "mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor."  Restatement (First) of Restitution § 1 cmt. C.  "One who improves his own land ordinarily benefits his neighbors to some extent," but as the Restatement illustrates, he is not "entitled to restitution."  *Id*.  Just like a homeowner who plants colorful flowers in her front yard, X put information into the public domain.  Neither has a claim for restitution when Bright Data or a passersby takes a gander.

***Blocking Public Web Search Absent a Valid Contract is Against Public Interest***.  X's quasi-contract or unjust enrichment claim also fails because blocking public search unreasonably restrains trade.  As the Restatement makes clear, unreasonable quasi-contractual restraints are unenforceable.  *See* Rest.2d §§ 69(2), 187.  A restraint is "necessarily unreasonable" unless it is "subsidiary to an otherwise valid transaction or relationship."  *Id*. At § 187 & cmt. B.  But as noted

above, an unjust enrichment claim presupposes the absence of a valid transaction or relationship (since such a relationship would be governed by contract law).  Without a valid and enforceable contractual relationship, any restraint on automated scraping – by definition – cannot be ancillary.  So if X is proceeding *quasi*-contractually, it cannot enforce *restraints* on Bright Data's right to search the public web.

## VI.    X'S INDIVIDUAL USER ACCOUNT CLAIMS SHOULD BE DISMISSED.

Once X put Bright Data on notice of its claims, Bright Data terminated its corporate accounts.  This precludes any liability for forward-looking conduct based on these accounts, an issue that will be addressed in separate motion practice.  But Bright Data cannot fire every employee that has an X account.  Recognizing this, X appears to base its contract claim on the fact that "several of [Bright Data's] executives, employees, and agents" also have individual X accounts.  Cmplt. ¶¶ 36, 37, 61.  But the mere fact that a Bright Data employee has an X account cannot bind Bright Data.  Virtually every company in the world has at least one employee with an X account.  But not every company is contractually bound to X.  Indeed, X does not actually allege that Bright Data is somehow bound by these accounts.  It alleges only that some Bright Data employees "are also registered X users and [themselves] expressly agreed to X Corp's Terms when registering their accounts."  *Id.* ¶¶ 36, 37.  But X is not bringing any claims against any Bright Data employee or based on any alleged agreement with a Bright Data employee.  To bind Bright Data through its employees' individual accounts, X must plead facts showing that Bright Data is, in fact, a party to the user agreement between the individual and X.  This X does not do.

X identifies seven individual accounts opened by current or former Bright Data employees.  *See* Cmplt. ¶¶ 36-37.  But there is no allegation that these accounts were owned, controlled, or managed by Bright Data, or opened on its behalf.  As X alleges, each account was opened in the individual's own name ("@[individual name]"), not Bright Data's.  *See* Cmplt. ¶ 36-37.  Nor does X allege that these individuals were acting in their capacities as Bright Data employees when opening these accounts.  Indeed, X does not even allege that these individuals were employed by

Bright Data when they opened their personal accounts.[13]  Nor does X allege that these accounts were used for the scraping activities at issue.  Put simply, nothing distinguishes these accounts from any of millions of X accounts opened by random people everywhere, other than the fact that their owners happen to receive a paycheck from Bright Data.

Both contract and agency law preclude liability based on these individual accounts.  As to contract law, the Court needs to look no further than the Terms themselves, which state that:

> "If you *are accepting these Terms and using the Services on behalf of a company* ..., you represent and warrant that you are *authorized to do so and have the authority* to bind such entity to these Terms, in which case the words 'you' and 'your' as used in these Terms shall refer to such entity."

Ex. 1 § 1. Under this plain language, an employer is not bound unless the employee (i) has "the authority" to act on behalf of the company with respect to account creation and use; (ii) actually opens the account "on behalf of a company;" and (iii) "us[es] the Services on behalf of" the company." *Id.*  None of these conditions are alleged, and none are satisfied when a person – who just happens to be a Bright Data employee – opens an account in his or her individual name.

Agency law confirms this.  The concept of respondeat superior, which governs tort cases, does not apply because X does not seek to hold Bright Data liable for the acts of any individual employee, none of whom are alleged to have engaged in any prohibited activity.  *See* Restatement (Third) Of Agency § 2.04 ("An employer is subject to liability *for torts* committed by employees while acting within the scope of their employment.").  Rather, X seeks to satisfy the contract formation element of its contract claim by asserting that these individual accounts constitute *assent* by Bright Data to the Terms.  But these accounts do not purport to be on behalf of Bright Data.  Nor does X allege that Bright Data actually authorized these individuals to act on its behalf when they opened their accounts.  This precludes holding Bright Data liable under contract based on its

---

[13] This is no mere oversight.  A LinkedIn search shows most X accounts pre-date their owners' association with Bright Data.  Erez Naveh allegedly had a Twitter account "since at least August 2009," but only joined Bright Data in April 2022.  Or Lechner had an account since "December 2012," but only joined in late 2015.  Yanay Sela had an account since "December 2014," but only joined in 2021.  Omri Orgad had an account since "November 2011," but only joined in 2014. Zachery Kaiser had an account since "December 2019," but only joined in November 2021.  Artem Shibakov had an account since "February 2013," but only joined in June 2021.

1  employees' individual accounts.  *See id*. § 6.03 cmt. c ("An undisclosed principal only becomes a

2  party to a contract when an agent acts on the principal's behalf in making the contract.").

3  **VII.    CONCLUSION.**

4         For the foregoing reasons, X's tortious interference claim must be dismissed for lack of

5  personal jurisdiction under Rule 12(b)(2), and its tortious interference, unjust enrichment, and

6  individual-account-based contract claims must be dismissed under Rule 12(b)(6).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: October 25, 2023

Respectfully submitted,

/s/ *Sehreen Ladak*

Sehreen Ladak (Bar No. 307895)
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
(310) 284-5652
sladak@proskauer.com

Colin R. Kass*
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick*
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

Robert C. Goodman (Bar No. 111554)
Lauren Kramer Sujeeth (Bar No. 259821)
ROGERS JOSEPH O'DONNELL, PC
311 California Street, 10th Floor
San Francisco, CA 94104
(415) 956-2828
rgoodman@rjo.com
lsujeeth@rjo.com

Attorneys for Defendant Bright Data Ltd.
*Pro hac vice pending