DAVID H. HARPER*
*david.harper@haynesboone.com*
JASON P. BLOOM*
*jason.bloom@haynesboone.com*
**HAYNES AND BOONE, LLP**
2801 N. Harwood Street, Suite 2300
Dallas, Texas 75201
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
*Admitted Pro Hac Vice*

JASON T. LAO, SBN 288161
*jason.lao@haynesboone.com*
ANDREA LEVENSON, SBN 323926
*andrea.levenson@haynesboone.com*
**HAYNES AND BOONE, LLP**
600 Anton Boulevard, Suite 700
Costa Mesa, California 92626
Telephone: (949) 202-3000
Facsimile: (949) 202-3001

*Attorneys for Plaintiff*
*X Corp.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X CORP., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>BRIGHT DATA LTD., an Israeli corporation,<br><br>Defendant. | Case No. 3:23-cv-03698-WHA<br><br>**X-CORP.'S OPPOSITION TO DEFENDANT BRIGHT DATA LTD.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:   January 10, 2024<br>Time:  8:00 a.m.<br>Ctrm:  12 |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...............................................................................1

II.   FACTUAL BACKGROUND .................................................................2

III.  ARGUMENT ...................................................................................5

    A.   This Court Has Personal Jurisdiction Over X Corp.'s Tort Claims....................5

        1.   Bright Data Has Consented to Personal Jurisdiction Under the X Corp. Terms ............................................................6

        2.   X Corp. Has Sufficiently Alleged Personal Jurisdiction ...................10

            a)   Bright Data purposefully directed its activities at California and this District..............................................................11

                (1)   Bright Data's Acts Were Intentional ...................11

                (2)   Bright Data Expressly Aimed Its Activities at California .....12

                (3)   Bright Data's Acts Had Foreseeable Effects in California....15

            b)   X Corp.'s Claims Arise Out of Bright Data's Activities in California ...............................................................15

            c)   Exercising Jurisdiction Over These Claims is Reasonable............16

        3.   Bright Data Misreads Precedent to Suggest It is Not Subject to Personal Jurisdiction .................................................17

        4.   The Court Should Permit Jurisdictional Discovery, If Appropriate ...........................................................19

    B.   X Corp. Has Stated a Claim for Tortious Interference .......................19

        1.   X Corp. Has Alleged Breach of Valid and Supportable Third-Party Contracts................................................20

        2.   X Corp. Has Alleged Inducement By Bright Data ..................22

    C.   X Corp. Has Sufficiently Pled a Claim for Unjust Enrichment........................24

        1.   X Corp. Has Sufficiently Pled Unjust Enrichment as a Quasi-Contract Claim ................................................24

        2.   X Corp. Has Sufficiently Pled Unjust Enrichment as an Independent Cause of Action......................................26

    D.   X Corp. Has Sufficiently Pled a Claim for Trespass to Chattels .......................26

    E.   X Corp. Has Sufficiently Pled a Claim for Misappropriation ..........................28

    F.   X Corp. Has Sufficiently Pled a Claim Under California's UCL......................30

i

1

      G.      Bright Data's Arguments Relating to "Individual User Account Claims"
              Lack Merit ................................................................................................................. 32

IV.      CONCLUSION ................................................................................................................. 33

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*625 3rd St. Associates, L.P. v. Alliant Credit Union*,
    633 F. Supp. 2d 1040 (N.D. Cal. 2009) (Alsup, J.) ...................................................22

*AirWair Int'l Ltd. v. Schultz*,
    73 F. Supp. 3d 1225 (N.D. Cal. 2014) ...................................................................11

*In re Anthem, Inc. Data Breach Litig.*,
    162 F. Supp. 3d 953 (N.D. Cal. 2016) ...................................................................31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................19

*Astiana v. Hain Celestial Grp., Inc.*
    783 F.3d 753 (9th Cir. 2015) ...................................................................23, 24

*Backhaut v. Apple, Inc.*,
    74 F. Supp. 3d 1033 (N.D. Cal. 2014) ...................................................................30

*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*,
    223 F.3d 1082 (9th Cir. 2000) ...................................................................6, 13

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................19

*Berman v. Freedom Fin. Network, LLC*,
    30 F.4th 849 (9th Cir. 2022) ...................................................................21

*Brayton Purcell LLP v. Recordon & Recordon*,
    606 F.3d 1124 (9th Cir. 2010) ...................................................................14

*Briskin v. Shopify, Inc.*,
    No. 22-15815, 2023 WL 8225346 (9th Cir. Nov. 28, 2023) ................................13, 17, 18, 19

*Brown v. Google LLC*,
    No. 20-CV-03664-LHK, 2021 WL 6064009 (N.D. Cal. Dec. 22, 2021) ..............................30

*Brown v. Google LLC*,
    No. 4:20-CV-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) ..............................22

*Burri Law PA v. Skurla*,
    35 F.4th 1207 (9th Cir. 2022) ...................................................................11

*Byton N. Am. Co. v. Breitfeld*,
    No. CV 19-10563-DMG, 2020 WL 3802700 (C.D. Cal. Apr. 28, 2020) ...........................20

iii

*CE Distribution, LLC v. New Sensor Corp.*,
   380 F.3d 1107 (9th Cir. 2004) ..................................................................................19

*In re Clearview AI, Inc., Consumer Priv. Litig.*,
   585 F. Supp. 3d 1111 (N.D. Ill. 2022) ......................................................................26

*ConsumerDirect, Inc. v. Pentius*,
   LLC, No. 8:21-cv-01968-JVS, 2022 WL 16949657 (C.D. Cal. Aug. 25, 2022)....................20

*Craigslist, Inc. v. Naturemarket, Inc.*,
   694 F.Supp.2d 1039 (N.D. Cal. 2010) ..................................................................7, 14, 28

*Creative Realty Partners, Inc. v. Michaelson Real Estate Grp., LLC*,
   No. 220CV03693MWFMRW, 2022 WL 16935330 (C.D. Cal. Sept. 13, 2022) ...................17

*Crown Imports, LLC v. Superior Ct.*,
   223 Cal. App. 4th 1395 (2014) ..................................................................................23

*Ebay, Inc. v. Bidder's Edge, Inc.*,
   100 F. Supp. 2d 1058 (N.D. Cal. 2000) ..................................................................27, 28

*EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*,
   711 F. Supp. 2d 1074 (C.D. Cal. 2010) ......................................................................19

*ESG Capital Partners, LP v. Stratos*,
   828 F.3d 1023 (9th Cir. 2016) ..................................................................................26

*In re First Alliance Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006) ....................................................................................30

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*,
   141 S. Ct. 1017 (2021) ..............................................................................................15

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*,
   328 F.3d 1122 (9th Cir. 2003) ..................................................................................19

*Hartford Cas. Ins. Co. v. J.R. Mktg., LLC*,
   61 Cal. 4th 988 (2015) ..............................................................................................24

*Herbal Brands, Inc. v. Photoplaza, Inc.*,
   72 F.4th 1085 (9th Cir. 2023) ..................................................................................12

*Herskowitz v. Apple Inc.*,
   940 F. Supp. 2d 1131 (N.D. Cal. 2013) ......................................................................31

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ..................................................................................28

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   No. 17-CV-03301-EMC, 2021 WL 1531172 (N.D. Cal. Apr. 19, 2021) ..............................29

iv

*Hollywood Screentest of Am., Inc. v. NBC Universal, Inc.*,
   151 Cal. App. 4th 631, 60 Cal. Rptr. 3d 279 (2007).................................................29

*Huffington v. T.C. Grp., LLC*,
   637 F.3d 18 (1st Cir. 2011)...................................................................................8

*Impossible Foods Inc. v. Impossible X LLC*,
   80 F.4th 1079 (9th Cir. 2023) ...........................................................12, 13, 15, 16

*Int'l News Serv. v. Associated Press*,
   248 U.S. 215 (1918).............................................................................................29

*Intel Corp. v. Hamidi*,
   30 Cal. 4th 1342 (2003) ......................................................................................28

*LeGrand v. Abbot Laboratories*,
   655 F.Supp.3d 871 (N.D. Cal. 2023) ..................................................................26

*Levy v. Only Cremations for Pets, Inc.*,
   57 Cal. App. 5th 203 (2020) ...............................................................................26

*Maisel v. S.C. Johnson & Son, Inc.*,
   No. 21-CV-00413-TSH, 2021 WL 1788397 (N.D. Cal. May 5, 2021) ................26

*Manetti-Farrow v. Gucci Am., Inc.*
   858 F.2d 509 (9th Cir. 1988) ................................................................................7

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
   647 F.3d 1218 (9th Cir. 2011) ..............................................................11, 12, 13, 15

*Meta Platforms, Inc. v. Soc. Data Trading Ltd.*,
   No. 21-CV-09807-AGT, 2022 WL 18806267 (N.D. Cal. Nov. 15, 2022).......................14, 26

*Mishiyev v. Alphabet, Inc.*,
   444 F. Supp. 3d 1154 (N.D. Cal. 2020) (Alsup, J.) ............................................20

*Moore v. Apple, Inc.*,
   73 F.Supp.3d 1191 (N.D. Cal. 2014) ....................................................................9

*Nunes v. Twitter, Inc.*,
   103 Va. Cir. 184 (Cir. Ct. 2019) ...........................................................................9

*Picot v. Weston*,
   780 F.3d 1206 (9th Cir. 2015) ........................................................................11, 12

*Pollstar v. Gigmania, Ltd.*,
   170 F. Supp. 2d 974 (E.D. Cal. 2000)..................................................................29

*Progressive W. Ins. Co. v. Superior Court*,
   135 Cal. App. 4th 263 (2005) ..............................................................................31

v

*Radiant Glob. Logistics, Inc. v. Drummond*,
    No. C18-1063JLR, 2018 WL 5276581 (W.D. Wash. Oct. 24, 2018)....................................10

*Randall v. Ditech Fin., LLC*,
    23 Cal. App. 5th 804 (2018) .........................................................................................................30

*Raymat Materials, Inc. v. A & C Catalysts, Inc.*,
    No. C 13-00567 WHA, 2013 WL 5913778 (N.D. Cal. Oct. 31, 2013) (Alsup,
    J.)..................................................................................................................................................24

*Rosenthal & Rosenthal of California, Inc. v. Hilco Trading, LLC*,
    No. 2:19-cv-10315-SVW-MAA, 2020 WL 2510587 (C.D. Cal. Apr. 14, 2020) ...................14

*Schwarzenegger, v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ...........................................................................................5, 6, 11

*Sellers v. Bleacher Report, Inc.*,
    No. 23-CV-00368-SI, 2023 WL 4850180 (N.D. Cal. July 28, 2023)......................................21

