Colin R. Kass (*pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania, Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

Robert C. Goodman (Bar No. 111554)
Lauren Kramer Sujeeth (Bar No. 259821)
ROGERS, JOSEPH, O'DONNELL, PC
311 California Street, 10th Floor
San Francisco, CA 94104
(415) 956-2828
rgoodman@rjo.com
lsujeeth@rjo.com

*Attorneys for Defendant Bright Data Ltd.*
*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X Corp.,<br><br>     Plaintiff,<br><br>    v.<br><br>BRIGHT DATA LTD.<br><br>     Defendant | Case No.  23-cv-03698-WHA<br><br>Time:  January 10, 2024, 8:00 AM<br>Court: Courtroom 12<br>Judge: Hon. William Alsup |

## BRIGHT DATA'S REPLY TO ITS
## <u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

I.     INTRODUCTION. ...............................................................................................1

II.    THE COURT LACKS PERSONAL JURISDICTION OVER X'S TORT
       CLAIMS. ..........................................................................................................1

       A.     Bright Data Did Not Waive Personal Jurisdiction over X's Tort Claims. ...............1

       B.     The Court Lacks Specific Jurisdiction Over X's Tort Claims. ...............................6

              1.     Shopify Controls ...............................................................6

              2.     The Court Cannot Exercise Pendant Jurisdiction. .....................11

              3.     The Court Should Reject X's Request for Jurisdictional Discovery. ........11

III.   X FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE. ...........................12

       A.     X Fails to Allege Breach of any Valid and Enforceable Third-Party
              Contract. ..........................................................................................12

       B.     Offering a Lawful Service is Not Inducement. .......................................15

IV.    X FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT. .................................16

V.     X FAILS TO STATE A CLAIM FOR TRESPASS TO CHATTELS. ...........................18

       A.     X Concedes that It Consented to Receive Server Requests for Public
              Information by Connecting Its Servers to the Public Web. .................................18

       B.     X Fails to Address Bright Data's Point that Public Search is Not
              "Interference." ........................................................................................18

       C.     X Has Not Alleged Substantial Interference. ..........................................19

VI.    X FAILS TO STATE A CLAIM FOR MISAPPROPRIATION. ...................................20

VII.   X FAILS TO STATE A CLAIM UNDER THE UCL. ..................................................24

VIII.  X'S INDIVIDUAL USER ACCOUNT CLAIMS SHOULD BE DISMISSED. ..............25

IX.    CONCLUSION..................................................................................................25

# TABLE OF AUTHORITIES[1]

**Page(s)**

**CASES**

*625 3rd St. Assoc. L.P. v. Alliant Credit Union*,
  633 F. Supp. 2d 1040 (N.D. Cal. 2009) ...................................................................15

*Alexander v. Metro-Goldwyn-Mayer Studios Inc.*,
  2017 WL 5633407 (C.D. Cal. 2017)......................................................................21

*Alexandria Real Est. Equities, Inc. v. RUNLABS Ltd.*,
  2019 WL 4221590 (N.D. Cal. 2019) ...................................................................7, 8

*Amini v. Bezsheiko*,
  2020 WL 1911212 (D. Ariz. 2020)......................................................................7, 8

*Ardente, Inc. v. Shanley*,
  2010 WL 546485 (N.D. Cal. 2010) .........................................................................18

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
  874 F.3d 1064 (9th Cir. 2017) ...............................................................................8

*Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*,
  223 F.3d 1082 (9th Cir. 2000) ...............................................................................7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................10

*Bluestar Genomics v. Song*,
  2023 WL 4843994 (N.D. Cal. 2023) .......................................................................7

*Bostick v. Gen. Motors, LLC*,
  2020 WL 13283478 (C.D. Cal. 2020).....................................................................11

*Briskin v. Shopify, Inc.*,
  87 F.4th 404 (9th Cir. 2023) ........................................................... *passim*

*Byton N. Am. Co. v. Breitfeild*,
  2020 WL 3802700 (C.D. Cal. 2020).......................................................................13

---

[1] Unless otherwise noted, all emphasis added, capitalizations conformed without brackets, and internal citations and quotation marks omitted. Exs. 1-3 refer to the Exhibits to the D. Munkittrick Declaration submitted with opening brief (ECF 42-1). Ex. 4-10 refer to the Exhibits to D. Munkittrick declaration submitted with this brief.

*Cap. Credit All., Inc. v. Lowpay, Inc.*,
  2008 WL 2513692 (D. Nev. 2008) .................................................................................21

*CE Distribution, LLC v. New Sensor Corp.*,
  380 F.3d 1107 (9th Cir. 2004) ......................................................................................11

*Clark-Alonso v. Southwest Airlines Co.*,
  440 F. Supp. 3d 1089 (N.D. Cal. 2020) ...................................................................3, 4, 5

*ConsumerDirect, Inc. v. Pentius LLC*,
  2022 WL 16949657 (N.D. Cal. 2022) ...........................................................................13

*Cont'l Appliances, Inc. v. Thomas*,
  2012 WL 3646887 (N.D. Cal. 2012) ...............................................................................8

*Craigslist Inc. v. 3Taps Inc.*,
  942 F. Supp. 2d 962 (N.D. Cal. 2013) ...........................................................................20

*Creative Realty Partners, Inc. v. Michaelson Real Estate Grp. LLC*,
  2022 WL 16935330 (C.D. Cal. 2022) ...........................................................................8, 9

*CZ Servs., Inc. v. Express Scripts Holding Co.*,
  2018 WL 3972030 (N.D. Cal. 2018) .............................................................................2, 3

*EBay, Inc. v. Bidder's Edge, Inc.*,
  100 F. Supp. 2d 1058 (N.D. Cal. 2000) .........................................................................20

*ESG Capital Partners, LP .v Stratos*,
  828 F.3d 1023 (9th Cir. 2016) ......................................................................................17

*Expeditors Int'l of Washington Inc. v. Cadena*,
  2022 WL 18999841 (W.D. Wash. 2022) .......................................................................11

*Gannett Satellite Info. Network, Inc. v. Rock Valley Cmty. Press, Inc.*,
  1994 WL 606171 (N.D. Ill. 1994) .................................................................................23

*Herbal Brands, Inc. v. Photoplaza, Inc.*,
  72 F. 4th 1085 (9th Cir. 2023) ........................................................................................8

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F. 4th 1180 (9th Cir. 2022) ......................................................................................19

*Hollywood Screentest of Am., Inc. v. NBC Universal, Inc.*,
  151 Cal. App. 4th 631 (2007) ........................................................................................21

*Impossible Foods, Inc. v. Impossible X LLC*,
  80 F. 4th 1079 (9th Cir. 2023) ........................................................................................7

*In re Clearview AI, Inc.*,
  2022 WL 2915627 (N.D. Ill 2023) ................................................................................17

*In re Orange, S.A.*,
    818 F.3d 956 (9th Cir. 2016) ................................................................2

*Intel v. Hamidi*,
    30 Cal.4th 1342, 1351 (2003) .....................................................19, 20

*Jenni Rivera Enters., LLC v. Latin World Entert. Holdings, Inc.*,
    36 Cal. App. 5th 766 (Ct. App. 2019) ................................................13

*Levitt v. Yelp!, Inc.*,
    765 F.3d 1123 (9th Cir. 2014) ..........................................................25

*Levy v. Only Cremations for Pets, Inc.*,
    57 Cal. App. 5th 203 (2020) .............................................................19

*Lu v. Cent. Bank of Republic of China (Taiwan)*,
    610 F. App'x 674 (9th Cir. 2015) ......................................................12

*Maeda v. Pinnacle Foods Inc.*,
    390 F. Supp. 3d 1231 (D. Haw. 2019) ...............................................11

*Maisel v. S.C. Johnson & Son, Inc.*,
    2021 WL 1788397 (N.D. Cal. 2021) ..................................................17

*Manetti-Farrow v. Gucci Am., Inc.*,
    858 F.2d 509 (9th Cir. 1988) ..............................................................3

*Mediterranean Enters., Inc. v. Ssangyong Corp.*,
    708 F.2d 1458 (9th Cir. 1983) ............................................................2

*Meta Platforms, Inc. v. Soc. Data Trading Ltd.*,
    2022 WL 18806267 (N.D. Cal. 2022) ................................................17

*Mishiyev v. Alphabet, Inc.*,
    444 F. Supp. 3d 1154 (N.D. Cal. 2020) (Alsup, J.) ..................12, 13, 14

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
    105 F.3d 841 (2d Cir. 1997) ..............................................................22

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ..........................................................14

*Nunes v. Twitter, Inc.*,
    103 Va. Cir. 184 (Cir. Ct. 2019) .........................................................4

*Pollstar v. Gigmania, Ltd.*,
    170 F. Supp. 2d 974 (E.D. Cal. 2000) ...............................................22

*Progressive W. Ins. Co. v. Superior Ct.*,
    135 Cal. App. 4th 263 (2005) ...........................................................25

