# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

X. Corp.,

                              Plaintiff,

          v.

BRIGHT DATA LTD.

                              Defendant

Case No. 3:23-CV-03698-WHA

## DECLARATION OF DAVID A. MUNKITTRICK IN SUPPORT OF BRIGHT DATA'S MOTION TO STAY DISCOVERY

I, David A. Munkittrick, state and declare as follows:

1.      I am an attorney at the law firm Proskauer Rose LLP in New York, New York. Proskauer Rose LLP serves as counsel to Defendant Bright Data, Ltd. ("Bright Data").

2.      I submit this declaration in support of Bright Data's Motion to Stay Discovery.

3.      I have personal knowledge of the information contained in this Declaration.

4.      Attached are true and correct copies of the following:

**Exhibit 1.**      Bright Data's Motion for Summary Judgement on Count One, *Meta Platforms, Inc. v. Bright Data Ltd.*, 3:23-cv-00077-EMC, ECF 75 (N.D. Cal. June 12, 2023)

5.      I declare under penalty of perjury under the laws of the United States that the foregoing is true and accurate to the best of my knowledge and belief.

1

Dated: January 3, 2024

Respectfully submitted,

/s/ *David A. Munkittrick*

David A. Munkittrick
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

# EXHIBIT 1

Colin R. Kass (*pro hac vice*)
Proskauer Rose LLP
1001 Pennsylvania, Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

Robert C. Goodman (Bar No. 111554)
Lauren Kramer Sujeeth (Bar No. 259821)
ROGERS, JOSEPH, O'DONNELL, PC
311 California Street, 10th Floor
San Francisco, CA 94104
(415) 956-2828
rgoodman@rjo.com
lsujeeth@rjo.com

*Attorneys for Defendant Bright Data Ltd.*
*Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| META PLATFORMS, INC., | |
| Plaintiff, | Case No. 3:23-CV-00077-EMC |
| v. | Hon. Edward M. Chen |
| BRIGHT DATA LTD. | Courtroom 5 – 17th Floor |
| Defendant. | 450 Golden Gate Avenue |
| | San Francisco, CA 94102 |

**<u>BRIGHT DATA'S MOTION FOR SUMMARY JUDGMENT ON COUNT ONE</u>**

## **NOTICE OF MOTION**

PLEASE TAKE NOTICE that the hearing on Bright Data's Motion for Summary Judgment on Meta's Contract Claim will take place on a date to be set by the Court.

The motion seeks summary judgment on Count I of the Complaint under Rule 56.

## **STATEMENT OF ISSUES TO BE DECIDED**

1.  Whether Bright Data's December 4, 2022, express rejection of Meta's browser-wrap offer precludes contract formation for lack of mutual assent.

2.  Whether Meta's browser-wrap contract claim fails for lack of consideration because Meta has no independent right to block Bright Data from public web search.

3.  Whether Meta's effort to enforce the terms of its rejected browser-wrap offer fails under quasi-contract.

4.  Whether Meta's past and future contract claims fail because Meta's Terms do not unambiguously restrict public web search.

5.  Whether Meta's past and future "facilitation" contract claims fail because Meta's Terms do not unambiguously block Bright Data from offering its customers lawful, general-purpose proxy network and scraping tools.

6.  Whether Meta's forward-looking contract claims based on the terminated accounts fail because the survival clauses do not and cannot prohibit public web search in perpetuity.

# **TABLE OF CONTENTS**

I.      INTRODUCTION. ................................................................................................1

II.     FACTS. ...............................................................................................................3

III.    META'S FORWARD-LOOKING CONTRACT CLAIM FAILS BECAUSE
        THERE IS NO CONTRACT...............................................................................4

        A.      Bright Data Rejected Meta's Browser-Wrap Offer; It Did Not Accept It. ..............4

                1.      Meta Ignores the Restatement's Manifest Rejection Provisions. ...............6

                2.      Apple Carts and Concerts Show that "Silence" and "Express
                        Rejection" Are Not the Same........................................................8

                3.      Meta Is Wrong that a "Take-It-Or-Leave-It" Offer Cannot Be
                        Expressly Rejected.....................................................................9

                4.      Meta Lacks the Power to Prohibit Express Rejection of its Terms. ..........10

        B.      Meta's Browser-Wrap Offer Lacks Consideration. .................................................10

                1.      Meta Provides Nothing that Bright Data is Not Already Entitled To........10

                2.      Meta Does Not Operate a Website for Bright Data's Benefit. .................12

        C.      Meta Cannot Enforce Its Browser-Wrap Offer Under Quasi-Contract. ...............14

                1.      Meta Does Not Own the Internet. ..............................................15

                2.      Public Web Search Is a Right; It Is Not Inconsistent with Any
                        Public Website Operator's Property Interests...........................................16

                3.      Meta's Browser-wrap Restraints Unreasonably Restrain Trade...............17

IV.     META'S CONTRACT CLAIMS FAIL AS A MATTER OF
        INTERPRETATION............................................................................................19

        A.      Meta's Terms Do Not Apply to Public Web Search.............................................19

        B.      Any Prohibition on Public Web Search Cannot Apply in Perpetuity....................24

        C.      Applying the Terms to Prevent Public Search in Perpetuity Is
                Unconscionable................................................................................27

        D.      Meta's Terms Do Not Prevent Third Parties from Using Bright Data's
                Services. ..................................................................................28

V.      CONCLUSION...................................................................................................29

# **TABLE OF AUTHORITIES**[1]

**CASES**

*Astiana v. Hain Celestial Grp., Inc.*,
   783 F.3d 753 (9th Cir. 2015) ..................................................................14

*Baltimore & O.R. Co. v. U.S.*,
   261 U.S. 592 (1923)..............................................................................15

*Blackburn v. Sweeney*,
   53 F.3d 825 (7th Cir. 1995) ...................................................................18

*Calhoun v. Google LLC*,
   526 F. Supp. 3d 605 (N.D. Cal. 2021) ......................................................20

*Centreville Veterinary Hosp., Inc. v. Butler-Baird*,
   2007 WL 1965538 (Del. Ch. 2007) .............................................................6

*CollegeSource, Inc. v. AcademyOne, Inc.*,
   2012 WL 5269213 (E.D. Pa. 2012) ......................................................23, 24

*Comcast Corp. v. Rovi Corp.*,
   2016 WL 7235802 (S.D.N.Y. 2016)..........................................................25

*ESCgov, Inc. v. BMC Software, Inc.*,
   2015 WL 12765989 (E.D. Va. 2015) .........................................................26

*ESG Cap. Partners, L.P. v. Stratos*,
   828 F.3d 1023 (9th Cir. 2016) .................................................................14

*Ewert v. eBay, Inc.*,
   2010 WL 4269259 (N.D. Cal. 2010) ......................................................19, 20

*Flores v. Transamerica HomeFirst, Inc.*,
   93 Cal. App. 4th 846 (2001) ................................................................27, 28

*Foster Cable Servs., Inc. v. Deville*,
   368 F. Supp. 3d 1265 (W.D. Ark. 2019).....................................................28

*Fteja v. Facebook, Inc.*,
   841 F. Supp. 2d 829 (S.D.N.Y. 2012).......................................................24

---

[1] Unless otherwise noted, all emphasis added, capitalizations conformed without brackets, and internal citations and quotation marks omitted. The "Delaware Litigation" refers to *Bright Data Ltd v. Meta Platforms, Inc.*, N23C-01-229-SKR-CCLD (Del. Super. 2023). The relevant summary judgment briefs in Delaware are attached as Exs. 7-9.

*Glenhaven Vill., Inc. v. Kortmeyer*,
 2003 WL 22125343 (Neb. Ct. App. 2003) .......................................................................... 6

*Headlands Reserve, LLC v. Center for Nat. Lands Mgmt.*,
 523 F. Supp. 2d 1113 (C.D. Cal. 2007) ............................................................................. 4

*hiQ Labs, Inc. v. LinkedIn Corp.*,
 31 F.4th 1180 (9th Cir. 2022) ........................................................................................ 17

*Howard Schultz & Assocs. v. Broniec*,
 236 S.E.2d 265 (Ga. 1977) ............................................................................................. 28

*Hutchison v. Sunbeam Coal Corp.*,
 519 A.2d 385 (Pa. 1986) ................................................................................................ 25

*In re Meta Pixel Healthcare Litig.*,
 2022 WL 17869218 (N.D. Cal. 2022) ............................................................................. 20

*Independence Mall, Inc. v. Wahl*,
 2012 WL 6945505 (Del. Super. 2012) .............................................................................. 6

*Ixchel Pharma, LLC v. Biogen, Inc.*,
 9 Cal. 5th 1130 (2020) ................................................................................................... 17

*Jones v. Hirschfeld*,
 348 F. Supp. 2d 50 (S.D.N.Y. 2004) ................................................................................. 6

*Joseph v. City of Atwater*,
 74 Cal. App. 5th 974 (2022) ........................................................................................... 20

*Kepner v. Weyerhaeuser Co.*,
 2016 WL 5939153 (D. Or. 2016) .................................................................................... 24

*Levin v. Ligon*,
 140 Cal. App. 4th 1456 (2006) ....................................................................................... 24

*Low v. LinkedIn Corp.*,
 900 F. Supp. 2d 1010 (N.D. Cal. 2012) .......................................................................... 14

*M & G Polymers USA, LLC v. Tackett*,
 574 U.S. 427 (2015) ................................................................................................... 3, 24

*McBride v. Boughton*,
 123 Cal. App. 4th 379 (2004) ......................................................................................... 14

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
 605 F. Supp. 3d 1218 (N.D. Cal. 2022) ..................................................................... 27, 28

*Milliner v. Bock Evans Fin. Couns., Ltd.*,
 114 F. Supp. 3d 871 (N.D. Cal. 2015) ............................................................................ 27

