DAVID H. HARPER (*Pro Hac Vice*)
david.harper@haynesboone.com
JASON P. BLOOM (*Pro Hac Vice*)
jason.bloom@haynesboone.com
**HAYNES AND BOONE, LLP**
2801 N Harwood St., Suite 2300
Dallas, Texas 75201
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

JASON T. LAO, SBN 288161
jason.lao@haynesboone.com
ANDREA LEVENSON, SBN 323926
andrea.levenson@haynesboone.com
**HAYNES AND BOONE, LLP**
600 Anton Boulevard, Suite 700
Costa Mesa, California 92626
Telephone: (949) 202-3000
Facsimile: (949) 202-3001

*Attorneys for Plaintiff*
*X Corp.*

Colin R. Kass (*pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick (*pro hac vice*)
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

*Attorneys for Bright Data Ltd*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X CORP., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>BRIGHT DATA LTD., an Israeli corporation,<br><br>Defendant. | Case No. 3:23-cv-03698-WHA<br><br>**JOINT CASE MANAGEMENT STATEMENT AND [PROPOSED] ORDER**<br><br>Date: January 10, 2023<br>Time: 8:00 a.m.<br>Courtroom: 12, 19th Floor<br><br>Hon. William Alsup |

The parties to the above-entitled action submit this Joint Case Management Statement and (Proposed) Order pursuant to Fed. R. Civ. P. 26(f), the Standing Order for All Judges of the Northern District of California, and Civil Local Rule 16-9. On November 8, 2023, the parties held a conference, pursuant to Fed. R. Civ. P. 26(f).

**1.     Jurisdiction and Service**

On September 25, 2023, Bright Data Ltd. ("Bright Data") filed an executed Waiver of Service of Summons. Dkt. 17.  This Court has subject matter jurisdiction under 28 U.S.C. § 1332 over the causes of action alleged in the Complaint because complete diversity exists, and the amount in controversy exceeds $75,000. Compl. ¶ 7. Bright Data has challenged personal jurisdiction for X Corp.'s tort claims (Counts II-VI). Dkt. 42.

**2.     Facts**

*X Corp.'s Statement of Facts*

X Corp. owns and operates the social media platform X (formerly known as Twitter), accessible through twitter.com, X.com, and various mobile and online applications. The X platform has hundreds of millions of active users worldwide. X Corp. allows its users to post and share content, including written comments, images and videos, and to share, like, and comment on other users' posts. To post content on X or to re-post, like or otherwise interact with posts by others, users must register for an account and log in to that account. To register, users must provide their name, phone number or email address, and date of birth. X Corp. then verifies registrants through email or phone confirmation. X Corp. utilizes a variety of technological measures to detect and prevent automated systems from registering for accounts, including by requiring potential account holders to complete a "CAPTCHA" fraud-detection process to determine whether the user is human.

X Corp. recently discovered that Bright Data has engaged in widespread scraping[1] of X Corp.'s data, circumventing X Corp.'s technical barriers and violating the Terms to which Bright

---

[1] Scraping is the process of using automated means to collect content or data from a website. The process involves making a request to a website's server, downloading the results and parsing them to extract the desired data.  Data scrapers typically send large volumes of these requests, taxing the capacity of servers and diminishing the experience for legitimate users.

Data agreed. Bright Data also facilitated the scraping of data from X and induced X users to violate X Corp.'s Terms. In fact, Bright Data's website makes clear that the company engages in prohibited scraping on an industrial scale and brazenly advertises that Bright Data sells tools and services that encourage and enable others to engage in prohibited scraping.

X Corp.'s Terms expressly prohibit such activities. Specifically, all users who register for a X account, and/or view the X website or application, agree to a binding contract with X Corp. as outlined in X Corp.'s User Agreement, which is comprised of the Terms of Service, Privacy Policy, and the Twitter Rules and Policies (collectively the "Terms").  X Corp.'s Terms state that a user may not "access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers" or "breach or circumvent any security or authorization measures."  They also state a user may not "access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us."  In addition, X Corp.'s Terms specifically state that "scraping the Services without our prior consent is expressly prohibited."  Under the Terms, users may not "forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information."  Users are also prohibited from any conduct that would "interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including … overloading, flooding, spamming … or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services."  The Terms also incorporate by reference X Corp.'s Platform Manipulation and Spam Policy (the "Policy"), which specifically prohibits "coordinated harmful activity that encourages or promotes behavior which violates the Twitter Rules." The Policy also prohibits "leveraging Twitter's open source code to circumvent remediations or platform defenses."  The Terms prohibit selling any content collected from the platform.  Users may not "reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services" unless otherwise authorized by the Terms or a developer agreement.

