Pages 1 - 55

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

```
X CORP., a Nevada Corporation,  )
                                )
             Plaintiff,         )
                                )
   VS.                          )     NO. C 23-03698 WHA
                                )
BRIGHT DATA, LIMITED,           )
                                )
             Defendant.         )
_____ )
```

San Francisco, California
Thursday, January 11, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

             HAYNES AND BOONE
             600 Anton Boulevard
             Costa Mesa, California  92626
      **BY:  JASON T. LAO, ATTORNEY AT LAW**
          **ANDREA LEVENSON, ATTORNEY AT LAW**

             HAYNES AND BOONE
             2801 North Harwood Street - Suite 2300
             Dallas, Texas  75201
      **BY:  JASON P. BLOOM, ATTORNEY AT LAW**

For Defendant:

             PROSKAUER ROSE LLP
             1001 Pennsylvania Avenue, NW
             Suite 400 South
             Washington, D.C.  20004
      **BY:  COLIN KASS, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
           United States District Court - Official Reporter

```
 1   APPEARANCES:  (continued)

 2   For Defendant:
                          PROSKAUER ROSE LLP
 3                        11 Times Square
                          New York, New York  10036
 4                BY:   DAVID A. MUNKITTRICK, ATTORNEY AT LAW

 5                        ROGERS JOSEPH O'DONNELL
                          311 California Street
 6                        San Francisco, California  94108
                  BY:   ROBERT C. GOODMAN, ATTORNEY AT LAW
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
1 | **Thursday - January 11, 2024**                              **8:03 a.m.**

2                             **P R O C E E D I N G S**

3                                 ---oOo---

4         **THE CLERK:**  Calling civil action 23-214, Kinsale

5   Insurance Company versus Associated Industries Insurance

6   Company, Inc.

7         Counsel, please approach the podium and state your

8   appearances for the record beginning with Counsel for the

9   Plaintiff.

10         **THE COURT:**  Please make your appearances.

11         **THE CLERK:**  Counsel for Plaintiff.

12         **MR. LAO:**  Good morning, Your Honor, Jason Lao from

13   Haynes and Boone for X Corporation.  And with me are my

14   colleagues Mr. Jason Bloom and Ms. Andrea Levenson.

15         Ms. Levenson is an attorney with six or fewer years and

16   prepared to argue some of the issues before the Court today.

17         **THE COURT:**  Wonderful.  Thank you.  All right.  And --

18         **MR. KASS:**  Good morning, Your Honor, Colin Kass from

19   Proskauer Rose on behalf of Bright Data.  And with me is David

20   Munkittrick, also from Proskauer Rose, and Robert Goodman from

21   Rogers O'Donnell.

22         **THE COURT:**  Great.  Welcome to all of you.  Let's --

23   who is arguing for you -- your side, Ms. Levenson?

24         **MR. LAO:**  Ms. Levenson and Mr. Bloom depending on the

25   questions that Your Honor has either for the motion to stay or

1   the motion to dismiss.

2          **THE COURT:**  Well, all right.   I want to first

3   address -- you are X; right?

4          **MR. LAO:**  Correct.

5          **THE COURT:**  So we are not dealing with the contract

6   claim today; is that correct?

7          **MR. LAO:**  That's correct.

8          **THE COURT:**  All right.   I want to start with X even

9   though it is your motion.

10      What is your best theory other than contract that would --

11   that would permit you to prohibit somebody from searching the

12   internet?

13          **THE COURT:**  Okay.   See you don't know the answer so

14   you are calling forward Mr. Lao; is that right?

15          **MR. BLOOM:**  This is Jason Bloom, Your Honor.

16          **THE COURT:**  Mr. Bloom.   Okay.   Go ahead, Mr. Bloom.

17          **MR. BLOOM:**  Your Honor, outside the --

18          **THE COURT:**  Let me just start with why I asked this

19   question.   You don't own the internet.

20          **MR. BLOOM:**  That's correct, Your Honor.

21          **THE COURT:**  The internet is a public resource like the

22   air we breathe, the water we drink.   You don't own it.   And

23   anyone has a right to use the air we breathe and to go to the

24   public places like a town square or a park.

25      So you are trying to appropriate part of the public --

1    something that's public and open to everyone and say it's only

2    open to you and your customers and that the customers'

3    information is -- what's the word -- can't be accessed by

4    anyone other than, I guess -- I'm not sure what your theory is.

5         All right.  So, but in the absence of a contract, it's a

6    separate problem if -- if this company Bright Data had an

7    agreement, it is a separate problem; but in the absence of an

8    agreement why isn't -- why isn't Bright Data able to do

9    whatever it was entitled to do prior to your company coming on

10   the scene and to examine -- that internet is open to public

11   view.  Anything that's open to public view, why can't everybody

12   just look at it?

13        And you got all these theories.  I would like to know what

14   is your best theory.  I don't have time for all of them, but

15   give me your best theory other than contract.  Contract is

16   separate.

17             **MR. BLOOM:**  Yes, Your Honor.  First let me

18   characterize what Bright Data is doing and how the internet --

19             **THE COURT:**  Tell me how it differs from what Google

20   does.

21             **MR. BLOOM:**  What Google does is Google crawls the

22   internet and basically sends links to websites.  When people

23   search certain terms, they are given a link to that website and

24   then taken to that website.

25        What Bright Data is doing is they are scraping -- and this

1    is not --

2              **THE COURT:**  Don't use the word "scrape."  That's a

3    pejorative term like stealing.  What do they actually do?

4              **MR. BLOOM:**  Well, they do use the term "scrape."

5    That's how they describe it.

6              **THE COURT:**  Tell me what that means.

7              **MR. BLOOM:**  That means they are using automated means.

8    This is not just an individual searching the internet --

9              **THE COURT:**  Google uses automated means.

10             **MR. BLOOM:**  Yes, and what Google does is --

11             **THE COURT:**  There is nothing magic about automated.

12   So what is the difference between what Google does and what

13   Bright Data does?

14             **MR. BLOOM:**  Yes, Your Honor.  And let me explain.

15   Google basically catalogs the internet and creates links to

16   websites so that people can use that as a search function to

17   find their way to different websites.

18             **THE COURT:**  In order to do that, Google has to visit

19   those sites and to see -- and not just sites.  The feed -- the

20   statements by customers on Twitter, it is not just sites.

21        So they go on the Twitter site, the X site, and scan there

22   to see and then categorize it and put it on its catalog, just

23   as you say.  All right.  But why is that so much different than

24   what Bright Data does?

25             **MR. BLOOM:**  So what Bright Data is doing, they are not

1   just looking at it.  They are using these automated means to

2   flood the system, to scrape massive amounts of data, and then

3   they are selling that.

4       They are taking the data and selling it.  Google doesn't

5   do that.  Google doesn't take data from --

6          **THE COURT:**  I've had so many Google -- I know what

7   they do.  They do it for free but then the advertisements come

8   in and that's where they make their money.

9       So Google makes a huge amount of money by doing exactly

10  what you are saying.

11         **MR. BLOOM:**  It's different, Your Honor, because what

12  Google is doing is directing people to the website.

13      So you go to Google.  You search for, you know, Wal-Mart

14  socks.  They are going to give you a link to Wal-Mart and where

15  you can find the socks.  Then you click on that link.  You go

16  to Wal-Mart and buy the socks.

17      What Bright Data is doing is they are taking the data --

18  so user data, which consists of all kinds of things, user

19  names, the traits and habits of users, things that are

20  valuable -- that they then go on and sell to --

21         **THE COURT:**  That's publicly available.  None -- all of

22  that is publicly available.  So if some user wants to explain

23  what their habits are and it's publicly available, that's their

24  problem, isn't it?

25         **MR. BLOOM:**  It is not publically available the way

```
 1   Bright Data is getting it.  So we have certain blocks and
 2   certain limits to what people can just scrape, take from --
 3            THE COURT:  No, that's contract now.  Unless -- unless
 4   X -- I'm sorry -- unless Bright Data agreed not to do it, where
 5   does the law say anything that -- that Bright Data cannot view
 6   what it -- what anyone else in the world can view?
 7            MR. BLOOM:  Not anyone else in the world can view it,
 8   Your Honor, because they are using deceptive means to trick our
 9   system to get this data in mass amounts and take it onto their
10   system.  So they are not doing --
11            THE COURT:  Okay.  Explain how that part works.  I
12   don't understand how this can be a trick.
