Colin R. Kass (*pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

Robert C. Goodman (Bar No. 111554)
Lauren Kramer Sujeeth (Bar No. 259821)
ROGERS, JOSEPH, O'DONNELL, PC
311 California Street, 10th Floor
San Francisco, CA 94104
(415) 956-2828
rgoodman@rjo.com
lsujeeth@rjo.com

*Attorneys for Defendant Bright Data Ltd.*
*Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

X Corp.,

                Plaintiff,

        v.

BRIGHT DATA LTD.

                Defendant

Case No. 23-cv-03698-WHA

Judge: Hon. William Alsup

**BRIGHT DATA'S SUPPLEMENTAL BRIEF ON BROWSER-WRAP**

**TABLE OF CONTENTS**

I.  INTRODUCTION. ................................................................................................................ 1

II. SKEPTICAL OF BROWSER-WRAP CONTRACTS, THE NINTH CIRCUIT
    HAS YET TO UPHOLD ONE INVOLVING MERE PUBLIC WEB ACCESS. ............. 2

    A.  Public Search on X's Site Does Not Require or Involve Manifestation of
        Assent to X's Browser-Wrap Offer. ....................................................................... 2

        1.  X's Unregistered Visitors Are Not on Constructive Notice. ....................... 4

        2.  X's Unregistered Visitors Do Not Unambiguously Manifest Assent
            by Searching the Public Web. ..................................................................... 8

        3.  The Same Rules Apply to Business Customers. ......................................... 9

    B.  Browser-Wrap Agreements Governing Public Search Lack Consideration. ........ 10

III. CONCLUSION ................................................................................................................. 12

# TABLE OF AUTHORITIES[1]

Page(s)

**CASES**

*Be In, Inc. v. Google, Inc.*,
    2013 WL 5568706 (N.D. Cal. 2013) ................................................................... 1, 6

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................ 6

*Berman v. Freedom Fin. Network, LLC*,
    30 F. 4th 849 (9th Cir. 2022) ............................................................................ *passim*

*Dohrmann v. Intuit, Inc.*,
    823 F. App'x 482 (9th Cir. 2020) ........................................................................... 6

*Ewert v. eBay, Inc.*,
    2010 WL 4269259 (N.D. Cal. 2010) ...................................................................... 9

*Gallagher v. Holt*,
    436 Fed. App'x 754 (9th Cir. 2011) ..................................................................... 10

*Kremen v. Cohen*,
    337 F.3d 1024 (9th Cir. 2003) ........................................................................ 10, 11

*Lopez v. Dave, Inc.*,
    2023 WL 8594393 (9th Cir. 2023) .................................................................... 7, 10

*Nat'l Funding, Inc. v. Com. Credit Counseling Servs., Inc.*,
    817 F. App'x 380 (9th Cir. 2020) ........................................................................... 1

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ................................................................... 2, 5, 7, 9

*Norcia v. Samsung Telecomms. Am., LLC*,
    845 F.3d 1279 (9th Cir. 2017) ...................................................................... 4, 7, 8

*Oberstein v. Live Nation Ent., Inc.*,
    60 F.4th 505 (9th Cir. 2023) ........................................................................ 2, 3, 7

*Olney v. Job.com, Inc.*,
    2014 WL 4660851 (E.D. Cal. 2014) .................................................................. 6, 9

---

[1] Unless otherwise specified, all emphasis added, initial capitalizations conformed without brackets, and internal citations and quotation marks omitted.

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ..................................................................................................... 9

*Specht v. Netscape Commc'ns Corp.*,
    306 F.3d 17 (2d Cir.2002) ........................................................................................................ 2

*Steiner v. Thexton*,
    48 Cal. 4th 411 (2010) ........................................................................................................... 12

*Williams v. Apple, Inc.*,
    338 F.R.D. 629 (N.D. Cal. 2021) ............................................................................................. 9

*Wilson v. Huuuge, Inc.*,
    351 F. Supp. 3d 1308 (W.D. Wash. 2018) ......................................................................... 8, 12

**OTHER AUTHORITIES**

Restatement (Second) of Contracts ......................................................................................... *passim*

