Colin R. Kass (*pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania, Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

Robert C. Goodman (Bar No. 111554)
Lauren Kramer Sujeeth (Bar No. 259821)
ROGERS, JOSEPH, O'DONNELL, PC
311 California Street, 10th Floor
San Francisco, CA 94104
(415) 956-2828
rgoodman@rjo.com
lsujeeth@rjo.com

*Attorneys for Defendant Bright Data Ltd.*
*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X CORP.,<br><br>                    Plaintiff,<br><br>          v.<br><br>BRIGHT DATA LTD,<br><br>                    Defendant. | Case No. 3:23-CV-03698-WHA<br>Hon. William H. Alsup<br>Courtroom 12 – 19th Floor<br>March 14, 2024, 8:00 a.m. |

### BRIGHT DATA'S MOTION FOR SUMMARY JUDGMENT
### ON X's BROWSER-WRAP CLAIM (COUNT ONE)

## NOTICE OF MOTION

PLEASE TAKE NOTICE that the hearing on Bright Data's Motion for Summary Judgment on X's Browser-Wrap Claim (Count I) will take place on March 14, 2024 at 8:00am.

The motion seeks partial summary judgment on Count I of the Complaint under Rule 56.

## STATEMENT OF ISSUES TO BE DECIDED

1.    Whether X's browser-wrap contract claims fails for lack of mutual assent.

2.    Whether X's browser-wrap contract claim fails for lack of consideration.

3.    Whether X's browser-wrap claim is pre-empted by the Copyright Act.

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION. ..........................................................................................................1

II.    THE FACTS. ...............................................................................................................2

III.   X'S BROWSER-WRAP CLAIM FAILS FOR LACK OF MUTUAL ASSENT...............3

       A.     Bright Data Rejected X's Browser-Wrap Offer; It Did Not Accept It. ...................4

       B.     X's Browser-Wrap Claim Fails Because "Public Search" Is Not an "Unambiguous Manifestation of Assent." ...............................................................6

       C.     Bright Data Did Not Accept Benefits of X's Purported Performance in Silence...................................................................................................................7

IV.   X'S BROWSER-WRAP CLAIM FAILS FOR LACK OF CONSIDERATION..............10

V.    X'S BROWSER-WRAP CLAIM IS PRE-EMPTED BY COPYRIGHT. .......................13

VI.   CONCLUSION...........................................................................................................17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES[1]

**Page(s)**

CASES

*American Movie Classics Co. v. Turner Enter. Co.*,
    922 F. Supp. 926 (S.D.N.Y. 1996) ...............................................................16

*Barclays Cap. Inc. v. Theflyonthewall.com, Inc.*,
    650 F.3d 876 (2d Cir. 2011)........................................................................15

*Berman v. Freedom Fin. Network, LLC*,
    30 F.4th 849 (9th Cir. 2022) .........................................................................6

*Best Carpet Values, Inc. v. Google, LLC*,
    2024 WL 119670 (9th Cir. 2024) ...........................................................14, 15

*BroadVision Inc. v. General Elec. Co.*,
    2008 WL 4684114 (S.D.N.Y. 2008).............................................................16

*Centreville Veterinary Hosp., Inc. v. Butler-Baird*,
    2007 WL 1965538 (Del. Ch. 2007)...............................................................6

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
    982 F.2d 693 (2d Cir. 1992).........................................................................16

*Cooper v. Sony Records Int'l*,
    2001 WL 1223492 (S.D.N.Y. 2001)............................................................16

*Craigslist Inc. v. 3Taps Inc.*,
    942 F. Supp. 2d 962 (N.D. Cal. 2013) .........................................................17

*Dow Jones & Co. v. Juwai Ltd.*,
    2023 WL 2561588 (S.D.N.Y. 2023)............................................................16

*Flood v. ClearOne Cmmc'ns, Inc.*,
    618 F.3d 1110 (10th Cir. 2010) ...................................................................11

*Gallagher v. Holt*,
    436 Fed. Appx. 754 (9th Cir. 2011)..............................................................10

*Glenhaven Vill., Inc. v. Kortmeyer*,
    2003 WL 22125343 (Neb. Ct. App. 2003) .....................................................5

---

[1] Unless otherwise specified, all emphasis added, initial capitalizations conformed without brackets, and internal citations and quotation marks omitted.

*Harper & Row Publishers, Inc. v. Nation Enters.,*
    471 U.S. 539 (1985)...........................................................................................15

*Harper & Row Publishers, Inc. v. Nation Enters.,*
    723 F.2d 195 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985)..........................15

*Headlands Reserve, LLC v. Center for Nat. Lands Mgmt.,*
    523 F. Supp. 2d 1113 (C.D. Cal. 2007) ...................................................................4

*Health Grades, Inc. v. Robert Wood Johnson Univ. Hosp., Inc.,*
    634 F. Supp. 2d 1226 (D. Colo. 2009)...................................................................16

*IBM Corp. v. Micro Focus (US), Inc.,*
    2023 WL 3902955 (S.D.N.Y. 2023)......................................................................16

*ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Offs.,*
    2016 WL 11769565 (D.D.C. 2016) ......................................................................16

*Independence Mall, Inc. v. Wahl,*
    2012 WL 6945505 (Del. Super. 2012)....................................................................5

*Jacobsen v. Katzer,*
    609 F. Supp. 2d 925 (N.D. Cal. 2009) ..................................................................17

*Jones v. Hirschfeld,*
    348 F. Supp. 2d 50. (S.D.N.Y. 2004)...................................................................6, 7

*Kremen v. Cohen,*
    337 F.3d 1024 (9th Cir. 2003) ...........................................................................10

*Kum Tat Ltd. v. Linden Ox Pasture, LLC,*
    2014 WL 4652355 (N.D. Cal. Sept. 18, 2014) ..........................................................7

*Mireskandari v. Daily Mail & General Trust PLC,*
    2013 WL 12114762 (C.D. Cal. 2013).....................................................................3

*ML Genius Holdings LLC v. Google LLC,*
    2022 WL 710744 (2d Cir. 2022).....................................................................15, 16

