DAVID H. HARPER*
david.harper@haynesboone.com
JASON P. BLOOM*
jason.bloom@haynesboone.com
**HAYNES AND BOONE, LLP**
2801 N. Harwood Street, Suite 2300
Dallas, Texas 75201
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
*Admitted Pro Hac Vice

JASON T. LAO, SBN 288161
jason.lao@haynesboone.com
ANDREA LEVENSON, SBN 323926
andrea.levenson@haynesboone.com
**HAYNES AND BOONE, LLP**
600 Anton Boulevard, Suite 700
Costa Mesa, California 92626
Telephone: (949) 202-3000
Facsimile: (949) 202-3001

*Attorneys for Plaintiff*
*X Corp.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X CORP., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>BRIGHT DATA LTD., an Israeli corporation,<br><br>Defendant. | Case No. 3:23-cv-03698-WHA<br><br>**X-CORP.'S SUPPLEMENTAL BRIEF RE BROWSEWRAP AND CONTRACT FORMATION**<br><br>Original Hearing:   January 10, 2024<br>No Additional Hearing Scheduled<br><br>*Complaint Filed:  September 26, 2023* |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT ................................................................................................................. 1

   A. X Corp. Sufficiently Pled that Bright Data's Customers Formed Valid Contracts with X Corp. ................................................................................................................................ 2

      1. Bright Data Does Not Dispute the Validity of X Corp.'s Clickwrap Agreements with Its Customers. ................................................................................................................. 3

      2. Bright Data Customers Formed Browsewrap Agreements with X Corp. ........................ 6

         a) Bright Data Customers Are Users of the X Platform ...................................................... 6

         b) Bright Data Customers Have Actual Notice of X Corp.'s Terms ................................ 7

         c) Bright Data's Customers Had Constructive Notice of X Corp.'s Terms. .................... 9

         d) Bright Data's Customers Assented to X Corp.'s Terms. ............................................ 11

III. CONCLUSION ........................................................................................................... 12

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Be In, Inc. v. Google Inc.*,
  No. 12-CV-03373-LHK, 2013 WL 5568706 (N.D. Cal. Oct. 9, 2013)..................................11

*Bekele v. Lyft, Inc.*,
  918 F.3d 181 (1st Cir. 2019).................................................................................................4

*Berman v. Freedom Fin. Network*,
  LLC, 30 F.4th 849 (9th Cir. 2022)..................................................................2, 3, 4, 9, 10, 11

*Bustamante v. Intuit, Inc.*,
  141 Cal. App. 4th 199 (Cal. 2006).......................................................................................12

*Byton N. Am. Co. v. Breitfeld*,
  No. CV 19-10563-DMG, 2020 WL 3802700 (C.D. Cal. April 28, 2022)..............................1

*Cairo, Inc. v. Crossmedia Services, Inc.*,
  No. C 04-04825 JW, 2005 WL 756610 (N.D. Cal. Apr. 1, 2005).........................................11

*ConsumerDirect, Inc. v. Pentius*,
  LLC, No. 8:21-cv-01968-JVS, 2022 WL 16949657 (C.D. Cal. Aug. 25, 2022).....................1

*Doe v. Xytex Corp.*,
  No. C 16-02935 WHA, 2016 WL 3902577 (N.D. Cal. July 19, 2016) (Alsup,
  J.)......................................................................................................................................8, 9

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ....................................................................................3, 4, 6, 7

*Oberstein v. Live Nation Entm't, Inc.*,
  60 F.4th 505 (9th Cir. 2023) ..........................................................................2, 3, 4, 6, 9, 10, 11

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004)............................................................................................2, 11

*Reichert v. Rapid Investments, Inc.*,
  56 F.4th 1220 (9th Cir. 2022) ................................................................................................2

*Sellers v. JustAnswer LLC*,
  73 Cal. App. 5th 444 (Cal. Ct. App. 2021) *reh'g denied* (Jan. 18, 2022),
  *review denied* (Apr. 13, 2022) .........................................................................2, 3, 4, 7, 10

*In re Stubhub Refund Litig.*,
  No. 22-15879, 2023 WL 5092759 (9th Cir. Aug. 9, 2023) ................................................2, 3

*Virtusio v. Fin. Indus. Regulatory Auth., Inc.*,
    No. 12-CV-00602 NC, 2013 WL 1899830 (N.D. Cal. May 7, 2013), *aff'd*, 615
    Fed. Appx. 400 (9th Cir. 2015) ................................................................................................12

