DAVID H. HARPER*
*david.harper@haynesboone.com*
JASON P. BLOOM*
*jason.bloom@haynesboone.com*
**HAYNES AND BOONE, LLP**
2801 N. Harwood Street, Suite 2300
Dallas, Texas 75201
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
*Admitted Pro Hac Vice*

JASON T. LAO, SBN 288161
*jason.lao@haynesboone.com*
ANDREA LEVENSON, SBN 323926
*andrea.levenson@haynesboone.com*
**HAYNES AND BOONE, LLP**
600 Anton Boulevard, Suite 700
Costa Mesa, California 92626
Telephone: (949) 202-3000
Facsimile: (949) 202-3001

REID PILLIFANT*
*reid.pillifant@haynesboone.com*
**HAYNES AND BOONE, LLP**
98 San Jacinto Blvd., Suite 1500
Austin, TX 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470
*Admitted Pro Hac Vice*

*Attorneys for Plaintiff*
*X Corp.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X CORP., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>BRIGHT DATA LTD., an Israeli corporation,<br><br>Defendant. | Case No. 3:23-cv-03698-WHA<br><br>**X-CORP.'S OPPOSITION TO BRIGHT DATA LTD.'S MOTION FOR SUMMARY JUDGMENT ON X'S BROWSER-WRAP CLAIM**<br><br>Date:   March 28, 2024<br>Time:  8:00 a.m.<br>Ctrm:  12<br>Hon. William Alsup |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................................... 3

   A.   X Corp's Services and Terms ....................................................................... 3

   B.   Bright Data Agreed to the X Corp. Terms ................................................... 5

   C.   Bright Data Violated the X Corp. Terms ..................................................... 6

   D.   Bright Data Failed to Terminate its Agreement with X Corp. ..................... 6

III.   LEGAL STANDARD .......................................................................................... 7

IV.    ARGUMENT ....................................................................................................... 7

   A.   Bright Data Has a Contractual Obligation Not to Violate X Corp.'s Terms ..................... 7

      1.   Bright Data Has Not Terminated Its Agreement With X Corp. ................................. 8

         a)   Bright Data Has Not Terminated Its X Accounts ..................................... 8

         b)   Bright Data Continues to Use the X Services .......................................... 8

         c)   The Meta v. Bright Data Decision Has No Impact on the Termination Issue .......... 9

      2.   Bright Data Agreed to a Survival Clause That Remains in Force ............................. 11

      3.   Bright Data Has a Valid "Browsewrap" Contract with X Corp. ............................... 12

         a)   Bright Data Misstates the Law Regarding Browsewrap Agreements ................... 13

         b)   Bright Data Has Actual Notice of X Corp.'s Terms ................................... 13

         c)   Bright Data Has Accepted X Corp.'s Terms By Accessing the X Platform ........... 14

         d)   Bright Data Cannot Purport to Reject X Corp.'s Terms While Accepting the Benefits ............... 15

      4.   The Terms Are Supported By Consideration ........................................................... 19

   B.   X Corp.'s Breach of Contract Claim is Not Preempted by the Copyright Act ................. 20

      1.   X Corp.'s Breach of Contract Claim is Outside the Scope of Copyright ..................... 20

      2.   X Corp.'s Breach of Contract Claim Contains an "Extra Element" ............................ 22

   C.   Bright Data Relies on Disputed Facts That Require Discovery ........................... 23

V.     OBJECTIONS TO BRIGHT DATA'S SUMMARY JUDGMENT EVIDENCE ............... 25

VI.    CONCLUSION ................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Abdul–Jabbar v. General Motors Corp.*,
　 85 F.3d 407 (9th Cir. 1996) ..................................................................................................7

5

*Adkins v. Facebook, Inc.*,
6
　 No. C 18-05982 WHA, 2019 WL 3767455 (N.D. Cal. Aug. 9, 2019) (Alsup,
7
　 J.)........................................................................................................................................17

8
*Altera Corp. v. Clear Logic, Inc.*,
　 424 F.3d 1079 (9th Cir. 2005) ............................................................................................22

9
*Anderson v. Liberty Lobby, Inc.*,
10
　 477 U.S. 242 (1986).............................................................................................................7

11
*Berman v. Freedom Fin. Network, LLC*,
12
　 30 F.4th 849 (9th Cir. 2022) .........................................................................................12, 13

13
*Best Carpet Values, Inc. v. Google, LLC*,
　 No. 22-15899, 2024 WL 119670 (9th Cir. Jan. 11, 2024) ...................................................21

14
*Bowers v. Baystate Tech., Inc.*,
15
　 320 F.3d 1317 (Fed. Cir. 2003)...........................................................................................22

16
*Cabrera v. Google LLC*,
　 No. 5:11-CV-01263-EJD, 2023 WL 5279463 (N.D. Cal. Aug. 15, 2023) ...........................18
17

18
*Cairo, Inc. v. Crossmedia Servs., Inc.*,
　 No. 04–04825, 2005 WL 756610 (N.D. Cal. Apr. 1, 2005) ...........................................14, 15

19
*Craigslist Inc. v. 3Taps Inc.*,
20
　 942 F. Supp. 2d 962 (N.D. Cal. 2013) .................................................................................23

21
*Craigslist, Inc. v. Autoposterpro, Inc.*,
　 No. 08-cv-05069-SBA, 2009 WL 890896 (N.D. Cal. Mar. 27, 2009) .............................22, 23
22

23
*Doe v. Xytex Corp.*,
　 No. C 16-02935 WHA, 2016 WL 3902577 (N.D. Cal. July 19, 2016) (Alsup,
24
　 J.)........................................................................................................................................24

25
*Facebook, Inc. v. ConnectU LLC*,
　 489 F. Supp. 2d 1087 (N.D. Cal. 2007) ...............................................................................22
26

27
*Grosso v. Miramax Film Corp.*,
　 383 F.3d 965 (9th Cir. 2004) ..............................................................................................20

28
*Gutierrez v. FriendFinder Networks Inc.*,
　 No. 18-CV-05918-BLF, 2019 WL 1974900 (N.D. Cal. May 3, 2019) ...........................14, 15

ii

*Hollyway Cleaners & Laundry Co., Inc. v. Cent. Nat'l Ins. Co. of Omaha, Inc.*,
219 F. Supp. 3d 996 (C.D. Cal. 2016) ..................................................................................24

*Laatz v. Zazzle, Inc.*,
No. 22-CV-04844-BLF, 2023 WL 4600432 (N.D. Cal. July 17, 2023)................................20

*Maffei v. Northern Ins. Co.*,
12 F.3d 892 (9th Cir. 1993) ...................................................................................................7

*Matera v. Google Inc.*,
No. 15-CV-04062-LHK, 2016 WL 5339806 (N.D. Cal. Sept. 23, 2016)...............................9

*McLellan v. Fitbit, Inc.*,
No. 3:16-CV-00036-JD, 2018 WL 1913832 (N.D. Cal. Jan. 24, 2018)...............................19

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
629 F.3d 928 (9th Cir. 2010) ................................................................................................22

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
605 F. Supp. 3d 1218 (N.D. Cal. 2022) ...............................................................8, 9, 10, 11, 12

*Meta Platforms, Inc. v. Bright Data Ltd.*,
No. 23-CV-00077-EMC, 2024 WL 251406 (N.D. Cal. Jan. 23, 2024) (Chen,
J.)...............................................................................................................................9, 10, 11

*Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*,
991 F.2d 426 (8th Cir. 1993) ................................................................................................22

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ........................................................................................12, 18

*NLRB v. Int'l Bhd. of Elec. Workers, Local 11*,
772 F.2d 571 (9th Cir. 1985) ................................................................................................10

*Norcia v. Samsung Telecomms. Am., LLC*,
845 F.3d 1279 (9th Cir. 2017) ..............................................................................................17

*Oberstein v. Live Nation Entm't, Inc.*,
60 F.4th 505 (9th Cir. 2023) .................................................................................................12

*Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*,
813 F.3d 1155 (9th Cir. 2015) ..............................................................................................10

*Pope v. Sav. Bank of Puget Sound*,
850 F.2d 1345 (9th Cir. 1988) ..............................................................................................19

*ProCD, Inc. v. Zeidenberg*,
86 F.3d 1447 (7th Cir. 1996) ................................................................................................22

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)......................................................................................12, 15, 16

iii

*Reichert v. Rapid Investments, Inc.*,
    56 F.4th 1220 (9th Cir. 2022) ...................................................................12, 16, 17

*Ryan v. Editions Ltd. W., Inc.*,
    786 F.3d 754 (9th Cir. 2015) .................................................................................20

*San Diego Gas & Electric Co. v. Canadian Hunter Marketing Ltd.*,
    132 F.3d 1303 (9th Cir. 1997) ................................................................................7

