Colin R. Kass (*pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania, Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick (*pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittric@proskauer.com

*Attorneys for Defendant Bright Data Ltd.*
*Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| X CORP., a Nevada corporation,<br><br>                Plaintiff,<br><br>                v.<br><br>BRIGHT DATA LTD, an Israeli corporation.<br><br>                Defendant. | Case No. 3:23-CV-03698-WHA<br><br>Hon. William H. Alsup<br>Courtroom 12 – 19th Floor<br>March 28, 2024, 8:00 a.m. |

**BRIGHT DATA'S REPLY IN SUPPORT OF ITS**
**<u>MOTION FOR SUMMARY JUDGMENT ON X's BROWSER-WRAP CLAIM</u>**

# TABLE OF CONTENTS

I. INTRODUCTION. ...................................................................................................................1

II. X'S BROWSER-WRAP CLAIM FAILS FOR LACK OF MUTUAL ASSENT. ..............2

    A. Bright Data Rejected X's Browser-Wrap Offer; It Did Not Accept It. ...................2

    B. X's Browser-Wrap Claim Fails Because "Public Search" Is Not an "Unambiguous Manifestation of Assent." ............................................................5

III. X'S BROWSER-WRAP CLAIM FAILS FOR LACK OF CONSIDERATION ...............7

IV. X'S BROWSER-WRAP CLAIM IS PRE-EMPTED BY COPYRIGHT. .........................8

V. X CANNOT FORESTALL SUMMARY JUDGMENT ON ITS BROWSER-WRAP CLAIM BY SEEKING FURTHER DISCOVERY ON ITS CLICK-WRAP CLAIM. ...................................................................................................................12

VI. X CANNOT FORESTALL SUMMARY JUDGMENT CLAIMS WITH UNPLED COMPLAINTS ABOUT IMPERFECT TERMINATION. ...............................13

VII. CONCLUSION. ....................................................................................................................15

# TABLE OF AUTHORITIES[1]

**CASES**            **Pages**

*Altera Corp. v. Clear Logic, Inc.*,
  424 F.3d 1079 (9th Cir. 2005) ...................................................................................... 11

*Berman v. Freedom Fin. Network, LLC*,
  30 F 4th 849 (9th Cir. 2022) ..................................................................................... 5, 6

*Best Carpet Values, Inc. v. Google, LLC*,
  90 F.4th 962 (9th Cir. 2024) .................................................................................. 10, 12

*Bowers v. Baystate Techs., Inc.*,
  320 F.3d 1317 (Fed. Cir. 2003) ...................................................................................... 12

*Cal. Trucking Ass'n. v. Teamsters*,
  679 F.2d 1275 (9th Cir. 1981) ........................................................................................ 2

*Craigslist, Inc. v. 3Taps Inc.*,
  942 F. Supp. 2d 962 (N.D. Cal. 2013) ........................................................................... 12

*Craigslist, Inc. v. Autoposterpro, Inc.*,
  2009 WL 890896 (N.D. Cal. 2009) ................................................................................ 11

*Endemol Ent. B.V. v. Twentieth Television Inc.*,
  1998 WL 785300 (C.D. Cal. 1998) ................................................................................ 12

*Facebook, Inc. v. ConnectU LLC*,
  489 F. Supp. 2d 1087 (N.D. Cal. 2007) ......................................................................... 10

*Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*,
  525 F.3d 822 (9th Cir. 2008) ........................................................................................ 13

*Kabehie v. Zoland*,
  102 Cal. App. 4th 513 (2002) ........................................................................................ 11

*McLellan v. Fitbit, Inc.*,
  2018 WL 1913832 (N.D. Cal. 2018) ................................................................................ 8

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
  629 F.3d 928 (9th Cir. 2010) ........................................................................................ 11

*Metrano v. Fox Broad. Co.*,
  2000 WL 979664 (C.D. Cal. 2000) ................................................................................ 12

---

[1] Unless otherwise specified, all emphasis added, initial capitalizations conformed without brackets, and internal citations and quotation marks omitted. Exhibits 1-4 are found at ECF 69-1; Exhibits 5-6 are found in the Declaration of David Munkittrick submitted with this Reply.

*ML Genius Holdings LLC v. Google LLC*,
    2022 WL 710744 (2d Cir. 2022) ........................................................................................... 9, 11

*Nat'l Basketball Ass'n (NBA) v. Motorola*,
    105 F.3d 841 (2d Cir. 1997) ................................................................................................. 9, 10

*Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*,
    991 F.2d 426 (8th Cir. 1993) ................................................................................................ 11, 12

*Nidds v. Schindler Elevator Corp.*,
    113 F.3d 912 (9th Cir. 1996) ..................................................................................................... 13

*Norcia v. Samsung Telecomms. Am., LLC*,
    845 F.3d 1279 (9th Cir. 2017) .................................................................................................. 2, 5

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ...................................................................................................... 4

*People v. Henderson*,
    211 Ill. 2d 90 (2004) .................................................................................................................... 3

*ProCD, Inc. v. Zeidenberg*,
    86 F.3d 1447 (7th Cir.1996) ..................................................................................................... 9, 11

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ......................................................................................................... 4

*Reichert v. Rapid Invs., Inc.*,
    56 F.4th 1220 (9th Cir. 2022) ....................................................................................................... 6

*Ritchie v. Williams*,
    395 F.3d 283 (6th Cir. 2005) ...................................................................................................... 11

