Colin R. Kass (*pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick (*pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

*Attorneys for Defendant Bright Data Ltd.*
*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X Corp.,<br><br>     Plaintiff,<br><br>   v.<br><br>BRIGHT DATA LTD.<br><br>     Defendant. | Case No.  23-cv-03698-WHA<br><br>Hon. William H. Alsup<br>Courtroom 12 – 19th Floor<br>July 25, 2024 at 8 a.m. |

## **BRIGHT DATA'S MOTION TO DISQUALIFY QUINN EMANUEL**

## NOTICE OF MOTION

PLEASE TAKE NOTICE that the hearing on Bright Data's Motion to Disqualify Quinn Emanuel will take place on July 25, 2024, at 8:00 AM.

The motion seeks disqualification of X's new counsel, Quinn, Emanuel, Urquhart & Sullivan, LLP ("Quinn"), under the California Rules of Professional Conduct ("RPC").

## STATEMENT OF ISSUES TO BE DECIDED

1.      Does RPC 1.9(a), and associated case law, prohibit Quinn from representing X in this matter, because *current* Quinn attorneys previously represented Bright Data in connection with the "substantially related" matter *Meta Platforms, LLC v. Bright Data Ltd.*, 23-cv-00077 (N.D. Cal.)?

2.      Does RPC 1.9(b), and associated case law, prohibit Quinn from representing X in this matter, because Quinn obtained, or is presumed to have obtained, confidential Bright Data information, including client confidences, attorney-client privileged information, and attorney work product in connection with its prior representation of Bright Data?

3.      Does RPC 1.10(a), and associated case law, require that Quinn be disqualified?

## **TABLE OF CONTENTS**

I.      INTRODUCTION. ................................................................................................ 1

II.     FACTUAL BACKGROUND. ............................................................................ 3

III.    STANDARD OF REVIEW. .............................................................................. 7

IV.   THE DUTY OF LOYALTY PRECLUDES QUINN FROM SWITCHING
SIDES. .............................................................................................................. 8

V.    THE DUTY OF CONFIDENTIALITY PRECLUDES QUINN FROM
SWITCHING SIDES. ..................................................................................... 14

VI.   DISQUALIFICATION IS REQUIRED TO PRESERVE THE INTEGRITY OF
THE CLIENT RELATIONSHIP. .................................................................... 18

VII.  CONCLUSION. ............................................................................................... 20

1

2

### <u>TABLE OF AUTHORITIES</u>[1]

3

**Cases**          **Page**

*Advanced Messaging Techs., Inc. v. EasyLink Servs. Int'l Corp.*,
    913 F. Supp. 2d 900 (C.D. Cal. 2012) ...................................................11

*Avocent Redmond Corp. v Rose Elecs.*,
    491 F.Supp.2d 1000 (W.D. Wash. 2007)...............................................10

*Avra Surgical, Inc. v. Dualis MedTech GmbH*,
    2014 WL 2198598 (S.D.N.Y. 2014)....................................................8, 9

*Bell N. Rsch., LLC v. ZTE Corp.*,
    2019 WL 1590472 (S.D. Cal. 2019) ....................................................17

*Blake v. S. California Edison Co.*,
    2020 WL 3262832 (Cal. Ct. App. 2020) ..............................................17

*Bold Ltd. v. Rocket Resume, Inc.*,
    2024 WL 589116 (N.D. Cal. 2024) ......................................................20

*Decaview Distribution Co. v. Decaview Asia Corp.*,
    2000 WL 1175583 (N.D. Cal. 2000) ......................................................9

*Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*,
    20 Cal. 4th 1135 (1999) ................................................10, 14, 15, 20

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
    2019 WL 144589 (N.D. Cal. 2019) ........................................10, 11, 13, 19

*Don Westerman, Inc. v. Vill. of Forsyth*,
    2020 WL 12811853 (C.D. Ill. 2020)......................................................8

*Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*,
    809 F. Supp. 1383 (N.D. Cal. 1992) ........................................7, 14, 18

*ESC-Toy Ltd. v. Sony Interactive Ent. LLC*,
    2024 WL 1335079 (N.D. Cal. 2024) ....................................................11

*Farhang v. Indian Inst. of Tech.*,
    2009 WL 3459455 (N.D. Cal. 2009) ....................................................14

[1] Unless otherwise noted, all emphasis added, initial capitalizations conformed without brackets, and internal citations and quotation marks omitted.  "Ex." refers to exhibits accompanying the Declaration of David Munkittrick.

*Farris v. Fireman's Fund Ins. Co.*,
  119 Cal.App.4th 671 (2004) ...................................................................15

*Flake v. Arpaio*,
  2015 WL 13743445 (D. Ariz. 2015)..........................................................8

*Flatt v. Superior Ct.*,
  9 Cal. 4th 275 (1994) ...............................................................8, 9, 10, 11,15

*FMC Techs., Inc. v. Edwards*,
  420 F. Supp. 2d 1153 (W.D. Wash. 2006)..................................................9

*Hewlett-Packard Co. v. EMC Corp.*,
  330 F. Supp. 2d 1087 (N.D. Cal. 2004) ....................................................17

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022) ...............................................................1, 4

*Jessen v. Hartford Cas. Ins. Co.*,
  111 Cal.App.4th 698 (2003) ........................................................... *passim*

*Kirk v. First Am. Ins. Co.*,
  183 Cal.App.4th 776 (2010) ....................................................................19

*Klein v. Facebook, Inc.*,
  2021 WL 3053150 (N.D. Cal. 2021) ........................................................20

*Klein v. Superior Ct.*,
  198 Cal.App.3d 894 (Ct. App. 1988).........................................................18

*Knight v. Ferguson*,
  149 Cal.App.4th 1207 (Cal. App. 2d Dist. 2007) ...............................2, 10

*Koch v. Koch Indus.*,
  798 F. Supp. 1525 (D. Kan. 1992)..............................................................9

*Largo Concrete, Inc. v. Liberty Mut. Fire Ins. Co.*,
  2008 WL 53128 (N.D. Cal. 2008) ............................................................18

*MD Helicopters, Inc. v. Aerometals, Inc.*,
  2021 WL 1212718 (E.D. Cal. Mar. 31, 2021) ..........................................11

*Meza v. H. Muehlstein & Co., Inc.*,
  176 Cal.App.4th 969 (2009) ....................................................................18

*MMCA Grp., Ltd. v. Hewlett-Packard Co.*,
  2007 WL 607659 (N.D. Cal. 2007) ..........................................................13

*Monster Energy Co. v. Vital Pharms., Inc.*,
  2018 WL 6431870 (C.D. Cal. 2018)..........................................................12

*O'Hagins, Inc. v. LGI LLP,*
  2017 WL 11665634 (C.D. Cal. 2017) ..................................................................9

