# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

X. Corp.,

                            Plaintiff,

          v.

BRIGHT DATA LTD.

                            Defendant.

Case No. 3:23-CV-03698-WHA

## DECLARATION OF DAVID A. MUNKITTRICK

I, David A. Munkittrick, declare as follows:

1.      I am an attorney at Proskauer Rose LLP in New York.  I submit this declaration in support of Bright Data's Motion to Disqualify Quinn Emanuel.

2.      Attached are true and correct copies of the following:

Exhibit 1.      Declaration of Mor Avisar, dated June 10, 2024.

Exhibit 2.      Engagement Letter between Quinn and Bright Data, dated February 16, 2023.[1]

Exhibit 3.      X's November 3, 2023 draft Joint Case Management Statement.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

---

[1] Quinn's Engagement Letter contains a privilege header, but it does not contain any confidential information of the type that would not be included in a typical privilege log.  Accordingly, by filing the Engagement Letter, Bright Data does not waive any privilege or confidentiality over any other information.

Dated: June 10, 2024

Respectfully submitted,

*/s/ David A. Munkittrick*

David A. Munkittrick
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

X. Corp.,

                              Plaintiff,                     Case No. 3:23-CV-03698-WHA

            v.

Bright Data Ltd.

                              Defendant

<u>**DECLARATION OF MOR AVISAR**</u>

I, Mor Avisar, declare as follows:

    1.    I am the General Counsel at Bright Data Ltd.  I submit this declaration in support of Bright Data's Motion to Disqualify Quinn Emanuel Urquhart & Sullivan ("Quinn").

    2.    In early February 2023, Bright Data decided to obtain legal advice from Quinn concerning litigation against Meta Platforms, Inc. and Instagram LLC.  Bright Data sought Quinn's advice because of its extensive experience in handling matters on behalf of scraping or data collection clients, including on behalf of hiQ in *hiQ v. LinkedIn*, 17-cv-03301 (N.D. Cal.).  I also knew that Quinn had extensive knowledge of, and familiarity with, Bright Data's business based on non-public, confidential information that Quinn received in discovery in the *hiQ* matter. I believed such knowledge would be helpful in providing legal advice to Bright Data, enable Quinn to provide such advice to Bright Data more quickly and efficiently, and reduce the need for substantial re-production of additional information.

    3.    On February 15, 2023, I emailed Hope Skibitsky, an associate at Quinn, who had been Bright Data's primary contact in connection with *hiQ* discovery, to discuss the engagement. Ms. Skibitsky responded later that day, informing me that Quinn was "free of conflicts."  She also indicated that she had canvassed her colleagues for information that may be relevant to the matter, and proposed a call to share those insights and discuss the matter.

4.      That call took place the following day, February 16, 2023.  During that call, we discussed the scope of the Engagement, and I provided additional information about our litigation with Meta and Bright Data's business.

5.      Shortly after the call, Ms. Skibitsky proposed a fee cap of $40,000, and sent a draft Engagement Letter, which would, upon execution, "confirm [Bright Data's] engagement of Quinn Emanuel Urquhart & Sullivan, LLP ("QEU&S") as counsel to represent Bright Data Ltd. and Bright Data, Inc. (collectively, "Bright Data") in connection with an analysis of the litigation currently pending between Bright Data and Meta Platforms, Inc. and Instagram, LLC (collectively, "Meta") in the Northern District of California and the Superior Court of the State of Delaware."

6.      According to Quinn's billing records, Quinn began work immediately, and no later than February 18th.

7.      On February 22, 2023, I informed Quinn that Bright Data was prepared to proceed in accordance with the terms of the proposed Engagement Letter and fee cap, but asked that the engagement be expanded to include additional discussions with Bright Data management.  The revised Engagement Letter was dated February 16, 2023 and executed on February 23, 2023, by Renita Sharma (a Partner who worked on the *hiQ* litigation), with an "effective date" of either February 16th or February 18th, depending on which was the actual "date on which [Quinn] first performed services."

8.      The Engagement Letter contained several relevant provisions:

- *First*, Quinn agreed to "provid[e] an analysis of the Litigation, including an analysis of the arguments that may be raised and defended against in the Litigation and an overview of what [Quinn] sees as potential next steps in the Litigation, and participating in calls with Bright Data's senior management to answer any questions arising following review of our analysis by Bright Data's senior management."

- *Second*, in providing advice, Quinn agreed that its work would "include a review of any key background documents, including correspondence between Bright Data and Meta;" "an analysis of the Litigation and defenses to pending claims;" a "recommendation regarding next steps in the Litigation;" and "interview[s] of individual(s) from Bright Data to answer questions relevant to Quinn's analysis."

- *Third*, the Engagement Letter made clear that Quinn would staff the matter with a multi-lawyer team, and noted that (at the time), it "anticipate[d] assigning to this Engagement" Renita Sharma, Hope Skibitsky, and Zane Muller.  It is unclear what, if any, work Ms. Sharma performed on this Engagement.  But as noted below, as the Engagement proceeded, Quinn added Adam Wolfson, a partner who was actively involved and provided advice directly to Bright Data.

- *Fourth,* Quinn requested an advance waiver, but committed not to represent any future client adverse to Bright Data on a substantially related matter absent consent.  Specifically, the Engagement Letter provides that Quinn "may represent other clients … ***provided that the other matter is not substantially related to our representation of Bright Data***."

9.     About a week after Quinn began substantive work on the Bright Data Engagement, Ms. Skibitsky explained that, in the course of preparing Quinn's litigation assessment, she needed additional information, and was preparing a list of questions for Bright Data.  On Sunday, February 26, 2023, I provided Ms. Skibitsky with non-public Bright Data documents, and had a video conference with Ms. Skibitsky, during which I answered her questions.

10.     On March 2, 2023, Quinn provided me with a detailed, 24-page, single-spaced litigation assessment (the "Quinn Report.").  The Quinn Report analyzed Bright Data's litigation strategy, and addressed forum selection and jurisdictional issues, Meta's claims, substantive litigation strategies, business considerations, affirmative defenses, counterclaims, and discovery.  Without revealing the substance of the Quinn Report, I can also say that the Report "approached the analysis" from the perspective that the *Meta* litigation could have implications "beyond [the] particular dispute" with Meta, including Bright Data's legal rights with respect to "***others like Meta***" who may try to enforce their Terms of Service.

