1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Andrew Schapiro (*Pro Hac Vice*)
2   *andrewschapiro@quinnemanuel.com*
    191 N. Wacker Drive, Suite 2700
3   Chicago, IL 60606-1881
    Telephone: (312) 705-7400
4
    David Eiseman (Bar No. 114758)
5   *davideiseman@quinnemanuel.com*
    50 California Street, 22nd Floor
6   San Francisco, California 94111-4788
    Telephone: (415) 875-6600
7
8   Stefan Berthelsen (*Pro Hac Vice*)
    *stefanberthelsen@quinnemanuel.com*
9   51 Madison Ave, 22nd floor
    New York, NY 10010
10  Telephone: (212) 849-7014
11
    *Attorneys for Plaintiff*
12  *X Corp.*

13                   **UNITED STATES DISTRICT COURT**

14                   **NORTHERN DISTRICT OF CALIFORNIA**

15

16   X CORP., a Nevada corporation,              Case No. 3:23-cv-03698-WHA

17                      Plaintiff,               **PLAINTIFF'S MEMORANDUM OF**
              vs.                                **POINTS AND AUTHORITIES IN**
18                                               **OPPOSITION TO DEFENDANT'S**
     BRIGHT DATA LTD., an Israeli                **MOTION TO DISQUALIFY QUINN**
19   corporation,                                **EMANUEL**

20                      Defendant.
                                                 Judge:      Hon. William Alsup
21                                               Courtroom:  12, 19th Floor
                                                 Date:       July 1, 2024
22                                               Time:       8:00 a.m.

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................. 1

ISSUE TO BE DECIDED ...................................................................................................... 2

STATEMENT OF FACTS ..................................................................................................... 3

    A.    Quinn Emanuel's "Meta Consultation" Representation ................................................ 3

    B.    The X Matter .............................................................................................................. 5

    C.    Quinn Emanuel's "X Matter" Representation .............................................................. 6

LEGAL STANDARD ............................................................................................................ 7

ARGUMENT ........................................................................................................................ 8

    D.    The Meta Consultation Is Not Substantially Related To This Representation ............. 8

        1.    The Information Quinn Emanuel Acquired From The Meta Consultation Is Immaterial To This Representation ......................................... 9

        2.    The Meta Consultation Involved Different Facts And Legal Issues Than This Representation .................................................................................. 14

            (a)    The Meta Consultation Involved Different Contracts ........................ 14

            (b)    The X Matter Involves Additional Causes of Action And Different Issues ............................................................................... 17

    E.    Disqualifying Quinn Emanuel Would Be Inequitable and Prejudicial ..................... 18

CONCLUSION ................................................................................................................... 21

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISQUALIFY QUINN EMANUEL

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

<u>Cases</u>

4

*Concat LP v. Unilever, PLC*,
    350 F. Supp. 2d 796 (N.D. Cal. 2004) ................................................................. 7

5

6

*Davis v. Wakelee*,
    156 U.S. 680 (1895) .......................................................................................... 19

7

*Del Thibodeau v. ADT Sec. Servs.*,
    No. 3:16-cv-02680-GPC-AGS, 2018 WL 2684254 (S.D. Cal. June 5, 2018) ........................ 18

8

9

*E.M.M.I. Inc. v. Zurich Am. Ins. Co.*,
    32 Cal. 4th 465 (2004) ...................................................................................... 15

10

11

*Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*,
    809 F. Supp. 1383 (N.D. Cal. 1992) .................................................................... 10

12

*Farhang v. Indian Inst. of Tech., Kharagpur*,
    No. C-08-02658 RMW, 2009 WL 3459455 (N.D. Cal. 2009) ................................. 10

13

14

*Farris v. Fireman's Fund Ins. Co.*,
    119 Cal. App. 4th 671 (2004) .......................................................................... 9, 11

15

16

*Faughn v. Perez*,
    145 Cal. App. 4th 592 (2006) .............................................................................. 12

17

*Flatt v. Superior Ct.*,
    9 Cal. 4th 275 (1994) ....................................................................................... 7, 8

18

19

*Foster Poultry Farms v. Conagra Foods Refrigerated Foods Co.*,
    No. F 04-5810, 2005 WL 2319186 (E.D. Cal. Sept. 22, 2005) ......................... 13, 14

20

*Fremont Indem. Co. v. Fremont Gen. Corp.*,
    143 Cal. App. 4th 50 (2006) ............................................................................... 13

21

22

*Gotham City Online, LLC v. Art.com, Inc.*,
    No. C 14-00991 JSW, 2014 WL 1025120 (N.D. Cal. Mar. 13, 2014) ....................... 7

23

24

*H.F. Ahmanson & Co. v. Salomon Bros., Inc.*,
    229 Cal. App. 3d 1445 (1991) ............................................................................. 10

25

26

*Human Longevity, Inc. v. J. Craig Venter Inst., Inc.*,
    No. 18-CV-1656-WQH-LL, 2018 WL 5840045 (S.D. Cal. Nov. 8, 2018) .......... 14, 15

27

*Jessen v. Hartford Casualty Ins. Co.*,
    111 Cal. App. 4th 698 (2003) ........................................................................... 8, 9

28

*Khani v. Ford Motor Co.*,
   215 Cal. App. 4th 916 (2013) ................................................................ 1, 7, 12, 14

*Kirk v. First Am. Title Ins. Co.*,
   183 Cal. App. 4th 776 (2010) ................................................................................ 21

*Lehman Bros. Holdings Inc. v. Direct Mortg. Corp.*,
   No. 2:09-cv-04170, 2013 WL 12114447 (C.D. Cal. Feb. 4, 2013) ........................ 13

*Meta Platforms, Inc. v. Bright Data Ltd.*,
   No. 23-CV-00077-EMC, 2024 WL 251406 (N.D. Cal. Jan. 23, 2024) ............................ 5, 15

*Nat'l Grange of Order of Patrons of Husbandry v. Cal. Guild*,
   No. 2:14-676 WBS DB, 2017 WL 2021731 (E.D. Cal. May 12, 2017) ......................... 20, 21

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ........................................................................................... 19

*Oaks Mgmt. Corp. v. Sup. Ct.*,
   145 Cal. App. 4th 453 (2006) .......................................................................... 19, 21

*Openwave Sys. Inc. v. Myriad France S.A.S.*,
   No. C 10-02805 WHA, 2011 WL 1225978 (N.D. Cal. Mar. 31, 2011) ................................ 7

*Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*,
   760 F.2d 1045 (9th Cir. 1985) ............................................................................... 7

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
   50 Cal. 3d 1118 (1990) ....................................................................................... 15

*Sherman v. CLP Res., Inc.*,
   No. CV 12-8080-GW(PLAX), 2015 WL 13542762 (C.D. Cal. Feb. 4, 2015) ...................... 18

*Skyy Spirits, LLC v. Rubyy, LLC*,
   No. C 09-00646 (WHA), 2009 WL 3762418 (N.D. Cal. Nov. 9, 2009) ............................ 7

*TWiT, LLC v. Twitter Inc.*,
   No. 18-CV-00341-JSC, 2018 WL 2470942 (N.D. Cal. June 1, 2018) ............................. 12

*ViChip Corp. v. Lee*,
   No. C 04-2914 PJH, 2004 WL 2780170 (N.D. Cal. Dec. 3, 2004) .............................. 10

