1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Andrew Schapiro (*Pro Hac Vice*)
2  *andrewschapiro@quinnemanuel.com*
   191 N. Wacker Drive, Suite 2700
3  Chicago, IL 60606-1881
   Telephone: (312) 705-7400
4
   David Eiseman (Bar No. 114758)
5  *davideiseman@quinnemanuel.com*
   50 California Street, 22nd Floor
6  San Francisco, California 94111-4788
   Telephone: 415-875-6600
7  Fax: 415-875-6700

8  Stefan Berthelsen (*Pro Hac Vice*)
   *stefanberthelsen@quinnemanuel.com*
9  51 Madison Ave, 22nd floor
   New York, NY 10010
10 Telephone: (212) 849-7014

11 *Attorneys for Plaintiff*
12 *X Corp.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| X CORP., a Nevada corporation, | Case No. 3:23-cv-03698-WHA |
| Plaintiff, | **DECLARATION OF HOPE D. SKIBITSKY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISQUALIFY QUINN EMANUEL** |
| vs. | |
| BRIGHT DATA LTD., an Israeli corporation, | |
| Defendant. | Judge: Hon. William Alsup<br>Courtroom: 12, 19th Floor<br>Date: July 1, 2024<br>Time: 8:00 a.m. |

## **DECLARATION OF HOPE D. SKIBITSKY**

I, Hope D. Skibitsky, declare as follows:

1. I am an attorney licensed to practice law in the States of New York and New Jersey, and I am a partner in the New York office of Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"). I have personal knowledge of the facts set forth in this declaration and if called as a witness could testify competently thereto.

2. I have reviewed Bright Data's motion to disqualify Quinn Emanuel and the declarations filed with the motion. I have also reviewed X Corp.'s complaint against Bright Data. In preparing this declaration, I have not spoken with Quinn Emanuel's X litigation team, but rather have worked to prepare this declaration with Quinn Emanuel's General Counsel, who has not been involved with either the X matter or the prior Bright Data engagement.

3. I was the attorney principally responsible for a limited, capped-fee engagement in which our firm performed work for Bright Data over the course of an approximate four-week period. Quinn Emanuel's work in connection with the engagement began on or around February 15, 2023, when I was first contacted by Mor Avisar of Bright Data and began reviewing the publicly-filed complaints she had sent me. At that time, I was an associate at the firm. Quinn Emanuel's work in connection with the engagement ended March 12, 2023, the last date on which I or anyone at Quinn Emanuel had substantive communications with Bright Data regarding the engagement.

4. During the approximately four weeks we were working on the Bright Data engagement, the only documents our firm received from Bright Data—apart from public filings—were an excerpt from a memorandum prepared by attorneys at Proskauer Rose LLP (discussed below) and Bright Data's agreement (with amendments) with a client of Bright Data's. I do not recall reviewing that agreement with any degree of detail and I cannot recall any of the terms of that agreement.

5. When Ms. Avisar first emailed me on February 15, 2023, she attached two publicly filed complaints involving Bright Data and Meta to her email and indicated that Bright Data was considering obtaining our firm's views regarding those matters. Ms. Avisar did not attach any confidential information to that email.

6. On February 16, 2023, I, along with other Quinn Emanuel attorneys (Zane Muller, Renita Sharma, and Corey Worcester) met with Ms. Avisar on a Zoom meeting. Ms. Avisar's declaration notes that no one at Quinn Emanuel billed time for that meeting. ECF No. 93-1, Ex. 1 ("Avisar Decl.") ¶ 17. That is correct; we considered that meeting to be an introductory call to learn about a potential engagement, and we did not bill for it.

