Colin R. Kass (*pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick (*pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

*Attorneys for Defendant Bright Data Ltd.*
*Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| X Corp.,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>BRIGHT DATA LTD.,<br><br>　　　　　　Defendant. | Case No. 23-cv-03698-WHA<br><br>Hon. William H. Alsup<br>Courtroom 12 – 19th Floor<br>July 1, 2024 at 8 a.m. |

**BRIGHT DATA'S REPLY TO**
**ITS MOTION TO DISQUALIFY QUINN EMANUEL**

**TABLE OF CONTENTS**

I.   INTRODUCTION. ................................................................................................................. 1

II.  DISQUALIFICATION IS "MANDATORY" BECAUSE THE *X* AND *META* MATTERS ARE "SUBSTANTIALLY RELATED." ...................................................... 2

    A.   Quinn Cannot Avoid Disqualification by Characterizing its Prior Engagement as "Discrete" or "Limited." ................................................................ 2

    B.   The *Meta* and *X* Cases Are Substantially Related. ................................................ 4

    C.   Quinn Actually Possesses Material Confidential Information ............................. 10

    D.   Disqualification is Required to Preserve the Integrity of the Client Relationship. ....................................................................................................... 13

III. CONCLUSION. .................................................................................................................. 15

# TABLE OF AUTHORITIES[1]

Page(s)

**CASES**

*Arias v. FCA US LLC*,
  2018 WL 3419709 (E.D. Cal. 2018) ................................................................................. 7, 13

*Costello v. Buckley*,
  245 Cal. App. 4th 748 (2016) ................................................................................................ 13

*DCR Mktg. Inc v. US All. Grp., Inc.*,
  2020 WL 2066148 (C.D. Cal. 2020) .................................................................................. 6, 7

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
  2019 WL 144589 (N.D. Cal. 2019) ......................................................................................... 7

*Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*,
  809 F. Supp. 1383 (N.D. Cal. 1992) .................................................................................. 2, 8

*Farris v. Fireman's Fund Ins. Co.*,
  119 Cal. App. 4th 671 (2004) ............................................................................................. 1, 9

*Foster Poultry Farms v. ConAgra Foods Ref. Foods Co., Inc.*,
  2005 WL 2319186 (E.D. Cal. 2005) ......................................................................................... 6

*H. F. Ahmanson & Co. v. Salomon Bros., Inc.*,
  229 Cal. App. 3d 1445 (1991) ...................................................................................... 2, 10, 13

*Human Longevity, Inc. v. J. Craig Venter Inst.*,
  2018 WL 5840045 (S.D. Cal. 2018) ......................................................................................... 6

*Jessen v. Hartford Cas. Ins. Co.*,
  111 Cal. App. 4th 698 (2003) ................................................................................................... 9

*Khani v. Ford Motor Co.*,
  215 Cal. App. 4th 916 (2013) .............................................................................................. 7, 12

*Lehman Bros. Holdings Inc. v. Direct Mortg. Corp.*,
  2013 WL 12114447 (C.D. Cal. 2013) ................................................................................. 6, 12

*Love v. Permanente Med. Grp.*,
  2013 WL 5273213 (N.D. Cal. 2013) ......................................................................................... 13

---

[1] Unless otherwise noted, all emphasis added, initial capitalizations conformed without brackets, and internal citations and quotation marks omitted. References to Ex. 2, "Avisar ¶," "Skibitsky ¶" and "Schapiro ¶" refer to ECF 93-1, Ex. 2; ECF 93-1, Ex. 1; ECF 99-1; and ECF 99-2.

*Marte v. Los Angeles*,
 2019 WL 1325035 (Cal. Ct. App. 2019) ...................................................................................7

*MD Helicopters, Inc. v. Aerometals, Inc.*,
 2021 WL 1212718 (E.D. Cal. 2021) .........................................................................................4

*O'Gara Coach Co., LLC v. Ra*,
 30 Cal. App. 5th 1115 (2019) .................................................................................................12

*Rodriguez v. Disner*,
 688 F.3d 645 (9th Cir. 2012) ..................................................................................................15

*SC Innovations, Inc. v. Uber Techs., Inc.*,
 2019 WL 1959493 (N.D. Cal. 2019) ...............................................................................5, 6, 7

*Signature MD, Inc. v. MDVIP, Inc.*,
 2015 WL 12781603 (C.D. Cal. 2015) ....................................................................................14

*Trone v. Smith*,
 621 F.2d 994 (9th Cir. 1980) ....................................................................................................7

*TWiT, LLC v. Twitter Inc.*,
 2018 WL 2470942 (N.D. Cal. 2018) ........................................................................................6

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*,
 2020 WL 7133773 (N.D. Cal. 2020) ...............................................................................7, 8, 9

*Wilkinson v. Garland*,
 601 U.S. 209 (2024) ..................................................................................................................8

*Wu v. O'Gara Coach Co., LLC*,
 38 Cal. App. 5th 1069 (2019) .................................................................................................11

**OTHER AUTHORITIES**

California Rules of Professional Conduct ("RPC") .................................................1, 3, 11, 12, 14

Restatement (Third) Law Governing Lawyers ("Rest. 3d") (2000) ......................................10, 11

## I.  INTRODUCTION.

X does not dispute the central facts or law undergirding Bright Data's motion. In its own words, "disqualification becomes mandatory" if the *X* and *Meta* matters are "substantially related." And it tallies a team of **nine** attorneys who provided an overall assessment of the *Meta* litigation. Save for what it acknowledges are "minor wording" differences between Meta's and X's Terms, it agrees the cases are virtually identical, involving the same Bright Data services and conduct, and the same legal issues for the overlapping claims. The cases are irrefutably "substantially related."

