UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

X CORP.,

    Plaintiff,

v.

BRIGHT DATA LTD.,

    Defendant.

No. C 23-03698 WHA

**ORDER DISQUALIFYING THE LAW FIRM OF QUINN EMANUEL URQUHART & SULLIVAN, LLP**

## INTRODUCTION

A law firm advised a client on how to defend its business model against litigation brought by a social media platform only to turn around and sue the same client in a suit designed to thwart the very same business model on behalf of a second social media platform. This violated the law firm's duty of loyalty to the client and the law firm must be disqualified.

## STATEMENT

**1. PAST MATTER: THE META LITIGATION.**

In early 2023, defendant Bright Data Ltd. retained Quinn Emanuel Urquhart & Sullivan, LLP when Meta Platforms, Inc. sued Bright Data in this district and Bright Data sued for declaratory relief in Delaware. Both suits involved the lawfulness under contract and tort law of Bright Data's business model that involves scraping social media platforms. The specific platforms there involved were Facebook and Instagram. *See Meta v. Bright Data*, No. 23-cv-00077-EMC (N.D. Cal.) (filed Jan 6, 2023); *Bright Data v. Meta*, N23C-01-229 SKR CCLD (Del. Super. Ct.) (filed Jan. 30, 2023). Quinn counseled Bright Data on those actions:

Specifically, on February 15, 2023, Bright Data's general counsel, Mor Avisar, contacted Quinn's then-associate, now-partner Hope Skibitsky. Partner Renita Sharma, who earlier had secured a scraping-related win, signed Bright Data's engagement letter. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1183, 1202–03 (9th Cir. 2022).

The engagement letter included a waiver of future conflicts of interest, "provided that the other matter is not substantially related":

> Our firm has many lawyers and several offices. We may currently or in the future represent one or more other clients in matters involving Bright Data and we may represent the parties that are adverse to you in this matter *in other unrelated matters*. We are undertaking this Engagement on condition that Bright Data gives its express consent and agreement that we may represent other clients, including the parties adverse to you in this matter, in the future in other matters in which we do not represent Bright Data even if the interests of the other clients are adverse to Bright Data (including the appearance on behalf of another client adverse to Bright Data in an *unrelated* negotiation, litigation or arbitration), *provided that the other matter is not substantially related to our representation of Bright Data*.

(Dkt. No. 93-1 Exh. 2 ("Engagement Letter") at 4 (emphases added)).

The engagement's scope was broadened at Bright Data's request to include discussions with its senior business leaders, and memorialized as follows:

> [Quinn]'s services will be limited to providing an analysis of the [Meta] Litigation [in both jurisdictions], including an analysis of the arguments that may be raised and defended against in the Litigation and an overview of what [Quinn] sees as potential next steps in the Litigation, and participating in calls with Bright Data's senior management to answer any questions arising following review of our analysis by Bright Data's senior management.

(*id.* at 2). Any litigation appearances or filings would require a separate agreement, as would any fees incurred over $40,000 — about forty billed hours.

To support the work, the engagement letter further required Bright Data to provide Quinn with "complete and accurate information regarding the subject matter of the Engagement" (*id.* at 4). Proposed sources included "key background documents, including correspondence between Bright Data and Meta" (*id.* at 5), "interview[s] of individual(s) from Bright Data to answer questions relevant to our analysis" (*ibid.*), and ultimately "calls with Bright Data's senior management" (*id.* at 2).

2

The Quinn attorneys who joined calls, received documents, or produced or communicated work were now-partner Hope Skibitsky, partners Renita Sharma, Corey Worcester, and Adam Wolfson, and two associates. Additionally, one more partner *was* exposed to the matter, another *may have been* exposed to it, and one last associate was until recently believed to have been exposed to it. That makes nine Quinn attorneys involved in or proximate to the work.

On March 1, 2023, Quinn provided a twenty-four page, single-spaced analysis to Bright Data. Quinn attorney Skibitsky and an associate co-authored the analysis. To "quote[] language . . . from [its] approximately one-and-one-half page Executive Summary": The report "approached the analysis" with the understanding that the Meta dispute would have implications for Bright Data "beyond [the] dispute" with regards to "others like Meta" (*see* Dkt. No. 99-1 ("Skibitsky Decl.") ¶ 11). One week later, Quinn attorneys Skibitsky and Wolfson met with Bright Data's general counsel to discuss the firm's advice.