*Sinatra v. Nat'l Enquirer, Inc.*,
    854 F.2d 1191 (9th Cir. 1988) ................................................................................................16

*Symantec Corp. v. Johns Creek Software, Inc.*,
    No. C 11-03146 WHA, 2011 WL 4026873 (N.D. Cal. Sept. 12, 2011) (Alsup,
    J.)..................................................................................................................................................16

*Thrifty-Tel v. Bezenek*,
    46 Cal. App. 4th 1559 (1996) .............................................................................................26, 27

*Trane Co. v. Gilbert*,
    267 Cal. App. 2d 720 (1968) ....................................................................................................32

*Usher v. City of Los Angeles*,
    828 F.2d 556 (9th Cir. 1987) ....................................................................................................20

*Will Co. v. Lee*,
    47 F.4th 917 (9th Cir. 2022) ...............................................................................................11, 12

*X17, Inc. v. Lavandeira*,
    563 F. Supp. 2d 1102 (C.D. Cal. 2007) ...................................................................................30

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
    433 F.3d 1199 (9th Cir. 2006) .............................................................................................11, 15

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
    901 F.3d 1081 (9th Cir. 2018), *holding modified by Lee v. Fisher*, 70 F.4th
    1129 (9th Cir. 2023)..............................................................................................................7, 8

**Statutes**

Cal. Bus. & Prof. Code § 17200 ..........................................................................................2, 30

Cal. Bus. & Prof. Code § 17204 ........................................................................30

California Civil Code Section 2332 ..................................................................32

**Other Authorities**

Fed. R. Civ. P. 12(b) ........................................................................................18

Fed. R. Civ. P. 12(b)(6)....................................................................................19

Fed. R. Civ. P. 12(h) ........................................................................................19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF AUTHORITIES
Case No. 3:23-cv-03698-WHA

## I.  INTRODUCTION

X Corp. filed this lawsuit to protect its X platform from large-scale scraping of information by Bright Data and its customers. This "scraping" involves bombarding X's servers with millions of automated requests using deceptive tools to evade X Corp.'s blocking mechanisms—which not only is in clear violation of X Corp's Terms of Service but also impairs the operation of the X platform for legitimate users. Bright Data, in its Motion to Dismiss ("Motion"), attempts to explain away its own scraping along with the sale of tools to customers to perform this scraping. But it fails to demonstrate why any of X Corp.'s claims should be dismissed at the pleading stage. In the absence of controlling case law and relying on *ipse dixit* and unpled allegations of its own, Bright Data asserts a "God-given freedom" for itself and its customers to scrape data from any website they choose—including by relentlessly scraping and selling data from the X platform—regardless of whether that conduct violates their contractual obligations, degrades the experience for the platform's legitimate users, or results in damages to companies who operate these sites.

Bright Data does not dispute that it agreed to X Corp's Terms of Service when it registered for accounts on X, and its Motion does not address X Corp.'s claim for breach of contract. Instead, Bright Data seeks dismissal of X Corp.'s tort claims, based primarily on inapposite analogies and sweeping generalizations about how it thinks the internet *should* operate (which conveniently align with Bright Data's business model). As a starting point, Bright Data attempts to analogize its sale of sophisticated tools specifically designed, advertised, and sold to scrape data from the X platform—such as its "Web Scraper" and "Twitter Scraper"—to a mere pen that happens to be misused. But, as the name implies, these tools are specifically designed *and marketed* to evade X Corp.'s technological barriers and can *never* be used in compliance with X Corp.'s Terms. In short, unlike a "pen," Bright Data's scraping tools serve no legitimate purpose.

Bright Data first attempts to avoid X Corp.'s tort claims on jurisdictional grounds. Bright Data suggests that this Court lacks personal jurisdiction over it, all while ignoring the personal jurisdiction waiver it expressly agreed to and the myriad ways it has expressly aimed its conduct at California. Notably, Bright Data presents *no evidence* controverting X Corp.'s allegations and does not dispute that it agreed to the forum-selection clause and personal jurisdiction waiver. Nor

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

does Bright Data dispute that it established a physical sales office in this District (overseen by employees who reside in this District) to sell scraping tools, offered California-specific IP proxies, cultivated the technology market based in this District, or that it has sold its scraping and IP products to California customers. Bright Data's own marketing also makes clear that it aimed its tortious conduct specifically at X Corp., a California business. For any one of these reasons, this Court has personal jurisdiction over X Corp.'s tort claims.

Bright Data then posits that X Corp. has failed to adequately plead its tort claims, solely based on unsupported legal conclusions and disputed factual assertions. Contrary to Bright Data's arguments, X Corp. has sufficiently pled its tortious interference claim by identifying the relevant contract (along with the specific contractual provisions at issue) and presenting evidence that Bright Data induced X users to violate this contract. Nothing more is required at the pleading stage. Similarly, even if the Terms were unenforceable—and they are not—Bright Data cannot escape quasi-contractual remedies for having unjustly enriched itself by violating those Terms. And Bright Data's entrance upon and use of X Corp.'s technological infrastructure, including X Corp.'s software and servers located in California, to obtain information for Bright Data's own economic benefit, adequately state claims for trespass, misappropriation, and a violation of Section 17200. Bright Data does nothing to meaningfully dispute these claims—raising only incomplete hypotheticals and suggestions that facts may be uncovered that will weigh in its favor. Bright Data's attempt to litigate these factual issues at the pleading stage is premature and should be rejected.

While X Corp. believes Bright Data's Motion to Dismiss can be denied in its entirety on its face, to the extent this Court requires additional evidence to evaluate this Motion, X Corp. respectfully requests leave to conduct jurisdictional discovery regarding Bright Data's customers and its California conduct.

## II.   FACTUAL BACKGROUND

X Corp. owns and operates the social media platform X (formerly known as Twitter), accessible through twitter.com, X.com, and various mobile and online applications.[1] Since its

---

[1] Dkt. 36, First Am. Compl. at ¶ 4.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

founding in 2007, X Corp. has maintained its headquarters and principal place of business in San Francisco, California.[2] The X platform has hundreds of millions of active users worldwide, with more than 23 million X accounts having been registered in California alone.[3]

X Corp. allows its users to post and share content, including written comments, images and videos, and to share, like, and comment on other users' posts.[4] To post content on X or to re-post, like or otherwise interact with posts by others, users must register for an account and log in to that account.[5] To register, users must provide their name, phone number or email address, and date of birth.[6] X Corp. then verifies registrants through email or phone confirmation.[7] X Corp. utilizes a variety of technological measures to detect and prevent automated systems from registering accounts, including by requiring potential account holders to complete a "CAPTCHA" fraud-detection process to determine whether the user is human.[8] X Corp. also allows unregistered users to access certain portions of the site on a more limited basis, subject to its Terms.[9]

Bright Data registered an account on the X platform in February of 2016.[10] Recently, X Corp. discovered that Bright Data has engaged in widespread scraping[11] of X Corp.'s data, circumventing X Corp.'s technical barriers and violating the Terms to which Bright Data (and several of its employees and executives) agreed.[12] Bright Data's website makes clear that the company engages in prohibited scraping on an industrial scale.[13] Its website also offers for sale a variety of scraping tools that allow its customers to scrape data from the X platform. These include the Twitter Scraper, Twitter Profile Scraper, Twitter Image Scraper, and Twitter Followers

---

[2] Dkt. 36, First Am. Compl. at ¶ 4.
[3] Dkt. 36, First Am. Compl. at ¶ 18.
[4] Dkt. 36, First Am. Compl. at ¶ 19.
[5] Dkt. 36, First Am. Compl. at ¶ 20.
[6] Dkt. 36, First Am. Compl. at ¶ 21.
[7] Dkt. 36, First Am. Compl. at ¶ 21.
[8] Dkt. 36, First Am. Compl. at ¶ 21.
[9] Dkt. 36, First Am. Compl. at ¶ 22.
[10] Dkt. 36, First Am. Compl. at ¶ 41.
[11] Scraping is the process of using automated means to collect content or data from a website by making a request to a server, downloading, and parsing the results to extract desired data. Data scrapers typically send large volumes of these requests, taxing the capacity of servers and diminishing the experience for legitimate users. *See* Dkt. 36, First Am. Compl. at ¶ 34.
[12] Dkt. 36, First Am. Compl. at ¶¶ 41–42.
[13] Dkt. 36, First Am. Compl. at ¶¶ 50–54.

Scraper.[14] Bright Data also offers more general scraping tools, which Bright Data has marketed for their ability to target the X platform.[15] It also offers a "Superior California Proxy" service that includes "[v]ast numbers of California IPs to get data off any website."[16] These proxy IP addresses are designed to evade usage restrictions and anti-scraping technology, such as those implemented by X, and allow users to "[o]vercome all blocks all of the time in California."[17]

X Corp.'s Terms expressly prohibit such activities. Specifically, all users who register for an X account, and/or view the X website or application, agree to a binding contract with X Corp. as outlined in X Corp.'s User Agreement, which is comprised of the Terms of Service, Privacy Policy, and the Twitter Rules and Policies (collectively, the "Terms"). The Terms state that a user may not "access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers" or "breach or circumvent any security or authorization measures." X users also may not "access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us."

X Corp.'s Terms additionally state that "scraping the Services without our prior consent is expressly prohibited." Under the Terms, users may not "forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information." Users are also prohibited from any conduct that would "interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including … overloading, flooding, spamming … or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services." The Terms also incorporate by reference X Corp.'s Platform Manipulation and Spam Policy (the "Policy"), which specifically prohibits "coordinated harmful activity that encourages or promotes behavior which violates the Twitter Rules." The Policy also prohibits "leveraging Twitter's open source code to

---

[14] Dkt. 36, First Am. Compl. at ¶ 58.
[15] Dkt. 36, First Am. Compl. at ¶ 56–57.
[16] Dkt. 36, First Am. Compl. at ¶ 13.
[17] Dkt. 36, First Am. Compl. at ¶ 13.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

circumvent remediations or platform defenses." The Terms prohibit selling any content collected from the platform. Users may not "reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services" unless otherwise authorized by the Terms or a developer agreement.

Despite agreeing to the Terms when it registered its account, and despite the awareness of top executives who also registered personal accounts on X, Bright Data does not dispute that it engaged in scraping of the X platform and sold tools to facilitate such scraping by other users. In addition to selling these tools on its own website, Bright Data maintained a physical sales office in San Francisco, California which it used to sell its products to California residents and businesses.[18] Bright Data also advertised its scraping services directly to X users on the X platform.