*Revitch v. DirecTV, LLC*,
  2018 WL 4030550 (N.D. Cal. 2018) ............................................................2

*Seiferth v. Helicopteros Atuneros, Inc.*,
  472 F.3d 266 (5th Cir. 2006) ....................................................................11

*Sellers v. Bleacher Rep., Inc.*,
  2023 WL 4850180 (N.D. Cal. 2023) ..........................................................14

*Sloan v. Gen. Motors LLC*,
  2019 WL 6612221 (N.D. Cal. 2019) ..........................................................11

*Smith v. Angelica Corp.*,
  2021 WL 4987951 (N.D. Cal. 2021) ..........................................................12

*Smith v. United States Dep't of Agriculture*,
  2016 WL 4179786 (N.D. Cal. 2016) ..........................................................12

*Snapkeys, Ltd. v. Google LLC*,
  2020 WL 6381354 (N.D. Cal. 2020) .....................................................24, 25

*Steiner v. Thexton*,
  48 Cal. 4th 411 (2010) .............................................................................15

*Sun v. Advanced China Healthcare, Inc.*,
  901 F.3d 1081 (9th Cir. 2023) ..................................................................3, 4

*Thrifty-Tel, Inc. v. Bezenek*,
  46 Cal. App. 4th 1559 (1996) .........................................................18, 19, 20

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) .................................................................................15

*U.S. Golf Assn. v. Arroyo Software Corp.*,
  69 Cal. App. 4th 607 (1999) ................................................................21, 23

*Victoria v. Superior Court*,
  40 Cal. 3d 734 (1985) ................................................................................2

*Volkswagen Grp. of Am., Inc. v. Smartcar, Inc.*,
  2022 WL 20184651 (N.D. Cal. 2022) ........................................................20

*Walden v. Fiore*,
  571 U.S. 277 (2014) ...................................................................................7

*Weitzenkorn v. Lesser*,
  40 Cal. 2d 778 (1953) ...............................................................................21

*Wexler v. AT&T Corp.*,
  211 F. Supp. 3d 500 (E.D.N.Y. 2016) ..........................................................2

*WhatsApp, Inc. v. NSO Grp. Techs. Ltd.*,
   472 F. Supp. 3d 649 (N.D. Cal. 2020) ............................................................18, 20

*Whirlpool Corp. v. Cabri*,
   2022 WL 1421126 (D. Del. 2022) ......................................................................11

*Whitfield v. Lear*,
   751 F.2d 90 (2d Cir. 1984)..................................................................................21

*X17, Inc. v. Lavandeira*,
   563 F. Supp. 2d 1102 (C.D. Cal. 2007) ........................................................22, 23

*Yellowcake, Inc. v. Morena Music, Inc.*,
   522 F. Supp. 3d 747 (E.D. Cal. 2021)................................................................22

STATUTES

47 U.C.S. § 230 (Communications Decency Act) ......................................................22

RULES

Fed. R. Civ. P. 9.........................................................................................................24

OTHER AUTHORITIES

Restatement (First) of Restitution § 1 ..................................................................16, 17

Restatement (Second) of Contracts § 69.....................................................................16

Restatement (Second) of Contracts § 206.....................................................................2

## I.    INTRODUCTION.

X says the "substantial focus of this case" is contract.  ECF 47 at 1.  But it larded up its Complaint with a panoply of throwaway tort claims.  Bright Data's motion to dismiss is designed to clear away the brush.  It begins by seeking dismissal of the tort claims for lack of personal jurisdiction.  X tries to save those claims by bootstrapping them to contract through its Terms' forum selection clause.  But the bootstrap fails for the simple reason that X's tort claims do not depend upon any contractual relationship between the parties.  X's attempts to draw some other tenuous connection to the Terms fail because none satisfy the Ninth Circuit's but-for causality test.

X next tries its hand at minimum contacts.  But the Ninth Circuit's *Shopify* decision forecloses that path.  X tries to create daylight between that case and this.  But both involve the alleged unauthorized collection of data from a California plaintiff through a global internet platform.  There is simply no intellectually honest way to avoid dismissal of X's tort claims.  If X doesn't like *Shopify*, the proper route is to accept the dismissal and seek to overturn it on appeal.

But even if this Court reaches the merits, the claims must be dismissed.  Tortious interference fails because X has not alleged that any Bright Data customer breached a valid contract with X.X responds with the equivalent of *res ipsa loquitor*, saying it is enough that Bright Data sold scraping services.  It isn't.  But even if it were, X cannot overcome the Supreme Court's *Twitter* decision that an internet service provider is not secondarily liable for a third-party's misuse of the service.  Conceding that the *Twitter* principle governs, X seeks to avoid it by declaring all scraping inherently illegal.  This too is a meritless *res ipsa loquitor* legal conclusion.

X's unjust enrichment, trespass, misappropriation, and unfair competition claims also fail because they are premised on the mistaken view that scraping is illegal and that a website operator has an inherent right to prevent the public from searching the public web.  That is not the law.

## II.    THE COURT LACKS PERSONAL JURISDICTION OVER X'S TORT CLAIMS.

### A.    *Bright Data Did Not Waive Personal Jurisdiction over X's Tort Claims.*

X accuses Bright Data of nothing more than scraping the public web and offering tools to third-parties to do the same.  X says this is tortious because it interferes with X's *third-party* contracts, trespasses on its servers, and misappropriates content X made available to the world

without password or log-in.  But a contract between Bright Data and X is not an element of these claims.  If Bright Data never had an X account, X's tort claims would not change in the slightest.  This simple, indisputable fact renders X's forum selection clause inapplicable.

X does not dispute that neither Bright Data nor its customers use an X account to scrape X's site.  X nonetheless claims the right to dictate where suit can be brought just because Bright Data once had an X account.  But X cites no case adopting such an expansive view of a forum clause.  As the cases make clear, "no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to [create a user account] would obligate them to [litigate] literally every possible dispute he or she might have with the service provider [in California]…. Rather, a reasonable person would be expressing, at most, an intent to agree to [litigate] disputes connected in some way to the service agreement …."  *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016); *Revitch v. DirecTV, LLC*, 2018 WL 4030550, *14 (N.D. Cal. 2018) (same).  X does not grapple with these cases or the law of reasonable expectations.

Instead, X says there is jurisdictional waiver unless Bright Data carries "the burden of proving the [forum] clause is unenforceable."  P. Br. 7.  This misstates Ninth Circuit law and Bright Data's argument.  The threshold question is not "*enforceability,*" but scope.  While it might be Bright Data's burden to show the clause is unconscionable, X bears the *initial* burden of showing the clause *applies* to the claim.  There is no presumption in favor of broad application.  *In re Orange, S.A.*, 818 F.3d 956, 962 (9th Cir. 2016) (distinguishing arbitration clauses as subject to the FAA).  Rather, the clause must be strictly construed ***against X*** because it is a contract of adhesion.  If there is any reasonable interpretation excluding the tort claims, the court must adopt it.  *Victoria v. Superior Court*, 40 Cal. 3d 734, 739 (1985) ("ambiguities in standard form contracts are to be construed against the drafter"); Restatement (Second) of Contracts § 206 (same).

Here, the most reasonable reading applies the forum clause only to torts that depend on a contractual relationship between the parties.  Under Ninth Circuit law, a forum clause does not apply if the alleged tort "could have been accomplished even if the Agreement did not exist."  *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983).  A claim that "will stand or fall without any reference to the agreements" is not covered.  *CZ Servs., Inc. v.*

*Express Scripts Holding Co.*, 2018 WL 3972030, *2 (N.D. Cal. 2018).   This is a simple but-for test:  Absent a contract, would there still be a tort?

X does not attempt to satisfy this but-for test.  Instead, it advocates for a looser, standardless "connections" test.  That is not correct.  D. Br. 5-6 (citing cases).  For support, X points to *Manetti-Farrow v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988), claiming it broadly applied a forum clause because the tortious interference claim "related to" the contract.  But this misreads *Manetti*, which *limited* forum clauses to disputes involving "*interpretation* of the contract."  There, the allegedly interfered-with contract *was* the contract between the parties with the forum clause.[2]  The claim thus concerned the "rights and duties enumerated in [Manetti's] exclusive dealership contract" and could not "be adjudicated without analyzing whether the parties were in compliance with the contract."  *Id.*  Here, in contrast, X's tort claims depend only on Bright Data operating its own scraping service, not on the existence of any *contract* between the parties.