*Mireskandari v. Daily Mail & General Trust PLC*,
2013 WL 12114762 (C.D. Cal. 2013) ..................................................................4

*Nalco Chem. Co. v. Hydro Techs., Inc.*,
984 F.2d 801 (7th Cir. 1993) ...........................................................................28

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ...........................................................................4

*Nova Chemicals, Inc. v. Sekisui Plastics Co., Ltd.*,
2008 WL 4170029 (W.D. Pa. 2008) ..................................................................24

*Nygard, Inc. v. Uusi-Kerttula*,
159 Cal. App. 4th 1027 (2008) .........................................................................22

*Oto, LLC v. Kho*,
8 Cal. 5th 111 (2019) ......................................................................................27

*Pami-Lemb I Inc. v. EMB-NHC, LLC*,
857 A.2d 998 (Del. Ch. 2004) ............................................................................6

*People v. One 1959 Porsche Coupe*,
252 Cal. App. 2d 1044 (1967) .........................................................................29

*ProCD, Inc. v. Zeidenberg*,
86 F.3d 1447 (7th Cir. 1996) ......................................................................8, 10

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) .......................................................................7, 8, 9

*Reichert v. Rapid Invs., Inc.*,
56 F.4th 1220 (9th Cir. 2022) ..........................................................................11

*Remedial Constr. Servs., LP v. AECOM, Inc.*,
65 Cal. App. 5th 658 (2021) .............................................................................20

*Revitch v. DIRECTV, LLC*,
977 F.3d 713 (9th Cir. 2020) ..............................................................22, 23, 24

*Sandquist v. Lebo Auto., Inc.*,
1 Cal. 5th 233 (2016) ......................................................................................19

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) ..............................................................................4

*South Jersey Hosp., Inc. v. Corr. Med. Servs.*,
2005 WL 1410860 (D.N.J. 2005) ........................................................................6

*Specht v. Netscape Comm'ns Corp.*,
306 F.3d 17 (2d Cir. 2002) ................................................................................8

*Stanley v. Robert S. Odell & Co.*,
  97 Cal. App. 2d 521 (1950) ................................................................................................4

*Steiner v. Thexton*,
  48 Cal. 4th 411 (2010) ...............................................................................................12, 13

*Ta Chen Int'l, Inc. v. Benada Aluminum Prods., LLC*,
  2021 WL 7541515 (M.D. Fla. 2021) .............................................................22, 26, 27

*Tatro v. Law Sch. Admission Council, Inc.*,
  2015 WL 13917988 (C.D. Cal. 2015) ...........................................................................5

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
  2003 WL 21406289 (C.D. Cal. 2003) ...........................................................................8

*Total Recall Techs. v. Luckey*,
  2021 WL 2590149 (N.D. Cal. 2021) ..........................................................................17

*Twitter, Inc., v. Taamneh*,
  143 S. Ct. 1206 (2023) ...........................................................................................2, 29

*Uniloc 2017 LLC v. Google LLC*,
  52 F.4th 1352 (Fed. Cir. 2022) ...................................................................................26

*Victoria v. Superior Court*,
  40 Cal. 3d 734 (1985) ..................................................................................................19

*W. Filter Corp. v. Argan, Inc.*,
  540 F.3d 947 (9th Cir. 2008) ......................................................................................20

*Walker v. Carnival Cruise Lines*,
  63 F. Supp. 2d 1083 (N.D. Cal. 1999) .........................................................................8

*Webb Candy, Inc. v. Walmart Stores, Inc.*,
  2010 WL 2301461 (D. Minn. 2010) ..............................................................3, 25, 26

*Wexler v. AT&T Corp.*,
  211 F. Supp. 3d 500 (E.D.N.Y. 2016) .......................................................................24

SECONDARY SOURCES

Restatement (Second) of Contracts (1981) ........................................................ *passim*

Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 470–71 (2006) ......................12

2 Williston on Contracts § 6.9 (4th ed.) .........................................................................7

## I.   INTRODUCTION.

The time has come to test whether Meta can control the public web as a matter of contract. The core facts are not disputed; they have been alleged.  Bright Data searches information that does not require any Facebook or Instagram account – today, it does not even have an account. But it still searches information that Meta and its "users have permitted everyone to see," including "[p]eople without Facebook or Instagram accounts or who are not logged into their accounts." Cmplt. ¶ 30b.  Meta says it can contractually block any public web search it does not like simply by posting terms and conditions at the bottom of its web page.  It cannot.

Contract law enforces agreements, not one-sided demands.  That requires mutual assent and bargained-for consideration.  Meta cannot establish either.

*Bright Data Rejected Meta's User Terms; It Did Not Agree to Them.*  Meta tells the world that, "if you do not agree to [its] Terms …, you can delete your account." Exs. 1-2.  Bright Data did this.  Ex. 4.  To avoid any doubt, Bright Data also put Meta "on notice that Bright Data affirmatively rejects and has not consented to any agreement to your user terms in any context for any reason." *Id*.  In response, Meta says it is legally impossible to expressly reject a website operators' terms and still visit that *public* site.  But the law does not require web surfers to shut down their computers to avoid being bound.  Because "manifestation of intention not to accept an offer is a *rejection*, … *subsequent conduct is not to be understood as an acceptance*." Restatement (Second) of Contracts § 38 & cmt. a.  Even the "rendering of a performance does not constitute an acceptance if … the offeree … notif[ies] the offeror of non-acceptance." *Id.* § 53(2). Meta does not deny that its forward-looking contract claims fail under the Restatement's terms.

Instead, Meta wants this Court to depart from the Restatement, saying there should be no difference between "implicit" acceptance and express rejection. Ex. 8 at 18-20.  But it offers no reason to deviate from bedrock law.  It says only that it can make a "take-it-or-leave-it" offer as "master of [its] offer." *Id*.  But nothing gives Meta the power to strip website visitors of their right to express rejection.  That is what Bright Data did.  It did not take Meta's offer; it left it.

*Meta's Browser-Wrap Offer Offers the Public Nothing.*  Even if Meta could establish assent, it did not provide any bargained-for consideration.  Meta has not promised or provided

anything to Bright Data.  Bright Data is accused of doing nothing more than searching publicly available information.  But website operators, like Meta, do not own the Internet, and they lack any independent right to block the public's right to search the web.  So – unlike when Meta grants account holders access to information behind a log-in screen – it has not granted access to corners of the Internet that Bright Data could not access without Meta's consent.  There is no consideration.

**Meta Cannot Control the Internet Through Quasi-Contract.**  Without a contract, Meta is left with "quasi-contract," claiming that anyone who visits a Meta website implicitly benefits from it and is thus bound to Meta's *offer*.  But quasi-contract does not grant Meta rights to control the Internet that property law does not, and it does not subject every human on the planet to the unilateral demands of every website operator of every public webpage ever visited.  So, Meta cannot restrain trade by blocking the public's right to search for public information.

**Meta's Terms Do Not Unambiguously Apply to Public Web Search.**  The foregoing disposes of Meta's forward-looking contract claims on contract formation grounds.  But all its contract claims – past and present – also fail because the Terms do not apply to public web search.  When you sign up for an account, you receive access to information behind the log-in screen, and in return, you agree not to misuse your account.  But you do not relinquish rights you enjoyed just seconds before as a non-member for activities that have nothing to do with your account.  Meta makes this clear, telling the world that, without a user account, you are not even an actual user:

> "A *putative Facebook user cannot become an actual Facebook user unless and until they have clicked through* the registration page where they acknowledge they have read and agreed to Facebook's terms of use."  Ex. 11, ¶ 2.

The Terms confirm this, making clear that they apply only to logged-on activities.  Because Bright Data only scraped when logged-off, there is no claim.

**The Terms Do Not Ban Bright Data from Offering Lawful General-Purpose Services.**  Just as Meta cannot prevent Bright Data from searching the web, it cannot prevent Bright Data from offering its general-purpose proxy network and scraping tools to its customers.  Nor can it use the Terms to obligate Bright Data to monitor its customers' usage.  The Supreme Court's recent decision in *Twitter, Inc., v. Taamneh*, 143 S. Ct. 1206, 1226, 1230-31 (2023), controls.

***Meta Cannot Ban Public Web Search in Perpetuity.*** Even if Meta's Terms did prevent past public search, they can't prevent future search. Meta relies on the survival clause in its Facebook Terms to stretch its prohibitions in perpetuity. But courts do not apply survival clauses to post-termination conduct that occurs "years, decades, or even centuries after the [contract] expired;" courts limit them to claims arising from conduct that occurred "while the agreement was still in effect." *Webb Candy, Inc. v. Walmart Stores, Inc.*, 2010 WL 2301461, *6 (D. Minn. 2010). Any other interpretation would be unconscionable, and courts do not "construe ambiguous writings to create lifetime promises." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441 (2015).

## II.    FACTS.

Bright Data is an internet company that searches the web for publicly available information, including information Meta's users choose to make public and Meta chooses not to place behind a log-in screen. Cmplt. ¶ 2. As Meta explains, this is information that "people without Facebook or Instagram accounts or who are not logged into their accounts are able to view." *Id.* ¶ 30b. Meta does not claim a property interest in this information. Exs. 2-3, 10.

Nonetheless, on November 29, 2022, Meta sent Bright Data a cease-and-desist notice demanding that Bright Data "stop scraping and facilitating the scraping of Meta users' data" within 48 hours. Cmplt. ¶ 59; Ex. 3. In response, Bright Data terminated all user accounts, and notified Meta it was rejecting any agreement incorporating Meta's Terms:

> "You directed us to 'the accounts [Bright Data] created' on Facebook and Instagram…. Those accounts, of course, are not used in connection with, and are completely unrelated to, the activities you have complained about….
>
> But because you have identified them as the source of your potential contract claims, ***we have exercised our right to terminate those accounts and are no longer a 'user' of Meta's products and services and are not now subject to Meta's user terms***.
>
> To be clear, ***as of now at least, you are on notice that Bright Data affirmatively rejects and has not consented to any agreement to your user terms in any context for any reason***. Nor will there be any future contract – or 'meeting of the minds' – between the parties relating to the activities at issue absent a written agreement physically hand-signed by both parties." Exs. 4, 6.