Advertisers on the X platform are also subject to X Corp.'s Ads Policies, which expressly state that advertisers must follow the Terms and all X Corp. Rules. For developers who wish to retrieve or analyze X Corp.'s data, X Corp. offers specialized access to its Application Programming Interfaces ("APIs") through a tiered subscription service. X Corp.'s Developer Agreement also limits the access of developers to X Corp.'s content. The Agreement instructs developers that they "may not exceed or circumvent rate limits, or any other limitations or restrictions described in this Policy or your agreement with Twitter, listed on the Developer Site, or communicated to you by Twitter." In addition, X Corp. utilizes a variety of technological measures to detect and prevent automated systems from scraping data from its platform, including industry standard automation prevention techniques, such as CAPTCHAs, user identification and IP rate limits and anomaly detection tools.

Bright Data agreed to all of those Terms when it created and maintained X Corp. accounts. Moreover, X Corp. has never granted Bright Data permission to scrape data from the X platform. Bright Data has not publicly disclosed how it evades X Corp.'s technical safeguards against scraping. But its website makes clear that Bright Data offers X Corp.'s data (which could have only been obtained by engaging in prohibited scraping of the X platform) for sale on its website; and sells tools and services that encourage and enable others to engage in prohibited scraping.

### *Bright Data's Statement of Facts*[2]

X's terms do not and cannot prohibit Bright Data from searching the public web.

The public has a right to search public information. Seems like a basic, even universal, human right. But X says no. It says it controls its corner of the Internet. But this case does not concern any proprietary or confidential information. Twitter, and now X, bills itself as a public town square, telling users – in the very contracts sued upon – that, by tweeting, they are "directing [X] to disclose [their] information as broadly as possible." In offering its service, X made the unilateral decision to connect its servers to the Internet and invite anyone, anywhere to access its content. X's content is "public by default" and "available for viewing by the ***general public***." X

---

[2] Unless otherwise noted, Bright Data's separate statements focus on X's operative Complaint. To the extent Bright Data asserts counterclaims, additional facts and legal questions may arise, which may require additional discovery and motions, and may require revisiting the schedule.

admits that "*the public does not need to be signed in to view [this] content*." Nor does X assert any copyright or other property interest in this information. It is also content X decided not to protect under the Computer Fraud and Abuse Act by putting it behind a log-in screen. Instead, X seeks to exert control over this *public domain* information through contract. This case tests the strength of those contracts

X first sues under contract. But there is no current contract between Bright Data and X, and thus, no *forward-looking* contract claim. After years of approving ads and accepting advertising dollars from Bright Data, X – under new ownership by Elon Musk – had a change of heart, and so, without notice, it filed suit against Bright Data seeking to enjoin Bright Data's services. Upon notice, Bright Data severed any ongoing contractual relationship with X, and provided formal notice of its rejection of X's Terms of Service. As Bright Data wrote on September 25, 2023:

> "[Y]ou identify a single Bright Data X account, @bright_data, that you assert forms the basis of your contract claim against Bright Data. As you know, this account is not and never was used in connection with, and is completely unrelated to, Bright Data's search and scraping activities that you now complain about. But because you have identified this account as the source of your contract claim, *we have exercised our right to terminate the account and any agreement between Bright Data and X*. ….
>
> As such, all Twitter or X accounts that are or were owned, controlled, or managed by Bright Data have now been terminated. Bright Data is, therefore, no longer "using" X's services and is now not subject to X's User Agreement.
>
> To be clear, *as of now at least, you are on notice that Bright Data affirmatively rejects and does not consent to any agreement to your user terms in any context for any reason.* Nor will there be any future contract – or "meeting of the minds" – between the parties relating to the activities at issue absent a written agreement physically hand-signed by both parties."