13            MR. BLOOM:  Okay.  I don't know if Your Honor is
14   familiar with CAPTCHAs, but it is when you go to a website and
15   you often have to identify the bicycles or traffic lights to be
16   able to get to --
17            THE COURT:  Right.
18            MR. BLOOM:  That is a limit we use to prevent
19   automated bots from getting onto our system and scraping.
20       They have designed a system that basically, through
21   automation, is basically able to get through that limit.  And
22   that's just one of many.
23            THE COURT:  So what?  Your anti-bot system is no good.
24   They found a way around it.  Why is that so bad?
25            MR. BLOOM:  Well, because we are setting up a barrier
```

1   that prevents -- and this is important to the maintenance of

2   our system.  When someone floods our systems with multiple

3   millions and millions of requests --

4       **THE COURT:**  Let's say you had a football field, and

5   everything that was going on out there, you were trying to make

6   it as private as you can; and there is a guy out there with

7   binoculars looking at everything that is going on.  And you

8   said:  "We will show him.  We are going to put up a screen" --

9   or a better example.

10   Somebody with a high apartment building is able to look

11   into the football field and watch the game for free.  Oh, my

12   God.  And then you put up a screen so they can't do that but

13   you can see through the screen.

14   Whose fault is that?  Is it their fault that you put up a

15   crappy screen?  No.  They can still see through it.

16   So if they can see over the fence and watch the game for

17   free, God bless them.  What's wrong with that?

18       **MR. BLOOM:**  Well, Your Honor, I think the legal

19   remedies that support our claim include trespass to chattels

20   because they are doing it in a manner --

21       **THE COURT:**  But you have to show it is an intrusion on

22   your system.  That is a fact question, isn't it?

23       **MR. BLOOM:**  It is.

24       **THE COURT:**  Okay.  So let's -- but what I'm told by my

25   law clerk, who knows more about it than me, is that these days

1   the intrusion thing is a lot less than it was when this theory

2   was first adopted 30 years ago; that it's really not a burden

3   on you anymore.

4          **MR. BLOOM:**  What they are doing is -- now, the cases

5   that they have cited that have found it not to be a burden have

6   involved a small number of intrusions or, you know, 1,600

7   e-mails --

8          **THE COURT:**  What's the percentage -- in your complaint

9   do you tell me what percentage of your capacity has been ruined

10  by bots?  No, you don't do that.

11         **MR. BLOOM:**  Not in our complaint, Your Honor.

12         **THE COURT:**  No, you don't.  And you don't have much of

13  an intrusion case at all.  You are just blather, just lawyer

14  blather.

15         **MR. BLOOM:**  Well, I disagree, Your Honor.  This is

16  something that -- I mean, a lot of it will depend on discovery.

17  These are fact intensive questions, as you know --

18         **THE COURT:**  They get to find out how much intrusion

19  there is.  They get to take discovery from you to find out how

20  much intrusion there is.

21         **MR. BLOOM:**  In fact, we don't know exactly how much

22  intrusion there has been because what they do is kept very

23  secret.  The way they --

24         **THE COURT:**  So you can't even tell me if they are

25  intruding?

1           **MR. BLOOM:**  We can't.

2           **THE COURT:**  All you know is that you think they are

3    but you -- from your own data and knowing your own system, you

4    don't feel any intrusion.

5           **MR. BLOOM:**  We can because they advertise it and they

6    sell it.  They sell data that they could have only gotten --

7    massive amounts of data they could have only gotten --

8           **THE COURT:**  They are compromising your system.

9           **MR. BLOOM:**  And it slows it down --

10          **THE COURT:**  That's not an intrusion.  That's not

11   wrecking your system and causing it not to work right.  It's

12   just that they profit from doing something that is publicly

13   available.

14          **MR. BLOOM:**  Your Honor, I don't think it has to wreck

15   a system.  I think it has to impair the operation of the system

16   and when you flood a system --

17          **THE COURT:**  No, that's not my view.  That's not my

18   view of what the -- the amount of intrusion that is required

19   for this common law theory, what's it called, chattel?

20          **MR. BLOOM:**  Trespass to chattel.

21          **THE COURT:**  Deals with farmland in the medieval ages,

22   so --

23          **MR. BLOOM:**  Your Honor --

24          **THE COURT:**  All right.  All right.  I want you to know

25   that I'm not too -- I'm not too keen on this but I -- but this

1   doesn't involve your contract theory.

2                    (Pause in the proceedings.)

3          **THE COURT:**  Okay.  I'm going to try to be quiet for a

4   few minutes and let you make your best point, and then I'm

5   going to call on the other side.

6          **MR. BLOOM:**  Yes, Your Honor.  So in addition to

7   contract -- and I would consider tortious interference with

8   contract to be part and parcel of our contract theory even

9   though that's a tort.

10         **THE COURT:**  Whose contract is being interfered with?

11         **MR. BLOOM:**  Well, so in that case that would be our

12  contracts with our customers.  So, Bright Data, you know,

13  advertises that it's -- and it admits that it has customers

14  that are members and users of the X platform.  In fact, to

15  scrape the X platform, you have to use the X platform.

16         **THE COURT:**  I come back to it -- let's take the

17  apartment house that overlooks the ball field; and the football

18  teams and baseball teams have an agreement with the stadium.

19  We are going to keep all this secret.  We are going to sell the

20  TV rights.  We will do everything we can.

21      And then the person up there looking at the ballgame for

22  free, are they interfering with someone's right, contract

23  rights, by watching the game for free?

24         **MR. BLOOM:**  No, I don't think in that context --

25         **THE COURT:**  No.

1      **MR. BLOOM:**  -- anybody is --

2      **THE COURT:**  They are not.  They just happen to be

3  looking at something that is publicly available from where

4  their house is from their apartment.  So I feel like --

5      **MR. BLOOM:**  Sorry, Your Honor.

6      **THE COURT:**  Why isn't that the right analogy, the

7  apartment overlooking the football field?

8      **MR. BLOOM:**  Well, in that analogy you are not causing

9  anybody to breach a contract.  By watching a football game from

10  afar, you are not causing anybody to breach any type of

11  agreement.

12      Here, we have specific agreements with all of our

13  customers and users that you will not scrape data.

14      Bright Data knows that because they were one of our

15  customers that explicitly agreed to those terms.

16      **THE COURT:**  That's a contract theory.

17      **MR. BLOOM:**  Well, then they designed a tool that is

18  specifically advertised and designed to scrape our data.  So in

19  breach of that contract.  Then they sold that tool to our

20  customers to enable them to breach the contract that Bright

21  Data well knew the terms of.

22      So that's the theory there.  They knew of the contract.

23  They designed a tool that's designed only to breach the

24  contract, and they sold that tool to our customers to enable

25  them to breach that contract.  I mean, that's a clear claim of

1  tortious interference, Your Honor.

2          **THE COURT:**  Okay.  What do you say to that point?

3          **MR. KASS:**  Your Honor, a couple of things.

4      So, number one, it is not true that everybody that uses

5  Bright Data service has a contract with X.  And, actually, it

6  hasn't been alleged that they have a contract with X.

7      What X is saying is that everybody in the world is

8  automatically bound by contract just because they post terms to

9  their website.  That's how they say if you use X, you are

10  bound; but it's not as though everybody that uses X actually

11  has an account.

12      When you sign up -- when you go to X or you go to some

13  other website and you sign -- you put in your user name, you

14  sign up for an account and you get a password and you click "I

15  agree," then you become bound by the terms.

16      X is saying that that's not the case here.  That's one way

17  of becoming bound.  Another way of being bound is simply by

18  typing "x.com" into your browser and you automatically become

19  bound.  That's a legal conclusion.  That's not a factual --

20          **THE COURT:**  That's called browsewrap; correct?

21          **MR. KASS:**  It is called --

22          **THE COURT:**  What is status of the law on that end, at

23  least in our circuit?

24          **MR. KASS:**  We have two -- so there is two points to

25  that.  Number one -- and both go to contract formation.  The

1    first one is browsewrap can be effective if there is
2    constructive notice to the user, and that depends on where the
3    links are and how all of that works.