## I.   INTRODUCTION.

X premises its tortious interference claim on the notion that its browser-wrap Terms bind all visitors to its site, including those that have no X account and do nothing more than search publicly-available content. But its view – that anyone who "view[s] the X website … agree[s] to a binding contract with X" – "is not a factual allegation sufficient to support the formation of a contract, but rather a conclusion of law 'couched as a factual allegation.'" FAC ¶ 22; *Be In, Inc. v. Google, Inc.*, 2013 WL 5568706, *9 (N.D. Cal. 2013). To state a "tortious inference claim," the Ninth Circuit requires the plaintiff to "plead the[] essential elements [of] an underlying enforceable contract." *Nat'l Funding, Inc. v. Com. Credit Counseling Servs., Inc.*, 817 F. App'x 380, 383 (9th Cir. 2020). Here, X seeks to do that by pointing to its browser-wrap Terms. But X employs the weakest form of all browser-wrap terms. Its Terms do not require any affirmative action by a website visitor – such as clicking a button agreeing to or acknowledging the Terms – and the visited pages do not warn visitors that they have wittingly or unwittingly become contractually bound to X by mere virtue of searching the public web.

At the January 10th hearing, this Court asked for supplemental briefing on the state of the Ninth Circuit's treatment of browser-wrap enforceability. As explained below, Ninth Circuit law unequivocally establishes that browser-wrap terms that do not require any affirmative action by the website visitor, and are purportedly triggered by doing nothing more than publicly searching the web, are unenforceable. Such contract claims fail both for lack of mutual assent and lack of consideration. As to mutual assent, the claim fails because X has failed to allege facts showing that visitors are on constructive notice that website visitation constitutes binding assent, and because visitors' mere act of searching the public web is not an "unambiguous manifestation of assent." *Berman v. Freedom Fin. Network, LLC*, 30 F. 4th 849, 855-57 (9th Cir. 2022).

X's browser-wrap claim similarly fails because X has not provided any bargained-for consideration to members of the public. X has no independent right to block members of the public from searching the public web, and thus, it has not conferred any benefit to the public beyond what they were already entitled to. Nor was X's decision about what information to make public

"bargained for." X chose to connect its servers to the public Internet and to make certain portions of its site publicly available without a log-in screen. It may have done so to attract eyeballs that make its platform more attractive to advertisers, or it may have had other reasons. But, whatever its motivation, X did not make these choices in order to induce visitors to agree to the Terms. For those reasons, X has failed to allege the existence of a valid and enforceable contract between it and visitors who view publicly-available content on the X website.

**II.     SKEPTICAL OF BROWSER-WRAP CONTRACTS, THE NINTH CIRCUIT HAS YET TO UPHOLD ONE INVOLVING MERE PUBLIC WEB ACCESS.**

The Ninth Circuit applies traditional principles of contract formation to online contracts. As the court explained in *Nguyen*, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014); *Berman*, 30 F. 4th at 855-56 ("Elemental principles of contract formation apply with equal force to contracts formed online."). In applying these traditional principles, the Ninth Circuit is guided by the Restatement (Second) of Contracts, *see id.*, which makes clear that the "formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Rest. 2d § 17; *see also Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 510 (9th Cir. 2023) ("It is essential to the existence of [an online] contract that there should be [party] consent … and … sufficient cause or consideration."). Here, X's visitors do not need to manifest assent to engage in public search of X's site, nor do they receive any consideration when they do.

**A.     Public Search on X's Site Does Not Require or Involve Manifestation of Assent to X's Browser-Wrap Offer.**

"Mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Nguyen*, 763 F.3d at 1175 (*citing Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir.2002) (applying California law)). In most cases, parties have "traditionally manifested assent through written or spoken word," but in limited cases, they can also do so through conduct. *Berman*, 30 F. 4th at 855 (citing § 19(2) of the Restatement, and noting that "[t]he conduct of a party is ***not effective*** as a manifestation of his assent *unless* he intends to engage

1  in the conduct and knows or has reason to know that the other party may infer from his conduct
2  that he assents.").

3        To determine whether a website visitor has assented to a website operator's terms, the
4  Ninth Circuit first looks at the specific type of (purported) online contract at issue. Online
5  agreements come in a variety of flavors. At one "end of the spectrum" are "clickwrap agreements"
6  in which the visitor must register for an account and affirmatively click "I agree" to the hyperlinked
7  terms before receiving access to the site's contents. *Berman*, 30 F.4th at 856.