*Montz v. Pilgrim Films & Tel., Inc.,*
    649 F.3d 975 (9th Cir. 2011) ............................................................................15

*Nat'l Basketball Ass'n v. Motorola, Inc.,*
    105 F.3d 841 (2d Cir. 1997)..........................................................................14, 15

*Nguyen v. Barnes & Noble Inc.,*
    763 F.3d 1171 (9th Cir. 2014) ............................................................................4

*Norcia v. Samsung Telecomms. Am., LLC,*
    845 F.3d 1279 (9th Cir. 2017)............................................................................9

*Pami-Lemb I Inc. v. EMB-NHC, L.L.C.*,
   857 A.2d 998 (Del. Ch. 2004)............................................................................6

*ProCD, Inc. v. Zeidenberg*,
   86 F.3d 1447 (7th Cir. 1996) ......................................................................4, 13

*Ramone v. Lang*,
   2006 WL 905347 (Del. Ch. 2006) ....................................................................7

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004)..............................................................................8

*Reichert v. Rapid Invs., Inc.*,
   56 F.4th 1220 (9th Cir. 2022) .......................................................................6, 7

*Ryoo Dental, Inc. v. Han*,
   2015 WL 4208580 (C.D. Cal. 2015)................................................................15

*Sellers v. JustAnswer LLC*,
   73 Cal. App. 5th 444 (2021) ..............................................................................3

*South Jersey Hosp., Inc. v. Corr. Med. Servs.*,
   2005 WL 1410860 (D.N.J. 2005) ...................................................................5, 6

*St. Paul Ins. Co. v. Underwriters Ins. Co.*,
   214 Cal. App. 3d 117 (Cal. Ct. App. 1989) ....................................................11

*Stanley v. Robert S. Odell & Co.*,
   97 Cal. App. 2d 521 (1950) ...............................................................................4

*Steiner v. Thexton*,
   48 Cal. 4th 411 (2010) .....................................................................................10

*Tatro v. Law Sch. Admission Council, Inc.*,
   2015 WL 13917988 (C.D. Cal. 2015)................................................................4

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
   2003 WL 21406289 (C.D. Cal. 2003)................................................................8

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*,
   924 F.3d 32 (2d Cir. 2019)...............................................................................16

*Williams v. Apple, Inc.*,
   338 F.R.D. 629 (N.D. Cal. 2021).......................................................................5

*Wilson v. Huuuge, Inc.*,
   944 F.3d 1212 (9th Cir. 2019) .........................................................................13

*Wilson v. Huuuge, Inc.*,
   351 F. Supp. 3d 1308 (W.D. Wash. 2018), *aff'd*, 944 F.3d 1212 (9th Cir.
   2019) ................................................................................................................13

**STATUTES**

17 U.S.C. § 106............................................................................................................13

**OTHER AUTHORITIES**

Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459 (2006) ....................................12

*Nimmer on Copyright*, §§ 1.13, 1.14 (2023)..................................................15, 16, 17

Restatement (Second) of Contracts........................................................................ *passim*

2 Williston on Contracts § 6:9 (4th ed.)....................................................................9

I.       INTRODUCTION.

"You don't own the internet."

"That's correct, Your Honor."

That simple exchange at the January 10th Hearing bars X's forward-looking contract claims.  X does not own the Internet, and it cannot prohibit Bright Data from searching public information on X's site after Bright Data terminated its contract with X and expressly rejected X's Terms.  The core facts are not disputed.  Bright Data searches information that does not require any X account; today, it does not even have an account.  But it still searches information that X describes as "Public posts" that "[a]re visible to anyone, whether or not they have a X account." X says it can contractually block any public web search it does not like simply by posting a link to its Terms at the bottom of its web page.  It cannot.  Contract law enforces agreements, not one-sided demands.  That requires mutual assent and bargained-for consideration.  X cannot establish either.  And, even if it could, its claim is pre-empted.

*Bright Data Rejected X's User Terms; It Did Not Agree to Them.*  After X filed suit, Bright Data terminated its accounts with X, "end[ed] [its] legal agreement with [X]," and, to avoid any doubt, put X "on notice that Bright Data affirmatively rejects and does not consent to any agreement to your user terms in any context for any reason."  Exs. 1, 2.  X does not dispute it received this notice.  Instead, X says it is legally impossible to expressly reject a website operators' terms and still visit that public site.  But the law does not require web surfers to shut down their computers to avoid being bound.  Because "manifestation of intention not to accept an offer is a rejection, … subsequent conduct is not to be understood as an acceptance."  Restatement (Second) of Contracts, (Rest. 2d), § 38 & cmt. a.  Even the "rendering of a performance does not constitute an acceptance if … the offeree … notif[ies] the offeror of non-acceptance."  *Id*. § 53(2).  Nothing gives X the power to strip website visitors of their right to express rejection.  That is what Bright Data did.  It did not accept X's offer; it rejected it.  Its browser-wrap claim fails for lack of assent.

*X's Browser-Wrap Offer Provides the Public Nothing.*  Even if X could establish assent, it did not provide any bargained-for consideration.  X has not promised or provided anything to Bright Data.  Bright Data is accused of doing nothing more than searching publicly available

information.  But website operators, like X, do not own the Internet, and they lack any independent right to block the public's right to search the web.  So – unlike account holders who are granted access to information behind a log-in screen – X has not granted Bright Data access to corners of the Internet that Bright Data could not access without X's consent.  There is no consideration.

*X's Browser-Wrap Claim is Pre-empted by the Copyright Act.*  Contract claims are not *per se* immune from pre-emption.  When a contract claim involves nothing more than a supposed promise not to copy or publish information within the general scope of copyright, it is the functional equivalent of copyright and will be pre-empted.  X's browser-wrap contract claim runs headlong into this principle.  X seeks to enforce its browser-wrap Terms to prevent Bright Data from copying and selling public information on X's website.  It, therefore, seeks to encroach upon the exclusive rights guarded by copyright.  Nor is there any consideration – flowing in either direction – that provides an "extra element" to save the claim.  Website visitors provide ***no consideration*** to X.  They simply search the web.  Nor does X provide any consideration to them, because X does not own the Internet and lacks any independent right to prevent the public from searching the public web.  Put simply, if X had a copyright claim (which it doesn't, for reasons unrelated to the pre-emption analysis), that claim would be indistinguishable from its browser-wrap contract claim.  For that reason, the latter is pre-empted.