*Wilson v. Huuuge, Inc.*,
    944 F.3d 1212 (9th Cir. 2019) ............................................................................................9, 10

**Other Authorities**

Mark A. Lemley, *Terms of Use*, 91 M<small>INN</small>. L. R<small>EV</small>. 459, 463 (2006)................................................7

Restatement (Second) of Contracts § 19(2) (1981) ......................................................................11

*500 Social Media Dance*, UM<small>ASS</small> D<small>ARTMOUTH</small> (Jan. 9, 2020), available at
    https://www.umassd.edu/cmr/research/2019-fortune-500.html..................................................5

I.    **INTRODUCTION**[1]

Before disclosing the identity of even a single customer in discovery, Bright Data moves for dismissal based on the possibility that *some* of its customers may not have a binding "browsewrap"[2] contract with X Corp. But it is clear—even before discovery—that numerous Bright Data customers *do* have valid contracts with X Corp., either through "browsewrap" or "clickwrap" agreements, and X Corp. has pled sufficient allegations to plausibly establish this fact. Even Bright Data does not dispute that many of its customers have valid contracts with X Corp.— nor could it, since Bright Data admits it has sold scraping tools and IP proxies to X users and account holders. These users have formed a valid contract with X Corp., under controlling Ninth Circuit precedent regarding "browsewrap" and "clickwrap" agreements. This Court should reject Bright Data's red herring and allow for discovery to determine the full extent of Bright Data's tortious interference with X Corp.'s contracts.

II.   **ARGUMENT**

X Corp. has sufficiently pled that Bright Data sold scraping tools to customers which had agreed to X's Terms of Service, including the Terms' explicit prohibition of automated scraping.[3] X Corp.'s tortious interference claim alleges that Bright Data's customers agreed to X Corp.'s Terms because they were either registered X account holders (which would be subject to "clickwrap" agreements) or X users (which, if not also account holders, would be subject to "browsewrap" agreements).[4]

To state a claim for tortious interference, X Corp. need only identify the specific contractual rights at issue and the group of entities with whom Bright Data interfered. *ConsumerDirect, Inc. v. Pentius*, LLC, No. 8:21-cv-01968-JVS (ADSx), 2022 WL 16949657, at *3 (C.D. Cal. Aug. 25, 2022); *Byton N. Am. Co. v. Breitfeld*, No. CV 19-10563-DMG (JEMx), 2020 WL 3802700 (C.D. Cal. April 28, 2022). X Corp. has identified the specific contractual rights at issue under its

---

[1] This brief is being submitted pursuant to the Court's request at the January 10, 2024 hearing on Bright Data's Motion to Dismiss.
[2] This brief uses the term "browsewrap," but courts occasionally refer to the same type of agreements as "browser-wrap" or "browserwrap." The terms are used interchangeably.
[3] Dkt. 36 ("FAC"), ¶¶ 24-28, 55-64, 79-84.
[4] Dkt. 36, ¶¶ 79-84.

1
X CORP.'S SUPPLEMENTAL BRIEF RE BROWSEWRAP AND CONTRACT FORMATION

Terms,[5] and identified the group of entities with whose contracts Bright Data interfered as Bright Data's customers who are bound to X Corp.'s Terms, either as X account holders or users of X Corp.'s services. Bright Data does not dispute that it has sold scraping tools and IP proxies to entities that have registered X accounts or that are on actual or constructive notice of X Corp.'s Terms while using X services. Regardless of how those customers agreed to X's Terms, Bright Data has interfered with those valid contracts between X Corp. and its users.

### A. X Corp. Sufficiently Pled that Bright Data's Customers Formed Valid Contracts with X Corp.

Traditional principles of contract formation apply with equal force to agreements formed online. *Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 513 (9th Cir. 2023). "It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree." *Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1230 (9th Cir. 2022) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)). This includes standardized, take-it-or-leave-it contracts of adhesion. *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 464 (Cal. Ct. App. 2021) *reh'g denied* (Jan. 18, 2022), *review denied* (Apr. 13, 2022) ("By their nature, internet contracts almost always fall into the category of adhesion contracts.").[6] Acceptance of X Corp.'s Terms thus binds the accepting account holder or user.