*Sellers v. JustAnswer LLC*,
    73 Cal. App. 5th 444 (Cal. Ct. App. 2021) *reh'g denied* (Jan. 18, 2022),
    *review denied* (Apr. 13, 2022) .............................................................................12

*In re Stubhub Refund Litig.*,
    No. 22-15879, 2023 WL 5092759 (9th Cir. Aug. 9, 2023) ....................................12

*Sw. Airlines Co. v. BoardFirst, L.L.C.*,
    06–CV–0891, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007)................................14

*Sybersound Recs., Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ...............................................................................20

*Taquino v. Teledyne Monarch Rubber*,
    893 F.2d 1488 (5th Cir. 1990) ...............................................................................22

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
    No. CV–997654, 2003 WL 21406289 (C.D. Cal. Mar. 7, 2003) ...............14, 15, 16

*Utopia Provider Sys., Inc. v. Pro-Med Clinical Sys., LLC*,
    596 F.3d 1313 (11th Cir. 2010) .............................................................................22

*Valente-Kritzer Video v. Pinckney*,
    881 F.2d 772 (9th Cir. 1989) .................................................................................20

*Wrench LLC v. Taco Bell Corp.*,
    256 F.3d 446 (6th Cir. 2001) .................................................................................23

**Statutes**

Cal. Civ. Code § 1605.............................................................................................19

Copyright Act...........................................................................................20, 21, 22, 23

**Other Authorities**

Fed. R. Civ. P. 56(a) .................................................................................................7

Federal Rules of Evidence Rule 802.........................................................................25

Rule 56(d) ....................................................................................................2, 23, 25

I.     **INTRODUCTION**

This case is not about the right of individuals who have never had an X account to "search" or "surf" the public internet, as Bright Data repeatedly contends. Rather, this case is about Bright Data—a sophisticated, multinational technology company with Fortune 500 clients—registering X accounts, knowingly and expressly consenting to X Corp.'s Terms of Service ("Terms"), and then engaging in targeted scraping and selling of massive amounts of X Corp. data in direct violation of those Terms. Bright Data does not merely "search" and "surf" the internet. It specifically targets X Corp.'s servers and data, and uses sophisticated deceptive means to circumvent X Corp.'s technological barriers to collect and sell massive amounts of data that is not, contrary to Bright Data's contentions, freely available to casual internet users.

Bright Data does not deny it is a longtime X account holder with actual knowledge of X Corp.'s Terms or that it expressly agreed to the Terms when establishing its accounts. Accordingly, Bright Data does not seek summary judgment for its activity prior to Sep. 25, 2023, when it contends it terminated its accounts. But Bright Data argues that, despite its undisputed awareness of and agreement to the Terms (including the Terms' survival clause), it is now free to scrape and sell X Corp.'s data in violation of those Terms, all because it unilaterally claims it is no longer bound by them.

First, Bright Data's position is fraught with factual disputes and legal errors that preclude summary judgment. There is at minimum a factual dispute as to what accounts Bright Data owns, controls, or manages, and whether such accounts were terminated. Indeed, in response to discovery seeking this information, Bright Data states that it will conduct a search for "responsive documents sufficient to show the X accounts that Bright Data owned, controlled, or managed during the Relevant Period," but has not yet produced any responsive documents. And while Bright Data submits inadmissible hearsay that it has purportedly terminated its two X accounts: @bright_data and @hola_org, X Corp.'s own data shows that that Bright Data's @hola_org account is still active even today. Moreover, Bright Data also owns the accounts @luminatinetwork and @luminati_proxy that are likewise active. There is therefore at least a fact issue as to whether Bright Data terminated its accounts, which is only the first of *two* required steps to end its

1

agreement with X Corp.

Second, setting aside the genuine dispute of fact regarding account termination, even if Bright Data had terminated all of its X accounts, it would still be bound by the Terms. Indeed, account termination alone is not sufficient to end its agreement with X Corp. Rather, as the Terms expressly provide, Bright Data may only terminate its agreement by deactivating its accounts ***and*** discontinuing its use of the X services. Bright Data has never discontinued its use of the X services; it uses the X services every time it accesses the X platform and servers to scrape and sell X Corp.'s data. Thus, even if Bright Data had effectively ended its ongoing agreement with X Corp., the Terms—to which Bright Data agreed via a "clickwrap" agreement—expressly provide that the scraping prohibitions survive termination. Granting summary judgment is therefore improper.

Third, Bright Data's claim that it is not bound by a "browsewrap"[1] contract with X Corp. is purely hypothetical and academic since, as noted above, Bright Data entered a "clickwrap" agreement with X Corp. and has never effectively terminated that agreement, which survives regardless. But even if the browsewrap issue was not a straw man and was ripe for summary consideration, Bright Data's argument is still flawed because it is based on a misstatement of the Ninth Circuit's standard governing browsewrap contracts. Because Bright Data is well aware of X Corp.'s Terms and voluntarily accepts the benefits of X Corp.'s services regardless, it enters an enforceable browsewrap agreement each time it accesses X Corp.'s platform to scrape.

And, finally, Bright Data fares no better by raising a purported lack of consideration, or arguing that X Corp.'s breach of contract claim is preempted by copyright law. Bright Data receives consideration as it clearly gains a benefit from accessing the X platform by ***selling*** the data it scrapes. Similarly, the gravamen of X Corp.'s claims involve claims outside the scope of copyright, and the obligations imposed by its Terms add an "extra element" that precludes preemption. Neither argument helps Bright Data to succeed on its Motion.

Accordingly, the summary judgment Bright Data seeks on post-termination activities— before it has produced a single document in discovery—should be denied. At the very least, this Court should defer ruling on Bright Data's motion pursuant to Rule 56(d).

---

[1] This brief uses the term "browsewrap," but courts occasionally refer to the same type of agreements as "browser-wrap" or "browserwrap." The terms are used interchangeably.

## II.   FACTUAL BACKGROUND

### A.   X Corp's Services and Terms

X Corp. owns and operates the social media platform X, accessible through twitter.com, X.com, and various mobile and online applications.[2]  Unlike open access websites, X Corp. does not make its platform and data broadly available to the general public.[3] Rather, to gain access to the X platform by visiting twitter, x.com, or downloading the X mobile application, a user must expressly agree to X Corp.'s Terms of Service, Privacy Policy, and Cookie Use policy by registering for an X account.[4] When an unregistered user visits the X homepage at x.com or twitter.com, the user is invited to create an account or sign in, and notified that by signing up, they will be agreeing to the X Corp. Terms of Service, Privacy Policy, and Cookie Use policy.[5] Those who create an account are taken through a multi-step process whereby they confirm their human identity and agreement to X Corp.'s Terms.[6] X Corp. allows users who create an account to post and share content, including written comments, images, and videos, and to share, like and comment on other users' posts.[7] However, X Corp. limits the access of registered X users in a variety of ways, including by setting limits on the number of accounts a registered user may follow.[8]

Those who do not create an account or sign in to an existing account are not granted access to X posts or data through x.com, twitter.com, or the X mobile application.[9] The information available to unregistered users is highly circumscribed.[10] If an unregistered user accesses a registered user's profile page, the unregistered user is shown only a curated sample of the registered user's posts, rather than all of that user's posts.[11] Additionally, an unregistered user may access a specific, individual post through a link to that specific post.[12] Through internet search engines, such as Google, unregistered users may access a limited subset of information from a

---

[2] Ex. A, Declaration of Haofei Wang ("Wang Decl.") at ¶ 3.
[3] Ex. A, Wang Decl., ¶ 6.
[4] Ex. A, Wang Decl., ¶ 6.
[5] Ex. A, Wang Decl., ¶ 7.
[6] Ex. A, Wang Decl., ¶ 8.
[7] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 5-7 (§ 4 Using the Services).
[8] Ex. A, Wang Decl., ¶ 9.
[9] Ex. A, Wang Decl., ¶ 7.
[10] Ex. A, Wang Decl., ¶ 10.
[11] Ex. A, Wang Decl., ¶ 10.
[12] Ex. A, Wang Decl., ¶ 10.

limited subset of X accounts.[13] Unregistered users may not, however, freely browse the X platform, nor may they access any replies to, or likes of, any posts, nor may they interact with posts.[14] When viewing the limited information available from X accounts, unregistered users are provided with a link to the Terms of Service, Privacy Policy, and Cookie Use policy in the top right corner of the page and invited to sign in or register for an account.[15]

X Corp.'s Terms expressly govern both "access to and use of" the X services, whether or not someone has registered for an account.[16] The X Services are defined to include accessing X's "various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services … that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services."[17]

Under the Terms, anyone who accesses the Services agrees they will not:

➢ "misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that [X] provide[s]."[18]

➢ "work around any technical limitations in the software provided … as part of the services."[19]

➢ "probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures."[20]

➢ "access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us …. (**NOTE: crawling or scraping the services in any form, for any purpose without our prior written consent is expressly prohibited**)."[21]

➢ "facilitate or assist others in violating these Terms, including by distributing products or

---

[13] Ex. A, Wang Decl., ¶ 10.
[14] Ex. A, Wang Decl., ¶ 10.
[15] Dkt. 62-1, Munkittrick Decl., Ex. 4.
[16] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 3 (preamble); at 5 (§ 4 Using the Services); at 8 (§ 5 Disclaimers and Limitations of Liability).
[17] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 3 (preamble).
[18] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 7 (§ 4 Misuse of the Services).
[19] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 7 (§ 4 Misuse of the Services).
[20] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 7 (§ 4 Misuse of the Services).
[21] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 7 (§ 4 Misuse of the Services) (emphasis added).