*Selby v. New Line Cinema Corp.*,
    96 F. Supp. 2d 1053 (C.D. Cal. 2000) ........................................................................................ 12

*Stanley v. Robert S. Odell & Co.*,
    97 Cal. App. 2d 521 (1950) .......................................................................................................... 2

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
    2003 WL 21406289 (C.D. Cal. 2003) ........................................................................................... 5

*Vault Corp. v. Quaid Software Ltd.*,
    847 F.2d 255 (5th Cir. 1988) .................................................................................................. 11, 12

*Wrench LLC v. Taco Bell Corp.*,
    256 F.3d 446 (6th Cir. 2001) ...................................................................................................... 11

## I. INTRODUCTION.

When X filed suit, Bright Data embarked on a well-trodden path to extricate itself from X's grip: Terminate its accounts, reject X's Terms, and go on its merry way. Bright Data's summary judgment motion is a crucial first step. It will dispense with X's claim that Bright Data is forever barred from public web scraping for no reason other than its awareness of X's rejected Terms, leaving X with nothing but a (weak) backward-looking claim and no damages to speak of.

Recognizing that Bright Data's motion – grounded in bedrock contract law – will immediately free Bright Data from X's clutches, X now tries to delay the inevitable. It goes through the motions of asking the Court to disregard Bright Data's rejection notice, depart from the Restatement, and change the law. But knowing that is a quixotic quest at best, it begs the Court to defer ruling while X takes discovery to see if it really wants to pursue its browser-wrap claim. It might choose to withdraw that claim, it suggests, if it ultimately decides it has a forward-looking *click-wrap* claim with legs. Until then, it protests, its browser-wrap claim is just "hypothetical and academic." But X's browser-wrap claim is a live case or controversy, ripe for decision, and requires no discovery to resolve. X can't stave off summary judgment just because it wants to evaluate the strength of a clickwrap claim it brought in the alternative.

But even if it could, its forward-looking clickwrap claim boils down to mere quibbles over the mechanics of termination. X does not deny that any contracts with X are terminable at will. Nor does X deny that Bright Data served notice of termination. X also admits that Bright Data properly terminated the *only* account sued upon. Lying-in-wait for five months, X now tries to play "gotcha" with unalleged facts about unpled accounts. Such games have no place in federal court. And its complaints have no merit. But even if they did, at most, X would have a short-lived unpled breach of contract claim for "improper termination" based on *unalleged* immaterial non-compliance with the account termination process, and no injury therefrom. That has nothing to do with X's browser-wrap claim. And nothing to do with scraping. These minor squabbles can't be used to hold Bright Data hostage in perpetuity. It is time to set Bright Data free.

## II. X'S BROWSER-WRAP CLAIM FAILS FOR LACK OF MUTUAL ASSENT.

### A. *Bright Data Rejected X's Browser-Wrap Offer; It Did Not Accept It.*

"Rejection … kills the offer." *Stanley v. Robert S. Odell & Co.*, 97 Cal. App. 2d 521, 534 (1950). This principle kills X's browser-wrap claim. As Bright Data explained, there is no scenario – under the Restatement or any case – finding assent in the face of express rejection. *See* D.Br. 4-5. In response, X says it is not possible to "reject X's Terms while" searching its site. P.Br. 15. But its argument is not grounded in the Restatement, and is contrary to law.

*Bright Data's Rejection is Not Hearsay*. X first leads the Court astray by asking it to pretend that Bright Data's rejection notice does not exist. It is "hearsay," X proclaims, and should be "stricke[n]." P.Br. 25. But the rejection letter is a "verbal act," which "itself affects the legal rights of the parties;" it is not hearsay. Fed. R. Evid. 801(c), Adv. Comm. Notes; *Cal. Trucking Ass'n. v. Teamsters*, 679 F.2d 1275, 1291 n.20 (9th Cir. 1981) ("contract rejection" is not hearsay).

*X Cannot Ignore Bright Data's Express Rejection*. X next says that, if the Court can't disregard Bright Data's rejection, X can. Actions, it says, speak louder than words, so it can infer that Bright Data secretly meant to accept the Terms by visiting X's site regardless of what it says. But the Restatement does not allow X to play ostrich. Words have power, and conduct is ambiguous. For that reason, "the conduct of a party is not effective as a manifestation of assent unless he … has reason to know the other party may infer from [that] conduct that he assents." Rest.2d § 19. Recognizing that it is unreasonable to infer assent when one says the opposite, X argues it can prohibit express rejection because the Terms "specifically say" that "accessing the X platform … constitutes assent." P.Br. 18. But an "offeror ***cannot prescribe conditions of rejection***." *Norcia v. Samsung Tel. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017). X may be master of its offer; but Bright Data is master of its rejection. X is not free to ignore it.

*Bright Data's Rejection Did Not Evaporate*. X next argues that, if it can't ignore Bright Data's rejection, it was only effective for a nanosecond. It says that, because its Terms are a "standing offer," a "person who 'rejects' [X's] offer one day can accept it the next day." P.Br. 18. The argument is twice flawed. *First*, rejection "terminate[s]" the "power of [subsequent] acceptance," unless the "offeror has manifested a contrary intention." Rest.2d § 38. X's Terms

do not address rejection and do not say that they *survive* rejection. At most, X chose not to take down its Terms from its website so *others* could see them. That does not obligate Bright Data to renew its rejection every day or every second. Nor does referring to its Terms as "standing offer" change this. After "the rejection of a standing offer," the "offer cannot be revived by a later acceptance" and the "parties go back to the drawing board." *People v. Henderson*, 211 Ill. 2d 90, 104 (2004) (*citing Sharp Elec. Corp. v. Deutsche Fin. Servs. Corp.*, 216 F.3d 388 (4th Cir.2000)).