*Openwave Sys. Inc. v. Myriad France S.A.S.,*
  2011 WL 1225978 (N.D. Cal. 2011) (Alsup, J.) ..............................................9, 19

*Pallon v. Roggio,*
  2006 WL 2466854 (D.N.J. 2006) ...................................................................8, 9

*Rosenfeld Constr. Co., Inc. v. Superior Ct.,*
  235 Cal.App.3d 566 (Ct. App. 1991) ...........................................................9, 18

*San Francisco v. Cobra Sols., Inc.,*
  38 Cal. 4th 839 (2006) ....................................................................................8

*SC Innovations, Inc. v. Uber Techs., Inc.,*
  2019 WL 1959493 (N.D. Cal. 2019) ................................................................11

*Talon Rsch., LLC v. Toshiba Am. Elec. Components, Inc.,*
  2012 WL 601811 (N.D. Cal. 2012) (Alsup, J.) ...............................................7, 8

*Touchcom, Inc. v. Bereskin,*
  299 F. App'x 953 (Fed. Cir. 2008) ..................................................................8

*Trone v. Smith,*
  621 F.2d 994 (9th Cir. 1980) ......................................................................9, 10

*U.S. v. Avanade Inc.,*
  2015 WL 13886329 (W.D. Wash. 2015) ...........................................................7

*Vaxmonsky v. Costco Wholesale Corp.,*
  2022 WL 20955638 (C.D. Cal. 2022) ..............................................................14

*ViChip Corp. v. Lee,*
  2004 WL 2780170 (N.D. Cal. 2004) ..........................................................11, 14

**OTHER AUTHORITIES**

ABA Formal Opinion 497 (2021) .....................................................................8, 10

Cal. Model Rules of Professional Conduct ................................................... *passim*

Hazard, et al., *The Law of Lawyering* (4d ed. 2023) .................................8, 10, 12, 17

## I.    INTRODUCTION.

When Meta and Bright Data filed dueling lawsuits against each other, Bright Data engaged Quinn, Emanuel, Urquhart & Sullivan, LLP for advice.   Now, Quinn has switched sides, representing X in suing Bright Data to prevent public web scraping and to shut down the same services at issue in the *Meta* case.   Doing so violates the core tenets of loyalty and confidentiality under California's Rules of Professional Responsibility.   Quinn must be disqualified.

When Bright Data engaged Quinn, Quinn had just concluded its litigation (on behalf of a scraper) of the highest-profile scraping case ever filed in the federal courts.   Though it ultimately lost the bulk of the case on summary judgment, Quinn succeeded in establishing the principle, cited by this Court in dismissing X's First Amended Complaint, that giving social media companies "free reign to decide ... who can collect and use data … risks the possible creation of information monopolies that would disserve the public interest."   *See* ECF 83 at 2 (quoting *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022)).   Having litigated against one of the most dominant social media platforms – and having secured a ruling supporting the core principle undergirding Bright Data's business and mission – Bright Data sought Quinn's counsel and advice.

Quinn jumped at the opportunity, touting its experience representing scrapers and battling social media platforms.   Bright Data formally engaged Quinn to provide behind-the-scenes strategic advice concerning the litigation.   Quinn was paid nearly $40,000, prepared a detailed strategic assessment, and participated in multiple calls and virtual meetings with Bright Data's senior leaders, including its General Counsel, CEO, and the board.   This was not merely a pitch for a prospective client, but a full-blown, paid-for engagement.

Quinn's attempt to lead Bright Data into battle failed, however, and ultimately, Bright Data secured the victory that Quinn was unable to obtain for hiQ.   Unable to represent the leading public web data company, and fresh off a stinging loss in the *hiQ* case, Quinn decided to switch sides. After this Court dismissed X's complaint, X hired Quinn to help revive it.   But because the *Meta* and *X* cases are "substantially related" – involving virtually identical conduct, claims, defenses,

and legal issues – California's ethics rules preclude Quinn from representing X.

Both the duties of loyalty and confidentiality compel disqualification.  The duty of loyalty precludes a firm from switching sides on substantially related matters.  X previously represented to this Court that the *X* and *Meta* cases "involve[] similar allegations of data scraping from social media platforms" and overlapping legal issues.  ECF 51 at 10.  Indeed, X's Complaint largely mirrors Meta's allegations, in many instances copying allegations verbatim.  In providing strategic litigation advice to Bright Data, Quinn recognized that the *Meta* case could set precedent for any future claims by other website operators, and advised Bright Data on how it might seek to vindicate its business model through litigation.  But now it seeks the opposite: to drive a stake through Bright Data's business.  The duty of loyalty does not permit this.  *Knight v. Ferguson*, 149 Cal.App.4th 1207, 1216 (2007) ("The law regards the shifting of loyalty and allegiance from one of two adverse interests to the other as impossible, and will have none of it.").

The duty of confidentiality also prevents Quinn from switching sides.  When successive matters are "substantially related," the exchange of confidential information is "conclusively presumed" as a matter of law.  This avoids requiring a former (or current) client to disclose attorney-client communications in order to seek (or resist) disqualification.  Indeed, it is hard to fathom how Quinn could even respond to this motion *factually* without Quinn's Bright Data Team improperly disclosing privileged attorney-client communications to its X Team.

But even aside from any presumption, Quinn became privy to Bright Data's core client confidences.  Just as any lawyer would and must do, Quinn probed Bright Data for information to enable it to provide detailed strategic advice.  This advice concerned, not just Bright Data's dealings with Meta, but also information about Bright Data's business, technology, priorities, and objectives.  Quinn also *received* attorney-client privileged and attorney work product from Bright Data's litigation counsel discussing the *Meta* litigation, strategy, and Quinn's strategic assessment.  Quinn then participated in a lengthy meeting with Bright Data's Board, senior leaders, and litigation counsel, discussing how best to defeat what Quinn has publicly stated were "unconscionable" efforts by dominant social media platforms to control the Internet.  Litigation

strategy, including discussions about the strength and weaknesses of claims and defenses, are client secrets or confidences worthy of protection.

Before joining arms with X, Quinn must have known that its representation of Bright Data posed a conflict.  It had a formal, executed engagement with Bright Data, sent invoices to Bright Data, and received payments from Bright Data.  A large, global firm like Quinn certainly has robust processes to identify potential conflicts before engaging a new client or new matter.  Yet Quinn remained silent while it worked on X's Second Amended Complaint, only disclosing its involvement late last week, days before filing.  It did not provide any notice to its former client.  When it appeared, it excluded the lawyers who had developed expertise in scraping matters, presumably because of the fact they worked on the *hiQ* and Bright Data matters, and were thus conflicted.  But the *firm* is disqualified, not just particular lawyers.  The rules of imputed conflicts do not allow Quinn, or any of its lawyers, to turn on its former client.  Lawyers may switch firms, but firms may not switch sides.  Quinn must be disqualified.