11.     After receipt, I provided the Quinn Report to Bright Data senior management, including Bright Data's CEO and Board.  I also asked Bright Data's Litigation Counsel, Proskauer Rose, LLP, to review the Quinn Report.  At my request, Proskauer provided a detailed, written response to Quinn's assessment and its proposed recommendations and strategies.   I provided portions of this response to Quinn and asked Quinn to provide additional information.

12.     In advance of the management call(s) specified in the Engagement Letter, Quinn informed me that it was adding a partner, Adam Wolfson, to the matter.  I understand that Mr. Wolfson worked on the *hiQ* litigation.  Ms. Skibitsy also explained that Mr. Wolfson had

"experience in ToS litigation" and was an "anti-trust expert." On March 8, 2023, I had another call with Ms. Skibitsky and Mr. Wolfson to discuss the Quinn Report, Quinn's analysis, and its advice and recommendations.

13.     Following this call, I scheduled a virtual all-hands meeting for Sunday, March 12, 2023, to discuss Quinn's legal advice. The meeting participants included: (i) Bright Data's CEO, the Bright Data Board, and me; (ii) Mr. Wolfson, Ms. Skibitsky, and Mr. Muller from Quinn; and (iii) Colin Kass and David Munkittrick from Proskauer.

14.     The Board Meeting lasted over two hours. Significant client confidences and attorney-client privileged information were shared during that meeting, as well as confidential information about Bright Data's policies, practices, and priorities. Again, without revealing the substance of the communications, I can say that we discussed Meta's and other potential website operators' claims, the likely defenses to such claims, and the procedural and substantive strategies to best advance Bright Data's principal contention that it had an unqualified right to freely search the public  web. As with the Quinn Report, the discussion was not limited to Meta's claims, but included the implications of Bright Data's overall litigation strategy on Bright Data's business model and its legal rights vis-à-vis other social media platforms and website operators.

15.     Bright Data did not request that Quinn provide any further work after this meeting, and Quinn's substantive work on the Engagement, and the Engagement itself, ended thereafter.

16.     Following the Engagement, Quinn invoiced Bright Data $36,191.50, which Bright Data paid in full. Quinn's billing records (as reflected in its invoice) show that Ms. Skibitsky and Mr. Muller billed over 30 hours to the Engagement.

17.     The billing records, however, appear to omit significant time that Quinn likely spent on the matter. For example, Quinn's billing records do not reflect the three conversations I had with Ms. Skibitsky on February 16th, February 26th, and March 8th. The records also omit any time spent on the matter by Mr. Wolfson, though he also participated in the March 8th call with Ms. Skibitsky, and he participated in and led the discussion from the Quinn side during the March 12th Board meeting. Though I believe Mr. Muller also participated in that Board Meeting,

Quinn's billing records also do not reflect any such time for that meeting.  Quinn's billing records also do not reflect any internal discussions between or among Ms. Skibitsky, Mr. Wolfson, Mr. Muller, Ms. Sharma, or other Quinn lawyers or personnel.  In fact, the billing records do not reflect any instance where two or more Quinn lawyers worked on or discussed the matter on the same day, despite the fact that this must have occurred.   Quinn also appears to have written off some time reflected in the billing records.  Specifically, it appears that, on two separate dates, Ms. Skibitsky worked on the matter for 8.1 and 3.0 hours respectively, but Quinn only billed 7.1 and 2.0 hours for that time.  All these potential time discrepancies or omissions were to Bright Data's benefit (and may have been necessitated by the fee cap), but they suggest that more work was performed on the matter than reflected in the Quinn Invoice or billing records.

18.     I understand that Quinn entered appearances in the X matter on June 4, 2024.  Prior to this date, Quinn did not inform me of any client relationship it had with X.  Indeed, on March 7, 2023, I had asked Quinn to disclose its representation of the Big Tech platforms.  Quinn provided a list of representative matters, which did not include any reference to X or Twitter.  Quinn also provided a link to its Internet Litigation landing page, where the only reference to X is a reference to a 2011 amicus brief that Twitter joined along with Google, Quinn's long-time client.  Nor did Quinn inform me or anyone else at Bright Data that it was undertaking representation of X.  In fact, it still has not done so, other than through its filing of its notices of appearances last week.  It has never sought consent from Bright Data to represent X in this litigation.  Nor has it ever stated that it took any steps to address the conflict.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and accurate to the best of my knowledge and belief.

Dated: June 10, 2024                                          /s/ *Mor Avisar*
                                                                          Mor Avisar

# EXHIBIT 2

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7413**

WRITER'S EMAIL ADDRESS
**renitasharma@quinnemanuel.com**

February 16, 2023

<u>**STRICTLY CONFIDENTIAL – ATTORNEY CLIENT**</u>
<u>**PRIVILEGED MATERIAL**</u>
<u>**PRIVILEGED & CONFIDENTIAL**</u>
<u>**VIA E-MAIL**</u>

Mor Avisar, Esq.
Legal Counsel
Bright Data
mora@brighdata.com

Re:     <u>Dispute with Meta Platforms, Inc.</u>

Dear Mor:

We are pleased to confirm your engagement of Quinn Emanuel Urquhart & Sullivan, LLP ("QEU&S") as counsel to represent Bight Data Ltd. and Bright Data, Inc. (collectively, "Bright Data") in connection with an analysis of the litigation currently pending between Bright Data and Meta Platforms, Inc. and Instagram, LLC (collectively, "Meta") in the Northern District of California and the Superior Court of the State of Delaware (collectively, the "Litigation") (the "Engagement"). The purpose of this letter is to confirm the terms and conditions upon which QEU&S will provide legal services to Bright Data in connection with the Engagement. We believe that a mutual understanding of these terms and conditions at the outset is fundamental to establishing a good working relationship. In this engagement letter, we sometimes refer to Bright Data as "you" or "your" and to QEU&S as "we," "our" or "us."