*Visa U.S.A., Inc. v. First Data Corp.*,
   241 F. Supp. 2d 1100 (N.D. Cal. 2003) ................................................................. 20

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*,
   No. 19-CV-07123-PJH, 2020 WL 7133773 (N.D. Cal. June 16, 2020) .......................... 8, 11

*Wu v. O'Gara Coach Co., LLC*,
   38 Cal. App. 5th 1069 (2019) ........................................................................... 9, 10

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISQUALIFY QUINN EMANUEL

*Yumul v. Smart Balance, Inc.*,
    No. CV 10-00927 MMM, 2010 WL 4352723 (C.D. Cal. Oct. 8, 2010)................................ 18

## Rules

California Rule of Professional Conduct 1.9 ....................................................... 7, 11, 12

## Other Authorities

Hazard, *et al.*, *The Law of Lawyering* § 14.07 ............................................. 9, 12, 19, 20

*How to Read robots.txt for Web Scraping*, Feb. 21, 2023, ZENROWS,
    https://www.zenrows.com/blog/robots-txt-web-scraping#robots-txt-web-scraping
    (last visited June 17, 2024)..................................................................................... 16

1

## INTRODUCTION

2       Bright Data argues, in essence, that as a result of a single, tightly circumscribed engagement,

3 Quinn Emanuel Urquhart and Sullivan, LLP ("Quinn Emanuel") can never be adverse to it in any

4 case involving Bright Data's business.  Neither the law nor the terms of the prior Bright Data-Quinn

5 Emanuel engagement support that position.  Under California law—including either the duty of

6 loyalty or confidentiality—a lawyer's acquisition of general knowledge about a client's business

7 practices or litigation strategy is not enough to establish substantial relatedness for conflicts purposes.

8 And that, at most, is what transpired here.  The fact that different Quinn Emanuel attorneys (who are

9 now ethically walled), pursuant to a tailored engagement letter, previously billed 30.6 hours for

10 discrete, peripheral advice regarding a specific lawsuit in which Bright Data allegedly breached a

11 different social media platform's different terms and conditions should not result in X being deprived

12 of its chosen attorneys at Quinn Emanuel in a case concerning Bright Data's breach of X's terms of

13 use and other claims.

14       A party seeking disqualification carries a heavy burden.  And rightfully so.  Litigants have an

15 interest in being represented by the counsel of their choice, and the possibility of tactical abuse is

16 always present.  To meet its burden Bight Data would need to demonstrate (1) substantial similarity

17 between the representations and (2) that common issues from the prior representation are of critical

18 importance to the new representation.  *Khani v. Ford Motor Co.*, 215 Cal. App. 4th 916, 921 (2013).

19 It cannot do so.  That is particularly the case in light of this Court's rulings significantly narrowing

20 the issues and determining that X's terms—unlike the terms at issue in the *Meta v. Bright Data* case—

21 apply to Bright Data's logged-out access, use, and scraping of X's platform.  This Court's narrowing

22 of the issues is unsurprising, as the *Meta* case involved a different social media platform with a

23 different use case and a different terms of use agreement with drastically different terms.

24       Bright Data knows the two matters are materially different.  In preparing the parties' Joint

25 Case Management Statement for this case, X suggested informing the Court that Meta had filed "a

26 similar case against Bright Data . . . based on Bright Data's scraping activities" and that the two cases

27 involved "some common legal issues."  Bright Data—the party best positioned to know, as it was a

28 defendant in both cases—rejected X's characterization of the *Meta* case as a lawsuit about "Bright

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISQUALIFY QUINN EMANUEL

Data's scraping activities," and said instead that it was based on "Meta's Terms of Use."  It rejected X's suggestion that the two cases shared "common" legal issues.  And it refused to sign on to X's assertion that "the *Meta* case involves similar allegations of data scraping from social media platforms as the present case."

Now, however, Bright Data has decided that Quinn Emanuel's two representations are so closely related that this Court should disqualify X's chosen counsel for having provided overview consultation about the *Meta* case more than a year ago.  The about-face is remarkable.  Nor can Bright Data pretend to be surprised to see Quinn Emanuel appear in this case.  Quinn Emanuel expressly told Bright Data that the firm does work "on both sides of the v" in cases like this one involving alleged breaches of terms of service.  Presumably that is one reason Bright Data was interested in getting Quinn Emanuel's assessment of the *Meta* case.  In any event, Bright Data expressly agreed in connection with Quinn Emanuel's limited consultation that Quinn Emanuel "may represent other clients, including the parties adverse to you in this matter, in the future . . . including the appearance on behalf of another client adverse to Bright Data . . .  provided that the other matter is not substantially related."  And Bright Data and Quinn Emanuel also expressly agreed in their engagement letter that the scope of Quinn Emanuel's work would be limited to providing an analysis of the *Meta* case.  That is precisely what the work entailed.

Bright Data has not carried its heavy burden to warrant the drastic remedy of disqualifying Quinn Emanuel.  It has not established that Quinn Emanuel's prior work is substantially related to this representation or that Quinn Emanuel actually received confidential information that is material to the current matter adverse to Bright Data.  It would be unfair and inconsistent with the governing law to deprive X of its chosen counsel.  The motion should be denied.

## ISSUE TO BE DECIDED

Whether X should be deprived of its chosen attorneys at Quinn  Emanuel in a case concerning Bright Data and its customers' breach of X's terms of use and other claims because different Quinn Emanuel attorneys previously billed 30.6 hours for discrete, peripheral advice regarding a dispute in which Bright Data allegedly breached a different social media platform's different terms of use.

**STATEMENT OF FACTS**

**A.    Quinn Emanuel's "Meta Consultation" Representation**

On February 15, 2023, Bright Data contacted Quinn Emanuel attorney Hope Skibitsky seeking an analysis of two pending lawsuits between it and Meta Platforms, Inc. and Instagram, LLC (the "Meta Consultation").  ECF No. 93-1, Ex. 1 ("Avisar Decl.") ¶ 2; Declaration of Hope D. Skibitsky filed concurrently herewith ("Skibitsky Decl.") ¶ 3.  After some negotiation, Bright Data signed an engagement letter affirming the parties' "mutual understanding" that the Meta Consultation would be limited to "an analysis of the litigation currently pending between Bright Data and Meta Platforms, Inc. and Instagram, LLC . . . in the Northern District of California and the Superior Court of the State of Delaware (collectively, the 'Litigation') (the 'Engagement')."  ECF No. 93-1, Ex. 2 ("Engagement Letter") at 1.    Specifically, Bright Data expressly agreed that the scope of Quinn Emanuel's engagement was limited as follows:

> You have engaged Quinn Emanuel to advise you in connection with the Engagement. ***Quinn Emanuel's services will be limited to providing an analysis of the Litigation, including an analysis of the arguments that may be raised and defended against in the Litigation and an overview of what Quinn Emanuel sees as potential next steps in the Litigation, and participating in calls with Bright Data's senior management to answer any questions arising following review of our analysis by Bright Data's senior management. Our services will not extend to other business, personal or legal affairs of Bright Data, or to any other aspect of Bright Data's activities.*** This Engagement is ***not*** intended to encompass any matter in which the professional services of Quinn Emanuel will be involved in entering an appearance or filing any documents or pleadings in any litigation, including in the Litigation, or in entering any appearance before any tribunal, and any such matter shall be the subject of an additional separate and specific engagement letter. Quinn Emanuel's receipt or use of confidential or other information from Bright Data or others in the course of this representation does not mean that Quinn Emanuel will render any other advice or services either to Bright Data or any other person or entity.