7. After the meeting on February 16, 2023, I sent Ms. Avisar an engagement letter (on Ms. Sharma's letterhead) setting forth the terms of Quinn Emanuel's engagement by Bright Data. ECF No. 93-1, Ex. 2 ("Engagement Letter"). The Engagement Letter defined the scope of Quinn Emanuel's engagement as analyzing "the Litigation," which was defined as "the litigation currently pending between Bright Data and Meta Platforms, Inc. and Instagram, LLC (collectively, 'Meta') in the Northern District of California and the Superior Court of the State of Delaware" in which the Proskauer firm was representing Bright Data. *Id.* at 1-2.

8. The Engagement Letter included a fees cap of $40,000, which included "a review of any key background documents, including correspondence between Bright Data and Meta, an analysis of the Litigation and defenses to pending claims, and a recommendation regarding next steps in the Litigation." *Id.* at 5. Bright Data agreed that the $40,000 cap would not cover "any fees incurred for providing a review of Bright Data's business practices; or any fees incurred to prepare for and commence any litigation." *Id.*

9. The Engagement Letter included a conflict waiver; Bright Data agreed that, even while Bright Data was a current client, Quinn Emanuel attorneys would be able to represent parties "in the future in other matters in which we do not represent Bright Data even if the interests of the other clients are adverse to Bright Data … provided that the other matter is not substantially related" to Quinn Emanuel's engagement by Bright Data to assess the *Meta* Litigation. *Id.* at 4.

10. On March 1, 2023, Zane Muller, an associate at Quinn Emanuel, sent Ms. Avisar a memorandum by e-mail, copying me. Based on our time records, consistent with my recollection, Mr. Muller and I were the only attorneys who prepared the memorandum, other than a junior associate, Sam Cleveland, who proofread and made light edits to the memorandum before we shared it with Ms. Avisar. We billed a total of $36,191.50 to the matter, for 30.60 hours of work. Quinn

Emanuel attorneys (myself included) did not bill for all of the time we worked on this matter. For example, Mr. Wolfson attended two calls with Bright Data; however, he did not bill for either of those calls. And, understanding we had a capped fee, I did not bill for all of the time that I worked on the matter. I cannot recall the precise amount of hours I worked on the Bright Data engagement and did not bill, but my best recollection is that likely would have been somewhere in the range of 10 to 20 hours.

11. Ms. Avisar states that the memorandum "'approached the analysis' from the perspective that the Meta litigation could have implications 'beyond [the] particular dispute' with Meta, including Bright Data's legal rights with respect to 'others like Meta' who may try to enforce their Terms of Service." Avisar Decl. ¶ 10. The quoted language is from the approximately one-and-one-half page Executive Summary of the approximately 24-page memorandum and was an acknowledgment of the obvious fact that the result in the *Meta* Litigation would likely set a precedent that could have wider implications for the industry in general and Bright Data in particular. The memorandum does not mention X or Twitter.[1]

12. Bright Data never, at any point, asked for our advice regarding any terms of service other than Meta's terms of service, and we did not provide any such advice. For avoidance of doubt, at no time did I or any other Quinn Emanuel attorneys analyze X's (then Twitter's) terms of service for Bright Data. As far as I can recall, X or Twitter was never mentioned in any of our discussions with Bright Data.

13. On March 7, 2023, in advance of a March 8, 2023 call, Ms. Avisar requested information regarding Quinn Emanuel's credentials. That same day, I provided Ms. Avisar with a summary of representative matters in internet-related litigation, noting that Quinn Emanuel has been on both sides of Terms of Service litigation.

14. Ms. Avisar states that in response to her request for Quinn Emanuel's credentials, I did not refer to X or Twitter. That was not an intentional omission; I was not aware that Quinn

---

[1] To preserve Bright Data's attorney-client privilege, Quinn Emanuel is not disclosing the substance of any communications between Quinn Emanuel and Bright Data or the substance of Quinn Emanuel's advice or assessments, but rather is limiting its recitation of facts to public information or information that would appear on a privilege log or that Bright Data has already made public.