X argues this is not dispositive because Quinn's *role* in the *Meta* case was too short-lived, "discrete," or "limited" to trigger any ethical obligation beyond that, no matter how related it is. But the disqualification inquiry focuses on the relatedness of the *cases* and whether the lawyer had a "direct and personal" contact with the former *client*. That Quinn was not lead counsel is irrelevant. Nor can Quinn escape disqualification by *characterizing* its engagement as "limited." That is just lawyer *argument*. The **facts** are that Quinn was hired to provide an overall assessment of the *Meta* litigation, and its report covered all aspects of the case, including procedural issues, discovery, strengths and weakness of the claims, defenses, and other issues.

True, X says, but irrelevant, because X was not mentioned *by name*. But cases can be substantially related even if the plaintiff is different. X concedes it geared its advice to place Bright Data in the best position *procedurally* and *substantively* to defend future claims by other website operators. That these other operators were referred to categorically, rather than by name, does not render Quinn's advice immaterial, given that the conduct and governing law are the same.

Faced with undeniable factual and legal similarity, X tries changing the test. "To determine whether a substantial relationship exists," it says, Bright Data must show that "any information Quinn Emanuel acquired … is material to the *X* Matter." Q.Br. 8-9. But "this type of inquiry is **outlawed**." *Farris v. Fireman's Fund Ins. Co.*, 119 Cal. App. 4th 671, 683 n.10 (2004). Under Rule 1.9(a), access to confidential information is irrelevant; and under Rule 1.9(c), access is presumed in substantially related matters. Neither rule would make sense if Bright Data had to prove that Quinn has confidential information to avoid proving that fact.

Regardless, Quinn possesses a wealth of material information. X's efforts to minimize this through lack of recollection and disregard for the connections between the two cases cannot overcome the *facts*. *Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F. Supp. 1383, 1392-93 (N.D. Cal. 1992) ("The Court, reading the stack of declarations from Irell attorneys, all proclaiming their ignorance …, is reminded of the words of Hamlet's mother: 'The lady doth protest too much, methinks.'"). Quinn prepared and received attorney work product, and engaged in multiple attorney-client communications, going to the heart of the legality of the services at issue. Not even the Quinn Report's primary author claims irrelevance.

Conceding that an ethical wall cannot "avoid vicarious disqualification" if the matters are "substantially related" or if Quinn possesses material information, X begs for mercy. Q.Br. 20-21. The Court, it says, should use its "equitable" powers to forgive its past transgression and sanction its continuing ethical violation. But California courts do "***not engage in a 'balancing of equities' between the former and current clients. The rights and interests of the former client will prevail.***" *H. F. Ahmanson & Co. v. Salomon Bros., Inc.*, 229 Cal. App. 3d 1445, 1451 (1991). Nor do the equities favor Quinn, which spent just a few weeks getting up to speed after *secretly* choosing to betray its former client.

**II.     DISQUALIFICATION IS "MANDATORY" BECAUSE THE *X* AND *META* MATTERS ARE "SUBSTANTIALLY RELATED."**

Acknowledging its clients place "precious trust" in it, Quinn promises not to undertake any adverse representation on "substantially related" matters. Ex. 2 at 3-4. Though this mirrors Quinn's ethical duties, X says that Quinn is free to sue Bright Data because (i) Quinn circumscribed the "scope" of its prior representation, (ii) there are some differences between the *X* and *Meta* cases, and (iii) Bright Data's refusal to waive privilege precludes it from showing that Quinn possesses material information. These excuses don't justify Quinn's betrayal.

    *A.     Quinn Cannot Avoid Disqualification by Characterizing its Prior Engagement as "Discrete" or "Limited."*

Pervading X's opposition is its belief that Quinn's prior representation was too "discrete" or "limited" to bar it from leading X into battle. But rather than focus on the similarities between

the cases, X tries reframing the debate over imagined lifetime bans on all manner of future representations. Q.Br. 1, 9, 12. It accuses Bright Data of "argu[ing], in essence, that [Quinn] can *never* be adverse to it in *any* case involving Bright Data's business." *Id*. This is a strawman. So is its lament over a poor hypothetical lawyer who "handle[s] a single patent matter" only to later find himself barred from "every aspect" of the former client's business. *Id*. Bright Data never argued that Quinn can't sue Bright Data in unrelated matters. It remains free to sue Bright Data under trademark, patent, labor law, and the like, for a broad range of conduct. But it cannot sue Bright Data for scraping websites after advising Bright Data on how to lawfully do exactly that.