On March 12, 2023, Bright Data in turn gave Quinn a four-page analysis from Proskauer Rose critiquing Quinn's work. Quinn attorney Skibitsky received the document. (Proskauer Rose did not evidently share its own memorandum analyzing the situation from the ground up.) Proskauer Rose remains Bright Data's litigation counsel in the X Corp. matter.

Finally, also on March 12, 2023, Bright Data held a two-hour board meeting for Quinn to discuss its analysis and advice with Bright Data's senior leaders. The meeting included Quinn attorneys Skibitsky and Wolfson and Bright Data's full board, chief executive, general counsel, and litigation counsel, Proskauer Rose. They discussed the Meta litigation and "implications [for] Bright Data's overall litigation strategy [to protect] Bright Data's business model and its legal rights vis-à-vis other social media platforms and website operators" (Dkt. No. 93-1 Exh. 1 ("Avisar Decl.") ¶ 14; *see also* Skibitsky Decl. ¶¶ 11, 18).

In total, Quinn attorneys performed forty to fifty hours of work, plus more time Quinn recalls but has not quantified (*see* Skibitsky Decl. ¶¶ 6, 10, 17 (not quantifying unbilled time for three partners and two associates); Tr. 6; *see also* Avisar Decl. ¶¶ 16–17). Quinn billed 30.6 of those hours, or about $36,000. Unbilled hours included all partner time, including for

3

in-scope substantive discussions with Bright Data's board, chief executive officer, general counsel, and Bright Data's litigation counsel, Proskauer Rose (Avisar Decl. ¶¶ 16–17; *see also* Skibitsky Decl. ¶¶ 6, 10, 17; Tr. 6).

Bright Data chose not to use Quinn further.

### 2. PRESENT MATTER: THE X CORP. LITIGATION.

In July 2023, about four months after Quinn stopped working for Bright Data, X Corp. filed this lawsuit against Bright Data. X Corp. asserted contract and tort claims to bar Bright Data from scraping X. It later added trespass to chattels and misappropriation claims addressing the same conduct (*compare* Dkt. No. 1, *with* Dkt. No. 36). There are obvious similarities to the Meta litigation.

On June 4, 2024, after a dismissal with leave to amend, Quinn entered its appearance in this matter on behalf of X Corp. and adverse to Bright Data. On June 6, 2024, Quinn filed X Corp.'s motion for leave to amend. And, on June 10, 2024 — six days after learning its former lawyer now represented its opponent — Bright Data moved to disqualify Quinn.

The reader will recall that the engagement letter waived future conflicts, "provided that [Quinn's future adverse] matter is not substantially related to our representation of Bright Data" (Engagement Letter 4). In their briefing and oral argument, parties dispute only whether the matters at issue are "substantially related" under the meaning that the professional rules and related caselaw give that term (*see, e.g.*, Br. 9; Opp. 2, 7–8; Reply Br. 3; Tr. 8, 13). For this reason and others, this order finds that the waiver's carveout simply restored the background duty all lawyers owe former clients, *see, e.g.*, Cal. RPC 1.9(a), putting only that duty at issue in this motion.

## ANALYSIS

### 1. LEGAL STANDARD.

Our court of appeals "refers to the local rules of each district when deciding which standards govern an ethical violation," *Radcliffe v. Hernandez*, 818 F.3d 537, 541 (9th Cir. 2016), and the Northern District's local rules incorporate the standards of the State Bar of California, *see* Civil L.R. 11-4. When construing those standards to decide a motion to

4

disqualify, the California Supreme Court directs that the "paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 980 P.2d 371, 378 (Cal. 1999) (reversing denial of disqualification). The district court exercises discretion to apply the standards to the facts it finds, as "[t]he primary responsibility for controlling the conduct of lawyers practicing before the district court rests with that court," yet it may be reversed where it construes rules "inconsistent with strict standards of professional conduct" or makes "finding[s] [that are] plainly wrong." *Trone v. Smith*, 621 F.2d 994, 996 n.1, 999–1000 (9th Cir. 1980) (granting writ of mandamus to reverse denial of disqualification); *accord Radcliffe*, 818 F.3d at 541; *see also Am. Prot. Ins. Co. v. MGM Grand Hotel-Las Vegas, Inc.*, 765 F.2d 925, 926 (9th Cir. 1985) (declining to grant writ to reverse disqualification, citing *Richardson-Merrell Inc. v. Koller*, 472 U.S. 424 (1985)). All declarative statements in this order constitute findings of fact by the district judge.