X Corp. has never granted Bright Data permission to scrape data from the X platform nor sell tools that would enable others to do so. Nor has X Corp. allowed Bright Data (or any company) to utilize proxies to subvert its technological safeguards. Bright Data has not publicly disclosed how it evades X Corp.'s technical safeguards against scraping. But its website makes clear that Bright Data offers X Corp.'s data (which could have only been obtained by engaging in prohibited scraping of X's platform) for sale on its website; and sells tools and services that encourage and enable others to engage in prohibited scraping. On November 13, 2023, X Corp. served discovery requests on Bright Data in order to determine the extent of Bright Data's targeting of X Corp. and its activities in California and this District. Bright Data has yet to provide any documents or information in response to these requests and has filed a Motion to Stay Discovery in this case.[19]

## III.   ARGUMENT

### A.   This Court Has Personal Jurisdiction Over X Corp.'s Tort Claims

Bright Data asserts that this Court lacks personal jurisdiction over X Corp.'s tort claims, but it fails to provide sufficient legal or evidentiary support to overcome X Corp.'s well-pleaded allegations. When personal jurisdiction is challenged, the plaintiff bears the burden of establishing the district court's personal jurisdiction over the defendant. *See Schwarzenegger*, *v. Fred Martin*

---

[18] Dkt. 36, First Am. Compl. at ¶ 10–11.
[19] Dkt. 43.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

*Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). "Although the plaintiff cannot simply rest on the bare allegations of its complaint, uncontroverted allegations in the complaint must be taken as true." *Id.* at 800 (quotations and citations omitted); *see also Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) ("Because the prima facie jurisdictional analysis requires us to accept the plaintiff's allegations as true, we must adopt [the plaintiff's] version of events for purposes of this appeal."). When the motion is based on written materials rather than an evidentiary hearing—as here—the plaintiff need only make a *prima facie* showing of jurisdiction to survive the motion to dismiss. *Id*.

Bright Data does not attach any affidavits to dispute the allegations in X Corp's First Amended Complaint. As a result, all of X Corp.'s allegations are uncontroverted and must be taken as true. *Schwarzenegger,* 374 F.3d at 800. X Corp. has made a *prima facie* showing of jurisdiction for its tort claims, based on well-pleaded allegations showing: (1) Bright Data's agreement to a forum-selection clause that waives any challenge to personal jurisdiction; and (2) intentional acts by Bright Data that were expressly aimed at California and this District, which Bright Data knew would cause harm in California and this District.

### 1.    Bright Data Has Consented to Personal Jurisdiction Under the X Corp. Terms

Bright Data attempts to evade personal jurisdiction for its tortious interference, unjust enrichment, unfair competition, trespass, and misappropriation through a tortured reading of X Corp.'s Terms of Service. Bright Data consented to personal jurisdiction in this Court when it agreed to the Terms, and the tort claims brought by X Corp. directly relate to the binding contract between X Corp. and Bright Data. As a result, the forum-selection clause applies to X Corp's tort claims and Bright Data has waived any objection to personal jurisdiction.[20]

---

[20] Bright Data's unsworn attorney arguments that it closed its X accounts after this lawsuit was filed and may not be legally bound to X Corp.'s Terms for forward-looking damages are also entirely inapposite at the pleading stage. Not only should the Court ignore this claim because it is not part of the record, even if it were, it would be a highly fact-specific determination not properly the subject of a motion to dismiss (or even a motion for summary judgment). Contrary to Bright Data's position, the Terms expressly state that they "survive the deactivation of termination of [Bright Data's] account." Additionally, the Terms do not only apply to registered users, but to any person who uses the X site and services. Bright Data's post-lawsuit termination of its account therefore has no impact on the jurisdictional analysis.

Forum selection clauses that contain a waiver of challenge to personal jurisdiction are presumptively valid and evidence consent to personal jurisdiction in the forum selected. *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F.Supp.2d 1039, 1052 (N.D. Cal. 2010). "The party disputing the validity of a forum selection clause bears the burden of proving the clause is unenforceable." *Id*. The X Corp. Terms state that "*[a]ll disputes related to these Terms or the Services* will be brought solely in the federal or state courts located in San Francisco County, California, United States, and *you consent to personal jurisdiction* and waive any objection as to inconvenient forum."[21] In addition to agreeing to the Terms by using X Corp.'s Services, Bright Data expressly accepted and agreed the Terms when it registered an X account.[22] In doing so, Bright Data consented to personal jurisdiction in this Court over all disputes *related to* the Terms or to X Corp.'s Services. These Services include all of X Corp.'s "various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, [and] commerce services."[23]

Bright Data now asserts that this agreement does not apply to its tortious interference, unjust enrichment, unfair competition, trespass, and misappropriation, claiming its conduct is not sufficiently connected to Bright Data's contract with X Corp.[24] This argument misreads Ninth Circuit precedent, including the test set forth in *Manetti-Farrow v. Gucci Am., Inc*. 858 F.2d 509 (9th Cir. 1988). In that case, the Ninth Circuit applied a valid forum-selection clause broadly to include tortious interference claims because all of the claims "relate[d] to" the contract. *Id*. at 514. This included applying the forum-selection clause even to *non-signatories*, because the "alleged conduct of the non-parties [was] so closely related" to the contract at issue. *Id*. at fn.5. Bright Data's attempt to narrow this broad application has clearly been rejected by subsequent case law. Whether a forum-selection clause "relates to" a contract does not require a relationship to "the interpretation and performance of the contract itself." *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1086 (9th Cir. 2018), *holding modified by Lee v. Fisher*, 70 F.4th 1129 (9th Cir. 2023) (distinguishing forum-selection clauses that contain "arising out of" language versus

---

[21] X Corp. Terms of Service, § 6 "General," available at https://twitter.com/en/tos; *see also* Dkt. 42-01, Exs. 1-3.
[22] Dkt. 36, First Am. Compl. at ¶ 41.
[23] X Corp. Terms of Service, available at https://twitter.com/en/tos.
[24] Dkt. 42, Mot. to Dismiss, at 5.

those with "related to" language). Instead, a forum-selection clause that uses "relating to" language applies to "any disputes that reference the agreement or have some 'logical or causal connection' to the agreement." *Id*; *see also Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 22 & n.2 (1st Cir. 2011) (explaining that "relating to" is synonymous with the phrases "with respect to," "with reference to," "in connection with," and "associated with").

Bright Data's tortious interference bears a logical and causal connection to both the Terms and its use of the Services. Bright Data designed, marketed, and sold its "Twitter Scraper" at a time when it was a registered X user.[25] As a registered user, Bright Data utilized its access to the X Services to develop its scraping technology.[26] Bright Data undoubtedly used its status as a registered X user to promote and market its scraping tools on the X platform to X users. Through its X account, Bright Data promoted products that were specifically designed to help X users circumvent X's limits on automated access to the platform and thereby breach their agreements with X.[27] Additionally, Bright Data advertised its products on the X platform in 2016 (under a previous company name) and from 2019 to 2021.[28] Bright Data could not have undertaken these activities on the X platform—marketing directly to X users—without agreeing to the X Terms. These activities also constitute use of X Corp.'s Services, which include any use of X Corp.'s "various websites, … applications, buttons, widgets ads, [and] commerce services."[29]  Bright Data does not dispute that it accessed and used the X website and applications in the service of its scraping tools and advertised these tools on X. As a result, this activity, and the resulting tortious interference claim, are both expressly included in the forum-selection clause and bear a "logical and causal connection" to Bright Data's agreement and its use of the X Services, making the claim subject to the forum-selection clause. *See Yei A. Sun*, 901 F.3d at 1086.

The First Amended Complaint also specifically references the agreement between Bright Data and X Corp. as foundational to its tortious interference claim. X Corp. refers to the agreement

---

[25] Bright Data maintained its X account from at least February 2016 until after this lawsuit was filed in 2023. Dkt. 36, First Am. Compl. ¶ 41.

[26] Dkt. 36, First Am. Compl. ¶¶ 42–43.

[27] Dkt. 36, First Am. Compl. ¶ 45.

[28] Dkt. 36, First Am. Compl. ¶ 44.

[29] X Corp. Terms of Service, § 6 "General," available at https://twitter.com/en/tos; *see also* Dkt. 42-01, Exs. 1-3.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

as evidence of Bright Data's awareness of its contractual obligations and the obligations of other visitors to the X platform and registered users of X Corp.'s services.[30] Under California law, a claim for tortious interference with contract requires (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Moore v. Apple, Inc.*, 73 F.Supp.3d 1191, 1202 (N.D. Cal. 2014) (internal quotations omitted) (applying California law). Bright Data's contract with X demonstrates that it was aware of the Terms governing usage of the X platform, including limitations on automated use that apply to all visitors to the X site and all registered X users, which is relevant to each of the elements of the claim.[31]

Bright Data asserts that the Terms do not contemplate a tortious interference claim because the Terms "are limited to a user's own 'use' of X" and only apply to disputes related to the Terms.[32] In fact, the Terms specifically state that "[i]t is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms."[33] The Terms therefore prohibit the actions giving rise to X Corp.'s tortious interference claim, and Bright Data's argument fails by its own logic.

Bright Data's reliance on the Virginia district court's decision in *Nunes v. Twitter* is similarly misplaced. In that case, the plaintiff brought defamation claims against a Twitter user, along with a related negligence claim against Twitter that was "totally dependent upon the defamation claim." *Nunes v. Twitter, Inc.*, 103 Va. Cir. 184 at *5 (Cir. Ct. 2019). Because the action was based solely on the defendant's use of Twitter, and there was no connection between that action and the plaintiff's use of Twitter, the Virginia district court found that the plaintiff was not bound by the forum-selection clause. *Id* at *3. In this case, as detailed above, there is a direct connection between Bright Data's status as an X user (and advertiser) that was aware of and bound by the Terms and its interference, so the conduct giving rise to the tortious interference claim bears

---

[30] Dkt. 36, First Am. Compl. ¶¶ 79–84.
[31] Dkt. 36, First Am. Compl. ¶ 80.
[32] Dkt. 42, Mot. to Dismiss, at 7.
[33] X Corp. Terms of Service, § 4 "Misuse of the Services."

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

a direct connection to the parties' agreement.

For the same reasons, Bright Data consented to personal jurisdiction for X Corp.'s unjust enrichment, unfair competition, trespass, and misappropriation claims, which bear a direct connection to Bright Data's agreement to X Corp.'s Terms. Each of these claims requires the court to interpret the Terms and analyze the parties' respective obligations and rights, including whether the Terms apply to Bright Data's conduct and for what period of time. Specifically, X Corp.'s unjust enrichment claim is premised on Bright Data's use of X Corp.'s Services, platform, and computer network without authorization to scrape data from the X platform.[34] X Corp.'s trespass and misappropriation claims are premised on Bright Data's intentional entry into, and use of, X Corp.'s technological infrastructure, including its software and servers located in California, to obtain information for its own economic benefit.[35] The FAC puts Bright Data's knowing decision to exceed the permission granted by X Corp. to access its property directly at issue—in other words—these claims directly relate to the permissions granted in X Corp.'s Terms.[36] X Corp.'s unfair competition claim is premised on much of Bright Data's same interaction with X Corp.'s platform and Terms, and is similarly related to Bright Data's agreement to be subject to personal jurisdiction in California.