Undermined by *Manetti's* facts and holding, X says "subsequent case law" narrowed its reach.  P. Br. 7.  But X does not address the many cases Bright Data cited that faithfully applied *Manetti* to even broader forum clauses that cover "any and all dispute[s] … arising out of or relating to the Agreement."  D. Br. 5-6 (quoting cases); *Clark-Alonso v. Southwest Airlines Co.*, 440 F. Supp. 3d 1089, 1094 (N.D. Cal. 2020) (same).  Instead, X points to *Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 108687 (9th Cir. 2023).  But *Sun* reiterated the "causal" connection test; it did not jettison it.  It simply clarified that the but-for test can be satisfied even if the claim does not require "*interpretation*" of the contract.  There, plaintiffs brought a fraud-in-the-inducement claim under state securities law.  Fraud-in-the-inducement, of course, does not require interpretation of the contract.  But it does depend on its existence.  The but-for test was, therefore, satisfied because the claim "***could not have been made without the agreement***."  *Id*.

The proper approach is illustrated by *Southwest Airlines*, 440 F. Supp. 3d at 1092-95.  There, Southwest secretly recorded calls to its call centers.  The plaintiff was a Southwest rewards member, the recorded call occurred on a members-only phone line, and the plaintiff had agreed to

---

[2] The issue was not, as X suggests, "applying the forum-selection clause even to *non-signatories*," (P. Br. 7); it was whether the defendants who were not party to the contract could also *enforce* it.

a forum clause that could not be broader, applying to "any and all matters arising out of or relating to the program…." *Id.* Yet, citing *Manetti*, the court held the clause did not apply as the privacy claim did not require contract interpretation or a "determination" of contractual compliance. *Id.* Then, citing *Sun*, the court rejected Southwest's argument that the plaintiff would not have made the call "but for [his] membership." *Id.* Even if true, the causal connection was "too attenuated" because, while the plaintiff happened to be a rewards member, the claim did "not stem from or require … participation in the program." The but-for test was not satisfied because the claim would be the same regardless of plaintiff's membership. Here, too, none of X's tort claims depend on or would change absent any contract.[3]

> *X's Tortious Interference Claim Does Not Depend on Any Bright Data Contract.* X acknowledges that its tortious interference claim does not depend on the existence of any Bright Data contract, but on the existence of *third-party* contracts. P. Br. 8-9 (citing claim elements). It nonetheless characterizes the (now-terminated) Bright Data contract as "foundational" because it may want to use that fact as "*evidence* of Bright Data's awareness of [both] its contractual obligations and the obligations of other visitors to the X platform." *Id.* That argument is meritless.

X conflates Bright Data's contractual obligations with third-parties' obligations. The former may be relevant to a breach of contract claim, but it has nothing to with tortious interference.[4] Nor can X transform claims relating to third-party contracts into one relating to Bright Data's own contract just because X employs uniform Terms for everyone. Many companies incorporate standard terms and conditions into their contracts. That does not mean that a breach by one customer relates to the company's contracts with every customer. Each contract is

---

[3] X's attempt to distinguish *Nunes v. Twitter, Inc.*, 103 Va. Cir. 184 (Cir. Ct. 2019) falls flat. P. Br. 9. There, the clause did ***not*** apply because the tort claims did not depend on any contractual relationship *among the parties*, but rather on the use of the Twitter platform by Twitter itself and other third-parties. That the plaintiff happened to also have a Twitter account was irrelevant to the claim. So too, X's tort claims have nothing to do with whether Bright Data ever had an X account.

[4] The Court should reject X's attempt to manufacture jurisdiction by pointing to its ***post-litigation*** amendment of the Terms, which introduced a new provision purporting to bar users from "distributing products" that "facilitate" a violation by others. *See* Ex. 1; Exs. 4-7. Aside from not being binding on Bright Data because its account was terminated *before* the amendment, the provision would only be relevant to a contract claim, not a tortious interference claim.

analytically distinct, even if X chooses standardized contracts over individualized negotiations.

Nor can X bridge this analytical gap by speculating that Bright Data might never have learned of the Terms but for its X account.  P. Br. 8-9.  Aside from failing to allege this supposed, incredulous fact, it is irrelevant.[5]  Forum clause coverage is not governed by evidentiary relevancy determinations.  But even if it were, X's claim does not depend on *how* Bright Data learned of the third-party's supposed contractual obligations, just on *whether* it did.  Just like in *Southwest*, where it was happenstance that the plaintiff was a Rewards member, X's desire to introduce Bright Data's account as "evidence" of Bright Data's "awareness" is too attenuated to trigger a waiver.

Nor can X effect waiver by arguing that Bright Data "designed, marketed, and sold its 'Twitter scraper'" while a registered X user.  P. Br. 8.  Temporal *correlation* is not but-for causation.  Billions of events happen at the same time every second, but not all are related.  Nor does X's speculation – that Bright Data "undoubtedly" used its access to X to develop its scraping technology – supply the missing causality.  *Id*.  Aside from being both conclusory and ***unalleged***, it too is irrelevant.[6]  This is not a product design or infringement case; the alleged contractual interference has nothing to do with how Bright Data developed or designed its tools.  X does not allege Bright Data's service would not exist but for a contract with X.  Nor does X allege that third parties would have complied with their contracts if Bright Data had never opened an account.

X gets no further by asserting that a few years ago Bright Data ran a couple Twitter ads, and that it had five tweets last year generically discussing its web scraping services (without discussing X).  FAC ¶¶ 44-45.  If X buys a cup of scalding McDonalds coffee in Texas, the fact that McDonalds advertised on X does not mean the claim must be brought in California.  This is so, even if X saw the ad.  Here, X does not claim that, but for these ads, Bright Data would not have sold its services or that the services would have been different.  Indeed, the connection is

---

[5] The Complaint contradicts X's argument.  X alleges that Bright Data was aware of Terms because several employees had personal accounts.  FAC ¶ 80.  If true, Bright Data's own account (the only one being sued upon) would not even have the evidentiary value X attributes to it.

[6] X misleadingly cites to Paragraphs 42-43 of the Complaint, which simply note that various Bright Data employees had Twitter accounts.  P. Br. 8, n. 26.  X's absurd argument is the equivalent of saying that courts use X to write opinions just because clerks have twitter accounts.

even more attenuated than in *Southwest*.  At least there, the plaintiff would not have been injured had he never signed up for the Rewards Program.  Here, X may speculate that Bright Data may have had fewer customers but for these ads, but it does not allege it.  Nor does it argue its claims depend on these few, sporadic ads.

   *X's Other Tort Claims Do Not Depend on Any Bright Data Contract*.  X's other tort claims also fail the but-for test.  The unjust enrichment claim is expressly brought "in the alternative," as it must be, and applies only "[i]f Defendant's acts are found not to be in breach of contract."  FAC ¶ 88.  By definition, the claim depends not on the existence of a contract, but its absence.  The trespass, misappropriation, and unfair competition claims similarly do not depend on the existence of any contractual relationship. D. Br. 5-6.  X says that the "claims directly relate to the permissions granted in X Corp's Terms," (P. Br. 10), but that argument makes no sense.  X certainly does not say the Terms granted Bright Data "permission" to scrape X.  Nor has Bright Data pointed to the Terms as a source of such consent.  Since neither X's prima facie case nor Bright Data's defense depends on any supposed "permission" granted in the Terms, the Court has no reason to interpret or refer to the contract.  The but-for test is not satisfied.  There is no waiver.

   **B.    The Court Lacks Specific Jurisdiction Over X's Tort Claims.**

      **1.    *Shopify* Controls.**

   X agrees that it must show, separately for each tort claim, that Bright Data committed an "intentional" tortious act "expressly aimed" at California that caused injury in the State.  P. Br. 11. But Bright Data is only accused of providing a global internet service that allows it and its customers to scrape publicly-available information from the web.  Under **controlling** Ninth Circuit precedent, decided just weeks ago, that is not an intentionally tortious act expressly aimed at California.  *Briskin v. Shopify, Inc.*, 87 F.4th 404 (9th Cir. 2023).  In response, X accuses Bright Data of "misreading" *Shopify*.  But X's effort to distinguish *Shopify* just proves it is on all fours.

   *Bright Data's Sales Office and Employees are Irrelevant*.  X concedes that, in assessing jurisdiction, the court must "narrow[] the allegations to the conduct relevant" to the tort claim.  P. Br. 17.  Because "an injury arising out of a defendant's forum contacts requires '**but for**' causation, in which a **direct nexus** exists between a defendant's contacts with the forum state and the cause

of action," allegations of a defendant's "broader business activities in California" are irrelevant. *Shopify*, 87 F.4th at 413-414.

Following this principal, the *Shopify* court excluded allegations of Shopify's California "store that promotes merchant relations," its California "fulfillment center," its partnerships with other California entities, and its own subsidiaries' California presence with a quarter of its US work force. *Id*. Here, in stark contrast, X asks this Court to consider as "sufficient to confer personal jurisdiction" what *Shopify* prohibits – namely, the fact that Bright Data allegedly "established a physical sales office … in downtown San Francisco" and "located key executives in the Bay Area." P. Br. 13. But Bright Data's sales office and its Bay Area employees are "broader business activities," not intentionally tortious acts or a but-for cause of X claims.[7]

*X's Location is Irrelevant*. X next tries to distinguish *Shopify* by claiming that, because X is located in California, Bright Data must have "expressly aimed" its activities in California. But *Shopify* and a long line of controlling cases expressly reject the argument that the *plaintiff's* location matters. D. Br. 9 (citing cases). In *Shopify*, the plaintiff was a California resident physically located in California when Shopify collected his data in California. Did this "California connection matter to the analysis of whether Shopify expressly aimed its activities toward California? *The answer is no.*" 87 F.4th at 415. X offers no reason to disregard this holding.