Today, Bright Data uses automated means to search for information that "people without

Facebook or Instagram accounts or who are not logged into their accounts are able to view." Cmplt. ¶ 30b. Without an active user account, it is not possible for Bright Data to scrape behind a log-in screen. Nor does Meta *allege* that Bright Data has scraped behind a log-in screen in the past. To the contrary, Meta points only to Bright Data's scraping tools, which expressly state that they are designed to scrape public web data. Cmplt. ¶¶ 38-40 (the "Data Collector tool … extract[s] *publicly available data*;" the "Facebook Scraper … scrape[s] Facebook *public data*;" and the "Instagram Scraper … scrape[s] Instagram *public data*.").

## III. META'S FORWARD-LOOKING CONTRACT CLAIM FAILS BECAUSE THERE IS NO CONTRACT.

Meta asserts that it has created a perpetual and unavoidable **"browser-wrap"** agreement, inextricably shackling to it anyone who types a Facebook.com or Instagram.com URL into their browser. But browser-wrap terms are "generally … unenforceable." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 466 (2021). The "formation of a contract requires a bargain in which there is a manifestation of *mutual assent* … and a *consideration*." Rest. 2d § 17; *Mireskandari v. Daily Mail & General Trust PLC*, 2013 WL 12114762, *18 (C.D. Cal. 2013) (same). Both are lacking.

### A. Bright Data Rejected Meta's Browser-Wrap Offer; It Did Not Accept It.

Meta argues that Bright Data is bound to the Terms – "regardless of whether Bright Data maintains any Facebook or Instagram accounts" – simply because it is aware of them. Cmplt. ¶ 60; Ex. 5. But "the Internet … has not fundamentally changed the principles of contract" or dispensed with the requirement of "*mutual manifestation of assent [as] the touchstone of contract*." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). Here, Meta's browser-wrap Terms are its offer. Bright Data expressly rejected it. That "*kills the offer*." *Stanley v. Robert S. Odell & Co.*, 97 Cal. App. 2d 521, 534 (1950).

The "objective of … the general law of contracts is to carry out the understanding of the parties rather than to impose obligations on them contrary to their understanding: *the courts do not make a contract for the parties*." Rest. 2d § 201, cmt. c; *Headlands Reserve, LLC v. Center for Nat. Lands Mgmt.*, 523 F. Supp. 2d 1113, 1123 (C.D. Cal. 2007) (same). For that reason, "contract acceptance is governed by the 'mirror-image' rule, which dictates that the terms

proposed in an offer must be met exactly, precisely, and unequivocally for its acceptance to result in the formation of a binding contract." *Tatro v. Law Sch. Admission Council, Inc.*, 2015 WL 13917988, *3 (C.D. Cal. 2015). Where the two differ, there is **no contract** and only **non-contractual** remedies are available.

In asserting that Bright Data expressly *agreed* to Meta's browser-wrap offer, Meta does not point to any *verbal* or *written* assent. Instead, it says that "Bright Data's continued use of Facebook and Instagram [by engaging in] unauthorized scraping activities … will continue to bind Bright Data to [Meta's] Terms regardless of whether Bright Data maintains any Facebook or Instagram accounts." Cmplt. ¶ 60; Ex. 5.

But Meta does not deny that Bright Data affirmatively rejected Meta's browser-wrap offer. Bright Data did so, first, by terminating its accounts. Meta tells the world that, if you do not want to agree to Meta's terms, all you need to do is delete your account:

> **Facebook**: "If you do not agree to our updated Terms …, you can delete your account at any time." Ex. 1.

> **Instagram**: "If you do not want to agree to these or any updated Terms, you can delete your account." Ex. 2.

Bright Data not only did this, it also informed Meta that it "affirmatively rejects and has not consented to any agreement to your user terms in any context for any reason." Ex. 4.

Meta does not argue that Bright Data failed to provide adequate notice of rejection. Instead, it argues that it is legally **impossible** to reject Meta's browser-wrap offer while still searching for public information posted on its sites. Ex. 8 at 18. But that is not what the Restatement says.

There is no scenario under the Restatement where mutual assent arises after express, manifest rejection. Express rejection is governed by Sections 19, 38, and 53, which make clear that an express rejection **trumps** any claim of acceptance by subsequent conduct or performance. Section 19 provides that the "conduct of a party is **not effective as a manifestation of his assent** unless he … has reason to know that the other party may infer from his conduct that he assents." Rest. 2d § 19(2). An offeror, however, cannot reasonably infer assent where there is rejection, because any "manifestation of intention not to accept an offer is a **rejection**," which "terminate[s]

the power of acceptance." *Id.* § 38 & cmt. a.  As the Restatement explains:

> "If [the offeree] has reason to know that the offeror may reasonably infer from his conduct that he assents, he runs the risk of being bound…. ***He may guard against that risk by manifesting an intention not to accept***."

*Id.* § 53, cmt. b.  At that point, neither the offeror's performance, nor the offeree's subsequent receipt of benefits, creates a contract.  *Id.* § 38, cmt. a ("This rule ... protects the offeree in accordance with his manifested intention that his ***subsequent conduct is not to be understood as an acceptance***."); *id.* § 53(2) ("the rendering of a performance does not constitute an acceptance if within a reasonable time the offeree … ***notif[ies] the offeror of non-acceptance***" of the offer).

Because "notifying the offeror of non-acceptance" does not require the rejection of any (purported) benefits, it does not matter whether Bright Data continued to search Meta's sites. Bright Data's rejection trumps all.[2]

### 1.     Meta Ignores the Restatement's Manifest Rejection Provisions.

When confronted with the Restatement in the Delaware Litigation, Meta did not deny that the Restatement governed.  Ex. 8.  Nor did it take issue with Bright Data's interpretation of the Restatement's rejection provisions.  It did not even address them.  The implication is clear.  If Meta had an answer to these provisions, it would have said something.  Its failure to do so is telling.

Ignoring the law of rejection, Meta focuses instead on Section 69(1), a provision that – by its express terms – applies only in the ***absence of rejection***.  Under Section 69(1):

---

[2] *See Glenhaven Vill., Inc. v. Kortmeyer*, 2003 WL 22125343, *5 (Neb. Ct. App. 2003) (The "contract came to an end when the [defendants] informed [plaintiff] that they were not going to pay the charges.  At that point, the circumstances clearly ceased to show mutuality of intent," ***even though defendants continued to accept the services***.); *Independence Mall, Inc. v. Wahl*, 2012 WL 6945505, *4 (Del. Super. 2012) (rejecting argument that tenant's "later actions acted as an acceptance" after tenant "rejected the [agreement] many times"); *South Jersey Hosp., Inc. v. Corr. Med. Servs.*, 2005 WL 1410860, *4 (D.N.J. 2005) (no contract where defendant "specifically told [the Hospital Plaintiff] that it would not pay" according to offer, but "continue[d] to bring its patients to the Hospital"); *Pami-Lemb I Inc. v. EMB-NHC, LLC*, 857 A.2d 998, 1015 (Del. Ch. 2004) ("Lehman made clear that it would not abide by the explicit terms of the partnership agreements [and] thereby rejected NHC's offer."); *Centreville Veterinary Hosp., Inc. v. Butler-Baird*, 2007 WL 1965538, *7 (Del. Ch. 2007) ("The rejection rule … protects offerees as well as offerors."); *Jones v. Hirschfeld*, 348 F. Supp. 2d 50, 61 n. 8. (S.D.N.Y. 2004) ("Where the offeree rejects an offer, ***including a unilateral offer***, prior to acceptance, the offer is terminated and ***cannot thereafter be accepted by performance***.").

> "Where an offeree *fails to reply to an offer*, his *silence* and inaction operate as an acceptance … *only* … where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation."

Rest. 2d § 69(1).  This Section only applies if the "offeree fails to reply to an offer," in which case "*silence and inaction*" coupled with acceptance of benefits can constitute acceptance.  *Id*.  The Restatement, therefore, gives the offeree *three* choices:  It can "reject" the offered services; accept the offered services in silence and be bound by the offer; or reply with a *rejection*, leaving offeror to any *non-contractual* remedies it may have.  Because Bright Data's express rejection is the antithesis of silence, Meta has no contract claim.

In response, Meta does not dispute that it would lose its browser-wrap claim if Section 69(1) applied according to its terms.  Afraid of asking the court to be the first to disregard this blackletter law, Meta instead argued that "neither courts nor leading commentators have interpreted" Section 69(1) as limited to cases involving silence. Ex. 8 at 19.  That is false.  Meta cited no case or commentator suggesting that Section 69(1)'s express conditions precedent – "failure to reply" and "silence and inaction" – do not mean what they say or should be disregarded.

Though Meta sought refuge in Williston on Contracts, Williston cites Section 69(1) with *approval*; it does not seek to nullify it.  For example, Williston highlights cases finding lack of assent after manifest rejection, despite acceptance of benefits.  2 Williston, § 6.9 at n.8 (4th ed.) (citing *David v. ANA Television Network, Inc.*, 997 F. Supp. 850 (E.D. Mich. 1998) ("*oral rejection* … prevented [the] offer from taking effect, *despite … receipt and retention*" of benefits).