This termination and rejection precludes any finding of mutual assent. X's forward-looking contract claim also fails for lack of consideration, since X does not provide Bright Data with anything of value in exchange for any purported promise not to search the web. Because X lacks any *independent* legal right to bar members of the public from searching the web (such as any right under property law, copyright law, or the CFAA), it has not provided Bright Data with anything to which Bright Data does not already have an unequivocal legal right.

X's **backward-looking** claims similarly fail on the facts. Bright Data does not use, and never has used, any Twitter (or X) account to scrape Twitter. Bright Data simply searches the public web. The Terms, which are terms of "adhesion" and must be strictly construed against X, do not unambiguously prohibit search activity that does not require the use of an account. That is, when X's contract claim is based on the existence of an account, only account-related activities are governed by the Terms. In any event, the parties' course of conduct makes clear that X's claims lack merit. As X alleges, "[b]eginning on March 7, 2016, [Bright Data] purchased advertising on X," in order to "promote [its] data scraping products and services." Having accepted, approved, and profited from Bright Data's services, X cannot now claim that those services were unauthorized or otherwise prohibited by X's Terms of Service.

In any event, X does not make any non-conclusory claim to damages arising from Bright Data's past scraping. It seeks attorneys' fees – in the euphemistically called "investigation costs" – but contract law does not allow recovery of such costs. Nor does it allege any other actual injury beyond unspecified, conclusory claims of a "hamper[ed] user experience." To the contrary, it represented to the world, through its Privacy Policy, that it wanted to "disclose [its user's tweets] as ***broadly as possible***," making the information "available for viewing by the **general public**" and for collection by "*Internet search engines*" who have scraped the data.

X also brings a tortious interference claim against Bright Data – not for Bright Data's own scraping activities – but for some unidentified, and unalleged, third-party customer who uses Bright Data's proxy network to search the web. The Complaint fails to allege that any such customer has a contract with X (which is fatal to any tortious interference claim). But even if X could overcome this deficiency, its claim would still fail. Bright Data offers services that enable customers to search the web through a proxy-network (which is a well-established Internet technology). This proxy network has an infinite variety of perfectly lawful, unchallenged purposes. X does not allege that Bright Data's tools lack any legitimate uses, or that Bright Data knew "with at least substantial certainty" that any *particular* customer would use them for illicit purposes. This is fatal. As the Supreme Court explained last term, "we generally do not think that internet or cell service providers incur culpability merely for providing their services to the public writ large,"

even if "some bad actors [take] advantage of these platforms." *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1126 (2023). "A contrary holding would effectively hold any sort of communication provider liable for any sort of wrongdoing ***merely for knowing*** that the wrongdoers were using its services and failing to stop them. ***That conclusion would run roughshod over the typical limits on tort liability***."

X's other non-contract claims, such as trespass to chattels, misappropriation, and unfair competition also fail for the simple fact that surfing the public web does not interfere with any property right. The Internet is a global communications network that X decided to participate in by connecting its servers to the Internet and inviting digital requests. Just because a particular server request may be unwelcome does not make it illegal.

3.  **Legal Issues**

The principal legal issues in this dispute are:

***X Corp's Statement of Legal Issues***

- Whether Bright Data's conduct constitutes a breach of X Corp.'s Terms.
- Whether Bright Data's conduct tortiously interfered with X Corp.'s contractual relations with its users.
- Whether Bright Data's conduct constitutes a trespass to chattels.
- Whether Bright Data is liable for committing Unlawful, Unfair Business Practices under Cal. Bus. & Prof. Code § 17200, et seq.
- Whether Bright Data conduct is unlawful under a theory of unjust enrichment.
- Whether Bright Data's conduct is unlawful under a theory of misappropriation.
- Whether X Corp. is entitled to the relief sought in the Complaint.