4        And we address that in our brief -- and I will get back to
5    that in a second -- basically the question is constructive
6    notice.
7        The second issue is whether or not, even if you have
8    constructive notice, you still need the other elements of
9    contract formation; namely, consideration.
10       And this goes back to your point about is X providing
11   consideration to people that do nothing more than search the
12   public web?  And they are not.
13       In your scenario -- in the scenario that you gave, there
14   is a football game.  There is an apartment building.  There is
15   a person on the apartment building.  The football stadium is
16   not giving consideration to the people sitting in the apartment
17   building.  It fails.
18       The person in the apartment building is just doing what
19   they have a lawful right to do anyway.  And so there is no
20   consideration supporting that claim.
21       So the browsewrap claim here fails for two reasons.  One,
22   constructive notice -- and I can get into more detail on that
23   if you would like -- and, number two, there is lack of
24   consideration where all we are doing is searching the public
25   web.

**THE COURT:**  Well, okay but you -- you have shifted the focus on the contract to -- and the analogy that -- the person in the apartment building, but the argument is being made that the contract that matters is with the people on the field.

The players on the field have agreed, let's say, not to broadcast or take pictures of what's going on on the field and that all of that belonged to the NFL or whoever and -- and that by -- let's say, by selling specially made broadcast equipment to the players on the field, you are interfering with that promise.

And that's the -- that's the argument or to put it in our present terms, that X has a contract with Joe Blow, and Joe Blow has promised not to scrape; but you are selling to Joe Blow a software app that will scrape.  And that -- and that in turn would violate what Joe Blow promised not to do.

Or let's -- instead of Joe Blow, let's say the ABC Company.  ABC has an account with X and you are selling to ABC the equipment to scrape Twitter.  So, there you don't get into consideration.  The -- there's a contract, right, I guess.  I'm asking you.  What is your answer to that interference issue?

**MR. KASS:**  So the answer to that is in your hypothetical ABC Company has an actual contract.  The contract is not a browsewrap contract the validity of which is in dispute.

We are saying -- so you don't need an account to visit X,

to scrape X, whether you are using Bright Data services or not.

And so the third parties that are at issue here are the ones that are Bright Data customers.  They are signing up for Bright Data services.  They are scraping X using Bright Data services, just as Bright Data uses its own services when it scrapes X.

And our contention is it hasn't been alleged that there is a valid third-party contract because all they are relying on is browsewrap for that contract -- for that underlying contract, that third-party contract, they are relying on browsewrap.  And our position is that that browsewrap contract is invalid.

They would have to show that there is an account -- that the people scraping are using an account just to get over that element of the tortious interference claim.  And then -- and that hasn't been alleged.  So the claim fails for that reason.

If they get over that, then they have to show that we have induced this account holder to breach their contract with X; and we have a separate argument on that, and that flows from the Twitter case -- or what we call the Twitter principle in our brief.

THE COURT:  What is that?  I'm not familiar with that.

MR. KASS:  Yeah.  So, about six months or so ago -- I don't have the exact date -- the Supreme Court issued a ruling in Twitter and a separate case in Google where they addressed the question of whether or not there was -- whether or not the

platforms were liable when ISIS used the platforms to generate

funds and promote their activities even with the knowledge --

the alleged knowledge by the platforms that that's what the

platform -- that ISIS was using it for.

And the Supreme Court came back and said:  Even if you

have knowledge, that is not enough to impose aiding and

abetting liability or secondary liability on the platforms

because to do so would hold -- would run roughshod -- that was

their term -- roughshod over tort liability and the notion that

a person is liable when they offer services that can be used

for both lawful and unlawful purposes and is being misused by a

third party.

So that's the principle that we are applying here.  It

applies also to tortious interference claims.  If you look at

the restatement, our hypothetical was, you know, you have a

cassette deck that's capable of recording copyright information

and non-copyrighted information, the cassette manufacturer --

cassette deck manufacturer is not liable just because it could

be misused.  It's the same concept that underlies the Twitter

case.  It is the same concept that applies here.

        **THE COURT:**  Let me put that in my own words and you

tell me how close I am to your point on that.  All right.

So you sell a product that is not per se illegal that has

plenty of lawful uses.  And, in fact, the -- if someone chooses

to use it and they are doing it in violation of a contract that

 1 | they have with someone else -- and let's assume it is a valid

 2 | contract -- that's not your concern because what you sold to

 3 | them had valid uses, lawful uses, and it's up to the customer

 4 | to decide whether or not they are bound by some contract.

 5 |   And, therefore, you are like the ISIS -- no.  You are like

 6 | Google, and you are not -- even if you have knowledge, you

 7 | are -- oh, that wasn't this kind of a case.  It was -- it

 8 | was -- under what law did it arise?

 9 |    **MR. KASS:**  So it arose under aiding and abetting law.

10 | Under California law it was a statute but the same principles

11 | apply.

12 |    **THE COURT:**  All right.  So using at least that

13 | principle, okay.  So let me pause.  And I hadn't thought about

14 | that point.

15 |   I want to hear what you say to that point, Mr. Bloom.

16 | What do you say to the point that selling a product that has a

17 | lawful use is not interference with contract if the -- even if

18 | there is knowledge that the customer is going to turn around

19 | and use it for -- to breach a contract?

20 |    **MR. BLOOM:**  Yes, Your Honor.  First, the aiding and

21 | abetting analysis is going to be different than the tortious

22 | interference analysis here.

23 |   That analysis was whether just by being a passive website

24 | where people post things that aid and abet terrorism, somehow

25 | you are liable even though you don't take any active role in

1    that.

2        Here, we have a very different situation where Bright Data

3    has created a system that has no lawful purpose.  I'm not

4    saying it is against any criminal law.  It has no lawful

5    purpose in the sense that it's only designed to violate the X

6    terms of service of which Bright Data was aware when they

7    designed the system and when they sold the system to others.

8    So this is not analogous, Your Honor.

9        **THE COURT:**  Why do you say it is only designed -- is

10   it limited to Twitter or to X or can it be used to across the

11   board on the internet?

12       **MR. BLOOM:**  They can scrape other websites,

13   Your Honor.  They advertise it as such.  They have actually got

14   a case pending in this district that was filed by Meta for this

15   exact same thing.  It is pending before Judge Chen.

16       So they do scrape other websites, but what's at issue here

17   is their specific advertised targeted scraping of X.  They

18   don't sell it as:  "Hey, use this software and you might be

19   able to scrape a lot of websites."  It's called the Twitter

20   scraper IDE.

21       **THE COURT:**  Okay.  Is that true?

22       **MR. KASS:**  We do have a scraper that's -- so one of

23   our products has Twitter in the name and so that's true, but

24   our point on that point is not all scraping of Twitter is

25   illegal or a breach of contract because not everybody is bound.

 1          You would first have to find that the entire world,

 2     anybody that visits Twitter, is bound by contract in order to

 3     conclude that our service -- even that limited service -- has

 4     no lawful purpose.

 5          **THE COURT:**  Okay.  Let's pause on that because -- I

 6     may need a tutorial on this.  I am not on X.  I am not on

 7     Facebook or any of those sites for the reason that I don't want

 8     a lawyer to become my, quote, friend and then create an ethical

 9     issue.

10          So for all these years I have stayed off of those

11     websites.  However, I do use Google.  And every now and then I

12     will put something in on Google and it returns things that were

13     on Twitter.  Somebody on Twitter made a comment, let's say,

14     about something I was interested in.  And so I -- it was

15     publicly available.  I don't know how.

16          But nevertheless, with that in mind, I have this question:

17     If someone buys your product and let's say it's someone who

18     does not have a contract with X, does your product allow that

19     purchaser to go through the entirety of the servers that are

20     run by X to find whatever the search engine is asking for?

21          **MR. KASS:**  The answer is yes if the information is

22     public.  So if -- unless X put it behind a login screen, and

23     for a lot of information -- like, for example, when you type in

24     Google and they show you a post, that was never put behind a

25     login screen.  So that's publicly available.  A lot of users

keep their information public and so -- and more so in the past

than currently but even today, there is information that's

publicly available; and you do not need an account to get it.

You don't need an account to get it through Google.  You

don't need an account to get it through X, and you don't need

an account to use Bright Data services to get that same

information.