8        While one could argue that the act of clicking "I agree" – like affixing a signature to a
9  contract – constitutes express assent to the terms, the Ninth Circuit does not take that approach.
10 Given the separation between the hyperlinked terms and the "I agree" box, the Ninth Circuit
11 instead prefers to treat such acknowledgement as "assent by *conduct*" rather than by written word.
12 As such, so long as the registered user has "received [adequate] notice of the terms being offered,
13 … courts have routinely found clickwrap agreements enforceable." *Id*. (finding clickwrap
14 **unenforceable** for lack of notice); *cf. Oberstein*, 60 F.4th at 515 (finding clickwrap enforceable
15 where users had to click on a "confirmation button" "when creating an account, signing into an
16 account, and completing a purchase," that expressly informed users that "by clicking on this
17 button, you agree to our Terms of Use").

18       "At the other end of the spectrum are so-called browser-wrap agreements, in which a
19 website offers terms that are disclosed only through a hyperlink and the user *supposedly* manifests
20 assent to those terms simply by continuing to use the website."[2] *Id*. at 513. Browser-wrap
21 contracts are disfavored. As the Ninth Circuit explained, "[c]ourts are more reluctant to enforce
22 browser-wrap agreements because consumers are frequently left unaware that contractual terms
23 were even offered, much less that continued use of the website will be deemed to manifest

---

[2] Many courts refer to such agreements as "browsewrap." For consistency, we have replaced all such references to "browser-wrap" without additional notation. Similarly, courts sometimes refer to "clickwrap" in its strictest sense, requiring a click of a button that unambiguously states "I agree" to the Terms, but excluding scenarios in which similar language appears in proximity to a "continue" button. This brief refers to both variants of clicking as "clickwrap," reserving the term "browser-wrap" for sites where access does not require clicking any Terms-related button.

acceptance of those terms." *Berman*, 30 F. 4th at 856.  Indeed, as the concurring opinion in *Berman* explained, "pending further word from the California appellate courts, browser-wrap agreements are unenforceable *per se*" under California law.  *Id.* at 868 (Baker, J., concurring).

But even if browser-wrap contracts were not *per se* unenforceable, traditional principles of contract formation still govern.  Under Section 69(1) of the Restatement,

> "Where an offeree **fails to reply to an offer**, his **silence and inaction** operate as an acceptance in the following cases **only** … [w]here an offeree takes the benefit of offered services with reasonable opportunity to reject them and **reason to know** that they were **offered with the expectation of compensation**."

Rest. 2d § 69(1); *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1287 (9th Cir. 2017) (similar, discussing "shrinkwrap"; "California's general rule that silence or inaction does not constitute acceptance is binding.").  To invoke Section 69(1), the website operator must show that (i) the visitor had "reason to know" that the information was "offered with the expectation" that he would be bound by the Terms; (ii) that the visitor failed to respond to the offer; and (iii) that the visitor accepted the benefits offered in silence.  In most cases, browser-wrap claims fail the first element.[3]

Here, X employs the ***weakest*** form of all known online contracts: pure browser-wrap that does not require click-through or acknowledgement at any point during the *entire* interaction between X and the unregistered visitor and does not contain any notice or warning on the visited pages that visitors are subject to the Terms.  Indeed, X's browser-wrap terms are particularly weak because X seeks to apply them to information that it has chosen to make publicly available to the entire world, rather than to any personalized service provided to the visitor.

### 1. *X's Unregistered Visitors Are Not on Constructive Notice.*

"Because no affirmative action is required [in the browser-wrap context] by the website

---

[3] This brief only addresses the issue of whether there is a valid and enforceable *third*-party browser-wrap agreement between X and unregistered visitors to its public site.  While many of these arguments overlap with X's browser-wrap claim against Bright Data, Bright Data has additional defenses flowing from the termination of its account and its express rejection of X's Terms.  Those issues, which implicate the second and third prongs of a Section 69(1) claim, are addressed separately in Bright Data's motion for summary judgment on the contract claim.

user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browser-wrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Nguyen*, 763 F.3d at 1176. Here, X does not allege that each of its millions of visitors – or even that any of them, including those that scrape X's website – had *actual* knowledge of the Terms.