## II.    THE FACTS.

Bright Data is an internet company that searches the web for publicly available information, including information X's users choose to make public and X chooses not to place behind a log-in screen.  As X explains, this is information that is "visible to anyone, whether or not they have a X account."  Ex. 3.  X does not claim a property interest in this information.  Ex. 4 ("[y]ou retain your rights to any Content you submit, post or display").

Nonetheless, X filed suit on July 26, 2023, seeking, through contract, to prevent Bright Data's scraping of public information on X's sites, alleging Bright Data agreed to X's Terms by registering an account with X in February 2016.  *See* FAC ¶ 41.  Bright Data responded on September 25, 2023, by terminating its account, and notifying X it was rejecting X's Terms:

Bright Data's X accounts were "not and never [were] used in connection with, and [are] completely unrelated to, Bright Data's search and scraping activities that you now complain about….

But because you have identified [them] as the source of your potential contract claims, *we have exercised our right to terminate those accounts and any agreement between Bright Data and X*…. Bright Data is, therefore, no longer "using" X's services and is now not subject to X's User Agreement….

To be clear, *as of now at least, you are on notice that Bright Data affirmatively rejects and does not consent to any agreement to your user terms in any context for any reason*.  Nor will there be any future contract – or 'meeting of the minds' – between the parties relating to the activities at issue absent a written agreement physically hand-signed by both parties."  Exs. 1, 2.

Today, Bright Data uses automated means to search for information that is "visible to anyone, whether or not they have a X account."  *See* Ex. 3.  Without an active user account, it is not possible for Bright Data to scrape behind a log-in screen.  Nor does X *allege* that Bright Data has scraped behind a log-in screen in the past.  To the contrary, X points only to Bright Data's scraping tools, which expressly state that they are designed to scrape public web data.  FAC ¶¶ 45(c), 56, 64 (Bright Data's "masterclass" showed "the latest data collection techniques to scrape, structure, and analyze ***public*** web data using [Bright Data's] tools and services"; Bright Data's Web Scraper IDE allows users to "start scraping Twitter ***public*** data"; Bright Data's proxies "allow users to gather vast amounts of ***public*** web data").

Nonetheless, X still asserts that Bright Data is bound "by using the X platform."  FAC ¶ 40.  Thus, the legal question is squarely presented:  Can X use its ***rejected*** browser-wrap offer to prevent Bright Data from searching X's websites for public information?  It cannot.

## III.   X'S BROWSER-WRAP CLAIM FAILS FOR LACK OF MUTUAL ASSENT.

X asserts that it has created an unavoidable **"*browser-wrap*"** agreement, inextricably shackling anyone who types X.com into their browser.  But browser-wrap terms are "generally … unenforceable."  *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 466 (2021).  A contract "requires a bargain in which there is a manifestation of ***mutual assent*** … and a ***consideration***."  Rest. 2d § 17; *Mireskandari v. Daily Mail & General Trust PLC*, 2013 WL 12114762, *18 (C.D. Cal. 2013) (same).  Both are lacking.

**A.      *Bright Data Rejected X's Browser-Wrap Offer; It Did Not Accept It.***

"[T]he Internet … has not fundamentally changed the principles of contract" or dispensed with the requirement of "***mutual manifestation of assent [as] the touchstone of contract***." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).  Here, X's offer is its browser-wrap Terms.  Bright Data expressly rejected it.  That "***kills the offer***."  *Stanley v. Robert S. Odell & Co.*, 97 Cal. App. 2d 521, 534 (1950).

The "objective of … the general law of contracts is to carry out the understanding of the parties rather than to impose obligations on them contrary to their understanding:  ***the courts do not make a contract for the parties***."  Rest. 2d § 201, cmt. c; *Headlands Reserve, LLC v. Center for Nat. Lands Mgmt.*, 523 F. Supp. 2d 1113, 1123 (C.D. Cal. 2007) (same).  For that reason, "contract acceptance is governed by the 'mirror-image' rule, which dictates that the terms proposed in an offer must be met exactly, precisely, and unequivocally for its acceptance to result in the formation of a binding contract."  *Tatro v. Law Sch. Admission Council, Inc.*, 2015 WL 13917988, *3 (C.D. Cal. 2015).  Where the two differ, there is ***no contract***.

X does not deny that Bright Data affirmatively rejected X's browser-wrap offer.  It not only terminated its accounts, but it also informed X that it "affirmatively rejects and does not consent to any agreement to your user terms in any context for any reason."  Ex. 2.  X does not claim that Bright Data failed to provide adequate notice of rejection.  And X does not point to any post-rejection *verbal* or *written* assent to show that Bright Data agreed to X's Terms.  Instead, it says Bright Data is bound "by using the X platform."  FAC ¶ 40.  X's position means it would be legally ***impossible*** to reject X's browser-wrap offer while still searching for public information on its sites.  That is not the law.[2]

---

[2] Nor can X argue that Bright Data is powerless to reject X's Terms and continue to search X's public sites.  An offeror cannot eliminate the right of rejection.  An offeror may be the master of the offer and "may propose limitations on the kind of conduct that constitutes acceptance," *see ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1452 (7th Cir. 1996), but X is not the master of rejection.  X cannot disregard a rejection just because it is not, for example, written in Sanskrit.  Any word or deed that reasonably indicates an "intention not to accept an offer" precludes contract formation.  Rest. 2d § 38(2).