When determining whether a contract has been formed, courts in the Ninth Circuit apply these longstanding principles on a "spectrum" that considers the various design elements and interactivity of a website in light of traditional principles of contract formation. *Berman v. Freedom Fin. Network*, LLC, 30 F.4th 849, 855 (9th Cir. 2022). This spectrum traditionally ranged from so-called "clickwrap" agreements, in which a user specifically clicks a box to confirm their

---

[5] Dkt. 36, ¶¶ 22–33.

[6] *Sellers* was decided by a California appellate court, but its reasoning and analysis has been cited approvingly by the Ninth Circuit in three separate opinions. *See Berman v. Freedom Fin. Network*, LLC, 30 F.4th 849, 857, 865–69 (9th Cir. 2022) (majority opinion and concurrence both endorse *Sellers'* reasoning); *Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 516 (9th Cir. 2023); *In re Stubhub Refund Litig.*, No. 22-15879, 2023 WL 5092759, at *2 (9th Cir. Aug. 9, 2023).

assent to contract terms, to "browsewrap" agreements, in which contract terms are disclosed through a hyperlink and assent is manifested by use of the website. *Id*. More recently, courts have also acknowledged so-called "scrollwrap" and "sign-in wrap" agreements, along with "hybrid" agreements at other points along this spectrum. *See Sellers*, 73 Cal. App. 5th at 463.

### 1. Bright Data Does Not Dispute the Validity of X Corp.'s Clickwrap Agreements with Its Customers.

The Court should deny Bright Data's Motion to Dismiss X Corp.'s tortious interference claim because X Corp. pled sufficient facts to plausibly allege that some—and possibly all—of Bright Data's scraping and IP proxy customers are registered X users, bound by clickwrap agreements with X Corp.[7] Bright Data does not dispute the existence or enforceability of these agreements—nor can it. Clickwrap agreements represent "the most straightforward application" of contract formation principles and "courts have routinely found clickwrap agreements enforceable." *Oberstein*, 60 F.4th at 514; *Berman*, 30 F.4th at 856. The Ninth Circuit has devised a two-part test to determine when a user is bound to such an online agreement: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Oberstein,* 60 F.4th at 515. Here, the X platform provides conspicuous links to the Terms, and users manifest their assent by expressly agreeing to the terms when signing up for an account.[8]

To assess whether a user has constructive notice of a clickwrap or hybrid agreement, courts in the Ninth Circuit look to "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Specifically, courts are to consider "(1) the size of the text; (2) the color of the text compared to the background; (3) the location of the text and its proximity to where the user clicks to consent; (4) the obviousness of an associated hyperlink; and (5) other elements on the screen which clutter or obscure the textual notice." *In re*

---

[7] Dkt. 36, ¶¶ 81–84.
[8] *See*, e.g., Dkt. 36, ¶¶ 39-41, 81.

*Stubhub Refund Litig.*, No. 22-15879, 2023 WL 5092759, at *2 (9th Cir. Aug. 9, 2023) (citing *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 473). Courts will not enforce agreements where the terms are "buried at the bottom of the page or tucked away in obscure corners of the website." *Nguyen*, 763 F.3d at 1177. This inquiry "has always been context-and fact-specific." *Oberstein*, 60 F.4th at 515 (quoting *Bekele v. Lyft, Inc.*, 918 F.3d 181, 187 (1st Cir. 2019)).

The X platform's homepage displays not one, but two links to the Terms of Service. One of these is prominently featured in the center of the page, with blue text denoting the Terms of Service as a hyperlink.[9] This conforms to the Ninth Circuit's requirements for constructive notice of a clickwrap agreement, because it puts a reasonably prudent user on notice of the Terms. *See Oberstein*, 60 F.4th at 516–17 (finding constructive notice where the Terms were "marked in bright blue font and distinguished from the rest of the text" and located next to the "action button"). The X platform homepage also clearly states: "By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use."[10] This notice comports with the requirements set forth in *Berman*. *See Berman*, 30 F.4th at 856 ("the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement"). This same notice is reiterated to the user twice more during the sign-up process for an X account.[11] As a result, users who complete the registration process for an X account have clearly manifested their assent to X Corp.'s Terms. *See Oberstein*, 60 F.4th at 515–16 (finding an agreement was formed when user was notified "at three independent stages" that by clicking on a button, the user agreed to Terms of Use). Again, Bright Data does not dispute this.