4

services that enable or encourage violation of these Terms."[22]

The Terms provide that they may be ended by both deactivating accounts **and** discontinuing use of the X Services.[23]  However, the Terms expressly provide that even when both of these steps are taken, "the misuse provisions of Section 4 ("Misuse of Services")"—which include the prohibitions on scraping—"shall continue to apply."[24]  The Terms further make clear that mere deactivation of an account alone does not terminate the agreement: "For avoidance of doubt, these Terms survive the deactivation or termination of your account."[25]  Rather, as clearly set forth, one must cease **all** further use of the Services to end the agreement.

In addition to the above prohibitions, X Corp. employs a variety of technological measures to prevent, detect, and stop unauthorized data scraping. X Corp. uses industry-standard automation prevention techniques, including CAPTCHAs,[26] to prevent automated systems from accessing and scraping data from the X platform.[27] In addition to CAPTCHAs, X Corp. attempts to protect its platform from scraping and other automated access through the use of user identification and IP rate limits, IP blocking, geographical access restrictions, lockouts, and anomaly detection tools.[28] When unauthorized scraping and automated access is detected, X Corp. limits responses to server calls and uses lockout mechanisms to limit access to the platform.[29]  The X Corp. Terms, as noted above, expressly prohibit those accessing the X platform from circumventing these measures.[30]

## B.  Bright Data Agreed to the X Corp. Terms

Bright Data expressly agreed to the X Corp. Terms on multiple occasions. On February 7, 2016, Bright Data registered an account on the X platform under the user name @bright_data.[31]

---

[22] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 7 (§ 4 Misuse of the Services).
[23] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 7 (§ 4 Ending These Terms).
[24] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 8 (§ 4 Ending These Terms).
[25] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 8 (§ 4 Ending These Terms).
[26] CAPTCHA stands for "Completely Automated Public Turing test to tell Computers and Humans Apart." CAPTCHAs are challenge tests, often involving assorted pictures, characters, or tasks, designed to prevent bots and automated systems from accessing online platforms. Due to the potential harm caused by scraping and other unauthorized computer access, CAPTCHAs are widely used throughout the online industry.
[27] Ex. A, Wang Decl., ¶ 4.
[28] Ex. A, Wang Decl., ¶ 5.
[29] Ex. A, Wang Decl., ¶ 5.
[30] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 7 (§ 4 Misuse of the Services).
[31] Ex. B, Declaration of Celestine Susi ("Susi Decl.") at ¶ 2.

In doing so, Bright Data expressly accepted and agreed to the X Corp.'s Terms.[32] Bright Data also agreed to the X Corp. Terms when it registered X accounts under the user names @hola_org on January 16, 2010, @luminati_proxy on January 27, 2016, and @luminatinetwork on February 19, 2016.[33] The @hola_org, @luminatinetwork, and @luminati_proxy accounts all remain active and are not presently deactivated.[34]  Bright Data does not dispute that it was aware of and expressly agreed to X Corp.'s Terms when registering the above accounts.

### C.    Bright Data Violated the X Corp. Terms

Bright Data does not dispute that it has breached the Terms by, among other things, (i) scraping data from the X platform, (ii) selling data sets scraped from the X platform, and (iii) enabling others to scrape data from the X platform, as alleged in the First Amended Complaint.[35] Accordingly, Bright Data does not move for summary judgment regarding these actions prior to September 25, 2023. Bright Data also does not dispute that it has engaged in the above activities since September 25, 2023, that it will continue to do so in the future, and that the above activities continue to violate the X Terms. Rather, Bright Data only contends that it is no longer bound by the X Terms—because it says so.

### D.    Bright Data Failed to Terminate its Agreement with X Corp.

On July 26, 2023, X Corp. sued Bright Data for breaching the Terms.[36] Despite being on notice of X Corp.'s claims, Bright Data did not attempt to deactivate its accounts at that time. Rather, two months later, on September 25, 2023, Bright Data claims that it deactivated the X accounts @bright_data and @hola_org.[37] Thereafter, on October 12, 2023, Bright Data admitted that it opened another company account on October 9, 2023, but claims it also deactivated that account.[38] However, contrary to Bright Data's claims, the @hola_org, @luminatinetwork, and @luminati_proxy accounts owned by Bright data are not presently deactivated and remain active.[39]

---

[32] Ex. A, Wang Decl., ¶ 8.
[33] Dkt. 62-1, Munkittrick Decl., Exs. 1, 2; twitter.com/hola_org; Ex. B, Susi Decl., ¶ 2. Bright Data's former name was Luminati Network. *See* Ex. C, Declaration of Reid Pillifant ("Pillifant Decl.") at ¶ 9.
[34] Ex. B, Susi Decl., ¶ 2; *see also* Pillifant Decl. at Att. 2–4.
[35] Dkt. 36, First Amended Complaint, ¶¶ 55–62.
[36] Dkt. 1, Original Complaint.
[37] Dkt. 62-1, Munkittrick Decl., Ex. 2.
[38] Dkt. 62-1, Munkittrick Decl., Ex. 2.
[39] Ex. B, Susi Decl. at ¶ 2; *see also* Pillifant Decl. at Att. 2–4.

1    Further, Bright Data concedes that it has not discontinued its use of the X Services, as required to

2    end its contract with X Corp., because it continues to access the Services to scrape and sell data.

3    **III.    <u>LEGAL STANDARD</u>**

4         Summary judgment is not proper unless "the movant shows that there is no genuine dispute

5    as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

6    56(a). At the summary judgment stage, courts do not "weigh the evidence or determine the truth

7    of the matter but only determine whether there is a genuine issue for trial." *Abdul–Jabbar v.*

8    *General Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996). Evidence must be viewed in the light

9    most favorable to the nonmoving party and all justifiable inferences are to be drawn in the

10   nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). When a contract

11   is ambiguous, courts are "hesitant to grant summary judgment 'because differing views of the

12   intent of parties will raise genuine issues of material fact.'" *San Diego Gas & Electric Co. v.*

13   *Canadian Hunter Marketing Ltd.*, 132 F.3d 1303, 1307 (9th Cir. 1997) (quoting *Maffei v. Northern*

14   *Ins. Co.*, 12 F.3d 892, 898 (9th Cir. 1993)).

15   **IV.    <u>ARGUMENT</u>**

16        This Court should deny Bright Data's motion for summary judgment because Bright Data

17   continues to be bound by X Corp.'s Terms pursuant to a clickwrap agreement and does not dispute

18   that it continues to violate the Terms. Whether Bright Data *would be* subject to a browsewrap

19   agreement if it effectively ended its clickwrap agreement is therefore a hypothetical inquiry the

20   Court need not reach. Even so, Bright Data formed an enforceable "browsewrap" contract with X

21   Corp. by continuing to access the X Services with actual notice of X Corp.'s Terms. Bright Data's

22   additional arguments—that the Terms lack consideration and that X Corp.'s breach of contract is

23   preempted by copyright—should also be rejected, because X Corp. provides a valuable benefit,

24   and because its breach of contract claim does not fall within the purview of federal copyright law.

25        **A.    Bright Data Has a Contractual Obligation Not to Violate X Corp.'s Terms**

26        Bright Data is not entitled to summary judgment on the breach of contract claim because

27   (1) it has not effectively terminated its binding clickwrap agreement with X Corp., and (2) even if

28   it had, Bright Data agreed that the prohibitions on scraping survive contract termination. Further,

although the Court need not reach the browsewrap issue, Bright Data, aware of X Corp.'s Terms, binds itself to a browsewrap agreement to the Terms each time it accesses the X platform to scrape.

### 1.    Bright Data Has Not Terminated Its Agreement With X Corp.

Under the X Corp. Terms—to which Bright Data expressly agreed—users of the X platform "have a right to terminate this agreement at any time by deactivating your account *and* discontinuing use of the Services."[40] In this case, Bright Data has done neither.