*Second*, even if Bright Data theoretically retained the "power" of acceptance, it did not exercise it. Far from retracting its rejection, Bright Data stated that there would be no "**future** contract – or 'meeting of the minds' – between the parties relating to the activities at issue absent a written agreement physically hand-signed by both parties." ECF 62-1, Ex. 1. X does not address this, or point to any case where the insistence on a signed writing evaporated the second it was sent. Indeed, accepting X's argument would thrust the entire corporate world into turmoil. Every day, parties send non-binding offers that expressly require a signed writing to become effective. Requiring that this statement be renewed before each and every subsequent statement, act, or event during the ensuing negotiations is not just unworkable, it defeats the parties' reasonable expectations. So too, finding that Bright Data accepted X's Terms *immediately* after sending notice of everlasting rejection defeats the parties' reasonable expectations.

**Bright Data's Conduct Does Not Override Its Express Rejection**. X next says it can disregard Bright Data's rejection because Bright Data had "reason to know" that X would "infer assent" from Bright Data's scraping. P.Br. 18. The argument is foreclosed by the Restatement, which explains that an offeree "may guard against [the] risk" that an offeror "may … infer from his conduct that he assents … by manifesting an intention not to accept." Rest.2d § 53(2), cmt. b. Put simply, rejection trumps. Nor can X ascribe whatever meaning it wants to Bright Data's conduct. "There is no manifestation of assent … if the parties attach materially different meanings to their manifestations and … each party … has reason to know the meaning attached by the other." Rest.2d § 20. This rule preserves the "meeting of the minds" requirement, and prevents one party from imposing its will upon the other. Here, X does not dispute that Bright Data intended to manifest rejection, and that X knew this. Thus, it does not matter how X might wish to interpret

Bright Data's conduct.  Section 20 precludes assent.

*X's Purported Performance Does Not Override Bright Data's Express Rejection*.  Unable to rely on Bright Data's conduct, X says its decision to make information public is performance.  But it admits that, under § 53, the "rendering of a performance does not constitute acceptance if … the offeree … notif[ies] the offeror of non-acceptance." P.Br. 18.  Seeking to avoid this result by invoking an exception under § 69(1), X says that Bright Data's rejection "carries no weight" because it "continues to take the benefit of accessing the X platform." *Id*.  But Section 69(1) only applies when the offeree "fails to reply" and accepts benefits "in silence," not when there has been express rejection.  Rest.2d § 69(1).  X does not address this point or the many cases supporting it.  *See* D.Br. 5-6 n.4 (citing cases).  Since X does not assert a "failure to reply," it does not qualify for the § 69(1) exception.  X's purported performance is irrelevant.

*The Court Should Not Depart from the Restatement*.  Recognizing that it loses this case if the Court applies the Restatement, X asks the Court to disregard it, asserting that "the Restatement directly contradicts controlling Ninth Circuit case law." P.Br. 18 (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014)).  But *Nguygen* declined to enforce the terms at issue and did not *discuss* rejection.  It certainly did not overrule the Restatement *sub silencio*.

Nor does X cite any other case rejecting the Restatement's rejection provisions.  X relies on *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403, 431 (2d Cir. 2004).  But *Register* was a silent acceptance case.  The majority found that accepting benefits with "silence and inaction" established assent, even if, as the minority noted, there was "no opportunity to reject" the website operator's terms.  *Id*.  In response, X says that, by citing § 69(1) in a "string cite," the Second Circuit secretly meant to disagree with it.  P.Br. 16.  The argument is frivolous, not least because the court's decision was grounded in an apple cart hypothetical involving silence, not rejection.

X gets no further trying to twist *Register* into a rejection case.  The defendant may have "refused to stop" the challenged conduct after receiving a cease-and-desist letter, *see id*., but a "refusal to stop" is no different from "silent acceptance;" it is not *express* rejection.  There is no indication that the refusal was communicated.  At most, the defendant "refused to sign" a separate settlement agreement, after ceasing some of the challenged conduct.  But that agreement was not

at issue. Nor did the Second Circuit treat the refusals as manifestations of rejection, let alone discuss or disagree with the Restatement's rejection provisions. It simply addressed the adequacy and timing of the plaintiff's notice.

X similarly misplaces reliance on *Ticketmaster Corp. v. Tickets.Com, Inc.*, 2003 WL 21406289 (C.D. Cal. 2003), because that too was a notice case. The court's sole purpose in parenthetically citing the rejection was to show that the defendant was "fully familiar" with the Terms. *Id*., at *2. X tries to read more into it, saying the court's brief treatment shows "how little [it] thought of the rejection argument." P.Br. 15-16. More likely, the rejection didn't matter much because the conduct appears to have "stopped" shortly after rejection. *Id*. Regardless, assent requires (i) notice of the terms, and (ii) conduct manifesting assent. Rest.2d § 19. Since a rejection letter presupposes knowledge, when a ***plaintiff*** points to a rejection letter, it is undermining the defendant's notice defense. That is all that happened in *Ticketmaster*. The court neither addressed the legal question of whether rejection negates assent, nor purported to override the Restatement.