## II.    FACTUAL BACKGROUND.[1]

On January 6, 2023, Bright Data and Meta filed competing lawsuits in Delaware state court and the Northern District of California.  Bright Data sought a Declaratory Judgment that its scraping services neither violated Meta's contractual rights nor any other law.  Meta, conversely, asserted that Bright Data breached its Terms of Service and tortiously interfered with third-parties.

On February 15, 2023, while the parties were engaged in preliminary motion practice, Bright Data's General Counsel, Mor Avisar, reached out to Hope Skibitsky at Quinn, seeking to retain its services.  Avisar Decl., Ex. 1 ¶ 3.  Ms. Skibitsky and her colleagues, including Adam Wolfson and Zane Muller, were fresh off their representation of hiQ in the highly publicized and long-running litigation, *hiQ v. LinkedIn*, 17-cv-03301 (N.D. Cal.).

In that matter, the Ninth Circuit ruled in hiQ's favor on the question of whether logged-off,

---

[1] In order to preserve Bright Data's attorney-client privilege, Bright Data is not disclosing the substance of any communications between Quinn and Bright Data or the substance of Quinn's advice or assessments, but rather is limiting its recitation of facts to public information or information that would otherwise appear on a Privilege Log.

or public scraping, violated the Computer Fraud and Abuse Act.  Central to the Ninth Circuit's ruling was its view that "giving companies like LinkedIn free rein to decide, on any basis, who can collect and use data — data that the companies do not own, that they otherwise make publicly available to viewers, and that the companies themselves collect and use — risks the possible creation of information monopolies that would disserve the public interest."  *hiQ Labs Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022).  This was a watershed ruling, essentially eliminating liability for scrapers under the CFAA.  But the case was not over.  Litigation in the district court proceeded on other theories, including breach of contract.  On November 4, 2022, the district court, Judge Edward Chen presiding, granted summary judgment in LinkedIn's favor on the question of whether logged-on, or non-public search, violated LinkedIn's Terms.  639 F.Supp.2d 944 (N.D. Cal. 2022).  The Court left certain issues open relating to logged-off search, but the judgment in LinkedIn's favor killed most of hiQ's defenses, and the matter soon settled.

Despite Quinn's *hiQ* loss, Bright Data was still interested in Quinn's counsel given its experience litigating scraping cases against social media giants.  Bright Data formally engaged Quinn to provide a detailed strategic assessment of the *Meta* cases, with fees prior to the entry of appearance in the litigation capped at $40,000.  Ex. 2.  In their Engagement Letter, the parties agreed that Quinn would "provid[e] an analysis of the Litigation, including an analysis of the arguments that may be raised and defended against in the Litigation and an overview of what [Quinn] sees as potential next steps in the Litigation, and participat[e] in calls with Bright Data's senior management to answer any questions arising following review of our analysis by Bright Data's senior management."  Ex. 2 at 2.  "In order [for Quinn] to represent [Bright Data] effectively," Bright Data also committed to "provide [Quinn] with complete and accurate information regarding the subject matter of the Engagement, and [to keep Quinn] informed on a timely basis of all relevant developments."  *Id*. at 4.

Quinn got to work immediately.  It prepared a series of questions for Bright Data regarding its business, the litigation, its priorities, and strategies, which it discussed with Bright Data's general counsel telephonically on or about February 26, 2023.  Avisar Decl., Ex. 1 ¶ 9.  Bright

Data also provided confidential documents to Quinn, at its request.  *Id*.  On March 2, 2023, Quinn sent a detailed 24-page (single spaced) assessment of Bright Data's litigation and other strategies, including procedural considerations, substantive arguments, potential affirmative defenses and counterclaims, discovery, and other potential avenues of attack (the "Quinn Report").  *Id*. ¶ 10. Importantly, the Quinn Report focused not just on Bright Data's continued ability to scrape Meta, it "approached the analysis' from the perspective that the Meta litigation could have implications 'beyond [the] particular dispute' with Meta, including Bright Data's legal rights with respect to '*others like Meta*' who may try to enforce their Terms of Service." *Id*.

After receiving the Quinn Report, Bright Data asked its current Litigation Counsel to review the Report and comment on Quinn's proposed strategy.  Bright Data provided Litigation Counsel's responsive analysis to Quinn, and scheduled an all-hands video meeting on March 12, 2023 to discuss.  *Id*. ¶¶ 11-13.  The meeting included Bright Data's board, its CEO, its General Counsel, three lawyers from Quinn (Ms. Skibitsky, Mr. Wolfson, and Mr. Muller), and two lawyers from Bright Data's current Litigation Counsel.  *Id*.  Over several hours, the client and the two outside law firms discussed website operators' claims, the likely defenses to such claims, and the procedural and substantive strategies to best advance Bright Data's principal contention that it had an unqualified right to freely search the public web.  *Id*. ¶ 14.  As with the Quinn Report, the discussion was not limited to Meta's claims, but also focused on implications for future litigations and website operators' legal attacks to Bright Data's services.  *Id*.  Following the all-hands meeting, Bright Data continued with its current litigation counsel, and the Quinn Engagement came to an end.  *Id*. ¶ 15.

While the *Meta* case was pending, X Corp. filed suit against Bright Data on July 26, 2023. ECF 1.  X's initial Complaint was a copycat, modeled extensively on Meta's.  X subsequently amended the Complaint to add a few additional claims in response to Bright Data's motion to dismiss.  *See* ECF 36.  But the similarities persist.  As the following chart shows, the facts, claims, and issues are virtually identical in both cases:

| Meta Complaint | X Proposed Second Amended Complaint |
|---|---|
| 31. "Defendant was bound by Facebook's and Instagram's Terms and Policies." | 76. "Defendant … is … bound by those Terms." |
| 77. "All Facebook and Instagram users must agree to the Facebook and Instagram Terms." | 124. "All X users must agree to abide by the Terms..." |
| 78. "Defendant is aware that the Facebook and Instagram Terms govern…" | 125. "As a user of X Corp.'s platform, … Defendant is aware of the Terms…" |
| 35. "Defendant used its Facebook and Instagram accounts to promote its automated scraping services…" | 82. "Defendant … used these X accounts to … promote their data-scraping products and services…" |
| 36. "Defendant has used automated means to scrape and facilitate the scraping of data from Facebook and Instagram." | 83. "Defendant … has engaged in widespread scraping of X Corp.'s data, … Defendant has also facilitated the scraping of data from X..." |
| 57. "Defendant took these steps to evade Meta's detection systems…" | 95. "[Bright Data's] tool … is designed to evade anti-scraping measures..." |
| 68. "Defendant has breached … Instagram's Terms and Facebook's Terms [by] (i) using automated means without Meta's permission to scrape data …, (ii) facilitating others to scrape data from Facebook and Instagram without Meta's permission, and (iii) selling data obtained from Facebook or Instagram." | 115. "Defendant has repeatedly violated the Terms … by (i) accessing the X platform through automated means without specific authorization from X Corp.; (ii) scraping data from the X platform …; (iii) selling tools that enable others  … to scrape data; … and (v) selling data … scraped from the X platform." |
| 80. "By offering services and tools designed to scrape data from Facebook and Instagram … Defendant induced a breach or disruption of [Meta's] Terms by other … users." | 128. "By offering services and tools designed … to scrape data from the platform, Defendant induced a breach or disruption of the Terms by X users." |
| 8. "The Court has personal jurisdiction … because Facebook's Terms … contain a forum selection clause…" | 9. "This Court has personal jurisdiction … because … X Corp.'s Terms … require all disputes … be brought in … California." |
| 10. "Defendant knowingly directed and targeted its conduct at California and at Meta, which has its principal place of business in California." | 10. "Defendant knowingly directed prohibited conduct to California … and [at] X Corp., which has its principal place of business in California…" |