*Client*

Our engagement is on behalf of Bright Data only. In representing Bright Data, we will not be representing any officer, director, employee, owner, founder, member, shareholder or partner of, or any other person affiliated with Bright Data; or any subsidiary, parent or other affiliate of Bright Data. If any of these persons or entities think that they may require counsel, we would be happy to discuss with them whether we might be able to represent them as well, but any such representation would need to be covered by a separate engagement letter, and would depend on a

**quinn emanuel urquhart & sullivan, llp**

ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM |
MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI |
SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

review by us and disclosure to all concerned of the conflicts of interest that would arise in connection with any such concurrent representation, and on appropriate consents being obtained from Bright Data and from those seeking such additional representation.

### *Scope of Engagement*

You have engaged QEU&S to advise you in connection with the Engagement.  QEU&S's services will be limited to providing an analysis of the Litigation, including an analysis of the arguments that may be raised and defended against in the Litigation and an overview of what QEU&S sees as potential next steps in the Litigation, and participating in calls with Bright Data's senior management to answer any questions arising following review of our analysis by Bright Data's senior management.  Our services will not extend to other business, personal or legal affairs of Bright Data, or to any other aspect of Bright Data's activities.  This Engagement is not intended to encompass any matter in which the professional services of QEU&S will be involved in entering an appearance or filing any documents or pleadings in any litigation, including in the Litigation, or in entering any appearance before any tribunal, and any such matter shall be the subject of an additional separate and specific engagement letter.  QEU&S's receipt or use of confidential or other information from Bright Data or others in the course of this representation does not mean that QEU&S will render any other advice or services either to Bright Data or any other person or entity.  Similarly, Bright Data will not look to or rely upon QEU&S for any investment, accounting, financial or other non-legal advice, including without limitation any advice regarding the character or credit of any person with whom Bright Data may be dealing.

### *Insurance Coverage and Claims*

Bright Data understands and agrees that QEU&S is not being engaged to advise regarding the existence of any insurance coverage in connection with the circumstances of the Engagement or to advise or assist in the formulation or submission of any insurance claim in connection with the Engagement.  If Bright Data has not done so already, Bright Data should consider tendering this matter to its insurer(s) in order to determine whether there is insurance coverage for any of the claims asserted.

### *Responsible Persons – Communications Between QEU&S and Gem*

We will keep you regularly and currently informed of the status of the Engagement and will consult with you whenever appropriate.  Within QEU&S, Hope Skibitsky will be primarily responsible for the Engagement.  Her telephone number is 908-868-9240 and e-mail address is hopeskibitsky@quinnemanuel.com.  I will be another point of contact and am available at (212) 849-7413 and at renitasharma@quinnemanuel.com  In the event that you need to reach us and we are unavailable, please leave a voicemail message.  It is our policy that all calls will be returned promptly and, in any event, no later than within one business day of receipt of the call; if you have not received a return call within that time, please call again.  I will of course seek to staff this Engagement in a manner that I think will be the most effective and efficient.  I will be happy to discuss with you any staffing issues or concerns you may have at any time.

DocuSign Envelope ID: F2A13806-E6BE-4C5B-A5A7-6509C103EA53

### *Protection of Client Confidences – High Tech Communication Devices*

We are always mindful of our central obligation to preserve the precious trust which our clients repose in us--their secrets and confidences.  We take this duty very seriously and, except to the extent permitted by the applicable rules of professional conduct, we will not disclose any confidential information of yours to any other client or person.  Similarly, we cannot disclose to you the confidences of any other client, even when such information relates to matters that might affect you.

In order to meet our obligation to preserve your confidences, it is important that we agree from the outset what kinds of communications technology we will employ in the course of this Engagement.  Unless you specifically direct us to the contrary, for purposes of this Engagement, we agree that it is appropriate for us to use fax machines and e-mail in the course of the Engagement without any encryption or other special protections.  Please notify me if you have any other requests or requirements in connection with the methods of telecommunication relating to the Engagement.

### *Bright Data's Designee to Receive Communications*

We understand that Bright Data has designated you, Mor Avisar, as the person who is primarily responsible for managing the Engagement within Bright Data and that you are authorized to direct our activities and deal with us on any issues relating to the Engagement, including billing.  Unless otherwise directed by Bright Data, we shall fulfill our obligation to Bright Data to keep Bright Data informed as to the progress of the Engagement by communicating with you and by keeping you so informed, and it shall be the obligation of you to communicate with all others within Bright Data regarding the progress of the Engagement.

### *Self-Representation*

QEU&S has designated one of the firm's partners to act as the firm's General Counsel (the "General Counsel").  The General Counsel acts as a lawyer to the firm, representing QEU&S in a variety of professional and legal matters and helping attorneys at the firm to comply with their professional and ethical responsibilities to clients.  Among other things, the General Counsel provides QEU&S and its attorneys with legal advice concerning professional responsibilities, potential or actual professional liabilities, and other matters.  QEU&S also retains outside counsel from time to time to provide similar legal advice to the firm.  It is possible that attorneys or staff working on matters for Bright Data may, from time to time, consult with the General Counsel or QEU&S's outside counsel on matters related to our representation of Bright Data. In the course of such consultation, QEU&S's attorneys and/or staff may disclose to the General Counsel or QEU&S's outside counsel privileged information concerning Bright Data's representation, and may receive legal advice related to QEU&S's work on Bright Data's matter, which legal advice QEU&S may or may not disclose to you. QEU&S views such consultations as privileged and not discoverable by anyone, not even the clients about whom such a consultation may take place.  By retaining QEU&S Bright Data acknowledges and consents to QEU&S's attorneys and staff consulting with the General Counsel or QEU&S's outside counsel as they deem necessary, both during QEU&S's representation of Bright Data and after such

representation ends, and Bright Data confirms that such communications are privileged and protected against disclosure to you.

### Responsibilities of Client

In order to represent you effectively, it is important that you provide us with complete and accurate information regarding the subject matter of the Engagement, and that you keep us informed on a timely basis of all relevant developments. In addition, it is important that Bright Data and its officers and employees provide us with timely assistance and cooperation in connection with the Engagement.