*Id.* at 2 (emphasis added).  As part of the Meta Consultation, Bright Data agreed in advance that Quinn Emanuel could be adverse to Bright Data in any matter not substantially related to the Meta Consultation:

> Our firm has many lawyers and several offices. ***We may currently or in the future represent one or more other clients in matters involving Bright Data and we may represent the parties that are adverse to you*** in this

matter or in other unrelated matters. ***We are undertaking this Engagement on condition that Bright Data gives its express consent and agreement that we may represent other clients,*** including the parties adverse to you in this matter, ***in the future in other matters in which we do not represent Bright Data even if the interests of the other clients are adverse to Bright Data (including the appearance on behalf of another client adverse to Bright Data in an unrelated negotiation, litigation or arbitration), provided that the other matter is not substantially related to our representation of Bright Data.***

*Id.* at 4 (emphasis added). Over the next approximately four weeks, two Quinn Emanuel attorneys billed 30.6 hours and a total of $36,191.50, which included authoring a 24-page memorandum,[1] and a few additional Quinn Emanuel attorneys participated in four calls and/or virtual meetings. Skibitsky Decl. ¶ 10; Avisar Decl. ¶ 16. (Quinn Emanuel attorneys spent an additional 10 to 20 hours on the matter for which they did not bill. Skibitsky Decl. ¶ 10.) During that time, the only documents Quinn Emanuel received from Bright Data—apart from public filings—were a Bright Data agreement with a client of Bright Data's and a four-page memo prepared by the Proskauer firm in response to Quinn Emanuel's analysis memorandum. Skibitsky Decl. ¶ 4.

On March 7, 2023, Bright Data requested information regarding Quinn Emanuel's credentials; Ms. Skibitsky responded identifying various representative matters in internet-related litigation, noting that Quinn Emanuel has been on both sides of terms of service litigation. Skibitsky Decl. ¶ 13. At that time, Ms. Skibitsky did not understand Ms. Avisar's request for Quinn Emanuel's credentials to be a request for a complete list of all technology-adjacent clients Quinn Emanuel has represented, as Ms. Avisar now suggests in her declaration. *Id.* ¶ 14.

Shortly thereafter, Ms. Skibitsky and Quinn Emanuel attorney Adam Wolfson attended a Bright Data board meeting on March 12, 2023, during which the Quinn Emanuel attorneys discussed the impact any rulings in the *Meta* case could have on Bright Data. *Id.* ¶ 18. Quinn Emanuel did not, however, advise Bright Data with regard to any specific website operators other than Meta. *Id.* After

---

[1]  An additional junior associate, Sam Cleveland, proofread and made light edits to the memorandum before Quinn Emanuel shared it with Bright Data; Mr. Cleveland did not bill time for his work. Skibitsky Decl. ¶¶ 10, 19.

the March 12, 2023 meeting, Quinn Emanuel's Engagement with Bright Data came to an end, less than four weeks after it began.  *Id.* ¶ 16.

**B.      The X Matter**

X filed its original complaint in this case on July 26, 2023 (the "X Matter").  ECF No. 1.  On November 14, 2023, X filed an amended complaint, asserting breach of X's Terms of Service, Privacy Policy, and X's Rules and Policies (the "X Terms"), tortious interference with contract, unjust enrichment, trespass to chattels, California statutory business fraud, and misappropriation.  ECF No. 36.  On January 3, 2024, Bright Data and X filed a Joint Case Management Statement.  ECF No. 51. As noted in Bright Data's motion, X's originally-submitted draft version of that statement stated, "Meta Platforms, Inc., which operates Facebook, has filed a similar case against Bright Data in this district, alleging breach of contract and tortious interference based on Bright Data's scraping activities.  Although the cases involve different plaintiffs and contracts, they involve some common legal issues."  ECF No. 93-1 at 27.  But Bright Data, a party in both cases, agreed only to a final version of the statement that described the *Meta* case as based on "Meta's Terms of Use" (ECF No. 51 at 10)—not "Bright Data's scraping activities" as X had proposed (ECF No. 93-1 at 27).  Bright Data further stated that the cases "may" involve some "similar" legal issues, and Bright Data refused to even jointly acknowledge that the allegations in the two cases were similar—leaving that point attributed only to X:

> ***There are no related cases.***  However, Meta Platforms, Inc., which operates Facebook, filed a case against Bright Data in this district, alleging breach of contract and tortious interference based on Meta's Terms of Use.  *See Meta Platforms, Inc. v. Bright Data Ltd.*, 3:23-cv-00077-EMC.  Although that case involves a different plaintiff, different contracts, and is not designated as a related case, it may involve some similar legal issues.  ***X Corp. additionally notes*** that the Meta case involves similar allegations of data scraping from social media platforms as the present case.

*Id.* (emphasis added).

On May 9, 2024, the Court dismissed X's claims against Bright Data and permitted X to move for leave to amend its complaint to address specific issues raised in the Court's ruling, primarily with

1  regard to the injury suffered by X and the interests that its lawsuit seeks to protect.  ECF No. 83 at
2  26.

3         **C.      Quinn Emanuel's "X Matter" Representation**

4         On May 11, 2024, X approached Quinn Emanuel partner Andrew H. Schapiro, with whom X
5  was already working on an unrelated matter (a copyright case with fellow Quinn Emanuel partner
6  David Eiseman), about stepping in to represent X in the Bright Data case.  Declaration of Andrew H.
7  Shapiro filed concurrently herewith ("Schapiro Decl.") ¶ 4.  A conflict check revealed that other
8  Quinn Emanuel attorneys had previously represented Bright Data, so Mr. Schapiro contacted Ms.
9  Skibitsky and Quinn Emanuel partner Renita Sharma to inform them that X wished to retain Quinn
10  Emanuel to come in and take over the X Matter.  *Id*. ¶ 6.  Without disclosing any confidential Bright
11  Data information, Ms. Skibitsky and Ms. Sharma explained that the scope of the prior engagement
12  had been limited to an analysis of the Meta litigation, had not touched on X, and was not in their view
13  substantially related to the X Matter (the details of which had been covered in the legal press).  *Id.*
14  ¶ 7.  They confirmed this conclusion in a follow-up communication with Quinn Emanuel's conflicts
15  department before the matter was opened.  Skibitsky Decl. ¶ 19.

16         Quinn Emanuel implemented an ethical wall between the attorneys involved in the Meta
17  Consultation and the X Matter, and worked diligently and on a short timetable to investigate the facts
18  and prepare X's Motion for Leave to Amend and X's proposed Second Amended Complaint.  *Id.*;
19  Schapiro Decl. ¶ 8.  In keeping with the Court's Order on the motion to dismiss, Quinn Emanuel's
20  work focused on determining and articulating the specific injuries suffered by X as a result of the data
21  scraping at issue and the interests that X's lawsuit is seeking to protect.  It was a substantial
22  undertaking which involved interviewing multiple witnesses at X, review of roughly a year of filings
23  and accessible discovery, and conducting extensive legal research.  Schapiro Decl. ¶ 9.