Emanuel had done or was doing any work for X or Twitter at the time. Further, Quinn Emanuel represents many Big Tech platforms and I did not understand Ms. Avisar's request for information regarding Quinn Emanuel's credentials to be a request for a list of all technology-adjacent clients our firm has represented. Also, I did not present the list of credentials as exhaustive; rather, I noted the list included "summaries of representative" matters.

15. Ms. Avisar's declaration states that "Proskauer provided a detailed, written response to Quinn's assessment and its proposed recommendations and strategies. I provided portions of this response to Quinn and asked Quinn to provide additional information." Avisar Decl. ¶ 11. It is correct that we received the Proskauer firm's response (though, at the time, I did not understand that we were sent only "portions" of Proskauer's response), but it is not correct that Ms. Avisar asked us "to provide additional information." Rather, on March 12, 2023, at 3:54 pm Eastern time, less than two hours before the March 12, 2023 board meeting referenced in Ms. Avisar's declaration, Ms. Avisar sent me a four-page document entitled "Appendix A: Response to Quinn Emanuel Memo" and simply noted it was for "your review." I did not have any meaningful time to analyze the response prior to the March 12 meeting during which the participants discussed both firms' analyses of the Meta litigation.

16. The March 12, 2023 meeting was the last substantive conversation anyone at Quinn Emanuel had with any representative of Bright Data relating to the engagement.

17. Ms. Avisar states that the participants in the March 12, 2023 board meeting included Mr. Zane Muller from Quinn Emanuel. Avisar Decl. ¶ 13. Mr. Muller did not attend that meeting. The two Quinn Emanuel participants were Adam Wolfson, who did not bill any time for the meeting, and myself.

18. Ms. Avisar states that during the meeting, "we discussed Meta's and other potential website operators' claims." Avisar Decl. ¶ 14. While we discussed the impact the rulings in the *Meta* Litigation could have on Bright Data, I do not recall discussing any claims by any specific website operators other than Meta. Nor would Quinn Emanuel have advised Bright Data with regard to any specific websites without first running a conflicts check relating to the other entities.

19. Because of the work we had done for Bright Data, since May 11, 2024 when I understand that X first contacted others at our firm about Quinn Emanuel potentially representing X in this matter, neither I nor anyone else who had contact with Bright Data have had any substantive communications regarding our Bright Data engagement with anyone else at our firm. In an abundance of caution, as of May 29, 2024, Mr. Muller, Ms. Sharma, and I have been subject to an ethical wall. On June 12, 2024, following my review of Bright Data's disqualification motion and subsequent re-visiting of the work Quinn Emanuel had done over a year prior, the ethical wall was updated to include additional attorneys—none of whom billed any time to the Bright Data engagement and many of whom likely did not receive any confidential information in any event. The following attorneys were added: Messrs. Wolfson, Worcester, and Cleveland, Crystal Nix-Hines, Kevin Teruya, and Tom Barnes.[2] The ethical wall prohibits me and any other attorneys who had any contact with or did work for Bright Data from having substantive communications regarding Bright Data with Quinn Emanuel's X litigation team. Nor have I or anyone else who did work for Bright Data ever shared the memo we prepared for Bright Data with anyone on the X litigation team.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed in Armonk, New York on June 19, 2024.

*/s/ Hope D. Skibitsky*
Hope D. Skibitsky

---

[2] Messrs. Teruya and Barnes do not recall ever discussing the Bright Data engagement. They were added to the wall out of an abundance of caution because I believe there is a possibility that Mr. Teruya may have been on a call where Bright Data was discussed and, when the wall was updated, I believed Mr. Barnes may have received the Bright Data memo. However, I have since confirmed that Mr. Barnes did not receive the Bright Data memo. Mr. Worcester's only involvement in the engagement was participating in the initial, February 16 zoom meeting with Ms. Avisar.

5                                            Case No. 3:23-cv-03698-WHA
                                         DECLARATION OF HOPE D. SKIBITSKY