X abandons its doomsday scenario in a footnote, *conceding* that "lawyers may take adverse legal action against a former client, no matter how antagonistic …, so long as the matters are not substantially related." Q.Br. 7 n.2. To salvage its argument, X says the two cases can't be substantially related because Quinn's Engagement Letter is limited to the *Meta* litigation and excluded "any other aspect of Bright Data's activities." *Id*. at 3, 10. But this Scope Provision does not define the boundaries of Quinn's ethical obligations.

The relevant question is whether the two "*matters*" – not the two "representations" – are substantially related. Rule 1.9(a) precludes successive representations "in the same or a substantially related *matter*," which is defined as "any judicial or other proceeding …, claim, controversy, investigation, [or] accusation …." *Id.*, cmt. 2; RPC Rule 1.7(e). The inquiry, therefore, focuses on the relationship between the *Meta* and *X cases*, not on Quinn's past or anticipated future ***work*** in the two matters. Nor does the Engagement Letter narrow Quinn's ethical obligations, as its Conflict Provision permits adverse representations only in "other ***matters*** [that are] not substantially related to [its] representation of Bright Data." Ex. 2 at 4.

In a strained reading that would narrow the Conflict Provision into oblivion, X argues that, because the Scope Provision excludes "other aspect[s] of Bright Data's activities," Quinn can sue Bright Data for any "other" activity no matter how related to the Bright Data engagement. Q.Br. 3; Ex. 2 at 2. But the Scope Provision merely clarifies that Quinn bears no *affirmative* responsibility to provide "services" in the excluded areas. The Conflict Provision expressly goes

beyond the Scope Provision by barring adversity not just in the *same* matter but "substantially related" matters. Indeed, the Conflict Provision is only triggered for "matters in which [Quinn does] not represent Bright Data," meaning for matters that fall *outside* the Scope Provision. *Id*. at 4. As such, even if Quinn limited its engagement, it still can't sue Bright Data for anything "substantially related" to it.

In any event, Quinn's representation was not narrowly circumscribed. It was not asked to opine on some arcane or peripheral issue of, say, tax law or even copyright law. Bright Data retained Quinn because it was lead counsel in *hiQ* and familiar with Bright Data's scraping technology from discovery in that case. Avisar ¶ 2. Quinn was given broad remit to advise on *all* of Bright Data's defenses and strategies in the *Meta* cases. That is not "peripheral;" it is core.

Nor is there merit to X's argument that Quinn's advice was only tangentially relevant to this case. Quinn concedes it provided advice with an eye towards future suits by "other" website operators. Skibitsky ¶ 11. To *minimize* this fact, Ms. Skibitsky observes that Bright Data only quoted from the Quinn Report's Executive Summary. *Id*. at ¶ 18. But the very purpose of an Executive Summary is to highlight the most important points in the Report. And this one was even in bold italics. One does not do that for unimportant points. Nor does Ms. Skibitsky deny that Quinn extensively discussed these issues with Bright Data's Board. At most, she states that she can't recall which "specific website operators" were discussed. *Id*. But that does not change the **undisputed** fact that she and her colleagues discussed Bright Data's strategy for defending the identical services from identical claims by other website operators. *See MD Helicopters, Inc. v. Aerometals, Inc.*, 2021 WL 1212718, *7 (E.D. Cal. 2021) ("To allow this presumption to be rebutted by declarations by self-interested parties would be improper.").

## B. The Meta and X Cases Are Substantially Related.

As Bright Data explained, California courts view the "substantially related" test expansively, requiring only that the "subjects of the prior and current representations are linked in some rational manner." B.Br. 11 (citing cases). X does not dispute this standard. And its arguments that the standard is not met are unavailing.

**_Both Cases Involve <u>Core</u> Common Facts_**.  X does not seriously dispute the factual similarity between the *X* and *Meta* cases.  It does not deny that the same Bright Data services and conduct are at issue, including not just website access and scraping, and the provision of such services to third-parties, but also its alleged efforts to "evade" virtually identical anti-scraping measures.  Indeed, X does not identify a single relevant factual distinction, other than some minor wording differences between X's and Meta's Terms.

X says these minor wording differences are dispositive because they "create[] a vastly different *legal* regime," rendering all other factual overlaps irrelevant.  Q.Br. 15-16.  But X does not dispute that X and Meta *interpret* their terms identically.  X just believes it has a stronger case, and can prevail where Meta lost, because "wording differences in contracts – even minor ones – [can] make all the difference."[1]  *Id*.  Of course, sometimes they do, and sometimes they don't.  But X's confidence in its case has no bearing on the *conflicts* question.  Even if it did, contract interpretation is only *one* of many contested issues.  Other elements of X's claims and Bright Data's defenses – including contract formation, unconscionability, laches, consent, restraint of trade, inducement, and injury – do not turn on contract interpretation and involve overlapping facts.  Moreover, contractual wording differences only go to one aspect of *X's conduct*, not Bright Data's.  Factual disputes about what *Bright Data* actually did **completely** overlap.[2]

Nor is there merit to X's argument that the cases are factually unrelated because the *plaintiff* is different.  *SC Innovations, Inc. v. Uber Techs., Inc.*, 2019 WL 1959493, *6-7 (N.D. Cal. 2019), is dispositive.  There, Quinn first defended Uber in a state law antitrust case brought by Maryland taxi cabs.  Quinn later sued Uber on behalf of a California ride-hailing app developer in a federal antitrust case.  In disqualifying Quinn, the court rejected Quinn's argument that the cases were

---

[1] *Without citation*, X says this Court already ruled that X's Terms "apply to Bright Data's logged-out access, use, and scraping of X's platform."  Q.Br. 1, 15.  The Court did no such thing.  Bright Data did not move on contract interpretation.  Nor did the Court rule on that basis.  It held only that X failed to plead injury, not that Bright Data *breached* the Terms.  As such, there are no "divergent" rulings between this Court and Judge Chen's contract *interpretation* against Meta.