2. **DUTY OF LOYALTY.**

Bright Data first moves to disqualify Quinn for violating the lawyer's duty of loyalty to former clients (Br. 8–14). Rule of Professional Conduct 1.9(a) directs that:

> [a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed written consent.

(asterisks omitted). Because loyalty requires keeping confidences, courts enforcing loyalty across successive matters "focus on the factual contours of both the former and the current transactions or matters and ask whether the affected lawyer *reasonably could have* learned confidential information in the first representation *that would be of significance in the second*." GEOFFREY C. HAZARD, JR. ET AL., THE LAW OF LAWYERING § 14.07 (4th ed. 2023); *accord Flatt v. Superior Ct.*, 885 P.2d 950, 954 (Cal. 1994); *Farris v. Fireman's Fund Ins. Co.,* 119 Cal. App. 4th 671, 681 (2004). Where the attorney-client relationship in the past matter was such that confidences normally would have been imparted, and where there is moreover a "substantial relationship" between that past matter and the present one, the possibility of

5

having acquired confidences in the first that may be abused in the second becomes conclusively "*presumed* and disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm." *Flatt*, 885 P.2d at 954; *see also Jessen v. Hartford Cas. Ins. Co.*, 111 Cal. App. 4th 698, 709 (2003); *H.F. Ahmanson & Co. v. Salomon Bros., Inc.*, 229 Cal. App. 3d 1445, 1454 (1991).

### A.     ATTORNEY-CLIENT RELATIONSHIP IN PAST MATTER.

Courts first look directly to the past matter to understand its contours, the lawyer's role, and whether the attorney remained at the periphery or entered a position where client confidences reasonably could have been shared. *Jessen*, 111 Cal. App. 4th at 709–11; *see also SpeeDee Oil*, 980 P.2d at 379–80; Cal. RPC 1.9 cmt. [3]. A representation is peripheral where there is no "realistic chance" an attorney would receive client confidences, as when an attorney normally does not directly interact with the client nor "need[] to know, ask[] to know, [or be] told" confidences in order to provide advice. *See H.F. Ahmanson & Co.*, 229 Cal. App. 3d at 1458. But "where the lawyer was [directly and] personally involved in providing legal advice and services to the former client . . . it must be presumed that confidential information has passed to the attorney." *Jessen*, 111 Cal. App. 4th at 709. Courts thus look to the factual problem the client faced, the legal or other questions posed to the attorney, and the resulting nature and extent of the relationship. *See id.* at 709, 711–12; *H.F. Ahmanson & Co.*, 229 Cal. App. 3d at 1454, 1457–58.

Here, in the Meta litigation, Bright Data faced an existential threat to its business. It sought Quinn's legal advice to manage the threat. And the relationship that resulted was not peripheral: All understood the engagement's core subject matter had direct consequence for Bright Data's core business, putting Quinn attorneys in a position where client confidences reasonably would have been shared. Quinn's task was to analyze whether Bright Data could scrape Meta's platforms legally. And the immediate implication was whether Bright Data could scrape at all. As Quinn attorney Skibitsky puts it now: That "the *Meta* Litigation would likely set a precedent that could have wider implications for the industry in general and Bright Data in particular" was "obvious" (Skibitsky Decl. ¶ 11). Consistent with that task's

importance, Bright Data asked Quinn not only to provide an "analysis of the [Meta] Litigation" to its own lawyers but to discuss "*any* questions arising following [the analysis's] review" by Bright Data's senior business leaders (*see* Engagement Letter 2 (emphasis added); *see also* Avisar Decl. ¶ 7). Accordingly, Quinn "approached [even its written] analysis" of Meta with "others like Meta" in mind (*see* Skibitsky Decl. ¶ 11 (ultimately quoting report she co-authored)).