In short, Bright Data's agreement to the Terms, and its use of X Corp.'s Services, are not "irrelevant" to its tort liability; they are intertwined with the conduct giving rise to X Corp.'s tort claims. Bright Data has therefore consented to personal jurisdiction related to X Corp.'s tort claims, and this Court need look no further to deny Bright Data's request to dismiss this claim on jurisdictional grounds. *See Radiant Glob. Logistics, Inc. v. Drummond*, No. C18-1063JLR, 2018 WL 5276581, at *4 (W.D. Wash. Oct. 24, 2018), ("The court need not embark on a minimum contacts analysis where the defendant[ ] consent[s] to the court's exercise of personal jurisdiction in the forum.").

**2.      X Corp. Has Sufficiently Alleged Personal Jurisdiction**

Even if Bright Data had not consented to personal jurisdiction under the forum-selection

---

[34] Dkt. 36, First Am. Compl. ¶ 89.
[35] Dkt. 36, First Am. Compl. ¶¶ 96-97.
[36] Dkt. 36, First Am. Compl. ¶¶ 96-97.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

clause, X Corp. has established sufficient facts to support personal jurisdiction over its tort claims. The Ninth Circuit employs a three-part test to determine whether personal jurisdiction exists: (1) the non-resident defendant must purposefully direct its activities at the forum or a resident thereof; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice. *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). Bright Data appears to challenge only the first prong—whether it purposefully directed its activities at California or its residents.

### a)   *Bright Data purposefully directed its activities at California and this District.*

For claims sounding in tort, courts in the Ninth Circuit apply the "purposeful direction" analysis and the three-part *Calder* "effects" test. *See Picot*, 780 F.3d at 1213–14 (applying "purposeful direction" analysis and three-part "effects" test to a claim of tortious interference with contract); *see also Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (adopting the *Calder* "effects" test). Under this test, the defendant must have allegedly (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Burri Law PA v. Skurla*, 35 F.4th 1207, 1213 (9th Cir. 2022). The "effects" test focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (internal quotations and citations omitted). X Corp.'s tort claims satisfy all three prongs of this test.

### (1)   Bright Data's Acts Were Intentional

Bright Data committed an intentional act by designing, advertising, using, and selling tools to scrape the X platform in violation of the X Terms of Service. An "intentional act" occurs when the defendant acts with the "intent to perform an actual, physical act in the real world." *Schwarzenegger*, 374 F.3d at 806. The threshold for an intentional act is "relatively low." *AirWair Int'l Ltd. v. Schultz*, 73 F. Supp. 3d 1225, 1233 (N.D. Cal. 2014). Bright Data has undertaken numerous intentional acts that satisfy the first prong, including operating a website, purchasing a domain name, selling products via that website, and using its products to scrape data from the X

1   platform. *See, e.g., Herbal Brands, Inc. v. Photoplaza*, *Inc*., 72 F.4th 1085, 1093 (9th Cir. 2023)

2   (holding defendant's sale of a product via an interactive website was an intentional act); *Will Co.*

3   *v. Lee*, 47 F.4th 917, 922 (9th Cir. 2022) (operating a website, purchasing a domain name, and

4   purchasing domain privacy services are intentional acts). Bright Data has submitted no evidence

5   disputing that it has committed intentional acts sufficient to satisfy this prong.

6                              (2)    Bright Data Expressly Aimed Its Activities at California

7          X Corp. has made the requisite showing that Bright Data expressly aimed its activities at

8   California. "Express aiming" asks whether the defendant's allegedly tortious actions were

9   "expressly aimed at the forum." *Picot*, 780 F.3d at 1214 (quoting *Brayton Purcell LLP v. Recordon*

10  *& Recordon*, 606 F.3d 1124, 1129 (9th Cir. 2010)). While operating a passive website may not

11  satisfy the "express aiming" requirement, "[o]perating a website in conjunction with 'something

12  more'—conduct directly targeting the forum—is sufficient" to satisfy the express aiming prong.

13  *Mavrix*, 647 F.3d at 1229 (quoting *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th

14  Cir. 2002) (internal quotations omitted)). To establish "something more," a defendant must

15  actively "appeal to" and "profit from" an audience in that forum. *Will Co., Ltd. v. Lee*, 47 F.4th

16  917, 922–23 (9th Cir. 2022). This may occur through in-person contacts, advertising directed at

17  the market, a business model that is aimed at the forum, or specific targeting of a business located

18  in the forum. *Id.* at 923. While only one of these is required to satisfy "something more," Bright

19  Data has expressly aimed at the California market in each of these ways.

20         Bright Data has done "something more" by establishing a base of operations in this District

21  which it has used to market, use, and sell its scraping and proxy products to the California market.

22  The Ninth Circuit has held that operating a "dedicated multi-year 'base' in the forum" from which

23  to do business is sufficient to establish personal jurisdiction, even when a company later closes

24  that base of operations. *See Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1090 (9th

25  Cir. 2023). Bright Data established such a base by targeting California customers through its sales

26  office located in San Francisco, California.[37] As recently as October 19, 2022, Bright Data

27

28  _____

[37] Dkt. 36, First Am. Compl. ¶ 10.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

encouraged potential customers to contact it at this California sales office.[38] Members of Bright Data's business development and sales team—including its Chief Revenue Officer, who oversees its sales operations—were also located in California.[39] Bright Data's Global Head of Presales is also based in California, along with numerous other Bright Data employees.[40] These are not "sporadic" activities that give rise to merely "random," "fortuitous," or "attenuated" contacts, but "deliberate actions within the forum state," sufficient to confer personal jurisdiction. *Id*. at 1090.

Bright Data's business—as a direct-to-consumer technology company—also supports finding personal jurisdiction. The Ninth Circuit has made clear that "the specific nature and structure of the defendant's business matters" to the "something more" analysis. *Briskin v. Shopify, Inc*., No. 22-15815, 2023 WL 8225346, at *11 (9th Cir. Nov. 28, 2023). When a company structures its business to avoid a forum, or merely interacts with intermediaries who happen to be located in a forum, that weighs against a finding of personal jurisdiction. Here, Bright Data has done the opposite, establishing a sales office and targeting the California market through direct sales to California customers. Bright Data has taken concrete steps to exploit that California market. Bright Data has established a physical sales office on Market Street in downtown San Francisco. Bright Data has located key executives in the Bay Area and has also sold and advertised California-specific IP address proxies—all of which demonstrates that Bright Data is directing efforts at Californians.[41] This alone is sufficient to confer personal jurisdiction.

Bright Data's targeting of X Corp. also satisfies the "something more" requirement. The Ninth Circuit has held "[the express aiming] requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Bancroft & Masters, Inc. v. Augusta Nat'l Inc*., 223 F.3d 1082, 1087 (9th Cir.2000). This prong is met when a defendant has "individually targeted" a plaintiff whom the defendant knows to be a forum resident. *Mavrix*, 647 F.3d at 1229. Here, Bright Data has individually targeted X Corp. with products that are specifically designed to interfere with X

---

[38] Dkt. 36, First Am. Compl. ¶ 11.
[39] Dkt. 36, First Am. Compl. ¶ 12.
[40] Dkt. 36, First Am. Compl. ¶ 12.
[41] Dkt. 36, First Am. Compl. ¶ 12.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

1   Corp.'s existing contracts. In addition to its general scraping tools, which are advertised for their

2   ability to scrape the X platform, Bright Data has marketed and sold at least four products

3   specifically designed to scrape information from the X platform: *Twitter Scraper, Twitter Profile*

4   *Scraper, Twitter Image Scraper, and Twitter Followers Scraper*. Bright Data and its officers are

5   also aware that X Corp. is a forum resident because that information is contained in the X Terms

6   to which Bright Data (and many of its executives) agreed. This individual targeting of products at

7   X Corp. is sufficient to exercise personal jurisdiction over Bright Data. *See Craigslist*, 694 F. Supp.

8   2d at 1053 (finding defendants expressly aimed at California company when defendants to bypass

9   the security measures of Plaintiff's website, in violation of its TOU"); *see also See Meta Platforms,*

10  *Inc. v. Soc. Data Trading Ltd.*, No. 21-CV-09807-AGT, 2022 WL 18806267, at *2 (N.D. Cal.

11  Nov. 15, 2022), report and recommendation adopted, No. 21-CV-09807-CRB, 2022 WL

12  18806265 (Dec. 8, 2022) (finding purposeful direction satisfied where defendant scraped the

13  Instagram accounts of approximately 250,000 California users) (citing *Morrill v. Scott Fin. Corp.*,

14  873 F.3d 1136, 1142 (9th Cir. 2017)). Bright Data's claim that the location of X Corp.'s servers

15  was not pled is also disingenuous in light of the allegations in the FAC.[42]

16      This Court also has personal jurisdiction over the tortious interference claim because Bright

17  Data interfered with contracts between X Corp., which is based in California, and other California

18  parties who contracted with X Corp. When analyzing tortious interference claims, courts consider

19  the location of the parties whose contracts the defendant allegedly interfered with. When the

20  contracting parties are California residents, courts have found personal jurisdiction. *Rosenthal &*

21  *Rosenthal of California, Inc. v. Hilco Trading, LLC*, No. 2:19-cv-10315-SVW-MAA, 2020 WL

22  2510587, at *5 (C.D. Cal. Apr. 14, 2020) ("Defendant's tortious interference with a contract

23  between two California-based corporations suffices to establish that Defendant's alleged conduct

24

25

26  ─────────────────
    [42] *See e.g.* Dkt. 36, ¶ 14 ("[Bright Data] has scraped data from X Corp. **servers in California**"); ¶

27  96 ("Defendant intentionally entered into, and made use of, X Corp.'s technological
    infrastructure, including its software **and servers located in California**"); ¶ 109 ("Defendant

28  used automated means—in violation of X Corp.'s Terms—to wrongfully access the X platform,
    systems and servers, **including systems and servers located in California**, and obtain data from
    the X platform").

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

is 'expressly aimed' at the forum state"). Bright Data concedes that it has California customers.[43] By selling its products to access and scrape the X platform, Bright Data is interfering with contracts between two California parties and the Court may assert personal jurisdiction on that basis.