Instead, X relies on bad law to argue "wrongful conduct targeted at [a California] resident" is enough. P. Br. 13 (citing *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082 (9th Cir. 2000)). In *Walden v. Fiore*, the Supreme Court held that "mere injury to a forum resident is not sufficient." 571 U.S. 277, 278 (2014). Since then, many courts recognize that *Bancroft* is "no longer good law." *Bluestar Genomics v. Song*, 2023 WL 4843994, *21 (N.D. Cal. 2023);

---

[7] Contrary to X's suggestion, *Impossible Foods, Inc. v. Impossible X LLC*, 80 F. 4th 1079 (9th Cir. 2023) does not subject a defendant to suit in every location where it has a sales outpost. There, the defendant had its *principal* place of business and headquarters in California before relocating to Texas, and all the "brand-building activities" at the heart of the trademark dispute occurred "in California" while it was "based" there. *Id*. at 1087. Moreover, even if sales outposts were relevant, Bright Data has not singled out California. The full content of Bright Data's complaint-incorporated website shows sales teams in Texas, Arizona, Washington, New York, New Jersey, North Carolina, California, Pennsylvania, Canada, Israel, China, Brazil, UK, and India. Ex. 7.

*Alexandria Real Est. Equities, Inc. v. RUNLABS Ltd.*, 2019 WL 4221590, \*10 (N.D. Cal. 2019) ; *Amini v. Bezsheiko*, 2020 WL 1911212, \*5 (D. Ariz. 2020) ; *see also Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1070 (9th Cir. 2017) (overruling prior Circuit law deeming "individualized targeting" of a forum plaintiff sufficient to "support … specific jurisdiction").

But even if a plaintiff's residence could be relevant in some cases, it is not relevant in the context of a "a nationally available [internet] platform." *Shopify*, 87 F. 4th at 409.  That was the express holding in *Shopify*.[8]  As X admits, jurisdiction was lacking there because the "plaintiff in *Shopify* could have been anywhere when he suffered the alleged injury, and plaintiffs from anywhere could have brought claims." P. Br. 17.  The same is true here.  Bright Data's services do not depend on where website operators are located.  X could be located in California, Omaha, or Timbuktu.  It makes no difference to Bright Data.  Nor is there anything unique about X.  There are thousands of sites around the world with public data.  Bright Data has not "expressly aimed" its services at wherever those website operators happen to be domiciled.

Nor is there merit to X's argument that because it is a business, its location is more important than the consumer-plaintiff's location in *Shopify*.  P. Br. 17-18.  A plaintiff's location is only relevant to the "injury" prong, not the "express aiming" prong of the "purposeful direction" test applied in *Shopify*.  But even as to the locus of harm, a business's residence is **less** relevant than an individual's because businesses can do business everywhere.  *See Cont'l Appliances, Inc. v. Thomas*, 2012 WL 3646887, \*4 (N.D. Cal. 2012) (doubtful conduct "was truly targeted at California" where the plaintiff corporation "did a worldwide business").[9]

---

[8] Disregarding *Shopify*, X says that, under *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F. 4th 1085, 1093 (9th Cir. 2023), selling "products [in California] via an interactive website" establishes jurisdiction.  P. Br. 11-12.  But *Shopify* **expressly** limited *Herbal Brands* to cases involving the sale of "physical" goods, noting that "the sale of **physical** items through the internet is simply different from other forms of internet activity," and thus, *Herbal Brands* does not apply to claims – like here – attacking the internet activity itself.  87 F. 4th at 422.

[9] X misplaces reliance on *Creative Realty Partners, Inc. v. Michaelson Real Estate Grp.*, LLC, 2022 WL 16935330, \*8-12 (C.D. Cal. 2022).  There, the court applied the "purposeful availment" test applicable to contract-based claims.  That availment test was satisfied because the claim arose out of the parties' "four-year business relationship," the misappropriated customer list was "the byproduct of over 20 years of business in California" and was accessed by defendant only "by

*Bright Data's Services Are Indistinguishable from Shopify's*.  Both this case and *Shopify* involve the alleged unauthorized collection of data from plaintiffs via the Internet.  Yet X tries to distinguish *Shopify* by subjectively labeling Shopify's conduct "*passive*" and Bright Data's as "active."  P. Br. 17.  The Ninth Circuit did not characterize it this way.  It noted that **Shopify** – not third parties – operated the e-commerce platform, collected private information from end-users, connected directly to plaintiff's browser, "installed cookies," generated forms "requiring" plaintiff to reveal private information, and stored this information.  87 F. 4th at 409-10.  Indeed, contrary to X's assertion that Shopify merely received information "supplied by merchants," it was "**Shopify** [that] shared [the information] with its merchant and other business partners," not the other way around.  *Id*.  There is no relevant difference between Shopify and Bright Data.

Even the features of Bright Data's services X highlights are not real differences.  X first says that Bright Data "actively scraped data from … X's servers located in California."  P. Br. 17.  But in *Shopify*, the defendant connected directly to plaintiff's browser in California.  Certainly, there is no difference between a computer browser in California and a server located there.  Nor has X alleged that Bright Data's service works differently based on where a website operator places its own servers.  X also has not alleged that *all* its servers are located in California; that Bright Data knows where they are; or that happenstance of where X might have a server has any bearing on its claim.  D. Br. 13 & n. 9 (citing cases); *Shopify*, 87 F. 4th at 416 (noting that plaintiff's injuries were "personal to him and would follow him wherever he might choose to live").[10]

X next points to the fact that Bright Data's proxy customers can choose the geo-location assigned to the IP address from which a server request will exit Bright Data's network.[11]  P. Br.

---

virtue of his contract and extensive contacts" with the plaintiff.  Here, X does business everywhere, its tort claims are not contract-based, and the availment test does not apply.

[10] In its response, X accuses Bright Data of being "disingenuous in light of the allegations" that it has servers in California.  P. Br. 14 (citing FAC ¶¶ 96, 109).  But the Complaint does not say that "*all*" of X's servers are in California, which was exactly Bright Data's point.  Bright Data could not have expressly aimed its conduct at California if X also has servers elsewhere, since personal jurisdiction cannot depend on where **X chooses** to locate them.

[11] X's unalleged claim that Bright Data "has not offered proxy IP addresses for every state," *see* P. Br. 18, cannot be considered and is contradicted by "full contents" of the documents

18.  But how third parties construct their own searches has nothing to do with *Bright Data's* forum contacts.  As *Shopify* held, "[a]ctions of third parties that the defendant does not control, *even those of the defendant's contractors*, tend to be less reflective of the defendant's own express aiming toward the forum".  87 F. 4th at 420.  Moreover, none of X's tort claims depend on, or are causally connected to, the geo-location of Bright Data's proxies.  X does not allege that California proxies are necessary, superior, or any different than non-California proxies when scraping X's site.  X does not, for example, allege that it only responds to server requests from California IP addresses. It receives and responds to requests from servers and IP addresses around the world.

Finally, X argues that it can escape *Shopify's* clutches because Bright Data sells "products to California residents."  P. Br. 18.  But Shopify had "***80,000***" California merchant-customers, and likely millions of California end-users who transacted on its platform and shared their private information with Shopify.  Indeed, "some of the largest merchants on Shopify's platform [were] California-based companies," and Shopify even "opened a physical office" to better serve them. *Id*. at 410.  In response, X says this case is different because Bright Data had an (unalleged) intent "to cultivate the California market."  P. Br. 17.  But that was true in *Shopify* too.  As the court explained, because cultivating a California market is not a tortious act, it did not matter that California was a "large market," that defendant "benefits" from serving customers there, or that it sought to "expand its access to the California market."  *Id*.  None of that "answer[ed] the purposeful direction question" because Shopify offered its service "nationally" and was ultimately "indifferent to location of the end-users."  *Shopify*, 87 F. 4th at 409, 423.