Meta similarly misplaces reliance on *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004).  Though Meta seeks to characterize *Register.com* as a rejection case, it is not.  It is a silent acceptance case.  The defendant *argued* that it had "rejected" the plaintiffs' terms.  But that purported rejection referred to the defendant's *subjective* intent, not expressed rejection.  While the dissent would have excused the obligation to manifest rejection because the defendant "had no opportunity to reject Register.com's terms," the majority hued to the Restatement, noting that where an offeree *fails to reply to an offer*, his *silence* and *inaction* operate as an acceptance" if he "takes the benefit of the offered services."  *Id.* at 403, 431 (citing Rest. 2d § 69(a)(1)).

Nor does Meta's sole rejection case, *Ticketmaster Corp. v. Tickets.Com, Inc.*, 2003 WL 21406289, *2 (C.D. Cal. 2003), suggest any parting of ways with the Restatement. The **only** issue the court addressed was whether, *factually*, the defendant was aware of the User Terms. The court noted – literally, parenthetically – that the defendant must have been aware of the terms because it sent a letter saying it "did not accept" them. *Id.* The court was not asked, and did not address, whether the rejection precluded mutual assent. Nor did the court address any of the Restatement's rejection provisions or Section 69(1). Put simply, Meta cannot nullify vast swaths of the Restatement based on a solitary parenthetical fragment in a single sentence on a completely different issue in a case decided twenty years ago.[3]

### 2. Apple Carts and Concerts Show that "Silence" and "Express Rejection" Are Not the Same.

In its zeal to rewrite the Restatement, Meta imagines a world that eradicates the distinction between express rejection and silence. It proposes a new rule in which the "nature of the rejection – whether express or implicit – [is] not determinative." Ex. 8 at 19. But equating express with silent or implicit conduct turns the clock back on the move from subjective intent in the First Restatement to manifest intent in the Second. No wonder Meta cannot find a single case in support.

So Meta resorts to hypothetical concert goers and apple sellers. But these hypos only prove Bright Data's point. Meta first invokes the hypothetical concert goer in *ProCD*, who silently accepts the venue's standard terms, breaches the contract by recording the artist, and is then "escorted … to the exit." Ex. 8 at 15. There is no express rejection in that hypothetical. Nor is the theater owner seeking specific performance of the contract. When the patron is shown the door, the theater owner invokes the law of trespass, not the law of contract.

Meta gets no further sympathizing with the hypothetical apple vendor in *Register.com*.

---

[3] Meta's benefits-acceptance cases also emphasize the necessity of "silence and inaction" in a Section 69(1) claim. *See Specht v. Netscape Comm'ns Corp.*, 306 F.3d 17, 33 (2d Cir. 2002) (declining to enforce browser-wrap terms due to lack of notice, but noting that acceptance arises after "***failing to object***."); *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1451 (7th Cir. 1996) (noting that defendant could not "proceed without indicating acceptance," and did so "***without protest.***"); *Walker v. Carnival Cruise Lines*, 63 F. Supp. 2d 1083 (N.D. Cal. 1999) (noting customer had an "opportunity to reject" terms).

There, the Second Circuit imagined a consumer who takes an apple *in silence* with full knowledge of its price, but then refuses to pay. Pointing to Section 69(1), the Second Circuit explained, the consumer "cannot continue [to do this] on a daily basis" because "[s]ilence and inaction operate as acceptance." *Register.com*, 401 F.3d at 401, 403. Recognizing this says nothing about the power of rejection, Meta changes the hypo. It wonders what would happen if the consumer – rather than staying silent – started "shouting 'I disagree,' while absconding with the apple." Ex. 8 at 19. Meta supposes the outcome would be the same. And it may be. But not for the same reason. Shouting "I disagree" has legal significance. The express rejection takes the hypo out of contract law addressed by Sections 19, 38, 53, and 69(1) of the Restatement and into the realm of *quasi-contract* addressed by Section 69(2) or tort law. The apple-cart vendor may still have a remedy if someone steals his apple, but the claim is not for breach of contract.

### 3. Meta Is Wrong that a "Take-It-Or-Leave-It" Offer Cannot Be Expressly Rejected.

Unable to prove its point through hypothetical, Meta resorts to another rhetorical device. It says "there is nothing novel or unique to the Internet in offering standard services subject to a binding take-it or leave-it" offer. Ex. 8 at 2. As a general principle, of course, that is true. The problem for Meta is that Bright Data left the offer, it did not take it.

The concept of a "take-it-or-leave-it" deal is born of the "mirror-image" rule, the applicability of which Meta does not dispute. Under a "take-it-or-leave-it" offer, a party refuses to negotiate, compromise, or alter the offered terms. If the other party does not like the deal, it can either reject the offer or counter. In either case the original "take-it-or-leave-it" offer is dead, leaving the parties to whatever non-contractual remedies they may have.

Meta argues otherwise, saying that under a "take-it-or-leave-it" offer, a buyer is legally prohibited from **expressly** manifesting rejection while accepting the offered benefits. Ex. 8 at 18-19. But the Restatement does not exempt "take-it-or-leave-it" offers from the rule of manifest rejection. An **express** rejection is **manifest** rejection, and that rejection kills a "take-it-or-leave-it" offer, just as it kills any other kind of offer. *See* Rest. 2d § 53(2).

Meta's contrary argument rests on word games. Meta implies that the "**it**" in a "take-**it**-or-

leave-*it*" offer refers to the offered benefits, or here, the data on its websites.  By accepting the data, Meta says, Bright Data is automatically bound by the browser-wrap terms regardless of express rejection.  But that is a false premise.  The "it" in a "take-it-or-leave-it" offer refers to the *offer itself*, not the subject of the contract, the product at issue, or the acceptance of benefits.

Consider, for example, Alice and Bob.  Bob makes a "take-it-or-leave-it" offer to paint Alice's fence for $100.  Alice says "NO," but she does not stop Bob from painting her fence.  She may have accepted the benefits of Bob's labor, but she rejected Bob's "take-it-or-leave-it" offer.  The result is that there is **no contract**.  Bob cannot collect $100, and the parties are left to whatever non-contractual remedies they may have.  That is what happened here.  Meta's browser-wrap offer represents a "take-it-or-leave-it" offer that Bright Data expressly rejected.  There is no contract.

### 4. *Meta Lacks the Power to Prohibit Express Rejection of its Terms.*

In a last-ditch effort to support its argument that "Bright Data cannot use [Meta's] services while rejecting [its] terms," Meta says that, as the "master of its offer," it alone has power to nullify any "purport[ed]" rejection.  Ex. 8 at 18-20.  But an offeror cannot eliminate the right of rejection.

It is true, of course, that an offeror is the "master of the offer" and "may propose *limitations* on the kind of conduct that constitutes *acceptance*."  *See id.*; *ProCD*, 86 F.3d at 1452.  But Meta does not seek to *limit* the kinds of conduct that constitute *acceptance*.  It seeks to preclude express rejection.  The Restatement does not give an offeror that power.  Meta cannot disregard a rejection just because it is not, for example, written in Sanskrit.  Any word or deed that reasonably indicates an "intention not to accept an offer" precludes contract formation.  Rest. 2d § 38.

### B. *Meta's Browser-Wrap Offer Lacks Consideration.*

Meta's entire argument is premised on the notion that it provides Bright Data with some benefit.  But in reality, Meta provides Bright Data with nothing.  Because Meta lacks any independent legal basis to block Bright Data from searching the public web, its browser-wrap offer is not supported by **bargained-for** consideration.

### 1. *Meta Provides Nothing that Bright Data is Not Already Entitled To.*

Bright Data does not need Meta's consent to search public websites because Meta does not own the Internet.  Meta does not own the information searched, and it is not providing Bright Data

with special access, user accounts, software, codes, or anything else used in the search.  Nor does Meta claim otherwise.

Neither here, nor in the Delaware Litigation, has Meta asserted any independent right to prevent Bright Data from scraping public data.  Meta does not, for example, claim that it is like the apple vendor whose chattel is protected by the law of conversion, or the theater owner whose land is protected by the law of trespass.  When the grocer hands its customer an apple, it provides consideration by transferring title.  When the usher shows the fan to her seat, the theater provides consideration by not exercising its legal right of expulsion.  But Meta does not claim any property or other legal interest in the data that Bright Data searches.

Since Meta has no right to tell anyone to stop surfing the web, Bright Data's searches do not constitute consideration.  You can't claim an agreement by saying "If you breathe, you owe me $100," since you have no independent right to prevent anyone from breathing.

*Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1229 (9th Cir. 2022), is instructive.  There, an inmate was given a pre-paid card reflecting amounts owed to him upon his release and notice of the card's Terms of Use.  After he withdrew the funds, the card company sought to enforce the Terms.  The Ninth Circuit declined to find a contract because the card was the only way the inmate could receive the money "confiscated" from him.  *Id*.  Just as "reasonable minds could not find" a contract from the inmate's use of "the card to obtain his own money," there can be no contract here because Bright Data has the right to search the public web, *regardless of what Meta says*.  *Id*.

In response, Meta argues that, by operating a website, it has provided consideration because Bright Data "profits" from its scraping business, and Meta "incurs a detriment" by investing in its own social media business. Ex. 8 at 23. But operating a public website is not consideration.  Under Meta's view – you, the Judge, as well as every other human being – enters into a contract with the operator of every website ever visited.  It is, according to Meta, all supported by consideration flowing solely from the mere fact that the user looked at the site.  That is not the way the Internet was designed.  The Internet is a *free* utility for all, supported by government funds.  Meta does not own it by contract.

Nor does it matter that Bright Data benefits – as does every human – from searching the

public web, or that Meta devotes resources to making information publicly available. Just consider two scenarios. In the first, Alice says to Bob, "if you walk on the *public* sidewalk in front of my house, you owe me $100." Since Alice has no independent right to obstruct Bob's journey, she has not provided consideration, regardless of how much Alice spent making her curtilage look pretty or how much Bob enjoys his stroll. In the second scenario, Chris, a tollbooth operator, tells Dave that, "if you want admittance to my private grounds, you must pay $100." Chris has provided consideration because the law of trespass provides a non-contractual ground for blocking access.