***Bright Data's Statement of Legal Issues***

- Whether X Corp's post-termination browser-wrap contract claim fails for lack of mutual assent and lack of consideration.
- Whether X's attempt to use its Terms to prevent public search is unconscionable or otherwise unreasonably restrains trade.
- Whether the Court lacks personal jurisdiction over Bright Data with respect to X

- Corp.'s tortious interference, unjust enrichment, trespass to chattels, misappropriation, and UCL claims.
- Whether X's trespass to chattels claim fails because searching the public web does constitute a trespass and neither does the website operator suffer injury from such a search.
- Whether X's misappropriation claim fails as X does not have any property rights to the public Internet.
- Whether X's unfair competition claims fails without any unfair method of competition or violation of any applicable law.
- Whether X Corp's unjust enrichment claim fails because X Corp. lacks any independently legally-protectable interest in blocking public web search.
- Whether X Corp.'s claims must be dismissed for lack of any alleged injury.

**4.    Motions**

***Pending Motions***

On December 13, 2023, Bright Data moved to dismiss X Corp.'s non-contract claims (Counts II through VI) and breach of contract claim, in part, under Rule 12(b)(6) for failure to state a claim, and the non-contract claims (Counts II through VI) under Rule 12(b)(2) for lack of personal jurisdiction. Dkt. 42. The hearing is scheduled for January 10, 2024.

Bright Data has also moved for a stay of discovery pending resolution of its Motion to Dismiss and anticipated Summary Judgment motion on X Corp.'s contract claim. Dkt. 43. The hearing is scheduled for January 10, 2024.

***X Corp.'s Anticipated Motions***

X Corp. initially intends to file a summary judgment motion on the affirmative elements of X Corp.'s breach of contract claim—namely that Bright Data is liable for breaching the Terms by scaping X Corp. user data, selling X Corp. user data, and enabling and encouraging others to do so. This initial summary judgment motion will not impact X Corp.'s ability to file additional summary judgment motions as appropriate.

***Bright Data's Anticipated Motions***

Bright Data also intends to file an early summary judgment motion on X Corp.'s breach of contract claim. Bright Data's position is simple: Today there is no contract, and that presents pure questions of law. Bright Data contends that no discovery is needed for the motion because the only material fact is Bright Data's termination of its accounts and rejection of X's Terms. As noted above, that requires simply putting Bright Data's rejection letter in the record. Otherwise, on a pre-discovery summary judgment motion, the allegations are accepted as true much like under Rule 12(b)(6). *See* Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2713 (4th ed. 2008). There is no reason to delay resolution of these legal issues, and as noted below, Bright Data proposed filing this motion by January 24, 2024. Like X Corp., Bright Data requests that this early summary judgment motion be without prejudice to additional summary judgment motions at a later date as appropriate.

5.  **Amendment of Pleadings**

In response to Bright Data's first motion to dismiss, X Corp. filed a First Amended Complaint on November 15, 2023. In addition, as outlined in the proposed schedule below, the parties request that the Court set a February 16, 2023 deadline to move to amend pleadings.

Bright Data has not yet filed any pleadings, but it expects to file an Answer, which may include counterclaims, following a ruling on its Motion to Dismiss.

6.  **Evidence Preservation**

The parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information, have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding preservation of discoverable information, and each party has taken steps it believes are reasonable and proportionate to preserve evidence relevant to the issues reasonably evident in this action.

7.  **Disclosures**

Bright Data served Initial Disclosures on November 22, 2023.

Per the Court's Order Setting Initial Case Management Conference and ADR Deadlines, X Corp. will serve its Initial Disclosures on or before January 3, 2023.

**8.      Discovery**

As noted above, Bright Data believes discovery should be stayed. The parties, however, have each served initial discovery requests. The parties have had preliminary discussions relating to a Confidentiality Order. The parties expect to present any stipulations or disputes to the Court as soon as reasonably practicable. The parties otherwise expect that discovery will be guided by the Federal Rules of Civil Procedure and Local Rules of this Court.

**9.      Class Actions**

This case is not a prospective class action.

**10.     Related Cases**

There are no related cases. However, Meta Platforms, Inc., which operates Facebook, filed a case against Bright Data in this district, alleging breach of contract and tortious interference based on Meta's Terms of Use. *See Meta Platforms, Inc. v. Bright Data Ltd.*, 3:23-cv-00077-EMC. Although that case involves a different plaintiff, different contracts, and is not designated as a related case, it may involve some similar legal issues.