There is other information that X has decided that they

want the protection of the Computer Fraud and Abuse Act and

they put it behind a login screen, and that stuff is private.

You can't get it.  You can't get it using Bright Data services.

You can't get it in any other way.  That's not what this case

is about.

THE COURT:  As an aside -- because, again, I don't

know how it works -- let's take Facebook as an example.  I do

know from Facebook in other cases that a lot of information is

public, but you do have the ability if you are on it to say

"friends only;" right?  So is that publicly available or --

MR. KASS:  It is not.  That's behind.

THE COURT:  -- is that behind a screen?  All right.

So does a customer with X have the ability to hide their posts?

MR. KASS:  You would have to ask that to X.  My

understanding is for most posts, at least their terms say by

posting it, you have authorized X to make it as broadly

available as possible.

1       And so I think for most posts, the answer is it's public.

2  I don't know whether there's something that isn't.  We attached

3  the privacy policy to our motion to dismiss -- X's privacy

4  policy -- where they say exactly that; by posting you have

5  authorized X to make this information as broadly available as

6  possible including to internet search engines.

7       **THE COURT:**  Okay.  Let me go back to Mr. Bloom.  What

8  do you say to his point; that the selling it to a customer of

9  Twitter, we don't know that they have a contract that

10  prohibits.  There could be customers that buy it.

11       So it's advertised specifically for Twitter; but,

12  nevertheless, some people could buy that product and have no

13  contract with you and still be able to scrape.

14       And so that's not illegal and there are others, maybe they

15  do have a contract -- and let's assume that it's enforceable --

16  nevertheless, how is -- they don't need to investigate to find

17  out which one has a contract and which ones don't.  They just

18  sell it to all comers.  What is your answer to that?

19       **MR. BLOOM:**  Two answers.  First, on the browsewrap

20  point, Your Honor, that is a very fact intensive issue, as I

21  think Mr. Kass notes, that depends on how the agreement is

22  displayed on the website.  Sometimes color choices, things like

23  that, whether somebody by visiting a website, using a website

24  is bound by the browserwraps [sic], I don't think that's

25  appropriate to resolve at a motion to dismiss whether or not

 1   users are bound by the contract.

 2        Our allegation is that they are, and no evidence has been

 3   or could be submitted to contradict that at the motion to

 4   dismiss --

 5             **THE COURT:**  It's your complaint.  Aren't you required

 6   to put in enough information from which you could conclude that

 7   every user is bound by -- I have read a tiny bit of the Ninth

 8   Circuit's decisions including one this morning.

 9        Browsewrap is different than clickwrap, and browsewrap is

10   more suspect because no one is clicking to assent.  You are

11   just using the site so --

12             **MR. BLOOM:**  Yeah, it --

13             **THE COURT:**  -- under your theory, a lot of people

14   would be bound by arbitration agreements if the terms of use

15   required it, and that just can't be the law that browsewrap is

16   enough to impose an arbitration agreement but could be the law

17   if it gets there some day.  To me that would be a monumental

18   step.

19             **MR. BLOOM:**  Right.  And this is not, of course, about

20   an arbitration agreement.  This is about scraping and what most

21   people know and they should know they are using the services,

22   they are bound by the terms.  My point is that that's a fact.

23             **THE COURT:**  I don't necessarily agree with that.

24   Why -- maybe you are a tech nerd and know all about this, but

25   the ordinary person doesn't know that; that you are bound by

1   some obscure document that you have to go search the internet

2   for.

3           MR. BLOOM:  Well, at this stage my only point is that

4   we have alleged that our users are bound by our terms and that

5   our terms are set forth in a sufficient way for them to

6   understand and be bound by them.

7       That's not contradicted at the motion to dismiss stage.

8   Now, maybe at summary judgment they can come up with enough to

9   say," Yeah, browsewrap doesn't apply here."

10      At the motion to dismiss stage our allegation stands as to

11  whether or not the people they are selling their tools to are

12  users or actually registered -- are registered users, so people

13  who like Bright Data had an account and expressly accepted the

14  terms.

15      We don't have to show at this stage -- there is case law

16  on this -- that the actual party to the contract -- just the

17  terms of the contract that they knew are breached and the

18  likelihood that there was a contract.

19      Here what we have alleged is there have been 23 million

20  Twitter accounts or X accounts registered from the State of

21  California.  That's an enormous number.

22      They advertise their products on X, their scraping

23  products.  They have advertised them on X.  The people that

24  would see that would likely be X users.  Now, it doesn't have

25  to be a registered user but it is being broadcast out to the

1   registered users.

2       But given the massive amount of people in this country and

3   in this state that are X users, there is an extraordinary

4   likelihood that the products that they are selling on a mass

5   scale are being sold to registered X users.

6       Either way, we have alleged sufficient facts to show that

7   browsewrap --

8       **THE COURT:**  Well, is there a California decision on

9   interference with contract that accepts the theory that you

10  don't have to identify the specific parties to a contract, just

11  the odds must be that somebody out there has a contract and is

12  bound by those terms?  Is there a decision that accepts that

13  probability theory?

14      **MR. BLOOM:**  I don't think it was phrased as a

15  probability theory, but it was phrased as a "you don't have to

16  identify who the other party to the contract is."  It just has

17  to be awareness of the terms.  You have to identify the terms

18  of the contract that was breached but not the party.  And I

19  know we cited that case in our brief, and I will try to find it

20  for Your Honor.

21      **THE COURT:**  What was that?  Tell me that decision in

22  the context.

23      **MR. BLOOM:**  I'm going to have to look.  I don't have

24  that off the top of my head.

25      **MR. KASS:**  It was *ConsumerDirect*, Your Honor, and

1   *Boynton* -- and we can address that if you like -- but those

2   were the two cases.

3        **THE COURT:**  Tell me what -- your turn then.  Tell me

4   what that decision was and how it's distinguishable.

5        **MR. KASS:**  There were two cases and let me address

6   both of them.  The first one was *Boynton* and that one was where

7   the Defendant poached employees from the Plaintiff.  It was a

8   group of high-level executives -- a very limited number of

9   people -- that all had contracts with the -- with the Plaintiff

10  that were breached by when they were solicited and then they --

11  you know, they switched employers.

12     So there was actual breach of a contract by a very finite

13  group of people, and the Judge basically just said:  "Well, you

14  didn't have to actually use their names in the complaint."

15  That was basically that case and that was it.  It was a very

16  finite universe of people.  There was really no question as to

17  whether --

18       **THE COURT:**  To that, the other side would say, well,

19  here, it is not finite.  It is infinite.  There are millions of

20  people who have this -- so it's even more likely.  That's what

21  they would say.

22       **MR. KASS:**  It wasn't a question of likelihood.  It is

23  a question of:  Did you allege enough to show that there was a

24  breach of an underlying valid contract?

25     And then the second element is:  Did you induce?

```
 1          So here, we have already established from our prior
 2   discussion that they have to show that our services have no
 3   legitimate use, which means that everybody that uses our
 4   service has to be bound by contract.  Okay.
 5          That is simply not true.  You don't need to use -- you
 6   don't need to -- you don't need to have a contract in order to
 7   use our services.
 8          So, the fact that there may or may not be some third party
 9   that has a contract that may use our services, that's all
10   speculation.  That's just speculation on their part.  That is
11   not enough to establish that there was, in fact, a valid
12   contract; that contract was breached and Bright Data induced
13   it.
14          Those are the things that you need to establish.  And the
15   way that -- even in this court in the *Mishiyev* decision says
16   you have to identify the third party in order to establish that
17   those elements are met.
18          And that's basically just *Twombly*.  I mean, you can't just
19   assume that we violated the law in ways that have not been
20   alleged.
21                       (Pause in proceedings.)
22          **THE COURT:**  When someone scrapes X and their servers,
23   does X have a way of knowing who those people are?
24          **MR. BLOOM:**  Who scraped it?
25          **THE COURT:**  Yeah.
```

1          **MR. BLOOM:**  Your Honor, we have data analytics.  But

2     the way that their system -- which is very, very sophisticated

3     and designed to allude the most sophisticated websites

4     including Facebook, Instagram and X -- is set up, we, frankly,

5     have not been able to detect.  It is something you would really

6     have to be able to detect in real-time.