Accordingly, the issue of mutual assent turns on whether visitors have constructive notice both of the content of the Terms and of the (purported) fact that the mere act of visiting the site would bind them. As the Ninth Circuit explained, in adopting a two-part standard for enforcement of online contracts:

> "Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides *reasonably conspicuous notice* of the terms to which the consumer will be bound; *and* (2) the consumer takes some action, such as clicking a button or checking a box, that *unambiguously manifests his or her assent* to those terms...."

*Berman*, 30 F.4th at 856. As explained below, it is impossible for a pure browser-wrap case, involving the mere access of public information, to satisfy this test. Nor is there any Ninth Circuit case that finds such a browser-wrap agreement enforceable. There is no reason for this Court to depart from this approach. *Id.* (explaining that these conditions "are essential if electronic bargaining is to have integrity and credibility").

At this point in the analysis, burdens become important. There is no dispute that X, as the plaintiff seeking to assert the contract, bears the burden of proving that users had constructive notice. At the pleading stage, therefore, X similarly bears the burden of pleading "enough factual matter" to plausibly establish that web visitors had constructive notice. Constructive notice, however, is an objective fact that courts resolve as a matter of law. And because the contract itself is understandably integral to any contract-based claim, the underlying contract is incorporated into the Complaint and can be considered on a motion to dismiss. Facts relating to the myriad ways in which visitors interact with X's site, and what they see, may or may not be alleged or incorporated into the Complaint. If they are not incorporated, and there are no other allegations relating to

constructive notice, then the claim will fail under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). If such facts are incorporated, then the Court must make an independent determination of whether users are on constructive notice. Here, X has not satisfied its burden.[4]

The Complaint does not contain any facts relating to constructive notice. X does not explain how, or when, visitors first encounter the Terms or any hyperlink to them. Nor does it allege any facts relating to the notices, warnings, or other disclosures it makes alerting visitors to the existence of the Terms, their scope, or their binding nature. If the court were to take judicial notice of X's website, however, it would find the opposite of reasonable notice:



*See* ECF. 49-1, Exs. 9-10. X's landing page and user pages do not satisfy constructive notice requirements because nowhere do they tell visitors that they will become bound to the Terms by searching public information. In fact, it suggests the opposite: that by not "signing up," and continuing to search only public information, the visitor is ***not*** "agree[ing] to the Terms." It also suggests that you only need to "sign-up" if you want special privileges, and "don't [want to] miss what's happening." *Id*. While the page contains a *grayed-out* (non-underlined) link to the Terms

---

[4] *See Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 n.3 (9th Cir. 2020) ("conspicuousness is a question of law"); *Olney v. Job.com, Inc.*, 2014 WL 4660851, *4 (E.D. Cal. 2014) (dismissing claim for failure to allege facts relating to constructive notice because allegation that user "agree[d] to be bound by [the terms] as a condition of their use of [website]' … is not a factual allegation sufficient to support the formation of a contract, but rather a conclusion of law 'couched as a factual allegation.'"); *Be In, Inc. v. Google, Inc.*, 2013 WL 5568706, *9 (N.D. Cal. 2013) (same).

of Service (assuming you scroll down far enough), the page itself does not describe the "service" to include public website search. While X argues that the *Terms* themselves can be interpreted to reach such public search, the visited page does not contain any such indication.

As the Ninth Circuit has repeatedly explained, "[t]he presence of 'an ***explicit textual notice*** that continued use will act as a manifestation of the user's intent to be bound' is ***critical to the enforceability*** of any browser-wrap-type agreement." *Berman*, 30 F. 4th at 856-58 (citing *Nguyen*, 763 F.3d at 1177). X does not allege, nor does its website reveal, any such explicit textual notice. Indeed, X's website stands in stark contrast to cases in which the *key* provisions – including mandatory arbitration provisions – are extracted from the Terms and highlighted on the pages actually and unavoidably encountered by the visitor. In *Berman*, for example, the Ninth Circuit *declined* to enforce a clickwrap agreement, where the user simply clicked "continue" (rather than "I agree"), where the following language was included directly above it: "I understand and agree to the Terms & Conditions which includes mandatory arbitration." 30 F. 4th at 854. Because this language was grayed out, "rather than in blue, the color typically used to signify the presence of a hyperlink," and because the surrounding "visual elements" of the page "naturally direct[ed] the user's attention everywhere else," the court found that the terms were the "antithesis of conspicuous." *Id*. at 854-57; *Lopez v. Dave, Inc.*, 2023 WL 8594393, **1-2 (9th Cir. 2023) (same); *Oberstein*, 60 F.4th at 515 (same).