The Restatement provides the guiding principles.[3]   There is no scenario under the Restatement where mutual assent arises after express, manifest rejection.  Express rejection is governed by Restatement Sections 19, 38, and 53, which make clear that an express rejection *trumps* any claim of acceptance by subsequent conduct or performance.  Section 19 provides that the "conduct of a party is ***not effective as a manifestation of his assent*** unless he … has reason to know that the other party may infer from his conduct that he assents." Rest. 2d § 19(2).  An offeror, however, cannot reasonably infer assent where there is express rejection, because any "manifestation of intention not to accept an offer is a ***rejection***," which "terminate[s] the power of acceptance." *Id.* § 38 & cmt. a.  As the Restatement explains:

> "If [the offeree] has reason to know that the offeror may reasonably infer from his conduct that he assents, he runs the risk of being bound…. ***He may guard against that risk by manifesting an intention not to accept***."

*Id.* § 53, cmt. b.  At that point, neither the offeror's performance, nor the offeree's subsequent receipt of benefits, creates a contract.  *Id.* § 38, cmt. a ("This rule ... protects the offeree in accordance with his manifested intention that his ***subsequent conduct is not to be understood as an acceptance***."); *id.* § 53(2) ("the rendering of a performance does not constitute an acceptance if within a reasonable time the offeree … ***notif[ies] the offeror of non-acceptance***" of the offer).  This rule preserves "the power of the offeree" – Bright Data – "to reject an offer even though he engages in conduct invited by the offer." *Id.*, cmt. b.

Because "notifying the offeror of non-acceptance" does not require the rejection of any (purported) benefits, it does not matter whether Bright Data continued to search X's sites.  Bright Data's rejection trumps all.[4]

---

[3] *Williams v. Apple, Inc.*, 338 F.R.D. 629, 638 (N.D. Cal. 2021) ("[The] Restatement is entitled to great consideration in the absence of a contrary statute or decision.").

[4] *See Glenhaven Vill., Inc. v. Kortmeyer*, 2003 WL 22125343, *5 (Neb. Ct. App. 2003) ("That contract came to an end when the [defendants] informed [plaintiff] that they were not going to pay the charges.  At that point, the circumstances clearly ceased to show mutuality of intent," ***even though defendants continued to accept the services***.); *Independence Mall, Inc. v. Wahl*, 2012 WL 6945505, *4 (Del. Super. 2012) (rejecting argument that tenant's "later actions acted as an acceptance" after tenant "rejected the [agreement] many times"); *South Jersey Hosp., Inc. v. Corr.*

**B.      X's Browser-Wrap Claim Fails Because "Public Search" Is Not an "Unambiguous Manifestation of Assent."**

Even if there was no express rejection, X still could not infer assent from Bright Data's public web searches.  In the Ninth Circuit, a browser-wrap contract is not effective unless the offeree "takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms...."  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).  Here, X does not claim that Bright Data clicked on an "I agree" button or checked a box manifesting assent.  Instead, it seeks to establish assent through the mere act of searching the public web.  But public web search is not an unambiguous manifestation of assent.

"Non-verbal conduct often has different meanings to different people," so divining the "meaning of conduct *not used as a conventional symbol*" of assent is "more uncertain … than are words."  *See* Rest. 2d § 19, cmt a.  As such, "the conduct of a party is ***not effective as a manifestation of his assent*** unless he … has reason to know that the other party may infer from his conduct that he assents."  *Id*. § 19(2).  Here, Bright Data's *actions*, as well as its words, demonstrate a lack of assent.  Even if deleting its old user account were not sufficient to indicate Bright Data's rejection of X's terms, the mere act of surfing the web does not imply acceptance.

Bright Data's conduct is not a "performance" under any browser-wrap offer.  Bright Data does not search the web for X's benefit; it does so for its own.  And Bright Data does not need X's consent to search public websites.  The Ninth Circuit's decision in *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220 (9th Cir. 2022), is particularly instructive.  There, an inmate was given a pre-paid card and notice of the Card's Terms of Use upon his release reflecting amounts owed to him.  After he withdrew the funds, the card company sought to enforce the Terms.  The Ninth Circuit declined to

---

*Med. Servs.*, 2005 WL 1410860, *4 (D.N.J. 2005) (no contract where defendant "specifically told [the Hospital Plaintiff] that it would not pay" according to offer, but "continue[d] to bring its patients to the Hospital"); *Pami-Lemb I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1015 (Del. Ch. 2004) ("Lehman made clear that it would not abide by the explicit terms of the partnership agreements [and] thereby rejected NHC's offer."); *Centreville Veterinary Hosp., Inc. v. Butler-Baird*, 2007 WL 1965538, *7 (Del. Ch. 2007) ("The rejection rule … protects offerees as well as offerors."); *Jones v. Hirschfeld*, 348 F. Supp. 2d 50, 61 n.8. (S.D.N.Y. 2004) ("Where the offeree rejects an offer, ***including a unilateral offer***, prior to acceptance, the offer is terminated and ***cannot thereafter be accepted by performance***.").

find a contract, noting that the withdrawal did not suggest assent by conduct – despite the Term's express statement that use constitutes acceptance – because use was the only way the inmate could receive the money that was "confiscated" from him. *Id*. at 1224. As such, "reasonable minds could not find that [the inmate] objectively manifested assent to the terms … by using the card to obtain his own money." *Id*. at 1229. Just as the inmate has the right to withdraw his own money, Bright Data has the right to search the public web – *regardless of what X says* – so "reasonable minds" cannot find assent from this act.

Moreover, even if conduct could be deemed assent when in conformity with the offer, Bright Data did the opposite. It engaged in allegedly "prohibited" conduct. X cannot credibly claim that Bright Data ***agreed*** not to collect public data through automated means by collecting data through automated means. It would be Kafkaesque to find that Bright Data *agreed* to X's Terms by *violating* them. The mirror image rule requires that acceptance must "be identical to the offer." *Ramone v. Lang*, 2006 WL 905347, *10 (Del. Ch. 2006). Conduct prohibited by the offer does not meet that requirement. *See Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 2014 WL 4652355, *5 (N.D. Cal. Sept. 18, 2014); *Jones v. Hirschfeld*, 348 F. Supp. 2d 50, 61 n.8. (S.D.N.Y. 2004) ("Any words ***or acts*** of the offeree indicating that he declines the offer … amounts to a rejection.").