While Bright Data has yet to disclose non-public information about its customers, Bright Data's own website indicates that many of its customers have registered X accounts. Among its customer testimonials,[12] which tout the success of Bright Data's scraping tools, are numerous

---

[9] *See* https://twitter.com/.
[10] *See* https://twitter.com/.
[11] See https://twitter.com/i/flow/signup (Steps 2 and 3).
[12] *See Customer Stories: A Word From Our Customers*, Bright Data, at https://brightdata.com/testimonials.

registered X users.[13] By registering accounts on the X platform, these Bright Data customers have been made aware of X's Terms and have manifested assent to those Terms. Again, Bright Data does not—and cannot—plausibly assert that these registered X users are not bound by X Corp.'s Terms.

Discovery is also likely to reveal additional Bright Data customers who are bound to X Corp.'s Terms through clickwrap agreements. The X platform has hundreds of millions of active users worldwide, and more than 23 million X accounts have been registered from California alone.[14] Further, Bright Data's testimonials reveal a number of technology-focused companies who have purchased and utilized its scraping and IP tools. Bright Data also touts Fortune 500 companies and major academic institutions as its customers.[15] These companies are disproportionately likely to have X accounts.[16] Further, any company that purchases scraping tools from Bright Data must be familiar enough with the X platform to understand the value of X Corp.'s data; these users are very likely to have their own registered X accounts.

X Corp. has therefore plausibly alleged that Bright Data has interfered with clickwrap agreements between X Corp. and its account holders. Even if Bright Data had a valid challenge to X Corp.'s browsewrap agreements (it does not), that would not dispose of X Corp.'s tortious interference claims, because these clickwrap agreements represent valid contracts between Bright Data's customers and X Corp.

---

[13] These include, but are not limited to: Apify (see X account at https://twitter.com/apify); BitGet (https://twitter.com/bitgetglobal); Cervello (https://twitter.com/mycervello); ClickBusBr (https://twitter.com/ClickBusBR); ClooTrack (https://twitter.com/clootrack); DataOx (https://twitter.com/data_ox); XChainer.io (https://twitter.com/xchainer_io); and YouGov Sport (https://twitter.com/YouGovSport). These facts are included as examples of what discovery is likely to reveal. While only Bright Data knows which of its customers used its tools to scrape X Corp. Data, the fact that several Bright Data customers have registered X accounts supports X Corp.'s plausible allegation that Bright Data sold scraping tools to X account holders. *See*, Dkt. 36, ¶ 81.

[14] Dkt. 36, ¶ 18.

[15] Dkt. 42, ("Mot. to Dismiss"), at 3.

[16] A study in the 2019 Fortune 500 found that 482 of them (96%) maintained an active X (then Twitter) account. *See* Nora Ganim Barnes, Ashley Mazzola, Mae Killeen, *Oversaturation & Disengagement: The 2019 Fortune 500 Social Media Dance*, UMASS DARTMOUTH (Jan. 9, 2020), available at https://www.umassd.edu/cmr/research/2019-fortune-500.html.

### 2. **Bright Data Customers Formed Browsewrap Agreements with X Corp.**

X Corp. also plausibly alleged tortious interference by Bright Data with valid contracts formed under browsewrap agreements between X Corp. and users of the X platform. While clickwrap may provide "the clearest manifestations of assent … it is not necessarily required." *Oberstein*, 60 F.4th at 514 (internal quotation marks omitted). Valid contracts may also be formed via browsewrap agreements. Under a browsewrap agreement, a website provides "notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service." *Nguyen*, 763 F.3d at 1176. "Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, … the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Id*. In the Ninth Circuit, browsewrap agreements are binding where (1) the user had actual notice of the agreement; and/or (2) the website put a reasonably prudent user on inquiry notice of the terms of the agreement. *Nguyen*, 763 F.3 at 1176-77. These are naturally fact-intensive questions that should rarely be addressed at the pleadings stage.

#### a) *Bright Data Customers Are Users of the X Platform*

By utilizing Bright Data's scraping and IP proxy services, Bright Data's customers are users of the X platform. X Corp.'s Terms state that they govern "access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services…that link to these Terms (collectively, the 'Services'), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services."[17] Bright Data's scraping tools directly interact with the X platform, by sending voluminous automated requests to retrieve data from X Corp.'s servers. This is promoted by Bright Data as "emulating" real users and is subject to (and prohibited by) X Corp.'s Terms. Similarly, Bright Data's proxy services feed false information to X Corp.'s servers by imitating legitimate users in particular geographic locations to evade X Corp.'s blocking mechanisms. This also constitutes use of the X Services.