#### a)    *Bright Data Has Not Terminated Its X Accounts*

Bright Data is bound to the Terms because it continues to maintain active accounts on the X platform. While Bright Data contends that it terminated the @bright_data and @hola_org accounts, it has submitted only hearsay evidence of such alleged termination.[41] Moreover, the summary judgment record shows that Bright Data's accounts @hola_org, @luminatinetwork, and @luminati_proxy remain active.[42] Bright Data also admits to opening a company account on October 9, 2023.[43] There is therefore, at a minimum, a fact issue as to whether Bright Data terminated its accounts, rendering summary judgment improper. In *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1257 (N.D. Cal. 2022), the defendant argued it was no longer bound by Meta's Terms of Use following termination of its corporate accounts. Because BrandTotal employees created additional accounts that still remained active, the Court found that BrandTotal continued to be bound by Meta's Terms. *Id*. The same is true here: Bright Data has active X accounts and remains a registered X user bound by the Terms.

Bright Data does not dispute that account termination is a prerequisite to ending its contract with X Corp. and bases its entire argument on the contention that it deactivated its accounts. Because there are clear fact issues as to whether Bright Data in fact deactivated its X accounts, it fails to establish the first prong for contract termination. The Court may deny summary judgment on this ground, alone.

#### b)    *Bright Data Continues to Use the X Services*

Bright Data also has an ongoing contract with X Corp. because it continues to use and

---

[40] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 7 (§ 4 Ending These Terms) (emphasis added).
[41] *See* Section V, *infra*.
[42] Ex. B, Susi Decl. at ¶¶ 2–3, Ex. C, Pillfant Decl. at Att. 2–4.
[43] Dkt. 62-1, Munkittrick Decl., Ex. 2.

access the X Services. Accordingly, Bright Data has failed to satisfy the second prong for contract termination. When a website's Terms state that a user will continue to be bound unless they "discontinue" use of the Services, then continued use of those services constitutes ongoing acceptance of the Terms. *See, e.g., Matera v. Google Inc*., No. 15-CV-04062-LHK, 2016 WL 5339806, at *17 (N.D. Cal. Sept. 23, 2016) (upholding contract when terms of service stated user should "discontinue" use of Services to avoid being bound by updated terms).

Bright Data concedes it has not discontinued use of the X Services. In fact, Bright Data seeks summary judgment to shield its ongoing use of the X Services (e.g., scraping and selling X data) from contractual liability. Because X Corp.'s terms require both account deactivation ***and*** discontinuation of use of the X Services, Bright Data failed to end its contractual agreement with X Corp. At a minimum, fact issues exist, and X Corp. is entitled to further discovery regarding the nature and extent of Bright Data's ongoing use.

<blockquote><em>c)      The Meta v. Bright Data Decision Has No Impact on the Termination Issue</em></blockquote>

In the event that Bright Data argues that the recently issued opinion in *Meta Platforms, Inc. v. Bright Data Ltd*., No. 23-CV-00077-EMC, 2024 WL 251406 (N.D. Cal. Jan. 23, 2024) (Chen, J.),[44] absolves it of forward-looking contract liability, Bright Data is wrong, as the *Meta* case involved materially different terms than X Corp.'s, as well as a materially different factual record.

*First*, in *Meta*, unlike this case, both parties moved for summary judgment, which motions were decided after "extensive discovery." *Meta*, 2024 WL 251406 at *6. There was apparently no factual dispute as to whether Bright Data had terminated its Meta accounts and thereby terminated its agreement with Meta. *Id.* at *8. Such a dispute certainly exists here, rendering summary judgment improper. Further, the X Corp.'s Terms cannot be terminated without discontinuation of use of the X Services.[45] Conversely, account deactivation was all that was required to terminate the Facebook and Instagram terms. *Id.* at *17. These material issues of fact and material differences in the contract terms render this case distinguishable from the *Meta* case.

*Second*, the *Meta* contracts at issue contained materially different terms related to non-

---

[44] The decision was issued after Bright Data filed the present motion for summary judgment.
[45] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 7 (§ 4 Ending These Terms).

9

account holders. The *Meta* court found that Meta's terms applied only to "logged-in" use of Meta's websites by account holders, not to use while "logged out" of any account. *Meta,* 2024 WL 251406 at *11. The court concluded that the *Meta* terms defined "use" as logged-in use only, in part, because the range of "commitments" that are required to "use" Meta's services repeatedly reference the need for an account. *Id.* at 12. By contrast, the X Corp. Terms specifically govern all "access" to the X platform.[46] In fact, by requiring two separate conditions to end the Terms— account deactivation **and** discontinuation of use—the X Corp. Terms clearly provide that "use" includes logged-out access without an active account, as one could never engage in "logged-in" access after deactivating their accounts. Any other interpretation would render the clause "***and*** discontinuing your use of the Services" in the X Terms superfluous. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*, 813 F.3d 1155, 1171 (9th Cir. 2015) ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable.").

The *Meta* court also admitted extrinsic evidence from the Facebook Help Center, stating: "You have to create a Facebook account in order to use Facebook." *Id.* at *16. The *Meta* Court found this statement "supports the narrow construction of user and hence 'use.'" *Id.* In this case, Bright Data offered no evidence to support a narrow reading of X Corp.'s Terms, and none need be admitted, since the Terms clearly do not limit "use" to "logged-in" use with an active account. *See NLRB v. Int'l Bhd. of Elec. Workers, Local 11*, 772 F.2d 571, 575 (9th Cir. 1985) (extrinsic evidence should not be considered for unambiguous contracts). Moreover, Bright Data has submitted no evidence whatsoever regarding the means it uses to scrape, including whether such scraping requires a "logged-in" account, further rending the *Meta* decision inapplicable.

Because Bright Data has not ceased using the X Services, the Terms remain in full force and effect. Bright Data has not submitted undisputed evidence that it satisfied either of the two contractual requirements to end its agreement with X Corp.

---

[46] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 3 (preamble); at 5 (§ 4 Using the Services); at 8 (§ 5 Disclaimers and Limitations of Liability).

## 2.    Bright Data Agreed to a Survival Clause That Remains in Force

Even if Bright Data had deactivated its X accounts **and** discontinued use of the X Services, Bright Data's ongoing scraping—not possible without *using* the X Services—would be barred by the Terms' survival clause. The Terms unambiguously provide that "the misuse provisions of Section 4 ("Misuse of the Service")," which specifically prohibit scraping and related activities, "shall continue to apply" after the Terms end.[47] The X Corp. Terms further provide that "For avoidance of doubt, these Terms survive the deactivation or termination of your account," making abundantly clear that merely deactivating an account, without ceasing all use of the Services, is insufficient to end the Terms.[48] These survival provisions defeat Bright Data's argument that by deactivating its accounts, it is permitted to scrape in violation of the Terms.

In *Meta*, the Court found that Meta's survival clause did not survive termination, but that decision is of limited application to X Corp.'s survival clause. The *Meta* court found that Meta's terms, which stated that certain sections "remain in place" after termination, was "not without ambiguity." *Meta,* 2024 WL 251406 at *19. The Court found a limited construction was "consistent with the structure of the [Meta] Terms," which "focuses on users (i.e. those with active accounts)." *Id*. at 18. The Court noted that the "remain in place" language did not appear in Meta's section containing users' "commitments" under the contract. *Id*. at 19. Here, X Corp.'s survival clause is unambiguous, and the "structure" of X Corp.'s Terms make clear that—unlike Meta's Terms—the prohibitions on scraping survive. Moreover, unlike in *Meta*, the X Corp. survival clause is in the same section of the Terms—Section 4—that prohibits scraping.[49]

While the *Meta* court questioned whether that survival clause should exist in perpetuity, this court has previously held that it is "not manifestly unreasonable for a user to agree, in return for the free services that [a social media company] provides, not to subvert the rules regarding automated access that [the company] has put in place for its platforms, even after termination of an account." *BrandTotal*, 605 F. Supp. 3d at 1255. The *BrandTotal* court noted that a party can avoid application of the survival clause by simply ceasing to interact with the website. *Id*. ("If a

---

[47] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 7 (§ 4 Misuse of the Services).
[48] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 7–8 (§ 4 Ending These Terms).
[49] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 7–8 (§ 4 Misuse of the Services, followed by Ending These Terms).

X CORP.'S OPPOSITION TO BRIGHT DATA LTD.'S MOTION FOR SUMMARY JUDGMENT ON X'S BROWSER-WRAP CLAIM

1   user were to walk away from Meta's products entirely, the continuing force of section 3.2.3 would

2   have no effect on them."). Here, Bright Data chose not to walk away, and in doing so, accepted

3   the Services X Corp. offers in return for agreeing to the Terms, including the survival clause.

### 3.      Bright Data Has a Valid "Browsewrap" Contract with X Corp.

5          Even if Bright Data did not have a current contract with X Corp. by virtue of its active

6   accounts and ongoing use of the X platform, Bright Data forms an enforceable browsewrap

7   contract with X Corp. each time it accesses the X platform with full knowledge of X Corp.'s

8   Terms.[50] "It is standard contract doctrine that when a benefit is offered subject to stated conditions,

9   and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the

10  taking constitutes an acceptance of the terms, which accordingly become binding on the offeree."