With no support in the Restatement or caselaw, X imagines a parade of horribles. "Allowing an offeree to reject the terms [in] standardized contracts," it predicts, would "force companies like X Corp. to negotiate individually with their millions of customers." P.Br. 15. But there is no special acceptance rule for "standardized contracts." They can be rejected just like any other offer. *See Norcia*, 845 F. 3d at 1287 (rejecting argument that "commercial practicalities" of modern commerce override the "general rule that silence or inaction does not constitute acceptance").[2] If X finds that "millions of its customers" hate X's Terms so much that they each send rejection letters, X should change its Terms. It should not beg the Court to impose its draconian terms upon the populous against their express will.

**B. X's Browser-Wrap Claim Fails Because "Public Search" Is Not an "Unambiguous Manifestation of Assent."**

Apart from rejection, X cannot show that public search is an "unambiguous manifestation of assent." D.Br. 6 (citing *Berman v. Freedom Fin. Network, LLC*, 30 F 4th 849 (9th Cir. 2022)).

---

[2] X tries to distinguish *Norcia* based on the defendant's knowledge. Factually, it is unclear what the defendant knew, as he was "deemed" to have received the Terms. 845 F. 3d at 1283. But even if unaware, notice is only relevant in the face of silence. Here, there was express rejection.

In response, X tries to distinguish *Berman*, arguing that "unambiguous manifestation of assent" is unnecessary because Bright Data "had actual knowledge of the Terms." P.Br. 13. But X conflates the "notice" and "acts" requirements. Knowledge may be a necessary predicate, but it does not *suffice* to infer assent from ambiguous acts. If X said, "if you breathe, you owe me a million dollars," do you need to sign over your bank account just because you are aware of X's demands? No. *Berman* proves this. The "question before [the court was] not whether [defendants were] aware of the mandatory arbitration provision," but whether their acts – clicking a "continue" button in close proximity to the Terms – were so "unambiguous" that they could be "deemed to have manifested assent *to any of the terms* … in the first place." 30 F.4th at 858. In saying no, the court affirmed the need for clear manifestation, not just knowledge.

X effectively concedes the point in trying to distinguish *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220 (9th Cir. 2022). There, the Ninth Circuit rejected the argument that the defendant was bound by debit card terms when he used the card to retrieve confiscated cash. Applying Restatement § 19, the court held that "reasonable minds could not find that [the defendant] objectively manifested assent to the terms … by using [the] card to obtain his ***own*** money." *Id*. at 1229. Without contesting *Reichert's* teaching – that the unilateral exercise of one's own rights is not unambiguous assent – X says the difference here is that Bright Data is not "entitled to access the X platform."[3] P.Br. 17. But this just proves the need for clear manifestation.

That clarity is absent here. X identifies no independent right to prevent Bright Data from accessing public websites. And even if X eventually convinces the Court that such a right exists, its remedy sounds in that other law, not contract. When underlying legal rights are disputed, the loser's conduct is not retroactively transformed into imagined assent to the winner's demands.

"To the victor go the spoils" may describe the outcome in war, but it is not an accurate

---

[3] X also tries to distinguish *Reichert* because the defendant did not have a "reasonable opportunity to reject the offered services." P.Br. 17. But this has nothing to do with whether *conduct* unambiguously communicates assent under Restatement § 19. The "opportunity to reject" concept relates to the Court's separate treatment of the plaintiff's § 69(1) claim. Under § 69(1), there must be (i) a "fail[ure] to reply" and "silence and inaction" in response to an offer; (ii) acceptance of "the benefit of offered services;" and (iii) a "reasonably opportunity to reject them." Rest.2d 69(1). In *Reichert*, the third element was absent. Here, the first element is missing.

reflection of contract formation.  Contract law has a more genial disposition, based on agreement and shared understandings.  A *disagreement* about what meaning to ascribe to an offeree's conduct – such as whether scraping of a public site conveys acceptance of Terms, as X says, or just reflects the exercise of a God-Given right, as Bright Data says – **negates** the meeting of the minds essential to contract formation.  Rest.2d § 20.  The Restatement illustrates:

> "**Illustrations**: … Under a claim of right made in error but in good faith, A digs a well on B's unused land and takes water therefrom… B notifies A that he will charge A $50 a day for every day on which A takes water from his land.  Even after it is adjudicated that A's right is nonexistent, *A does not accept B's terms by taking water.*"  Rest.2d § 69, cmt. e (*citing Wright v. Sonoma Cnty.*, 156 Cal. 475 (1909)).

Here, the lack of assent is even clearer.  X claims the *same* conduct that constitutes assent also constitutes breach.  But X cites no case where a party is deemed to have agreed to a contract by violating it.  In any event, X does not dispute that it knew – with certainty – that Bright Data did not intend its conduct to manifest assent to the Terms.  That is dispositive of contract formation.

**III.    X'S BROWSER-WRAP CLAIM FAILS FOR LACK OF CONSIDERATION.**

X's browser-wrap claim also fails for lack of bargained-for consideration.  In response, X does not attempt to satisfy the "bargained-for" element, or claim that it should be excused from it.  The word "bargain" does not even appear in its brief.  Dismissal is warranted for that reason alone.