Following this Court's dismissal of X's First Amended Complaint, X retained Quinn as lead counsel going forward. Quinn entered its appearance on June 4, 2023. *See* ECF 84-86. Just

two days later, on June 6, 2022, Quinn filed a Motion for Leave to Amend the Complaint, asserting the same claims X had previously asserted.  The Quinn lawyers appearing in this matter are not the same as those that billed time to the Bright Data matter.  But the lawyers who worked on the Bright Data engagement remain at Quinn.  And all the Quinn attorneys on both matters work in the same two offices (New York and San Francisco).

## III.     STANDARD OF REVIEW.

"Every attorney before this district court must comply with the standards of professional conduct required of the members of the State Bar of California."  *Talon Rsch., LLC v. Toshiba Am. Elec. Components, Inc.*, 2012 WL 601811, *1 (N.D. Cal. 2012) (Alsup, J.).  "Accordingly, California law governs the issue of disqualification."  *Id.*   Under California Model Rule of Professional Conduct 1.9,

> "(a)     A lawyer who has formerly represented a client in a matter ***shall not*** thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client [absent informed consent]; [and]

> (c)     A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter ***shall not*** thereafter … use [or] reveal [the client's confidential information except as specified]."  RPC Rule 1.9.

As the Comments to the Rule make clear, this imposes ***two*** separate and independent duties on counsel with respect to former clients:  "The lawyer may not (i) do anything that will injuriously affect the former client in any matter in which the lawyer represented the former client, ***or*** (ii) at any time use against the former client knowledge or information acquired by virtue of the previous relationship."  *See id.*, Comment 1 (citing cases).[2]

These Rules are "written in the disjunctive," and emanate from two separate ethical canons: the duty of loyalty preventing lawyers from switching sides in substantially-related matters, and

---

[2] *See also Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F. Supp. 1383, 1387 (N.D. Cal. 1992) ("an attorney is forbidden to do either of two things after severing his relationship with a former client.  He may not do anything which will injuriously affect his former client in any manner in which he formerly represented him, nor may he at any time use against his former client knowledge or information acquired by virtue of the previous relationship.").

the duty of confidentiality preventing lawyers from misusing knowledge of a client's secrets, confidences, or confidential information.  *See*, *e.g.*, *U.S. v. Avanade Inc.*, 2015 WL 13886329, *8 (W.D. Wash. 2015) ("RPC 1.9(a) and 1.9(c) are written in the disjunctive."); *San Francisco v. Cobra Sols., Inc.*, 38 Cal. 4th 839, 846-47 (2006) ("The interplay of the duties of confidentiality and loyalty affects the conflict of interest rules….  When a substantial relationship between the two representations is established, the attorney is automatically disqualified from representing the second client.").  Here, both of these rules compel Quinn's disqualification.

## IV.     THE DUTY OF LOYALTY PRECLUDES QUINN FROM SWITCHING SIDES.

"An attorney's duty of loyalty to a client is not one that is capable of being divided." *See Flatt v. Superior Ct.*, 9 Cal. 4th 275, 282 (1994).  Here, Quinn's Engagement Letter promises Bright Data that it will be "always mindful of our central obligation to preserve the ***precious trust*** which our clients repose in us."[3]  Ex. 2 at 3.  Quinn has violated that trust and breached its duty of loyalty in assisting X to prosecute its claims against Bright Data.  *Talon*, 2012 WL 601811, at *7 ("The sad fact is that a former client in numerous cases finds itself being sued by its former lawyer on a substantially related matter.  The former client has every right to expect that professional standards will be honored.").

In 2018, California revamped its code of professional responsibility, adopting in large part the ABA's Model Rules of Professional Conduct.  As relevant here, the revised rules broadened the limitations on a lawyer's ability to take on conflicting successive representations.  Whereas the prior rule focused largely on the canon of confidences, the new rule contained a separate provision trained upon the duty of loyalty, preventing side-switching even absent any receipt, use, or disclosure of client confidences.  *See* ABA Formal Opinion 497 (2021) (recounting history); Hazard, *The Law of Lawyering*, § 14.12 (4th ed. 2023) (Under Rule 19(a), "there is no need to assess the risk to former client confidences.").[4]

---

[3] Bright Data reserves its right to assert claims, including breach of contract and violation of the ethics rules, against Quinn.  To the extent Quinn informed X of its prior engagement, Bright Data also reserves the right to assert tortious interference claims against X.

[4] *See also Touchcom, Inc. v. Bereskin*, 299 F. App'x 953, 955 (Fed. Cir. 2008) ("Rule 1.9(a) of the Model Rules safeguards not only confidentiality, but also the client's expectation of the attorney's

Under Rule 1.9(a), a lawyer may not take on a new representation materially adverse to a former client if the two matters are the "same or … substantially related." RPC § 1.9(a); *see also O'Hagins, Inc. v. LGI LLP*, 2017 WL 11665634, *2 (C.D. Cal. 2017) (a "former client can establish a … violat[ion] … by showing (1) the attorney is acting adversely to the former client[;] and (2) a 'substantial relationship' exists between the subjects of the [successive] engagements.") (citing *Flatt v. Sup. Ct.*, 9 Cal. 4th 275, 283 (1994)); *Openwave Sys. Inc. v. Myriad France S.A.S.*, 2011 WL 1225978, *1 (N.D. Cal. 2011) (Alsup, J.) (same).   Quinn recognized **and agreed** to this, as its Bright Data Engagement Letter includes an advance waiver *except* in matters "substantially related to [Quinn's] representation of Bright Data."  Ex. 2 at 4.