### Preservation of Electronically Stored Information ("ESI")

Recent changes in the Federal Rules of Civil Procedure, Federal Rules of Evidence, and case law addressing electronic discovery have profoundly altered the obligations of the parties involved in litigation and their counsel. An understanding of these changes, which relate to the duties of preservation and discovery of electronically stored information ("ESI"), is an essential prerequisite to the development of a successful litigation strategy for every client. The duty to preserve potentially relevant information is triggered when litigation is reasonably anticipated or commenced, and the failure to comply with these rules can have dire consequences (including sanctions such as monetary penalties). In the event Bright Data has not already issued a litigation hold in this matter, we request that you immediately do so. We would be pleased to assist you with preparing the litigation hold and otherwise providing guidance on the duties related to preservation of ESI.

### No Guarantee of Result

In providing legal advice to you, I or others at QEU&S may from time to time express opinions or beliefs regarding the likely effectiveness of various courses of action or about results that may be anticipated. You understand that any such statements are opinions and beliefs only and are not promises or guaranties. We cannot and do not guarantee any particular course or outcome of the Engagement.

### Future Conflicts of Interest

Our firm has many lawyers and several offices. We may currently or in the future represent one or more other clients in matters involving Bright Data and we may represent the parties that are adverse to you in this matter in other unrelated matters. We are undertaking this Engagement on condition that Bright Data gives its express consent and agreement that we may represent other clients, including the parties adverse to you in this matter, in the future in other matters in which we do not represent Bright Data even if the interests of the other clients are adverse to Bright Data (including the appearance on behalf of another client adverse to Bright Data in an unrelated negotiation, litigation or arbitration), provided that the other matter is not substantially related to our representation of Bright Data.

To the extent insurance is at issue in relation to the Engagement, we disclose that QEU&S has previously represented or is currently representing, various insurance companies, such as American International Group, Allstate Insurance Company, Liberty Mutual Insurance,

4

Prudential Insurance Company of America, State Farm Insurance Company, The Travelers Companies, and others.

### Billing

Our fees are based on the amount of time we spend on this Engagement, subject to a cap for this Engagement of $40,000.  The Engagement shall include a review of any key background documents, including correspondence between Bright Data and Meta, an analysis of the Litigation and defenses to pending claims, and a recommendation regarding next steps in the Litigation.  The Engagement may also include an interview of individual(s) from Bright Data to answer questions relevant to our analysis.

Bright Data agrees that the Engagement shall not cover any fees incurred in discussions, negotiations, or litigation with any third party, including Meta; any fees incurred for providing a review of Bright Data's business practices; or any fees incurred to prepare for and commence any litigation.  Bright Data agrees that additional work beyond the Engagement will be subject to a separate engagement agreement.

Each QEU&S attorney, legal assistant and other timekeeper assigned to this Engagement will have an hourly billing rate.  These billing rates, which are set based upon seniority and expertise, are subject to adjustment annually and we will notify you of these changes thirty days in advance of their going into effect.  In addition, our associate rates are based on years out of law school, so annually on September 1, each associate's rate moves up to the next higher class rate on our rate schedule; for example, on September 1, 2022, a class of 2021 graduate's rate will move up from a first-year associate rate to a second-year associate rate, and so on.  These "class graduation" adjustments are not rate increases, and Bright Data acknowledges and agrees to these associate class adjustments by signing this letter.  The billing rates of the attorneys whom we anticipate assigning to this Engagement currently range from $1,505.00 (for Renita Sharma) and $1,390.00 (for Hope Skibitsky) to $1,095.00 (for Zane Muller).  If one of our professionals performs multiple tasks for Bright Data during the course of a day, our statement will describe those tasks in a single time entry with the time spent on each task or set of tasks separately itemized (rounded to the nearest tenth of an hour increment).

### Ancillary Costs

We will charge separately for certain ancillary services we provide, such as facsimile charges, secretarial and paralegal overtime and word processing.  We pass along out-of-pocket costs and charges that we incur on our clients' behalf.  These typically include messenger charges, deposition videography and transcript charges and administrative charges.  Other charges are based on market, not cost, including service of process, document reproduction, color document reproduction, binders, tabs, tab creation, manila folders, redwelds, binding, punching, black and white scanning, color scanning, black and white oversized scanning, color oversized scanning, black and white blowbacks, color blowbacks, slipsheets, native file printing, TIFF generation, OCR, ECA filtering, data processing, image endorsement, media creation and duplication, document coding, hosting, and litigation support consulting at hourly rates, depending on the work performed.  Additionally, we charge for computerized legal research (Westlaw or Lexis fees, without any applicable discount), travel costs, meal charges and parking charges (when we

are working exclusively on your matter), filing fees, telephone toll charges, fees for experts and other consultants retained on Bright Data's behalf, and similar charges. Our charges may also include cellular or air telephone charges that are not related to the representation, but are necessarily incurred while we are traveling on a client's case. These charges will be at cost. The costs listed are the current rates but may be subject to future adjustment. Bright Data agrees that the ancillary costs described in this paragraph are costs to be paid in addition to our hourly billings, are not "overhead," and are payable separate and apart from our hourly billings in the event of any dispute.

In some cases, particularly if the amount is large, we may forward an invoice from an outside vendor or service directly to Bright Data for payment, which will also be due and payable upon receipt. Failure to pay such invoice upon request will be grounds for us to withdraw from our representation.

In the event Bright Data has supplied us with billing guidelines that are inconsistent with the terms of this Engagement Letter, Bright Data agrees that the terms of this Engagement Letter shall apply unless a copy of Bright Data's billing guidelines are attached to this Engagement Letter countersigned on behalf of QEU&S, in which event Bright Data's billing guidelines shall control.

We will submit bills on a monthly basis. All bills shall be paid within sixty (60) days of receipt by you. The obligation to pay our bills is solely yours and is not contingent upon any judgment or settlement; any right you may have for reimbursement, indemnification, insurance or the like; or your receipt of any other form of payment you may expect to receive from some other party. If Bright Data has any question regarding, or wish to challenge any bill, Bright Data shall notify us promptly of any such question or challenge, and shall in any event pay any portion of such bill that is not subject to question or challenge.