24         On June 4, 2024, Quinn Emanuel attorneys entered their appearance in this case in advance
25  of filing X's Motion for Leave to Amend and its proposed Second Amended Complaint.  ECF Nos.
26  84, 85, 86.  Quinn Emanuel did not seek permission from Bright Data because Bright Data had agreed
27  in advance in the Meta Consultation Engagement Letter (consistent with applicable ethical rules) that

28

1    Quinn attorneys could enter an "appearance on behalf of another client adverse to Bright Data" in

2    matters not substantially related.  Schapiro Decl. ¶ 11; Engagement Letter at 4.

3         On June 6, 2024, X filed its Motion for Leave to Amend.  ECF No. 90.  On June 10, 2024,

4    Bright Data moved to disqualify Quinn as counsel for X under California Rules of Professional

5    Conduct 1.9(a) and 1.9(c).  ECF No. 93 ("Mot.").  In response to apparent inaccuracies in Bright

6    Data's Motion, this Court ordered the motion to be "immediately corrected in an errata sheet."  ECF

7    No. 94.  Bright Data filed a notice of errata on June 12, 2024.  ECF No. 95.

8                                    **LEGAL STANDARD**

9         "An order of disqualification of counsel is a drastic measure, which courts should hesitate to

10   impose except in circumstances of absolute necessity."  *Gotham City Online, LLC v. Art.com, Inc.*,

11   No. C 14-00991 JSW, 2014 WL 1025120, at *3 (N.D. Cal. Mar. 13, 2014); *see also Skyy Spirits, LLC*

12   *v. Rubyy, LLC*, No. C 09-00646 (WHA), 2009 WL 3762418, at *1 (N.D. Cal. Nov. 9, 2009) (Alsup,

13   J.) (same).  Motions for disqualification "should be subjected to particularly strict judicial scrutiny,"

14   *id.* (quoting *Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*, 760 F.2d 1045, 1050 (9th Cir. 1985)),

15   and granted only when necessary,  *Openwave Sys. Inc. v. Myriad France S.A.S.*, No. C 10-02805

16   WHA, 2011 WL 1225978 (N.D. Cal. Mar. 31, 2011) (citing *Concat LP v. Unilever, PLC*, 350 F.

17   Supp. 2d 796, 814-15 (N.D. Cal. 2004)).  A party seeking disqualification "carries a heavy burden

18   and must satisfy a high standard of proof."  *Gotham City Online*, 2014 WL 1025120, at *3.

19        California Rule of Professional Conduct ("RPC") 1.9(a) requires a party seeking to disqualify

20   counsel to establish that the successive representations are both (1) "substantially related" and

21   (2) "materially adverse."  RPC 1.9(a); *see also Khani*, 215 Cal. App. 4th at 921.  Under either the

22   duty of loyalty[2] or the duty of confidentiality, absent a showing that the attorney "has actual

23   knowledge of material confidential information," a "substantial relationship" must be established to

24   justify the drastic remedy of disqualification.  *See Flatt v. Superior Ct.*, 9 Cal. 4th 275, 283 (1994)

25   ("Thus, where a former client seeks to have a previous attorney disqualified from serving as counsel

26

27   _____

     [2]  While it "is common to speak of the duty thus imposed on a former lawyer as one of 'continued
     loyalty,' . . . this characterization "is something of a misnomer, because lawyers may take adverse

28   legal action against a former client, no matter how antagonistic or serious . . . so long as the matters
     are not substantially related."  Hazard § 14.07.

1  to a successive client in litigation adverse to the interests of the first client, the governing test requires

2  that the client demonstrate a "***substantial relationship***" between the subjects of the antecedent and

3  current representations." (emphasis in original)).  If, and only if, the "requisite substantial relationship

4  between the subjects of the prior and the current representations can be demonstrated," access to

5  confidential information is presumed and disqualification becomes mandatory.  *Id.*

6  **ARGUMENT**

7  **D.    The Meta Consultation Is Not Substantially Related To This Representation**

8    Bright Data has not met its heavy burden to demonstrate a "substantial relationship" between

9  Quinn Emanuel's representations in the Meta Consultation and the X Matter.[3]  To determine whether

10  a "substantial relationship" exists, courts consider two factors:  First, "it must be shown that the

11  information from the prior representation is material to the current representation."  *WhatsApp Inc. v.*

12  *NSO Grp. Techs. Ltd.*, No. 19-CV-07123-PJH, 2020 WL 7133773, at *4 (N.D. Cal. June 16, 2020).

13  Second, courts consider "the similarities between the two factual situations, similarities in legal

14  questions posed, and the nature and extent of the attorney's involvement with the case and whether

15  he was in a position to learn of the client's policy or strategy."  *Id.* (denying motion to disqualify

16  where plaintiff had "not carried its burden to demonstrate that the two matters are substantially related

17  or that [the accused law firm] actually retain[ed] confidential material").

18    Although, as X noted in the parties' Joint Case Management Statement, the Meta Consultation

19  and X Matter present some facially similar legal issues and allegations, the test for disqualification is

20  more demanding: whether Quinn Emanuel's ***representations*** in each case are ***substantially*** related.

21  Under California law, a "substantial relationship" turns in part on "the relationship between the

22  attorney and the former client with respect to the legal problem involved in the former representation."

23  *Jessen v. Hartford Casualty Ins. Co.*, 111 Cal. App. 4th 698, 705–09 (2003).  The representations—

24  not the particular cases themselves—are the proper comparators.  *Id.*

25

26

27  [3]  Bright Data cannot demonstrate that Quinn Emanuel has ***actual knowledge*** of ***material***

28  confidential information.  *See* Mot. at 20-24.  Thus, to meet its burden, Bright Data must establish
that Quinn Emanuel's representations in the Meta Consultation and X Matter are substantially related.

1        As the treatise on which Bright Data heavily relies explains, (*see* Mot. at 8, 10, 12, 17), the

2   former-client substantial relationship test "looks at the practicalities from the lawyer's point of view

3   rather than the client's."  Hazard, *et al*., *The Law of Lawyering* § 14.07.  That is because "[i]t would be

4   unfair to the lawyer and to the lawyer's new client for a former client to be able to paint a

5   disingenuously broad picture of the prior representation without fear of contradiction.  For example,

6   if a former client engaged a lawyer to handle a single patent matter, the client should not later be

7   heard to claim that the lawyer was 'pervasively involved' in every aspect of its entire business

8   operation, thus making virtually any new matter 'substantially related' to the prior representation and

9   off-limits for the lawyer without the consent of the original client."  *Id*.  That is precisely what Bright

10  Data is trying to do here—to convert a limited engagement into arguments that Quinn Emanuel is

11  forever barred from nearly all forms of adversity.