[2] X also notes that its Terms, unlike Meta's, **permit** automated "crawling" (but not "scraping").  Q.Br. 16.  That may kill its access claim, but it does not render any factual overlap irrelevant.

unrelated because the earlier case "involved litigation with traditional taxi companies" while the later case was "between two ride-hailing companies that … do not themselves provide transportation," and thus, involved "different markets, different facts, different claims, different statutes, and different legal theories." *Id*.  Both cases, the court explained, "relate to the same services provided by Uber, even if the competitors might be in different markets." *Id*.  Here, the need for disqualification is even greater because it involves the same *services*, *conduct*, **and** *claims*.

X does not grapple with, or even mention, *SC Innovations*.  Instead, it cites five cases expressly distinguished by *SC Innovations* and others.  These cases highlight the distinction between matters involving the same services, or nucleus of operative fact, and those that don't.

| *Case* | *Reasons Not Substantially-Related* |
|---|---|
| *TWiT, LLC v. Twitter Inc.*, 2018 WL 2470942 (N.D. Cal. 2018). | "Actual audio and video technology" in prior patent case not a "fact relevant" to later trademark and breach of contract case. <br><br> <u>Distinguished by</u>: *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 2020 WL 7133773 (N.D. Cal. 2020) ("case is unlike" *Twitter*); *SC Innovations*, 2019 WL 1959493 (not "analogous"). |
| *Foster Poultry Farms v. ConAgra Foods Ref. Foods Co., Inc.*, 2005 WL 2319186 (E.D. Cal. 2005) | Prior advice relating to merger of former client's "*fresh chicken*" business had no bearing on case over fraudulently-obtained patent for making precooked "*browned and smoked turkey*." <br><br> <u>Distinguished by</u>: *SC Innovations*, 2019 WL 1959493. |
| *Lehman Bros. Holdings Inc. v. Direct Mortg. Corp.*, 2013 WL 12114447 (C.D. Cal. 2013). | Successive contract cases not related because the "circumstance constituting the alleged breaches" were different, and liability turned on the "unique factual circumstances surrounding the individual loans." <br><br> <u>Distinguished by</u>: *SC Innovations*, 2019 WL 1959493; *DCR Mktg. Inc v. US All. Grp., Inc.*, 2020 WL 2066148 (C.D. Cal. 2020). |
| *Human Longevity, Inc. v. J. Craig Venter Inst.*, 2018 WL 5840045 (S.D. Cal. 2018). | Successive trade secret cases "involve[ed] different types of information," misappropriation by different employees, and different "*methods*" of misappropriation. <br><br> <u>Distinguished by</u>: *SC Innovations*, 2019 WL 1959493. |

| *Case* | *Reasons Not Substantially-Related* |
|---|---|
| *Khani v. Ford Motor Co.*, 215 Cal. App. 4th 916 (2013). | Finding no disqualification "just because [the two actions] involved claims under the same statute," and, though the lawyer was involved in other Lemon Law cases *years ago*, he had no knowledge of the alleged defects in the plaintiff's "2008 Lincoln Navigator" or any relevant "policies, practices, or procedures." <br><br> *Distinguished by*: *SC Innovations*, 2019 WL 1959493; *Arias v. FCA US LLC*, 2018 WL 3419709 (E.D. Cal. 2018); *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 2019 WL 144589 (N.D. Cal. 2019); *Marte v. Los Angeles*, 2019 WL 1325035 (Cal. Ct. App. 2019); *DCR Mktg.*, 2020 WL 2066148. |

Here, X does not deny that the *Meta* and *X* matters arise out of a common nucleus of operative fact. That renders them factually related.

***Common Legal Issues Pervade Both Cases***. X also does not deny that the legal issues in the *Meta* and *X* cases overlap. Instead, it argues the overlap is not *complete* because it brings "two additional causes of action … not at issue in the *Meta* case." Q.Br. 17. But "the substantial relationship test does not require that the issues in the two representations be identical." *Trone v. Smith*, 621 F.2d 994, 1000 (9th Cir. 1980). A kitchen-sink complaint cannot erase the overlap in the overlapping claims. Nor are the new claims unrelated to the original ones. They all arise out of the same nucleus of operative fact. Indeed, this Court's Dismissal Order (ECF 83) viewed ***all*** X's claims through the prism of two forms of conduct: access and scraping. It applied this "two-fold framing" to all claims precisely because they all involve similar facts and legal issues.