Quinn's core task entailed understanding Bright Data's scraping conduct on Facebook and Instagram, legally assessing that conduct against contract and tort claims brought by Meta, and strategically theorizing defenses and procedural and substantive steps to prevail in this district and in Delaware. Quinn required Bright Data to "provide [it] with complete and accurate information regarding the subject matter of the Engagement" (Engagement Letter 4). It offered to "prepar[e] [a] litigation hold" (*ibid.*). And indeed, over twenty-five days, Quinn received at the very least public and private documents, multiple calls (including to answer a list of questions prepared by Quinn (*see, e.g.*, Avisar Decl. ¶ 9)), a four-page memo from Proskauer Rose critiquing Quinn's advice, and a two-hour board meeting with Bright Data's board, chief executive officer, general counsel, and still-current litigation team. By comparison, Quinn says that when preparing litigation filings for the case at bar it looked in roughly the same time to roughly the same resources: In twenty-six days or fewer, it "investigate[d] the facts" by "interviewing multiple witnesses at [the company], reviewing the filings and discovery to date in the case, and conducting extensive legal research" (Dkt. No. 99-2 ¶ 9; *see also* Opp. 6).

In short, Quinn was advising a battleplan for the survival of a business model. And so there was more than a "realistic chance that confidences were disclosed" to Quinn. *See City Nat'l Bank v. Adams*, 96 Cal. App. 4th 315, 328 (2002) (quoting *H.F. Ahmanson & Co.*, 229 Cal. App. 3d at 1455). Quinn's attorneys needed to know, asked to know, and reasonably would have been told confidential information to advise their client. *See H.F. Ahmanson & Co.*, 229 Cal. App. 3d at 1458.

Quinn makes three counterarguments regarding the first representation and its material confidences: *First*, that no confidential information was demonstrably shared with or retained by Quinn (*see* Opp. 8 n.3, 11). *Second*, that any confidences shared could only have been "inconsequential" given the "peripheral" or "circumscribed nature" of the representation (*see id.* 2, 9–10 & nn.4–5). *Third*, that any material confidences pertained only to Bright Data's strategic decision-making, a type of confidence that Quinn suggests has not been "adopt[ed]" as cognizable under the test (*see id.* 10–13 & n.8). For reasons above, all three points are not credible on the facts. They are also not persuasive on the law.

*First*: "The [duty of loyalty to former clients] test does not require the former client to show that actual confidences were disclosed." *Trone*, 621 F.2d at 999; *accord, e.g.*, *City Nat'l Bank*, 96 Cal. App. 4th at 327; *Jessen*, 111 Cal. App. 4th at 709. Indeed, the test "outlaw[s]" the inquiry. *Farris,* 119 Cal. App. 4th at 683 n.10. For related reasons, the inquiry does not require the former client to show what *was* or now *is* in the attorney's mind. *Id.* at 681 & n.7; *Global Van Lines, Inc. v. Superior Ct.*, 144 Cal. App. 3d 483, 489 (1983). As a result, Quinn's arguments about what direct evidence it says Bright Data lacks and about what documents Quinn says it received but never read or cannot remember are without legal import. Quinn's vague rebuttal that information confidential in 2023 is "generally known" in 2024 (*see* Opp. 12 n.7) is also unpersuasive (*see also* Skibitsky Decl. ¶ 11 n.1 (contradicting its own contentions by stating Quinn "is not disclosing the substance of any communications" because not all is "public" nor information "Bright Data has already made public")). *Cf.* Cal. RPC 1.9 cmt. [5].

*Second*: As for the weight of the confidences shared, for similar reasons the test again does not "inquire into their nature and extent." *City Nat'l Bank*, 96 Cal. App. 4th at 325 (quoting *T.C. & Theatre Corp. v. Warner Bros. Pictures*, 113 F. Supp. 265, 268 (S.D.N.Y. 1953)). Rather, the test inquires into the nature and extent of the representation or matter, then presumes all confidences that *could have* been made *were* made. *See id.* at 327. And, some confidence transfers are efficient. *See SpeeDee Oil*, 980 P.2d at 381–82.

Here, even though Quinn worked one month at the start of the Meta litigation, one month is one month and plenty of time to gather confidential information and strategies. And

communications related to the engagement came through channels likely to disclose material confidences efficiently: through Bright Data's in-house counsel's meetings, through Bright Data's outside counsel's memorandum, and through Bright Data's board meeting. *See, e.g.*, *Trone*, 621 F.2d at 1000 (reversing denial where original representation lasted one month); *see also, e.g.*, *Global Van Lines*, 144 Cal. App. 3d at 488–89 & n.3 (endorsing *Trone*); *H.F. Ahmanson & Co.*, 229 Cal. App. 3d at 1455 (same); *City Nat'l Bank*, 96 Cal. App. 4th at 325 (same). For similar reasons, even though Quinn charged $36,000 in bills rather than vast sums, this does not establish that the engagement did not entail material confidences. *See Trone*, 621 F.2d at 997 ($15,000 in bills).