(3)    Bright Data's Acts Had Foreseeable Effects in California

The third prong of the *Calder* "effects" test requires that the defendant's intentional act must have foreseeable effects in the forum. *Brayton*, 606 F.3d at 1131. In determining the foreseeable harm to a corporation, economic harm can be suffered both where the bad acts occurred and where the corporation has its principal place of business. *Mavrix* 647 F.3d at 1231 (citing *Dole Foods Co., Inc. v. Watts*, 303 F.3d 1104, 1113 (9th Cir. 2002) ("[J]urisdictionally sufficient harm may be suffered in multiple forums.")). In this case, Bright Data was well aware that its scraping activities would cause harm to X Corp., which is based in California. While Bright Data now attempts to disclaim knowledge about how its scraping tools might be used, its own website advertised its ability to circumvent X Corp.'s technological safeguards, impersonate user accounts, and harvest data through automated means that are expressly prohibited by X Corp. Thus, the effects on X's platform—and the location where that harm would be felt—were clearly foreseeable.

b)    **X Corp.'s Claims Arise Out of Bright Data's Activities in California**

Bright Data's conduct in California gave rise to X Corp.'s tort claims. To satisfy this prong, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (quoting *Bristol-Myers*, 582 U.S. at 262, 137 S. Ct. 1773). "But for" causation will satisfy this test, but "some relationships will support jurisdiction without a causal showing." *Id*. The degree to which claims arise out of forum-related activities is measured on a scale along with the defendant's forum-related contacts. *See Yahoo!*, 433 F.3d at 1210 (holding that the more extensive the defendant's contacts with the forum, the less plaintiff's suit must be related to those contacts).

---

[43] Bright Data admits it has California customers in its Motion to Dismiss. *See* Dkt. 42, Mot. to Dismiss, at 11 (stating Bright Data "certainly has some California customers").

1    Here, X Corp.'s suit arises directly out of Bright Data's sale of scraping tools and IP proxies, which

2    include sales to California customers. *See Symantec Corp. v. Johns Creek Software, Inc.,* No. C

3    11-03146 WHA, 2011 WL 4026873, at *4 (N.D. Cal. Sept. 12, 2011) (Alsup, J.) ("The present

4    action arises out of defendants' alleged sales of counterfeit software on their interactive websites,

5    a portion of which were made to California residents.").

                    c)    ***Exercising Jurisdiction Over These Claims is Reasonable***

7              Because Bright Data has purposefully directed its activities toward California and X

8    Corp.'s tort claims arise out of or relate to those contacts, the burden shifts to Bright Data to

9    "present a compelling case that the exercise of jurisdiction would not be reasonable." *Impossible*

10   *Foods*, 80 F.4th at 1099 (quotations omitted). Bright Data makes no argument that the exercise of

11   jurisdiction would be unreasonable, much less a "compelling case" against it.

12             Reasonableness is assessed based on seven factors: "(1) the extent of the defendant's

13   purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending

14   in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum

15   state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the

16   controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective

17   relief; and (7) the existence of an alternative forum." *Id*. The extent of the defendant's "purposeful

18   interjection" into the forum "is analogous to the purposeful direction" factor. *Sinatra v. Nat'l*

19   *Enquirer, Inc*., 854 F.2d 1191, 1199 (9th Cir. 1988). Bright Data does not face any special burden

20   litigating the tort claims in this District since it will already be litigating the breach of contract

21   claim here. For the same reason, this District allows for the most efficient judicial resolution and

22   supports the plaintiff's interest in convenience and effective relief. Bright Data has shown no

23   conflict with regard to sovereignty, and no alternative forum exists for these claims. Given that all

24   of these factors weigh in favor of this District or are at most neutral, exercising jurisdiction is

25   reasonable. What would be unreasonable and inefficient is having to litigate related contract and

26   tort claims against Bright Data in different forums when Bright Data expressly agreed to

27   jurisdiction in the Northern District of California.

28

1

2

### 3.    Bright Data Misreads Precedent to Suggest It is Not Subject to Personal Jurisdiction

3       Bright Data asserts that none of its conduct targeting California is relevant to personal

4 jurisdiction, based primarily on a misreading of the Ninth Circuit's recent decision in *Briskin v.*

5 *Shopify, Inc*. No. 22-15815, 2023 WL 8225346, at *5 (9th Cir. Nov. 28, 2023).[44] In *Shopify*, the

6 plaintiff brought a putative class action alleging Shopify—a back-end, payment-processing

7 platform—violated various California privacy laws when it collected and retained his personal

8 data. In conducting the jurisdictional inquiry, the court declined to consider Shopify's "broader

9 business activities in California outside of its extraction and retention of the plaintiff's data,"

10 because whether Shopify had a brick-and-mortar store or had contracts with California merchants

11 had "nothing to do" with the alleged data-privacy injuries. *Shopify,* 2023 WL 8225346, at *5.

12       Bright Data attempts to exploit this narrow holding, ignoring the obvious differences

13 between *Shopify* and this case. Shopify received data from third-party merchants and was

14 ultimately "indifferent to the location of end users." *Id.* at *1. Here, X Corp.'s claims directly relate

15 to—and arise from—Bright Data's attempts to cultivate the California market. Additionally,

16 Shopify simply made its platform accessible through a third-party site that happened to be

17 accessible in California. *Id*. at *5. Meanwhile, Bright Data has specifically targeted California

18 residents with marketing, use, and sales of its services, including by using a sales office in this

19 District—overseen by employees who reside in this District—and selling California-specific proxy

20 IPs used for scraping. Further, in *Shopify*, the defendant passively gathered information from

21 individual consumers, which was supplied by merchants, who were themselves "engaged in

22 independent transactions that themselves do not depend on consumers being present in California."

23 As a result, the plaintiff in *Shopify* could have *been anywhere* when he suffered the alleged injury,

24 and plaintiffs *from anywhere* could have brought the same claims. Here, injuries to X Corp. are

25 specific to California, because Bright Data has actively scraped data from X Corp., a California

26 company, including from X Corp. servers located in California.[45] *See Creative Realty Partners,*

27

28

[44] Dkt. 42, Mot. to Dismiss, at 9–10.
[45] Dkt. 36, First Am. Compl. at ¶¶ 4, 14.

17

1   *Inc. v. Michaelson Real Estate Grp., LLC*, No. 220CV03693MWFMRW, 2022 WL 16935330, at

2   *12 (C.D. Cal. Sept. 13, 2022) ("when defendant takes direct aim at a California **business** those

3   actions are inevitably more likely to be connected to the state itself than actions aimed exclusively

4   at individuals") (emphasis in original). And, Bright Data's scraping includes scraping from X

5   Corp. servers located in California.[46]

6          Unlike in *Shopify*, Bright Data's conduct **in California** provides a "strong, direct

7   connection between the defendant's forum-related activities and plaintiff's claims." *Shopify,* 2023

8   WL 8225346, at *5. Bright Data's sale of products to California residents is crucial conduct that

9   gives rise to X Corp.'s tortious interference claims. As a result, the "butterfly effect" that was

10  rejected in *Shopify*—in which plaintiff's harm was highly attenuated from Shopify's broader

11  business conduct—is simply not present here, where Bright Data's California sales are directly

12  "related to" X Corp.'s injuries. The *Shopify* court itself rejected the broad application suggested

13  by Bright Data, noting in its opinion that "[i]t is readily apparent there will be causes of action that

14  do arise out of Shopify's broader business contacts with California (such as claims by a California

15  merchant)" where it would be proper to consider Shopify's broader business activities. *Shopify,*

16  2023 WL 8225346, at *5.

17         Bright Data also cherry-picks from *Shopify* to suggest that a finding of jurisdiction in this

18  case would upend the concept of personal jurisdiction and subject it to lawsuits in every

19  jurisdiction. This is simply not the case. Bright Data has not opened a sales office in every state,

20  does not have executives in every state, it has not offered proxy IP addresses for every state, it has

21  not targeted specific industries in every state, and the harm of its scraping tools is not felt equally

22  in every state. While X Corp. makes no claims about where else Bright Data might be subject to

23  personal jurisdiction, X Corp.'s uncontroverted allegations are more than sufficient to demonstrate

24  that Bright Data is subject to personal jurisdiction in California based on Bright Data's own

25  California-specific conduct.

26         Additionally, in contrast to *Shopify*, Bright Data knew that it and customers who purchased

27  tools to scrape the X platform were bound by a California forum-selection clause. In *Shopify*, the

28

---

[46] Dkt. 36, First Am. Compl. at ¶ 14.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

1    defendant disputed jurisdiction on all claims. But Bright Data has waived any challenge to personal

2    jurisdiction over X Corp.'s breach of contract claims. *See* Fed. R. Civ. P. 12(h) (challenge to

3    personal jurisdiction is waived if not included in Rule 12(b) motion). Allowing these related claims

4    to be tried in separate jurisdictions would cause unnecessary inefficiency. *See CE Distribution,*

5    *LLC v. New Sensor Corp.*, 380 F.3d 1107, 1113 (9th Cir. 2004) (exercising pendent personal

6    jurisdiction over breach of contract and tortious interference claims because they arise from the

7    same nucleus of operative fact).

8                    **4.    The Court Should Permit Jurisdictional Discovery, If Appropriate**

9              While X Corp. believes Bright Data's Motion to Dismiss should be denied on its face, if

10   this Court finds that additional facts are needed to assess personal jurisdiction, X Corp. requests

11   leave to conduct jurisdictional discovery. "A court may permit discovery to aid in determining

12   whether it has personal jurisdiction." *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*,

13   711 F. Supp. 2d 1074, 1093 (C.D. Cal. 2010) (citing *Wells Fargo & Co. v. Wells Fargo Express*

14   *Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977)). Jurisdictional discovery should be granted where

15   "discovery on th[e] issue might well demonstrate facts sufficient to constitute a basis for

16   jurisdiction," *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th

17   Cir. 2003). Because Bright Data admits that it has California customers, but has not disclosed

18   details regarding those customers, X Corp. requests leave to seek jurisdictional discovery

19   regarding Bright Data's activities in California (if necessary), which may aid the Court in its

20   jurisdictional inquiry. Specifically, X Corp. seeks information regarding Bright Data's California

21   offices, employees, sales, customers, and scraping activities, which may aid this Court in

22   determining whether it has personal jurisdiction.

23            **B.    X Corp. Has Stated a Claim for Tortious Interference**

24            X Corp. has sufficiently pled tortious interference. To survive a Rule 12(b)(6) motion, a

25   complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell*

26   *Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff

27   pleads factual content that allows the court to draw the reasonable inference that the defendant is

28   liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When evaluating

a Rule 12(b)(6) motion, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). The focus is therefore on the facts as pled in the live complaint. Bright Data's repeated reference to unsworn assertions of unpleaded fact, inapplicable hypotheticals, and unsupported conclusions of law should be disregarded.