Here, Bright Data is similarly indifferent to where its customers are located.  As in *Shopify*, "[n]o one has alleged that [the defendant] alters [the operation of its service] based on the location of a given online [customer]."  *Id*.  X's injuries are also unrelated to where Bright Data's customers are located.  If a Bright Data customer in Idaho scrapes Elon Musk's tweets, is X less injured than

---

incorporated into the complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007). Specifically, Bright Data's website shows that Bright Data offers 3,823,862 US proxies (and over 72 million globally) covering "***every city, state, and region in the United States***."  Ex. 8.  While California has a separate page, so does Arizona, Chicago, Delaware, Texas, Florida, Massachusetts, New York, Virginia, Washington, and 23 others.  *Id*.  California is not unique.

if a customer does the same thing from San Bernadino? No. So, the same disconnect – or "butterfly effect" that animated the court's decision in *Shopify* – is in effect here.[12]

### 2. *The Court Cannot Exercise Pendant Jurisdiction.*

As a fallback, X asks the Court to exercise pendant jurisdiction because Bright Data did not challenge jurisdiction over the contract claim. P. 19. This fails for two reasons. *First*, contract claims covered by a forum selection clause cannot be used to bootstrap uncovered tort claims. That would impermissibly rewrite the parties' contract and violate due process. *Whirlpool Corp. v. Cabri*, 2022 WL 1421126, *17 (D. Del. 2022) ("For the court to attempt to broaden the reach of [defendant]'s limited consent to personal jurisdiction through the exercise of its discretionary powers would violate the minimum contacts standard of due process."); *Expeditors Int'l of Washington Inc. v. Cadena*, 2022 WL 18999841, *8 (W.D. Wash. 2022) ("it would be illogical and unfair to extend personal jurisdiction over claims that clearly fall outside its scope").

*Second*, "[i]n the Ninth Circuit, the exercise of pendent personal jurisdiction is inappropriate in a diversity case." *Expeditors*, 2022 WL 18999841, at *8.[13] "Nearly every court" has held that pendent jurisdiction "cannot be exercised by a federal court sitting in diversity." *Sloan v. Gen. Motors LLC*, 2019 WL 6612221, *9 (N.D. Cal. 2019). Here, X does not address the distinction between federal question and diversity cases, but that distinction renders *CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107 (9th Cir. 2004), inapposite. *See Expeditors*, 2022 WL 18999841, at *8 (distinguishing *CE Distribution* as it was a federal question case).

### 3. *The Court Should Reject X's Request for Jurisdictional Discovery.*

---

[12] *Shopify* negates personal jurisdiction over all of X's tort claims. But the Court separately lacks personal jurisdiction over X's tortious interference claim because X failed to allege any *inducement* aimed at California. D. Br. 12-13. X does not respond to this point. Moreover, if X could establish personal jurisdiction for some portion of its tort claims, California courts do not have personal jurisdiction over claims relating to non-California customers or activities involving non-California servers or proxies. *Id.* 13-14. X does not respond to this point either.

[13] *See also Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 n.6 (5th Cir. 2006) ("no such thing as supplemental specific personal jurisdiction"); *Bostick v. Gen. Motors, LLC*, 2020 WL 13283478, *4 (C.D. Cal. 2020) ("pendant personal jurisdiction depends on … a federal claim on which Plaintiffs can 'hook' the state claims"); *Maeda v. Pinnacle Foods Inc.*, 390 F. Supp. 3d 1231, 1247 (D. Haw. 2019) ("pendent jurisdiction is inapplicable absent a federal claim").

In a last-ditch effort to stave off dismissal, X asks for jurisdictional discovery with a vague assertion that it may "aid the Court in its jurisdictional inquiry." P. Br. 19. But jurisdictional discovery is not appropriate for facial challenges like Bright Data's. *Lu v. Cent. Bank of Republic of China (Taiwan)*, 610 F. App'x 674, 675 (9th Cir. 2015) (defendants "mounted a facial attack on [plaintiff]'s jurisdictional allegations, so further discovery was not relevant to the motion."); *Smith v. United States Dep't of Agriculture*, 2016 WL 4179786, *5 (N.D. Cal. 2016) (same). Nor does X meet its burden to show how jurisdictional discovery "would create a reasonable probability that the outcome" of Bright Data's motion would change. *Smith v. Angelica Corp.*, 2021 WL 4987951, *3 (N.D. Cal. 2021). Again, *Shopify* controls. There, the court denied discovery because the plaintiff could not "explain[] .... how [discovery] would change the result of this case" in light of the jurisdictional defects "endemic to the nature of [plaintiffs'] claims and *Shopify's* business structure." 87 F.4th at 424. The same is true here.

## III.   X FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE.

### A.   *X Fails to Allege Breach of any Valid and Enforceable Third-Party Contract.*

X's tortious interference claim must be dismissed because X has alleged neither third-party breach nor that Bright Data's scraping customers are contractually bound to X. D. Br. 6-7. X's only response is that it has no such obligation, or if it does, it is satisfied by operation of law. Neither argument has merit.

***X Must Identify Third-Parties Subject to a Valid Contract, Not Just that Bright Data has Scraping Customers.*** X admits that a tortious interference with contract claim requires "a valid contract between plaintiff and a third-party." P. Br. 20. X says it alleged this by identifying "the specific contractual rights that are at issue [when it quoted] X Corp. Terms." P. Br. 20. But this does not establish the existence of a contract with any third party, only the existence of X's Terms.

X cites no case where quoting standardized terms sufficed to identify a third-party wrongdoer. Nor does X distinguish the many cases Bright Data cited dismissing tortious interference claims for failure to identify such a person. D. Br. 14-15. Indeed, X cites with approval this Court's dismissal of a claim where the plaintiff only alleged he had "many subscribers" but "fail[ed] to identify any contract [with] a third party." *Mishiyev v. Alphabet, Inc.*,

444 F. Supp. 3d 1154, 1156 (N.D. Cal. 2020) (Alsup, J.).  *Mishiyev* is dispositive.

Instead of grappling with this law, X cites two inapposite cases.  P. Br. 20.  Both involved a "finite" group of identifiable, though unnamed third-parties.  In *Byton N. Am. Co. v. Breitfeild*, 2020 WL 3802700, *6 (C.D. Cal. 2020), the defendant improperly solicited plaintiff's employees, who then "began working" for the plaintiff.  The court found that, though unnamed, these high-level employees did have "valid employment … agreements."  In *ConsumerDirect, Inc. v. Pentius LLC*, 2022 WL 16949657, *4 (N.D. Cal. 2022), the defendant similarly improperly "sought out" a "finite" group of plaintiff's "clients and told them to 'stop doing business' with" the plaintiff.  There, however, the plaintiff did not need to allege a valid contract, because it merely brought a tortious interference with contractual *relations* claim, not "tortious interference with *contract*," as here.  The difference is crucial because the former focuses solely on defendant's conduct, while the latter also requires third-party wrongdoing.  *See Jenni Rivera Enters., LLC v. Latin World Entert. Holdings, Inc.*, 36 Cal. App. 5th 766, 782 (Ct. App. 2019).  It is that element that X fails to plead.  X may have pled that Bright Data sold scraping tools; but it has not alleged that its customers breached *their* contracts with X.[14]

X does not dispute that it failed to identify any such third-party.  Instead, it says it should be excused from doing so because "Bright Data keeps the identities of its customers private."  P. Br. 21 n.48.  But X cannot save its deficient pleading by arguing that discovery might allow it to cure the defect.  Discovery is not a fishing expedition for suspicious plaintiffs to investigate whether they have a plausible claim.  Nor does lack of information excuse a pleading deficiency.  So, X's speculation that Bright Data's customers may have X accounts does not survive *Twombly*.

*X Cannot Satisfy Its Obligation to Plead a Valid Third-Party Contract by Arguing that the Entire World is Bound to Its Terms.*  Unable to identify a breach of a valid contract with a third-party, X relies on *res ipsa loquitor*.  It says that everyone who visits X's website (including anyone who scrapes it using Bright Data's tools) is automatically bound by contract.  But that is

---

[14] X tries to gloss over its pleading defect by stating, without citation, that "Bright Data does not dispute that it has sold scraping tools to X users who are bound by [the] Terms."  P. Br. 21.  Bright Data made no such concession.

not a factual allegation, it is a legal theory that cannot be accepted as true.  This Court rejected the same argument in *Mishiyev*, explaining that, "[t]o the extent the complaint alleges that a contractual relationship arose between plaintiff and his subscribers based on the advertisement revenue the subscribers generated …, this is a legal conclusion we need not accept as true."  444 F. Supp. 3d at 1161.  Here too, X's argument – that every person who ever typed "twitter.com" into a browser is contractually tied to X – cannot be accepted as true.

In response, X says it has two types of visitors: "registered" and "unregistered."  Registered users, X says, are bound by clickwrap because they have an account and "expressly consent[ed]" to the Terms.  P. Br. 21.  But X does not allege that Bright Data's customers must have an X account or be "registered" X users to scrape X's website.  So, X cannot invoke *res ipsa loquitor* by pointing to its registered users.  To invoke the doctrine, X would also have to show that all unregistered visitors to X's website are also bound to the Terms.  But it cannot do so for at least two reasons.