As this shows, consideration turns on Meta's legal rights, not how much Meta invests in its social media business or how much profit Bright Data earns from its data collection business. Meta's own cases prove that consideration involves a benefit to "***to which the promisor is not [otherwise] lawfully entitled.***" *Steiner v. Thexton*, 48 Cal. 4th 411, 420 (2010); s*ee also* Rest. 2d § 71(3) ("performance" can consist of "the creation, modification, or destruction of a legal relation."); *see* Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 470–71 (2006) (addressing internet contracts) ("The reason my 'no-trespassing' sign is effective in the real world is not because there is any sort of agreement to abide by it, but because the law already protects my land against intrusion by another. ***If the sign read 'no walking on the road outside my property,' no one would think of it as an enforceable agreement***."). That is not so here.

Nor can Meta claim that it provides consideration because it hosts users' public content on "privately-owned servers." Ex. 8 at 21. Meta may be providing consideration to its own users by hosting that data and making it publicly available, but it is not providing consideration to members of the public who surf the web. Hooking up its servers to the public internet does not give Meta an independent legal basis to block Bright Data's access. Again, consider Alice. She may own the land underlying the sidewalk, but if the public has an easement to traverse the path, her ownership interest is irrelevant.

### 2.    *Meta Does Not Operate a Website for Bright Data's Benefit.*

The lack of an independent legal right to block Bright Data's public search also precludes Meta from transforming its own investment decisions into "***bargained for***" consideration. Rest. 2d § 71(2). A "performance … is bargained for if it is sought by the promisor *in exchange* for the

promise **and** is given by the promisee in exchange for that promise." *Id.* There must be "reciprocal relation of motive or inducement." *Id.* "It is **not enough** … to confer a benefit or suffer prejudice for there to be consideration;" "the benefit or prejudice must have **induced** the promisor's promise." *Steiner*, 48 Cal. 4th at 421. The inducement element is missing here.

Meta does not claim it is induced to do anything when members of the public – like Bright Data – search public information. It simply hooked up its servers to the world wide web and donated what it describes as "limited" information to the public domain. This is no different than Barnes & Noble displaying a featured author's book in its windows. By doing so, Barnes & Noble has advertised its offerings – it has not provided bargained-for consideration, even if passersby find the information interesting and beneficial as a source for cocktail party conversation.

Here, Meta unilaterally decides what user information to make public. It did not consult Bright Data before making those decisions, and decisions about what to post publicly were not made in return for any promise from Bright Data. Meta made its own choices for its own selfish reasons. It cannot turn that selfish act into bargained-for consideration.

This stands in stark contrast to Meta's dealings with its own users. There, Meta is indeed being *induced* to provide access to information behind a log-in screen by the user's reciprocal promise to abide by the Terms. That is not true for public search. When a door-to-door salesman knocks on your door, you are free to listen to the pitch or say no thanks. But either way, you have not provided consideration just because you left your gate open. Here, Meta left the gate open. It could have placed all its information behind a log-in screen, gaining the protections of the CFAA and an independent legal basis for blocking public access. It chose not to, opting for attention over protection. That may have been a choice; but it was not bargained-for consideration.

Meta bristles at the distinction between logged-on and public search, saying that "website operators need not password-protect their pages to have contractually-protectable interests." Ex. 8 at 22. But the difference between logged-on and public search is not a matter of degree. It is a difference in kind. Meta may have an independent basis to block access to logged-in information, but it has no such right for public information. Having donated information to the public domain, it cannot thereafter dictate how the public uses that information. Meta's resort to analogy proves

the point. Meta notes that news organizations often place articles behind "a paywall after a few free articles." *Id*. As a statement of fact, that is, of course, true. But that does not mean news organizations have "*contractually-protectible interests*" in free articles that are not independently protected by copyright. Free articles are free; they are not consideration. Once they are placed behind a paywall, the CFAA protections kick in and subsequent access constitutes consideration for the subscription fee. If Meta were correct that paywalls were irrelevant, there would be no need for paywalls.

### C.   Meta Cannot Enforce Its Browser-Wrap Offer Under Quasi-Contract.

Unable to rely on **contractual** arguments, Meta seeks to bar Bright Data from searching public web sites under an "unjust enrichment" theory. Cmplt. ¶ 71. It says the public benefits from searching its sites, so there is no escape from its browser-wrap restraints. But the law only binds parties to *unaccepted* offers in extremely limited cases. This is not one of them. Quasi-contract is a narrow doctrine with a narrow purpose: to compel payment for benefits unjustly retained even in the absence of a contract. That is it. It does not empower a party to restrict another's freedom through an unaccepted contract.

"California does not recognize a stand-alone cause of action for unjust enrichment." *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1031 (N.D. Cal. 2012). So, when a party "alleges unjust enrichment," courts "construe the cause of action as a quasi-contract claim seeking restitution." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015); *ESG Cap. Partners, L.P. v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) (same). Here, "the only possible premise of [Meta's] cause of action of unjust enrichment is that [it] is entitled to restitution … on a quasi-contract or assumpsit theory." *McBride v. Boughton*, 123 Cal. App. 4th 379, 387-89 (2004).

Implied-in-law quasi-contracts fall under Section 69(2) of the Restatement. Under this provision, "an offeree who does any act inconsistent with the offeror's ownership of offered property is bound in accordance with the offered terms unless they are manifestly unreasonable." Rest. 2d. § 69(2). This is the modern equivalent of "waiving the tort and suing in assumpsit," and addresses situations like shoplifting, theft, and misappropriation of property. *See id.* § 4, cmt. b. To state a claim, Meta must show that (i) it "owns" the public data Bright Data searches or has a

non-contractual right to restrict access to it; (ii) Bright Data's public search constitutes an act "inconsistent with" Meta's ownership; and (iii) it would not be unreasonable to enforce Meta's browser-wrap restraints.  *Id*. § 69(2).  Meta has not alleged any element.[4]

### 1.  Meta Does Not Own the Internet.

Meta cannot block Bright Data from searching the web because Meta does not own the Internet.  It is literally that simple.

There is an "important distinction" between an "actual agreement *inferred* from the parties' conduct and a quasi-contract *implied as a matter of law* to avoid unjust enrichment."  *See id*. § 19, cmt. a*; Baltimore & O.R. Co. v. U.S.*, 261 U.S. 592, 597 (1923).  If an offer is accepted, the receipt of benefits justifies enforcing the offer.  But if there is no valid contract, intentional malfeasance is required to enforce an unaccepted offer.  In that case, courts find assent *implied-in-law* because a person is "not ordinarily permitted to avoid contract obligation by asserting that he is a ***tortfeasor*** rather than a ***promisor*.**"  *See* Rest. 2d § 69, cmt. e; *id*. § 19, cmt. a.

As such, Meta must show that it has an *undisputed* property right to block Bright Data from searching the web.  Assent cannot be reasonably implied-in-law when there is a good faith dispute over ownership.  In such cases, courts leave the parties to the remedies afforded by property law.  The Restatement provides an apt illustration:

> "**Illustrations**: … Under a claim of right made in error but in good faith, A digs a well on B's unused land and takes water therefrom…  B notifies A that he will charge A $50 a day for every day on which A takes water from his land.  Even after it is adjudicated that A's right is nonexistent, ***A does not accept B's terms by taking water*.**"  Rest. 2d § 69, cmt. e (*citing Wright v. Sonoma Cnty.*, 156 Cal. 475 (1909)).

Here, Meta does not deny that Bright Data's right to search the public web is at least disputed.  Meta expressly disclaims any ownership in its users' data, and it offers no other non-contractual basis for preventing Bright Data's public search.  Instead, it says it has "some interest in policing the manner in which users access data on its social networks."  Ex. 8 at 27.  But Meta's

---

[4] Even if Meta alleged the elements of a Section 69(2) claim, it cannot obtain specific performance of the rejected Terms.  Quasi-contract merely "broaden[s] the remedies" for the unlawful dominion over another's property by creating "a ***fiction***" allowing ***damages*** to be "fixed by the offer rather than by the fair value of the property."  Rest. 2d §§ 4, cmt. b; 69.

*business* interest in blocking access to its platform has nothing to do with any underlying *property* right. Meta does not respond to this.

Instead, it argues that limiting quasi-contract claims to cases where the underlying property right is undisputed would "flip the summary judgment standard on its head." *Id.* Meta's argument is a non-sequitur. Rule 56 has nothing to do with whether quasi-contract provides an alternative vehicle to litigate disputed underlying *property* rights.

Consider again Meta's apple vendor. If the consumer "absconds" with the apple after "shouting 'I disagree,'" quasi-contract will step into the void because title to the apple was clear. But let's say two consumers reach for the same apple at the same time, each shouting to the other, "it's mine, and if you take it, you owe me $100." Quasi-contract cannot resolve the ownership question and will not require the victor to pay $100. Rather, the parties will be left to whatever non-contractual remedy they may have. This case is no different. The parties dispute whether Bright Data has the right to search the public web free from Meta's interference. Quasi-contract cannot resolve that claim.

### 2. Public Web Search Is a Right; It is Not Inconsistent with Any Public Website Operator's Property Interests.

Even if Meta could identify an ownership interest, Bright Data does not engage in an "act inconsistent" with that interest when it searches the web. Internet access presupposes the ability to search public websites. It does not make web surfers beholden to those who publicly post information. If Madonna posts information about her upcoming concerts on her public Instagram page, she has not formed a quasi-contractual relationship with each of the millions of fans who view that page. Nor has Instagram entered into a quasi-contractual relationship with those same fans when they view that same web page.

Everyday experience confirms this. Consider the following:

- A person browses a law firm's website to check his adversary's bio. He is not using the law firm's services; he is viewing the law firm's advertising materials.