X Corp. additionally notes that the *Meta* case involves similar allegations of data scraping from social media platforms as the present case, and both Meta and Bright Data have filed cross-motions for summary judgment that are awaiting determination by Judge Chen.

**11.     Relief**

As set forth in the Complaint, X Corp. seeks damages for Bright Data's alleged breach of the Terms and to enjoin Bright Data from continuing its scraping activities going forward, as well as other equitable relief including an accounting and disgorgement, reasonable costs and fees.

Bright Data has not yet filed any counterclaims and associated claims for relief.

**12.     Settlement and ADR**

The parties have conferred regarding ADR options and anticipate that they will elect private mediation.

Bright Data believes that this case is appropriate for early mediation, and, to avoid unnecessary litigation costs and conserve judicial resources, would request that the Court order the parties to conduct a mediation through an agreed-upon or Court-appointed mediator no later than

February 16, 2024. X Corp. does not believe an early mediation would be effective based on past settlement discussions. Rather, X Corp believes mediation should occur after the parties have conducted written discovery and key party depositions.

### 13. Other References

The parties do not believe a referral to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation is necessary.

### 14. Narrowing of Issues

Bright Data believes that the issues may be substantially narrowed or clarified through its pending motion to dismiss and the parties' anticipated cross-motions for early summary judgment. The parties met and conferred on this issue but were unable to reach agreement on any other way of narrowing the issues at this time. The parties will discuss issues that could be narrowed at trial or resolved through stipulation at the appropriate time, if necessary.

### 15. Expedited Trial Procedure

The parties do not believe that this case is appropriate for Expedited Trial Procedure of General Order No. 64, Attachment A.

### 16. Scheduling

As set forth above, Bright Data has moved to stay discovery, which X Corp. opposes. Pending the outcome of the motion, the Parties have proposed one schedule with deadlines stemming from the commencement of discovery if discovery is stayed, and one with a proposed schedule if discovery is not stayed.

#### a. Parties' Proposal With a Stay of Discovery

| Action | X Corp.'s Proposed Deadline | Bright Data's Proposed Deadline |
|---|---|---|
| Early Summary Judgment | N/A[3] | January 24, 2024 |
| Deadline to seek to amend pleadings | The parties will submit an amended case management statement and schedule for all | 3 months after commencement of discovery |

---

[3] X Corp. does not believe there should be a deadline to file initial summary judgment motions independent of the dispositive motion deadline. X Corp. additionally opposes any summary judgment practice before the commencement of discovery.

| | | |
|---|---|---|
| | | below deadlines once the discovery stay is lifted. |
| Non-expert discovery cutoff | | 9 months after commencement of discovery |
| Initial expert disclosures | | 30 days after close of discovery |
| Rebuttal expert disclosures | | 60 days after initial reports |
| Expert discovery cutoff | | 60 days after rebuttal reports |
| Dispositive and *Daubert* motion cutoff | | 30 days after close of expert discovery (filing) <br><br> 45 days after filing (opposition) <br><br> 30 days after opposition (reply) |
| Pre Trial Conference | | 45 days after *Daubert* motion cutoff |
| Trial | | 30 days after pretrial conference |

b. **Parties' Proposal Without a Stay of Discovery**

| Action | X's Proposed Deadline | Bright Data's Proposed Deadline |
|---|---|---|
| Early Summary Judgment | N/A[4] | January 24, 2024 |
| Deadline to seek to amend pleadings | February 16, 2024 | February 16, 2024 |
| Non-expert discovery cutoff | August 30, 2024 | August 30, 2024 |
| Initial expert disclosures | September 27, 2024 | September 27, 2024 |
| Rebuttal expert disclosures | November 14, 2024 | November 29, 2024 |
| Expert discovery cutoff | January 10, 2025 | January 31, 2025 |

---

[4] X Corp. does not believe there should be a deadline to file initial summary judgment motions independent of the dispositive motion deadline.

| | | |
|---|---|---|
| Dispositive and *Daubert* motion cutoff | February 10, 2025 (filing) March 12, 2025 (opposition) April 2, 2025 (reply) | February 27, 2025 (filing) April 10, 2025 (opposition) May 8, 2025 (reply) |
| Pre Trial Conference | May 21, 2025 at 2:00 p.m. | June 18, 2025 at 2:00 p.m. |
| Trial | June 2025 subject to the Court's convenience. All other pre-trial Deadlines to be set in accordance with the trial date, this Court's orders, the Civil Local Rules, and the Federal Rules of Civil Procedure. | July 2025 subject to the Court's convenience. All other pre-trial Deadlines to be set in accordance with the trial date, this Court's orders, the Civil Local Rules, and the Federal Rules of Civil Procedure. |

**17.   Trial**

X Corp. has demanded a trial by jury, and expects the trial to last five to seven days.