7          What we can detect is a massive volume that's burdening

8     our servers at a single time because millions and millions of

9     requests are being given that are getting around our various

10    blocking mechanisms which are put in place to make our servers

11    run smoothly and to provide a good experience to our users so

12    they can quickly access posts and their own information.

13          **THE COURT:**  When you say that you can -- give me a

14    measurement of -- is it 10 percent of the server time?

15    50 percent?  How much is going into -- on a given day, how much

16    server time is burned up with these scraping requests?

17          **MR. BLOOM:**  Your Honor, I do not have that statistic

18    available at this point.

19          **THE COURT:**  Well, you said that you do have

20    information.

21          **MR. BLOOM:**  Well, I'm telling you --

22          **THE COURT:**  It could be found; right?  You can tell me

23    what that is.

24          **MR. BLOOM:**  Yes, Your Honor, I can tell you what could

25    be detected by X.  You asked me whether we can detect who was

1  doing the scraping and the answer is no because they do a very

2  good job of hiding the identity of the scrapers.

3      We can detect when our servers are being burdened by these

4  mass requests, which can only be related to scraping.  That's

5  the clarity I wanted to provide.

6      As far as me today having specific statics as to how much

7  of the servers were burdened or on any particular day, I don't

8  have that with me today.

9      **THE COURT:**  All right.  I want to give the other side

10  to make -- it doesn't have to be limited to interference with

11  the contract.  You make whatever point you wish on the subject

12  of the motion to dismiss.

13      **MR. KASS:**  So one point I would like to emphasize,

14  Your Honor, is personal jurisdiction.  This case really goes to

15  the question of whether a California court exercising state

16  law -- and only state law -- has the power to tell global

17  website operators and platforms how to operate.

18      What if California passes a statute that says the internet

19  shall not be available in California, period, the end.  Can it

20  then sue -- can people then sue platforms all over the world

21  under California law and does California courts have the

22  authority, the jurisdiction, to entertain that claim?

23      The *Shopify* decision says the answer to that is

24  unequivocally no.  There is no daylight between our case and

25  the *Shopify* case.

1          **THE COURT:**  Explain the *Shopify* case to me.

2          **MR. KASS:**  *Shopify* case, can *Shopify* -- when you go to

3     a website to purchase things -- so you want to buy something on

4     the internet -- there is a whole infrastructure behind that to

5     deal with payment processing, order taking, you know, the

6     inbox.  There is a whole bunch of technology behind that.

7          Shopify provides that technology to third party merchants.

8     So if you are XYZ Boutique that has a store and you want to

9     sell online, you will sign up with Shopify.  Shopify will be

10    the engine for that e-commerce platform.  Okay.

11         Shopify has 80,000 merchants in California alone.  Some of

12    its largest customers are in California.  Shopify has

13    facilities in California.  It directed its activities in sense

14    of it tried to, quote, expand its access to the California

15    market.  It then -- so that's some of the things that it did.

16         What it was accused of doing was it was accused of

17    collecting individual users' private information when they

18    engaged those -- when they sought to purchase online.

19         So, again, you are a customer.  You want to buy through

20    that boutique.  You sign on.  You put your credit card

21    information into the payment platform, into the form, and other

22    information; and you click enter and what Shopify would do is

23    it would collect all of that information allegedly in violation

24    of state privacy law.

25         So it did this for millions and millions of California

1    consumers as well as everyone else, and it was the one that

2    created --

3              THE COURT:  Where was Shopify located?

4              MR. KASS:  Canada.  It was a Canadian company.  It

5    operated throughout the United States.  It had its U.S.

6    subsidiary resident in California.  It had a quarter of its

7    U.S. employees in California through a subsidiary, and so --

8    and its largest market was in California.

9         And what the Ninth Circuit held was that that was not

10   enough to establish specific personal jurisdiction.  General

11   jurisdiction was lacking because it was a Canadian company, and

12   specific jurisdiction was also lacking because what it said was

13   if you are going to operate a national platform, then -- and

14   you are basically indifferent to where the users are -- that

15   is, you do the same thing everywhere throughout the country

16   then there is no specific jurisdiction.

17        And it ruled on that as a matter of first impression just

18   about a month or so ago.  And so that case is controlling over

19   our case because there is no difference at all between what

20   Shopify was doing and what Bright Data is doing.  And so that

21   case sort -- absolutely resolves it.

22        We submitted a supplemental notice -- statement of a

23   supplemental authority on a decision that came in on Monday

24   where the Ninth Circuit then said, well, then if you are

25   applying federal law and federal -- you know, federal law -- as

1    a federal court exercising federal law, then it's a different

2    standard.

3         And it said there, you know, if you have a global platform

4    and there is enough context in the United States a whole, then

5    that's enough.

6         So the only way to reconcile those two cases is to say

7    that a state court does not have -- or a federal court sitting

8    in diversity -- does not have the power to regulate national or

9    international platforms under personal jurisdiction.

10        And, again, even in this *Doe* case -- the one that came out

11   on Monday -- what the Court did is it had a footnote that said:

12   In order to even get to this question, it has to be the case

13   that no state has personal jurisdiction over the Defendant, and

14   the only reason it could entertain the state law claim in that

15   case was because it exercised pendent jurisdiction based on the

16   existence of the federal claim.  So here --

17            **THE COURT:**  And the federal claim was what?

18            **MR. KASS:**  The federal claim there was, it was

19   trafficking and other things.  This was a porn website and so

20   there were --

21            **THE COURT:**  So these two cases are *Shopify* and what?

22            **MR. KASS:**  It is called *Doe* versus -- it begins with a

23   W.  I don't have the exact name.

24            **THE COURT:**  D-O-E?

25            **MR. KASS:**  D-O-E, yes.  And we submitted a

 1   supplemental statement of authority on Friday on that.

 2       THE COURT:  Do we have that?  Okay.  All right.

 3   What's your response to the -- what I just heard?

 4       MR. BLOOM:  Yes, Your Honor.  First, this case is

 5   distinguishable from *Shopify* for one very key reason, which is

 6   that there was a contract, forum selection clause in this case,

 7   that covered not only claims arising out of the contract but

 8   relating to the contract or services.

 9       The *Sun* case that we cite in our brief talks about

10   relating to language and how that is very broad and all that a

11   tort has to do to relate to a contract, just a contract, is

12   have some logical or causal connection to it.

13       If it relates to services, that's even broader.  So a

14   clause that they agreed to, that they are bound by a California

15   forum for any tort that relates to our contract or our

16   services, surely covers scraping from our services and breach

17   of our contract.

18       *Shopify* did not have that.  There was no forum selection

19   clause.  So you don't even have to reach that issue due to the

20   very strong forum selection clause here.  And we cite a series

21   of classes that uphold related to.  They primarily rely on

22   cases that talk about arising out of.

23       THE COURT:  What is their answer to that point?

24       MR. BLOOM:  They primarily focus on cases that use

25   "arising out of" language, which is much narrower.  So that

1  arising out of says the forum selection clause covers any

2  claims arising out of the contract.

3      Arising out of or relating to language is much broader

4  because that just has to have a casual connection to the

5  subject matter of the contract.  It doesn't have to be based on

6  the performance of the contract.  So I would say they don't

7  have a good answer to that, Your Honor.

8      **THE COURT:**  What is the response to the forum

9  selection?

10     **MR. KASS:**  So that wasn't our argument.  If you look

11  at the Ninth Circuit case law, it applies to broad and

12  non-broad forum selection clauses including arising out of and

13  relating to cases.  We cited that.

14     What the Ninth Circuit did was it established a but-for

15  causality test.  And it said:  Would there still be a tort

16  claim if there was no contract?

17     If the answer -- so if there is no -- if there was no

18  contract, would there still be a tort claim?  If there is, the

19  forum selection clause does not apply to the tort claim.  It's

20  only when --

21     **THE COURT:**  You are doing a great job but it's so many

22  complex dependent clauses.  Go through that argument again,

23  that -- let's assume that you have a forum selection clause

24  that if it were about the contract, it would -- but there is a

25  contract claim here.  We are just not -- so there is a contract

1   claim; right?  So why isn't that enough to anchor jurisdiction?