Nor can X claim that, in today's modern age, visitors should expect that they will be bound by whatever terms a website operator chooses to employ. The Ninth Circuit has repeatedly rejected that argument. *First*, in *Nyugen*, the Ninth Circuit held that a defendant's "familiarity with other websites governed by similar browser-wrap terms … [was] of no moment." 763 F.3d at 1179. *Second*, and more importantly, in *Norcia*, 845 F.3d at 1287, the Ninth Circuit *expressly* parted ways with the Seventh Circuit's holding that "[p]ractical considerations support" enforcing terms that accompany their products. As the Ninth Circuit explained, California courts have not adopted that view, but rather have made clear that "silence alone does not constitute assent." *Id*. at 1290. Practical commercial realities do not overcome this, the court explained, because "California

Legislature … can amend the law [if it] believes that its current commercial code fails to strike an appropriate balance between consumer expectations and the burden on commerce." *Id*.; *Wilson v. Huuuge, Inc.*, 351 F. Supp. 3d 1308, 1316 (W.D. Wash. 2018), *aff'd*, 944 F.3d 1212 (9th Cir. 2019) (rejecting "blanket presumption that users these days just assume that every app they download is riddled with binding terms and provisions").

### 2. *X's Unregistered Visitors Do Not Unambiguously Manifest Assent by Searching the Public Web.*

In *Berman*, the Ninth Circuit also found mutual assent lacking because the act of clicking "continue" was not, by itself, an "unambiguous manifestation of assent." As the court explained, the website "must explicitly notify the user of the legal significance of that action she must take to enter a contractual agreement." *Berman*, 30 F.4th at 857-58. Thus, even if the user had been "aware of the mandatory arbitration provision," the lack of direction concerning the significance of clicking "continue" defeated mutual assent, despite the language of agreement above or "in close proximity" to the "continue" button. This, the court said, distinguished its prior precedents that "explicitly warned" users of the conduct that would be deemed assent. *Id*.

Here, public web search is not and cannot be an "unambiguous manifestation of assent" because that conduct is indistinguishable from conduct that the public could engage in without ever meaning to agree to the Terms. As the Restatement explains, "non-verbal conduct often has different meanings to different people," so divining the "meaning of conduct *not used as a conventional symbol*" as expression of assent is "more uncertain … than are words." *See* Rest. 2d § 19, cmt. a. Searching the public web does not indicate assent because it is not a conventional or unambiguous non-verbal expression of assent. For example, if Alice tells Bob, "you owe me $100 if you walk down the public sidewalk," the fact that Bob walked down the public sidewalk is not a non-verbal expression of assent. For the same reason, conducting public search is not an unambiguous expression of assent because the visitor is only doing that which he has every right to do anyway. For that reason, it is impossible to establish assent in *pure* browser-wrap cases based on a visitor's mere search of public information absent "some action, such as clicking a button or checking a box," agreeing to the Terms. *Berman*, 30 F. 4th at 856-57.

### 3. *The Same Rules Apply to Business Customers.*

Nor can X avoid this clear, binding precedent by alleging that Bright Data is a business, or by speculating that customers who use Bright Data's services to scrape X are likely to be businesses. These arguments fail for several reasons.

*First*, neither Bright Data's status as a business nor *its* alleged awareness of the Terms has any bearing on whether third-party customers are bound by, or on constructive notice of, the Terms. *See Job.com, Inc.*, 2014 WL 4660851, at *5 (that the third-party defendants were "sophisticated" Internet businesses was of "no moment" absent **actual** knowledge of the terms).