For example, if Alice says to Bob, "if you paint my fence, I will pay you $100," it *might* be reasonable to infer that Bob has accepted if he paints the fence. But if Bob disregards Alice's offer by washing her car instead, no one could reasonably infer acceptance. And she certainly cannot now force Bob to paint her fence. In that instance, Bob's conduct constitutes an act inconsistent with acceptance, and thus, a *rejection*. Here, Bright Data's words and actions were the antithesis of a manifestation of assent.

### C.    *Bright Data Did Not Accept Benefits of X's Purported Performance in Silence.*

Unable to show that Bright Data manifested acceptance of X's browser-wrap offer, X argues that continued public search constitutes acceptance of benefits that negates express rejection. That view is inconsistent with the Restatement. Section 69(1) governs acceptance where a user is on notice of a website's terms, and continues to use that site *in silence*:

> "Where an offeree *fails to reply to an offer*, his *silence* and inaction operate as an acceptance … *only* … where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation."

Rest. 2d § 69(1)(a).  This provision requires X to demonstrate that (i) Bright Data received the benefits of X's contractual performance that it was not otherwise entitled to, *and* (ii) it accepted those benefits in silence.  Neither is present here.  Bright Data did not "fail to reply" to X's offer, and X did not perform any contractual obligation by making information publicly available.

*Bright Data Did Not "Fail to Reply" or Silently Accept Benefits.*   Section 69(1) implements – it does not negate – the fundamental "objective" of contract law to "carry out" the parties' understandings, rather than to "make a contract for the parties" "contrary" to their mutual intent.  Rest. 2d § 201, cmt. c.  For that reason, when there is an express reply to an offer, that intent will govern, not some fictional notion of assent contrary to that expression.

A simple example makes the point.  Suppose a copyright holder tells a teacher, "You owe me $100 for my article."  The teacher claims, "Fair use. I owe you nothing."  If the teacher turns out to be wrong, he may have accepted benefits, but he still rejected the contract.  Any remedy lies in copyright, not contract.

Here, Bright Data contests X's attempt to usurp public search, so X cannot rely on contract – or a fictional "meeting of the minds" – to extract an injunction no other law permits.  Section 69(1) is consistent with this view.  It gives offerees an offeree *three* choices:  It can "reject" the offered services; accept the offered services in silence and be bound by the offer; or reply with a *rejection*, leaving offeror to any *non-contractual* remedies it may have.  Bright Data chose the latter path.  Because its express rejection is the antithesis of silence, X has no contract claim.[5]

---

[5] Bright Data's express rejection of X's browser-wrap offer distinguishes this case from other browser-wrap cases.  They involved *silent acceptance*.  This includes *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401 (2d Cir. 2004).  There, while Verio *argued* it "rejected" the terms, it did not affirmatively or expressly do so, as Bright Data did.  Thus, Verio was deemed to have assented because rather than express rejection, it remained silent.  *Id.* at 403 (citing Rest. 2d § 69).   Nor is *Ticketmaster Corp. v. Tickets.Com, Inc.*, 2003 WL 21406289, *2 (C.D. Cal. 2003), contrary.  The *only* issue addressed there was whether, *factually*, the defendant was aware of the User Terms.  The court noted – literally, parenthetically – that the defendant must have been aware because it sent a letter saying it "did not accept" them.  The court was not asked, and did not address, whether

*X Did Not Provide Contractual Benefits to Bright Data*.  Even if Bright Data had remained silent, that would not be enough to establish assent.  "California courts … have made clear that silence alone does not constitute assent."  *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1287-90 (9th Cir. 2017).  As the Ninth Circuit explained, regardless of "commercial practicalities" of modern commerce, the "general rule that silence or inaction does not constitute acceptance is binding."  *Id*.  In *Norcia*, the defendant purchased a Samsung smartphone, and included within the package was a lengthy set of terms, including an arbitration agreement.  The defendant kept the phone, and continued to use it, but it was not bound by those terms – despite any claim of awareness – because he had every right to use the phone he purchased.  His silence and failure to return the product could not constitute assent.

That principle applies here.  X claims that Bright Data benefited from being able to search X's site.  But Bright Data had every right to this without X's permission, so X has not provided any contractual "benefit."  X does not contend that Bright Data made an offer that X accepted through performance.  X only argues that it made its website available to the world, and that act constitutes a "performance" that can bind the world to its terms.  Not so.  First, X's unsolicited "performance" does not dispense with the need for *mutual* assent.  "Mutual assent" requires that "***each party*** either make a promise or … render a performance."  Rest. 2d § 18.  Without that, there is only an "offer," not "acceptance."  Here, X seeks to enforce its *own* demands based on its *own* (alleged) performance.  That is called a "reverse unilateral contract."  In a reverse unilateral contract, "it is generally necessary that the acceptance must be communicated."  2 Williston on Contracts § 6:9 (4th ed.).  Were it otherwise, selfish offerors could go around binding others to their offers with impunity.  Here, there is no communicated acceptance.

*Second*, even if X could rely on its own conduct, it has not performed any contractual obligation.  It simply hooked up its servers to the world wide web and donated certain information to the public domain.  This is no different than Barnes & Noble displaying a featured author's book

---

the rejection precluded mutual assent.  Nor did the court address any of the Restatement's rejection provisions or Section 69(1).  Put simply, the solitary parenthetical fragment in a single sentence on a different issue twenty years ago in *Ticketmaster* did not nullify swaths of the Restatement.

in its windows.  By doing so, Barnes & Noble has advertised its offerings – it has not performed a contractual duty in accordance with its offer.  And passersby have not contracted with the book seller, even if they find the information displayed interesting and beneficial as a source of cocktail party conversation.  So too, here.  X has not "performed" any obligation when a farmer in Okinawa, Japan types an X URL into his browser, or when Bright Data does the same.