---

[17] Dkt. 36, First Am. Compl., ¶ 40. The Terms appear online at: https://twitter.com/en/tos.

As users of the X platform, these Bright Data customers are subject to X Corp.'s Terms. As the Terms explicitly state: "By ***using*** the Services you agree to be bound by these Terms."[18] Under Ninth Circuit law, this browsewrap agreement is enforceable against Bright Data's customers who have either actual or constructive knowledge of X Corp.'s Terms.

### b)     *Bright Data Customers Have Actual Notice of X Corp.'s Terms*

Bright Data customers who have actual notice of X Corp.'s Terms are bound to those Terms. *Nguyen*, 763 F.3d at 1176 ("[C]ourts have consistently enforced browsewrap agreements where the user had actual notice of the agreement."). While the knowledge level and status (account holder vs. user) of Bright Data's customers is a fact-intensive inquiry that will need to be determined in discovery, X Corp. pled sufficient facts to defeat Bright Data's Motion to Dismiss on this ground.

Bright Data's own website suggests that many of its customers have actual notice of X Corp.'s Terms. As previously noted, Bright Data's customer testimonials disproportionately consist of sophisticated technology companies, who are much more likely to have investigated, and to be aware of, X Corp.'s Terms. *See Sellers* 73 Cal. App. 5th at 470 ("courts generally have enforced browsewrap terms only against knowledgeable accessors, such as corporations"); *see also* Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 463 (2006) ("courts presume that businesses know what they are doing when they access another company's website and are therefore more likely to bind them to that site's terms of use"). Bright Data concedes that its scraping customers consist of companies likely to be knowledgeable about their online activities, such as "Fortune 500 companies, academic institutions, and small businesses" who are specifically in need of a means to obtain "vast amounts" of information for various business purposes.[19] Similarly, Bright Data advertises that its IP proxies are "[u]sed by Fortune 500 & 20K+ business."[20] Bright Data's customers are thus not casual internet users, but rather sophisticated entities that would be well-aware that X Corp. (and almost every other commercial website)

---

[18] Dkt. 36, ¶ 40 (emphasis added). The Terms appear online at: https://twitter.com/en/tos.
[19] Dkt. 42, p. 3.
[20] Dkt. 36, Ex. J.

requires agreement to binding terms of service as a condition of use. In fact, several of Bright Data's customers identified on its website have binding terms of service of their own.[21]

In addition, Bright Data puts its own customers on notice of X Corp.'s Terms by specifically marketing its products as a means to dodge X Corp.'s Terms and circumvent X Corp.'s anti-scraping defenses. Bright Data advertised its "Twitter Scraper" and "Twitter Profile Scraper" tools to "appear as a real user browser to bot-detection system[s]"[22] and to "[e]mulate a user in any geo-location with built-in fingerprinting, automated retries CAPTCHA solving, and more."[23] Bright Data has also marketed its IP proxies as a means to "bypass any location restriction" and "[s]ay goodbye to IP location blocks and CAPTCHA for good."[24] These are not products intended for casual internet users, but are clearly aimed at sophisticated users who intend to evade X Corp.'s anti-scraping technology through complex, automated means. In fact, by advertising its services and tools to evade X Corp.'s anti-scraping measures, Bright Data is putting its customers on constructive notice that X Corp.'s Terms prohibit scraping. Any Bright Data customer who is aware of the Terms has actual notice of those Terms, and is therefore bound by "browsewrap" agreements, regardless of whether that entity ultimately registered as an X account holder.

Because notice of the terms is a fact-intensive inquiry and X Corp. has pled facts to plausibly allege notice, the Court should deny the Motion to Dismiss. Alternatively, if the Court believes additional evidence of actual notice is required to determine the Motion to Dismiss, it should hold the Motion to Dismiss in abeyance until sufficient discovery has been taken on the issue. *Doe v. Xytex Corp.*, No. C 16-02935 WHA, 2016 WL 3902577, at *5 (N.D. Cal. July 19, 2016) (Alsup, J.). (holding motion to dismiss in abeyance pending further discovery on plaintiff's actual notice of the agreement). In *Xytec*, this Court found that a browsewrap agreement was not sufficiently conspicuous to support constructive notice, but this Court allowed discovery to determine whether the plaintiff had actual notice of the agreement. *Id*. In that case, counsel for

---

[21] *See, e.g.*, Apify (https://apify.com/terms-of-use); BitGet (https://www.bitget.com/support/articles/360014944032-terms-of-use); YouGov (https://business.yougov.com/terms-and-privacy).
[22] Dkt. 36, ¶ 62.
[23] Dkt. 36, Exs. F and G.
[24] Dkt. 36, Ex. J.

the plaintiffs (one of the parties to the alleged agreement) averred that his clients did not have actual notice of the agreement. *Id*. This Court found that statement lacked foundation and was "insufficient to overcome Xytex's reasonable request for limited discovery on this issue."[25] *Id*.