11  *Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1230 (9th Cir. 2022) (quoting *Register.com,*

12  *Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)). This includes standardized, take-it-or-leave-

13  it contracts of adhesion. *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 464 (Cal. Ct. App. 2021)

14  *reh'g denied* (Jan. 18, 2022), *review denied* (Apr. 13, 2022) ("By their nature, internet contracts

15  almost always fall into the category of adhesion contracts.").[51]  In the case of a browsewrap

16  agreement, a website provides "notice that—by merely using the services of, obtaining information

17  from, or initiating applications within the website—the user is agreeing to and is bound by the

18  site's terms of service."  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014).

19  "Because no affirmative action is required by the website user to agree to the terms of a contract

20  other than his or her use of the website, … the validity of the browsewrap contract depends on

21  whether the user has actual or constructive knowledge of a website's terms and conditions."  *Id.*

22  "[C]ourts have consistently enforced browsewrap agreements where the user had actual notice of

23  the agreement." *Id.*

24

---

25  [50] Because the Court in *Meta* found that Meta's Terms were limited to logged-in activity, it did not
26  analyze whether Bright Data had formed a browsewrap agreement with Meta by accessing its sites.
    [51] *Sellers* was decided by a California appellate court, but its reasoning and analysis has been
27  cited approvingly by the Ninth Circuit in three separate opinions. *See Berman v. Freedom Fin.*
    *Network, LLC*, 30 F.4th 849, 857, 865–69 (9th Cir. 2022) (majority opinion and concurrence
    both endorse *Sellers'* reasoning); *Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 516 (9th
28  Cir. 2023); *In re Stubhub Refund Litig.*, No. 22-15879, 2023 WL 5092759, at *2 (9th Cir. Aug. 9,
    2023).

X CORP.'S OPPOSITION TO BRIGHT DATA LTD.'S MOTION FOR SUMMARY JUDGMENT ON X'S
BROWSER-WRAP CLAIM

This case is not, as Bright Data would like to suggest, about whether casual web "surfers" who have never owned an X account are bound by X Corp.'s Terms by simply viewing an X page found through a search engine. Rather, this case is about whether Bright Data, a sophisticated multi-national company that has agreed to X Corp.'s Terms by opening no fewer than four corporate accounts (not to mention numerous accounts owned by its executives and employees), that specifically targets X Corp.'s platform and servers to scrape and sell data, and that was further put on notice of X Corp.'s Terms by virtue of this lawsuit months before it attempted to deactivate an account, can continue scrape and sell data from the X platform in violation of the Terms for the simple reason that it no longer wants to be bound. The law is clear that, even if Bright Data had effectively ended its agreement with X Corp., by continuing to access the X platform, Bright Data agrees to comply with X Corp.'s Terms, including the prohibitions on scraping and selling data.

### a)    *Bright Data Misstates the Law Regarding Browsewrap Agreements*

Initially, Bright Data bases its argument on a misstatement of the law. Bright Data suggests that a browsewrap contract is only valid in the Ninth Circuit if an offeree "takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms...." *Berman v. Freedom Fin. Network*, LLC, 30 F.4th 849, 856 (9th Cir. 2022). But Bright Data's selective quotation refers to a clickwrap agreement based on inquiry notice, not a browsewrap based on actual notice—and there is no dispute that Bright Data agreed to the Terms through a clickwrap agreement. The quoted sentence from *Berman*, which Bright Data omits, begins: "***Unless the website operator can show that a consumer has actual knowledge of the agreement***, an enforceable contract will be found based on an inquiry notice theory only if" the operator can show certain manifestations of assent. *Id.* (emphasis added). Here, X Corp. can show that Bright Data, which has owned at least four X Corp. accounts whereby it expressly agreed to the Terms, has actual knowledge of the Terms. Accordingly, the section quoted by Bright Data is not the correct standard for contract formation in this case.

### b)    *Bright Data Has Actual Notice of X Corp.'s Terms*

Bright Data does not—and cannot—dispute that it has actual notice of X Corp.'s Terms. A

X CORP.'S OPPOSITION TO BRIGHT DATA LTD.'S MOTION FOR SUMMARY JUDGMENT ON X'S BROWSER-WRAP CLAIM

user can acquire actual knowledge of a website's Terms through any number of means, including the user's independent review of the Terms, notification by the website's owner, and, in some cases, from repeated use of the website (such as scraping). *See, e.g., Gutierrez v. FriendFinder Networks Inc.*, No. 18-CV-05918-BLF, 2019 WL 1974900, at *7 (N.D. Cal. May 3, 2019) (finding actual notice where customer service representative notified plaintiff of terms); *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04–04825, 2005 WL 756610, at *2, *4–5 (N.D. Cal. Apr. 1, 2005) (finding enforceable contract where defendant was notified of Terms); *Sw. Airlines Co. v. BoardFirst, L.L.C.*, 06–CV–0891, 2007 WL 4823761 at *4–6 (N.D. Tex. Sept. 12, 2007) (finding a valid contract where defendant continued to access website after being notified of the terms in a cease and desist letter); *Ticketmaster Corp. v. Tickets.Com, Inc.*, No. CV–997654, 2003 WL 21406289 at *2 (C.D. Cal. Mar. 7, 2003) (denying summary judgment motion where defendant continued breaching the contract after receiving letter quoting the browsewrap contract terms). Bright Data acquired actual notice of the Terms when it expressly agreed to the Terms on multiple occasions as part of the account-registration process for at least four accounts.[52] Separately, Bright Data was also made aware of the Terms in July of 2023, when X Corp. filed this lawsuit, and Bright Data did not first attempt to terminate an account for another two months.[53] Bright Data's correspondence with X Corp. also references the Terms.[54] If there was any uncertainty regarding Bright Data's knowledge of X Corp.'s Terms, its Motion to Dismiss and its Motion for Summary Judgment also reference and attach copies of the Terms.[55] Each of these independently satisfies the requirements of actual notice.  Again, Bright Data is not some casual web "surfer," but a sophisticated scraping company that expressly acknowledged and agreed to X Corp.'s Terms on multiple occasions. It cannot acquire amnesia simply by closing an account.

> ### c)   *Bright Data Has Accepted X Corp.'s Terms By Accessing the X Platform*

Because Bright Data has actual knowledge of the Terms, Bright Data manifests its assent to the Terms each time it accesses the X platform. *See Gutierrez,* 2019 WL 1974900, at *7

---

[52] *See* Ex. B, Susi Decl., ¶ 2; Ex. A, Wang Decl., ¶ 8.
[53] Dkt. 36, First Amended Complaint.
[54] Dkt. 62-1, Munkittrick Decl., Ex. 1, 2.
[55] Dkt. 49-1, Munkittrick Decl., Ex. 4, 5; Dkt. 62-1, Munkittrick Decl., Ex. 4.

("Because the Terms clearly stated that continued use of the site would constitute acceptance of the Terms, Plaintiff's continued use of the site after being put on notice of the Terms and his need to comply with them constituted acceptance of the Terms."); *Cairo,* 2005 WL 756610, at *5 ("Cairo's use of CMS's web site under circumstances in which Cairo had actual or imputed knowledge of CMS's terms effectively binds Cairo to CMS's Terms of Use"); *Register.com*, 356 F.3d at 402 (finding assent where defendant "was fully aware of the terms on which [plaintiff] offered the access"). The X Terms clearly state: "You may use the Services only if you agree to form a binding contract with us."[56] Bright Data admits that it continues to use the X Services to scrape data from the X platform.[57] In doing so, Bright Data establishes a valid contract with X Corp. each time it accesses the X platform. *See Gutierrez,* 2019 WL 1974900 at *8 (continuing "use of the site, in light of the Terms' provisions regarding acceptance by use, constituted acceptance of the Terms").

### d)    Bright Data Cannot Purport to Reject X Corp.'s Terms While Accepting the Benefits

Bright Data cannot "reject" the Terms of a standardized contract while accepting its benefits. Faced with a standardized contract, an offeree has two choices: "either to accept the offer of contract, taking the information subject to the terms of the offer, or, if the terms [a]re not acceptable, to decline to take the benefits." *Register.com*, 356 F.3d at 403. Allowing an offeree to reject the terms but continue to accept the benefits would undermine the longstanding basis for standardized contracts and force companies like X Corp. to negotiate individually with their millions of customers. Bright Data's attempt to upend settled law—by creating a third option that allows it to accept the benefits of a contract without incurring any obligations—should be rejected.

Case law is clear that a party who is aware of the terms of a standardized contract cannot avoid contract formation by purporting to reject those terms while accepting the benefit. In *Ticketmaster*, the defendant tried the same tack. *Ticketmaster*, 2003 WL 21406289, at *2. Defendant Tickets.com sent a letter to Ticketmaster stating that it did not accept the conditions for use of Ticketmaster's website, while continuing to scrape the website. *Id*. The Court rightly

---

[56] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 3 (§ 1 Who May Use the Services).
[57] Dkt. 62, Mot. at 3.