Rather than address the "bargained-for" requirement, X focuses on trying to show that Bright Data derives a benefit from scraping the public web, and that X expends resources to develop its own business.  P.Br. 19.  Neither is consideration.  Bright Data surely benefits from its activities, but that does not mean X can claim credit for it.  Consideration requires X to provide something that Bright Data is not legally entitled to.  With no independent right to block Bright Data from scraping, X cannot satisfy this requirement.  Nor does it matter that X spends money on its platform.  It does so for its *own benefit*.  Its investment is not a "detriment" incurred in exchange for a promise.  A seller does not provide consideration when it advertises on a billboard, and X does not provide consideration when it makes information public in its zeal to attract eyeballs.

Rather than show that X provided something that Bright Data could not get on its own, X advances a nonsensical argument.  It says it provides consideration when Bright Data "scrape[s]

and sell[s] information from the platform" (allegedly) in violation of the terms.[4]  *Id*.  But doing something *contrary to* the terms cannot be consideration *supporting* it.  X cites no case where a contractual prohibition, or its violation, provides consideration.  An *obligation* – such as the purported promise not to scrape – is the antithesis of a *benefit* needed for consideration.

Nor does X point to some **other** benefit that supports its purported scraping prohibition.  For account holders, the right to, say, post tweets may serve as a "peppercorn" of consideration, even if that right isn't exercised.  But for browser-wrap assent based on the "tak[ing] of offered services," the accepted services must actually be "offered."  Rest.2d § 69(1).  Here, X says it has "never given [Bright Data's] consent to scrape."  FAC ¶ 71.  By seeking to block all of Bright Data's conduct, there is no remaining peppercorn.  That X can imagine some *hypothetical* use that *others* may enjoy but that Bright Data does not avail itself of (or care about) cannot provide consideration because Bright Data did not "take" or "accept" those benefits.

More importantly, no case holds that website operators provide consideration to the entire world by making information public.[5]  Even X disclaims that outlandish proposition, asserting that it is "not challenging Bright Data's right to internet access."  P.Br. 19-20.  Grasping for some limiting principle, X returns to its mantra that Bright Data is "aware of X Corp's Terms."  *Id*.  But "awareness" of X's draconian terms does not supplant the need to provide consideration.  Posting a sign that says, "I own the Internet," does not make it true and does not confer consideration.  The true limiting principle is the one Bright Data identified:  Does the website operator have an independent right to block the defendant's conduct?  If so, *relinquishing* that right can be consideration.  But X lacks that right and has not relinquished it.  So, there is no consideration.

**IV.   X'S BROWSER-WRAP CLAIM IS PRE-EMPTED BY COPYRIGHT.**

X tries to avoid pre-emption by recasting its claim.  The "essence" of its claim, it now says,

---

[4] X repeatedly asserts that Bright Data "conceded" that its conduct violates the Terms.  Bright Data has done no such thing; it simply has not raised contract *interpretation* issues on this motion.

[5] Contrary to X's assertion, *McLellan v. Fitbit, Inc.*, 2018 WL 1913832 (N.D. Cal. 2018), does not hold that access to a public website is consideration.  *McLellan* had nothing to do with web "access."  It was a product liability case.  The plaintiffs purchased a physical product and signed up for additional subscription services "required for device functionality."  *Id*., at *2.

is not the copying and reproduction of data from its platform, but Bright Data's "access to and permissible uses" of it.  P.Br. 20.  That is just semantics.  Bright Data is accused of scraping publicly available information and selling it.  That claim is pre-empted.  As the Second Circuit held, where the "gravamen of [the] claim" is that the defendant "copied and reproduced [portions of plaintiff's] website," the claim will be pre-empted.  *ML Genius Holdings LLC v. Google LLC*, 2022 WL 710744, *3, *5 (2d Cir. 2022) (pre-empting scraping claim).

        *X's Browser-Wrap Claim Falls Within the Subject Matter of Copyright*.  X asserts that the scraped information does not involve copyright subject matter because "facts and data" are not copyrightable, and X "does not own" the copyrightable user-generated information on its site, such as Tweets and videos.  P.Br. 21.  That explains why X does not have a copyright claim.  But it does not avoid pre-emption.  X does not dispute that pre-emption is broader than the scope of protection since Congress cares just as much about what is protectable as it does about what is available for public use.  *See ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453 (7th Cir.1996) ("Congress has decided [what] should be in the public domain.").  X does not address this principle or the legions of cases applying it.  D.Br. 13-15 (citing cases); ECF 60 (citing cases).

        This principle is dispositive.  As for user-generated content, X's argument – that it can avoid pre-emption because it "does not own" the information – turns Copyright law on its head.  By granting *exclusive* rights to copyright holders, the Act extinguishes third-party rights.  X cannot *gain* rights to that same information by *disclaiming* ownership in it.  *See Genius*, 2022 WL 710744, at *4 (claims relating to lyrics owned by others pre-empted).[6]

        As for "facts and data," X does not grapple with well-settled law that extraction of facts and data from larger copyrightable works falls within the scope of pre-emption.  *See* D.Br. 14 (citing cases, including *Nat'l Basketball Ass'n (NBA) v. Motorola*, 105 F.3d 841 (2d Cir. 1997)).  X does not address these cases, challenge the principle, or dispute its application.  Nor can it.  Congress could have chosen to protect all facts in copyrighted works, but it believed the public's right of access to such information was paramount.  States cannot undo that value judgment.