The duty of loyalty thus prevents a lawyer from switching sides.  *See FMC Techs., Inc. v. Edwards,* 420 F. Supp. 2d 1153, 1160 (W.D. Wash. 2006) ("Parties are allowed to switch sides; lawyers are not").[5]  As the Ninth Circuit explained, "the interest to be preserved by preventing attorneys from accepting representation adverse to a former client is the protection and enhancement of the professional relationship *in all its dimensions*."  *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980).   The policy behind this is clear.  If firms can simply switch sides after an engagement ends, clients will be less trusting of their counsel and less willing to share confidences and litigation strategies and priorities.  As a leading treatise explains,

---

loyalty and public confidence in the integrity of the bar"); *Don Westerman, Inc. v. Vill. of Forsyth*, 2020 WL 12811853 (C.D. Ill. 2020) (similar); *Flake v. Arpaio*, 2015 WL 13743445 (D. Ariz. 2015) (similar); *Avra Surgical, Inc. v. Dualis MedTech GmbH*, 2014 WL 2198598 (S.D.N.Y. 2014) (similar); *Pallon v. Roggio*, 2006 WL 2466854 (D.N.J. 2006) (similar); *Koch v. Koch Indus.*, 798 F. Supp. 1525, 1534 (D. Kan. 1992) (similar).

[5] The duty of loyalty operates differently in cases involving former clients (or "successive" litigation) than it does in cases involving current clients (or "concurrent" litigation).  Lawyers are not permitted to act adversely to a current client on any matter (without consent), but can act adversely to former clients on matters that are not "substantially related."  But a lawyer can *never* act adversely to a current or former client on a substantially related matter.  *Rosenfeld Constr. Co., Inc. v. Superior Ct.*, 235 Cal.App.3d 566, 575 (Ct. App. 1991) ("If a substantial relationship is established, the discussion should ordinarily end."); *Decaview Distribution Co. v. Decaview Asia Corp.*, 2000 WL 1175583, *13 (N.D. Cal. 2000) (successive representation on substantially related matters "**forbidden**").

"Fearing these kinds of *later* betrayals, a client in an existing relationship might hesitate to confide fully in a lawyer, thereby damaging the quality of the relationship and hence the quality of the representation that the lawyer will provide. Thus, the chief office of rules like Model Rule 1.9 is to provide clients with assurance *during the representation* that they have no need to fear suffering adverse consequences *later* because of having retained a lawyer currently."

*See* Hazard, *et al.*, *The Law of Lawyering* §14.03.  The duty of loyalty thus protects the integrity of the judicial system by ensuring that clients can have frank and open conversations with their lawyers, free of the concern that they will later be betrayed on matters for which their advice was sought.  It is about trust, perhaps the single most important currency in our judicial system.[6]

Here, there is no question that Quinn is acting adversely to Bright Data by representing X on the other side of the "v" in this litigation.  *See* ABA Formal Opinion 497 (2021) ("Suing a former client … (*i.e.*, being on the opposite side of the "v" from a former client) on the same or on a substantially related matter is a ***classic example*** of representing interests that are … 'materially adverse' to the interests of a former client"); *Avocent Redmond Corp. v Rose Elecs.*, 491 F.Supp.2d 1000, 1007 (W.D. Wash. 2007) (The material adversity element is "met because Heller Eherman's former client is the plaintiff in this case" and its current clients are the "defendants.").  As such, the only question is whether Quinn's prior representation of Bright Data is "substantially related" to its current representation of X.[7]  It is.

The fact that the *Meta* and *X* cases were filed separately on behalf of different plaintiffs is of no moment.  Because the Rules apply equally to successive representations in the "same ***or*** a substantially related matter," a complete identity of parties and claims is not required.  The "substantial relationship test is broad and not limited to strict facts, claims, and issues involved in a particular action."  *Knight v. Ferguson*, 149 Cal.App.4th 1207, 1213 (Cal. App. 2d Dist. 2007); *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 2019 WL 144589, *10 (N.D. Cal. 2019) (same).  Rather,

---

[6] *See Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1146–47 (1999) ("The effective functioning of the fiduciary relationship between attorney and client depends on the client's trust and confidence in counsel.  The courts will protect clients' legitimate expectations of loyalty to preserve this essential basis for trust and security in the attorney-client relationship."),

[7] *Trone*, 621 F.2d at 998   ("[t]he relevant test for disqualification is whether the former representation is 'substantially related' to the current representation.").

a "'substantial relationship' exists whenever the 'subjects' of the prior and current representations are linked in some rational manner." *Jessen v. Hartford Cas. Ins. Co.*, 111 Cal.App.4th 698, 711 (2003) (citing *Flatt*, 9 Cal. 4th at 283); *Advanced Messaging Techs., Inc. v. EasyLink Servs. Int'l Corp.*, 913 F. Supp. 2d 900, 908 (C.D. Cal. 2012) ("a rational link between the subject matter of the two cases will suffice."); *ViChip Corp. v. Lee*, 2004 WL 2780170, *3 (N.D. Cal. 2004) (same); *ESC-Toy Ltd. v. Sony Interactive Ent. LLC*, 2024 WL 1335079, *7 (N.D. Cal. 2024) (same).

"In evaluating whether there is a substantial relationship between successive representations courts look to the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases … as well as the attorney's possible exposure to formulation of policy or strategy." *Diva*, 2019 WL 144589, at *6. Here, the factual and legal similarities, plus Quinn's direct involvement with senior Bright Data executives in formulating litigation strategy, compel a finding that the *Meta* and *X* cases are substantially related.

***The Meta and X Cases are Factually Similar.*** As X has admitted, the "Meta case involves similar allegations of data scraping from social media platforms as the present case."[8]  ECF 51¶ 10.  The factual allegations in both cases are virtually identical.  Both matters involve the same Bright Data services.  Bright Data's actions – including opening accounts for purposes of advertising, terminating those accounts and sending rejection letters – are the same in both cases. Moreover, both Meta and X have taken similar steps to make their users' information public, and

---

[8] X's draft Case Management Statement represented that the *Meta* case was a "related case" because it alleged  "similar" claims "based on Bright Data's scraping activities," and involved some "common legal issues." Ex. 3.  Because that is not the test under the Local Rules, the parties agreed in the final Joint Case Management Statement that the cases were not related for purposes of judicial assignment and coordination.  ECF 51.  But this has no bearing on whether the two matters are related for disqualification purposes.  *See SC Innovations, Inc. v. Uber Techs., Inc.*, 2019 WL 1959493, *6 (N.D. Cal. 2019) ("the Court rejects Sidecar's argument that the present motion is informed in any way by Judge White's decision that this case is not related to another case … [u]nder this Court's local rules" because "[n]either element of [the Local Rule's] test is the same as the test for whether cases are 'substantially related' for the purpose of disqualification."); *MD Helicopters, Inc. v. Aerometals, Inc.*, 2021 WL 1212718, *8 (E.D. Cal. Mar. 31, 2021) (rejecting argument that "there is no substantial relationship between the [successive] matters … because Defendant never filed a Notice of Related Case.").

yet, attempt to restrict the public from scraping that information through "automated" means.  Even the jurisdictional allegations – a hotly contested issue in this case – are the same in both cases.