### *Award of Costs and Fees*

A court may sometimes order a payment of costs or attorneys' fees by one party to the other. If any fees or costs are paid to us, they will be credited against any amounts Bright Data owes us, but Bright Data will be obligated for any unpaid portion of our statements as they become due. Payment of our statements may not be deferred pending a ruling on an application for attorneys' fees, costs or sanctions or pending the receipt of such an award. Any fee or cost award received from another party will be credited to Bright Data's account, unless it results in a credit balance. If it does, we will refund the balance to Bright Data. If a court awards fees or costs against Bright Data and in favor of an opposing party, Bright Data will be responsible for payment of that amount separately from any amounts due to us.

### *Termination*

Above all, our relationship with you must be based on trust, confidence and clear understanding. If you have any questions at any time about this letter or the work that the firm, or any attorney, is performing, please call me or, if you prefer, John Quinn in our Los Angeles office at (213) 443-3000, to discuss it. You may terminate this representation at any time, with or without cause. Subject to the application of the applicable rules of professional responsibility, we also

reserve the right to withdraw if, among other things, you fail to make timely payment of any invoice, you fail to cooperate or follow QEU&S's advice on a material matter, or any fact or circumstance arises that, in QEU&S's view, renders our continuing representation unlawful or unethical. Any termination of our representation of you would be subject to such approval as may be required from any court(s) in which we are appearing on your behalf. In the event of termination by either of us, fees and costs for work performed prior to termination will still be payable to the extent permitted by law.

### Date of Commencement and Termination of the Engagement

The effective date of our agreement to provide services is the date on which we first performed services. The date at the beginning of this letter is for reference only. If this letter is not signed and returned for any reason, Bright Data will be obligated to pay us the reasonable value of any services we have performed as well as the costs we have incurred on Bright Data's behalf.

QEU&S's representation of Bright Data will be considered terminated at the earliest of (i) Bright Data's termination of the representation, (ii) QEU&S's withdrawal from the representation, (iii) the completion of QEU&S's substantive work for the Client, or (iv) following 60 days of inactivity by QEU&S on the matter.

### File Retention and Disposition

After the Engagement has concluded, and subject to payment of all outstanding fees and disbursements, you may request the return of files pertaining to the Engagement. Bright Data's files will be released only following delivery to QEU&S of a signed release letter containing appropriate directions and acknowledgment of the obligation to pay outstanding fees. QEU&S may charge you for the reasonable costs of retrieval, assembly, copying and transfer of all files or materials in any format. It is our practice to retain the permanent records of the matter, in accordance with our records retention policy, for a period of not less than 7 years after the Engagement has ended. If you do not request the files in writing before the end of our retention period, upon the expiration of that period we will have no further obligation to retain the files and may, at our discretion, destroy the files without further notice to you.

### Other Litigation or Proceedings

If, as a result of this Engagement, and even if the Engagement has ended, we are required to produce documents or appear as witnesses in any governmental or regulatory examination, audit, investigation or other proceeding or any litigation, arbitration, mediation or dispute involving Bright Data or related persons or entities, Bright Data shall be responsible for the costs and expenses we reasonably incur (including professional and staff time at our then-standard hourly rates). Similarly, if we are sued or subjected to legal or administrative proceedings as a result of our representation of Bright Data in this matter (including unmeritorious disqualification proceedings), Bright Data agrees to indemnify us for any attorney's fees and expenses (including our own professional and staff time at our then-standard hourly rates) we incur as a result. This paragraph is not intended to apply to any claim brought by or on behalf of Bright Data alleging wrongdoing by QEU&S.

*Arbitration*

Although we think it is unlikely, it is possible that a dispute may arise between us regarding some aspect of the Engagement and our representation of you.  If the dispute cannot be resolved amicably through informal discussions, we believe that most, if not all, disputes can be resolved more expeditiously and with less expense by binding arbitration than in court.  This provision will explain under what circumstances such disputes shall be subject to binding arbitration.

(a)      AGREEMENT TO ARBITRATE:

Any dispute between QEU&S and You as to attorneys' fees and/or costs in connection with the Engagement shall be resolved as follows:

1.      If any such fee and/or cost dispute arises, QEU&S shall provide You with written notice of Your right to arbitrate under the California State Bar Act (Bus. & Prof. Code § 6200, *et seq.*).  Those procedures permit a trial after arbitration, unless the parties agree in writing, after the dispute has arisen, to be bound by the arbitration award.

2.      If Bright Data exercises its rights under the California State Bar Act, Bright Data and QEU&S may thereafter agree that the arbitration will be binding.

3.      If Bright Data exercises its rights under the California State Bar Act, and Bright Data and QEU&S do not agree that the arbitration is binding, then upon the rejection by either party of the decision resulting from the arbitration procedures under the Act, Bright Data and QEU&S agree that the dispute will then be subject to mandatory arbitration as described in ¶ (b) below.

4.      If, after receiving notice of its right to arbitrate, Bright Data does not exercise its rights under the California State Bar Act by filing a request for fee arbitration within 30 days, Bright Data and QEU&S agree that the dispute will be subject to mandatory arbitration as described in ¶ (b) below.

Any other dispute arising under the Engagement or in connection with the provision of legal services by QEU&S including, without limitation, any claim for breach of contract, professional negligence or breach of a fiduciary duty, shall be resolved by confidential, binding arbitration as described in ¶ (b) below.

By signing this Engagement Letter, Bright Data and QEU&S confirm that they have read and understand these paragraphs concerning arbitration and voluntarily agree to binding arbitration. In doing so, Bright Data and QEU&S voluntarily give up important constitutional rights to trial by judge or jury, as well as rights to appeal; depending on the rules of the arbitration program, both also may be giving up their rights to discovery.  If Bright Data later refuses to submit to arbitration after agreeing to do so, Bright Data may be ordered to arbitrate pursuant to the provisions of California law.  Bright Data is advised that it has the right to have an independent lawyer of Bright Data's choice review these arbitration provisions, and this entire agreement, prior to signing this Engagement Letter.

(b)      ARBITRATION PROCEDURES:

In the event of any dispute that is subject to arbitration pursuant to ¶ (a) above, the initiating party will provide a written demand for arbitration to the other party setting forth the basis of the initiating party's claim and the dollar amount of damages sought.