12          1.      The Information Quinn Emanuel Acquired From The Meta Consultation Is

13                  Immaterial To This Representation

14        Bright Data has not shown that any information Quinn Emanuel acquired from the Meta

15  Consultation is material to the X Matter.  To be material, "the information acquired during the first

16  representation . . . must be found to be ***directly at issue in, or have some critical importance to, the***

17  ***second representation***.'"  *Farris v. Fireman's Fund Ins. Co*., 119 Cal. App. 4th 671, 680 (2004)

18  (cleaned up and emphasis added); *see also Wu v. O'Gara Coach Co., LLC*, 38 Cal. App. 5th 1069,

19  1083 (2019) (reversing grant of a disqualification motion, explaining that "[u]nder California law a

20  law firm is not subject to disqualification because one of its attorneys possesses information

21  concerning an adversary's general business practices or litigation philosophy acquired during the

22  attorney's previous relationship with the adversary").[4]

23

24

---

25  [4]   Most of the cases Bright Data cites do not involve a discrete, limited-time engagement and thus do
26  not shed much light on the current motion.  *E.g.*, *Jessen*, 111 Cal. App. 4th at 705–09 (first
    representation involved "no less than twenty matters" including several appearances as counsel of
27  record and second representation involved direct representation as counsel of record in litigation
    against former client).  These cases primarily involve a context where attorneys were actively and
28  directly involved in litigating a case, not a situation that involved preparing a singular background
    memo with two follow-up calls.

In its prior Engagement with Bright Data, Quinn Emanuel limited its representation to "providing **an analysis of the Litigation**."  Engagement Letter at 2.  The parties expressly agreed that Quinn Emanuel's "services will **not** extend to other business, personal or **legal affairs** of Bright Data, or to any other aspect of Bright Data's activities."  *Id*.  All told, the limited engagement, including any precursor interactions, lasted less than four weeks in early 2023; resulted in 30.6 hours of time billed;[5] produced an invoice of less than $37,000; and generated a single memo.  Skibitsky Decl. ¶¶ 10-16; Avisar Decl. ¶¶ 10, 16.  Because of the Engagement's circumscribed nature, the only documents Quinn Emanuel received from Bright Data—apart from public filings—were an excerpt from a memorandum prepared by the Proskauer firm and Bright Data's agreement with one of its clients. Skibitsky Decl. ¶ 4.  However, as Bright Data acknowledges, the Proskauer memo was simply a written response to Quinn Emanuel's assessment memo.  Avisar Decl. ¶ 11.  And the Bright Data agreement with one of its clients that it shared with Ms. Skibitsky was inconsequential to the Meta Consultation.  *See* Skibitsky Decl. ¶ 4.  As California courts have explained, "[t]here is reason to differentiate for disqualification purposes between lawyers who become heavily involved in the facts of a particular matter and those who enter briefly on the periphery for a limited and specific purpose relating solely to legal questions."  *H.F. Ahmanson & Co. v. Salomon Bros., Inc.*, 229 Cal. App. 3d 1445, 1457 (1991); *see also Wu*, 38 Cal. App. 5th at 1083 (reversing decision disqualifying law firm where the movant failed to "demonstrate the required material link between [the lawyer's] knowledge

---

[5]  Notably, the low-hour cases which Bright Data cites for the proposition that Quinn Emanuel's circumscribed engagement billing only 30.6 hours is enough to warrant disqualification  either (1) did not ultimately result in disqualification even though the underlying business negotiation  in the first representation was directly at issue in the second representation,  *Farhang v. Indian Inst. of Tech., Kharagpur*, No. C-08-02658 RMW, 2009 WL 3459455, *1-2 (N.D. Cal. 2009) (withholding judgment and scheduling an evidentiary hearing), *evidentiary hr'g*, 2010 WL 199706 (N.D. Cal. Jan. 13, 2010) (denying disqualification motion after hearing); (2) involved "a four and one-half years" representation in which $850,000 was billed to the client, *Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F. Supp. 1383, 1388 (N.D. Cal. 1992); or (3) massively under-counted the relevant hours billed because the matter involved the dual representation of both a corporation's CEO and the corporation itself,  *see ViChip Corp. v. Lee*, No. C 04-2914 PJH, 2004 WL 2780170 (N.D. Cal. Dec. 3, 2004) (attorney disqualified from representing corporation's former CEO because of simultaneous representation of corporation and CEO when CEO was with corporation).

of the development and implementation of the company's workplace policies and the issues presented by [movant's] lawsuit").

Bright Data claims it "shared sensitive confidential documents, attorney-client communications, and Litigation Counsel's work product—essentially, Bright Data's playbook." Mot. at 16 (citing Avisar Decl. ¶¶ 4, 9, 11, 14). But Bright Data fails to point to any such confidential documents or describe the documents with remotely enough specificity to warrant the "drastic remedy" of disqualification. *See WhatsApp Inc.*, 2020 WL 7133773, at *8 (finding that, to meet its burden, a movant should "pinpoint with specificity the confidential information that plaintiff contends is both actually obtained . . . and material to the current representation"). In the portions of Ms. Avisar's declaration Bright Data cites, she states: "I provided additional information about our litigation with Meta and Bright Data's business," (¶ 4); "I provided Ms. Skibitsky with non-public Bright Data documents," (¶ 9); "I provided portions of [Proskauer's memo] response to Quinn," (¶ 11); "Significant client confidences and attorney-client privileged information were shared during that meeting, as well as confidential information about Bright Data's policies, practices, and priorities," including "the implications of Bright Data's overall litigation strategy on Bright Data's business model and its legal rights vis-à-vis other social media platforms and website operators," (¶ 14). But none of these statements provide sufficient detail to determine whether the information is "directly at issue in, or [has] some critical importance to, *the second representation*." *Farris*, 119 Cal. App. 4th at 680; *WhatsApp Inc.*, 2020 WL 7133773, at *8.[6] To be clear, no Quinn Emanuel attorney has confidential or privileged information from Bright Data that is material to this case. Skibitsky Decl. ¶ 19; Schapiro Decl. ¶ 8.

---

[6] Bright Data appears also to assert in passing that confidential information Quinn Emanuel received in a different case involving neither X nor Bright Data should disqualify Quinn Emanuel. Mot. at 16 ("Quinn had already received large volumes of Bright Data's confidential information in connection with discovery in the *hiQ* litigation pursuant to a Protective Order that restricted its use."). Yet again, Bright Data does not show, as it must, that any information Quinn Emanuel received from the *hiQ* litigation relates in any way—let alone substantially relates—to the X Matter.

It is not sufficient for Bright Data to rely on assertions that Quinn Emanuel attorneys became privy to Bright Data's broad litigation strategies during the limited Meta Consultation.[7]    An "attorney's acquisition of general information about the former client's 'overall structure and practices' would not of itself require disqualification unless it were found to be 'material'—*i.e.*, directly in issue or of critical importance—in the second representation.  The same is true about information such as the first client's 'litigation philosophy' or 'key decision makers.'"  *Khani*, 215 Cal. App. 4th at 921 (quotation omitted).  Citing to the Hazard treatise, Bright Data asserts Quinn is disqualified under the so-called "playbook approach," Mot. at 23, but Bright Data elides the fact that the same treatise explains the playbook approach's "general applicability, even as a way of demonstrating 'substantial relatedness,' is disfavored unless "the information 'will be directly in issue or of unusual value in the subsequent matter.'"  Hazard, §14.10 (citing Restatement (Third) Law Governing Lawyers, § 132, comment d(iii)); *accord TWiT, LLC v. Twitter Inc.*, No. 18-CV-00341-JSC, 2018 WL 2470942, at *5-6 (N.D. Cal. June 1, 2018) (denying a motion to disqualify even though both representations concerned audio and video streaming, the law firm "necessarily ha[d] access to confidential information regarding how the" owners thought and operated, the law firm received "financial information in the prior representation," and the law firm knew the company's business organization history as well as the company's "views about litigation").