X next tries to diminish the overlap, saying it is "much less salient" after the Court's Dismissal Order. Q.Br. 17. Pretending that it won summary judgment on contract interpretation – an issue neither before the Court nor addressed by it – X says the "primary issues in the *X* Matter now are the existence of quantifiable injury and the interests X is trying to protect." *Id*. But even if X were correct that both issues are still live questions (the latter is not), they are just *threshold* hurdles X must overcome to plead itself into court. They do not eradicate the slew of overlapping legal issues that will arise if X is permitted to amend its complaint.

Taking a different tack, X says the legal overlap does not extend beyond a similarity in the

causes of action themselves. *Id*. All breach of contract claims, it says, have the same elements, but that does not render them *ipso facto* related. True enough. A contract can be breached in many ways. But here, the *conduct* forming the alleged breach is identical, so the application of facts to law and the associated legal issues are common. *Cf. Wilkinson v. Garland*, 601 U.S. 209 (2024) (applying a "given set of facts" to law is a "question of law").

X's own case shows the distinction. In *WhatsApp*, 2020 WL 7133773, at *4-7, King & Spalding defended WhatsApp as local counsel in an earlier matter under seal. In the subsequent matter, WhatsApp sued K&S's new client for using WhatsApp to distribute malware. While "at a high level of generality both cases involve[d] WhatsApp's technology," the court explained, "any potential overlap in the factual matter is circumscribed by the distinct nature of the legal claims between the prior and current representations," and "no such overlap of legal claims exist[ed]" in that case. *Id*. Here, the legal issues overlap not just because the elements of the claims are the same but because the conduct X will need to prove to satisfy those elements is the same.

*Quinn Engaged Directly with Bright Data on Matters Central to Both Cases*. X does not deny that Quinn had a team of lawyers who directly engaged with Bright Data, and that they became privy to attorney work product, client confidences, litigation strategy, and confidential information relating to the conduct at issue here. Skibitsky ¶ 19 (tallying *nine* Quinn attorneys). This establishes the requisite "direct relationship." *See* B.Br. 13, 14 (citing cases).[3]

In response, X attempts to graft an additional "materiality" requirement onto the test. "To determine whether a substantial relationship exists," X says, "it must be shown that the information from the prior representation is material to the current representation." Q.Br. 8. It then faults

---

[3] X fails to meaningfully distinguish Bright Data's cases. Q.Br. 10 n.5. While the firm in *Farhang v. Indian Inst. of Tech.*, was ultimately not disqualified, this was not due to low hours; it was because the conflicted lawyers left the firm. 2009 WL 3459455 (N.D. Cal. 2009), *sub. order*, 2010 WL 199706 (N.D. Cal. 2010). Nor is *Elan*'s holding – that "the fact that [the current attorneys] billed only a short period of time does not preclude their work from being substantially related" – undermined just because the firm was ultimately disqualified on other grounds. 809 F. Supp. at 1389. And X's skepticism that the lawyer in *ViChip Corp. v. Lee* only worked 2.5 hours does not diminish the fact that the court accepted the representation and disqualified him on that basis. 2004 WL 2780170, *3 (N.D. Cal. 2004).

Bright Data for not carrying this supposed "heavy burden." *Id*. But X describes the *wrong* test.

It is true that, where matters are **not** factually or legally related, disqualification is still warranted if the lawyer was sufficiently immersed in the former client's business. But where, as here, the matters are so related, courts only look to whether the lawyer had a "direct and personal" relationship without "delving into the specifics of the communications." *Jessen v. Hartford Cas. Ins. Co.*, 111 Cal. App. 4th 698, 709 (2003). Even X agrees that "actual knowledge of material confidential information" is only needed "absent" a "substantial relationship." Q.Br. 7, 8 n.3.

X's argument that Bright Data must waive privilege and show what information Quinn possesses and how it can be used to Bright Data's disadvantage misreads the cases. X cites *Farris v. Fireman's Fund Ins. Co.*, 119 Cal. App. 4th 671, 680-83 (2004), for the proposition that "the information acquired during the first representation … must be found to be directly at issue in, or have some critical importance to, the second representation." But in disqualifying counsel, *Farris* said the opposite: "whether [the attorney] actually possesses confidential information that would work to his advantage in his current representation is **not the test**." *Id*. Similarly inapposite is *WhatsApp*, which cited to *Farris*, and found that the matters were not substantially related because the conduct, defendants, and claims were different. *WhatsApp*, 2020 WL 7133773, at *4. Neither case required an exchange of material information to establish a substantial relationship.