For similar reasons, Quinn's contention at oral argument that the Court should review the twenty-four page analysis Quinn prepared misses the point. As an initial matter, the Quinn-authored memo would not reveal the confidential information Quinn received before writing the memorandum, nor the confidential information the firm received afterwards when discussing the memorandum's implications with Bright Data's full board and litigation counsel. More fundamentally, what exact confidences Quinn now retains is not a burden the former client bears. *Farris,* 119 Cal. App. 4th at 681 & n.7, 683 n.10.

*Third*: Quinn does not squarely contest that it reasonably would have received (or provided) information about Bright Data's strategic decision-making in the Meta litigation — its general "playbook" or indeed here its specific battleplan. Instead, Quinn suggests that such information has not been "adopt[ed]" as cognizable under the test (*see* Opp. 11–13). But whether the "so-called playbook approach" has been adopted or not, the relevant result is clear: California courts hold that a client's "overall structure and practices," "key decision makers," and "litigation philosophy" are "some of the categories of information that might be found to be 'material' and therefore relevant to a determination whether the attorney ought to be disqualified." *Farris*, 119 Cal. App. 4th at 680 (quoting then summarizing *Jessen*, 111 Cal. App. 4th at 712–13). Such confidential information is material to a matter — indeed even a successive matter — when it affects a given matter's "*evaluation*, *prosecution*, *settlement* or *accomplishment*." *Id.* at 679 (emphases added) (quoting *Jessen*, 111 Cal. App. 4th at 712–13);

9

*see also* Charles W. Wolfram, *Former-Client Conflicts*, 10 GEO. J. LEGAL ETHICS 677, 681, 723, 727 (1997) (article cited by *Farris*).

None of the decisions Quinn cites says otherwise. Indeed, the case that Quinn chiefly relied upon in oral argument (Tr. 25–26) is instructive. In *Khani v. Ford Motor Co.*, the appeals court recognized the caselaw holding that even a client's litigation playbook is confidential information that may be material to a proceeding of the right kind. 215 Cal. App. 4th 916, 921 (2013) (citing *Farris*, 119 Cal. App. 4th at 680). The appeals court in *Khani* held that the lower court in *Khani* erred not because it considered playbook information as such, but because the lower court assumed "exposure to playbook information in prior lemon law cases was sufficient to disqualify [the lawyer] *in this case*." *Id.* at 922 (emphasis added). The appeals court decided that the client's playbook from prior matters was no longer material to the current matter because the "decision makers" and the "policies, practices, or procedures [had *not*] continued in existence unchanged between [the prior matters ending in] 2007 and [the present matter starting in] 2011." *See ibid.* (distinguishing *Farris*). Here, Bright Data's Meta battleplan was plainly material to the Meta litigation — and, as described below in the next step, Bright Data's decision-makers remain in place.

In sum, this order thus finds that the relationship between Quinn and Bright Data was direct, not peripheral; specifically, Quinn attorneys were "personally involved in providing legal advice and services" to Bright Data to manage the threat posed by the Meta litigation. *See Jessen*, 111 Cal. App. 4th at 709. This order thus presumes these attorneys were provided with all confidences — factual, legal, and strategic — "bearing on the subject matter of th[at] representation." *See City Nat'l Bank*, 96 Cal. App. 4th at 324–25 (quoting *T.C. & Theatre Corp.*, 113 F. Supp. at 268). "As a result, disqualification will [now] depend upon the strength of the similarities between the legal problem involved in the former representation and the legal problem involved in the current representation." *Jessen*, 111 Cal. App. 4th at 709. If disqualification is thereby required, it will extend firmwide. *Flatt*, 855 P.2d at 954; *see also* Cal. RPC 1.10(a)(2), (c).

### B. SUBSTANTIAL RELATIONSHIP BETWEEN PAST AND PRESENT MATTERS.

Courts next compare the past matter to the adverse, present matter and ask if they are "substantially related." *Jessen*, 111 Cal. App. 4th at 711–13.

> [S]uccessive representations will be "substantially related" when the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues.