To plead a claim for tortious interference, a plaintiff must allege: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damages." *Mishiyev v. Alphabet, Inc.*, 444 F. Supp. 3d 1154, 1160–61 (N.D. Cal. 2020) (Alsup, J.). As shown below and in the FAC, X Corp. has sufficiently stated a claim.

### 1.   X Corp. Has Alleged Breach of Valid and Supportable Third-Party Contracts

X Corp. has alleged sufficient facts to demonstrate Bright Data tortiously induced interference with its contractual relations. Bright Data's attempt to win dismissal of this case, based solely on X Corp.'s lack of access to Bright Data's customer data—entirely in the control of Bright Data—should be rejected out of hand. At the pleading stage, the central inquiry in a tortious interference claim is "not whether the pleading specifically identifies the third parties, but whether it sufficiently indicates the contractual rights that are at issue." *ConsumerDirect, Inc. v. Pentius*, LLC, No. 8:21-cv-01968-JVS (ADSx), 2022 WL 16949657, at *3 (C.D. Cal. Aug. 25, 2022) (rejecting argument that failure to identify specific contracts and customers is fatal to the claim); *Byton N. Am. Co. v. Breitfeld*, No. CV 19-10563-DMG (JEMx), 2020 WL 3802700, at *6 (C.D. Cal. Apr. 28, 2020) (rejecting argument that the claim should be dismissed for failure to identify a specific third-party where the plaintiff "described the contracts, and a specific, albeit unnamed, group of people who were parties to them").

X Corp. has identified the specific contractual rights that are at issue in this case under the X Corp. Terms.[47] X Corp. has specifically pleaded the relevant provisions, including prohibitions

---

[47] Dkt. 36, First Am. Compl. ¶¶ 22–33.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

1   on circumventing X Corp.'s technological safeguards, accessing the platform through automated

2   means, impersonating legitimate users, and assisting others in violating the Terms. Bright Data's

3   products—including its Web Scraper and Twitter Scraper—are expressly designed and sold to

4   facilitate the violation of these Terms. While X Corp. cannot identify Bright Data's customers at

5   this stage of the litigation,[48] Bright Data does not dispute that it has sold scraping tools to X users

6   who are bound by X Corp.'s Terms, including customers in California.[49]

7          Bright Data focuses instead on unregistered visitors to the X platform. But X Corp. has

8   pled that these visitors are also subject to X Corp.'s  Terms, including the prohibitions on

9   circumventing X Corp.'s technological safeguards, accessing the platform through automated

10  means, impersonating legitimate users, and assisting others in violating the Terms.[50] Bright Data

11  alleges that these users may not be legally bound to X Corp.'s Terms. But the question of whether

12  a user assented to the Terms of a given website is a highly fact-specific determination that depends

13  on the visual layout of the website, including the placement of the Terms and, in some cases, the

14  surrounding color combinations. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 853

15  (9th Cir. 2022) (discussing whether assent was attained based on font size, placement, and color

16  of notice). This Court has previously rejected making such a fact-specific determination at the

17  motion to dismiss stage. *See Sellers v. Bleacher Report, Inc*., No. 23-CV-00368-SI, 2023  WL

18  4850180, at *8 (N.D. Cal. July 28, 2023) (denying motion to dismiss as "premature" based on

19  "factual dispute as to whether plaintiff received notice" of website's terms).[51] In any event, given

20  that registered X users expressly consent to X Corp.'s Terms of Service, Bright Data's argument

21  as to whether X Corp. has formed contracts with unregistered users only goes to the factual

22  question of how many of X Corp.'s users' contracts Bright Data has tortiously interfered with (and

23

24  [48] Bright Data keeps the identities of its customers private.

25  [49] Dkt. 36, First Am. Compl. ¶ 14.
    [50] Dkt. 36, First Am. Compl. ¶ 22.

26  [51] In a footnote, Bright Data also suggests that it does not have the requisite knowledge to
    support a claim for tortious interference based on a "browserwrap" agreement, but this argument
27  is premised on its (mistaken) legal position regarding the validity of such a contract. The only
    case cited by Bright Data to support this assertion is *Orchard Supply Hardware LLC v. Home
28  Depot USA, Inc*., in which the Court found that Home Depot was unaware of a competitor's
    contracts with third parties. 967 F. Supp. 2d 1347, 1364-65 (N.D. Cal. 2013). That is not the case
    here, where Bright Data assented to the very same contract that it now disclaims knowledge of.

21

therefore the size of X Corp.'s damages), not to the question of whether Bright Data has tortiously interfered with X Corp.'s contracts with its users at all.

Bright Data also baldly asserts that no contract is even possible between X Corp. and its users due to lack of consideration. That argument makes no sense, given that X Corp.'s Terms impose various obligations on X Corp.'s users,[52] in exchange for which X Corp. provides those users with the X Services. *See, e.g., Brown v. Google LLC*, No. 4:20-CV-3664-YGR, 2023 WL 5029899, at *13 (N.D. Cal. Aug. 7, 2023) (finding Google's Terms of Service represented a "bargained-for exchange" that was supported by consideration). Bright Data's argument would also render X Corp.—and by extension, any website—unable to protect its own platform from activities that might disrupt its operations, such as Bright Data's industrial-scale scraping and the use of IP proxies to evade X Corp.'s technological safeguards. Notably, Bright Data does not cite to any legal authority for its sweeping argument, which should be rejected.

## 2.    X Corp. Has Alleged Inducement By Bright Data

This Court should also reject Bright Data's assertion that it cannot be liable for tortious interference because offering a "lawful service" is not inducement, since some of its products can be used for "legitimate purposes."[53] Initially, it should be noted that these assertions are not pled in the FAC, but are Bright Data's unsupported *ipse dixit* and should be disregarded. Further, as this Court has noted, tortious interference "does not require wrongful conduct by the defendant apart from the interference." *625 3rd St. Associates, L.P. v. Alliant Credit Union*, 633 F. Supp. 2d 1040, 1048 (N.D. Cal. 2009) (Alsup, J.). "[A] plaintiff need not allege the interference and a second act independent of the interference. Instead, a plaintiff must plead and prove that the conduct

---

[52] *See e.g.* Dkt. 42-1, p. 9 ("In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others…"); p. 11 ("You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us…").

[53] Dkt. 42, Mot. to Dismiss, at 18.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

alleged to constitute the interference was independently wrongful, i.e., unlawful for reasons other than that it interfered with a prospective economic advantage." *Crown Imports, LLC v. Superior Ct.*, 223 Cal. App. 4th 1395, 1404 (2014). Bright Data's claim that it cannot be liable because it does not know with "substantial certainty" whether third parties' use of its products will interfere with their contracts with X Corp. should be rejected.[54] Bright Data does not explain how its products—including its Web Scraper, Twitter Scraper, Twitter Profile Scraper, Twitter Image Scraper, Twitter Followers Scraper and its Scraping Browser—can be used without violating X Corp.'s Terms. In fact, Bright Data has specifically advertised the capability of these scraping tools to access the X platform and to perform "all website unlocking operations under the hood, including: CAPTCHA solving, browser fingerprinting, automatic retries, selecting headers, cookies, & Javascript rendering, and more."[55] Bright Data makes similar representations with regard to its California proxies, which allow users to "[o]vercome all blocks all of the time in California."[56] Contrary to Bright Data's assertions, this *is* a "case where the defendant's services can only be used for illicit purposes."[57]

Instead of explaining how its products can be used for legitimate purposes with reference to the FAC, Bright Data offers only a strained hypothetical, attempting to analogize its sophisticated, targeted scraping tools to a tape deck in 1968.[58] But the "misuse" of a tape deck is not analogous to Bright Data's products, which are specifically designed, advertised, and sold to evade X Corp.'s technological safeguards and violate its Terms. As with Bright Data's "pen" analogy, this is not an innocuous product that has simply fallen into the hands of a tortfeasor; it is a product that has been engineered, marketed, and sold to undermine X Corp.'s technological safeguards and interfere with X Corp.'s contracts—the terms of which Bright Data was well aware.

---

[54] Dkt. 42, Mot. to Dismiss, at 18, citing *Nevada DeAnza Fam. Ltd. P'ship v. Tesoro Re. & Mktg. LLC*, 474 F. Supp. 3d 1087, 1095 (N.D. Cal. 2020) (dismissing claim where "complaint does not allege [the defendant] knew with substantial certainty that its actions would interfere with the [plaintiff's contract]").

[55] Dkt. 36, First Am. Compl. ¶ 61.

[56] Dkt. 36, First Am. Compl. ¶ 13.

[57] Dkt. 42, Mot. to Dismiss at 18.

[58] Dkt. 42, Mot. to Dismiss at 18–19. While Bright Data contends that copying tapes in 1968 was "perfectly lawful," it cites no authority supporting the contention, but again relies on its own "say so."

23

1   While X Corp. will bear the burden of proving inducement and interference, Bright Data's attempt

2   to litigate this claim at the pleadings stage should be rejected. *See Raymat Materials, Inc. v. A &*

3   *C Catalysts, Inc.*, No. C 13-00567 WHA, 2013 WL 5913778, at *3 (N.D. Cal. Oct. 31, 2013)

4   (Alsup, J.) (denying motion to dismiss tortious interference claim because inducement facts were

5   disputed).

6          C.       **X Corp. Has Sufficiently Pled a Claim for Unjust Enrichment**

7                 **1.       X Corp. Has Sufficiently Pled Unjust Enrichment as a Quasi-Contract**

8                           **Claim**

9          Even if there were not an enforceable contract (there is), X Corp. has alleged sufficient

10  facts to demonstrate that Bright Data unjustly enriched itself by selling (and facilitating the

11  purchase of) X user data, using unauthorized, automated means to access and collect data from the

12  X platform, and enabling its customers to do the same. As Bright Data correctly states, when a

13  plaintiff alleges unjust enrichment, a court may "construe the cause of action as a quasi-contract

14  claim seeking restitution." *Astiana v. Hain Celestial Grp., Inc.* 783 F.3d 753, 762 (9th Cir. 2015).

15  Relief sought through quasi-contract is appropriate where the defendant has been unjustly

16  conferred a benefit through "mistake, fraud, coercion, or request." *Id.* In fact, a quasi-contract

17  action for restitution measured by unjust enrichment lies when "a benefit has been received by the

18  defendant," even if "the plaintiff has not suffered a corresponding loss or, in some cases, any loss,

19  but nevertheless the enrichment of the defendant would be unjust." Restatement (First) of

20  Restitution § 1, cmt. e; *Hartford Cas. Ins. Co. v. J.R. Mktg., LLC*, 61 Cal. 4th 988, 998 (2015).

21         X Corp. has sufficiently alleged that Bright Data was unjustly conferred a benefit here.

22  Bright Data conducts unauthorized scraping of X Corp. data and receives benefits, at minimum, in

23  the form of profits derived from its unauthorized scraping and the sales of its products that do the

24  same.[59] And this benefit was conferred through "mistake, fraud, coercion, or request" as Bright

25  Data's conduct is in violation of X Corp.'s Terms.[60] Each of Bright Data's arguments that this

26  claim should be dismissed are inapposite.