*First*, X has not alleged that all unregistered visitors were on constructive notice that they were bound to the Terms just by visiting the site.  Constructive notice is an objective question of law often decided on threshold motion practice.  *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014).  X concedes this question turns on the "visual layout of the Terms." P. Br. 21.  But the Complaint is devoid of any constructive notice allegations, so the Court cannot conclude that every visitor is contractually bound as a matter of law.  And even if the Court were to take judicial notice of X's website, it only says that "***[b]y signing up***, you agree to the Terms of Service."[15]  This suggests to any reasonable person that by not signing up, there is no agreement.

X's only response is that the Court cannot address this issue at the pleading stage.  But the case X cites undermines its contention.  In *Sellers v. Bleacher Rep., Inc.*, 2023 WL 4850180 (N.D. Cal. 2023), the defendant sought to invoke the terms' class action waiver, so it had the burden to show the plaintiff had constructive notice.  After taking judicial notice, the court found such notice lacking.  Here, the roles are reversed.  Unlike in *Sellers*, X bears the burden of alleging constructive

---

[15] Exs. 9-10.

notice to properly plead a *res ipsa loquitor* theory of third-party contract.  It has not done so.

Second, even if every unregistered visitor had constructive notice of the Terms, that does not mean they are legally bound.  A contract must still be "valid."  As Bright Data explained, X's browser-wrap Terms are not supported by consideration because the public has the right to search for and use the public Internet.  Because visitors need not enter into a contract with X to visit X's site, or even to scrape information from it, a contract that purports to entitle them to do what they are otherwise "lawfully entitled" lacks consideration and is not valid.  D. Br. 17-18; *Steiner v. Thexton*, 48 Cal. 4th 411, 420 (2010).  In response, X just asserts that "it provides [unspecified] services."  P. Br. 22.  But this is conclusory and does not identify anything that a visitor cannot do without a contract.  Bargained-for consideration is lacking.

### B.    Offering a Lawful Service is Not Inducement.

In *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), the Supreme Court established a simple rule:  a provider of internet services with legitimate uses is not secondarily liable for a third-party's misuse of the service.  This is so even if the service provider has actual knowledge of the misuse.  As Bright Data explained, this principle disposes of X's tortious interference claim because Bright Data's scraping services have legitimate uses.  D. Br. 19.  In response, X does not dispute the *Twitter* principle or its application to tortious interference claims.[16]

Instead, X makes an even broader *res ipsa loquitor* argument, asserting that Bright Data's services "can **only** be used for illicit purposes."  P. Br. 21.  As an initial matter, that argument is demonstrably false and inconsistent with the Complaint, which specifically alleges that Bright Data's services can be used to scrape other sites as well, such as Meta, Amazon, and others.  FAC ¶¶ 6, 50.  Indeed, even X admits that Bright Data offers "general scraping tools."  P. Br. 4.  X does not attempt to prove that all scraping is illegal or that those uses are unlawful.  So, the fact that some customers might use them to scrape X runs headlong into the *Twitter* principle.

---

[16] *625 3rd St. Assoc. L.P. v. Alliant Credit Union*, 633 F. Supp. 2d 1040 (N.D. Cal. 2009), does not support X's argument that it need only allege that Bright Data sold improperly-used tools.  There, the defendant ran plaintiff's business into the ground to force liquidation.  The conduct had no legitimate purpose.  That case has nothing to do with the bedrock principle that a person who sells a product with legitimate uses does not, by that act alone, induce a breach when it is misused.

Recognizing this, X narrows its claim to the four Bright Data products with the word "Twitter" in the name. P. Br. 23. As to these products, X faults Bright Data for "not explain[ing] how [they] can be used without violating X Corp.'s Terms." *Id*. But this just rehashes X's flawed *res ipsa loquitor* argument that everyone who visits X becomes contractually bound. If there are Bright Data customers without a valid contract with X, the sale of scraping tools – even those with Twitter in the name – is nothing more than the sale of a lawful web service, with the potential for third-party misuse. Accordingly, unless this Court is willing to hold, on this motion, that every person in the world who ever visited X's site is contractually bound to X or that all scraping is illegal, the *Twitter* principle requires dismissal of X's tortious interference claim.

## IV.   X FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT.

X acknowledges that its "unjust enrichment" claim is actually a claim under "quasi-contract." P. Br. 24. But as Bright Data explained, X's quasi-contract claim fails because X does not own the information Bright Data scraped and has no independent legal right to prevent Bright Data from exercising its right to search the public web.[17]  D. Br. 19-20.

In its response, X does not identify any independent legal right to block Bright Data from searching publicly available information. Instead, it *avoids* the issue by claiming that the "relief sought by X Corp. is not on behalf of the whole of the Internet," but just "activity specific to the X platform." P. Br. 25. That is a non sequitur. Of course X is not suing to prevent scraping of, say, Google or Amazon. But that does not mean it has an extra-contractual right to prevent Bright Data and everyone else in the world from searching information that X *does not own* and has chosen to make publicly available. If X wants to enforce quasi-contractual rights, then it must have an independent basis, other than quasi-contract itself, to block access to the information.

X does not seriously disagree. It does not point to *any case* that did not involve property

---

[17] A quasi-contract claim falls under § 69(2) of the Second Restatement of Contracts, in which X must show that Bright Data acted "inconsistent with [X's] *ownership* of offered property" and that enforcement of the Terms would not be "manifestly unreasonable." Restatement (Second) of Contracts § 69(2). X does not address § 69(2), but instead cites § 1 of the Restatement (First) of Restitution. P. Br. 24. Section 1, however, just speaks to general principles of restitution and unjust enrichment, not quasi-contract. Regardless, X claim fails even under § 1.

independently protected by law.[18]   Instead, X takes issue with Bright Data's analogy, and substitutes its own.  But both analogies prove Bright Data's point.  Bright Data posited a street fair vendor who displays artwork for all to see and enjoy.  That may confer a benefit on passersby, but there is no claim because the vendor has no independent legal right to prevent anyone taking a gander.  *See* Restatement (First) of Restitution, § 1 cmt. c. ("[o]ne who improves his own land ordinarily benefits his neighbors to some extent" but is not "entitled to restitution").

Even X agrees that, in this context, there would be no quasi-contract claim.  But it says it would be more "apt" to imagine someone who "breaks into an art gallery through an air vent [to] photograph [the] artwork."  P. Br. 25.  But, in this hypothetical, the law of trespass (and perhaps copyright, or breaking and entering) provides an independent basis to prevent the recording.  Here, X does not bring a claim under Copyright or the Computer Fraud and Abuse Act, the modern analog of breaking and entering.  And its trespass claim fails for reasons discussed below.  Instead, X only alleges that Bright Data has surfed the Internet, which is no different from a public sidewalk.  There is no unjust enrichment.

Nor can X get around its lack of ownership by pointing to the technological measures it uses to disrupt public search.  X, of course, is free to direct its own servers to respond, or not respond, to any server request it receives.  But these lines of code do not strip the public of its right to search the Internet when those measures fail.  A homeowner may erect an obstacle on a public sidewalk to hinder access, but it does not mean that she owns the sidewalk.[19]

---

[18] *Meta Platforms, Inc. v. Soc. Data Trading Ltd.*, 2022 WL 18806267 (N.D. Cal. 2022), and *In re Clearview AI, Inc.*, 2022 WL 2915627 (N.D. Ill 2023), are inapposite.  *Meta* was a non-adversarial default judgment, did not address the ownership issue, and did not involve ***public*** information.  *Clearview* involved biometric information *independently* protected by California law.

[19] Unable to satisfy the elements of a quasi-contract claim, X argues that some courts have "recognized unjust enrichment as an independent cause of action."  P. Br. 26.  But its cases do not support that contention.  *ESG Capital Partners, LP .v Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) recognized the split of authority but declined to resolve it because the allegations stated a claim under either approach.  In *Maisel v. S.C. Johnson & Son, Inc.*, 2021 WL 1788397 (N.D. Cal. 2021), the court just followed *ESG* and did not address the distinction between quasi-contract and an independent unjust enrichment claim.  In any event, the outcome is the same.

## V.      X FAILS TO STATE A CLAIM FOR TRESPASS TO CHATTELS.

### A.      *X Concedes that It Consented to Receive Server Requests for Public Information by Connecting Its Servers to the Public Web.*

X's trespass claim must be dismissed because X consented to receive server requests when it voluntarily connected its servers to the Internet.  D. Br. 23-25.  As Bright Data explained, when a person participates in a group endeavor – such as a communications network – it necessarily consents to activities normally associated with it.  *Id*.  X does not deny that consent "dooms a trespass claim," and that such consent can be "manifested by action or inaction."  *Id*.  Nor does it deny that X granted consent when it chose to "participate in a worldwide communications network, known as the World Wide Web."  *Id*.  In fact, X does not respond to Bright Data's consent argument at all.  It has, therefore, conceded the point.  *Ardente, Inc. v. Shanley*, 2010 WL 546485, *6 (N.D. Cal. 2010) (failure to "respond to [an] argument … concedes it through silence.").