- A person walks down the street and stops to browse a menu posted on an outside window. He is not using the restaurant products; he is *viewing* its advertising.

- A person clicks on a Google link and is redirected to the New York Times public Instagram page. That page contains teaser information about the New York Times

Cooking section along with a sign-in request to get more information about featured recipes.  That person is not using Instagram; he is *viewing* Meta's advertising.

The Internet is a "Social Contract."  Anyone can connect their servers to the Internet to make their websites available to the public, and anyone else can use their browsers to search those websites.  When they do, neither has become quasi-contractually bound to the other.  They are each simply exercising their God-given freedom.

### 3.    Meta's Browser-wrap Restraints Unreasonably Restrain Trade.

Even if Section 69(2) supplies "*implied*" assent and binds the offeree "in accordance with the offered terms," it does not allow a purported property owner to enforce a "promise in restraint of trade."  Rest. 2d §§ 62, 186; *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1150-51 (2020); *Total Recall Techs. v. Luckey*, 2021 WL 2590149, *12 (N.D. Cal. 2021) (interpreting licensing agreement as barring defendant from marketing products "beyond the specific prototype designs made for [plaintiff's] consideration" would lead to "door sealed shut by section 16600").

Here, through its browser-wrap offer, Meta seeks to enforce a promise not to compete with Meta by using "automated means" to scrape Meta sites or to sell data obtained in this manner.  That is a classic non-compete.[5]  "Giving companies like [Meta] free rein to decide, on any basis, who can collect and use data – data that the companies do not own, that they otherwise make publicly available to viewers, and that the companies themselves collect and use – risks the possible creation of information monopolies that would disserve the public interest."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022).

Under the Restatement, a "promise is in restraint of trade if its performance would limit competition in *any* business."  Rest. 2d § 186.  Meta does not deny that enforcing its browser-wrap terms would *completely* bar Bright Data from competing in the collection, sale, and use of public data found on Meta's website.  It also protects Meta from competition in that market and in a broader market for the collection, sale, and use of public data (or social media related public data)

---

[5] It does not matter that Meta's Terms avoid the word "non-compete" or that there may be some circumstances where it is appropriate to prevent automated search or sale of data (for example, when searching behind a log-in screen).  Rather, the question is whether it is reasonable *as-applied* to Bright Data's public search.  *See* Rest. 2d § 208, cmt. e ("Some types of terms are not enforced, regardless of context.…  Other terms may be unconscionable in some contexts but not in others.").

by making Meta the sole source of data derived from its websites.

Meta argues that it is impossible for it to restrain trade because nothing "prevent[s] Bright Data from developing it owns competing platform … if it is so inclined." Ex. 8 at 24. But that is not the market in which Bright Data competes, and it is not the only market in which Meta operates. Perhaps someday, Meta's dominance may be displaced by a new platform in the same way Facebook displaced MySpace. But that theoretical possibility does not mean that Meta is incapable of restraining trade in the meantime.

To determine if a restraint is enforceable, the Restatement establishes a two-part framework.[6] *First*, the Court must determine whether the restraint is "ancillary" to the overall purpose of the transaction or relationship. If it is not ancillary, it is *per se* unenforceable.

> "The restraint must … be **subsidiary** to an otherwise valid transaction or relationship that gives rise to such an interest. A restraint that is not so related to an otherwise valid transaction or relationship is necessarily unreasonable."

Rest. 2d § 187, cmt. b; *Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995) (finding a "covenant not to compete" of "infinite duration" was "naked, not ancillary, and *per se* illegal to boot").

Here, a prohibition on public web search is not ancillary to any business relationship with Bright Data. Bright Data, as a non-user, has no business relationship with Meta. Though a provision that prohibits automated scraping of information obtained **while logged-in** may be subsidiary to the creation of a user account, prohibitions relating to logged-off activity are not.

*Second*, even if the restraint was ancillary, it can only be enforced if reasonably tailored to protect a legitimate interest. Under the Restatement, an "ancillary" restraint is unreasonable if: "(a) [it] is greater than is needed to protect the promisee's legitimate interest, **or** (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public." Rest. 2d § 188. Here, Meta cannot show any legitimate need to restrict public web search. It argues only that the restraints are needed to "protect user privacy and the security of the Meta's platforms."

---

[6] There is no need to define markets, establish market power, or otherwise demonstrate violation of federal or state antitrust law. A different rule applies in antitrust cases and contract cases, since antitrust law imposes affirmative liability on dominant firms that engage in anticompetitive activity. Contract law simply asks whether a contractual restraint of trade should be enforced.

Ex. 8 at 24.  But this case involves only "public information [that Meta admits] can … be seen, accessed, reshared, or downloaded through third-party services," including "search engines" and the "media."  Ex. 10.  Meta's Terms do not purport to block any of this.  They only purport to block "automated" collection and sale of this data.  That is, it only prohibits **competitive** uses of public data, not non-competitive uses.

In contrast, the harm to Bright Data and the public is immediate and palpable, since Bright Data will be forced out of the market for this line of business, and the public will be deprived of their ability to engage in their own automated public searches or to contract with Bright Data for that information.  The provision cannot be enforced quasi-contractually.

## IV.   META'S CONTRACT CLAIMS FAIL AS A MATTER OF INTERPRETATION.

In the seconds before Bright Data first signed up for a Meta user account, it was not subject to any contract and had the unequivocal right to search any public website, including Facebook and Instagram.  Meta now claims that Bright Data was forever stripped of that right when it created the now-terminated user accounts.  But that argument fails because Meta's Terms do not apply to public search and, even if they did, any such prohibition does not survive in perpetuity.

### A.   *Meta's Terms Do Not Apply to Public Web Search.*

Meta says that "this case is not about Bright Data's (or anyone else's) right to view information on the Internet."  Ex. 8 at 1.  But it seeks to enforce its Terms to prohibit exactly that.  It cannot do so because the Terms do not apply to public web search.  No person signing up for an internet user account would reasonably believe that, by doing so, they are giving up their inherent rights as members of society to engage in lawful conduct unrelated to the use of that account.

Meta's Terms are contracts of adhesion offered, in Meta words, on a "take-it-or-leave-it" basis.  Ex. 8 at 14-15.  Because it is a "standard contract" not subject to negotiation, extrinsic evidence of meaning and intent are inadmissible.  *Ewert v. eBay, Inc.*, 2010 WL 4269259, *6-7 (N.D. Cal. 2010).  Its terms, instead, are narrowly interpreted as **a matter of law** with all ambiguities resolved against the drafter.  Rest. 2d § 206; *Victoria v. Superior Court*, 40 Cal. 3d 734, 739 (1985) ("Ambiguities in standard form contracts are to be construed against the drafter"); *Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 248 (2016) (same).  As such, if **any** reasonable

interpretation favors Bright Data, that interpretation governs. *W. Filter Corp. v. Argan, Inc.*, 540 F.3d 947, 954 (9th Cir. 2008) (***rejecting*** drafter's broad "interpretation [that was] reasonable" and even "more practical" because the provision "can also be reasonably read" more narrowly); *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, *10 (N.D. Cal. 2022) ("Meta's policies must have only one plausible interpretation" to be construed in its favor); *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 620 (N.D. Cal. 2021) (same).

Meta must, therefore, show that the Terms ***unambiguously*** apply to public web search.  It cannot do this.  The Terms do not contain a single word about public web search.  Nor do they expressly state that they apply to non-member or logged-off activity.  Meta also does not disclose to account holders that the Terms might prohibit conduct *indistinguishable* from activities non-members freely engage in, and that they too could have engaged in just prior to signing up.

To the contrary, the Terms, read fairly, make clear that they apply only to logged-on activities.  Meta's Terms begin with a statement concerning their scope.  Meta tells account holders that the Terms only "govern [their] use of Facebook" and their "use of Instagram."  Exs. 1, 2. These provisions set the boundaries on the scope of users' obligations under the Terms.  The word "govern" means to "control," *see* Black's Law Dictionary (11th ed. 2019), and thus, the Terms, by definition, only "control" a user's use of Facebook and Instagram; they do not "control" anything else.  Meta ignores this limitation on the scope of its Terms.  But it cannot because that would render the scope provision superfluous.  *Remedial Constr. Servs., LP v. AECOM, Inc.*, 65 Cal. App. 5th 658, 663 (2021) (courts "avoid interpretations that render any portion superfluous.").

To fall within the Terms' scope limitation, Meta must show public web search is unambiguously a "use of Facebook" or a "use of Instagram."  The Terms, however, do not define "Facebook," "Instagram," or "use" of either.  The Court must, therefore, look to the "reasonable expectations of the average member of the public," construing the Terms "as a whole."  *eBay, Inc.*, 2010 WL 4269259 at *7; *Joseph v. City of Atwater*, 74 Cal. App. 5th 974, 983 (2022).  Doing so makes clear the Terms apply only to logged-on activities.

The Terms describe Meta's services *exclusively* in terms of logged-on user activities.  Meta describes the Facebook Service as a "personalized experience" that is "unlike anyone else's: from

the posts, stories, events, ads, and other content you see;" "connect[ing] you with people" by making suggestions for "groups to join, events to attend, Facebook pages to follow …, shows to watch, and people you may want to become friends with;" and posting information to "express yourself." Ex. 1. Meta does not provide any of these services to non-members. Nor can these benefits be obtained without signing in to a user account. Logged-off searchers and visitors do not receive a personalized experience, are not connected to other users, and can't post anything.

The same is true of Instagram. The Instagram Terms say the "Service is made up of … personalized opportunities;" "a positive, inclusive, and safe environment;" use of "technologies that help [**Meta**] serve [its] growing community;" a "consistent and seamless experience[] across other Meta Company Products;" "access to [its] service" by "stor[ing] and "transfer[ring] data" to foreign jurisdictions to enable **Meta** to provide its service; selling user data to third parties in order to "connect" users to third-party advertisers; and use of user data to "study" them. Ex. 2. Most of these so-called "services" are for Meta's benefit, not obligations, promises, or services made to users. But even if they were, none are services available to **non-members** or logged-off searchers.