Bright Data expects the trial to last two to three weeks, or about 10 full trial days. Bright Data believes this case largely concerns equitable relief (as X has not alleged any actual damages), and therefore, the case is not triable by jury. Bright Data reserves the right to seek a trial by jury for any counterclaim it may assert in its Answer.

**18.   Disclosure of Non-Party Interested Entities or Persons**

The parties have filed certifications required by Civil Local Rule 3-15 and the Federal Rules of Civil Procedure. Dkt. 2, 21.  The parties certify that as of the date of this filing, other than the named parties, there is no such interest to report.

**19.   Professional Conduct**

All attorneys of record for the parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

**20.   Opportunities for Junior Lawyers**

The parties are mindful of the Court's encouragement to involve junior lawyers in the action. Counsel for X Corp., Haynes and Boone, LLP, has two lawyers six years or fewer out of law school who are already actively involved in this case—Andrea Levenson and Reid Pillifant (*pro hac vice* to be filed). Counsel for Bright Data, Proskauer Rose LLP, have three lawyers six

years or fewer out of law school who are already active in this case: Erica Jones, Reut Samuels, and Timothy Burroughs (*pro hac vice*). The parties anticipate opportunities for each of these junior lawyers, as well as other junior lawyers who may later appear in the case, to argue discovery and evidentiary motions, depose fact and expert witnesses or defend such depositions, and/or to examine witnesses at any trial. At this stage of the litigation, the parties believe it is premature to attempt to identify such motions, depositions, or witnesses with greater specificity.

Dated: January 3, 2023                              Respectfully submitted,

**HAYNES AND BOONE, LLP**

By:  /s/Jason T. Lao
David H. Harper (*Pro Hac Vice*)
david.harper@haynesboone.com
Jason P. Bloom (*Pro Hac Vice*)
jason.bloom@haynesboone.com
2801 N. Harwood St., Suite 2300
Dallas, Texas 75201
Telephone: (214) 651.5000

Jason T. Lao
jason.lao@haynesboone.com
Andrea Levenson
andrea.levenson@haynesboone.com
600 Anton Boulevard, Suite 700
Costa Mesa, California 92626
Telephone: (949) 202-3000

*Attorneys for Plaintiff X Corp.*

**PROSKAUER ROSE LLP**

By:  /s/David A. Munkittrick
Colin R. Kass (*pro hac vice*)
Proskauer Rose LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick *(pro hac vice)*
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

*Attorneys for Defendant Bright Data Ltd*

**CERTIFICATION**

I, Jason T. Lao, am the ECF User whose identification and password are being used to file this JOINT CASE MANAGEMENT STATEMENT.  In compliance with Civil L.R. 5-1(h)(3), I hereby attest that each other signatory has concurred in this filing.

Date:  January 3, 2024                                      /s/Jason T. Lao
                                                                         Jason T. Lao

| | |
|---|---|
| 1 | **CASE MANAGEMENT ORDER** |
| 2 | The above Joint Case Management Statement and (Proposed) Order is approved as the |
| 3 | Case Management Order for this case and all parties shall comply with its provisions. |
| 4 | |
| 5 | **IT IS SO ORDERED.** |
| 6 | |
| 7 | Dated: _____    _____ |
| 8 |                                             William Alsup<br>UNITED STATES DISTRICT JUDGE |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this day, a true and correct copy of the foregoing document was served by filing the same via the Court's CM/ECF system, which will provide notice of the filing of same to all counsel of record.

Date: January 3, 2024                                            /s/Jason T. Lao
                                                                                    Jason T. Lao