2          MR. KASS:  Because our motion is only directed towards

3   the tort claims, and they have to establish jurisdiction over

4   each of the specific claims.

5          There's a separate question of whether you can exercise

6   pendent jurisdiction based on the existence of jurisdiction

7   over the contract claim, and we address that in our brief too.

8   The answer is no.

9          THE COURT:  What is the answer to that?

10          MR. KASS:  The answer is no because pendent

11   jurisdiction does not apply in diversity cases.  You need to

12   have a -- you need to have a federal question hook in order to

13   exercise supplemental jurisdiction.

14          And we cited a whole bunch of cases on that.  There's

15   actually two separate grounds for that.  Number one is if you

16   are relying on a contract -- a contract forum selection clause

17   as your hook, the courts say, well, you can't extend that

18   beyond what the parties agreed and use that to exercise pendent

19   jurisdiction.  That's number one.  Number two --

20          THE COURT:  Who said that?

21          MR. KASS:  I think we cited, like, three different

22   cases.

23          THE COURT:  Are they Court of Appeals Ninth Circuit?

24          MR. KASS:  They are, I believe, in this circuit; but I

25   don't have in my mind whether they are Ninth Circuit, but

1    that's ground one.

2        Ground two -- and this is the bigger point -- is that

3    courts through -- including circuit courts.  I don't know if

4    the Ninth Circuit itself has addressed it -- but courts in this

5    district as well as courts throughout the country have said

6    pendent jurisdiction does not apply as a matter of federalism,

7    not just a matter of contract but a matter of federalism, does

8    not apply unless you have a federal claim.

9        And if you even look at that *Doe* case -- the footnote that

10   I was referring to -- when they say we are going to apply

11   pendent jurisdiction, the reason it did it is because it said

12   they had the, quote, federal hook.  And that was a Ninth

13   Circuit case.

14       So pendent jurisdiction does not exist for a state law

15   contract claim as your hook.  You need a federal claim.

16       **THE COURT:**  All right.  What's your response to the

17   pendant point?

18       **MR. BLOOM:**  Yes, Your Honor.  And I do want to circle

19   back to *Shopify* since I never got to answer your question on

20   that.

21       On the pendant point, we are not arguing pendant

22   jurisdiction.  Rather, we are arguing that the contract

23   claims -- the tort claims relate to the subject matter of the

24   contract, and there's a body of case law in the Ninth Circuit

25   that says that doesn't mean it has to be a breach of contract

1   claim.  It doesn't even have to, you know, relate to anybody's

2   performance under the contract.  It just has to have some

3   causal or logical connection to what is stated in the contract.

4        Here, the contract prohibits scraping; using automated

5   means to scrape data.  That's what all the tort claims are

6   based upon.

7        So there is a causal or logical connection.  And, again,

8   there is a *Roblox* case that was recently -- opinion recently

9   issued by Judge Illston out of this district, and then there's

10  the *Sun* case that is cited in our case -- that's out of the

11  Ninth Circuit -- that specifically holds that when you have

12  related to language, it's much, much broader.

13            **THE COURT:**  What do we have here?

14        **MR. BLOOM:**  Related to.  Our contract says it covers

15  any claims related to -- not only the terms but the services as

16  well, and the services are defined to include any use of our

17  website, any use of our apps, which scraping invariably is.

18        So that's the hook.  And under the body of law, this

19  circuit, the related to language definitely covers these tort

20  claims.

21            **THE COURT:**  What do you say to that Judge Illston and

22  related to?

23        **MR. KASS:**  So the related to -- and the *Sun* cases is

24  an important case -- the related to establishes the but-for

25  test that I have been talking about.  It is not anything that

1   is somehow connected.

2        If you look at the tortious interference claim, what they

3   are saying is it is a third-party contract.  It relates to the

4   third-party contract.  It doesn't relate to our contract with

5   X.

6        If you look at the unjust enrichment claim, it assumes

7   that there is no contract between us and X.  Otherwise, there

8   is no unjust enrichment claim.

9        If you look at these other claims, they are all based on

10  the assumption that there is no contract between us.  That's

11  very different from what the Ninth Circuit has said in their

12  cases including the *Manetti* case, all the cases that we cited

13  that apply *Manetti*, the Sun case and then the *Southwest*

14  *Airlines* case.

15       And the *Southwest Airlines* case -- and I just want to

16  spend a minute.  I think that was Judge Illston too.  Let me

17  just spend a minute about that case.  In that case what the

18  Defendant did -- it was Southwest Airlines -- what the

19  Defendant did was they recorded telephone calls to their call

20  centers.

21       The Plaintiff was a member of their rewards program, their

22  frequent flier program, who signed -- obviously clicked "agree"

23  and signed the terms and the terms had a forum selection

24  clause, and he then called Southwest on a members' only phone

25  line and had his call recorded and then he brought suit saying

1   his privacy rights were interfered with or privacy rights were

2   breached.

3        What Judge Illston held was that that did not -- the forum

4   selection clause did not apply to that tort claim.  It did not

5   apply to that tort claim because if you looked at the

6   *Manetti-Farrow* case -- which is the key Ninth Circuit case.

7   That's the start of all of this -- it said it doesn't

8   require -- the tort claim doesn't require interpretation of the

9   contract.  And so the *Manetti* case doesn't apply.

10       Then it addressed the broad related to concept under *Sun*

11  or it was the Plaintiff's argument that it should be broadly

12  construed.  And the Court said no.  The connection was too

13  attenuated because the harm that could occur, which is calling

14  call centers and having your call recorded, has nothing to do

15  whether or not you happen to be a member of the program.

16       It is too attenuated.  It doesn't satisfy -- there, it may

17  have satisfied but-for, but it didn't satisfy proximate cause.

18       **THE COURT:**  Here, the argument is the contract

19  prohibited scraping and all these tort claims are related to

20  that.

21       **MR. KASS:**  The contract -- if they have a contract

22  claim, then that may be governed by the forum selection clause.

23       The tort claims assume that there is no contract.  It is

24  very different from the Ninth Circuit -- the Ninth Circuit

25  case, the *Manetti* case that I was telling you about, where they

said what kinds of tort claims do fall under a forum selection
clause, there, the Plaintiff had an exclusive dealing or
dealership with the Defendant.  That was the main contract, and
the Plaintiff brought a series of tort claims.

    And the court said:  Yes, those tort claims fall within
the forum selection clause because we have to interpret that
specific contract and determine whether the parties were in
compliance with the contract in order to determine whether or
not the tort claims also have merit.

    **THE COURT:**  Are you contending that the contract is
invalid from the get-go or are you -- what's your argument
there?

    **MR. KASS:**  So our argument is that the tort claims are
completely independent of the contract.

    **THE COURT:**  I get that.  But are you going further and
saying there never was a forum selection clause to begin with?

    **MR. KASS:**  On this motion we have not done that.  We
will be doing that on our summary judgment, but on this motion
we have not done that.

    **THE COURT:**  Okay.  Thank you for being honest about
that.  Okay.  All right.  We spent an hour on this.

    I want to hear about the motion to stay for a minute.
Whose motion is that?

    **MR. BLOOM:**  Ms. Levenson.  Your Honor, may I address
*Shopify* for just a moment since you asked a question about

1    that?

2            **THE COURT:**  All right.  I will give you 30 seconds.

3            **MR. BLOOM:**  *Shopify* is different from this case,

4    Your Honor, for one thing *Shopify* was a passive website that

5    collected data that people submitted.

6        Bright Data has targeted the California market, has set up

7    California proxies that it advertises to mask as though you are

8    located in California.  It has offices in California.  It has

9    employees in California.  Shopify submitted declarations

10   denying that any of its California --

11           **THE COURT:**  All right.  Just a second.  I forgot to

12   ask you on the -- you are the Bright Data?

13           **MR. KASS:**  Yes.

14           **THE COURT:**  Where do you contend that X Corp. could

15   sue you, Bright Data?

16           **MR. KASS:**  So, X Corp. could sue us in Israel for

17   sure.  I think for state law, you know, that would be the only

18   place that they can sue us.

19       And the Ninth Circuit addressed that very same argument

20   saying, look, if you read our opinion the way we are reading

21   it, there is no place that anybody could see and said it didn't

22   matter.