*Second*, X has not alleged that all of Bright Data's customers are businesses. And even if they were, there is no rule that a business is on greater inquiry notice than an individual. Indeed, many businesses are one-person shops, or have just a few employees. It would be unreasonable to assume that their actions are meaningfully different than consumers' actions, who may similarly spend the day trolling X's site.

*Third*, the law does not distinguish between consumers and businesses, or even take into account their specific circumstances. X's Terms are terms of adhesion that apply equally to *everyone*, construing them equally for the most and least sophisticated of users.[5] *See Ewert v. eBay, Inc.*, 2010 WL 4269259, *7 (N.D. Cal. 2010) ("Courts in construing and applying a standardized contract … effectuate the reasonable expectations of the average member of the public [even though that may] … give the advantage of a restrictive reading to some sophisticated customers…."); *Williams v. Apple, Inc.*, 338 F.R.D. 629, 638-39 (N.D. Cal. 2021) (same).

*Fourth*, even if businesses are held to a different standard, at most, there would be an (unalleged) factual question for each and every business as to whether their specific situation was

---

[5] The distinction between business and consumers first arose in *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004). There, the defendant was a repeat user, who received notice of the terms after every server request. It argued that it was not bound because it did not receive the notice until after the request was made. The Second Circuit rejected this argument because the defendant admitted he was "fully aware" of the terms. Nor is dicta in *Nguyen* to the contrary. There, the court explained the rules of law relating to enforcement of browser-wrap agreements in "individual consumer" cases. While it cited a law review article in a footnote suggesting that a different rule *might* apply to corporations, it did not so hold. 763 F.3d at 1178, n. 2.

sufficient to put them on notice. *Lopez*, 2023 WL 8594393, at *2 (expressing skepticism that "length of the relationship" is "relevant to inquiry notice," but noting even if it were, there was no evidence that the key provisions were communicated during that relationship).

*Fifth*, even constructive notice would not change the fact that X's site affirmatively suggests that a person (including a business) only becomes bound by "signing up." That is, even if businesses are held to a different standard when it comes to "constructive notice," the same rules apply to the second *Berman* element of what conduct constitutes an "unambiguous manifestation of assent." A business has the same right to search the web as an individual, and the inferences associated with that act are no different for one than the other. If consumers do not manifest assent by searching X's site, then neither do businesses.

### B. Browser-Wrap Agreements Governing Public Search Lack Consideration.

Even if X could show assent, it has not provided its unregistered visitors with bargained-for consideration.[6] "Consideration is an essential element of a contract." *Gallagher v. Holt*, 436 Fed. App'x 754, 755 (9th Cir. 2011). To constitute consideration, the offering party must provide the offeree with a benefit, and that benefit must be "bargained for." Rest. 2d § 71. This consideration must be "something of real value," and must be a "benefit conferred … upon the promisor … ***to which the promisor is not lawfully entitled***," offered "as an inducement to the promisor" for making his promise. *Gallager*, 436 Fed. App'x at 755.

Here, X cannot show that it has provided website visitors with consideration, since they already have every right to search the public web without X's permission. Nor can X claim that its own unilateral decision to make portions of its website accessible to the public was an "inducement" in exchange for a return promise from the public to be bound by the Terms. As such, bargained-for consideration does not support X's browser-wrap offer. Importantly, no case has found that a website operator has provided consideration to a visitor who merely searches for publicly-available information. This Court should not be the first.

---

[6] Though the Ninth Circuit has not specifically addressed the consideration element in connection with browser-wrap, it has addressed consideration in other contexts, including online contracts generally. *See Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003) (rejecting online contract claim).

*X's Browser-Wrap Offer Lacks Consideration Because X Has No Independent Right to Block Public Search*.  As the Ninth Circuit has held in finding that an online contract lacked consideration, a "party claiming breach must show that, in return for the promise, it conferred some benefit ***the other party was not already entitled to receive***, or suffered some prejudice it was not already bound to endure."  *Kremen*, 337 F.3d at 1028.  Here, X has not conferred on the public any right that they were not already entitled to receive, nor has it suffered any prejudice it was not already bound to endure.