## IV.   X'S BROWSER-WRAP CLAIM FAILS FOR LACK OF CONSIDERATION.

X's browser-wrap offer also fails for want of consideration.  To constitute consideration, the offering party must provide the offeree with a benefit, and that benefit must be "bargained for." Rest. 2d § 71; *Gallagher v. Holt*, 436 Fed. Appx. 754, 755 (9th Cir. 2011) ("consideration is an essential element of a contract.").  This consideration must be "something of real value," and must be a "benefit conferred … upon the promisor … ***to which the promisor is not lawfully entitled***," offered "as an inducement to the promisor" for making his promise.  *Id.*; *see also Kremen v. Cohen*, 337 F.3d 1024, 1028 (9th Cir. 2003) (a "party claiming breach must show that, in return for the promise, it conferred some benefit ***the other party was not already entitled to receive***, or suffered some prejudice it was not already bound to endure."); *Steiner v. Thexton*, 48 Cal. 4th 411, 420 (2010) (consideration involves a benefit "the promisor is not [otherwise] lawfully entitled" to).

Here, Bright Data has not asked X for anything, and X has not provided anything to Bright Data.  Bright Data simply searches the web – a right every person on the planet has and that X has no non-contractual right to block.  Because X lacks any independent legal basis to block Bright Data from searching the public web, its browser-wrap offer is not supported by consideration.

***X Makes No Promises to Bright Data.***  Consideration can take the form of a promise or a performance.  X has provided neither.  One can search in vain for an express promise in the X Terms.  X does not even promise to maintain Twitter.

While X describes its services – just like any advertisement would do – it does not promise anyone that X will maintain those services or give anyone access to them.  Indeed, it "***disclaim[s] all responsibility***" and liability for: (i) the … availability … of the Services…."  Ex. 4.  But even if X promised its *members* something, it did not promise *anything* to non-members like Bright Data.

Non-members cannot post content onto the site, cannot "like," comment on, or "share" content posted by others, and cannot "follow" or connect with other users.

Perhaps not surprising in a one-sided contract of adhesion, X's Terms only restrict what users can do. That is not promised consideration. Without any obligation, its "putative promise[s]" are illusory and cannot "function[] as consideration for a return promise." *Flood v. ClearOne Cmmc'ns, Inc.*, 618 F.3d 1110, 1118-19 (10th Cir. 2010) (Gorsuch, J.) (citing Rest. 2d §§ 77, 184, cmt. b); *St. Paul Ins. Co. v. Underwriters Ins. Co.*, 214 Cal. App. 3d 117, 125 (Cal. Ct. App. 1989) ("Where performance is optional with one of the parties no enforceable obligation exists.").

*X Has Not Provided Consideration Through Performance.* Operating a public website is not consideration, because X has no right to block people from searching the Internet. At least when X grants access to non-public information posted behind a log-in screen, the user receives something it cannot otherwise get. But the same is not true when the general, logged-out public surfs the web. Consider the implications of X's position. Under its view – you, the Judge, as well as every other human being – enters into a contract with the operator of every website ever visited. It is, according to X, all supported by consideration flowing solely from the mere fact that the user looked at the website. That is not the way the Internet was designed. The Internet is a *free* utility for all, supported by government funds. X does not own it by contract.

Nor does it matter that Bright Data benefits – as does every human – from searching the public web, or that X devotes resources to making information publicly available. Consider two scenarios. In the first, Alice says to Bob, "if you walk on the *public* sidewalk in front of my house, you owe me $100." Since Alice has no independent right to obstruct Bob's journey, she has not provided consideration, regardless of how much Alice spent making her curtilage look pretty or how much Bob enjoys his stroll. In the second scenario, Chris, a tollbooth operator, tells Dave that, "if you want admittance to my private grounds, you must pay $100." Chris has provided consideration because the law of trespass provides a non-contractual ground for blocking access.

As this shows, consideration turns on X's legal rights, not how much X invests in its social media business or how much profit Bright Data earns from its data collection business. *See* Rest.

2d § 71(3) ("performance" can consist of "the creation, modification, or destruction of a legal relation."); *see also* Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 470–71 (2006) (addressing internet contracts) ("The reason my 'no-trespassing' sign is effective in the real world is not because there is any sort of agreement to abide by it, but because the law already protects my land against intrusion by another. *If the sign read 'no walking on the road outside my property,' no one would think of it as an enforceable agreement*.").  That is not so here.

Nor can X claim that it provides consideration because it hosts users' public content on privately-owned servers.  X may be providing consideration to its own users by hosting that data and making it publicly available, but it is not providing consideration to members of the public who surf the web.  Again, consider Alice.  She may own the land underlying the sidewalk, but if the public has an easement to traverse the path, her ownership interest is irrelevant.

*Bright Data Has Not "Bargained For" Any Benefit.*  The lack of an independent legal right to block Bright Data's public search also precludes X from transforming its own investment decisions into "bargained for" consideration.  Rest. 2d § 71(2).  A "performance … is bargained for if it is sought by the promisor *in exchange* for the promise *and* is given by the promisee in exchange for that promise."  *Id.*  There must be "reciprocal relation of motive or inducement."  *Id.*, cmt. b.  That is, the promise must be designed to *induce* the performance; and the performance must be designed to *induce* the making of the promise.  "Both elements must be present, or there is no bargain."  *Id.*

X does not claim it is induced to do anything when members of the public – like Bright Data – search public information.  X unilaterally decides what information is available to the public.  It did not consult Bright Data before making those decisions, nor were such decisions made in return for any promise from Bright Data.  X made its own choices for its own selfish reasons.  It cannot turn that selfish act into bargained-for consideration.

This stands in stark contrast to X's dealings with its own registered users.  There, X is indeed being *induced* to provide access to information behind a log-in screen by the user's reciprocal promise to abide by the Terms.  X may have an independent basis to block access to

logged-in information, but it has no such right for public information.  Having donated information to the public domain, it cannot thereafter dictate how the public uses that information.  When a door-to-door salesman knocks on your door, you are free to listen to the pitch or say no thanks.  But either way, you have not provided consideration just because you left your gate open.  Here, X left the gate open.  It could have placed all its information behind a log-in screen, gaining the protections of the CFAA and an independent legal basis for blocking public access.  It chose not to, opting for attention over protection.  That may have been a choice; but it was not bargained-for consideration.  *See Wilson v. Huuuge, Inc.*, 351 F. Supp. 3d 1308, 1317 (W.D. Wash. 2018), *aff'd*, 944 F.3d 1212 (9th Cir. 2019) (app developer who "chose to make its Terms non-invasive so that users could charge ahead to play their game … must live with the consequences of that decision.").