The record is even less developed in this case, where Bright Data has only generally asserted that its customers are not bound by a browsewrap agreement, without having identified any of those customers. Whether these customers are subject to a browsewrap agreement with X Corp. based on actual notice can only be determined as a matter of law *after* discovery has been conducted regarding the identity of Bright Data's customers. Because this Court has denied Bright Data's motion to stay and ruled that discovery is now open, X Corp. requests that this Court wait until discovery is complete to determine the validity of any browsewrap agreement, which is a fact-intensive question more appropriate for determination on summary judgment or at trial.

       c)  **Bright Data's Customers Had Constructive Notice of X Corp.'s Terms.**

Bright Data's customers who do not have actual notice of the Terms have nonetheless formed a browsewrap agreement with X Corp. via constructive notice. While notice and assent remain the touchstones for any contract, evaluation of a browsewrap agreement requires courts to "carefully consider the totality of the circumstances." *Oberstein*, 60 F.4th at 514. Here, the totality of the circumstances—the prominent display of X Corp.'s Terms, the sophistication of Bright Data's customers, and the nature of their scraping activities—favors a finding of constructive notice.

Like clickwrap agreements, courts reviewing browsewrap agreements consider the design elements of a website when determining constructive notice. "[C]ourts will not enforce agreements where the terms are buried at the bottom of the page or tucked away in obscure corners of the website, especially when such scrolling is not required to use the site." *Wilson v. Huuuge,*

---

[25] Similarly, in *Berman*, the district court allowed ample time for discovery before it ruled on the validity of the browsewrap agreement. *Berman*, 30 F.4th at 859. As the Ninth Circuit noted, the Defendant in *Berman* failed to timely present evidence of actual notice obtained in discovery, but regardless, the opinion makes clear that the District Court did not rule before Defendant had the opportunity to obtain that information. *Id*. at 858–59.

*Inc.*, 944 F.3d 1212, 1220–21 (9th Cir. 2019). Here, as previously noted, X Corp.'s home page contains not one, but two references to the Terms—one in the center of the screen and one along the bottom of the screen. Unlike the notice in *Wilson*, notice of the X Corp. Terms is not "buried twenty thousand leagues under the sea," nor is finding them a "hide-the-ball exercise." *Id.* at 1221 (finding no constructive notice where link to Terms did not appear on the home page and required clicking "an ambiguous button" and "scroll[ing] through multiple screen-lengths of similar-looking paragraphs").

In addition to a website's design elements, courts may also consider "the context of the transaction." *Oberstein*, 60 F.4th at 516 (quoting *Sellers*, 73 Cal. App. 5th at 477.). In *Oberstein*, the Court found constructive notice when "the context of [the] transaction … would have put users on notice for a link to the terms." *Id*. Here, the context of the transaction is that Bright Data's customers use its products as a way to "evade" and "bypass" X Corp.'s safeguards in order to harvest X Corp.'s data and fool its geo-location systems. The nature of this transaction—circumventing X Corp.'s rules—should put Bright Data's customers on notice that they are subject to the X Corp. Terms they are intentionally breaching, and the design of the X platform makes it easy for those users to find a link to the Terms of this relationship.

A court may also consider the identities of the parties to the transaction, recognizing that "not all internet users are alike." *Berman* 30 F.4th at 867 (Baker, J., concurring) (quoting *Sellers*, 73 Cal. App. 5th at 24). In *Sellers*, the Court considered that the website in question was marketed to users as young as 13 years old, who were not likely to understand the significance of contractual terms. *Sellers*, 73 Cal. App. 5th at 456. Here, the opposite is true: Bright Data's customers (as detailed above) are highly sophisticated, tech-savvy parties who have a deep knowledge of how the internet operates. Indeed, Bright Data's marketing uses technical terminology that would make no sense to an average internet user. *See, e.g.*, FAC Ex. F ("Handle your browser control and parsing codes with simple procedural JavaScript;" "Capture browser network calls, configure a proxy, extract data from lazy loading UI, and more!"; "Trigger crawls on a schedule or by API, and connect our API to major storage platforms").