15

ignored this purported rejection and found that Tickets.com had formed an enforceable browsewrap contract, because the company had actual knowledge of the conditions and accepted those conditions by continuing to scrape Ticketmaster's website. *Id*. Bright Data attempts to minimize *Ticketmaster* by suggesting the purported "rejection" in that case was only mentioned in a parenthetical, and because the case is 20 years old, and because it did not sufficiently cite to the Restatement.[58] But Bright Data cannot escape the fact that *Ticketmaster* presents similar facts as this case. If anything, the parenthetical mention of Tickets.com's "rejection" and the lack of citation to the Restatement only demonstrate how little the Court thought of the rejection argument.

Similarly, in *Register.com*, the Second Circuit dismissed the defendant's purported rejection when the defendant was made aware of the plaintiff's conditions for access and "refused to stop" scraping plaintiff's website. *Register.com*, 356 F.3d at 397. The Court found that a valid browsewrap contract had been formed, despite this purported rejection, because—again—the defendant knew of the terms and chose to continue accessing the website. *Id*. at 403. Bright Data incorrectly suggests this case is distinguishable because the defendant was "silent" and points to a brief reference to § 69 of the Restatement.[59]  In fact, the Restatement is included in the opinion as part of a string cite to underscore the Court's statement that "[i]t is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree." *Id*. at 403. Despite Bright Data's attempts to distinguish this case, *Register.com* makes clear that Bright Data must choose either to accept X Corp.'s Terms or cease accessing the X platform. Bright Data is not forced to target the X platform and scrape and sell X Corp.'s data—Bright Data chooses to do so—and by virtue of that choice Bright Data accepts benefits from X Corp. and agrees to be bound by X Corp.'s Terms, of which Bright Data has long been aware.

Bright Data musters only two inapposite cases regarding standardized contracts to support its novel theory of contract law. In *Reichert*, an inmate released from a jail in Washington State was given no choice but to accept his own personal funds on a prepaid card that immediately began

---

[58] Dkt. 62, Mot. at 8–9, fn.5.
[59] Dkt. 62, Mot. at 8, fn.5

X CORP.'S OPPOSITION TO BRIGHT DATA LTD.'S MOTION FOR SUMMARY JUDGMENT ON X'S BROWSER-WRAP CLAIM

1   charging him fees. *Reichert*, 56 F.4th at 1229. The Ninth Circuit held that Reichert had not assented

2   to the standardized contract because he had not been presented a "reasonable opportunity to reject

3   [the] offered services." *Id*. at 1230. Nonetheless, Bright Data suggests that it has an equal right to

4   access the X Services as the plaintiff in *Reichert* has to his own funds.[60]  But, unlike the plaintiff

5   in *Reichert*, Bright Data is not entitled to access the X platform, and, in fact, it has every

6   opportunity to reject the X contract by ceasing to access the X platform. *See Adkins v. Facebook,*

7   *Inc*., No. C 18-05982 WHA, 2019 WL 3767455, at *2 (N.D. Cal. Aug. 9, 2019) (Alsup, J.)

8   (accessing social media site "is not a necessity of life and anyone who does not like the terms of

9   service can go elsewhere"). Instead, Bright Data has freely chosen—unlike the *Reichert* plaintiff—

10  to accept the Terms of a standardized contract with X Corp.

11      Bright Data gets no further with *Norcia*, a case in which the Ninth Circuit considered

12  whether a consumer was bound by an "in-the-box" arbitration agreement that was included with

13  his cellular phone. *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017).

14  In that case, the plaintiff was not aware of the contract and took no action to assent to it. The Ninth

15  Circuit found there was no contract because Norcia "did not give any outward manifestations of

16  consent [that] would lead a reasonable person to believe the offeree has assented to the agreement."

17  *Norcia,* 845 F.3d at 1286. Nor was Norcia bound by his inaction, because "such a contract is

18  ineffective ***where the customer does not receive adequate notice of its existence***."  *Id*. (emphasis

19  added). Here, there is no question that Bright Data has actual notice of X Corp.'s Terms, nor is

20  this a case of silence or inaction. *Norcia*'s "in-the-box" analysis simply has no application to this

21  case since Bright Data has long had actual notice of the Terms and it has taken—and continues to

22  take—affirmative action to manifest its assent by using the Services. Further, unlike *Norcia*, this

23  case does not involve an arbitration agreement of which the plaintiff was unaware, but Terms

24  prohibiting scraping to which Bright Data agreed.

25      With no case law to support its novel argument, Bright Data relies on a selective reading

26  of the Restatement of Contracts. But the Restatement only reaffirms the basic principles of contract

27  law—that a party can either accept or reject an offer (but not both), and that its actions can manifest

28

---

[60] Dkt. 62, Mot. at 7.

X CORP.'S OPPOSITION TO BRIGHT DATA LTD.'S MOTION FOR SUMMARY JUDGMENT ON X'S
BROWSER-WRAP CLAIM

assent when the party has knowledge of the Terms. Bright Data cobbles together quotes from §§ 19, 38, and 53, but none of these sections support the idea that a party can simultaneously reject an offer and accept its benefits.

Section 19(2) states: "The conduct of a party is not effective as a manifestation of his assent *unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents*." Rest. 2d § 19(2) (emphasis added). Here, Bright Data intends to engage in the conduct—accessing the X platform—and it knows that its conduct constitutes assent to X Corp.'s Terms because the Terms specifically say so.[61]

Section 38(1) states: "An offeree's power of acceptance is terminated by his rejection of the offer, *unless the offeror has manifested a contrary intention*." Rest. 2d § 38(1) (emphasis added). Here, X Corp.'s standardized contract is a standing offer. *See id.*, cmt. b ("a manifestation of intention on the part of either [party] that the offeree's power of acceptance is to continue is effective"). A person who "rejects" that offer one day can accept it the next day by registering for an X account or by accessing the X platform.

Section 53(2) states: "*Except as stated in § 69*, the rendering of a performance does not constitute an acceptance if within a reasonable time the offeree exercises reasonable diligence to notify the offeror of non-acceptance." Rest. 2d § 53(2) (emphasis added). The first clause is critical, since the "exceptional cases covered by § 69 involve taking the benefit of offered goods or services." *Id*. cmt b; Rest. 2d § 69(1)(a). Here, Bright Data continues to take the benefit of X Corp.'s offer by accessing the X platform, so its notification of "rejection" carries no weight.

Even if the Restatement could be twisted to support Bright Data's position—and it cannot—the Restatement is entitled to "great consideration" only "in the absence of a contrary statute or decision in this state." *See Cabrera v. Google LLC*, No. 5:11-CV-01263-EJD, 2023 WL 5279463, at *7, n.8 (N.D. Cal. Aug. 15, 2023). Here, Bright Data's tortured reading of the Restatement directly contradicts controlling Ninth Circuit case law that browsewrap agreements can and should be upheld when a user has actual notice of the Terms. *Nguyen*, 763 F.3d at 1176.

---

[61] Dkt. 62-1, Munkittrick Decl., Ex. 4 at 3 (preamble and § 1 Who May Use the Services) ("These [Terms] govern your access to and use of our services …. You may use the Services only if you agree to form a binding contract with us").

X CORP.'S OPPOSITION TO BRIGHT DATA LTD.'S MOTION FOR SUMMARY JUDGMENT ON X'S BROWSER-WRAP CLAIM

#### 4.     The Terms Are Supported By Consideration

Bright Data's argument that X Corp.'s Terms are not supported by consideration is unavailing, because access to the X Services provides "real value" to Bright Data. In the Ninth Circuit, a challenge to contract formation based on consideration is a "slender reed indeed." *McLellan v. Fitbit, Inc.*, No. 3:16-CV-00036-JD, 2018 WL 1913832, at *3 (N.D. Cal. Jan. 24, 2018); *see also Pope v. Sav. Bank of Puget Sound*, 850 F.2d 1345, 1356 (9th Cir. 1988) ("the first lesson in contracts [is] the peppercorn theory—that courts will not inquire into the adequacy of consideration, so long as it was true and valuable."). Under California law, "[a]ny benefit conferred, or agreed to be conferred … or any prejudice suffered, or agreed to be suffered, ... as an inducement to the promisor, is a good consideration for a promise." Cal. Civ. Code § 1605. Access to a website is consideration for an agreement to be bound by a website's terms. *McLellan,* 2018 WL 1913832, at *3.

Bright Data suggests that it gains no benefit by agreeing to X Corp.'s Terms. This is false. X Corp. offers licensed access to a complex, proprietary platform used by hundreds of millions of people to quickly and efficiently communicate.[62]  If access to the X platform was truly of no value, then Bright Data would cease using deceptive means to scrape ***and sell*** information from the platform, and its Fortune 500 customers would not pay for that data, nor for the scraping tools that Bright Data sells to extract that data.[63]  In fact, Bright Data receives substantial financial benefit from its ability to access the X platform.[64] Further, X Corp. incurs a detriment by providing its Services, including the significant costs of operating the platform (and policing against malicious actors).[65] This is sufficient consideration to support the contract between X Corp. and Bright Data.