---

[6] X does not limit its claims specific types of information.  So, if *any* information falls within the scope of pre-emption, the entire claim as pled, is pre-empted.

As such, the only question is whether facts were scraped from a larger copyrightable work. They were. Under now-controlling precedent, "commercial websites are copyrightable." *Best Carpet Values, Inc. v. Google, LLC*, 90 F.4th 962, 971 (9th Cir. 2024). Having asserted copyright over its own site, X does not and cannot contest this. Instead, advancing a strawman, X says that *Best Carpet* does not control because Bright Data does not "display or duplicate the X website" in its entirety. P.Br. 23. But accepting this argument would mean overruling *NBA*. Pre-emption is not limited to wholesale copying of entire works. Just as copyright *protection* applies to copying of any copyrighted *element*, pre-emption applies to copying of any element from a copyrightable work. Put simply, neither protection nor pre-emption is limited to copying entire works of art.

This principle renders the distinction between "facts" and other creative content irrelevant. The only case X cites, *Facebook, Inc. v. ConnectU LLC*, 489 F. Supp. 2d 1087 (N.D. Cal. 2007), undermines its argument that "claims based on unprotectible elements of social media websites [are not] preempted." P.Br. 22. There, the court *agreed* that copying of uncopyrightable elements – there, email addresses – would be pre-empted if "those addresses are … 'elements' of some larger work of authorship that is within the scope of copyright law." *Id*. (citing *NBA*). But analogizing websites to old-school bulletin boards, the court held that websites "as a whole" are not copyrightable. *Best Carpet* overruled that aspect of the case. So, while *ConnectU's* rationale – that claims relating to scraping facts from larger copyrightable works are pre-empted *if* websites are copyrightable – is good law, its *holding* – that such claims are not pre-empted because websites are not copyrightable – is not. Rather, under *Best Carpet*, scraping facts from a website is no different from scraping facts from a TV program or a book. All are subject to pre-emption.

**X Asserts Rights Equivalent to Copyright with No "Extra Element."** X seeks to use contract to stop Bright Data's efforts to "scrape and sell information from the [X] platform." P.Br. 19; FAC ¶¶ 1, 34. But scraping *is* copying, and selling *is* publication—both exclusive rights reserved for the Copyright Act. While X tries to recast its complaint to focus on "access," it does not allege that Bright Data accessed the site for any reason except to copy information. X cannot avoid pre-emption simply by specifying the manner by which the copying occurs. A state law is not saved from pre-emption just because it prohibits copying by Xerox, photo, or pencil and paper.

For the same reason, X cannot avoid pre-emption by limiting its claim to automated scraping.

With no extra element lurking in its own allegations, X turns to misstating the law. "Every federal court of appeals to have issued a published opinion," it incorrectly asserts, "has agreed that the Copyright Act does not preempt a contract claim because of the extra elements of contract formation and the making of a legally binding promise." P.Br. 22 n.71. But the Ninth Circuit is not among them; and the Second, Fifth, Sixth, and Seventh Circuits *expressly* reject X's position.[7] As the California Supreme Court explained after canvassing the legal landscape, while "[a] few courts have concluded that breach of contract actions are never preempted … because the promise to perform automatically constitutes the extra element," those "courts are in the *distinct minority*." *Kabehie v. Zoland*, 102 Cal. App. 4th 513, 525 (2002).

To be sure, some contract claims will escape pre-emption because the challenged conduct does not involve copying or publication, but rather "use," which is not an exclusive copyright right. 17 U.S.C. § 106. Indeed, most of X's cases are "use" cases. In *Blizzard*, the defendant's bots played video games, and in *Autoposterpro*, the defendant used "automated posting devices." But playing games and posting one's own information is not copying another's. *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 957 (9th Cir. 2010); *Craigslist, Inc. v. Autoposterpro, Inc.*, 2009 WL 890896, *2 (N.D. Cal. 2009); *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089-90 (9th Cir. 2005) (distinguishing copying from use); *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 432 (8th Cir. 1993) ("use" is not "one of the acts reserved" to the Act).[8]

---

[7] *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 457 (6th Cir. 2001) ("we do not embrace the proposition that all state law contract claims survive preemption simply because they involve the additional element of promise."); *ProCD*, 86 F.3d at 1445 ("We think it prudent to refrain from adopting a rule that anything with label 'contract' is necessarily outside the preemption clause."); *Genius*, 2022 WL 710744, at *4 ("a per se rule that all breach of contract claims are exempt from preemption … would be in tension with our precedent.'"); *Ritchie v. Williams*, 395 F.3d 283, 287 (6th Cir. 2005) (pre-empting claims relating to a "partnership agreement" designed to "control the ownership, performance rights and exploitation of copyrights on songs written by Kid Rock."); *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 270 (5th Cir. 1988) (claim relating to breach of license agreement pre-empted);

[8] *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317 (Fed. Cir. 2003), is inapposite because the conduct – reverse engineering – is largely a "use," even though it involves incidental copying. Notably, the minority would have nonetheless found pre-emption because it involved shrinkwrap. *Id.* at

In contrast, when the gravamen of the claim involves the copying and publication of data, the fact that the restriction is embodied in a contract does not avoid pre-emption. *Vault*, 847 F.2d at 269 (preempting claim for breach of contract in which licensees agreed not to "copy, modify, translate, convert to another programming language, decompile or disassemble"). This is especially so where, as here, the claim involves a contract of adhesion and acceptance is merely *implied* in fact or in law.[9] Here, there is no promise to pay; no other services provided or used; and no conduct at issue other than the copying and selling of data from the X platform. Those are exclusive copyright rights. X's browser-wrap claim is pre-empted.