There are only a few minor differences between the *X* and *Meta* matters, none of which are material.  X devoted an entire section of its opposition to Bright Data's motion for Summary Judgment to explaining why Judge Chen's Summary Judgment decision in the Meta case should not apply here.  ECF 69 at 9-10.  X did not identify any factual difference in Bright Data's conduct or services.  Instead, it focused largely on minor wording differences between Meta's and X's Terms (though both platforms *interpret* their Terms identically), and the different procedural posture of the cases (that some discovery had already been completed in the *Meta* case).  Neither difference renders the cases factually dissimilar.  *Monster Energy Co. v. Vital Pharms., Inc.*, 2018 WL 6431870, *3 (C.D. Cal. 2018) (matters "substantially related" even though they involved different products; noting that plaintiff "paints with too fine a brush in distinguishing the basis of the legal claims in these lawsuits" because "a substantial relationship … does not require an exact match between facts and issues in the two cases.").

***The Meta and X Cases Involve Common Legal Issues***.  Courts also look to whether the successive matters involve similar legal issues.  If there are common legal issues, it is likely "the lawyer will be called upon in the new matter to challenge or set aside his own work product in the previous matter."  *See The Law of Lawyering* §14.07.  The concern about "attacking one's own work" or "fouling the nest" directly implicates the duty of loyalty.  *Id*.

Here, virtually every legal issue that arose in the *Meta* case has, or will, arise in this case.  X's initial complaint asserted the same two claims as Meta – breach of contract and tortious interference – and X seeks to maintain them today.  Even the new tort claims arise out of the same nucleus of operative fact, and involve the same subject matter.  *Jessen*, 111 Cal.App.4[th] at 711 ("The words 'subject' and 'subject matter' mean more than the strict facts, claims, and issues involved in a particular action").

Bright Data will not, here, reveal the specific advice Quinn provided.  But Quinn has a long history of representing scrapers.  In the *HiQ* case, for example, Quinn publicly took the position

that Terms of Service prohibiting scraping were unconscionable and violated public policy.  Quinn will now be forced to disavow that position and any advice it provided to Bright Data based on that prior view.  Indeed, even if Quinn tries to reconcile its positions in the two cases, it would not solve the problem.  No matter how "consistent or confident [it] may have been in its [prior] position, it still had to anticipate challenges to that position…, which likely engendered frank discussion of legal and factual issues" and "any weaknesses or vulnerabilities" in Quinn's advice and arguments.  *Diva*, 2019 WL 144589, at * 11.

Nor does it matter that Quinn did not appear in the *Meta* matter.  A client is entitled to its lawyer's honest and best advice, not advice that shifts in the winds based on the client's identity or interests.  When a lawyer disavows its own work, it casts doubt of the *reliability* of the earlier advice.  Indeed, if a lawyer, upon taking a conflicting matter, could just say "ignore everything I said previously, I didn't mean it," clients will not only be deprived of the advice they paid for but they will also be hesitant to rely upon it from inception.  Preventing lawyers from switching sides, therefore, protects the integrity of a lawyer's candid *advice*, as well as its *public* work product.

***Quinn Engaged Directly with Bright Data's Senior Leadership on Matters Central to Both Litigations***.  Nor can Quinn escape disqualification on the ground that its involvement was "limited."  It was not.  The engagement was substantial and substantive, and it triggered Quinn's full duties of loyalty and confidentiality.

Quinn dedicated a *team* of lawyers – not just a single individual – to the Bright Data Engagement, and it canvassed the firm for their insights.  Avisar Decl. ¶ 13.  Indeed, at least three Quinn lawyers had direct, personal contact with Bright Data's executive team and were "personally involved in providing legal advice and services" to Bright Data.  *MMCA Grp., Ltd. v. Hewlett-Packard Co*., 2007 WL 607659, *4 (N.D. Cal. 2007).  Quinn also **billed** over 30 hours to the engagement.  Avisar Decl. ¶ 16.  And even this understates the amount of work Quinn performed, as its billing records omit at least three client calls and does not include any partner time (despite the fact that a partner led the discussion for Quinn at the Board meeting).[9]  *Id*. ¶ 17.

---

[9] Avisar Decl., Ex. 1 ¶ 17 (explaining that Quinn's invoice did not include all the time it spent on the matter, and did not include all the attorneys who worked on or, even, engaged directly with the

*See Farhang v. Indian Inst. of Tech.*, 2009 WL 3459455, *2 (N.D. Cal. 2009) (matter substantially related where lawyer billed 19 hours to the former client); *ViChip*, 2004 WL 2780170, at *3 (a mere 2 ½ hours sufficient to support disqualification where actual legal advice was provided); *Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F. Supp. 1383, 1388 (N.D. Cal. 1992) ("The fact that Cost and Rothman billed only a short period of time does not preclude their work from being substantially related to the present litigation").

More importantly, Quinn had access to, and participated in discussions with, the highest levels of the company. And it was privy to attorney-client confidences and work product in the *Meta* litigation. *Vaxmonsky v. Costco Wholesale Corp.*, 2022 WL 20955638, *2 (C.D. Cal. 2022) (Inquiry into the "nature and extent" of the representation involves consideration of "the type of work performed, and the attorney's possible exposure to formulation of policy and strategy").

## V.    THE DUTY OF CONFIDENTIALITY PRECLUDES QUINN FROM SWITCHING SIDES.

In addition to the duty of loyalty, the duty of confidentiality also precludes Quinn from switching sides. When Bright Data engaged Quinn to provide strategic assessment of the *Meta* litigation, Bright Data was forthcoming about its business, its objectives, and analyses of its claims, potential defenses, and potential counterclaims. Quinn probed Bright Data for information to help it provide a fulsome assessment of Bright Data's legal exposure, and it received access to Bright Data's sensitive attorney-client communications and work product relating to that matter.

Under Rule 1.9(c), "a lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter … use [or] reveal" that information. This rule, however, is not just a proscription on the actual use or disclosure of the information, it operates as a direct limitation on a lawyer's ability to take on an adverse successive representation. As the California Supreme Court declared, "where an attorney successively represents clients with adverse interests, and where the subjects of the two

client). Whether the billing omission was in error or recognition that Quinn was fast approaching the agreed-upon cap is irrelevant. What is relevant is that Quinn's involvement was not peripheral, but went to the core of Bright Data's litigation strategy in dealing with dominant social media platforms bent upon eradicating scrapers.

representations are substantially related, the need to protect the first client's confidential information requires that the attorney be disqualified from the second representation."  *SpeeDee*, 20 Cal. 4th at 1146.