The parties further agree that, if arbitration is necessary, each arbitration will:

1.      Be heard and determined by a panel of three arbitrators with one selected by each party to the arbitration, and the third selected by the first two from the panel of arbitrators of JAMS (or its successor). Once a party selects an arbitrator and notifies the other party (the "non-selecting party") of its selection, the non-selecting party shall select an arbitrator within thirty (30) calendar days. If the non-selecting party fails to select an arbitrator within thirty (30) calendar days, JAMS (or its successor) shall select an arbitrator on the non-selecting party's behalf. Once two arbitrators are selected, those two arbitrators shall select the third arbitrator (from the panel of arbitrators of JAMS, or its successor) within twenty (20) calendar days. If the first two arbitrators fail to select a third arbitrator within twenty (20) calendar days, JAMS (or its successor) shall select an arbitrator (from the panel of arbitrators of JAMS, or its successor) on their behalf.

2.      All selected arbitrators shall be retired state or federal judges;

3.      Take place in the city in the United States where the QEU&S attorneys who spent the most time on the Engagement are located (the "applicable city");

4.      Be conducted in accordance with JAMS Streamlined Arbitration Rules and Procedures (or any successor rules and procedures), in effect at the time the initiating party delivers to the other party the demand for arbitration required hereunder;

5.      Require the arbitrators to enforce the terms of this agreement, and they will lack authority to do otherwise;

6.      Apply the laws of the jurisdiction in the United States where the applicable city is located. The arbitration proceedings and the decision of the arbitrator will be confidential. Notwithstanding anything to the contrary contained in this agreement, the prevailing party in any arbitration, action or proceeding to enforce any provision of this agreement (for avoidance of doubt, a party that obtains a net monetary recovery shall be the prevailing party) will be awarded attorneys' fees and costs incurred in that arbitration, action or proceeding even if the law provides otherwise, including, without limitation, the value of the time spent by QEU&S attorneys to prosecute or defend such arbitration, action or proceeding (calculated at the hourly rate(s) then normally charged by QEU&S to clients which it represents on an hourly basis), except that the foregoing shall not apply to any mediation, as described above, and the parties will split the fees of the arbitrator; and

7.      Be final and binding on both parties, will not be subject to de novo review, and that no appeal may be taken. The ruling of the arbitrator(s) may be entered and enforced as a judgment by a court of competent jurisdiction. The arbitration provisions of this Agreement may

be enforced by any court of competent jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses.

### Binding Agreement

By signing below, Bright Data agrees that it has had enough time to review this letter, that we have advised you that Bright Data has the right to consult another, independent lawyer about the provisions relating to the waiver of conflicts of interest and any other aspect of this letter as to which Bright Data may wish to avail itself of such advice, and that Bright Data is satisfied that it understands this letter. Bright Data also agrees that it has the freedom to select and engage the counsel of its own choice and accordingly that this is an arm's length agreement between parties of equal bargaining strength and that Bright Data has freely determined, without any duress, to sign and agree to these terms.

### Severability

Should any part of this Agreement, or language within any provision of this Agreement, be rendered or declared invalid by a court of competent jurisdiction, such invalidation of such part or portion of this Agreement, or any language within a provision of this Agreement, should not invalidate the remaining portions thereof, and they shall remain in full force and effect.

### Amendments and Additional Engagements

The provisions of this letter may only be amended in writing, signed by both parties.

If Bright Data later asks us to take on additional assignments, we will send you a supplementary engagement letter reflecting each additional assignment.

I am enclosing two executed copies of this letter. If the foregoing accurately reflects our agreement, please confirm that by signing and returning one of the enclosed copies to me. Please do not hesitate to call me to discuss any questions you may have regarding this agreement. In conformance with QEU&S's policies, we cannot commence work on this Engagement until we have received a copy of this letter countersigned by you.

Thank you again for this opportunity to be of service. We look forward to working with you on this Engagement.

Very truly yours,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Renita Sharma

**[STATEMENT TO BE SIGNED BY CLIENT:]**

I have read the above Engagement Letter and understand and agree to its contents.  The parties to this Engagement hereby agree that a faxed, pdf or electronic signature shall count as the original.

Bright Data

By: _____

Name: _____

Title: _____

Date: _____

Or Lencnher

CEO

2/23/2023

2.22

09384-00001/13897319.1

# EXHIBIT 3

DAVID H. HARPER (*Pro Hac Vice*)
david.harper@haynesboon.com
JASON P. BLOOM (*Pro Hac Vice*)
jason.bloom@haynesboone.com
**HAYNES AND BOONE, LLP**
One Victory Park
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

JASON T. LAO, SBN 288161
jason.lao@haynesboone.com
ANDREA LEVENSON, SBN 323926
andrea.levenson@haynesboone.com
**HAYNES AND BOONE, LLP**
600 Anton Boulevard, Suite 700
Costa Mesa, California 92626
Telephone: (949) 202-3000
Facsimile: (949) 202-3001

*Attorneys for Plaintiff*
*X Corp.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X CORP., a Nevada corporation,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>BRIGHT DATA LTD., an Israeli corporation,<br><br>　　　　Defendant. | Case No. 3:23-cv-03698-WHA<br><br>**JOINT CASE MANAGEMENT STATEMENT AND [PROPOSED] ORDER** |

The parties to the above-entitled action jointly submit this Joint Case Management Statement and (Proposed) Order pursuant to Fed. R. Civ. P. 26(f), the Standing Order for All Judges of the Northern District of California, and Civil Local Rule 16-9. On November 8, 2023, the parties held a conference, pursuant to Fed. R. Civ. P. 26(f).

## 1.   Jurisdiction and Service

On September 25, 2023, Bright Data Ltd. ("Bright Data") filed an executed Waiver of Service of Summons.  Dkt. 17.  This Court has jurisdiction under 28 U.S.C. § 1332 over the causes of action alleged in the Complaint because complete diversity exists, and the amount in controversy exceeds $75,000.  Compl. ¶ 7.  Bright Data has challenged personal jurisdiction for X Corp.'s tortious interference claim (Count II).  *See* Dkt. 22.