California courts agree and have not "adopt[ed] a 'playbook approach' to the substantial relationship test or create[ed] a lifetime prohibition against representation adverse to a former client." *Khani*, 215 Cal. App. 4th at 921 (quotations omitted).  Disqualification is thus not required even when an attorney previously performed a significant amount of work for a former client.  *Id.* at 919 (representation of former client in 150 cases did not require disqualification); *see also Faughn v. Perez*, 145 Cal. App. 4th 592, 610-11 (2006) (220 cases handled by former firm were not enough to

---

[7]  What is more, the risk of betraying client confidences does not apply to information or advice that has become "generally known."  RPC 1.9(c); Restatement (Third) Law Governing Lawyers, § 132. Here, Bright Data could hardly be any more public about its general strategy and goals: it routinely argues—in its public court filings, in the press, and on social media—that scraping is no different than accessing or searching the public internet.  *See e.g.*, Avisar Decl. ¶ 14.  The same goes for the allegations at issue in both the Meta Consultation and the X Matter.

trigger disqualification).  To the extent Bright Data implies to the contrary with cites to *Jessen* and its progeny, (Mot. at 5-6, 18),  California courts have made clear that just the opposite is true: "*Jessen* did not adopt the so-called playbook approach."  *Fremont Indem. Co. v. Fremont Gen. Corp.*, 143 Cal. App. 4th 50, 69 (2006).[8]

For example, in *Lehman Bros. Holdings Inc. v. Direct Mortg. Corp.*, No. 2:09-cv-04170, 2013 WL 12114447 (C.D. Cal. Feb. 4, 2013), the court denied Lehman Brothers Holdings, Inc.'s ("LBHI") motion to disqualify a law firm from a case about breach of a loan repurchase agreement even though that law firm previously represented an LBHI entity in loan repurchase cases because the two cases were not "substantially related."  In that prior work, the law firm learned LBHI's nationwide strategy for litigating loan repurchase cases; received an LBHI memorandum containing suggestions as to where to file new cases, which parties to name as plaintiffs, which claims to bring and when, how quickly to litigate the cases, and how to limit disclosure and discovery; coordinated efforts "to prepare pleadings, discovery responses, and to discuss strategy overall;" and received a "Loan Document Checklist" that contained a list of several documents that LBHI thought are relevant to loan repurchase cases.  The cases involved similar Agreements and Seller's Guides, loans that traveled through the same transactional channels with many of the same entities, and the same witnesses.  *Id.* at *1-4.  Despite noting that "there will, no doubt, be similar legal issues throughout [the breach of contract cases]," "beyond the general legal issues underlying all such cases, LBHI pointed to no specific legal issue that was present in the Aurora cases that is also critical to this case."  *Id.* at *5. The court refused to disqualify counsel.

Likewise, in *Foster Poultry*, the court denied a motion to disqualify a law firm from an antitrust case about competition among turkey sellers, even though that firm ***previously advised*** the moving party on ***antitrust issues relating to the poultry market*** and billed it $72,490.58 for 213.50 hours of work on the issues.  *Id.* at *1.  The law firm, including two partners and eight associates, reviewed the various submarkets involved in the poultry business and was exposed to "strategic planning information including ConAgra's internal views of what constitutes relevant markets," its

---

[8]   In any event, as explained further below, any playbook that might have been relevant here is no longer applicable given the Court's rulings on Bright Data's motion to dismiss.

1   "supply agreements," "strategic plans for [the] ConAgra poultry unit," and "strategic business plans."

2   *Id.* at *1-2, *7-8.   There was even a "telephone conference with [the moving party] re turkey

3   business." *Id.* at *7.   Nevertheless, the court did not find the representations to be substantially related

4   and denied the motion to disqualify.  *Id.* at *9.

5       It is beyond dispute that Quinn Emanuel has received significantly less information from

6   Bright Data during its limited engagement than did the firms in either *LBHI* or *Foster Poultry*. The

7   case law does not support disqualification.

8           2.    <u>The Meta Consultation Involved Different Facts And Legal Issues Than This</u>

9               <u>Representation</u>

10      Quinn Emanuel's representation in the Meta Consultation is not substantially related to its

11   representation in the X Matter because the two representations involve different factual situations and

12   pose different legal questions.   "The fact that both representations share a common area of law is

13   insufficient." *Foster Poultry Farms v. Conagra Foods Refrigerated Foods Co.,* No. F 04-5810, 2005

14   WL 2319186, at *7 (E.D. Cal. Sept. 22, 2005) (denying a motion to disqualify where successive

15   representations were both "antitrust" matters).

16           (a)    *The Meta Consultation Involved Different Contracts*

17      The fact that the representations share two remaining causes of action—breach of contract and

18   tortious interference with contract—is not, on its own, enough to create substantial relatedness. *See*

19   *Khani*, 215 Cal. App. 4th at 922. "Overlapping causes of action or relevant facts between the former

20   and present matters, without more, do not establish a substantial relationship."  *Human Longevity,*

21   *Inc. v. J. Craig Venter Inst., Inc.*, No. 18-CV-1656-WQH-LL, 2018 WL 5840045, at *3 (S.D. Cal.

22   Nov. 8, 2018) (finding no substantial relatedness between successive trade secret claim

23   representations with only four months between engagements).

24      In *Human Longevity*, the court denied a motion to disqualify a firm that sued Human

25   Longevity, Inc. ("HLI") for trade secret misappropriation less than four months after it had

26   represented HLI in a related trade secret case, finding that the two cases lacked a "substantial

27   relationship."  *Id.*   The court found no conflict even though the law firm obtained confidential

28   information in the prior matter regarding HLI's business plans, financial condition, valuation and

1   other trade secrets, and the successive matter involved many of the same people and HLI policies,

2   procedures, and proprietary and trade secret information that were relevant to the prior matter.  *Id.*

3   HLI submitted a declaration that showed the prior representation went significantly further than what

4   Bright Data claims occurred here.  HLI's General Counsel stated that in the prior matter the law firm

5   "drafted discovery requests, analyzed discovery responses, prepared a detailed meet and confer letter

6   regarding discovery issues, and strategized regarding future handling of the matter to ensure the

7   protection of HLI's Trade Secrets."  *Id.* at *4.  The declaration continued generally, "To properly

8   represent HLI, prosecute the matter, and evaluate the merits" of the prior matter, the law firm "was

9   required to educate itself about HLI's business, proprietary information, and trade secrets, the HLI

10  PIIA [a relevant document], HLI's confidential training materials, business, plans, sales, strategies,

11  pricing lists, and financial condition."  *Id.*  The law firm also "was further required to consult with

12  and learn" HLI's litigation and settlement strategies and "strategized and communicated directly with

13  [HLI's General Counsel] about HLI confidential information."  The court nonetheless denied the

14  motion to disqualify.

15      Successive litigations involving breach of contract and tortious interference with contract

16  claims are even less likely to be substantially related than other types of litigation.  In these actions,

17  the chief element is the differing underlying contracts.  On this point, Bright Data mischaracterizes

18  the contracts at issue in the Meta Consultation and the X Matter as involving only "minor wording

19  differences."  Mot. at 18.  Even if were it true that the differences were minor (they are not), wording

20  differences in contracts—even minor ones—ordinarily make all the difference.  *See E.M.M.I. Inc. v.*

21  *Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 470 (2004) ("Under statutory rules of contract interpretation,

22  the mutual intention of the parties at the time the contract is formed governs interpretation," and

23  "[s]uch intent is to be inferred, if possible, solely from the written provisions of the contract."