Rather, under this test, the inquiry into the nature of the attorney's involvement is limited to whether the lawyer had "direct" client contact about the matter. "If the relationship [is] direct – that is, where the lawyer was personally involved in providing legal advice" – "disqualification will depend upon the strength of the similarities between" the cases. *Jessen*, 111 Cal. App. 4th at 709. It is a low bar, plainly cleared by Quinn's nine-lawyer Bright Data Team.[4]

In rebuttal, X returns to its mantra that Quinn's Bright Data engagement was "limited" and "discrete." Q.Br. 9-10. "There is reason to differentiate," it says, "between lawyers who become

---

[4] X repeatedly tries to minimize Quinn's representation by claiming it *billed* only 30.6 hours. Q.Br. 1, 2, 4, 10, 18, and 20. But Ms. Skibitsky admits that Quinn's bills omit "10 to 20 hours" of her own time, and unquantified amounts for Ms. Sharma, Mr. Wolfson, Mr. Muller, Mr. Worcester, Mr. Cleveland, Ms. Nix-Hines, Mr. Teruya, and Mr. Barnes. Skibitsky ¶¶ 10, 19.

heavily involved in the facts of a particular matter and those who enter briefly on the periphery for a limited and specific purpose relating solely to legal questions." *Id*. (citing *Ahmanson*, 229 Cal. App. 3d at 1457). But as noted above, the Rules focus on the relationship between the *cases*, not the *representations*. Nor does *Ahmanson* suggest the contrary. *Ahmanson* did not involve a substantially related matter, as there was no "factual similarity" and "no legal similarity" between the prior *credit* protection advice and the subsequent *interest rate* protection advice. 229 Cal. App. 3d at 457. In the financial world, interest rates and credit facilities are two separate asset classes and two separate businesses. In contrast, because the *Meta* and *X* cases bear remarkable factual and legal similarities, *Ahmanson* is inapposite and Quinn cannot excuse its conflict by *characterizing* its involvement as "limited" or "discrete," or its 24-page, single-spaced report a mere "background memo." *See* Q.Br. (*passim*). It was anything but.

        **C.**      ***Quinn Actually Possesses Material Confidential Information.***

The parties agree that, if the matters are substantially related, the inquiry is over. The parties also agree that, even if they are not, disqualification is still warranted if Quinn received or created material confidential information during the Bright Data engagement. It did.

As an initial matter, the fact that Quinn (*secretly*) established an ethical wall strongly suggests that there was something that needed protection. X says Quinn only erected the wall "in an abundance of caution," but it does not say there was nothing to protect. Q.Br. 20. Indeed, both Quinn's declarants attest that the wall was effective in preventing disclosure of information and cross-contamination among the teams. Skibitsky ¶ 19; Schapiro ¶ 8.

Quinn also concedes it possesses confidential information; it just seeks to minimize it.[5] In doing so, it glosses over the Quinn Report, which itself is "confidential client information." *See* Rest. 3d of Law Governing Lawyers § 59, cmt. b ("confidential client information" includes "work

---

[5] Presumably unintentionally, X inaccurately states that "no Quinn Emanuel attorney has confidential or privileged information from Bright Data that is material to this case." Q.Br. 11 (citing Skibitsky ¶ 19; Schapiro ¶ 8). Neither declaration says this. Nor is it true. Mr. Schapiro says *he* has never "received" confidential information because of the ethical wall. And Ms. Skibitsky says *she* never "***shared***" the Quinn Report or other confidential information with "anyone on the X litigation team." Neither say that *Quinn* does not *possess* such information.

product that the lawyer develops in representing the client"). X does not say the Report is irrelevant. Instead, Ms. Skibitsky says the Report does not "mention X or Twitter" by name, and that she did not "analyze X's … terms." Skibitsky ¶¶ 11, 12. But, the fact that the memo did not address *one* contract interpretation issue, does not mean that the other 24 pages are immaterial.[6]

Quinn also received a confidential agreement relating to the *Meta* litigation. Ms. Skibitsky says she doesn't *now* recall the *specific* terms of that agreement. Skibitsky ¶ 4. But her lack of recollection over a year later neither changes the fact that she asked for and still has it, nor renders it irrelevant. Nor does Ms. Skibitsky dispute that she internally prepared a list of questions about Bright Data's business, which the client answered during a video conference on February 26, 2023. Avisar ¶ 9. She does not contend that this information is irrelevant to X's claims.

Apart from the information it received as part of its own investigation, Quinn also engaged in *senior-level* attorney-client communications and exchanged privileged *work product* with Bright Data's Litigation Counsel.[7] Taking advantage of the fact that Bright Data has not waived privilege, Ms. Skibitsky tries to downplay the import of this information. She says Bright Data only shared Appendix A of Litigation Counsel's response to the Quinn Report, not the whole response, and that she did not "*meaningful[ly]*" analyze it at the time. Skibitsky ¶ 15. But she does not deny that it contained legal strategies and theories relevant to Meta's and other website operators' claims (and Bright Data's defenses) that she extensively discussed with the Board.

X belittles this information by calling it nothing more than a playbook about "litigation philosophy" and general "litigation strategies." Q.Br. 9, 12 (citing *Wu v. O'Gara Coach Co., LLC*, 38 Cal. App. 5th 1069 (2019)). But *Wu* is inapposite. There, the attorney was a businessperson, **not a lawyer**, when he acquired information about his former employer. As such, Rule 1.9 did not apply, and the only question was whether he actually possessed any *attorney-client privileged*

---

[6] Ms. Skibitsky also says she doesn't recall discussing X specifically and likely wouldn't have without running conflicts. Skibitsky ¶ 18. A policy of never mentioning *any* third-party during *any* client conversation without first running conflicts is certainly unusual. But even so, referring to other website operators generically or categorically does not render the information immaterial.