*Id.* at 713; *accord City Nat'l Bank*, 96 Cal. App. 4th at 324 n.2; Cal. RPC 1.9 cmt. [3]. In other words, the matters are substantially related when "there is a reasonable probability that [the prior matter's confidences] could be used against the client in [the] later, adverse representation." *Trone*, 621 F.2d at 998; *see also, e.g.*, *Jessen*, 111 Cal. App. 4th at 709. Factors supporting this "rational conclusion" may include whether the two matters involve sufficiently related factual, legal, or even strategic scenarios, as well as whether the current matter attacks the lawyer's work product from the prior matter. *Jessen*, 111 Cal. App. 4th at 711–13; *City Nat'l Bank*, 96 Cal. App. 4th at 324 n.2; *Farris*, 119 Cal. App. 4th at 680.

Here, confidential information that Bright Data shared with Quinn in the Meta litigation could be used materially against Bright Data in the X Corp. litigation. *Factually*, Bright Data's alleged scraping conduct on Facebook and Instagram is the same as Bright Data's alleged scraping conduct on X — as Quinn does not dispute. *Legally*, every Meta claim attacking that conduct reappears as an X Corp. claim attacking that conduct — as Quinn again does not dispute. Those similarities suffice to find the matters substantially related. *See, e.g.*, *City Nat'l Bank*, 96 Cal. App. 4th at 330.

And *strategically*, this order also finds the evidence establishes that Quinn reasonably could use information about Bright Data's decision-making from the Meta litigation against Bright Data in the X Corp. litigation. Much like the lawyer in *Farris*, Quinn now attacks a former client whose on-point battleplan it helped create just over one year ago. *See* 119 Cal. App. 4th. at 686. And unlike the lawyer in *Khani*, Quinn does so while the former client's key

11

personnel remain in place, including Bright Data's general counsel (Mor Avisar) and outside litigation counsel (Proskauer Rose).  *See* 215 Cal. App. 4th at 922.

For all those similarities — factual, legal, and even strategic — this order finds the two matters substantially related.  *Jessen*, 111 Cal. App. 4th at 713.  "[D]isqualification of the attorney's representation of the second client is [therefore] mandatory; indeed, the disqualification extends vicariously to the entire firm."  *Flatt*, 885 P.2d at 954.

Quinn raises several counterarguments, all unconvincing and even self-undermining:

*First*, Quinn blames the similarity on someone else.  It argues that to the extent the two cases are alike, that likeness does not derive from Quinn, which just joined the litigation (Opp. 17).  But showing the two matters were alike beforehand means Quinn should not have become adverse in the first place.

Relatedly, Quinn argues Bright Data should be held to its case management position that the two cases were not related under Civil Local Rule 3-12 (*see* Opp. 18–19).  But the standards for case relation under that rule differ from those under Professional Conduct Rule 1.9(a).  And, X Corp. said the two cases were related in its initial case management statement.

*Second*, Quinn argues the matters are legally distinct because the present matter raised all the same claims as the past matter (breach of contract and tortious interference) *plus* others as well (chiefly trespass to chattels and misappropriation) — and because Quinn promises the present matter will focus on the new claims (*see* Opp. 17 & n.10).  Exact identity of claims, however, has never been required to find substantial relationship.  *Farris*, 119 Cal. App. 4th at 681–82.  Even if Meta had asserted only contract claims, lawyers advising Bright Data reasonably would have received information relevant both to contract and to trespass to chattels claims *and* to other tort claims because the same facts apply across the board.  And, on appeal, won't all the issues be in play?  Both cases present existential challenges to the very business model of Bright Data, a model that depends on scraping social media platforms.  Both cases are brought by social media companies against Bright Data to stop its scraping.  Yes, some of the legal theories vary between the suits and some are identical.  That is more than enough for the cases to be substantially related within the meaning of the rule.  *Ibid.*; *Jessen*,

12

111 Cal. App. 4th at 711 ("[T]he 'subjects' of the prior and the current representations [need only be] linked in some rational manner.")

*Finally*, Quinn argues the two matters are "factually" distinct because they involve different terms of use. It argues that Meta's purported terms governed "use of" a social media platform, whereas X Corp.'s governed "access to and use of" one (*see* Opp. 15–16; Tr. 7, 13–14). And it argues that Meta's purported terms did not specifically call out "crawling" or "scraping," whereas X Corp.'s did (Opp. 16–17; Tr. 7). Quinn contends these "'minor difference[s]' create[] a vastly different legal regime governing the different platforms" (Opp. at 16). The argument is unpersuasive.