27

28  [59] Dkt. 36, First Am. Compl. ¶ 90–91.
    [60] Dkt. 36, First Am. Compl. ¶ 89.

                                                 24

First, X Corp. has alleged that Bright Data, among other things, (i) accesses the X platform through unauthorized means; (ii) scrapes data from the X platform without authorization; (iii) sells tools which enable others to do both (i) and (ii); and (iv) bundles and sells the data which has been scraped.[61] Bright Data's attempt to paint its activity as a "public web search" that cannot be prohibited because "X does not own the internet"[62] ignores the well-pled allegations in the FAC. The relief sought by X Corp. is not on behalf of the whole of the internet, rather X Corp. is seeking the prohibition of the unauthorized activity specific to the X platform.

Second, Bright Data's statement that its activity is consistent with X Corp.'s ownership interests is categorically incorrect. X Corp. clearly and expressly defines the terms under which users can access its platform. Bright Data's activity is in direct violation of those Terms and in contravention of X Corp.'s technical safeguards and is thus inconsistent with X Corp.'s ownership interest in its own platform. A simple correction of one of the logical flaws that pervade Bright Data's many analogies in its Motion illustrates this point succinctly. Bright Data compares its activity to a mere passerby observing street art, an activity for which it contends it cannot possibly be held liable. But a more apt description would be someone who breaks into an art gallery through an air vent, takes an unauthorized photograph of a piece of artwork, and then sells that photograph for profit. Realizing a profit, the passerby then decides to sell tools online that are specifically made to break into that same art gallery through the same air vent, so that others too can observe and take photographs of the artwork inside. The artwork remains untouched, yet no reasonable person would take the position that this is consistent with the art gallery's ownership rights.

Finally, Bright Data's argument that it would be unreasonable to block "public search," as discussed above, relies on factual disputes, including the precise manner in which Bright Data's tools operate and interact with X Corp.'s servers. The extent of Bright Data's technological subterfuge to evade X Corp.'s access restrictions is but one factual issue that will bear on whether it unjustly retains the benefit it takes from X Corp. and must be tested in discovery. In similar circumstances, courts have upheld quasi-contract claims for restitution measured by unjust

---

61 Dkt. 36, First Am. Compl. ¶ 70.
62 Dkt. 42, Mot. to Dismiss at 20.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

1   enrichment. *See Meta Platforms, Inc.*, 2022 WL 18806267, at *3 (N.D. Cal. Nov. 15, 2022); *In re*

2   *Clearview AI, Inc., Consumer Priv. Litig.*, 585 F. Supp. 3d 1111, 1131 (N.D. Ill. 2022), clarified

3   on denial of reconsideration, 2022 WL 2915627 (July 25, 2022).

4           **2.      X Corp. Has Sufficiently Pled Unjust Enrichment as an Independent**

5                   **Cause of Action**

6           The Ninth Circuit and other California courts have further recognized unjust enrichment as

7   an independent cause of action. *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th

8   Cir. 2016) (emphasis added) ("We therefore allow the cause of action, as we believe it states a

9   claim for relief as *an independent cause of action or* as a quasi-contract claim for restitution");

10  *LeGrand v. Abbot Laboratories*, 655 F.Supp.3d 871, 898 (N.D. Cal. 2023); *Maisel v. S.C. Johnson*

11  *& Son, Inc.*, No. 21-CV-00413-TSH, 2021 WL 1788397, at *12 (N.D. Cal. May 5, 2021). To allege

12  unjust enrichment as an independent cause of action, a plaintiff must allege that the defendant

13  received and unjustly retained a benefit at the plaintiff's expense. *ESG Capital,* 828 F.3d at 1038.

14          As previously stated, Bright Data has received a benefit in the form of profits from its

15  unauthorized scraping of X Corp. data.[63] This benefit has been obtained at X Corp.'s expense,

16  including hampering the user experience for authorized X users and customers, in addition to time

17  and money spent investigating and mitigating Bright Data's unlawful conduct.[64] X Corp. has

18  therefore properly alleged unjust enrichment, both as a quasi-contract claim and an independent

19  cause of action. Bright Data's Motion should be denied.

20          **D.      X Corp. Has Sufficiently Pled a Claim for Trespass to Chattels**

21          Under California law, trespass to chattels "lies where an intentional interference with the

22  possession of personal property has proximately caused injury." *Thrifty-Tel v. Bezenek*, 46 Cal.

23  App. 4th 1559, 1566 (1996). X Corp. alleged that Bright Data intentionally interfered with X

24  Corp.'s platform and servers and caused injury to X Corp. "in the form of impaired condition,

25  quality, and value of its servers, technology infrastructure, services, and reputation."[65] X Corp.

26  thus has adequately pled a claim for trespass to chattels. Bright Data contends that X Corp. has not

27

28
[63] Dkt. 36, First Am. Compl. ¶ 90.
[64] Dkt. 36, First Am. Compl., ¶ 92.
[65] Dkt. 36, First Am. Compl., ¶ 102.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

established "substantial" intentional interference with its property and thus that X Corp.'s trespass claim should be dismissed.[66]  But Bright Data's argument fails for at least two reasons. First, X Corp. has alleged facts that plausibly suggest both existing interference and threatened future interference from Bright Data's activity, and there has not yet been discovery into the extent of Bright Data's scraping. Second, Bright Data's scraping and its sale of tools to facilitate this scraping by its customers is sufficient to state a claim for trespass to chattels.

First, the quantum of harm necessary to sustain trespass to chattels involving electronic resources is minimal. The claim in *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1564 (1996), was upheld as valid on evidence that "approximately 90" manual telephone calls "consuming roughly 24 minutes of telephone time during the first two days" and 72 calls on a third day "over an almost 16-minute period" was sufficient harm to state a claim. Indeed, the California Court of Appeal has approved nominal damages for such a claim. *Levy v. Only Cremations for Pets, Inc.*, 57 Cal. App. 5th 203, 262 (2020). X Corp. alleges that Bright Data sent large volumes of requests to X Corp.'s servers,[67] and that X Corp. devotes substantial resources to abating the harm caused by such scraping activity.[68] X Corp. also alleges that "Defendant's acts have caused injury to X Corp., and if continued, expanded, and/or replicated unchecked by others, will cause damage in the form of impaired condition, quality, and value of its servers, technology infrastructure, services, and reputation."[69] Accepting X Corp.'s allegations as true, the question is not whether Bright Data interfered with X Corp.'s property, but how much—an issue that can only be resolved once there is an opportunity for discovery.

Second, X Corp. alleges that Bright Data markets and advertises its products to others, who use these tools in the exact manner Bright Data intends them to be used—to scrape X platform data and bypass X platform security features, inundating X Corp.'s servers with countless requests. The California Supreme Court in *Hamidi* recognized that the mere threat of such follow-on harm

---

[66] Bright Data also argues by analogy (and without any legal support) that its actions—which it calls nothing more than a "public internet search"—do not constitute trespass. As explained, Bright Data's scraping and sale of scraping tools is much more than a public internet search.
[67] Dkt. 36, First Am. Compl., ¶ 34.
[68] Dkt. 36, First Am. Compl., ¶¶ 35–38.
[69] Dkt. 36, First Am. Compl., ¶ 102.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

is sufficient to state a trespass to chattels claim. *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1355–57 (2003) (holding that "conduct, if widely replicated, would likely impair the functioning of the plaintiff's system" states a trespass to chattels claim). Bright Data's acts and conduct explicitly consist of data mining, which courts have suggested constitutes an invasion of property rights, including trespass to chattels. *See Craigslist Inc.*, 942 F. Supp. 2d at 976 (finding defendants' unauthorized use of Craiglist's website through automated data mining could constitute trespass to chattel); *Ebay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1070 (N.D. Cal. 2000) (granting preliminary injunction to eBay based on its claim of trespass to chattels predicated on defendant's use of automated "crawlers" to collect info from eBay because "eBay has made a strong showing that it is likely to prevail on the merits of its assertion that [defendant's] use of eBay's computer system was an unauthorized and intentional interference with eBay's possessory interest."); *cf. also hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 n.21 (9th Cir. 2022) ("[I]t may be that web scraping exceeding the scope of the website owner's consent gives rise to a common law tort claim for trespass to chattels, at least when it causes demonstrable harm.").

In short, contrary to Bright Data's claim that its conduct is nothing other than "ordinary" internet usage, X Corp. alleges that Bright Data created tools specifically intended to bypass X Corp.'s security features, used those tools to interact with the X platform in a prohibited manner, "knowingly exceeded the permission granted by X Corp." to access its platform, and encouraged and enabled others to do so. This pleading is sufficient to allege a trespass claim. *See Ebay, Inc.*, 100 F. Supp. 2d at 1070 ("[I]t is undisputed that eBay's server and its capacity are personal property, and that BE's searches use a portion of this property. Even if, as BE argues, its searches use only a small amount of eBay's computer system capacity, BE has nonetheless deprived eBay of the ability to use that portion of its personal property for its own purposes. The law recognizes no such right to use another's personal property. Accordingly, BE's actions appear to have caused injury to eBay and appear likely to continue to cause injury to eBay.")

### E.    X Corp. Has Sufficiently Pled a Claim for Misappropriation

A common law misappropriation claim requires: (1) the plaintiff made a substantial investment of time, effort, and money into creating the thing misappropriated such that the court

can characterize the 'thing' as a kind of property right; (2) the defendant appropriated the 'thing' at little or no cost; and (3) the defendant injured the plaintiff by the misappropriation. *Hollywood Screentest of Am., Inc. v. NBC Universal, Inc.*, 151 Cal. App. 4th 631, 650, 60 Cal. Rptr. 3d 279 (2007). Bright Data appears to challenge only that the data found on X Corp.'s platform constitutes X Corp.'s "property" such that it can be misappropriated.

That X Corp. is not required to claim exclusive "ownership" over the specific misappropriated information is clear from the lengthy history of the tort, which recognizes a proprietary interest in facts that are available to the public. Most famously, the "hot news" application of the tort was established in *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 238–39 (1918), where the Supreme Court recognized that, although the facts underlying the news reports were not the plaintiff's "property," the competitor's tactic of "copying news from bulletin boards and from early editions of complainant's newspapers and selling this, either bodily or after rewriting it, to defendant's customers" nonetheless constituted misappropriation. *Id*. at 231, 239–40 (finding that such conduct is actionable under unfair competition law).

Under California's version of the misappropriation tort, the tort is not limited to "hot news;" it applies more broadly to anything the "plaintiff invested substantial time, skill or money in developing." *U.S. Golf Ass'n*, 69 Cal. App. 4th at 618. In *U.S. Golf Association*, the "property" was a published system and formulas for determining golf handicaps—which was not subject to patent, copyright, trademark, or trade secret protection. *See id.* at 618–19. The formulas were freely available to "any entity …, free of charge, for the purpose of providing handicap computation services or software to any authorized public or private golf club or association utilizing the USGA Handicap System," subject to conditions such as publicly posting scores and peer review of the results. *Id.* at 613. When the defendant took the formulas and built software to provide computational golf handicap services without meeting the conditions, the Court of Appeal found actionable misappropriation. *Id.* at 614–15. The tort has been applied in other contexts as well. In *Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 979–80 (E.D. Cal. 2000), the plaintiff alleged a sufficient interest in concert listing information it collected from public sources and posted online—allowing a misappropriation claim to proceed to discovery on allegations that the

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

defendant copied the data and reposted it. *See also X17, Inc. v. Lavandeira*, 563 F. Supp. 2d 1102, 1103 (C.D. Cal. 2007) (finding a property interest in being the first to publish a photo). In none of these cases was the plaintiff required to show "ownership" beyond the substantial investment of time, skill, or money.

X Corp. has alleged a classic misappropriation under California law. It has invested substantially in developing its platform, including building out its physical infrastructure and attracting the participation of hundreds of millions of members.[70] Bright Data, on the other hand, used automated means—in violation of X Corp.'s Terms—to wrongfully access the X platform, systems and servers and obtain data from the X platform.[71] In other words, Bright Data is free-riding on X Corp.'s investments in the exact manner proscribed by the common law. *See U.S. Golf Ass'n*, 69 Cal. App. 4th at 618. Courts have denied motions to dismiss on almost identical facts. *hiQ Labs, Inc. v. LinkedIn Corp*., No. 17-CV-03301-EMC, 2021 WL 1531172, at *6–8 (N.D. Cal. Apr. 19, 2021) (Denying motion to dismiss where defendant, wrongfully and without authorization accessed plaintiff's website and obtained data, since one company can misappropriate "another's commercial advantage" by misappropriating the "expenditure of labor, skill, and money" of another) (citing *Am. Cyanamid Co. v. Am. Home Assurance Co*., 30 Cal. App. 4th 969, 976–77, 35 Cal. Rptr. 2d 920 (1994)).

## F.   X Corp. Has Sufficiently Pled a Claim Under California's UCL

X Corp's Fifth Cause of Action is also adequately pled under California's UCL. The UCL's coverage is "sweeping," and its standard for wrongful business conduct is "intentionally broad." *In re First Alliance Mortg. Co*., 471 F.3d 977, 995 (9th Cir. 2006). California's UCL "provides a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent." *Backhaut v. Apple, Inc*., 74 F. Supp. 3d 1033, 1050 (N.D. Cal. 2014) (citing Cal. Bus. & Prof. Code § 17200). As shown below, Bright Data has violated all three prongs of the UCL.

First, X Corp. adequately alleges that it "has suffered injury in fact and has lost money or property as a result of the unfair competition." *See* Cal. Bus. & Prof. Code § 17204. "[T]he UCL

---

[70] Dkt. 36, First Am. Compl., ¶¶ 18, 108.
[71] Dkt. 36, First Am. Compl., ¶ 109.

1   only requires a plaintiff to 'demonstrate some form of economic injury' and that there are

2   'innumerable ways in which economic injury from unfair competition may be shown.'" *Brown v.*

3   *Google LLC,* No. 20-CV-03664-LHK, 2021 WL 6064009, at *16 (N.D. Cal. Dec. 22, 2021) (citing

4   *Kwikset*, 51 Cal. 4th at 323.)  Here, the FAC alleges that Bright Data's improper scraping through

5   its proxies interferes with X Corp's own sale of its data through a tiered subscription service.[72]

6   The injury from Bright Data's unfair competition affects the revenue and price at which X Corp.

7   can market these services.

8        Second, Bright Data's actions violate the "unlawful" prong since, as discussed above, they

9   constitute trespass, tortious interference with contract, unjust enrichment, and misappropriation.

10  "[V]irtually any law or regulation—federal or state, statutory or common law—can serve as [a]

11  predicate for [an] ... 'unlawful' [prong] violation." *Randall v. Ditech Fin., LLC*, 23 Cal. App. 5th

12  804, 811 (2018).

13       Third, Bright Data's actions with its proxy and scraping services falls squarely under the

14  "unfair" conduct prohibited by § 17200. For a competitor to bring a claim under the unfair prong

15  of the UCL, the "conduct that threatens an incipient violation of an antitrust law, or violates the

16  policy or spirit of one of those laws because its effects are comparable to or the same as a violation

17  of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 973 P.2d 527

18  (emphasis added). Courts considering the "unfair" prong utilize the "balancing test," which

19  examines if the challenged business practice is "immoral, unethical, oppressive, unscrupulous or

20  substantially injurious to consumers and requires the court to weigh the utility of the defendant's

21  conduct against the gravity of the harm to the alleged victim." *Herskowitz v. Apple Inc.*, 940 F.

22  Supp. 2d 1131, 1145–46 (N.D. Cal. 2013). Here, by illegally scraping X Corp.'s data, Defendant

23  gains an unfair advantage over its competitors who are lawfully purchasing it through the tiered

24  subscription service. This undercuts X Corp.'s pricing and harms the entire market. At a minimum,

25  the proper balancing of the harm to X Corp. against the utility (if any) of Bright Data's conduct

26  "is a question to be resolved at a later stage in this litigation."  *In re Anthem, Inc. Data Breach*

27  *Litig.*, 162 F. Supp. 3d 953, 990 (N.D. Cal. 2016); *see Progressive W. Ins. Co. v. Superior Court*,

28

---

[72] Dkt. 36, First Am. Compl., ¶ 32

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

135 Cal. App. 4th 263, 287 (2005) ("The balancing test . . . is fact intensive and is not conductive to resolution at the demurrer stage.").

And finally, Bright Data's actions also satisfy the "fraudulent" prong of UCL. The FAC alleges that Bright Data was fraudulently sending requests to X Corp.'s servers via proxies and other evasive technologies as it was masquerading as legitimate users.[73] Indeed, Bright Data advertises that customers can "[e]mulate a user in any geo-location with built-in fingerprinting, automate retries, CAPTCHA solving, and more." (Dkt. 36-09 (Ex. I to FAC) at 10.) Bright Data also claims it uses its proxy service to "unblock capabilities"—i.e., not just for anonymization— and this unblocking is key to its service as it is the "future of web scraping."[74] The FAC provides Bright Data with ample notice of the misconduct alleged to violate California UCL. Bright Data's Motion to Dismiss should therefore be denied.

### G. Bright Data's Arguments Relating to "Individual User Account Claims" Lack Merit

Bright Data's characterization of X Corp.'s contract claims (improperly raised in a motion to dismiss) is also confusing and incorrect. X Corp. has not pled any breach of contract claim against individual Bright Data employees, and "dismissal" of unpled claims is not possible. What Bright Data really appears to seek through this convoluted argument is a ruling, on a motion to dismiss, that Bright Data executives' knowledge of the X Terms cannot be imputed onto Bright Data.[75] Bright Data is wrong, both procedurally and substantively. Section 2332 of the California Civil Code states "[a]s against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." Ca. Civil Code § 2332; *see also*, *Trane Co. v. Gilbert*, 267 Cal. App. 2d 720, 727 (1968) ("it is a well established rule in California that the principal is chargeable with, and is bound by the knowledge of, or notice to, his agent"). The individuals named in the FAC are high-level Bright Data corporate executives responsible for the creation, sale, and

---

[73] Dkt. 36, First Am. Compl., ¶¶ 63–64.
[74] Dkt. 36, First Am. Compl., ¶ 45.
[75] Dkt. 42, Mot. to Dismiss at 33–34.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

oversight of the scraping and proxy tools used by Bright Data.[76] Their knowledge of the X Corp.'s Terms is relevant here, and X Corp. will demonstrate, at the appropriate time, that it can be imputed to Bright Data under California law. But to bypass the discovery process, which will shed light onto Bright Data's knowledge and assent of the X Corp. Terms, remains inappropriate.[77]

## IV.    CONCLUSION

For the foregoing reasons, Bright Data's Motions to Dismiss should be denied in its entirety.  To the extent this Court requires additional evidence to evaluate this Motion, X Corp. respectfully requests leave to conduct jurisdictional discovery regarding Bright Data's customers and its California conduct.


Dated: December 27, 2023                Respectfully submitted,


                                        **HAYNES AND BOONE LLP**

                                        By:  */s/ Jason T. Lao*
                                             David H. Harper*
                                             david.harper@haynesboone.com
                                             Jason P. Bloom*
                                             jason.bloom@haynesboone.com
                                             2801 N. Harwood Street, Suite 2300
                                             Dallas, Texas 75201
                                             Telephone: (214) 651.5000
                                             Telecopier: (214) 651.5940
                                             *Admitted Pro Hac Vice*

                                             Jason T. Lao
                                             jason.lao@haynesboone.com
                                             Andrea Levenson
                                             andrea.levenson@haynesboone.com
                                             600 Anton Boulevard, Suite 700
                                             Costa Mesa, California 92626
                                             Telephone: (949) 202-3000
                                             Facsimile: (949) 202-3001

                                             *Attorneys for Plaintiff X Corp.*

---

[76] Dkt. 36, First Am. Compl. ¶ 42–43.

[77] Bright Data's argument should likewise be disregarded because, like much of its Motion to Dismiss, it is based on unpleaded and unproven facts, including the dates, circumstances, intent, and purpose of the individual user accounts and the dates certain personnel began working at Bright Data. *See* Dkt. 42, Motion to Dismiss at 34, n. 2.

X CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:23-cv-03698-WHA

1

## **<u>CERTIFICATE OF SERVICE</u>**

2          I hereby certify that on December 27, 2023, I caused the foregoing to be filed electronically

3    with the Clerk of Court and to be served via the Court's Electronic Filing System upon all counsel

4    of record.

5

6    Dated: December 27, 2023                              **HAYNES AND BOONE LLP**

7

8                                                          By*: /s/ Jason T. Lao*
                                                              Jason T. Lao
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE
Case No. 3:23-cv-03698-WHA