### B.      *X Fails to Address Bright Data's Point that Public Search is Not "Interference."*

The Internet is a communication network in which computers and servers interact to request and receive information.  When that happens, there is ***at most*** use of another's property for its intended purpose, not "*interference*" with it.  Because Bright Data is only accused of making server requests for the purpose of requesting and receiving information, X has failed to allege interference, let alone "substantial" interference.  D. Br. 25-26.

X does not address the distinction between *interference* with X's servers and ordinary-course requests for information.  Instead, it assumes that *any* request not expressly permitted by the Terms causes interference.  But courts say otherwise.  *WhatsApp, Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649, 684-85 (N.D. Cal. 2020) (dismissing trespass claim where "defendants' program was reliant on WhatsApp's servers to function exactly as intended").  X has no response. It doesn't distinguish *WhatsApp* or explain why scraping does not fall within the ordinary usage of the Internet.  Indeed, if scraping constituted interference, then Google, Bing, Yahoo, ChatGPT, and even X's own AI bots would not exist.  Wide swaths of the Internet could be shut down by website operators seeking to assert dominion over it.

X's own cases undermine its position that there is no difference between use of a communications network to communicate, and intentional acts ***designed*** to *disrupt* it.  In *Thrifty-*

*Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559 (1996), the defendants "hacked" into plaintiff's phone network by "crack[ing] plaintiff's access and authorization codes and to make long distance phone calls" without paying for them.  The defendants' purpose was *not* to use the phone network to *communicate* with the plaintiff, but to use plaintiff's phone lines instead of their own.  X alleges nothing of the sort.  It only alleges that Bright Data requested and received information through the Internet.  That is not interference.

### C.     X Has Not Alleged Substantial Interference.

Even if public scraping could constitute interference, X has not alleged "*substantial*" interference.  X does not deny that it failed to allege actual injury.  It does not, for example, say that Bright Data caused any outage or server failure, that X had to turn away other users, or that Bright Data's requests took up a significant percent of X's virtually unlimited server capacity.

Instead, X says it need only show "minimal" harm because the court can award "nominal" damages.  P. Br. 27-28.  Not so.  In *Intel v. Hamidi*, the California Supreme Court rejected Intel's claim against a spammer because Intel's email system continued to "work[] as designed, delivering the messages without any physical or functional harm or disruption."  30 Cal.4th 1342, 1351, 1360 (2003).  As the court explained, the "interest of a possessor of a ***chattel*** …, unlike the similar interest of a possessor of *land*, is not given legal protection by an action for ***nominal*** damages for ***harmless intermeddlings*** with the chattel."  *Id*.  X cite no case to the contrary.[20]

Instead, X seeks to confine *Intel* to its facts, saying it does not apply if the challenged conduct could be "replicated" by others.  But *Intel* did not say this.  To the contrary, it said a trespass claim requires "proximately caused injury."  30 Cal.4th at 1357.  Certainly, Bright Data is not liable for the actions of all scrapers out there.  Actions by independent third parties break the proximate causal chain, so the possibility of replication by others does not cure deficient allegations of defendant's own conduct.  Indeed, *Intel*'s discussion of the threat of replication only

---

[20] *Levy v. Only Cremations for Pets, Inc.*, 57 Cal. App. 5th 203, 262 (2020) is inapposite.  There, the defendant crematorium sent back random ashes, permanently dispossessing the plaintiffs of their own dogs' ashes.  This substantially interfered with plaintiff's property, despite the inability to value the loss.  X also misplaces reliance on *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F. 4th 1180, 1201 n. 21 (9th Cir. 2022), which specifically required "*demonstrable harm.*"

arose in connection with its effort to distinguish and **curtail** *EBay, Inc. v. Bidder's Edge, Inc*., 100 F. Supp. 2d 1058 (N.D. Cal. 2000), which adopted a more expansive view of injury.  As the *Intel* court explained, *Ebay*'s view, that mere use of server capacity sufficed, would "not be a correct statement of California law or general American law."  30 Cal.4th at 1357.

X next points to *Thrifty-Tel*, 46 Cal. App. 4th at 1564, characterizing the harm there as "minimal."  But as noted, defendants hacked plaintiff's phone lines to make long distance calls at plaintiff's expense.  More importantly, the harm was ***not*** minimal.  The plaintiff made "over one thousand three hundred calls" during a sustained "six or seven hours" period, and because the plaintiff was a "small" business, defendants' conduct "overburdened the [plaintiff's] system, denying some subscribers access to phone lines."  *Id.*  This, the court, held, sufficed.  *See also Intel*, 30 Cal. 4th at 1357 (distinguishing *Thrifty-Tel* on this basis).  X makes no such allegation.

Finally, X says that the Court cannot assess the sufficiency of its injury allegations at the pleading stage, citing *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 981 (N.D. Cal. 2013).  But so holding would render the substantial interference element of the claim immune from *Twombly*'s pleading requirements.  In *Craigslist*, the court held that the plaintiff had plausibly alleged substantial disruption.  In *WhatsApp*, this Court distinguished *Craigslist* on this basis, and then dismissed a scraping claim at the pleading stage because the plaintiff had "not alleged that any WhatsApp customer was deprived or denied access to the WhatsApp system."  472 F. Supp. 3d at 686; *see also Volkswagen Grp. of Am., Inc. v. Smartcar, Inc.*, 2022 WL 20184651, *9 (N.D. Cal. 2022) (allegations that "'unauthorized access has and will … burdening [plaintiff's] Networks … are too vague and generalized to plausibly state measurable harm.").  The same is true here.

## VI.    X FAILS TO STATE A CLAIM FOR MISAPPROPRIATION.

X's misappropriation claim fails for the simple reason that there is no misappropriation when one person sends a server request for *public* information and the receiving party's server voluntarily responds with public information that the website operator does not own.  D. Br. 29-31.  This defeats both the property and consent elements of the claim.  In response, X addresses only the property element, waiving the consent point and requiring dismissal on that basis alon.  As to the property point, it says it has a legally protectable interest in literally "anything" that it

invested resources in developing.  P. Br. 29.  That is not the law.

"Under California law ... misappropriation ... claims are actionable only to vindicate legally protected ***property*** interests."  *Alexander v. Metro-Goldwyn-Mayer Studios Inc.*, 2017 WL 5633407, *6 (C.D. Cal. 2017); *Whitfield v. Lear*, 751 F.2d 90, 92 (2d Cir. 1984) (citing *Weitzenkorn v. Lesser*, 40 Cal. 2d 778, 789 (1953)).  Here, X does show any property interest in the data Bright Data allegedly scraped.  Instead, it says investment of resources is enough to <u>*create*</u> a property interest out of thin air.  P. Br. 29.  Its cases do not support that view.  Indeed, *U.S. Golf Assn. v. Arroyo Software Corp.*, 69 Cal. App. 4th 607, 610, 618 (1999), says the opposite.  It found the claim's first element – that plaintiff showed investment in "***its property***" – satisfied because the plaintiff had "developed <u>***and owned***</u>" the golf handicap formulas and service marks at issue.  *Id*.  Nothing in *U.S. Golf* suggests that investment creates property.

Nor does *Hollywood Screentest of Am., Inc. v. NBC Universal, Inc.*, 151 Cal. App. 4th 631 (2007), support X's position.  There, addressing intangible property, the court said the plaintiff must show that the misappropriated "thing" is "a kind of property right."  *Id*.  But it did not say that investment alone is enough.  Indeed, it declined to address whether the "thing" at issue "should be considered property" because the claim failed for other reasons.  *Id*.  Subsequent decisions are clear, however: investment is not enough.  *Cap. Credit All., Inc. v. Lowpay, Inc.*, 2008 WL 2513692, *2 (D. Nev. 2008) (rejecting misappropriation of business information claim because "[w]hile Plaintiffs have no doubt invested substantial 'time, effort and money' into their business, … Plaintiffs have not and cannot acquire a common law *property* right in their business.").

Indeed, the concept that investing in a "thing" creates a property interest is absurd.  If a person lends a hand raking his neighbor's leaves, he doesn't become part owner of the house.  Similarly, if Barnes & Noble opens a new location, the law of trespass may protect the store and the law of conversion may protect its own inventory.  But misappropriation law doesn't give it an "ownership" interest in authors' creative works that line the bookshelves.  Here too, the fact that X spent money building its platform does not give it ownership in all the information on it.

The vast bulk of the information on X concerns user-generated content, which is the creative work of X's users, not X.  This precludes any misappropriation claim for *five* separate

reasons.  *First*, any such claim is pre-empted by copyright.  *See* D. Br. 30 n. 18 (citing cases).  X fails to respond to this point.  *Second*, X has not claimed investment in the creation of user-generated content; it only alleges investment in its platform, which is not the alleged misappropriated property.  *Third*, X expressly disclaimed all ownership interest in its users' content, telling them "what's yours is yours."  D. Br. 30.  X's response – that it is not "required to claim exclusive 'ownership,'" *see* P. Br. 29 – misses the point because it hasn't alleged any ownership.  *Fourth*, at most, X claims a right as a *publisher* of its users' content.  And even that is dubious because Section 230 of the Communications Decency Act strips X of the right to sue or be sued as a publisher.  *See* 47 U.C.S. § 230 ("No provider … of an interactive computer service shall be treated as the publisher … of any information provided by another….").  But even if X could sue as publisher or distributor, its contractual publishing or distribution rights are not "*property*;" they are contract rights subject to *license* between X and its users.  Ex. 1, 2. Interference with contract rights may be protected by other law, but they are not covered by misappropriation.  *Fifth*, even if publishing and distribution rights were "property," such rights have not been misappropriated.  X can continue to publish tweets and other user content on its site.

Beyond user-generated content, X similarly fails to identify any misappropriated information not subject to copyright pre-emption.  *See Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997) (misappropriation claim for re-publication of basketball statistics pre-empted); *Yellowcake, Inc. v. Morena Music, Inc.*, 522 F. Supp. 3d 747, 773 (E.D. Cal. 2021) (rejecting misappropriation claim where plaintiff failed to identify anything that would fall outside the scope of copyright pre-emption.).  Pre-emption aside, X's attempt to show "ownership" for any non-user public content under the hot news doctrine also fails.  Under this doctrine, if not pre-empted, a content *creator* can bring a misappropriation claim if the public "information is highly time-sensitive;" the defendant "is in direct competition with" the plaintiff; it has "free-rid[en] on plaintiff's costly efforts;" and such free-riding would "reduce the incentive of [the plaintiff] to produce the product [such that] its existence or quality would be substantially threatened."[21]

---

[21] *Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 977-80 (E.D. Cal. 2000); *X17, Inc. v.*

Here, X does not identify any misappropriated "time sensitive" information. Nor does it claim its incentives to invest in its platform or even create its own information have been reduced due to Bright Data's scraping, or that Bright Data has "free-ridden" on X's efforts when it searches the public web for public information. Indeed, in hot news cases, the information is generally copied and sold in an unaltered, non-transformative form. Here, X does not allege that Bright Data cloned the X platform or that it copied any datasets appearing on X's website. Instead, Bright Data is accused only of looking up public information on X's site, and compiling selected information into data tables. That is not free-riding. That is Bright Data's own creative endeavor based on Bright Data's own investment in its tools and technologies. It is no different than if a reporter manually looked up information on X and reported it in its own news articles. The source of the information may originate on X's site in both cases, but neither case fits the hot news doctrine.

Indeed, the hot news doctrine – which has its roots in unfair competition – was never designed to eliminate competition over the sale and use of public information. Instead, it balances the need to protect the incentive to create information with the desire to encourage competition in its dissemination. In the case of time-sensitive data, where information can be "scooped" before the creator has a chance to distribute it, that balance tips in favor of conferring a *limited-in-time* protection to encourage the news creation. It was never designed – as X seeks to do here – to provide protection in ***perpetuity*** for information that it has chosen to make public. *Gannett Satellite Info. Network, Inc. v. Rock Valley Cmty. Press, Inc*., 1994 WL 606171, \*5 (N.D. Ill. 1994) (no misappropriation where "defendant's use of the quoted material occurred only after plaintiff had already published its newspaper articles"). Nor is such protection necessary. If X didn't want the information to enter the public domain, all it had to do was put it behind a log-in screen.

---

*Lavandeira*, 563 F. Supp. 2d 1102 (C.D. Cal. 2007). Recognizing that the hot news doctrine does not apply, X argues that California's misappropriation law is "not limited to hot news." P.Br. 29. But both *Pollstar* and *X17* applied the traditional hot news doctrine. In *Pollstar*, the plaintiff "created and developed up-to-the-day time sensitive concert information." In *X17*, the traditional hot news doctrine applied to recent plaintiffs' celebrity photographs used in gossip blogs. And, in *U.S. Golf*, the court merely noted that, under California law, the parties need not be "direct competitors," but it did not jettison the other elements. 69 Cal. App. 4th at 614.

## VII.   X FAILS TO STATE A CLAIM UNDER THE UCL.

As Bright Data explained, X's UCL Claim fails because the UCL does not render scraping illegal under any of its three prongs.  D. Br. 31.

*The UCL Bootstrap Claim Fails*.  As to the unlawful prong, X concedes that its claim fails if its other claims fail.  P. Br. 31.  That is, this prong does not independently make scraping illegal.

*The UCL Fraud Claim Fails*.  X does not dispute Rule 9(b) applies to the UCL fraud prong.  Nor does X attempt to satisfy that rule by alleging any specific fraudulent statement.  It also fails to cite any case holding that either scraping, or the use of a proxy network, is inherently fraudulent.  As Bright Data explained, the UCL does not take away the right to anonymously search the internet because internet users have no duty to disclose their identities.  D. Br. 32.  X's only response is that Bright Data's service is "not just for anonymization" but to overcome X's efforts to block Bright Data's search.  But in the cat-and-mouse game between a website operator's efforts to block public search and the public's efforts to engage in that search, the UCL does not pick sides.  If there is no fraudulent statement, there is no UCL fraud claim.

*The UCL Unfair Competition Claim Fails*.  Bright Data noted in its opening brief that X did not bring a claim under the UCL's "unfair competition" prong.  D. Br. 31.  In response, X improperly attempts to amend the complaint through argument.  But even if that were permitted, the claim fails because scraping is not "an incipient violation of an antitrust law."  P. Br. 31  Scraping creates or increases competition in data markets; it does not eliminate or harm competition.  Indeed, X seeks to invoke the UCL not to encourage competition, but to preserve its own monopoly over data it does not own.  *Id*.  The UCL will not aid X in this effort because the UCL only reaches conduct that "*significantly* threatens or harms competition;" meaning that there must be "harm to the competitive market as a whole, and not just to a competitor."  *Snapkeys, Ltd. v. Google LLC*, 2020 WL 6381354, *3 (N.D. Cal. 2020).  Here, X does not allege that Bright Data has market power or that its conduct *prevented* competition.[22]

---

[22] Nor can X overcome the deficiency by arguing that Bright Data "gains an unfair advantage over its competitors who are lawfully purchasing [data] through [X's] subscription service."  P. Br. 31. Aside from being unalleged, X lacks standing to sue for injuries between Bright Data and some unnamed Bright Data competitor.  And even if it did, that is not an incipient antitrust violation.

Nor can X save its UCL claim by branding Bright Data's conduct "immoral."  P. Br. 31. The "balancing test" applicable to conduct alleged to be "immoral, unethical, oppressive, unscrupulous or substantially injurious to *consumers*" only applies in ***consumer*** cases.  *Levitt v. Yelp!, Inc.*, 765 F.3d 1123, 1136-37 (9th Cir. 2014) (dismissing business-competitor "manipulative conduct"); *Progressive W. Ins. Co. v. Superior Ct.*, 135 Cal. App. 4th 263, 285 (2005) (noting the California Supreme Court's limitation of the balancing test to consumer cases because it was too "amorphous" for "business competitor" cases).  For this reason, X's argument that the "balancing test" requires discovery lacks merit.  *Snapkeys*, 2020 WL 6381354, at *4 ("Following [*Levitt*], district courts have dismissed UCL claims" in business competitor cases).

## VIII.   X'S INDIVIDUAL USER ACCOUNT CLAIMS SHOULD BE DISMISSED.

In response to Bright Data's argument that X cannot bring a contract claim against Bright Data based on the individual accounts of its employees, X asserts that it "has not pled any breach of contract claim against individual Bright Data employees." P. Br. 32.  But X does not otherwise respond to the point that X also cannot bring a claim *against Bright Data* based on breach of the individual account contracts.  Instead, X makes a convoluted argument that it should still be free to rely on the employee accounts as *evidence* of Bright Data's knowledge of the Terms.  But Bright Data's motion is not directed to evidentiary questions.  The question is whether Bright Data is contractually *bound* by those contracts, and whether Bright Data can be held liable for a breach of them.  X's failure to respond to this simple question mandates dismissal of any such claim.

## IX.   CONCLUSION.

For the foregoing reasons, the Court should dismiss the X's tort claims.

Dated: January 3, 2024

Respectfully submitted,

*/s/ Colin R. Kass*

Colin R. Kass*
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick*
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

Robert C. Goodman (Bar No. 111554)
Lauren Kramer Sujeeth (Bar No. 259821)
ROGERS JOSEPH O'DONNELL, PC
311 California Street, 10th Floor
San Francisco, CA 94104
(415) 956-2828
rgoodman@rjo.com
lsujeeth@rjo.com

Sehreen Ladak (Bar No. 307895)
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
(310) 284-5652
sladak@proskauer.com

*Attorneys for Defendant Bright Data Ltd.*
*\*Admitted pro hac vice*