In the Delaware Litigation, Meta did not deny that all the services described in its Terms are only available when signed in through a user account. Instead, it tried to sidestep the point by asserting that the Terms merely describe "*additional* services to accountholders" above some **undisclosed** "baseline services" that it supposedly provides to the public. Ex. 8 at 23. That argument is frivolous. Since the Terms represent the "entire agreement" among the parties and expressly exclude any implied obligations, *see* Ex. 1 § 4.5.1, there is no separate "baseline" of unspecified services that Meta provides to non-accountholders.

The "commitments" users make, including those that Meta seeks to apply to Bright Data, are made "in exchange" for "these services." Ex. 1 § 3; Ex. 2. That is, the "commitments" are made by logged-in users to obtain the logged-in services from Meta. Also consider Meta's definition of "who can use" Facebook or Instagram. *Id.* Users must use their real name, "provide accurate information," "create only one account," and "not share" passwords. Again, all logged-in activities. Facebook and Instagram users also cannot be "under 13 years old." While Meta may not allow a 12-year-old to open an account, it certainly is not stopping all middle schoolers from

accessing public Facebook and Instagram pages.

Even the provisions-at-issue make clear that they do not apply to logged-off activities.  The Instagram Terms tell users that they cannot "sell … data obtained from us," explaining that "this includes attempts to buy, sell, or transfer any aspect of *your account* (including your username); solicit, collect, or use *login credentials* or badges of other users; or request or collect Instagram *usernames, passwords*, or misappropriate access tokens." Ex. 2.  Each of these examples *requires* a user account.  As such, this prohibition does not apply to mere *logged-off* search.  *See Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1045-46 (2008) (under the principle of *ejusdem genirs* (literally, of the 'same kind'), in which "general words in a contract … are construed to embrace only things similar in nature to those enumerated by the specific words.").

The Instagram Terms relating to automated access similarly *cannot* be construed to include public web search.  That provision says users cannot "access or collect information in unauthorized ways" and it says that it "reserve[s] all rights not expressly granted to you." Ex. 2.  But Meta does not *expressly* authorize non-members to do anything, so – under Meta's interpretation – all public web search (including manual visitation) is "unauthorized."  That is absurd.  The only reasonable interpretation is that Meta provides authorization through the user account, which implies that logged-off search is not covered.  *Ta Chen Int'l, Inc. v. Benada Aluminum Prod., LLC*, 2021 WL 7541515, *7 (M.D. Fla. 2021) ("If one construction … would lead to an absurd conclusion, such interpretation must be abandoned."); *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 719 (9th Cir. 2020).

The Facebook Terms are also ambiguous at best.  They say, "you may not access or collect data from our Products using automated means (without our prior permission) or attempt to access data you do not have permission to access."  But as noted, the Facebook Terms preclude the grant of any implied rights.  So, if Meta's interpretation were correct, no nonmember could manually view a Meta website because Meta never *expressly* gives them permission to view its sites.

The Terms' remedy and termination provisions similarly demonstrate that they do not apply to public web search.  The Facebook Terms provide a special remedy to address violations of the prohibited activities section of the Terms, including the provisions relating to scraping.  The only remedy specified is account termination.  Ex. 1 § 3.2 ("We can remove or restrict access to

content [or] suspend or disable your account."). The clear implication is that this suffices to prevent future violations. But because account termination has no effect on public web search, public web search must not be a violation. Similarly, the Instagram Terms' scraping prohibitions do not survive account termination, which also strongly suggests that logged-off scraping is not a prohibited activity because logged-off scraping and non-member scraping is indistinguishable.

*CollegeSource, Inc. v. AcademyOne, Inc.*, 2012 WL 5269213, *11-12 (E.D. Pa. 2012), is squarely on-point. There, the plaintiff claimed that its subscription agreement expressly "extend[ed] beyond the actions of [the defendant] while logged in as a subscriber and includes [its logged-off] access" to plaintiffs' "other electronic services." Rejecting this argument, the court looked to how the agreement used the term "Service," noting that "some of these usages are not applicable" to logged-off search but specific to logged-in activities – *e.g.*, sharing usernames. Thus, "from the position of the subscriber, it is difficult to imagine that [defendant] intended to bind itself to restrictions to use in the [logged-off] context." *Id.* As the Court explained, if the plaintiff "had intended its subscriber agreement to include [logged-off access], it did not make its intention clear." *Id.* The Third Circuit affirmed because a subscriber "could not have reasonably interpreted the Agreement" to cover logged-off search. 597 Fed. Appx 116, 127 (3d Cir. 2015).

Here, not only do the Terms themselves suggest that they are limited to logged-on search, so do the "circumstances under which [the agreement] was made." *See DIRECTV*, 977 F.3d at 717. Both Facebook and Instagram employ sign-up pages to ask visitors if they would like to join in exchange for access. Up to that point, Meta is not providing any services to the visitor, but instead is advertising its wares. Meta itself does not view mere visitors to the public portions of its website as "users" of its services. Meta has admitted in judicial filings that non-members who search *public* Facebook pages are not "actual users" of Meta's Products:

> "A **putative *Facebook user* cannot become an *actual Facebook user*** unless and **until they have clicked through** the registration page where they acknowledge they have read and agreed to Facebook's terms of use." Ex. 11, ¶ 2.

Based on this, courts have held that, as "a matter of logic" it is "***impossible***" to use Meta's services

without a user account. *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 834 (S.D.N.Y. 2012).[7] As such, public search not involving a user account is not a "use of" Facebook or Instagram.

Bright Data's interpretation – that the Terms are limited to the use of services Meta makes available through a user account – may or may not be what Meta intended its Terms to say, and it may not even be the only possible interpretation of the Terms. But it is certainly a reasonable one. Indeed, it is the most likely one. No reasonable person would believe that, by signing up for an account, even for a nanosecond, they have forever given up their right to search public information on terms they had seconds before. That is enough to conclude that the Terms do not apply. *CollegeSource*, 2012 WL 5269213; *DIRECTV, LLC*, 977 F.3d at 717; *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016) ("no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain cell phone service would obligate them [sic] to arbitrate literally every possible dispute … *unrelated* to cell phone coverage.").

## B. Any Prohibition on Public Web Search Cannot Apply in Perpetuity.

Even if Meta's Terms do apply to pre-termination public search, they cannot prevent Bright Data from searching and using publicly available information in perpetuity. Meta concedes that the survival clause in its Instagram account does not apply to any prohibition on future scraping. Ex. 8 at 12. So, any forward-looking Instagram claim must be dismissed.[8]

The Facebook claims must also be dismissed. As the Supreme Court explained, under "traditional principle[s]" of contract law, "courts should not construe ambiguous writings to create lifetime promises." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441 (2015). As such, "lifetime" commitments must be stated in "clear and express language." *Kepner v. Weyerhaeuser Co.*, 2016 WL 5939153, *3 (D. Or. 2016); *Nova Chemicals, Inc. v. Sekisui Plastics Co., Ltd.*, 2008

---

[7] In the Delaware Litigation, Meta tried to disavow its own declaration as a mere "litigation filing" that is "more than a decade ago." Ex. 8 at 20 n.1. But the fact that courts have relied on this declaration is a reason to credit the concession – and indeed, to judicially estop Meta from denying it – not to discredit it. *See Levin v. Ligon*, 140 Cal. App. 4th 1456 (2006).

[8] Meta argues that claims for ***post-termination*** sales of data collected prior to account termination survive termination. Because the Instagram Terms do not survive termination, if the pre-termination search did not violate the Terms, then neither does the post-termination sale. As to Facebook, Bright Data agrees that, for purposes of this motion, the Court's disposition of pre-termination claims applies to the post-termination sale of data collected prior to termination.

WL 4170029, *10 (W.D. Pa. 2008) ("Contractual provisions should not be construed to create a perpetual term unless such intention is expressed in clear and unequivocal terms."); *Hutchison v. Sunbeam Coal Corp.,* 519 A.2d 385, 390, n. 5 (Pa. 1986) ("a lease will not be construed to create a perpetual term unless the intention is expressed in clear and unequivocal terms.").

Meta, however, did not use clear and express language to create a lifetime ban. The Facebook Terms do not state that they apply to former members' search in perpetuity. If Meta wanted to create a lifetime ban, it could have said: "WARNING:  If you create an account, you may ***never*** visit a Facebook page again in the future without abiding by these terms."  That may still be unconscionable, but at least it would have been clear.  Meta chose not to do this.  Nor did Meta tell users that they are permanently giving up important legal rights the rest of society enjoys, and that they too enjoyed just minutes before, with no opportunity to ever get them back.

No reasonable person reading the Facebook Terms would believe that the four-word fragment – "will remain in place" – forever strips them of their lawful right to search the web. Consider, for example, a person who wondered what the hubbub was all about in 2004, the year Facebook was founded.  She signs up for an account, and promptly deletes it ten minutes later after finding it to be a total waste of time.  Is she now forever bound, even though she has not used a Meta account in twenty years and isn't doing anything that couldn't be done by some less curious person who never opened an account?  And if she is bound, what Terms is she bound to?  The Terms in effect twenty years ago that not even Meta says applies anymore, the current Terms she never agreed to, or some weird amalgam of past and present?

The simple answer is she is not bound at all because the Terms do not apply to post-termination conduct.  Courts reject any interpretation of survival clauses that would apply "years, decades, or even centuries after the [contract] expired."  *Webb Candy, Inc. v. Walmart Stores, Inc.*, 2010 WL 2301461, *6-7 (D. Minn. 2010).  Rather, courts limit survival provisions to conduct that arises out of or shares a nexus to pre-termination conduct.  *Id.* ("the only sensible" reading of a survival clause is that it applies "only to [disputes about] merchandise … delivered while the agreement was still in effect."); *Comcast Corp. v. Rovi Corp.*, 2016 WL 7235802, *4 (S.D.N.Y. 2016) (clause "survives" only with respect to transactions "that occurred before" the agreement

expired); *Uniloc 2017 LLC v. Google LLC*, 52 F.4th 1352, 1358 (Fed. Cir. 2022) (dispute resolution terms "by their nature" only "survive termination [for] ***breach occurring during the term of the contract***."); *ESCgov, Inc. v. BMC Software, Inc.*, 2015 WL 12765989, *3 (E.D. Va. 2015) (the parties "could not have intended the provision to last 'perhaps, into perpetuity'…. It is far more reasonable that … the provision would carry over only to claims arising from events that occurred prior to the expiration of the PNA, not alleged tortious interference years later.").

Meta's attempt to create a lifetime ban is also inconsistent with the Terms' structure. Meta tells users that they are free to reject Meta's terms going forward. "If you do not agree to [the Facebook] Terms," Meta says, "you can delete your account at any time," which will then "terminate [any] agreement between" the parties. Ex. 1. But because the survival clause applies to ***all*** user obligations and "commitments," under Meta's interpretation, it would be impossible for a user to ever terminate *any* obligation. Indeed, there would be no difference between the Terms as written and telling users that "if you don't agree to the terms, you can delete your account. Just kidding. You can't."

Because the "logical implication of [Meta's] argument is that [a terminating user's] obligations continue in perpetuity," it "cannot be right." *Ta Chen Int'l, Inc. v. Benada Aluminum Prod., LLC*, 2021 WL 7541515, *7 (M.D. Fla. 2021); *Webb Candy*, 2010 WL 2301461 at *6 ("When interpreting contracts, a court must, to the extent possible, give effect to every provision…. If, as Walmart contends, the Supplier Agreement is meant to last into eternity, then many of its clauses would be rendered useless, including the clauses providing that the agreement expires in one year…. Walmart's reading of the contract is entirely implausible.").

The court's decision in *Ta Chen* is highly instructive. There, the parties entered into a "take-or-pay" contract, in which the obligations to "take-or-pay" for aluminum supplies "expressly survive[d] termination." *Ta Chen*, 2021 WL 7541515 at *1, *6-7. The court rejected the counterclaim plaintiffs' argument that this provision created any post-termination obligations. Instead, the court agreed that the "most reasonable interpretation of the Survival Clause is that any ***accrued*** obligations the parties owed each other prior to termination ... are not extinguished by virtue of the termination, but that any obligation for ***future performance*** is terminated." *Id.* As

the Court explained, this interpretation "comports with reason, probability, and traditional contract principles; does not render multiple provisions of the Supply Agreement superfluous; and does not lead to absurd results." *Id.* Here, too, the only reasonable interpretation of the survival clause is that it preserves claims relating to or arising out of pre-termination conduct.

### C.    Applying the Terms to Prevent Public Search in Perpetuity Is Unconscionable.

Meta's interpretation also renders the Terms unconscionable. Under California law, "overly harsh, unduly oppressive, … unfairly one-sided" provisions in adhesion contracts are unenforceable." *Oto, LLC v. Kho*, 8 Cal. 5th 111, 125 (2019). To be unconscionable, a provision must be both procedurally and substantively unconscionable, with each prong evaluated on a sliding scale. *Id.* "Unconscionability is ultimately a question of law for the court." *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 851 (2001).

Here, Meta cannot deny that its Terms are procedurally unconscionable. "California and Ninth Circuit case law have consistently found that 'take it or leave it' contracts implicate procedural unconscionability." *Milliner v. Bock Evans Fin. Couns., Ltd.*, 114 F. Supp. 3d 871, 878 (N.D. Cal. 2015). This Court also found that Meta's Terms are "procedurally unconscionable." *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218 (N.D. Cal. 2022).

The application of the Terms to create a lifetime ban is particularly unconscionable because it "appears to have been drafted with an aim to thwart, rather than promote, understanding." *Oto*, 8 Cal. 5th at 129. It would certainly surprise most people that the four-word fragment – "will remain in place" – was secretly designed to nullify the user's ability to forever escape **any** of the Term's obligations, after just telling them that they can "delete [their] account at any time" if they "do not agree … to the Terms." Exs. 1, 2.

Not only is this procedurally unconscionable, it is substantively unconscionable. The survival clause would impose perpetual obligations on former users, but release Meta from any obligations to provide services in the future. *Flores*, 93 Cal. App. 4th at 855 (concluding that provisions that are "one-sided [are] substantively unconscionable.").

Even aside from one-sidedness, a lifetime ban on public web search is substantively unconscionable. While Magistrate Spero ultimately concluded that the prohibitions on **logged-on**

*search* was not substantively unconscionable in *BrandTotal*, he expressly noted that he might reach the opposite conclusion for logged-off search if the question were presented.

> "It is not entirely clear whether Meta is taking the position that even non-automated access by BrandTotal to public (*i.e.*, ***non-password-protected***) portions of Facebook is a violation.… In light of the concerns raised by the Supreme Court … and the *Ninth Circuit* [about restrictions on public access], enforcing the terms of use in that manner would raise greater concerns."  605 F. Supp. 3d at 1256 n.27.

Here, Meta offers no justification for preventing future public web searching in perpetuity. In the Delaware Litigation, Meta offered a hypothetical in which a user "could create accounts, ***use them for scraping***, and then seek to evade liability by cancelling their accounts." Ex. 8 at 12. But that presupposes that the injury arises from the pre-termination use of an account.  Bright Data does not dispute that the survival clause preserves claims arising out of pre-termination use of a user account.  We argue only that post-termination conduct that does not make use of any such account is not covered.  *Foster Cable Servs., Inc. v. Deville*, 368 F. Supp. 3d 1265, 1274 (W.D. Ark. 2019) ("The fact that the Agreement … does not state a time limitation, but instead applies forever, further supports a finding that it is unenforceable."); *Howard Schultz & Assocs. v. Broniec*, 236 S.E.2d 265, 270 (Ga. 1977) ("The nondisclosure covenant here contains no time limitation and hence it is unenforceable."); *Nalco Chem. Co. v. Hydro Techs., Inc.*, 984 F.2d 801, 804 (7th Cir. 1993) (confidentiality clause without "a durational limitation" is void and unenforceable).

### D.      Meta's Terms Do Not Prevent Third Parties from Using Bright Data's Services.

Meta also asserts that Bright Data breached its alleged contracts with Meta by facilitating, supporting, or encouraging third parties to violate their contracts with Meta.  Cmplt. ¶¶ 22, 50, 68. But this claim fails for the same reasons Meta's tortious interference claim fails.  Meta has not alleged that Bright Data knowingly induced, facilitated, supported, or encouraged third parties to breach their obligations to Meta.  All Meta alleges is that Bright Data offered ***lawful*** proxy and scraping services.  Just as that does not state a claim for knowing inducement, it does not state a claim for facilitation, support, or encouragement.

But even putting pleading deficiencies aside, the Terms do not affirmatively oblige Bright Data to monitor its customers' use of its network for compliance with Meta's terms.  Nor do the

Terms allow Meta to conscript Bright Data into Meta's enforcement team.  This is for two separate reasons.  *First*, as discussed above, the Terms, by their express language, limit their scope to the "use of Facebook" and "use of Instagram."  Bright Data is not using Facebook or Instagram when it offers customers access to its proxy network or scraping tool.  Just as Verizon does not "use Facebook" when its millions of customers search the web, neither is Bright Data.

  *Second*, the terms "facilitate," "support," and "encourage" are susceptible to many interpretations and do not unambiguously cover third-party use of Bright Data's tools.  A mother that feeds her child breakfast before he goes off and robs a bank is arguably supporting and facilitating the violation.  But the definition of facilitation and support does not extend so far.  *People v. One 1959 Porsche Coupe,* 252 Cal. App. 2d 1044, 1050–51 (1967) ("'Facilitate' should be given a meaning similar to the word 'abet' which, in law, implies action taken with a purpose to reach a planned and unlawful objective.").  As the Supreme Court held just weeks ago:

> "The mere creation of [social media] platforms … is not culpable.  To be sure, it might be that bad actors … are able to use platforms … for illegal – and sometimes terrible – ends.  But the same could be said of cell phones, email, or the internet generally.  Yet, we generally do not think that internet or cell service providers incur culpability merely for providing their services to the public writ large."

*Twitter, Inc., v. Taamneh,* 143 S. Ct. 1206, 1225-26 (2023).  Perhaps if Meta had alleged that, pre-termination, Bright Data made its user account available to customers (i.e., shared its password) so they could scrape Meta's sites using automated means, it could state a claim for breach of contract, since it would involve both the use of Meta services and facilitation.  But Meta has not alleged anything of the kind.  It alleges only the sale of a lawful service.  That is not unlawful.  There is no breach of contract claim flowing from it.

## V.  CONCLUSION.

  For the foregoing reasons, Bright Data's motion for summary judgment on Count I should be granted.

Dated: June 12, 2023

Respectfully submitted,

/s/ *Colin R. Kass*

Colin R. Kass*
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick*
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

Robert C. Goodman (Bar No. 111554)
Lauren Kramer Sujeeth (Bar No. 259821)
ROGERS JOSEPH O'DONNELL, PC
311 California Street, 10th Floor
San Francisco, CA 94104
(415) 956-2828
rgoodman@rjo.com
lsujeeth@rjo.com

Sehreen Ladak (Bar No. 307895)
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
(310) 284-5652
sladak@proskauer.com

*Attorneys for Defendant Bright Data Ltd.*
*\*Admitted pro hac vice*