23           **THE COURT:**  Here is the problem I have with that.

24   Here you are exploiting servers in California and certainly in

25   the United States and saying:  Oh, sorry, you can't sue us

1   except in Israel.  I don't like that argument.  That's not the

2   American way.

3        **MR. KASS:**  Congress can.  I mean, there is no question

4   that Congress can, and that's the whole point of *Doe* is that

5   Congress has the ability; but state courts do not have that

6   same ability to interfere with a national platform.  That's

7   what *Shopify* was all about.

8        **THE COURT:**  All 50 states cannot sue Israel and Israel

9   can take advantage of the American economy in the way Bright

10  Data is doing?

11       **MR. KASS:**  I think Bright Data has the ability -- if

12  there is no -- if there is no U.S. statute -- if there is no

13  congressional statute that prohibits what we are doing, I don't

14  think a state can do that under *Shopify*.

15       **THE COURT:**  I don't know.  Something wrong is with

16  that picture.  Okay.  I interrupted you.  You get 30 seconds.

17       **MR. BLOOM:**  Yes, Your Honor.  In Shopify -- another

18  distinguishing factor is that Shopify submitted declarations.

19  One from Shopify, Inc. in Canada saying, "We don't have any

20  offices or connection to California whatsoever."

21       They submitted another one from Shopify USA that formerly

22  had an officer here saying it had nothing to do with the claims

23  at issue.

24       Here, we have affirmatively alleged that Bright Data's

25  office and employees in California were used to sell scrape

1  data and used to scrape -- well, at least used to sell tools

2  that scrape.  So that supports the tort claim.

3      They did not submit any declaration denying that.

4  Therefore, unlike *Shopify*, our pleading is taken as true.  They

5  could have submitted a declaration.  They chose not to.  So

6  there is nothing controverting our facts at all.

7      And the last thing I would like to say, Your Honor -- and

8  I apologize for jumping around -- but going back to the forum

9  selection issues, Mr. Kass continuously represents a but-for

10  test.  It is referenced in their briefing too.  That's not the

11  law.  There is no but-for test.  You won't find it in the case

12  law.

13      There is a but-for statement in the *Southwest* case, but

14  that's not setting forth a standard or a test.  That's just

15  reaching a conclusion.  There is no but-for test.  It is

16  whether there is a logical or causal connection.  So I wanted

17  to make that point, Your Honor.

18      **THE COURT:**  Let's go to the motion for stay.  Who is

19  going to argue that?

20      **MR. KASS:**  Your Honor, my colleague David Munkittrick

21  will be arguing that.

22      **THE COURT:**  Okay.  Let's hear the motion for stay.

23      **MR. MUNKITTRICK:**  Good morning, Your Honor.

24      **THE COURT:**  Go ahead.  What -- give me your most

25  important point.

1          **MR. MUNKITTRICK:**  The most important point -- I will

2     start with the two factors considered by courts in this

3     district are status.  I think the most important point is that

4     it is the most efficient way forward, to stay discovery until

5     we know which claims are going to be going forward in this

6     case.

7          We filed a motion to dismiss that covers all of X's tort

8     claims, and it attacks them on fundamental legal infirmities in

9     those claims.

10         And the summary judgment motion that we proposed to file

11    is going to attack the majority of the remaining contract claim

12    also on the legal infirmity of whether there is or is not a

13    contract.

14         **THE COURT:**  You know, I have been at this for 25 --

15    you could have filed a motion already.  A lot of lawyers would

16    have already filed the motion for summary judgment so that you

17    could say, Judge, it's already filed.

18         Now you are asking me to take it on a gamble.  See, you

19    didn't do that because of the, quote, holidays; and you lawyers

20    didn't want to work over the holidays.  So now you are asking

21    me to take it on faith that you are going to file it by January

22    what?

23         **MR. MUNKITTRICK:**  Our proposal is January 24th.

24         **THE COURT:**  I know what will happen.  Twenty-third

25    will come and you will ask for an extension.

1          **MR. MUNKITTRICK:**  We will not ask for an extension.

2          **THE COURT:**  Should have already been filed.  All

3    right.  What's your most important point?  Well, first -- yes,

4    I want your most important point.  Then I have got a follow-up

5    question.

6          **MS. LEVENSON:**  Of course, Your Honor.  The most

7    important point is -- as Your Honor just mentioned, this -- the

8    motions to dismiss in this case as well as the motion for

9    summary judgment that the Defendants claim that they will file

10   in January are still not dispositive of all the issues in this

11   case.

12         **THE COURT:**  Well, why wouldn't it be?  Let's say I

13   granted their motion to dismiss the tort claims and then their

14   summary judgment motion succeeds.  What's left?

15         **MS. LEVENSON:**  What's left is all of the -- what they

16   call the backward looking portions of the breach of contract

17   claim.

18      So all that they are asking to move for summary judgment

19   on is forward looking breach of contract claims once they claim

20   that they --

21         **THE COURT:**  Oh, I see.  That's a good point.  That's a

22   good point.  So you are saying even if -- even if they win on

23   everything, they still are facing a contract claim pre-- what's

24   that word -- repudiation?

25         **MS. LEVENSON:**  Correct, Your Honor.  And what's

1   important about that is that the breach of contract claim in

2   this case alleges that they breached the contract with X by not

3   just scraping the data from X but by also selling that data, by

4   selling proxy servers, and by selling tools by other people to

5   be able to breach contracts here.

6        So discovery -- we very much dispute that there is no

7   discovery needed to resolve that motion for summary judgment,

8   and discovery is actually -- the discovery that has been

9   propounded in this case already is very relevant to that breach

10  of contract claim.  Even if everything were to go in Bright

11  Data's favor, the discovery here --

12          **THE COURT:**  Have they propounded discovery to you?

13          **MS. LEVENSON:**  They have, yes.

14          **THE COURT:**  Have you come across with discovery?

15          **MS. LEVENSON:**  I'm sorry?

16          **THE COURT:**  Have you come across -- given up

17  discovery?  Are you resisting stonewalling?

18          **MS. LEVENSON:**  Our response deadline for the discovery

19  dispute is one week from today.

20          **THE COURT:**  Well, do you plan on stonewalling?

21          **MS. LEVENSON:**  We do not plan on stonewalling and we

22  very much hope --

23          **THE COURT:**  I have a feeling you do.  I have a feeling

24  they do as well.  That's -- see, you have big firms here.

25  That's the name of the game.  Stonewall.  Stonewall.  Evade.

1          **MS. LEVENSON:**  We are very much interested in getting

2     to some type of resolution in this case where we can truly

3     understand the scope of everything that Bright Data has done to

4     breach their contracts with X.

5          And so I'm -- so far based on this motion to stay, Bright

6     Data has only given us objections to our discovery.  We haven't

7     responded to their discovery yet, but we are very much

8     interested in getting discovery moving in this case so that we

9     can figure out what the best resolution is.

10          **MR. MUNKITTRICK:**  If I can add --

11          **THE COURT:**  All right.  I want to hear back from

12     Bright Data.  Please, go ahead.

13          **MR. MUNKITTRICK:**  Sure.  Thank you.  Two points.

14          One is that it is important to emphasize that --

15          **THE COURT:**  If they ask for your customers, are you

16     going to turn it over?

17          **MR. MUNKITTRICK:**  No.

18          **THE COURT:**  Then I'm going to deny your motion across

19     the board.

20          **MR. MUNKITTRICK:**  Well, let me explain.

21          **THE COURT:**  Because that's unreasonable for you not to

22     turn over to discovery so they can understand who you are

23     selling these scraping tools to.

24          **MR. MUNKITTRICK:**  Well, this is a very important

25     point.  It is not that we won't provide discovery.  That is not

1  our position.  Our position on that point is that we will -- we

2  would not provide customer identifiable information.

3         THE COURT:  That's ridiculous.  That is ridiculous.

4         MR. MUNKITTRICK:  It's not because of the harm that it

5  could cause if it was disclosed.

6         THE COURT:  No, no, no.  Maybe they are criminals.

7  Maybe they are criminals.  That's what they are contending, and

8  you don't want the criminals to come to light.

9         MR. MUNKITTRICK:  We don't want them to shut down our

10 business -- to use that information to shut down our customers,

11 to send cease and desist letters to our customers, even to send

12 subpoenas.  That could shut down our entire business.

13        THE COURT:  Too bad.  That's your line of business

14 that you chose to get into.

15        MR. MUNKITTRICK:  Our position is, Your Honor, that is

16 an improper use of discovery.  Discovery is not for that.

17 Discovery is defined as the information that is pertinent to

18 the claims at issue and more importantly, pertinent to the

19 claims that have a legal basis.

20     If there is no legal basis for a tortious interference

21 claim, for example, there is no reason --

22        THE COURT:  All right.  Listen, I will give you a

23 perfect example.  You have made a point today about, they have

24 not -- meaning -- what's your company? -- X has not identified

25 who has got a contract that's being breached.

1          Well, they say we want to know who it is that is using

2     this scraping tool and then we will go and check and see if we

3     have a contract with them.  And if we do, by God, we are going

4     to tell you.  We have got a contract with the ABC Company, and

5     they are using the scraping tool; and they promised us they

6     wouldn't do it; right?  Right.

7          And you are saying, Oh, we are going to keep ABC secret.

8     No one is ever going to know.  No.  Too bad.

9          **MR. MUNKITTRICK:**  I think there are two issues -- if I

10    can address -- there, Your Honor.  One is there needs to be

11    sufficient allegations to get them to discovery.

12         Just some speculation that there may be scrapers with

13    contracts doesn't get them there; but, two, there is a path

14    forward.  It takes some work.  It takes some consideration to

15    get there, and that's what we are trying to do with the motion

16    to stay.

17         **THE COURT:**  Which should have already been filed.

18         **MR. MUNKITTRICK:**  Sorry?

19         **THE COURT:**  Which should have already been filed.

20    This case has been on file for only six months; right?

21         **MS. LEVENSON:**  Correct.

22         **THE COURT:**  What have you been doing all this time?

23    You could have filed this motion in September for summary

24    judgment.  We will wait.  We will wait until the case

25    management and we will tell him that we are going to do it.

1    "Going to do it" is not "has done it."  Sorry.  I'm ready to

2    rule.  I'm ready to rule.  Are you ready?

3              **MR. MUNKITTRICK:**  Can I make one more point?

4              **THE COURT:**  Yeah, go ahead.  Make one more point.

5              **MR. MUNKITTRICK:**  Thank you, Your Honor.  Address the

6    path forward.  There is a path forward that can work, and we

7    have done it in the related case that they have mentioned

8    against Meta where we have produced our customer specific

9    information but we have anonymized the identifying information.

10   That has allowed us to protect our customers' identities, but

11   we have produced that customer specific information.  It gets

12   what both sides need, and it protects our interest.

13        So there is a path forward.  But again, it takes work and

14   it may not be --

15             **THE COURT:**  That path forward is called stonewalling

16   because they need to know who the customer is so they can see

17   what the contract with that customer is so they can find out if

18   it is a violation of that contract.

19             **MR. MUNKITTRICK:**  We address that issue in the *Meta*

20   case as well, Your Honor.

21             **THE COURT:**  Thank you for letting me know -- you want

22   to transfer this case to that judge, go ahead.  Who is that

23   judge?  Judge Chen?  Go ahead.  Make a motion to transfer the

24   case to Judge Chen, and it will be off of my docket.

25        In the meantime, I'm going to decide it the way I think is

1    right and fair.

2          Okay.  Have you had anything more to say?

3          **MS. LEVENSON:**  Just briefly, Your Honor.  An important

4    thing here, as Your Honor has already mentioned, the customer

5    information is certainly relevant to both the contract claim

6    that will remain despite all of the motions that Bright Data

7    has filed here as well as the interference claim; but Bright

8    Data has a heavy burden to show that discovery should be stayed

9    in this case.

10         Importantly, they did not move for a protective order and

11   specific discovery requests saying that those are no longer

12   relevant in light of the motions to dismiss.

13         This is just a request to stay all discovery whatsoever so

14   that we cannot get to the bottom of what the actual facts in

15   this case are, and that's why we believe it's inappropriate.

16         **THE COURT:**  Thank you.  All of you have a seat.

17         **MR. MUNKITTRICK:**  Thank you, Your Honor.

18         **THE CLERK:**  I will correct the calling of the case.

19         **THE COURT:**  No, no.  Wait.  I have some things to say.

20   Do you want to rule for me?  Come on.  Give me a break.

21         **THE CLERK:**  Apologies.

22         **THE COURT:**  You are forgiven.  All right.  I don't

23   have an answer on the merits, and it is going to take a lot of

24   work but one thing is clear.  Even if all the motions are

25   granted and the supposed "to be filed motion" is filed, which

1   is not yet filed and should have been filed and is just asking

2   the Judge to gamble on the come -- no, I'm not going to do

3   that.  I have learned the hard way.  That doesn't work -- no.

4   You should have already filed it.  So, discovery is wide open.

5   Wide open.  No limitation.

6       I'm not saying that you get unreasonable discovery but I'm

7   just saying that I'm not limiting discovery on account of this

8   motion.  It is not a good path forward in my view.

9       No matter what happens, the contract claim with respect to

10  pre-repudiation is going to survive.  So we are going to get

11  started on discovery, and the fact that it relates also to a

12  tort claim is not enough to oppose discovery.

13      Right now all of the claims are still in the case.  If you

14  stonewall on discovery because there is a pending motion, I'm

15  going to deny the motion across the board because it's unfair.

16      I am working on the motion.  I don't -- it's a lot of work

17  to do, and I'm working on it.  In the meantime, discovery goes

18  forward.

19      I have a request for additional briefing.  One is on the

20  issue of copyright preemption.  I did not cite in that order

21  that I sent out yesterday Judge Illston's decision -- that I

22  think you are all aware of -- it's called *Yu versus ByteDance*,

23  Case Number 23-3503, September 2023.

24      Judge Illston had a reference to this copyright preemption

25  case, and I personally think there is a -- I shouldn't say

"personally" -- I individually think that even though there is

an illusion to this issue in your briefing, that it deserves

more attention than the lawyers have given it.

So I'm going to ask -- give each of you 12 pages and give

you until one week from today at noon to file briefs at noon.

Please don't wait to see what the other side says and play that

game.

If your brief is not filed on time, please don't do that

to me.  I -- all right.

Then the second issue on which I want briefing -- and,

again, you get another 12 pages -- is the enforceability of

browsewrap versus clickwrap in the Ninth Circuit.  And by

"Ninth Circuit," I mean the Court of Appeals for the Ninth

Circuit.

So those two issues.  And that's also due on Wednesday,

noon, next week.

Now, I encourage you too file the motion for summary

judgment and -- but I still am not going to stay discovery

based on that because no matter what we have an issue.

And if I start trying to let you say, no, you only get

discovery on this or discovery on that, then there will be

interminable fights over whether or not the discovery is

permissible.

That's -- I'm not going to give you any more case -- have

you done your initial disclosures?

1          (No response.)

2          **THE COURT:**  All right.  I'm going to give you until a

3    week from today to update them because if you don't do it

4    properly, I have to get into preclusion; and I don't like to

5    preclude evidence, but a lot of lawyers cheat on initial

6    disclosures.

7          So if you want to be a cheater, you are going to be

8    precluded later.  So please don't -- do a good job.  I'm giving

9    you an extra week to update your initial disclosures.

10         Meanwhile, though, I'm not going to set any other

11   deadlines because I have a feeling I will be seeing you again

12   soon; and then I can set some deadlines later, but discovery is

13   open and you can bring that motion for summary judgment.

14   That's fine too.

15         Okay.  While I have got you here -- we have been at it

16   almost two hours -- is there something more that you feel a

17   burning need to bring up?

18         **MR. KASS:**  No, Your Honor.

19         **THE COURT:**  Okay.  Good luck to both sides.

20         **THE CLERK:**  The clerk will correct the calling of the

21   case as civil action 23-3698, X Corp. versus Bright Data

22   Limited.

23              (Proceedings adjourned at 9:17 a.m.)

24                    ---oOo---

25

## CERTIFICATE OF REPORTER

       I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   January 11, 2024

_____

    Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
   United States District Court - Official Reporter