At its core, this case comes down to the simple fact that the Internet is a public communications network.  Any participant with an Internet connection may freely search the web, without interference from any other party.  No one – including X – has the right to prevent any other participant from exercising that right.  X may choose not to respond to server inquiries or may choose not to provide the requested information when asked.  But it has no independent legal right to prevent other Internet users from searching the web.  As such, any purported benefit that consists of nothing more than allowing visitors to "access" X's site cannot serve as consideration because it does not confer any benefit the visitor was not already entitled to receive.

Nor can X argue that it suffered a prejudice that it was not already bound to endure.  When X connected its servers to the Internet, it became bound to accept server traffic from other users, just as when a homeowner installs a phone line, it becomes bound to accept incoming calls as long as its phone remains plugged into the wall.  Just like the homeowner can decide what information to provide in response to an incoming call, X's servers can decide what information to provide in response to a visitor's request.  But X cannot secure an injunction preventing the public from making the request in the first instance.  For that reason, if receipt of an incoming server request could be deemed a "prejudice," it is one that the website operators are "bound to endure" by virtue of their decision to participate in the public web.

Indeed, just imagine if a website operator had a policy that no one could access its site.  Could it secure an injunction against the entire world, or bring a breach of contract claim against every person on the planet?  Of course not.  If it wants to prevent access, it can either disconnect

from the Internet, or put the portions it wants to be invite-only behind a log-in screen.

Here, X chose to get into the business of operating a social media platform open to the world, rather than creating its own off-the-grid private network. It also chose to make the information available to all Internet users, rather than placing the information behind a log-in screen. Had it relied on a log-in screen, access to its information would be protected by the Computer Fraud and Abuse Act and X would have an independent legal right *under federal statute* to block the public's access to this information. But X has eschewed taking such steps in favor of maximizing eyeballs. The choice was its own, but it means that X has not provided anything of value to members of the public that they were not already entitled to. *See Wilson*, 351 F. Supp. 3d at 1317 (App developer "chose to make its Terms non-invasive so that users could charge ahead to play their game. Now, [it] must live with the consequences of that decision.").

*X's Decision to Post Public Information Was Not Bargained-For*. X's browser-wrap offer also lacks consideration because its decision to make information public was not "bargained for." Rest. 2d § 71(2). A "performance … is bargained for if it is sought by the promisor *in exchange* for the promise **and** is given by the promisee in exchange for that promise." *Id.* There must be "reciprocal relation of motive or inducement." *Steiner v. Thexton*, 48 Cal. 4th 411, 420 (2010). "It is **not enough** … to confer a benefit or suffer prejudice for there to be consideration;" "the benefit or prejudice must have **induced** the promisor's promise." *Id.* The inducement element is missing here.

X does not claim it is induced to do anything when members of the public – like Bright Data or its customers – search public information. Indeed, X unilaterally decided what user information to make public. It did not consult Bright Data before making such decisions, nor was any decision about what to post publicly made in return for a promise from Bright Data or its customers. X made its own choices for its own selfish reasons. It cannot transform that selfish act into bargained-for consideration.

### III.    CONCLUSION

For the foregoing reasons, X's third-party browser-wrap contracts are unenforceable.

| | |
|---|---|
| Dated: January 17, 2024 | Respectfully submitted, |
| | /s/ *Colin Kass* |
| | Colin R. Kass*<br>PROSKAUER ROSE LLP<br>1001 Pennsylvania Ave., N.W.<br>Washington, D.C. 20004<br>(202) 416-6890<br>ckass@proskauer.com |
| | David A. Munkittrick*<br>PROSKAUER ROSE LLP<br>Eleven Times Square<br>New York, New York 10036<br>(212) 969-3000<br>dmunkittrick@proskauer.com |
| | Robert C. Goodman (Bar No. 111554)<br>Lauren Kramer Sujeeth (Bar No. 259821)<br>ROGERS JOSEPH O'DONNELL, PC<br>311 California Street, 10th Floor<br>San Francisco, CA 94104<br>(415) 956-2828<br>rgoodman@rjo.com<br>lsujeeth@rjo.com |
| | Sehreen Ladak (Bar No. 307895)<br>PROSKAUER ROSE LLP<br>2029 Century Park East, Suite 2400<br>Los Angeles, CA 90067-3010<br>(310) 284-5652<br>sladak@proskauer.com |
| | *Attorneys for Defendant Bright Data Ltd.*<br>*\*Admitted Pro Hac Vice* |