By the same token, consideration cannot arise from the technological restrictions X uses to disrupt Bright Data's public search.  FAC ¶¶ 33, 48.  If those technologies were effective, X could say to Bright Data:  "I will turn off my disruption technologies, if you agree to my Terms."  X's voluntary cessation of its disruption technologies would then support consideration.  But X did not do this.  It employs these technologies for its own benefit, not as consideration for Bright Data.

The Internet is a "Social Contract."  Any person can hook up their servers to make their websites available to the public, and anyone else can use their browsers to search those websites.  When they do, neither has induced the other to perform, and neither as provided "bargained for" consideration to the other.  They are each simply exercising their God-given freedom.

## V.   X'S BROWSER-WRAP CLAIM IS PRE-EMPTED BY COPYRIGHT.

Even if X could make out a browser-wrap claim, it would be pre-empted by the Copyright Act because it merely asserts the same subject matter and rights covered by copyright:  the copying and reproduction of material from its website.  17 U.S.C. § 106.

As explained in Bright Data's supplemental brief on copyright pre-emption, the purpose of copyright pre-emption is, in part, to ensure state law does not restrict access to "works of authorship that Congress has decided should be in the public domain."  *ProCD*, 86 F.3d at 1452-53.  For that reason, the pre-emption analysis does not require an assessment of whether a particular

work or part of a work is actually protected by copyright.  Rather, the inquiry in the first instance is "whether the subject matter of the state law claim falls within the subject matter of copyright…." *Best Carpet Values, Inc. v. Google, LLC*, 2024 WL 119670, *6 (9th Cir. 2024).  If it is, and if "the rights asserted under state law are equivalent to … the exclusive rights of copyright holders" under the Copyright Act, the claim is pre-empted.  *Id.*  X's contract claim satisfies both elements.

*X's Browser-Wrap Claim Falls Within the Subject Matter of Copyright*.  X challenges Bright Data's use of "automated means to collect content or data from [its] website."  FAC ¶ 34. There can be no question websites are within the subject matter of copyright.  And if there was any doubt, the Ninth Circuit dispelled it last week in *Best Carpet Values*.  There, the court confirmed that websites are "within the subject matter of federal copyright law" because they are "works of authorship fixed in a[] tangible medium of expression".  *Best Carpet*, 2024 WL 119670, at *6 (noting "websites possess copyrightable literal elements (source code); non-literal elements (including 'logos, images, fonts, videos and sound effects') and dynamic non-literal elements (such as the experience of viewing the website)").  X does not contest that websites fall within the general scope of copyright.  Indeed, X itself puts a ©2024 at the bottom of its website.

Nor is it necessary to parse the copyrightability of the specific data and information Bright Data scraped from X's site.  In *Nat'l Basketball Ass'n v. Motorola, Inc.*, the Second Circuit found claims with respect to uncopyrightable facts were pre-empted because the facts were taken from a sports broadcast and thus within the subject matter of copyright.  105 F.3d 841, 849-50 (2d Cir. 1997).  As the Second Circuit explained:

> "Copyrightable material often contains uncopyrightable elements within it, but Section 301 preemption bars state law misappropriation claims with respect to uncopyrightable as well as copyrightable elements….
>
> Adoption of a partial preemption doctrine – preemption of claims based on misappropriation of broadcasts but no preemption of claims based on misappropriation of underlying facts – would expand significantly the reach of state law claims and render the preemption intended by Congress unworkable, [and]

turns [pre-emption] on its head by allowing state law to vest exclusive rights in material that Congress intended to be in the public domain." *Id.*[6]

The same is true of websites—they may contain uncopyrightable elements, but that does not remove claims relating to the copying of those elements from the scope of federal pre-emption.[7] *See Ryoo Dental, Inc. v. Han*, 2015 WL 4208580, *2 (C.D. Cal. 2015) (plaintiff "copied elements from [defendant's] website including text, photograph[s] ... and artwork," thus the "state-law claims clearly falls within the subject matter of copyright."). Were, it otherwise, pre-emption analysis would collapse into an infringement inquiry and would violate the principle that "the scope of the subject matter of copyright law is broader than the protections it affords." *Best Carpet*, 2024 WL 119670, at *7 (quoting *Montz v. Pilgrim Films & Tel., Inc.*, 649 F.3d 975, 979 (9th Cir. 2011). That brings us to the second step of the pre-emption test.

**_X's Browser-Wrap Claim Asserts Rights Equivalent to Copyright Without Any "Extra Element_."** A contract claim falling within the subject matter of copyright may escape pre-emption if it involves some promise that is an "extra element" that "changes the nature of the action" beyond the exclusive rights of copyright. *Best Carpet*, 2024 WL 119670, at *7. However, a contract claim that alleges "essentially nothing other than derogation of rights under copyright" will be pre-empted. *Nimmer on Copyright*, § 1.13 (2023). As the leading treatise explains:

> "That situation typically unfolds when the 'contract' at issue does not result from negotiation between consenting parties, but instead consists of a '***shrinkwrap license***' or other similar device to which the copyright owner demands adhesion as a condition to licensing its materials. To the extent that this contract is determined to be binding under state law, then that law may be attempting to vindicate rights indistinguishable from those accorded by the Copyright Act." *Id.*

---

[6] *See also Best Carpet*, 2024 WL 119670 at *6 ("a work need not consist entirely of copyrightable material in order to meet the subject matter requirement."); *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985) (claims involving copying of "purely factual" information from President Ford's memoirs pre-empted); *Barclays Cap. Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 892 (2d Cir. 2011) ("It is not determinative that the plaintiff seeks redress with respect to a defendant's alleged misappropriation of uncopyrightable material – *e.g.*, facts – contained in a copyrightable work … if the work as a whole satisfies the subject matter requirement.").

[7] It does not matter if some of the information was posted or even owned by third parties and not X, or that X disclaims any ownership in it. The material is still within the subject matter of copyright. *See ML Genius Holdings LLC v. Google LLC*, 2022 WL 710744, **2-3 (2d Cir. 2022) (holding state claims related to user-generated lyric transcriptions pre-empted).

Because X's browser-wrap claim seeks vindication of nothing more than the rights covered by copyright – copying and reproducing material from its website – its claim is pre-empted. *See Genius Holdings*, 2022 WL 710744, at *4 (claim that Google "breache[d] Genius's Terms of Service regarding the copying and reproduction of Genius [c]ontent" is not "qualitatively different from a copyright claim.").

Pre-emption "turns on 'what the plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforce." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992). "A state law right is equivalent to one of the exclusive rights of copyright if it may be abridged by an act which, in and of itself, would infringe one of the exclusive rights" afforded by the Copyright Act. *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 48 (2d Cir. 2019) (breach of contract pre-empted); *American Movie Classics Co. v. Turner Enter. Co.*, 922 F. Supp. 926 (S.D.N.Y. 1996) ("a breach of contract claim is pre-empted if it is merely based on allegations that the defendant did something that the copyright laws reserve exclusively …, (such as unauthorized reproduction, performance, distribution, or display)."); *see also Nimmer*, § 1.14(C) (a right that is "equivalent to copyright" (and therefore pre-empted) is "one that is infringed by the mere act of reproduction, performance, distribution, or display").[8]

---

[8] *See also, e.g.*, *Dow Jones & Co. v. Juwai Ltd.*, 2023 WL 2561588, *8 (S.D.N.Y. 2023) ("The Dow Jones 'Terms of Use' concern the right to 'use, sell, publish, distribute, retransmit or otherwise provide access' to its articles[, so] both copyright law and the contract are violated by the same act of reproduction [and] Dow Jones's breach of contract claim is pre-empted."); *IBM Corp. v. Micro Focus (US), Inc.*, 2023 WL 3902955, *10 (S.D.N.Y. 2023) (breach of contract pre-empted where the "claim is simply a restatement of IBM's claims under the Copyright Act for unlawful copying and distribution"); *ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Offs.*, 2016 WL 11769565, *7 (D.D.C. 2016) ("ICC asserts that its Website User Agreement creates a contract," but the "promise amounts only to a promise to refrain from reproducing, performing, distributing or displaying the work" and is pre-empted); *Health Grades, Inc. v. Robert Wood Johnson Univ. Hosp., Inc.*, 634 F. Supp. 2d 1226, 1246 (D. Colo. 2009) (contract claim for "making use of the information contained on Health Grades' website beyond the terms" pre-empted); *BroadVision Inc. v. General Elec. Co.*, 2008 WL 4684114, *4 (S.D.N.Y. 2008) (claim that licensee of copyrighted software had exceeded usage limits under non-exclusive license agreement was pre-empted because "it does not allege that [defendant] breached a promise to pay, to allow an audit, or any other promise"); *Cooper v. Sony Records Int'l*, 2001 WL 1223492, *5 (S.D.N.Y. 2001) (claim that licensee exploited music beyond scope of license was pre-empted).

That is all X has done here.   X claims Bright Data violated the Terms by copying information publicly available on X's website.   FAC ¶¶ 70-73.   It does not assert any "extra element" that could escape pre-emption.   It does not seek to vindicate any contractual right or obligation that does not exist under copyright law.   *Jacobsen v. Katzer*, 609 F. Supp. 2d 925, 933 (N.D. Cal. 2009) (breach of contract claim pre-empted because it "alleges violations of the exact same exclusive federal rights protected by … the Copyright Act, the exclusive right to reproduce, distribute and make derivative copies.").[9]

Nor is there any consideration – flowing in either direction – that provides an "extra element" to save the claim.   Website visitors provide ***no consideration*** to X.   They simply search the web.   Nor does X provide any consideration to them.   At least as to unregistered users, X offers no personalized services, does not grant them access to information behind a log-in, and does allow them to post information.   X may have connected its servers to the Internet, but that it not consideration provided to web surfers.   For that reason, in the words of Professor Nimmer, X's browser-wrap claim is nothing more than "***a subterfuge*** to control nothing other than the reproduction [etc.] of works within the subject matter of copyright."   *Nimmer* § 1.13.   X's browser-wrap is pre-empted.

## VI.   CONCLUSION.

For the foregoing reasons, Bright Data's motion for summary judgment on Bright Data's browser-wrap claim should be granted.

---

[9] *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 966 (N.D. Cal. 2013), is not to the contrary. There, the defendants were not bound by browser-wrap, but instead were registered users with accounts and had "affirmatively accepted and agreed to be bound" by the Terms.   In return, the defendants were given rights *in addition* to mere copying and use of information; they were granted the right to "submit" and "post" classified ads.   As the court explained, "[i]f Craigslist alleged a breach of contract based solely on the reproduction of copyrighted content, the claim might be preempted," Craigslist also provided registered users with additional "services …, including but not limited to classified advertising, forums, and email forwarding."   *Id*. at 977.   Here, in contrast, at least browser-wrap claims, there is no additional consideration supporting the contract, and thus, no extra element that removes the claim from pre-emption.

Dated: January 17, 2024

Respectfully submitted,

*/s/ Colin Kass*

Colin R. Kass*
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick*
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

Robert C. Goodman (Bar No. 111554)
Lauren Kramer Sujeeth (Bar No. 259821)
ROGERS JOSEPH O'DONNELL, PC
311 California Street, 10th Floor
San Francisco, CA 94104
(415) 956-2828
rgoodman@rjo.com
lsujeeth@rjo.com

Sehreen Ladak (Bar No. 307895)
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
(310) 284-5652
sladak@proskauer.com

*Attorneys for Defendant Bright Data Ltd.*
*Admitted pro hac vice*