As discussed above, Bright Data's sophisticated customers should be well-aware that X

Corp. has Terms to which they are bound—they are deliberately trying to avoid them. These sophisticated parties cannot bombard X Corp.'s servers with tens of thousands of automated requests—using specially designed software—and then turn around and claim they are "average" internet users ensnared by X Corp.'s Terms of Service. At the very least, discovery is warranted to explore the extent of Bright Data's customers' knowledge of the Terms.

### d) Bright Data's Customers Assented to X Corp.'s Terms.

While a clickwrap agreement requires users to expressly click their agreement to the Terms, under a browsewrap agreement, "assent may be inferred from other action the users have taken." *Oberstein*, 60 F.4th at 514. "[C]ourts analyze mutual assent under an objective-reasonableness standard." *Id*. at 513 (citing Berman's "fact-intensive inquiry to determine whether a non-clickwrap agreement met an objective standard of mutual assent"). As *Berman* makes clear, a user manifests assent when he "intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Berman*, 30 F.4th at 855 (quoting Restatement (Second) of Contracts § 19(2) (1981)).

The "repeated and automated" use of the X platform by Bright Data's customers may in itself impute knowledge of—and assent to—X's Terms. Courts have found valid contracts in cases involving similar allegations of scraping to those in this case. *See Cairo, Inc. v. Crossmedia Services, Inc.*, No. C 04-04825 JW, 2005 WL 756610, at *5 (N.D. Cal. Apr. 1, 2005) (finding "Cairo's repeated and automated use of CMS's web pages can form the basis of imputing knowledge to Cairo of the terms on which CMS's services were offered"); *see also Ticketmaster*, 2003 WL 21406289, at *2 ("a contract can be formed by proceeding into the interior web pages after knowledge (or, in some cases, presumptive knowledge) of the conditions accepted when doing so"); *Register.com*, 356 F.3d at 401-02 (imputing knowledge of web site's terms of use to repeated user of Register.com's database).

The industrial-scale scraping that is facilitated by Bright Data's products should bind its customers to X Corp.'s Terms. If there is any uncertainty whether these activities have formed a binding contract, this Court should allow discovery to proceed to uncover the extent of those activities. *See Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 WL 5568706, at *8 (N.D.

Cal. Oct. 9, 2013) (acknowledging "a middle ground, in which the proper formation of browsewrap agreements hinges on a triable question of fact). "Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed." *Virtusio v. Fin. Indus. Regulatory Auth., Inc.*, No. 12-CV-00602 NC, 2013 WL 1899830, at *6 (N.D. Cal. May 7, 2013), *aff'd*, 615 Fed. Appx. 400 (9th Cir. 2015) (quoting *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 208 (Cal. 2006). Because this case presents material issues of fact with regard to contract formation, this Court should deny Bright Data's Motion to Dismiss.

### III. CONCLUSION

Bright Data cannot avoid liability for interfering with X Corp.'s contracts by hypothetically asserting that *some* customers *may* not have agreed to X Corp.'s Terms. This Court should reject Bright Data's misdirection and allow discovery to proceed because X Corp. plausibly alleged tortious interference with valid Bright Data customers' contracts under Ninth Circuit precedent.

Dated: January 17, 2024                                Respectfully submitted,

**HAYNES AND BOONE LLP**

By: /s/Jason T. Lao
David H. Harper*
david.harper@haynesboone.com
Jason P. Bloom*
jason.bloom@haynesboone.com
2801 N. Harwood Street
Suite 2300
Dallas, Texas 75201
Telephone: (214) 651.5000
Telecopier: (214) 651.5940
     * *Admitted Pro Hac Vice*

Jason T. Lao
jason.lao@haynesboone.com
Andrea Levenson
andrea.levenson@haynesboone.com
600 Anton Boulevard, Suite 700
Costa Mesa, California 92626
Telephone: (949) 202-3000
Facsimile: (949) 202-3001

*Attorneys for Plaintiff X Corp.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this day, a true and correct copy of the foregoing document was served by filing the same via the Court's CM/ECF system, which will provide notice of the filing of same to all counsel of record.

Date:  January 17, 2024            /s/Jason T. Lao
                                   Jason T. Lao