Further Bright Data's arguments, unsupported by any evidence, that the internet is a "social contract" and "a ***free*** utility for all, supported by government funds" and that Bright Data merely "search[es] the public web" misconstrue X Corp.'s claims. X Corp. is not challenging Bright Data's right to internet access, but rather Bright Data's actions, while fully aware of X Corp.'s

---

[62] *See* Wang Decl. at ¶ 6–7, 9–10; Pillifant Decl. at Att. 1; *see also* Dkt. 36, First Amended Complaint, ¶ 18;
[63] Dkt. 42, Mot. to Dismiss" at 3.
[64] Dkt. 42, Mot. to Dismiss" at 3; Pillifant Decl. at Atts. 6–10.
[65] Ex. A, Wang Decl., ¶ 11.

1   Terms, of targeting X Corp.'s platform and servers to scrape and sell X Corp.'s data in violation

2   of  those Terms. Moreover, the numerous fact issues regarding how Bright Data accesses and

3   scrapes X Corp.'s platform and whether the information it scrapes is "public" demonstrate that

4   summary judgment is not proper.[66]

5       **B.**    <u>**X Corp.'s Breach of Contract Claim is Not Preempted by the Copyright Act**</u>

6       X Corp.'s  breach of contract claim is not preempted by the Copyright Act because X

7   Corp.'s claim is not equivalent to a copyright claim and the Terms impose extra obligations beyond

8   those of the Copyright Act. Copyright law does not preempt state laws with respect to 'activities

9   violating legal or equitable rights that are not equivalent to any of the exclusive rights within the

10  general scope of copyright as specified by section 106.'" *Sybersound Recs., Inc. v. UAV Corp.*,

11  517 F.3d 1137, 1150 (9th Cir. 2008) (quoting § 301(b)(3)). "Under the Ninth Circuit's two-part

12  test for determining whether a state law claim is preempted by the Copyright Act, the court

13  'consider[s] whether (1) the work at issue falls within the scope of copyrightable subject matter,

14  and (2) the law at issue grants rights equivalent to any of the exclusive rights within the scope of

15  copyright.'" *Laatz v. Zazzle, Inc.*, No. 22-CV-04844-BLF, 2023 WL 4600432, at *2 (N.D. Cal.

16  July 17, 2023) (quoting *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 760 (9th Cir. 2015)). "To

17  survive preemption, the state cause of action must protect rights that are qualitatively different

18  from the rights protected by copyright: the complaint must allege an 'extra element' that changes

19  the nature of the action." *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004); *see,*

20  *e.g., Valente-Kritzer Video v. Pinckney*, 881 F.2d 772, 776 (9th Cir. 1989) (holding fraud claim

21  was not preempted because "misrepresentation is a necessary element of any fraud claim" and

22  "[t]his is not substantially equivalent to a claim for copyright infringement."). In this case, X

23  Corp.'s breach of contract claim does not fall within the subject matter of copyright, and X Corp.'s

24  Terms impose additional obligations that constitute an "extra element" to survive preemption.

25      **1.**    **X Corp.'s Breach of Contract Claim is Outside the Scope of Copyright**

26      The essence of X Corp.'s breach of contract claim is that Bright Data breached provisions

27  of the Terms governing access to and permissible uses of the X platform. Bright Data admits that

28

---

[66] Ex. A, Wang Decl., ¶ 12; Ex. C, Pillifant Decl., ¶ 18.

X CORP.'S OPPOSITION TO BRIGHT DATA LTD.'S MOTION FOR SUMMARY JUDGMENT ON X'S
BROWSER-WRAP CLAIM

much of the data it scrapes does not fall within the subject matter of copyright.[67]   Instead, the majority of the data Bright Data scrapes is not protectable under the Copyright Act (i.e., number of followers, verification, account type, links, brand affiliation, shares, location, and hashtags).[68] And even if some portion of the data were protectable under the Copyright Act, X Corp. does not claim to own any copyright interest in such data (apart from the contents of X Corp.'s own accounts) and therefore could not assert a copyright claim.

Bright Data argues that the facts and data it scrapes from the X platform fall within the subject matter of copyright based on a recent Ninth Circuit decision reiterating that a website "may qualify for copyright protection." *See Best Carpet Values, Inc. v. Google, LLC*, No. 22-15899, 2024 WL 119670, at *6 (9th Cir. Jan. 11, 2024). But the question in *Best Carpet Values* involved the *display* of the plaintiff's website—not scraping the data contained therein.[69] The plaintiff objected to the manner in which Google displayed its website in Google's search results. The Ninth Circuit held that "***the manner that Plaintiffs' websites are displayed*** falls within the subject matter of federal copyright law." *Id.*, at *6 (emphasis added). In this case, X Corp.'s claims do not involve the manner in which the X website is displayed by Bright Data. To X Corp.'s knowledge, Bright Data does not even display or duplicate the X website. Instead, Bright Data collects and compiles noncopyrightable data from the X platform and repackages that data "in the format of JSON, ndJSON, CSV or Excel."[70] These data files (which are ultimately rendered as spreadsheets) do not contain any of the elements that may qualify a website for copyright protection, which the Ninth Circuit identified as: "copyrightable literal elements (source code); non-literal elements (including 'logos, images, fonts, videos and sound effects'); and dynamic non-literal elements (such as the experience of viewing the website)." *Id.* at *6. Because Bright Data is not displaying or duplicating the X website—or even the copyrightable design elements it contains—X Corp.'s breach of contract claim does not implicate the rights protected by the Copyright Act.

---

[67] Bright Data concedes that "[f]acts and figures in a database are not protected by copyright." Dkt. 42 at 30:15–16.
[68] Dkt. 36, First Amended Complaint, Ex. E at 2.
[69] The district court certified the following question for interlocutory appeal: "Whether website owners can invoke state law to control how their websites are displayed on a user's screen without preemption by federal copyright law." *Best Carpet Values, Inc. v. Google, LLC*, No. 22-15899, 2024 WL 119670, at *5 (9th Cir. Jan. 11, 2024).
[70] Ex. C, Pillifant Decl., at Att. 6.

21

1    Further, the Ninth Circuit's holding does not disturb prior decisions of this Court that

2    declined to find claims based on unprotectable elements of social media websites preempted. *See,*

3    *e.g., Facebook, Inc. v. ConnectU LLC*, 489 F. Supp. 2d 1087, 1093 (N.D. Cal. 2007). In *ConnectU*,

4    the court noted that "[t]here may be instances where an entire website consists of a work of

5    authorship [but] this does not appear to be such an instance." *Id*. at 1093, n.9.  While a social media

6    website may include protectable elements, the court found that these elements do not make a social

7    media website "*as a whole* a work of authorship or give rise to copyright preemption with respect

8    to … uncopyrightable facts posted on it." *Id*. at 1093. That is precisely the situation here, where X

9    Corp.'s breach of contract claim asserts scraping of noncopyrightable user data.

10    **2.    X Corp.'s Breach of Contract Claim Contains an "Extra Element"**

11    Even if X Corp.'s breach of contract claim fell within the scope of the Copyright Act, it

12    would not be preempted because it contains an "extra element." As the Ninth Circuit has noted,

13    "[m]ost courts have held that the Copyright Act does not preempt the enforcement of contractual

14    rights."  *Altera Corp. v. Clear Logic, Inc*., 424 F.3d 1079, 1089 (9th Cir. 2005); *see also Bowers*

15    *v. Baystate Tech., Inc*., 320 F.3d 1317, 1324–25 (Fed. Cir. 2003) (noting that "most courts to

16    examine this issue have found that the Copyright Act does not preempt contractual constraints on

17    copyrighted articles"); *Craigslist, Inc. v. Autoposterpro, Inc.*, No. 08-cv-05069-SBA, 2009 WL

18    890896, at *2 (N.D. Cal. Mar. 27, 2009) (finding no preemption where "[t]he TOUs contain extra

19    obligations beyond those imposed by the Copyright Act," including that users "are not to . . . use

20    automated posting devices"); *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 957 (9th

21    Cir. 2010) (finding "anti-bot" provisions of video game website's terms of use, which prohibits

22    use of automated robots to play the video game, were not preempted); Nimmer on Copyright § 1.15

23    (2022) (noting that so long as "a breach-of-contract cause of action alleges more than simply

24    reproduction (or adaptation, distribution, etc.) of a copyrighted work" it is not preempted).[71] This

---

[71] Indeed, every federal court of appeals to have issued a published opinion on the subject has
agreed that the Copyright Act does not preempt a contract claim because of the extra elements of
contract formation and the making of a legally binding promise. *Utopia Provider Sys., Inc. v.
Pro-Med Clinical Sys., LLC*, 596 F.3d 1313, 1327 (11th Cir. 2010); *Bowers v. Baystate Techs.,
Inc.*, 320 F.3d 1317, 1324–25 (Fed. Cir. 2003) (collecting cases); *ProCD, Inc. v. Zeidenberg*, 86
F.3d 1447 (7th Cir. 1996); *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d
426, 431 (8th Cir. 1993); *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1501 (5th Cir.
1990). Even the Sixth circuit, which holds that a breach-of-contract claim is generally preempted

X CORP.'S OPPOSITION TO BRIGHT DATA LTD.'S MOTION FOR SUMMARY JUDGMENT ON X'S
BROWSER-WRAP CLAIM

Court has declined to find preemption in cases where a website's terms prohibit more than the mere reproduction of copyrighted material. *See Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 976–77 (N.D. Cal. 2013). In *Craigslist*, the court found the plaintiff's breach of contract claim was not preempted, because "relevant provisions of the [Terms of Use] do not merely prohibit copying or reusing content, but rather include accessing the website for inappropriate purposes, using the website to develop computer programs and services that interact with Craigslist, and circumventing technological measures intended to restrict access to the website." *Id*. at 977.

Here, as in *Craigslist*, X Corp. alleges that Bright Data breached the Terms governing access and use of the X platform by circumventing technological safeguards, impersonating legitimate user accounts, and harvesting data through automated means that are expressly prohibited.[72] Such allegations constitute an "extra element" beyond the protections of the Copyright Act and are not preempted. Because X Corp. accuses Bright Data of scraping facts and data that are not within the subject matter of copyright and in violation of a contract that contains an extra element from a copyright claim, Bright Data's preemption defense fails.

### C.   Bright Data Relies on Disputed Facts That Require Discovery

In the event the Court does not deny Bright Data's motion for summary judgment outright, X Corp. requests, pursuant to Federal Rule of Civil Procedure 56(d), for the Court to defer consideration of Bright Data's Motion until the parties can conduct discovery on the factual issues raised in this Opposition, which require discovery and a fully developed record before any adjudication is appropriate. X Corp. should be provided with a full and fair opportunity to conduct discovery on the factual issues relevant to the parties' contracts in this case. Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). "The purpose of Rule 56(d) relief is to prevent the nonmoving party from being 'railroaded' by a summary judgment motion that is filed too soon

---

if the only enforceable obligation imposed is to not copy material, makes an exception if the contract imposes some additional element that makes the contract claim qualitatively different from a copyright claim. *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 459 (6th Cir. 2001).
[72] *See* Dkt. 36, First Amended Complaint, ¶¶ 70, 73–75.

X CORP.'S OPPOSITION TO BRIGHT DATA LTD.'S MOTION FOR SUMMARY JUDGMENT ON X'S BROWSER-WRAP CLAIM

after the start of a lawsuit for the nonmovant to properly oppose it without additional discovery." *Hollyway Cleaners & Laundry Co., Inc. v. Cent. Nat'l Ins. Co. of Omaha, Inc.*, 219 F. Supp. 3d 996, 1003 (C.D. Cal. 2016).

Here, X Corp. is at risk of being "railroaded" by Bright Data's summary judgment motion because Bright Data has delayed producing substantive discovery on issues central to its Motion.[73] X Corp. served Requests for Production, Interrogatories, and Requests for Admission on Bright Data on November 13, 2024.[74] Bright Data moved to stay discovery on December 13, 2024,[75] and that same day served written responses refusing to substantively answer X Corp.'s written discovery based on the Motion to Stay.[76] After the Court unequivocally denied Bright Data's Motion to Stay on January 10, 2024 and declared discovery to be "wide open," Bright Data waited another three weeks, until February 1, 2024, to serve amended responses.[77] Even then, Bright Data's responses are woefully deficient, and Bright Data has yet to produce a single document, rendering X Corp. unable to discover all essential facts needed supporting this response.[78]

As noted above, there are several fact issues that require discovery—discovery which Bright Data is resisting—before Bright Data's motion for summary judgment can be fairly resolved.[79] For instance, Bright Data contends that it has deactivated its X accounts, whereas X Corp. has submitted evidence showing otherwise. Further, discovery is needed to determine how Bright Data has accessed the X platform to scrape data and what data Bright Data has scraped since allegedly deactivating its accounts, as X Corp. contests Bright Data's claim that it only scrapes "public data." Discovery is also needed as to Bright Data and its executives' knowledge and awareness of X Corp.'s Terms. *See Doe v. Xytex Corp.*, No. C 16-02935 WHA, 2016 WL 3902577, at *5 (N.D. Cal. July 19, 2016) (Alsup, J.) (ordering discovery on the issue of actual notice of a website's Terms). Bright Data also possesses relevant information regarding X accounts maintained by Bright Data and its employees, and the functionality of Bright Data's platform.

---

[73] *See* Ex. C, Pillifant Decl., ¶ 19.
[74] *See* Ex. C, Pillifant Decl., ¶ 15.
[75] *See* Bright Data's Motion to Stay Discovery, Dkt. 43.
[76] *See* Ex. C, Pillifant Decl., ¶ 16.
[77] *See* Ex. C, Pillifant Decl., ¶ 17.
[78] *See* Ex. C, Pillifant Decl., ¶ 18.
[79] *See* Ex. C, Pillifant Decl., ¶ 19.

24

Accordingly, Bright Data's motion, if not denied on legal grounds, is premature and should not be considered until X Corp. has had an opportunity to take fulsome discovery.

## V.      OBJECTIONS TO BRIGHT DATA'S SUMMARY JUDGMENT EVIDENCE

X Corp. objects to Exhibits 1 and 2[80] to Bright Data's motion for summary judgment as inadmissible hearsay under Rule 802 of the Federal Rules of Evidence. The exhibits are letters dated September 25, 2023 and October 12, 2023 from counsel for Bright Data to counsel for X Corp. Each of the letters is improperly submitted for the truth of the matters asserted therein, including the following:

> ➤ Bright Data terminated its X accounts, including @bright_data and @hola_org;

> ➤ Bright Data never used its X accounts to scrape the X platform;

> ➤ Bright Data is no longer using X Corp.'s Services;

> ➤ Bright Data's executive and employee accounts are not controlled by Bright Data and were never used to scrape the X platform;

> ➤ Bright Data rejects and does not consent to X Corp.'s Terms;

> ➤ Bright Data and X Corp. have no contractual relationship.

Each of the above unsworn factual assertions, as well as all other factual assertion in the letters, is inadmissible hearsay. X Corp. requests this Court sustain its objection to the letters and all factual assertions therein and strike the letters from the summary judgment record.

## VI.     CONCLUSION

For the foregoing reasons, Bright Data's Motion for Summary Judgment should be denied in its entirety. To the extent this Court requires additional evidence to evaluate the Motion, X Corp. respectfully requests leave to conduct additional discovery pursuant to Rule 56(d). X Corp. additionally requests that the Court sustain X Corp.'s objection and strike Exhibits 1 and 2 to Bright Data's Motion as inadmissible hearsay.

/ / /

/ / /

/ / /

---

[80] Dkt. 62-1.

Dated: February 7, 2024           Respectfully submitted,

**HAYNES AND BOONE LLP**

By:  /s/Jason T. Lao
    David H. Harper*
    david.harper@haynesboone.com
    Jason P. Bloom*
    jason.bloom@haynesboone.com
    2801 N. Harwood Street
    Suite 2300
    Dallas, Texas 75201
    Telephone: (214) 651.5000
    Telecopier: (214) 651.5940
     *Admitted Pro Hac Vice*

    Jason T. Lao
    jason.lao@haynesboone.com
    Andrea Levenson
    andrea.levenson@haynesboone.com
    600 Anton Boulevard, Suite 700
    Costa Mesa, California 92626
    Telephone: (949) 202-3000
    Facsimile: (949) 202-3001

    Reid Pillifant*
    reid.pillifant@haynesboone.com
    98 San Jacinto Blvd., Suite 1500
    Austin, TX 78701
    Telephone: (512) 867-8400
    Facsimile: (512) 867-8470
     *Admitted Pro Hac Vice*

    *Attorneys for Plaintiff X Corp.*

X CORP.'S OPPOSITION TO BRIGHT DATA LTD.'S MOTION FOR SUMMARY JUDGMENT ON X'S BROWSER-WRAP CLAIM

1

### <u>CERTIFICATE OF SERVICE</u>

2          I HEREBY CERTIFY that on this day, a true and correct copy of the foregoing document

3    was served by filing the same via the Court's CM/ECF system, which will provide notice of the

4    filing of same to all counsel of record.

5

6    Date:  February 7, 2024                    _/s/Jason T. Lao_____
                                                Jason T. Lao

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28