### V.   X CANNOT FORESTALL SUMMARY JUDGMENT ON ITS BROWSER-WRAP CLAIM BY SEEKING FURTHER DISCOVERY ON ITS CLICK-WRAP CLAIM.

X devotes the bulk of its brief trying to avoid the merits of its browser-wrap claim. It argues its own browser-wrap claim is "purely hypothetical and academic" because there are fact issues about whether Bright Data properly terminated its accounts. P.Br. 2. If Bright Data still has an account, X muses, then it might not need to rely on browser-wrap. But X cannot stave off dismissal just because it asserts a different claim *in the alternative*. When X filed suit, it advanced both click-wrap and browser-wrap theories, even before any account termination. ECF 1 ¶¶ 34, 60. It maintained both theories in its Amended Complaint, and even now, it asserts that, as a "**former X account holder**," Bright Data was "aware of the Terms" and "formed an enforceable 'browser-wrap' contract with X Corp. by continuing to access the X Services." FAC ¶¶ 40, 67, 80, P.Br. 7, 12. X's browser-wrap claim, therefore, is not a "hypothetical inquiry the Court need

---

1338 (Dyk, J.) ("*Vault* states the correct rule: state law authorizing shrink-wrap licenses that prohibit reverse engineering is preempted."). Nor is *Craigslist, Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 977 (N.D. Cal. 2013), persuasive because it adopted the minority view that contracts are "not the sort" claims "preemption primarily targets." Even so, it held that a contract "claim might be preempted" if it is "based solely on the reproduction of copyrighted content."

[9] *See Best Carpet*, 90 F.4th at 967 ("implied-in-law" contract claims without additional consideration are pre-empted); *Endemol Ent. B.V. v. Twentieth Television Inc.*, 1998 WL 785300, *1 (C.D. Cal. 1998) ("implied contract" claim pre-empted where the parties "understood that disclosure … was made in confidence and that Plaintiff would be compensated for any subsequent use" was pre-empted); *Metrano v. Fox Broad. Co.*, 2000 WL 979664, *6 (C.D. Cal. 2000) (same); *Selby v. New Line Cinema Corp.*, 96 F. Supp. 2d 1053, 1062 (C.D. Cal. 2000) ("implied-in-fact contract … equivalent to the exclusive rights protected by the Act.").

not reach," as X asserts, but a live case or controversy. P.Br. 7. It is ripe for adjudication.

Nor does X assert that that it needs *any* discovery to respond to Bright Data's browser-wrap arguments. To seek a "continuance on a motion for summary judgment" under Rule 56(d), X must "show[] by affidavit or declaration that, for *specified reasons*, it cannot present facts *essential* to justify its opposition" to Bright Data's motion. Fed. R. Civ. P. 56(d); *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008). Vague arguments about how further facts are "generically relevant" to the parties' dispute do not suffice. *Id*. Rather, X must identify "specific facts it hopes to elicit," and why those facts would "prevent summary judgment." *Id*.; *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 921 (9th Cir. 1996). X's Rule 56(d) declaration – consisting of a single paragraph in the Pillifant declaration – does not conform to the Rule. *Family Home*, 525 F.3d at 827 ("Failure to comply with [the Rule's] requirements is a proper ground for denying discovery and proceeding to summary judgment.").

Mr. Pillifant says there are "factual disputes relating to this Motion." ECF 69-4 ¶ 19. But counsel's opinion about the existence of a factual dispute is not the same as demonstrating need for specific discovery to respond to the motion. Though Bright Data's motion focused on assent, consideration, and pre-emption, Mr. Pillifant does not mention any of these issues. Nor could he, as they are all legal issues. Indeed, virtually all the discovery X seeks is directed to X's click-wrap claim, not its browser-wrap claim. Specifically, X says it wants discovery into "what accounts Bright Data owns, controls, or manages," and "whether such accounts were properly terminated." P.Br. 1. But account information is irrelevant to a browser-wrap claim. The only browser-wrap discovery X seeks concerns Bright Data's alleged "knowledge and awareness of X Corp.'s terms *at any time*." ECF 69-4 ¶ 19. But as X notes, Bright Data "does not – and cannot – dispute that it has actual notice of X Corp's Terms" after it sent its rejection letter on September 25, 2023. P.Br. 13. And because Bright Data "does not move for summary judgment regarding [activities] prior" to that date, *see id.* at 6, there is nothing left to discover. It is time to get to the merits.

### VI. X CANNOT FORESTALL SUMMARY JUDGMENT CLAIMS WITH UNPLED COMPLAINTS ABOUT IMPERFECT TERMINATION.

Beyond browser-wrap, X seeks to forestall summary judgment on its forward-looking

claim by asserting that Bright Data has three active X accounts. But these surprise *unalleged* account-based claims cannot stave off summary judgment on X's forward-looking claims.

Though X tries to bind Bright Data to its Terms in perpetuity by quibbling about the termination process, it is certainly not impossible to terminate the parties' relations. X does not deny that the relationship is **terminable at will**. Nor does X deny that Bright Data attempted to terminate all agreements with X when it served notice on September 25, 2023. While X now plays "gotcha" with these surprise claims, it does not bring a breach of contract claim for improper termination. Nor does it claim that any (unalleged) non-compliance with the termination process was material or that X suffered injury from it. So, any imagined complaint is irrelevant.

Even aside from the unasserted improper termination claim, there is no merit to X's argument. X sued only on a single account: @bright_data. *See* FAC ¶ 41. X does not dispute that this account was validly terminated on September 25, 2023. Because the survival clause in effect at account termination expressly excluded the prohibition on scraping, *see* ECF 49-1, Ex. 1, the only *asserted* forward-looking click-wrap claim is dead.[10]

Nor can X delay judgment on **unasserted** contract claims relating to three different **unpled** accounts. Even if X could sue on these accounts, it would do it no good. X's reliance on the @hola_org account as "still active" is disingenuous. P. Br. 1. Bright Data brought this account to X's attention on September 25, 2023, serving "formal notice of account termination, effective immediately." ECF 62-1, Exs. 1, 2. As Bright Data noted, it was forced to terminate the account by letter, rather than online, because "the X platform [was] malfunctioning and X has not responded to Bright Data's inquiries for technical assistance." *Id*. X did not respond or claim that the termination was ineffective. Nor can it. *See* Rest.2d § 261 ("impracticability" discharges

---

[10] X argues that, even if the "account" was terminated, the "agreement" lives on as long as Bright Data scrapes. P.Br. 2. This is a red-herring. The Terms do not say how long one has to stop using the services before the agreement ends. Because courts do not infer lifetime promises from ambiguous contracts, the only reasonable interpretation is that the agreement ends when a user first logs off after account deactivation. A contrary interpretation would mean the agreement lasts in perpetuity or springs back from the dead days or centuries later. Moreover, X is wrong that scraping is a "use" of the service. The Terms expressly distinguish between "use" and "access." Scraping involves the latter, but only the former (supposedly) delays termination.

technical performance). Thus, this account was properly terminated as of September 25, 2023.

Similarly, X's attempt to sandbag Bright Data with two long-dormant unalleged accounts opened by two former employees fails. Bright Data's termination letter was effective as to **all** X accounts, as the Terms do not say that website deactivation is the exclusive termination method. Moreover, when Bright Data sent its termination letter *five* months ago, it informed X that it had terminated all X accounts it was aware of, and specifically asked X to identify "any additional Twitter or X accounts" in X's systems associated with Bright Data so they can be investigated and terminated. ECF 62-1, Exs. 1, 2. X stayed silent and omitted them from its Amended Complaint, preferring litigation games instead.

But even if X had sued upon them, its claim would still fail. X's own exhibits show no posts, tweets, or other activity on the @luminatinetwork account since 2018. ECF 69-5, Ex.3. Unlike Bright Data accounts, which were opened in the name of Bright Data, @luminatinetwork was opened with a personal Hotmail account, and the content concerns sports and retweets about unrelated ad agencies. *Id*.; ECF 69-3; Exs. 5-6. It does not bind Bright Data. Similarly, there has been no activity on the @luminati_proxy account since *2016*, a mere *five* days after it was opened. ECF 69-5, Ex. 4. It too was opened by a former employee and was "***deactivated***" eight years ago. *Id*. Though X latches on to an apparent glitch in its system showing *simultaneous* reactivation, it submits no evidence of use after deactivation, with the last activity a week *before* deactivation. In any event, X submits no evidence that either account is currently being used by Bright Data, or is under Bright Data's control. Ex. 6. If X wants to take the position that these accounts belong to Bright Data, it should deactivate them rather than try to hold Bright Data hostage.[11]

### VII.   CONCLUSION.

For the foregoing reasons, Bright Data's motion for summary judgment should be granted.

---

[11] X argues that "even if Bright Data had deactivated its accounts and discontinued its use," Bright Data's conduct would still be "barred by the Terms' survival clause." P.Br. 11. ***X fails to disclose that it amended its Terms to include this survival clause <u>four days</u> after account termination***. *See* ECF 49-1, Exs. 4, 5. X does not dispute that the survival clause in effect at the time of account termination ***expressly excluded*** the anti-scraping provision at issue. *Id*.

| | |
|---|---|
| Dated: February 14, 2024 | Respectfully submitted,<br><br>*/s/ Colin R. Kass*<br>Colin R. Kass*<br>PROSKAUER ROSE LLP<br>1001 Pennsylvania Ave., N.W.<br>Washington, D.C. 20004<br>(202) 416-6890<br>ckass@proskauer.com<br><br>David A. Munkittrick*<br>PROSKAUER ROSE LLP<br>Eleven Times Square<br>New York, New York 10036<br>(212) 969-3000<br><br>Robert C. Goodman (Bar No. 111554)<br>Lauren Kramer Sujeeth (Bar No. 259821)<br>ROGERS JOSEPH O'DONNELL, PC<br>311 California Street, 10th Floor<br>San Francisco, CA 94104<br>(415) 956-2828<br>rgoodman@rjo.com<br>lsujeeth@rjo.com<br><br>Sehreen Ladak (Bar No. 307895)<br>PROSKAUER ROSE LLP<br>2029 Century Park East, Suite 2400<br>Los Angeles, CA 90067-3010<br>(310) 284-5652<br>sladak@proskauer.com<br><br>*Attorneys for Defendant Bright Data Ltd.*<br>**Admitted pro hac vice* |