The prohibition against successive representations does not require a showing that the lawyer *actually* possesses or used confidential information, since that would require delving into – and disclosing – attorney-client communications relating to both the former and current engagements.  As the California courts have explained:

> "The trial court asked at the hearing 'what knowledge is [Wilkins] really going to have that's going to give him any undue or unfair advantage in this present litigation against Fireman's Fund?'  The trial court was in essence asking FFIC to reveal the specific confidential information that Wilkins had in his possession that could be used to FFIC's disadvantage in this case.  As we articulated in *Jessen*, **this type of inquiry is outlawed**."

*Farris v. Fireman's Fund Ins. Co.*, 119 Cal.App.4th 671, 683 & n.10 (2004) (citing *Jessen*, 111 Cal.App.4th at 709) ("Whether he actually possesses confidential information that would work to his advantage in his current representation is not the test.  Rather, the test is whether a substantial relationship exists between the subjects of the two compared representations.").

Accordingly, a lawyer will be disqualified upon a showing ***either*** that the lawyer possessed relevant confidential information, or that the two successive matters are "substantially related." *Id*.  In the latter case, the courts will "***conclusively presume***" that the lawyer obtained access to client confidences.  *Flatt*, 9 Cal. 4th at 283 ("Where the requisite substantial relationship can be demonstrated, access to confidential information in the first representation (relevant, by definition, to the second representation) is presumed and disqualification is mandatory"); *Jessen*, 111 Cal.App.4th at 709 ("If the relationship between the attorney and the former client is shown to have been direct—that is, where the lawyer was personally involved in providing legal advice and services to the former client—then it … will be *conclusively presumed* that the attorney acquired confidential information.").

As noted, Quinn, through at least three of its lawyers, was directly and personally involved

in providing legal advice to Bright Data on a substantially related matter.[10]  As such, Quinn must be conclusively presumed to have acquired confidential information.

Moreover, the circumstances surrounding the Quinn's engagement show it obtained confidential information and had access to client confidences concerning Bright Data's business, operations, and legal strategies.  As the Quinn Engagement notes, Bright Data committed to provide "complete and accurate information regarding the subject matter of the Engagement," and the engagement involved "a review of any key background documents, including correspondence between Bright Data and Meta, an analysis of the Litigation and defenses to pending claims, and a recommendation regarding next steps in the Litigation," as well as discussions with "individual(s) from Bright Data to answer questions relevant to [Quinn's] analysis."  Ex. 2 at 4-5.

Given the nature and scope of the Engagement, it is inconceivable that Quinn would not be privy to client confidences and confidential information.  But we do not need to rest on presumptions or circumstantial evidence.  We have the Declaration of Bright Data's General Counsel, who attests that Bright Data actually shared sensitive confidential documents, attorney-client communications, and Litigation Counsel's work product—essentially, Bright Data's playbook.  Avisar Decl. ¶¶ 4, 9, 11, 14.

While *some* – but not all – of the information Quinn considered in providing its strategic assessment included information in the public record, that does not solve the problem.  Quinn had already received large volumes of Bright Data's confidential information in connection with discovery in the *hiQ* litigation pursuant to a Protective Order that restricted its use.  Avisar Decl., Ex. 1 ¶ 2.  Indeed, one reason Bright Data retained Quinn was its knowledge of Bright Data's

---

[10] This is not a case, for example, where a junior lawyer with no direct client contact working on a discrete and peripheral legal issue transferred to a new firm, which later took on an adverse engagement.  In such cases, a further showing of likely access to confidential information is required.  *Jessen*, 111 Cal.App.4th at 711 ("if … the former attorney was not placed in a direct, personal relationship with the former client, the court must assess whether the attorney was positioned during the first representation so as to make it likely the attorney acquired confidential information relevant to the current representation.").  Here, because Quinn lawyers were directly involved in providing litigation advice to Bright Data, no further showing – beyond substantial relatedness – is required.

technology and operations through this non-public information.  *Id*.  In any event, after retaining Quinn, Bright Data supplemented this record with additional non-public information, through conversations and documents.  *Id.*¶ 9.

But even if Quinn only had access to public information, the California Rules make clear that client confidences are not limited to "competitively sensitive" information or even non-public business information.  *See* RPC Rule 1.9, Comment 5 ("the fact that information can be discovered in a public record does not, by itself, render that information generally known under paragraph (c).").  Protected client confidences also include litigation strategies and assessments, other attorney-client privileged information, and work product.  *See* RPC 1.6 ("The principle of lawyer-client confidentiality … encompasses matters … protected by the lawyer-client privilege, matters protected by the work product doctrine."); *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1094 (N.D. Cal. 2004) (Confidential information is information that "can be readily identified as either attorney work product or within the scope of the attorney-client privilege.").

As a leading treatise explains, disqualification is warranted under the "'playbook' approach … where the lawyer learns such subtleties as the former client's strategic decision-making processes or levels of risk aversion, rather than confidential information as such."  *The Law of Lawyering* §14.07.  California follows this approach.  *See Jessen*, 111 Cal.App.4th at 710 (disqualification warranted where the lawyer "outlined the legal posture of the client and described four legal options available to the client," even though the "record ... did not reveal whether the attorney acquired any knowledge or information from his clients, … because the attorney had given the client legal advice."); *Bell N. Rsch., LLC v. ZTE Corp.*, 2019 WL 1590472, *5 (S.D. Cal. 2019) ("Confidential information may also involve communications related to litigation strategy and the strengths and weaknesses of each side of the case.").  Indeed, Quinn has been disqualified in other cases for similarly participating in client strategy sessions.  *Blake v. S. California Edison Co.*, 2020 WL 3262832, *7 (Cal. Ct. App. 2020) ("QE attorneys participated in the December 2017 joint IOU meeting at which in-house attorneys discussed joint efforts and ***strategies***…").  Nor can there be any meaningful dispute that the information received in connection with the *Meta*

engagement would be relevant to the *X* matter, given the factual and legal similarities.

## VI.   DISQUALIFICATION IS REQUIRED TO PRESERVE THE INTEGRITY OF THE CLIENT RELATIONSHIP.

Quinn's breach of the duties of loyalty and confidentiality require disqualification.  As the California Professional Rules make clear, "[w]hile lawyers are associated in a firm, ***none*** of them shall knowingly represent a client when any ***one*** of them practicing alone would be prohibited from doing so by rules 1.7 or 1.9."  RPC Rule 1.10(a).  This rule of imputed disqualification is inviolate, where, as here, the lawyers involved in the prior representation were at the firm when that engagement occurred, and remain at the firm when the firm takes on the new conflicting matter.  There is no exception to disqualification in this scenario.

Nor can the conflict be solved through an ethical screen.  *Rosenfeld Constr. Co. v. Superior Ct.*, 235 Cal.App.3d 566, 577 (1991) (If "the current representation is substantially related to the former …, a screening procedure cannot suffice to safeguard against the conflicting representations.").  Screens work when lawyers switch firms, but not when firms switch sides. Indeed, firms would be rife with conflicting matters if the "problem" could be solved simply by having different teams work on the two matters, even over the client's objections.

The Rules do not permit this.  Under Rule 1.10(a)(2), a screen is effective in preventing imputed disqualification *only* where the "prohibition is based upon Rule 1.9(a) and ***arises out of the prohibited lawyer's association with a <span style="color:red">prior firm</span>.***"  RPC 1.10(a)(2); *Elan Transdermal*, 809 F. Supp. at 1393 (disqualifying plaintiff's firm because firm's former attorneys had defended client in substantially similar case); *Meza v. H. Muehlstein & Co., Inc.*, 176 Cal.App.4th 969, 978-79 (2009) ("where an attorney is disqualified from representation, the entire law firm is vicariously disqualified as well….  Accordingly, an 'ethical wall' between an attorney with confidential information and his or her firm will generally not preclude the disqualification of the firm."); *Largo Concrete, Inc. v. Liberty Mut. Fire Ins. Co.*, 2008 WL 53128, *5 (N.D. Cal. 2008) (disqualifying firm when member attorney representing opposing party, ***despite*** the creation of an ethical wall); *Klein v. Superior Ct.*, 198 Cal.App.3d 894, 912 (Ct. App. 1988) ("California precedent has not rushed to accept the concept of disqualifying the attorney but not the firm, nor has it

enthusiastically embarked upon erecting [ethical] walls."); *cf. Openwave Sys. Inc. v. Myriad France S.A.S.*, 2011 WL 1225978, *4 (N.D. Cal. 2011) (screen sufficient where lawyer switched firms); *Kirk v. First Am. Ins. Co.*, 183 Cal.App.4th 776, 108 (2010) (same).[11]

Here, the prohibition on conflicting engagements arises, not out of any lawyer's association with a prior firm, but with Quinn's own representation of Bright Data.  Because there is no exception to imputed disqualification in this scenario, there is no need to engage in any balancing of the equities.  But even if the Court did so, the equities compel disqualification.

X will not face significant prejudice if Quinn, which recently stepped in as replacement counsel, is disqualified.  It has only been a month since the Court dismissed X's complaint, so Quinn has likely been working on the matter for just a couple of weeks.  Nor do the Quinn attorneys in this case mention any prior representation of Twitter or X on their bios, so disqualification would not deprive X of long-time counsel.[12]  Indeed, because Quinn historically represented scrapers, it is unlikely that Quinn obtained any confidential information from X relating to its anti-scraping efforts prior to this engagement.

Nor has X shown any reason why its prior counsel (or any other non-conflicted lawyers of its choosing) cannot handle this matter.  Indeed, it appears that the only reason X switched horses is that its prior counsel lost the initial motion to dismiss.  But that does not mean they cannot represent X, at least until X can find new replacement counsel.  Indeed, having worked on the case for almost a year, its prior counsel – who remain counsel of record in this case – have full

---

[11] Quinn clearly worked on this case prior to entry of its appearance last week, and has either failed to erect an ethical screen and/or failed to disclose the screen to Bright Data, as required by Rule 1.10(a)(2)(iii).  Because it is inconceivable that Quinn's new matter intake and conflict procedures would not have identified Bright Data as a recent, former client in a substantially related matter, this Court should order Quinn to Show Cause why it did not engage in bad faith in undertaking the representation without notice or disclosure to Bright Data.

[12] Bright Data specifically asked Quinn to disclose its representation of other "Big Tech platforms."  Avisar Decl., Ex. 1 ¶ 18.  In response, *Quinn* did not identify X in its list of representative matters.  *Id.*  To show its experience, it also pointed to its Internet Litigation landing page on its website, which identifies representations of other Internet companies, such as Google (both as a platform and a scraper).  *Id.*  The only reference to X (or Twitter) is an amicus brief, which Twitter joined along with Google in a second Circuit case over a decade ago. www.quinnemanuel.com/practice-areas/internet-litigation/#representations.

knowledge of the facts and issues.  *See Diva Limousine, Ltd. v. Uber Techs.*, Inc., 2019 WL 144589, at *13 (N.D. Cal. 2019) ("Diva has not shown that Uber unduly delayed in bringing this motion, that Uber's motion constitutes tactical abuse, or that disqualification will result in undue hardship or impose an undue financial burden in Diva's prosecution of this litigation."); *Bold Ltd. v. Rocket Resume, Inc.*, 2024 WL 589116, *12 (N.D. Cal. 2024) ("Gibson Dunn would remain as lead counsel, so Defendants will not face the financial burden or delay of replacing disqualified counsel."); *Klein v. Facebook, Inc.*, 2021 WL 3053150, *8 (N.D. Cal. 2021) ("Finally, the Court notes that Plaintiffs are unlikely to be significantly prejudiced because Keller Lenkner is one of four law firms representing consumers in the instant case.").

Moreover, this is not a case where Bright Data has sought to use disqualification as a tactical tool to disadvantage X.  It did not lie in wait while X invested resources in Quinn.  Rather, X chose not to disclose Quinn's involvement until late last week, a mere two days before it filed its Motion to Amend.  Bright Data filed this motion less than a week after Quinn's appearance. *See Bold Ltd.*, 2024 WL 589116, at *12  ("The Court also does not find that Bold engaged in tactical abuse because … Bold did not delay in seeking disqualification once it became aware of the conflict."); *Antelope Valley Groundwater Cases*, 30 Cal.App.5th 602, 623 (2018) ("This case was not one where a party tried to increase an opponent's litigation burdens by seeking disqualification only after the challenged counsel performed a substantial amount of work."); *SpeeDee*, 20 Cal. 4th at 1145 (same).

In the end, "the need to maintain ethical standards of professional responsibility;" and "the preservation of public trust in the scrupulous administration of justice and the integrity of the bar" favor disqualification.  X ***chose*** to use Quinn, either knowing that Quinn had represented Bright Data in the *Meta* matter, or because Quinn failed to disclose the conflict to X.  Either way, Bright Data should not be punished for Quinn's betrayal.

## VII.   CONCLUSION.

For the foregoing reasons, the Court should disqualify Quinn from this case.

Dated: June 10, 2024

Respectfully submitted,

*/s/ Colin R. Kass*
Colin R. Kass*
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick*
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

Robert C. Goodman (Bar No. 111554)
Lauren Kramer Sujeeth (Bar No. 259821)
ROGERS JOSEPH O'DONNELL, PC
311 California Street, 10th Floor
San Francisco, CA 94104
(415) 956-2828
rgoodman@rjo.com
lsujeeth@rjo.com

Sehreen Ladak (Bar No. 307895)
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
(310) 284-5652
sladak@proskauer.com

*Attorneys for Defendant Bright Data Ltd.*
*\*Admitted Pro Hac Vice*