## 2.   Facts

### X Corp.'s Statement of Facts

X Corp. owns and operates the social media platform X (formerly known as Twitter), accessible through twitter.com, X.com, and various mobile and online applications.  The X platform has hundreds of millions of active users worldwide.  X Corp. allows its users to post and share content, including written comments, images and videos, and to share, like, and comment on other users' posts.  To post content on X or to re-post, like or otherwise interact with posts by others, users must register for an account and log in to that account.  To register, users must provide their name, phone number or email address, and date of birth.  X Corp. then verifies registrants through email or phone confirmation.  X Corp. utilizes a variety of technological measures to detect and prevent automated systems from registering for accounts, including by requiring potential account holders to complete a "CAPTCHA" fraud-detection process to determine whether the user is human.

X Corp. recently discovered that Bright Data has engaged in widespread scraping[1] of X Corp.'s data, circumventing X Corp.'s technical barriers and violating the Terms to which Bright

---

[1] Scraping is the process of using automated means to collect content or data from a website. The process involves making a request to a website's server, downloading the results and parsing them to extract the desired data.  Data scrapers typically send large volumes of these requests, taxing the capacity of servers and diminishing the experience for legitimate users.

Data agreed.  Bright Data also facilitated the scraping of data from X and induced X users to violate X Corp.'s Terms.  In fact, Bright Data's website makes clear that the company engages in prohibited scraping on an industrial scale and brazenly advertises that Bright Data sells tools and services that encourage and enable others to engage in prohibited scraping.

X Corp.'s Terms expressly prohibit such activities.  Specifically, all users who register for a X account, and/or view the X website or application, agree to a binding contract with X Corp. as outlined in X Corp.'s User Agreement, which is comprised of the Terms of Service, Privacy Policy, and the Twitter Rules and Policies (collectively the "Terms").  X Corp.'s Terms state that a user may not "access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers" or "breach or circumvent any security or authorization measures."  They also state a user may not "access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us."  In addition, X Corp.'s Terms specifically state that "scraping the Services without our prior consent is expressly prohibited."  Under the Terms, users may not "forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information."  Users are also prohibited from any conduct that would "interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including … overloading, flooding, spamming … or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services."  The Terms also incorporate by reference X Corp.'s Platform Manipulation and Spam Policy (the "Policy"), which specifically prohibits "coordinated harmful activity that encourages or promotes behavior which violates the Twitter Rules." The Policy also prohibits "leveraging Twitter's open source code to circumvent remediations or platform defenses."  The Terms prohibit selling any content collected from the platform.  Users may not "reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services" unless otherwise authorized by the Terms or a developer agreement.

Advertisers on the X platform are also subject to X Corp.'s Ads Policies, which expressly state that advertisers must follow the Terms and all X Corp. Rules.  For developers who wish to retrieve or analyze X Corp.'s data, X Corp. offers specialized access to its Application Programming Interfaces ("APIs") through a tiered subscription service.  X Corp.'s Developer Agreement also limits the access of developers to X Corp.'s content.  The Agreement instructs developers that they "may not exceed or circumvent rate limits, or any other limitations or restrictions described in this Policy or your agreement with Twitter, listed on the Developer Site, or communicated to you by Twitter."  In addition, X Corp. utilizes a variety of technological measures to detect and prevent automated systems from scraping  data from its platform, including industry standard automation prevention techniques, such as CAPTCHAs, user identification and IP rate limits and anomaly detection tools.

Bright Data agreed to all of those Terms when it and its agents and employees created and maintained X Corp. accounts.  Moreover, X Corp. has never granted Bright Data permission to scrape data from the X platform.  Bright Data has not publicly disclosed how it evades X Corp.'s technical safeguards against scraping.  But its website makes clear that Bright Data offers X Corp.'s data (which could have only been obtained by engaging in prohibited scraping of X's platform) for sale on its website; and sells tools and services that encourage and enable others to engage in prohibited scraping.

### *Bright Data's Statement of Facts*

[Bright Data to insert]

### 3.    <u>Legal Issues</u>

The principal legal issues in this dispute are:

- Whether Bright Data's conduct constitutes a breach of contract for violating X Corp.'s Terms;

- Whether Bright Data's conduct tortiously interfered with X Corp.'s contractual relations with its users;

- Whether Bright Data was unjustly enriched as a result of its actions, and at the detriment of X Corp.;

- X Corp.'s entitlement to the relief sought in the Complaint, including injunctive relief; compensatory, statutory, and punitive damages in an amount to be proven at trial; reasonable costs, including reasonable attorneys' fees; pre-and post-judgment interest as allowed by law, an accounting of Bright Data's profits resulting from its scraping activity, disgorgement of those profits; and all other equitable and legal relief the Court deems just and proper.

Bright Data filed a motion to dismiss, arguing that the Court does not have personal jurisdiction over it for X Corp.'s tortious interference claim, that X Corp.'s tortious interference and unjust enrichment claims should be dismissed pursuant to Rule 12(b)(6), and that X Corp.'s breach of contract claim should be dismissed, in part, pursuant to Rule 12(b)(6).

### 4.    **Motions**

***Pending Motions***

On October 25, 2023, Bright Data moved to dismiss X Corp.'s  tortious interference and unjust enrichment claims and breach of contract claim, in part, under Rule 12(b)(6) for failure to state a claim, and the tortious interference claim under Rule 12(b)(2) for lack of personal jurisdiction.  Dkt. 22.  The hearing is scheduled for November 30, 2023.

***X Corp.'s Anticipated Motions***

X Corp. intends to file an early summary judgment motion on the affirmative elements of X Corp.'s breach of contract claim—namely that Bright Data is liable for breaching the Terms by scaping X Corp. user data, selling X Corp. user data, and enabling and encouraging others to do so.  This early summary judgment motion will not impact X Corp.'s ability to file additional summary judgment motions as appropriate.

***Bright Data's Anticipated Motions***

[Bright Data to insert]

### 5.    **Amendment of Pleadings**

In response to Bright Data's pending motion to dismiss, X Corp. intends to amend its Complaint by November 15, 2023.  In addition, as outlined in the proposed schedule below, the parties requests that the Court set a February 16, 2023 deadline to amend pleadings.

### 6. <u>Evidence Preservation</u>

The parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information, have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding preservation of discoverable information, and each party has taken steps it believes are reasonable and proportionate to preserve evidence relevant to the issues reasonably evident in this action.

### 7. <u>Disclosures</u>

The parties will exchange Initial Disclosures on November 22, 2023.

### 8. <u>Discovery</u>

Discovery has only recently begun, and no discovery issues have been identified.  The parties expect that discovery will be guided by the Federal Rules of Civil Procedure and Local Rules of this Court.  The parties have had preliminary discussions relating to a Confidentiality Order, ESI Protocol, and Privilege Protocol.  The parties expect to present any stipulations or disputes to the Court as soon as reasonably practicable.

[Bright Data to insert]

### 9. <u>Class Actions</u>

This case is not a prospective class action.

### 10. <u>Related Cases</u>

Meta Platforms, Inc., which operates Facebook, has filed a similar case against Bright Data in this district, alleging breach of contract and tortious interference based on Bright Data's scraping activities.  *See Meta Platforms, Inc. v. Bright Data Ltd.*, 3:23-cv-00077-EMC.  Although the cases involve different plaintiffs and contracts, they involve some common legal issues.

### 11. <u>Relief</u>

As set forth in the Complaint, X Corp. seeks damages for Bright Data's alleged breach of the Terms and to enjoin Bright Data from continuing its scraping activities going forward, as well as other equitable relief including an accounting and disgorgement, reasonable costs and fees.

### 12. <u>Settlement and ADR</u>

The parties have conferred regarding ADR options, and anticipate that they will elect

private mediation at the appropriate time.

### 13.   Other References

The parties do not believe a reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation is necessary.

### 14.   Narrowing of Issues

The parties met and conferred on this issue but were unable to reach agreement on a way of narrowing the issues at this time.  The parties will discuss issues that could be narrowed at trial or resolved through stipulation at the appropriate time, if necessary.

### 15.   Expedited Trial Procedure

The parties do not believe that this case is appropriate for Expedited Trial Procedure of General Order No. 64 Attachment A.

### 16.   Scheduling

The parties propose the following joint schedule:

| Action | Proposed Deadline |
|---|---|
| November 22, 2023 | Initial Disclosures |
| February 16, 2024 | Deadline to amend pleadings |
| August 30, 2024 | Non-expert discovery cutoff |
| September 20, 2024 | Initial expert disclosures (on issues where each party bears burden) |
| October 18, 2024 | Rebuttal expert disclosures |
| December 6, 2024 | Expert discovery cutoff |
| December 20, 2024 (filing)<br>January 24, 2025 (opposition)<br>February 7, 2025 (reply)<br>February 27, 2025 (hearing) | Dispositive motion cutoff |
| February 28, 2025 | Motions in limine (served not filed) |
| March 7, 2025 | Joint pre-trial statement |
| March 14, 2025 | Oppositions to Motions in limine (served not |

JOINT CASE MANAGEMENT STATEMENT AND [PROPOSED] ORDER

| | filed) |
|---|---|
| March 19, 2025 | Collated Motions in limine filed |
| March 26, 2025 2:00 p.m. | Pre-Trial Conference |
| April 14, 2025 7:30 a.m. | Trial (5-7 days) |

### 17.  Trial

X Corp. has demanded a trial by jury, and expects the trial to last five to seven days.

[Bright Data to insert]

### 18.  Disclosure of Non-Party Interested Entities or Persons

The parties have filed certifications required by Civil Local Rule 3-15 and the Federal Rules of Civil Procedure.  Dkt. 2, 21.  The parties certifies that as of the date of this filing, other than the named parties, there is no such interest to report.

### 19.  Professional Conduct

All attorneys of record for the parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

### 20.  Opportunities for Junior Lawyers

The parties are mindful of the Court's encouragement to involve junior lawyers in the action.  Counsel for X Corp., Haynes and Boone, LLP, has two lawyers six years or fewer out of law school who are already actively involved in this case—Andrea Levenson and Reid Pillifant (*pro hac vice* to be filed).  X Corp. anticipates opportunities for each of them, as well as other junior lawyers who may later appear in the case, to argue discovery and evidentiary motions, depose fact and expert witnesses or defend such depositions, and/or to examine witnesses at any trial.  At this stage of the litigation, X Corp. believes it is premature to attempt to identify such motions, depositions, or witnesses with greater specificity.

1    Dated: June 10, 2024                    Respectfully submitted,

2
                                            **HAYNES & BOONE LLP**
3
                                    By:  /s/ Jason T. Lao
4                                        David H. Harper (*Pro Hac Vice*)
                                         david.harper@haynesboone.com
5                                        Jason P. Bloom (*Pro Hac Vice*)
                                         jason.bloom@haynesboone.com
6                                        One Victory Park
                                         2323 Victory Avenue, Suite 700
7                                        Dallas, Texas 75219
                                         Telephone: (214) 651.5000
8                                        Telecopier: (214) 651.5940
                                         Jason T. Lao
9                                        jason.lao@haynesboone.com
                                         Andrea Levenson
10                                       andrea.levenson@haynesboone.com
                                         600 Anton Boulevard, Suite 700
11                                       Costa Mesa, California 92626
                                         Telephone: (949) 202-3000
12                                       Facsimile: (949) 202-3001
                                         *Attorneys for Plaintiff X Corp.*
13

14

15

16

17                      **CASE MANAGEMENT ORDER**

18        The above Joint Case Management Statement and (Proposed) Order is approved as the

19   Case Management Order for this case and all parties shall comply with its provisions.

20

21        **IT IS SO ORDERED.**

22

23   Dated: _____          _____

24                                            William Alsup
                                             UNITED STATES DISTRICT JUDGE
25

26

27

28

                                        9

1

## **<u>CERTIFICATE OF SERVICE</u>**

2

3        I HEREBY CERTIFY that on this day, a true and correct copy of the foregoing document

4    was served by filing the same via the Court's CM/ECF system, which will provide notice of the

5    filing of same to all counsel of record.

6    Date:  June 10, 2024                    */s/Jason T. Lao*
                                                Jason T. Lao
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28