24  (citations omitted)).  The same goes for tortious interference with contract, which also requires an

25  underlying contractual breach or disruption.  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d

26  1118, 1125-26 (1990).

27      The contracts here demonstrate the point: the court in the *Meta* case concluded that, "[i]t is

28  reasonable to interpret the [Facebook and Instagram contractual Terms of Use] such that Bright Data

did not 'use' Facebook and Instagram when it engaged in public logged-off data scraping." *Meta Platforms, Inc. v. Bright Data Ltd.*, No. 23-CV-00077-EMC, 2024 WL 251406, at *11 (N.D. Cal. Jan. 23, 2024). In direct contrast, this Court found that, "[e]ven assuming that Bright Data shut down its registered account(s) and that this had the effect of terminating its click-wrap contract(s) with X Corp., there is no question that Bright Data remained bound by the X Corp. Terms, having impliedly agreed to them in ongoing scraping" of "data that X Corp. has made publicly available,"  ECF No. 83, 4, 17.  These divergent findings make sense because of the "wording differences" in the terms of use and their application in practice on the different platforms: The X Terms are written such that "use" includes logged-off access to the X platform.  *Compare* X Terms Preamble ("These [Terms] govern your ***access to*** and use of our services"), *with* Meta Terms Preamble ("These Terms govern your use of Facebook, Messenger, and the other [Meta Products and Services].").

This "minor difference" creates a vastly different legal regime governing the different platforms.  X effectively requires both account deactivation ***and*** discontinuation of logged-out use without a registered, active account—Meta does not.  *Compare* X Terms § 4 ("You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services."), *with* Meta Terms ("We hope that you will continue using our Products, but if you do not agree to our updated Terms and no longer want to be a part of the Facebook community, you can delete your account at any time.").  As X has consistently maintained, "[a]ny other interpretation would render the clause '***and*** discontinuing your use of the Services' in the X Terms superfluous.'" ECF No. 69 at 15.

One additional major material difference is that the X Terms at issue expressly provided that "***crawling*** the Services is permissible if done in accordance with the provisions of the robots.txt file, however, ***scraping*** the Services without our prior consent is expressly prohibited."  X Terms § 4(iii).[9] There is no such distinction between permissible crawling and scraping in Facebook or Instagram's

---

[9]  If present, a "robots.txt is a file that websites use to let web scrapers know if they should crawl a page or not."  *See How to Read robots.txt for Web Scraping*, Feb. 21, 2023, ZENROWS, https://www.zenrows.com/blog/robots-txt-web-scraping#robots-txt-web-scraping (last visited June 17, 2024).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISQUALIFY QUINN EMANUEL

Terms—indeed, "scraping" and "robots.txt file" are not mentioned at all.  *See* Facebook Terms; *see also* Instagram Terms.

      (b)  *The X Matter Involves Additional Causes of Action And Different Issues*

   X brings two additional causes of action in this case which were not at issue in the *Meta* case: trespass to chattels and misappropriation.[10]  *Compare* No. 3:23-cv-00077, ECF No. 1 (N.D. Cal. Jan. 6, 2023), *with* ECF No. 36.  Quinn inherited these additional causes of action as counsel entering the case midstream.  These additional claims amplify the already-present differences discussed above.  If the Court determines, as X hopes it will, that X's repleading of these claims addresses the concerns underlying the Court's ruling on the motion to dismiss, these additional claims will generate different discovery issues, different dispositive briefing issues, and different issues at trial.

   Moreover, Quinn Emanuel entered the case *after* the Court made the findings about the X Terms which further crystallized the differences between the prior Meta Consultation and the X Matter.  Whatever previously overlapping allegations or contractual issues might have been relevant at the outset, these commonalities are now much less salient.  The primary issues in the X Matter now are the existence of quantifiable injury that X suffered as a result of Bright Data's scraping of X's platform, and the interests X is trying to protect; neither of which relate in any way to the Meta Consultation.

   Bright Data's chart of overlapping allegations (which omits via ellipses significant differences, *see* Schapiro Decl., Ex. 1) only highlights the new procedural setting.  *See* Mot. at 12.  The chart at most demonstrates the commonplace awareness that in order to state a claim for breach of contract and tortious interference with contract one must plead the underlying elements of breach of contract.  But all of that overlap was already present in this case when Quinn Emanuel entered the case—that is, it was present even in the First Amended Complaint, *see* ECF No. 36, and with regard to many of the issues where there is some overlap, the Court has already ruled.  The discrete,

---

[10]  X repleaded its business fraud claim under Section 17200 of the California Business and Professions Code not for the purposes of argumentation but to preserve the issue.

1    background assessment Quinn Emanuel gave Bright Data near the outset of the *Meta* case could

2    hardly be less relevant to the X Matter as it procedurally stands today.

3        **E.    Disqualifying Quinn Emanuel Would Be Inequitable and Prejudicial**

4        Disqualification proceedings are equitable in nature. *Sherman v. CLP Res., Inc*., No. CV 12-

5    8080-GW(PLAX), 2015 WL 13542762, at *7 (C.D. Cal. Feb. 4, 2015).  "Because a motion to

6    disqualify a party's counsel may implicate several important interests, it is important that judges

7    examine such motions carefully, bearing in mind such considerations as a client's right to chosen

8    counsel, an attorney's interest in representing a client, the financial burden on a client to replace

9    disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion."

10   *Yumul v. Smart Balance, Inc*., No. CV 10-00927 MMM (AJWx), 2010 WL 4352723, at *3 (C.D. Cal.

11   Oct. 8, 2010) (internal quotation marks and alterations omitted).  These factors weigh decidedly

12   against disqualifying Quinn Emanuel.

13       **Evidence of tactical abuse**.  If anyone is "switching sides" here, it is Bright Data, with its

14   tactical about-face to argue that this case is "substantially related" to the Meta Consultation despite

15   previously insisting the cases are not "related" under Local Rule 3-12(a).  ECF No. 51 at 10.  Although

16   the tests for whether cases are "substantially related" for purposes of disqualification or "related"

17   under L.R. 3-12 are different, Bright Data did not just decline to designate the cases as related, it

18   resisted the very characterizations it now proffers.  To get from there to here, Bright Data has had to

19   twist itself in knots.  It previously rejected X's characterization of the Meta case as a lawsuit about

20   "Bright Data's scraping activities," and said instead that it was based on "Meta's Terms of Use."

21   *Compare* ECF No. 93-1 at 27 *with* ECF No. 51 at 10.  Now it says the opposite.  It previously rejected

22   X's suggestion that the two cases shared "some common legal issues."  ECF No. 93-1 at 27.  Now it

23   says the opposite.  ECF No. 51 at 10.  And it refused to sign on to X's assertion that "the Meta case

24   involves similar allegations of data scraping from social media platforms as the present case."  *Id.*

25   But now it says the opposite.

26       It is plain that, for tactical reasons in 2023, Bright Data did not want the two cases to be

27   deemed related.  Equity should not permit it to come in now and insist that the two cases are so

28   intimately intertwined that Quinn Emanuel's 30.6 billed hours on the Meta case bars it from

representing X here.  *See, e.g.*, *Del Thibodeau v. ADT Sec. Servs.*, No. 3:16-cv-02680-GPC-AGS, 2018 WL 2684254, at *2 (S.D. Cal. June 5, 2018) ("[C]ourts may properly consider . . . whether the motion is being brought in bad faith or otherwise for tactical reasons."); *cf. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).[11]

**X's right to chosen counsel**. This factor is particularly salient where, as here, the client's chosen counsel "is highly skilled in the relevant area of the law." *Oaks Mgmt. Corp. v. Sup. Ct.*, 145 Cal. App. 4th 453, 463 (2006). The Schapiro Declaration highlights Quinn Emanuel's experience litigating similar cases involving copyright and copyright preemption.  Schapiro Decl. ¶ 14.  If Quinn Emanuel were disqualified, X would lose the benefit of this experience and expertise even where the posture of the case will benefit from such experience.  Disqualification would further prejudice X because it would unfairly deny X from implementing a cohesive litigation strategy across its various cases through Quinn Emanuel, which is counsel for X in many of X's current disputes.  *Id.* ¶ 6.

**Quinn Emanuel's Interest in Representing X After Offering Discrete, Unrelated Advice To Bright Data.**  To disqualify Quinn Emanuel in this case based only on the Meta Consultation would have a chilling effect on firms providing similarly discrete advice to clients.  In its Motion, Bright Data cherry picks one policy rationale underlying the rules against betraying former client confidences: to "provid[e] clients with assurance ***during the representation*** that they have no need to fear suffering adverse consequences *later* because of having retained a lawyer currently."  Mot. at 9-10 (citing Hazard, § 14.03 (emphasis in original)).  But Bright Data omits the next section of the same treatise, which further supports a finding that disqualification would be inequitable under the circumstances here:

---

[11]   In addition, Bright Data notably did not raise its concerns with Quinn Emanuel after Quinn Emanuel noticed its appearance.  Bright Data may not have significantly delayed in raising these concerns via motion, but it did wait to see the strength of Quinn Emanuel's filing, which the Court had ordered filed by an impending date-certain deadline, before raising them.

If protecting the lawyer-client relationship by protecting the interests of former clients were the *only* value at stake, it would be sensible to apply essentially the same conflicts of interest rules as are applied in the case of current clients.  A lawyer has no obligation to accept a particular client or matter, but once having accepted, the lawyer must accept as well that the client can usually exercise a temporary veto over the lawyer's choice of other clients and other work, even in unrelated (but adverse) matters, simply by withholding consent to the adverse representation.  ***Such an approach, however, if applied in the former client context, would exact too heavy a price in terms of the future availability of counsel*** and also the lawyer's freedom of action, including the freedom to develop professionally and to earn a living. ***Moreover, if acceptance of even relatively minor matters in the present would broadly foreclose lawyers from employment in the future, lawyers would be reluctant to accept such matters, thus negatively impacting the ability of clients generally to retain lawyers***. This price is worth paying in the case of currently represented clients, for some of the reasons stated above, but if former clients were given as extensive a veto right as current clients, the veto would follow the lawyer for the rest of a career, and the cost of the veto would cumulate dramatically as each lawyer's list of former clients lengthened.

Hazard, §14.03 (emphasis added and cleaned up).  Professor Hazard's concern is more than apt here, where Bright Data argues that a circumscribed, 30.6-billed-hour consultation regarding a specific lawsuit forever bars Quinn Emanuel from being adverse to it in any case involving data-scraping.

**The financial burden on X**.  Although retained recently, Quinn Emanuel has worked diligently to investigate the facts and review a year's worth of filings, written discovery, and document productions.  Schapiro Decl. ¶ 10.  If Quinn Emanuel were disqualified, much of that work would be for naught.

**Quinn Emanuel Has Maintained The Highest Ethical Standards of Professional Responsibility.**  In an abundance of caution, Quinn Emanuel instituted an ethical wall between the attorneys who worked on the Meta Consultation and the X team.  The ethical screen further eliminates any conceivable prejudice to Bright Data.  *See, e.g., Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1110 (N.D. Cal. 2003) (denying a motion to disqualify, in part, "because Heller has demonstrated that it immediately put an ethical wall in place as soon as Heller was retained as Visa's counsel in this action"); *Nat'l Grange of Order of Patrons of Husbandry v. Cal. Guild*, No. 2:14-676 WBS DB, 2017 WL 2021731, at *4 (E.D. Cal. May 12, 2017) (denying motion to disqualify because the law firm imposed an ethical wall that, although imperfect, prevented the sharing of confidences).

Although Quinn Emanuel's ethical wall may not be ***independently*** sufficient to avoid vicarious disqualification because the attorneys involved in the Meta Consultation were not from a "prior firm," the implementation of the wall further demonstrates the firm has maintained the highest ethical standards of professional responsibility and thus weighs against disqualification.  This ethical wall ensures that the members of the X team will not be exposed to any information (let alone privileged or confidential information) obtained by the attorneys who worked on the Meta Consultation.  *Id.*; Schapiro Decl. ¶¶ 3, 9; *see also generally Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776, 810 (2010) (memo was "circulated warning the legal staff to isolate the tainted individual[s] from communications on the matter and to prevent access to the relevant files").  Even beyond the ethical wall, no attorneys who worked on the Meta Consultation or otherwise had contact with Bright Data have had any substantive communications regarding the Meta Consultation with any member of Quinn Emanuel's X litigation team.  *See* Skibitsky ¶ 19.  This factor too weighs against disqualification.

Under these circumstances, "disqualification would serve no legitimate purpose and would unfairly deprive the plaintiff[] of trial counsel of [its] choice." *Oaks Mgmt.*, 145 Cal. App. 4th at 458. There is no need to disqualify X's attorneys as a prophylactic measure, and there is no reason to believe Quinn Emanuel's prior relationship with Bright Data will improperly impact the outcome of these proceedings.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Bright Data's motion to disqualify Quinn Emanuel.

1    DATED:  June 19, 2024                    Respectfully submitted,

2                                             QUINN EMANUEL URQUHART &
                                              SULLIVAN, LLP
3
                                              By  /s/ Andrew Schapiro
4
5                                             Andrew Schapiro (*Pro Hac Vice*)
                                              *andrewschapiro@quinnemanuel.com*
6                                             191 N. Wacker Drive, Suite 2700
                                              Chicago, IL 60606-1881
7                                             Telephone: (312) 705-7400

8                                             David Eiseman (Bar No. 114758)
                                              *davideiseman@quinnemanuel.com*
9                                             50 California Street, 22nd Floor
                                              San Francisco, California 94111-4788
10                                            Telephone: 415-875-6600
                                              Fax: 415-875-6700
11
                                              Stefan Berthelsen (*Pro Hac Vice*)
12                                            *stefanberthelsen@quinnemanuel.com*
                                              51 Madison Ave, 22nd floor
13                                            New York, NY 10010
                                              Telephone: (212) 849-7014
14
15                                            *Attorneys for Plaintiff X Corp.*

16

17

18

19

20

21

22

23

24

25

26

27

28

05766-00020/15023612.16

PLAINTIFF X'S OPPOSITION TO DEFENDANT'S MOTION TO DISQUALIFY QUINN EMANUEL