[7] Quinn also retains confidential internal interview notes, memos, drafts, and emails. Rest. 3d § 59, cmt. b ("confidential client information" includes a "lawyer's notes to a personal file").

information (not "confidential" information). Because the employee-turned-lawyer did not possess any such information, but just had access to **non-privileged** workplace policies, the court held that disqualification was not warranted. *Id.*; *see also O'Gara Coach Co., LLC v. Ra*, 30 Cal. App. 5th 1115, 1128 (2019) (explaining Rule 1.9 did not apply to employee-turned-lawyer).

But in the lawyer context, the Rules are more restrictive. Contrary to X's assertion, California courts do not say that playbook information is undeserving of protection. The courts simply recognize that labels and characterizations are not helpful. As the court explained in *Lehman*, "although California has not adopted a 'playbook approach' to lawyer disqualification, confidential information an attorney learns about a former client's overall structure and practices, litigation philosophy, or key decision makers, may be grounds for disqualification if such issues are of critical importance or directly implicated in the latter case." *Lehman Bros. Holdings Inc. v. Direct Mortg. Corp.*, 2013 WL 12114447, *4 (C.D. Cal. 2013). Here, Quinn was privy to confidential and privileged information about Bright Data's operations, policies, and litigation strategies related specifically to data scraping, not just general strategies and philosophies.

To rebut any finding of materiality, X turns to Mr. Schapiro. But Mr. Schapiro never saw Bright Data's information. Instead, he relays the hearsay statements of his initial conversation with Ms. Skibitsky and Ms. Sharma (who apparently didn't work on the matter) about how they immediately formed the "view" that the *matters* were not "substantially related." Schapiro ¶ 7. But Ms. Skibitsky, who authored the Quinn Report, did not share this view in her declaration. Nor would her views about the relatedness of the *matters* speak to the relevance of the *information*.

In any event, what matters is this Court's views of materiality, not those of interested lawyers. In making that determination, two Lemon Law cases – one at each end of the spectrum – are instructive. At one end is *Khani*, where the court held that matters were not substantially related because the claim turned on the specifics of the defective vehicle, and the lawyer – who had departed four years earlier – had no knowledge of the specific vehicle, the specific defect, or any relevant "policies, practices, or procedures." 215 Cal. App. 4th at 922. At the other end is *FCA*, which distinguished *Khani* and disqualified a lawyer who left three months earlier. Even

though she too lacked information about the specific plaintiff's defective vehicle, she possessed relevant playbook information because "FCA's people, policies, and litigation strategies remain the same." 2018 WL 3419709, at *2. This case is closer to and goes beyond *FCA*. Unlike in *FCA* and *Khani*, Bright Data's conduct is identical, so discussions about litigation strategies and the strengths and weaknesses of overlapping claims and defenses are necessarily material.

### D. Disqualification is Required to Preserve the Integrity of the Client Relationship.

X concedes that if "the requisite substantial relationship between" the successive matters "can be demonstrated … disqualification becomes mandatory" and that an ethical wall is "not … independently sufficient to avoid vicarious disqualification." Q.Br. 8, 21.

Nonetheless, X asks the Court to excuse its ethical violations because "disqualification proceedings are equitable in nature." Q.Br. 18. But California courts do not sanction ongoing rule violations for expedience. As the court explained in *Ahmanson*, "***the court does not engage in a 'balancing of equities' between the former and current clients. The rights and interests of the former client will prevail.***" *Ahmanson*, 229 Cal. App. 3d at 1451; *Costello v. Buckley*, 245 Cal. App. 4th 748, 754 (2016) (same); *Love v. Permanente Med. Grp.*, 2013 WL 5273213, *3 (N.D. Cal. 2013) (same). To rule otherwise would be to not only forgive a past transgression, but to sanction a *continuing* ethical breach of the unambiguous Rules of Professional Conduct.

But if the Court were to balance the equities, they compel disqualification. X accuses Bright Data of bringing this motion for tactical reasons by waiting four business days to file its 20-page motion, replete with evidence and affidavits. In X's telling, Bright Data waited to see X's Motion to Amend and was so impressed with Quinn's work that it scrambled over the weekend to cobble together its motion, hoping some lesser counsel will take Quinn's place. Q.Br. 19 n.11. The implicit hubris in this argument aside, it lacks merit. X does not assert waiver and concedes Bright Data did not "significantly delay[]" its motion. *Id*.

X next invokes judicial estoppel, claiming Bright Data "switched sides" by not designating the *Meta* case as "related" in the initial Joint Case Management Statement. *Id*. 18. But X concedes that the "tests for whether cases are 'substantially related' for purposes of disqualification or

'related'" for judicial re-assignment or coordination "are different." Q.Br. 18. And it has no answer to the cases finding the lack of initial designation irrelevant to the conflict analysis. B.Br. 11 n.8 (citing cases). Nor does satisfaction with judicial assignments suggest that Bright Data has unclean hands or engaged in improper "tactics" by seeking to vindicate its rights as a former *client*.

In the same breath that it maligns Bright Data, X praises Quinn's supposed virtues. The fact that it (*secretly* and *belatedly*) established an ethical wall, it says, shows that it "maintained the highest ethical standards." Q.Br. 20-21. But, even if a wall could cure the conflict, the Rules *require* its disclosure to the former client; it is, after all, the former client's interests and information that are in need of protection. RPC 1.10(a)(2). Here, X admits that it consciously chose "not [to] seek permission" from Bright Data. Schapiro ¶ 11. But X's view that it is better to ask for forgiveness than for permission has no place under the Rules of Professional Conduct.

Nor is there merit to X's argument that it did not need to inform Bright Data because it concluded there was no violation of Rule 1.9. If the Court reaches the question of *remedies*, by definition, there was a violation. In any event, two half wrongs – a (supposed) *de minimis* violation of Rule 1.9 and partial non-compliance with Rule 10(a)(2)(iii) – do not make a right.[8]

X's effort to establish prejudice also falls flat. It first seeks to vindicate *Quinn's* interest in taking on small matters without fear of later preclusion from larger ones. *Id.* at 19. Standing aside, its argument – that disqualification will disincentivize Quinn from taking smaller, less profitable engagements – is speculative, as it wrongly assumes that later engagements will always be bigger than earlier ones. Regardless, the duty of loyalty does not depend on relative profits. Quinn picked its horse when it accepted the prior engagement; it can't switch mid-race. If Quinn wants looser

---

[8] Quinn violated Rule 10(a)(2)(iii) in two other ways. *First*, it did not erect the wall until May 29th, *four business days* before it appeared. Skibitsky ¶ 19. *See Signature MD, Inc. v. MDVIP, Inc.*, 2015 WL 12781603, *3 (C.D. Cal. 2015) (two-day delay warrants disqualification because "an ethical screen [must] be implemented *before* undertaking the challenged representation"). Quinn does not disclose when it first undertook the representation, but it almost certainly began before establishing the wall, as Quinn claims to have engaged in a "substantial undertaking that involved interviewing witnesses …, reviewing filings and discovery …, and conducting extensive research" before June 6th. Schapiro ¶ 9. *Second*, Quinn failed to ensure its wall covered all relevant attorneys, expanding it to include six more attorneys after Bright Data's motion. Skibitsky ¶ 19.

ethical rules, it should seek their amendment, not ask for court permission to violate them.

X fares no better decrying the deprivation of chosen counsel. The rules strike the right balance: New clients are free to select from the **millions** of lawyers who have not represented former clients on substantially related matters, but they cannot abet the betrayal of trust by their adversary's former counsel. Unless Quinn was duplicitous, X knew of the potential conflict when Quinn ran its conflict check. Schapiro ¶ 6. But regardless of what X knew, X does not deny that its other counsel of record – Haynes and Boone – stands at the ready. X's only response is that it would be "unfair [to] deny X from implementing a cohesive litigation strategy across its various cases through Quinn." Q.Br. 19. Putting aside the irony of its argument – that the *X* and *Meta* cases are not related, but *every* case X has (regardless of subject matter) is so substantially related that they need common counsel – it is simply untrue. X uses many different law firms, and it points to nothing about *this* case that requires coordination with any other case involving Quinn.

X's lament that it paid Quinn for a few weeks also falls flat. Q.Br. 20. Not only does it fail to substantiate or quantify its burden, it concedes Quinn did its work "on a short timetable." Schapiro ¶ 9. Nor will disqualification deprive X of that work. The review of background materials duplicates the knowledge already possessed by X's other counsel. And any work on the proposed Second Amended Complaint is not "for naught" because it has already been filed. *Id.* So, X's burden amounts to the cost of just a few weeks of time—a period even shorter than the Bright Data engagement. And even that is illusory. California ethical rules preclude Quinn from billing X for its own ethical violation, so X is out-of-pocket for nothing. *Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012) ("The representation of clients with conflicting interests … is a particularly egregious ethical violation that may be a proper basis for complete denial of fees.").

### III.  CONCLUSION.

For the foregoing reasons, the Court should disqualify Quinn from this case.

| | |
|---|---|
| Dated: June 24, 2024 | Respectfully submitted,<br><br>/s/ *Colin Kass*<br>Colin R. Kass*<br>PROSKAUER ROSE LLP<br>1001 Pennsylvania Ave., N.W.<br>Washington, D.C. 20004<br>(202) 416-6890<br>ckass@proskauer.com<br><br>David A. Munkittrick*<br>PROSKAUER ROSE LLP<br>Eleven Times Square<br>New York, New York 10036<br>(212) 969-3000<br>dmunkittrick@proskauer.com<br><br>Robert C. Goodman (Bar No. 111554)<br>Lauren Kramer Sujeeth (Bar No. 259821)<br>ROGERS JOSEPH O'DONNELL, PC<br>311 California Street, 10th Floor<br>San Francisco, CA 94104<br>(415) 956-2828<br>rgoodman@rjo.com<br>lsujeeth@rjo.com<br><br>Sehreen Ladak (Bar No. 307895)<br>PROSKAUER ROSE LLP<br>2029 Century Park East, Suite 2400<br>Los Angeles, CA 90067-3010<br>(310) 284-5652<br>sladak@proskauer.com<br><br>*Attorneys for Defendant Bright Data Ltd.*<br>**Admitted Pro Hac Vice* |