*First*, it contradicts Quinn's supposition that contract issues will no longer be material to this case.

*Second*, the two matters involve the same scraping conduct, and both involve terms of use. And minor differences in the terms' wording makes no difference under this test when the terms are being invoked to end the same business model, Bright Data's. Indeed, Quinn's argument about this minutia makes clear exactly why counsel for the past matter, that is, Quinn, would have needed to know the facts of the client's operations to form the client's preferred legal positions — and why that counsel could exploit that information now. Both cases also involve terms choosing the same California law and its canons of construction. *Compare Meta v. Bright Data*, No. 23-cv-00077-EMC, 2024 WL 251406, at *10 (N.D. Cal. Jan. 23, 2024) (Instagram's and Facebook's choice of law), *with* X Terms § 6 (X's).

*Finally*, the cases Quinn cites for support considered different physical subjects or conduct in successive representations — not, as here, merely different contracts or policies respecting otherwise identical subjects or conduct. In *Khani*, for instance, the old client's matters concerned defects in vehicles made in 2007 or earlier, whereas the new client's adverse matter concerned defects in a 2008 Lincoln Navigator with a specific repair history. 215 Cal. App. 4th at 919, 922. Similarly, in *Foster Poultry Farms v. Conagra Foods Refrigerated Foods Co.*, the old client's antitrust matter concerned a corporate transaction in the "fresh chickens" market, whereas the new client's adverse antitrust matter concerned a fraudulently

13

obtained patent in the "precooked turkey meat" market. No. F 04-5810 AWI LJO, 2005 WL 2319186, at *1–2, 8 (E.D. Cal. Sept. 22, 2005) (Judge Anthony W. Ishii). So too in *Human Longevity, Inc. v. J. Craig Venter Institute*, where different employees in different roles misappropriated different trade secrets using different methods. No. 18cv1656-WQH-LL, 2018 WL 5840045, at *6 (S.D. Cal. Nov. 8, 2018) (Judge William Q. Hayes). And in *TWiT, LLC v. Twitter Inc.*, the facts and the law were different: "The legal problem in the previous representation was a third party's ultimately unrealized threat to initiate patent litigation against TWiT. The legal problem in [the latter representation was] trademark infringement/breach of contract that focuse[d] on each party's marks and the services they offer[ed] to the public and the public's perception of those marks." No. 18-cv-00341-JSC, 2018 WL 2470942, at *4 (N.D. Cal. June 1, 2018) (Judge Jacqueline Scott Corley). Finally, even in *Faughn v. Perez*, the old client's matters involved other hospitals' policies applied to claimants from various types of cases, whereas the new client's adverse matter involved a different hospital's policies applied to a different claimant in a different type of case. 145 Cal. App. 4th 592, 600, 608–10 (2006). Were the rule as Quinn espouses, a lawyer who represents an insured patient against an insurer could switch sides to represent a different insurer against that same insured patient so long as the two insurers apply different policies to the same underlying medical facts. *Cf.* HAZARD ET AL., THE LAW OF LAWYERING ch. 14, nn.8, 11, 23 (collecting cases precluding representations on those kinds of facts).

    This order finds the two matters are substantially related. Quinn is, therefore, disqualified from representing X Corp. in this litigation. Because the conflicted Quinn attorneys have not changed firms and their former client has not consented, "disqualification extends vicariously to the entire firm" and "is mandatory." *See Flatt*, 885 P.2d at 954. Screening lawyers or offices is no fix in these circumstances: Quinn is Quinn. *See* Cal. RPC 1.10(a)(2), (c).

    3.    CONFIDENTIALITY: DUTY TO FORMER CLIENTS.

    Bright Data also asserts that the duty of confidentiality disqualifies Quinn (Br. 14–18). This duty need not be reached. The duty of loyalty bars Quinn from suing its former client.

**CONCLUSION**

Bright Data's motion to disqualify is **GRANTED**, and the related stay is hereby lifted.

X Corp.'s motion for leave to amend its complaint (Dkt. No. 89), which Quinn drafted without informing Bright Data it had switched sides, is hereby **DENIED**. Should X Corp. wish to move for leave to amend its complaint, a new motion prepared by someone else is due in **35 CALENDAR DAYS**.

Otherwise, judgment will be entered (*see* Dkt. No. 83).

**IT IS SO ORDERED.**

Dated: July 12, 2024.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE