JOSHUA D. BRANSON*
jbranson@kellogghansen.com
DANIEL V. DORRIS*
ddorris@kellogghansen.com
BETHAN R. JONES*
bjones@kellogghansen.com
MATTHEW D. READE*
mreade@kellogghansen.com
TIBERIUS T. DAVIS*
tdavis@kellogghansen.com
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
* *Admitted Pro Hac Vice*

ADRIAN SAWYER, State Bar No. 203712
sawyer@sawyerlabar.com
SAWYER & LABAR LLP
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: (415) 262-3820

*Counsel for Plaintiff*
*X Corp.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

X CORP., a Nevada corporation,

Plaintiff,

v.

BRIGHT DATA LTD., an Israeli corporation,

Defendant.

Case No. 3:23-cv-03698-WHA

**PLAINTIFF X CORP.'S NOTICE OF MOTION AND MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Judge: Hon. William H. Alsup
Date: March 13, 2025
Time: 8:00 a.m.
Crtrm: 12, 19th Floor

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** the hearing on Plaintiff X Corp.'s ("X") Motion to Dismiss Defendant's Counterclaims will take place on March 13 at 8:00 a.m. or as soon thereafter as the matter may be heard before the Honorable William H. Alsup, United States District Court Judge for the Northern District of California.

X moves this Court, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Defendant Bright Data Ltd.'s ("Bright Data") counterclaims. This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities set forth below, the accompanying Declaration of Joshua D. Branson, the other documents on file in this action, and any oral argument of counsel at the hearing on the Motion.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Bright Data sufficiently alleges that X violated the Sherman Act and caused antitrust injury to Bright Data.

2. Whether Bright Data states a claim under California's, Nevada's, or Texas's antitrust statutes.

3. Whether Bright Data states a claim under California's Unfair Competition Act.

4. Whether Bright Data states a claim for tortious interference.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

BACKGROUND ..... 2

A. X's Platform and Terms ..... 2

B. X's Claims and Bright Data's Counterclaims ..... 3

LEGAL STANDARD ..... 4

ARGUMENT ..... 5

I. Bright Data Fails To Plead Any Plausible Sherman Act Claim (Counts I-III) ..... 5

A. Bright Data Fails To Allege Any Anticompetitive Conduct ..... 5

1. X has no antitrust duty to deal with scrapers or other platforms ..... 6

2. Bright Data's attempts to reframe its refusal-to-deal theory fail ..... 10

3. Bright Data cannot invoke any exception to the no-duty-to-deal rule ..... 13

B. Bright Data Fails To Plead A Claim In Any Viable Antitrust Market ..... 15

1. The Platform Markets ..... 15

2. The Data Markets ..... 19

II. Bright Data Fails to Plead Plausible State Antitrust Claims (Counts IV, VI, VII) ..... 23

III. Bright Data Fails to Plead a Plausible UCL Claim (Count V) ..... 23

IV. Bright Data Fails to Plead a Plausible Tortious-Interference Claim (Count VIII) ..... 25

CONCLUSION ..... 25

## TABLE OF AUTHORITIES


Page(s)

**CASES**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ........ 7, 8

*AIDS Healthcare Found., Inc. v. Gilead Scis., Inc.*, 2016 WL 3648623 (N.D. Cal. July 6, 2016) ........ 23

*Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008) ........ 5, 15, 21

*ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*, 137 F. App'x 694 (5th Cir. 2005) ........ 23

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ........ 13, 14, 15

*Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019 (7th Cir. 2017) ........ 7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........ 4

*Breakdown Servs., Ltd. v. Now Casting, Inc.*, 550 F. Supp. 2d 1123 (C.D. Cal. 2007) ........ 23

*Buller v. Sutter Health*, 160 Cal. App. 4th 981 (2008) ........ 24

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001) ........ 23

*Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959 (E.D. Cal. 2018) ........ 24

*Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ........ 19

*Costar Grp., Inc. v. Com. Real Est. Exch. Inc.*, 619 F. Supp. 3d 983 (C.D. Cal. 2022) ........ 5, 9, 11, 12, 19

*Crowder v. LinkedIn Corp.*, 2023 WL 2405335 (N.D. Cal. Mar. 8, 2023) ........ 1, 7, 8, 11

*Doe v. Abbott, Lab'ys*, 571 F.3d 930 (9th Cir. 2009) ........ 12

*Dominick v. Collectors Universe, Inc.*,
2012 WL 4513548 (C.D. Cal. Oct. 1, 2012) .......... 21

*Dream Big Media Inc. v. Alphabet Inc.*,
2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) .......... 22

*Dreamstime.com, LLC v. Google LLC*,
54 F.4th 1130 (9th Cir. 2022) .......... 5, 8

*Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd.*,
71 Cal. App. 5th 528 (2021) .......... 25

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .......... 5

*Facebook, Inc. v. Power Ventures, Inc.*,
2010 WL 3291750 (N.D. Cal. July 20, 2010) .......... 5, 9, 13

*Feitelson v. Google, Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) .......... 17

*FTC v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021) .......... 6, 9, 11, 21, 22, 23

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) .......... 5, 6, 7, 9, 13, 14, 15, 21

*Garon v. eBay, Inc.*,
2011 WL 6329089 (N.D. Cal. Nov. 30, 2011) .......... 9

*Hadley v. Kellogg Sales Co.*,
243 F. Supp. 3d 1074 (N.D. Cal. 2017) .......... 23

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) .......... 17, 18, 21

*hiQ Labs, Inc. v. LinkedIn Corp.*,
485 F. Supp. 3d 1137 (N.D. Cal. 2020) .......... 7, 8, 10, 11, 12, 13, 14, 18, 21

*Honey Bum, LLC v. Fashion Nova, Inc.*,
2021 WL 4205618 (C.D. Cal. Mar. 26, 2021) .......... 18

*I.B. ex rel. Fife v. Facebook, Inc.*,
905 F. Supp. 2d 989 (N.D. Cal. 2012) .......... 24

*In re CNET Networks, Inc.*,
483 F. Supp. 2d 947 (N.D. Cal. 2007) .......... 2

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
313 F. Supp. 3d 931 (N.D. Ill. 2018) ..... 20

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ..... 24

*Kinderstart.com LLC v. Google, Inc.*,
2006 WL 3246596 (N.D. Cal. July 13, 2006) ..... 10, 24

*LiveUniverse, Inc. v. Myspace, Inc.*,
304 F. App'x 554 (9th Cir. 2008) ..... 9, 10

*LiveUniverse, Inc. v. Myspace, Inc.*,
2007 WL 6865852 (C.D. Cal. June 4, 2007) ..... 14

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
2019 WL 1767335 (N.D. Cal. Apr. 22, 2019) ..... 18

*Nazemi v. Specialized Loan Servicing, LLC*,
637 F. Supp. 3d 856 (C.D. Cal. 2022) ..... 24

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
2022 WL 2791201 (E.D. Cal. July 15, 2022) ..... 21

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) ..... 10

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ..... 6, 7, 10, 14, 15

*Olympia Equip. Leasing Co. v. W. Union Tel.*,
797 F.2d 370 (7th Cir. 1986) ..... 10

*Pac. Bell Tel. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) ..... 7

*R Power Biofuels, LLC v. Chemex LLC*,
2016 WL 6663002 (N.D. Cal. Nov. 11, 2016) ..... 25

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ..... 21

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) ..... 19

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F. Supp. 3d 981 (N.D. Cal. 2020) ..... 9, 16, 20

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
532 F.3d 963 (9th Cir. 2008) .......... 23

*Sabol v. PayPal Holdings, Inc.*,
2024 WL 3924686 (N.D. Cal. Aug. 23, 2024) .......... 24

*Sambreel Holdings LLC v. Facebook, Inc.*,
906 F. Supp. 2d 1070 (S.D. Cal. 2012) .......... 6, 7, 8, 9, 11, 12

*Soil Retention Prods., Inc. v. Brentwood Indus., Inc.*,
521 F. Supp. 3d 929 (S.D. Cal. 2021) .......... 25

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) .......... 5, 16, 20

*Synopsys, Inc. v. ATopTech, Inc.*,
2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) .......... 16

*Tampa Elec. Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) .......... 18

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) .......... 19

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .......... 1, 6, 7, 8, 9, 10, 11, 12, 13, 15, 23

*Zhang v. Twitter Inc.*,
2023 WL 5493823 (N.D. Cal. Aug. 23, 2023) .......... 17

**STATUTES**

Nev. Rev. Stat. § 598A.050 .......... 23

Sherman Act, 15 U.S.C. § 1 .......... 5, 6

Sherman Act, 15 U.S.C. § 2 .......... 5, 6

Tex. Bus. & Com. Code § 15.04 .......... 23

**RULES**

Fed. R. Civ. P. 9(b) .......... 24, 25

# INTRODUCTION

Bright Data claims a "God Given right" under the antitrust laws to access X's platform for free and siphon away and sell the data it hosts. Dkt. 158 ("CC") ¶ 72. No such right exists. As the Supreme Court affirmed decades ago, even alleged monopolists (which X is not) may refuse to deal with rivals. *See Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). The reason is simple: forcing service providers like X to open their systems to rivals hinders the very competition the Sherman Act seeks to promote. These counterclaims exemplify that concern. Bright Data has built no platform of its own. It has done nothing to attract the users whose data it wants to sell. And it has invested in no infrastructure to stimulate the "public square conversation" it purportedly values. CC ¶ 105. But X *has* done all those things. So Bright Data wants to exploit X's investment – to usurp the benefits of X's platform without the burden of innovating to create one itself. The Sherman Act does not compel X to facilitate such free-riding.

That principle forecloses Bright Data's counterclaims. All its antitrust theories (and its derivative state-law claims) require *anticompetitive* conduct. But X's efforts to halt data scraping on its own platform – and to "throttle" links from that platform to competing sites – are just lawful refusals to deal with putative rivals. Many cases have made that very point in dismissing similar antitrust claims about other platforms' anti-scraping measures. *See, e.g.*, *Crowder v. LinkedIn Corp.*, 2023 WL 2405335, at *4-6 (N.D. Cal. Mar. 8, 2023). The same result is warranted here.

Bright Data's theories suffer from other flaws, too. To make X look like a monopolist, Bright Data invents "Public Square" markets it gerrymanders to exclude virtually all X's largest competitors (like Meta, YouTube, TikTok, and Reddit). It also measures X's market share using a single metric – Daily Active Users – that bears no logical relationship to the made-up data markets it alleges. And it lacks antitrust standing to assert claims in those markets anyway.

In the end, these allegations are a distraction. They are full of rhetoric about X and Elon Musk – digressing about "hate speech" and "mismanagement," CC ¶¶ 44, 51 – but devoid of any plausible antitrust theory. The real goal is to burden X and Mr. Musk with "extremely overbroad" discovery on antitrust issues far afield from the claims by X this Court allowed to proceed. Dkt. 163 at 1. The Court should not reward that gambit. The counterclaims should be dismissed.

## BACKGROUND

### A. X's Platform and Terms

From its "modest beginnings" in 2006, X (once Twitter) has become a "global platform." CC ¶ 3. It facilitates "public self-expression and conversation in real time" that "allows people to consume, create, distribute and discover content." *Id.* ¶ 113. X boasts hundreds of millions of users worldwide who "post approximately 500-700 million tweets per day, with an exponentially greater number of posts viewed or accessed." *Id.* ¶ 85. In facilitating such user engagement, X "compete[s]" with other platforms to "attract content" by giving users "an attractive, convenient, and useful public forum." *Id.* ¶ 115. It also "compete[s]" with other platforms to "monetize[e]" engagement on its platform, through (among other things) premium subscription fees and ad sales. *Id.* ¶ 119. Still, X has long struggled to turn a profit. *Id.* ¶¶ 40-52. When Mr. Musk bought X in 2022, it "only had one year of profit in its 15-year history." *Id.* ¶ 40. And when the supposedly anticompetitive conduct began in 2023, "X was losing $4 million a day." *Id.* ¶ 52.

X requires everyone who uses its platform to agree to its Terms of Use ("Terms"). *Id.* ¶ 66; *see* Exs. 1-5.[1] Those Terms are "similar to" the terms that govern access to other "websites" across the internet. CC ¶ 19. X's Terms first stress that users "retain ownership and rights to any of your Content you post or share." Ex. 1 ("2024 Terms") at 1; *see id.* at 4 ("You retain your rights to any Content you submit, post or display on or through the Services."); Ex. 2 ("Sept. 2023 Terms") at 1, 4; Ex. 3 ("May 2023 Terms") at 3; Ex. 4 ("2022 Terms") at 5; Ex. 5 ("2021 Terms") at 5. They also incorporate X's "Privacy Policy," 2024 Terms at 2, allowing users to control their privacy settings and restrict the degree to which their data is shared with others, *see* Ex. 6 §§ 3, 5-6. In exchange for the right to use X's platform, users grant X a "worldwide, non-exclusive, royalty-free license" to reproduce or sell their content "for any purpose." 2024 Terms at 4.

At all relevant times, the Terms have provided that "scraping [X's platform] in any form, for any purpose without our prior written consent is expressly prohibited." *Id*. at 7; *see* Sept. 2023

---

[1] "Ex." refers to the exhibits to the accompanying Declaration of Joshua D. Branson. Those exhibits comprise the Terms the counterclaims incorporate, which the Court may consider under "the doctrine of incorporation by reference." *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 953 (N.D. Cal. 2007) (Alsup, J.). X denies Bright Data's allegations and accepts them solely for this motion.

Terms at 8; May 2023 Terms at 5; 2022 Terms at 6; 2021 Terms at 7. They similarly have barred any "attempt to access or search [X's platform] by any means (automated or otherwise) other than through our currently available, published interfaces" in compliance with X's "applicable terms and conditions." 2024 Terms at 7; *see* Sept. 2023 Terms at 8; May 2023 Terms at 5; 2022 Terms at 6; 2021 Terms at 6. These bars apply not just to users who directly violate the Terms, but also to those who "facilitate or assist others in violating" them, "including by distributing products or services that enable or encourage violation." 2024 Terms at 7. And since September 2023, the Terms have clarified that the bars on scraping and access likewise prohibit "crawling" the platform "for any purpose without our prior written consent." 2024 Terms at 7; *see* Sept. 2023 Terms at 8.

For users who want to "reproduce" or "sell" the "Content on the Services," they must "use the interfaces and instructions [X] provide[s], except as permitted through the Services, these Terms, or" the terms in X's Developer Agreement. 2024 Terms at 6. That restriction limits users' rights to sell or copy *other users'* content posted on X; it does not displace users' copyrights in their own content they post on X. *See id.* at 4 ("You retain your rights to any Content you submit, post or display on or through the Services."). Users thus remain free to sell, license, or otherwise distribute their own content to others, including data scrapers. Dkt. 117-4 ("SAC") ¶ 42 ("X acknowledges that its users retain the right to sell or license their posts to others, including Bright Data, just as they retain the right to exclude others from exploiting those posts."). But the Terms forbid users from selling or distributing other content from X's platform that they do not own.

Bright Data does not comply with X's Terms. CC ¶¶ 69-71. It alleges that it has "already terminated its X accounts" and "served formal notice rejecting the Terms." *Id.* ¶ 69. It thus continues to scrape data from X's platform, *id.* ¶¶ 22, 69; Answer ¶¶ 1-6, claiming it "is not bound by the Terms" because it "is no longer an X account holder," *id.* ¶ 6.

### B. X's Claims and Bright Data's Counterclaims

X sued Bright Data for unauthorized scraping on X's platform. SAC ¶¶ 1-7. The Court allowed X to pursue its "access-based" claims hinging on Bright Data's unlawful intrusion into X's servers. Dkt. 156 ("November Order") at 5-16. It also allowed X to pursue statutory claims under the Digital Millenium Copyright Act, the Computer Fraud and Abuse Act, and the

California Comprehensive Computer Data Access and Fraud Act. *Id*. at 20-22. By contrast, it dismissed X's state-law "*scraping and selling*-type claims." *Id*. at 16. The Court ruled that X's users are the "copyright holders" who "enjoy the right to bar (or not) Bright Data from copying their works." *Id*. at 17. Because X "does not possess that right" under the Copyright Act, X cannot pursue claims premised on the scraping (as opposed to the access that enables it). *Id*.

Bright Data now asserts eight counterclaims against X. CC ¶¶ 147-224. It cites this Court's preemption ruling and alleges that X's "contractual provisions seeking to strip internet users of their scraping rights are unenforceable against anyone." *Id.* ¶ 70. But it also calls those same "contractual restrictions" anticompetitive, because they seek to restrict scrapers from "access[ing] and scrap[ing]" X's platform. *Id*. ¶¶ 72-74. According to Bright Data, "each person has God Given right to search the public web," *id*. ¶ 72, by which it means the right to appropriate any content on any website that is not behind a "login-in" screen," *id*. ¶¶ 58-64. Bright Data also alleges that X "[t]hrottl[es] web traffic or bur[ies] posts with links to competing Public Social Media Platforms." *Id.* ¶ 162. Bright Data says that those acts cement X's supposed "monopoly" in the "Public Square Platform market" and the "Public Square Data market." *Id.* ¶ 109.

Based on these allegations, Bright Data pleads three federal antitrust claims under the Sherman Act: an unreasonable restraint of trade under Section 1 (Count I, *id.* ¶¶ 147-57); monopolization under Section 2 (Count II, *id.* ¶¶ 158-66); and attempted monopolization under Section 2 (Count III, *id.* ¶¶ 167-75). It also brings three derivative antitrust claims under California's (Count IV), Nevada's (Count VI), and Texas's (Count VII) respective antitrust statutes. *Id.* ¶¶ 176-86, 196-205, 206-15. It further alleges that X violated California's Unfair Competition Law (Count V) for similar reasons. *Id.* ¶¶ 187-95. It last pleads a state-law tortious-interference claim (Count VIII) based on the same conduct. *Id.* ¶¶ 216-23.

## LEGAL STANDARD

To survive dismissal, Bright Data must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[2] Although the Court accepts well-pleaded "allegations of material fact," the specific facts alleged must reveal

[2] All internal quotation marks, citations, brackets, and emphasis are omitted unless noted.

"*plausible* grounds for an entitlement to relief." *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1195 (N.D. Cal. 2008) (Alsup, J.). That burden is especially exacting in antitrust cases. Courts "insist[] on specificity of facts . . . before permitting a case to proceed into costly and protracted discovery in an antitrust case, especially where, as here, the potential expense of discovery is obviously great." *Somers v. Apple, Inc.*, 729 F.3d 953, 966 (9th Cir. 2013).

## ARGUMENT

### I. Bright Data Fails To Plead Any Plausible Sherman Act Claim (Counts I-III)

#### A. Bright Data Fails To Allege Any Anticompetitive Conduct

Bright Data's Sherman Act claims fail at the threshold because X's alleged conduct was not anticompetitive. Sections 1 and 2 of the Sherman Act both require "anticompetitive conduct." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 989-90 (9th Cir. 2020). Under § 1, Bright Data must allege the "existence of an agreement" that is an "*unreasonable* restraint of trade." *Id*. at 989. Under § 2, it must allege possession (or attempted possession) of "monopoly power" coupled with "anticompetitive *conduct*." *Id*. at 990. Those requirements, whether applied under § 1 or § 2, are "essentially the same." *Id*. at 991. If the "conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023); *see Costar Grp., Inc. v. Com. Real Est. Exch. Inc.*, 619 F. Supp. 3d 983, 989 (C.D. Cal. 2022) (conducting "single analysis of the alleged anticompetitive conduct . . . instead of a separate analysis for each statutory provision").

Anticompetitive conduct must "impair the opportunities of rivals" without "further[ing] competition on the merits" or at least while operating "in an unnecessarily restrictive way." *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022). Whether a "particular practice is anticompetitive" is a "question of law that may be determined by the Court" at the pleading stage. *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *14 (N.D. Cal. July 20, 2010). The Ninth Circuit instructs courts to tread cautiously before branding as anticompetitive "novel business practices – *especially* in technology markets." *Qualcomm*, 969 F.4th at 990. Courts that too quickly "treat novel products or business practices as

anticompetitive" are "likely to decide cases wrongly in rapidly changing dynamic markets," thus impeding the very "innovation" the Sherman Act seeks to promote. *Id*. at 991.

**1. X has no antitrust duty to deal with scrapers or other platforms**

Bright Data's counterclaims advance a series of scattershot attacks on X's business practices (and those of Mr. Musk). Those allegations, if true, may show that X has "acted with sharp elbows – as businesses often do." *Id.* at 1005. But such practices represent the very sort of "legitimate competition" the antitrust laws protect. *Trinko*, 540 U.S. at 414. None reflects the "element of anticompetitive *conduct*" required to survive a motion to dismiss. *Id*. at 407.

**a.** ***Anti-scraping restrictions.*** The Court should dismiss the counterclaims because X has no antitrust duty to deal with Bright Data or any other data scraper. Bright Data's theories rest on a common premise: that X's Terms are anticompetitive because they do not allow Bright Data (and others) to access X's platform and scrape the data hosted on it. CC ¶¶ 70-97, 153, 162, 171. But "the Sherman Act does not restrict [X's] long recognized right" to "exercise [its] own independent discretion as to parties with whom [it] will deal." *Trinko*, 540 U.S. at 409. That principle is decisive. Under *Trinko*, X has the freedom to dictate the terms on which other parties may access or use its platform. *See id.* at 407-08 (firm may "den[y] interconnection services to rivals"); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.) ("Even a monopolist generally has no duty to share . . . its intellectual or physical property with a rival."). Its refusal to grant such access to data scrapers does not violate the Sherman Act, whether considered under § 1 or § 2. *See Qualcomm*, 969 F.3d at 995 (addressing both together); *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1079-82 (S.D. Cal. 2012) (similar).

Strong "considerations of antitrust policy" support the rule that "refusals to deal" are "presumptively legal." *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 22 (D.D.C. 2021) (quoting *Novell*, 731 F.3d at 1073). Most importantly, forcing alleged monopolists to give rivals access to their "infrastructure" risks "lessen[ing] the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities" in the first place. *Trinko*, 540 U.S. at 407-08. Compelling a firm to deal with its rivals also thrusts federal courts into "the role of central planners," dictating business relationships in private markets "despite [courts] being ill-equipped

to assume this role." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183 (9th Cir. 2016). And "compelled sharing may actually provide opportunities for collusion," *id.*, which is the "supreme evil of antitrust," *Trinko*, 540 U.S. at 407-08. Those considerations reduce to a common theme. Forcing a firm like X to aid a competitor's business "might make rivals happy but it usually leaves consumers paying more for less." *Novell*, 731 F.3d at 1072.

Those principles foreclose Bright Data's theory of anticompetitive conduct. Put simply, X has no antitrust duty to open its platform to Bright Data or any other data scraper. *See Trinko*, 540 U.S. at 408-10; *see Pac. Bell Tel. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (firms are "free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing"). So X is not obliged to let Bright Data access its platform at all, much less extract information from the platform for free. Blocking such activity, whether through contract terms or technological safeguards, is X's core prerogative as the owner of the platform Bright Data seeks to access. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1151 (N.D. Cal. 2020) (dismissing antitrust claims by scraper "excluded from access to information publicly available on LinkedIn's website"); *cf.* Dkt. 83 at 13 (X may "restrict access to [X's] systems," because the "law allows X Corp. to undertake reasonable measures to protect its possession").[3]

Each restriction challenged by Bright Data exemplifies that prerogative. The restrictions it attacks merely set the terms by which third parties may gain "access to X's platform" or obtain "access to Twitter Data" collected from that platform. CC ¶¶ 18, 37. Such restrictions are part and parcel of X's freedom to "choose the parties" and the "prices, terms, and conditions" on which it "will deal" with others. *linkLine*, 555 U.S. at 448. X's alleged motive in forbidding scraping makes that clear. Bright Data says that X bars scraping because it wants to *sell* access to its platform through its API – or to license the platform's data to AI companies. CC ¶¶ 34-42, 61, 86. These are classic business goals the Sherman Act endorses. *See Qualcomm*, 969 F.3d at 994 n.15

[3] *See also Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1022-26 (7th Cir. 2017) (holding it "inconsistent with *Trinko*" to order data companies to "do business with" firm that " 'scrapes' (or collects) data" from them); *Crowder*, 2023 WL 2405335, at *6 (platform had right to "limit[] access to data" by scraper); *Sambreel*, 906 F. Supp. 2d at 1075 (requiring users to "comply with Facebook's terms" is "unquestionably permissible under the antitrust laws").

("desire to maximize profits" through refusal to deal is pro-competitive). Indeed, the antitrust laws permit X to grow its own revenues by "dictat[ing] the terms on which it will permit its users to take advantage of the [X] social network." *Sambreel*, 906 F. Supp. 2d at 1080.

That conclusion well illustrates why courts often reject refusal-to-deal claims. Bright Data admits that X "compete[s]" with other platforms in creating and operating a "useful public forum" that "attract[s] content generated from or supplied by [its] users." CC ¶ 115. A rule requiring X to open its systems to scrapers – allowing them to take for free the data X has worked to attract and compile – would "lessen the incentive" for X and others to "invest" in those very systems. *Trinko*, 540 U.S. at 407-08; *see Sambreel*, 906 F. Supp. 2d at 1076 ("Facebook has surely invested a significant amount of resources to develop its business" and has a "right" to control "the manner in which its website will be viewed"). If Bright Data wants unfettered access to the "Public Square Data" it covets, it should create its own platform and compete with X for users. CC ¶ 115. But its desire for a competitive shortcut – cost-free access to the fruits of the platform built by someone else – does not make out a viable antitrust theory. *See Dreamstime.com*, 54 F.4th at 1137 (9th Cir. 2022) (anticompetitive conduct demands harm to "competitive process as a whole," not just an effect on "the success or failure of individual competitors").[4]

Courts often dismiss antitrust claims for similar reasons. In *Crowder*, for example, Judge Gilliam rejected an antitrust challenge to LinkedIn's "'anti-scraping' measures," holding that LinkedIn "was under no obligation to share its data at all." 2023 WL 2405335, at *5. The "terms" there – like the Terms here – barred users "from getting *LinkedIn* data from third parties or through particular methods, such as scraping and crawling." *Id*. Yet the court dismissed the claims because the anti-scraping provisions implemented LinkedIn's "right of freedom" to control its own platform. *Id*. at *4-5. In *hiQ*, Judge Chen rejected similar antitrust claims because platforms may freely "refus[e] to deal" with scrapers as they wish. 485 F. Supp. 3d at 1151. And

[4] Bright Data's request for unfettered access to X's platform also underscores the other concerns the Ninth Circuit recognized in *Aerotec*. Were X forced to give Bright Data access, it would beg questions about how much X should be allowed to charge and the conditions it could reasonably impose, given its costs of operating the platform and its infrastructure. Courts are "ill-equipped" to serve as "central planners" resolving such questions. *Aerotec*, 836 F.3d at 1183.

in *CoStar*, a court likewise rejected an antitrust challenge to a website's "contractual provisions" that "block[ed] competitors" from "accessing public . . . information" on the site. 619 F. Supp. 3d at 990. "[M]andating access" to a website, the court explained, raises "the same concerns as mandating dealing with a competitor." *Id.* at 991. Other analogous decisions abound.[5]

Those decisions support dismissal here. As in the other data scraping cases, "the information" Bright Data wants X to share "(for free no less) constitutes a form of assistance under the antitrust laws that [X] is not obligated to provide." *CoStar*, 619 F. Supp. 3d at 991-92. X's withholding of such assistance may well harm Bright Data's business, but it is hardly "conduct which unfairly tends to destroy competition itself." *Qualcomm*, 969 F.3d at 1005. The Court should not compel X to "share the source of [its] advantage" with data scrapers looking to free-ride off the platform X invested so much in creating. *Trinko*, 540 U.S. at 407.

**b.** ***Throttling*****.** The same principles compel dismissal of Bright Data's "throttling" theory. CC ¶¶ 98-111. Bright Data alleges that X "[t]hrottl[es] web traffic or bur[ies] posts with links to competing Public Social Media Platforms and other websites." CC ¶¶ 162, 171. Much like the scraping theory, this throttling theory fails because X has no antitrust duty to support the websites of competing platforms. *See Qualcomm*, 969 F.3d at 993 ("no duty to deal under the terms and conditions preferred by a competitor's rivals"). In fact, X need not link to other websites at all, much less drive traffic to those sites at Bright Data's preferred speeds. *See LiveUniverse, Inc. v. Myspace, Inc.*, 304 F. App'x 554, 556-58 (9th Cir. 2008) (not anticompetitive for MySpace to "disabl[e] links on MySpace.com to other social networking websites"); *Power Ventures*, 2010 WL 3291750, at *13 (website operators have no antitrust duty

---

[5] *See Facebook*, 560 F. Supp. 3d at 24 (dismissing antitrust challenge to Facebook's "policy of withholding API access from competitors" because "a firm's merely announcing its choice not to deal with competitors, whatever the motivation for doing so, cannot violate" the antitrust laws); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002 (N.D. Cal. 2020) (dismissing claims based on Facebook's refusal to "sell its social data to any *competitive* third-party developer"); *Sambreel*, 906 F. Supp. 2d at 1075 (dismissing claims for denial of website access to competitor); *Power Ventures*, 2010 WL 3291750, at *13 (dismissing claim because Facebook is not "obligated to allow third-party websites unfettered access to its own website"); *Garon v. eBay, Inc.*, 2011 WL 6329089, at *4 (N.D. Cal. Nov. 30, 2011) (dismissing claim premised on allegations that "[plaintiffs] have been excluded from Defendant's own website").

to make their site "technologically interoperable with competing" sites); *Olympia Equip. Leasing Co. v. W. Union Tel.*, 797 F.2d 370, 377-78 (7th Cir. 1986) ("Advertising a competitor's products free of charge is not a form of cooperation commonly found in competitive markets.").

At most, the "throttling" allegations suggest that X has made it slightly harder for its users to "access[]" other social-media sites "*through [X's own platform]*." *LiveUniverse*, 304 F. App'x at 557. But users "remain free to choose which online social networks to join," to navigate to other platforms through a "web browser" or a "search engine," or to "upload text, graphics, and other content" to any other platform. *Id*. Those alternatives make clear that Bright Data is really just alleging a refusal to help X's competitors. *Trinko* forecloses that claim, just like it does Bright Data's claims about scraping. *See Kinderstart.com LLC v. Google, Inc.*, 2006 WL 3246596, at *3 (N.D. Cal. July 13, 2006) (rejecting under *Trinko* claim that Google engaged in website "Blockage" by "delisting, de-indexing" or otherwise "isolating a website from search queries"); *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 33 (D.D.C. 2021) (upholding under *Trinko* Facebook's right to bar apps on its site from linking or integrating with competing social media platforms), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023).

**2. Bright Data's attempts to reframe its refusal-to-deal theory fail**

Like many antitrust plaintiffs before it, Bright Data seeks to evade *Trinko* by recasting its theory as something other than a refusal-to-deal claim. *See, e.g.*, *Novell*, 731 F.3d at 1078 (rejecting similar attempt to "recast" conduct as "'affirmative' act of interference with a rival rather than a 'unilateral' refusal to deal"). But "refusal to deal doctrine is not so easily evaded." *Id*. at 1079. None of Bright Data's reframing devices is persuasive.

***"Public" data.*** Bright Data first seeks to conjure anticompetitive conduct by calling X's platform part of the "public web." CC ¶ 13. Because Bright Data supposedly collects only data that users may access without logging in, *but see* Dkt. 149 at 1-3 (reciting X's allegations to the contrary), Bright Data insists that X unlawfully "strip[s] the public of its right to access and scrape public portions of the web." CC ¶ 74; *see id.* ¶¶ 14-15, 19, 70, 72, 77. Even accepting that flawed characterization, it still shows only X's lawful "refusal to deal" with scrapers. *hiQ*, 485 F. Supp. 3d at 1149-51 (scraper was lawfully "excluded from access to information publicly available on

LinkedIn's website"). Public or not, the data at issue is undisputedly hosted on X's platform. CC ¶¶ 8, 18, 37, 89. The antitrust laws thus allow X to set the terms by which others use X's platform to access that data – whether or not they login. *See Crowder*, 2023 WL 2405335, at *4 & n.2 (dismissing claim about scraping "*public* data"); *CoStar*, 619 F. Supp. 3d at 991 (dismissing claim about access to information otherwise "available to the 'public' for free" on website).

***Exclusive dealing.*** Bright Data also characterizes the Terms as "*de facto* exclusive contracts" barring X's users from "doing business with X's competitors." CC ¶ 14; *see id.* ¶¶ 89-90, 92-93. They do no such thing. Bright Data does not allege that the Terms forbid X's users from "deal[ing] with other social-networking services" like Threads. *Facebook*, 560 F. Supp. 3d at 29 (dismissing analogous "exclusive dealing" claim under *Trinko*). Nor does it allege that X stops users from dealing with Bright Data itself in other contexts – for instance, by buying tools to scrape other platforms. *See Sambreel*, 906 F. Supp. 2d at 1078 (plaintiff could "develop[] products on other websites"). Rather, the Terms merely regulate the collection and sale of "data *published on X's platform*." CC ¶ 89 (emphasis added). Such restrictions again "implicate[] only [X's] actions to control the content of its own website." *Sambreel*, 906 F. Supp. 2d at 1082. That is why other courts have rebuffed similar challenges to terms barring platform users from "getting [the defendant's hosted] data from third parties or through particular methods such as scraping and crawling." *Crowder*, 2023 WL 2405335, at *5. As in those cases, X's Terms simply restrict "access to [X's users'] own data" via X's systems. *Id*. That is a lawful refusal to deal, not a ban on users "dealing with competitors altogether." *Id.*; *see hiQ*, 485 F. Supp. 3d at 1154 (similar).[6]

Further, Bright Data does not allege that X bars scrapers from obtaining data directly from X's users. *Supra* p. 3. X has a "non-exclusive" license to user content, 2024 Terms at 4, meaning that its users "retain ownership and rights to any of your Content," *id.* at 1; *see id*. at 5; November Order at 16-19. The upshot is simple: X's users remain free to license their content to Bright

[6] Bright Data also suggests that the Terms "prevent anyone bound by the Terms from purchasing the data from anyone other than X." CC ¶ 14. But Bright Data does not identify what language in the Terms, if any, X supposedly believes to impose such a restriction. CC ¶ 94 (inconsistently alleging that the Terms "cannot be construed in that way"); *cf.* SAC ¶ 35 (X alleging that the "Terms prohibit *selling* any content collected from the platform") (emphasis added).

Data (or anyone else), just as Bright Data remains free to ask users for it. Such flexibility shows that X's Terms impose no exclusive-dealing requirement. That X "does not own" users' content – which users may give to Bright Data as they wish – "highlights that [Bright Data] has not been denied access to anything it cannot obtain [] elsewhere." *CoStar*, 619 F. Supp. 3d at 991.

On this score, Bright Data's exclusive-dealing theory conflicts with the copyright-preemption arguments it convinced the Court to accept. CC ¶¶ 15, 69-70. Although X respectfully preserves its objection for appeal, in this posture X's "*scraping and selling*-type claims" are preempted because the Court agreed that X "does not possess" the right "to bar (or not) Bright Data from copying [X user] works." November Order at 16-17. Bright Data cannot have it both ways. Having successfully argued that the Copyright Act divests X of any contractual right to stop others from selling X users' data, Bright Data cannot use the same provisions to manufacture an anticompetitive restraint in the market for such data. Indeed, this Court's preemption framework – using copyright (rather than antitrust) doctrine to address the parties' competing interests – negates the supposedly anticompetitive effects Bright Data imagines. *Cf. Trinko*, 540 U.S. at 411 (Telecommunications Act's separate "provision for access makes it unnecessary to impose a judicial doctrine of forced access" under antitrust law).

***Leveraging.*** Bright Data relatedly alleges that X's Terms amount to "leveraging its dominant position" by forcing users to forgo "their right to lawfully access and scrape the public web" and "their right to compete with X in the monetization or use of data on the platform." CC ¶ 77. This is just Bright Data's refusal-to-deal theory, repackaged. As the Ninth Circuit has held, "allegations of monopoly leveraging" do not "state a claim under § 2 of the Sherman Act absent an antitrust refusal to deal (or some other exclusionary practice)." *Doe v. Abbott Lab'ys*, 571 F.3d 930, 931 (9th Cir. 2009). And as just explained, *supra* pp. 6-9, X's selling-and-scraping restrictions lawfully implement its antitrust right to exclude data scrapers from its platform. Bright Data cannot resurrect its flawed refusal-to-deal theory by repackaging it as a "leveraging" claim. *See hiQ*, 485 F. Supp. 3d at 1155 (dismissing similar leveraging theory for lack of underlying "anticompetitive conduct" arising from refusal to deal with data scraper); *Sambreel*, 906 F. Supp. 2d at 1077 (similar refusal-to-deal theory could not sustain a § 1 claim).

***Liquidated damages.*** Bright Data finally criticizes the Terms' "liquidated damages" provision, which it assails as an "*in terrorem* threat" to "eliminate competition in the data market." CC ¶ 18; *see id*. ¶¶ 83-86. Those allegations add nothing to the analysis. The damages clause applies only to those who "violate the Terms" or who "induce or facilitate others to do so." 2024 Terms at 9. It thus merely enforces the substantive restrictions imposed by the Terms. Because those restrictions represent a lawful refusal to deal with data scrapers, the damages clause enforcing them is procompetitive for the same reason. *See Power Ventures*, 2010 WL 3291750, at *14 ("[i]f Facebook has the right to manage access to and use of its website, then there can be nothing anticompetitive about taking legal action to enforce that right").

In any event, Bright Data improperly seeks to transform a contract dispute into an antitrust violation. It calls the damages clause an "illegal penalty" that is not a "'reasonable estimate' of [X's] actual damages." CC ¶ 18. If that were true (which X denies), it would mean only that the damages provision is "unenforceable" and will "not hold up in court," *id*. – as a matter of contract, not antitrust, law. *See Qualcomm*, 969 F.3d at 997 ("antitrust laws are not well suited to govern contract disputes between private parties in light of remedies available under contract . . . law"). As the Ninth Circuit has explained, the "hammer of antitrust law" is a poor fit for "what are essentially contractual disputes between private parties." *Id*. That principle is controlling.

**3. Bright Data cannot invoke any exception to the no-duty-to-deal rule**

Courts recognize only "one, limited exception" to the "general rule that there is no antitrust duty to deal." *Qualcomm*, 969 F.3d at 993. Under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585 (1985), a refusal to deal may be anticompetitive when "(1) it unilaterally terminates a voluntary and profitable course of dealing; (2) the only conceivable rationale or purpose is to sacrifice short term benefits in order to obtain higher profits in the long run from the exclusion of competition; and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 993-94. Courts are "very cautious" in applying the *Aspen Skiing* exception to new facts. *Trinko*, 540 U.S. at 408. Indeed, the "Supreme Court and Ninth Circuit have made clear" that the "*Aspen Skiing* exception is very narrow." *hiQ*, 485 F. Supp. 3d at 1151. Bright Data cannot meet it.

*First*, Bright Data does not allege that X terminated a "voluntary and profitable course of dealing" with Bright Data. *Qualcomm*, 969 F.3d at 993. Even leaving aside that X never profited from scraping at all, *infra* pp. 14-15, X's Terms have always barred "scraping the services without the prior consent of Twitter." *E.g.*, 2021 Terms at 7. And Bright Data does not allege that X ever gave Bright Data such consent, which precludes the course of dealing *Aspen Skiing* demands. Instead, Bright Data alleges at most that X (for a time) tacitly declined to enforce its Terms against data scrapers targeting its platform. CC ¶ 12 (quoting former employee that "We knew about it. It was fine."); *see id.* ¶¶ 53, 68. Passively "tolera[ting]" a scraper's "data gathering" is not the "mutual commerce or course of dealing" *Aspen Skiing* requires. *hiQ*, 985 F. Supp. 3d at 1151; *see LiveUniverse, Inc. v. Myspace, Inc.*, 2007 WL 6865852, at *13 (C.D. Cal. June 4, 2007) (MySpace's "previous practice" of tacitly allowing site access was not enough).

*Second*, Bright Data does not plausibly allege that X's "only conceivable rationale" for barring scraping was to "sacrifice short-term benefits" to foreclose competition "in the long run." *Qualcomm*, 969 F.3d at 993-94. In fact, its allegations show the opposite of a short-term profit sacrifice: that X stopped allowing free data scraping because it wanted to "start charging customers for access." CC ¶ 61; *see id.* ¶ 141 (alleging that X seeks to "profit[]" from "data licensing" to developers "through its API"); November Order at 20 ("X Corp. is happy to allow the extraction and copying of X users' content so long as it gets paid"). Of course, charging for data access is more profitable – in both the short and long run – than letting scrapers take it for free. Moreover, X's contractual bars on scraping at least plausibly (and as X will later prove, in fact do) protect its server infrastructure and reduce costs. November Order at 5-9. For those reasons, Bright Data's "theory of short-term sacrifice is far from obvious or even intuitive." *hiQ*, 485 F. Supp. 3d at 1151. It cannot credibly claim that X's desire to be paid for data access is "irrational but for its tendency to harm competition." *Novell*, 731 F.3d at 1076.

Bright Data strains to avoid that conclusion by asserting in conclusory fashion that scraping boosted user "engagement," which "made the platform more attractive to advertisers." CC ¶ 53. But that connection, too, is far from "intuitive." *hiQ*, 485 F. Supp. 3d at 1151. Bright Data alleges that Twitter was a "money losing platform" that "only had one year of profit in its 15-

year history." CC ¶ 40; *see id.* ¶¶ 52-53. So whatever scraping's effect on ad revenue, Bright Data admits there were no "short term profits" for X to "forsake." *Novell*, 731 F.3d at 1075. At any rate, scrapers are not human users who are valuable to advertisers; they use robots to extract data rather than consume content or look at ads. There is thus an obvious "efficiency justification" for banning them, *id.* at 1077: the profusion of "non-human accounts" on X's platform detracted from genuine engagement while delivering no real value to advertisers. CC ¶ 53 n.34.

*Third*, Bright Data does not allege that X allows "other similarly situated" actors to scrape its platform. *Qualcomm*, 969 F.3d at 993-94. Bright Data instead claims that X bans *all* scraping – by anyone and everyone – through generally applicable terms of service that "cover[] nearly the entire market." CC ¶¶ 14, 90. Because X never singled out Bright Data for special treatment, the counterclaims fail *Aspen Skiing*'s final element. *See Trinko*, 540 U.S. at 410 (no duty under *Aspen Skiing* to provide services "not otherwise marketed or available to the public"); *Qualcomm*, 969 F.3d at 995 ("Because Qualcomm applies the . . . policy neutrally with respect to *all* competing modem chip manufacturers, the third *Aspen Skiing* requirement does not apply.").

In sum, Bright Data fails all three elements of the *Aspen Skiing* test for refusal-to-deal liability. *Aspen Skiing* was already "at or near the outer boundary" of antitrust liability. *Trinko*, 540 U.S. at 409. Bright Data's claims extend well beyond it. They should be dismissed.

### B. Bright Data Fails To Plead A Claim In Any Viable Antitrust Market

Even if Bright Data had alleged anticompetitive conduct, its Sherman Act claims would fail for other reasons. Sections 1 and 2 both require Bright Data to allege "market power in a 'relevant market.'" *Psystar Corp.*, 586 F. Supp. 2d at 1196. And for each market it alleges, Bright Data must possess antitrust standing. *See Qualcomm*, 969 F.3d at 992.

Bright Data proposes four interrelated "Public Square" markets: two concerning "Platforms," and two concerning "Data." CC ¶ 112. None passes muster.

#### 1. The Platform Markets

Bright Data pleads no plausible claim about the two "Public Square Platform" markets it identifies. *Id.* ¶¶ 113-24. It first defines a "Public Square Platform" market comprising "social media platforms that focus on facilitating public conversation about real-time events, often

through a micro-blogging structure." *Id.* ¶ 113. It then alleges a derivative "Public Square User Engagement" market comprising the platforms' "quality and features" designed "to maximize both the number of users and visitors on the platform, as well as the time spent on the platform." *Id.* ¶ 126. Neither alleged market supports a plausible antitrust claim.

**a.** ***Antitrust Standing.*** Bright Data's Platform-market claims fail at the threshold because it lacks antitrust standing in those markets. Antitrust standing requires a plaintiff to suffer injury that "flows from that which makes the conduct unlawful" and that "is of the type the antitrust laws were intended to prevent." *Somers*, 729 F.3d at 963. To plead those elements, Bright Data must show it is "either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Id.*

Bright Data participates in neither Platform market it identifies. It concedes it does not compete with X in those markets, given that it does not operate a platform. CC ¶ 146. So it tries to peg antitrust standing to a single, conclusory sentence asserting "standing as a consumer or customer" of such platforms. *Id.* The lack of any well-pleaded facts supporting that assertion warrants dismissal. *See Reveal Chat*, 471 F. Supp. 3d at 998 (dismissing when lack of facts made it "unclear whether Plaintiffs are consumers or competitors of Facebook").

The counterclaims allege that Bright Data does *not* consume any services in the Platform markets. Customers in these markets seek out a "public forum for engaging in conversation and exchanging thoughts," CC ¶ 115, so they can carry on a "real-time public discourse about current events," *id.* ¶ 127. Bright Data participates in no such discourse. Indeed, it says it is not X's customer at all, having "terminated its X accounts" in 2023. *Id.* ¶ 69. That Bright Data does not even need an X account shows it is not truly a consumer of the platforms it invokes. Rather than consume services in these markets – by "post[ing] information" or "follow[ing] other users," *id.* ¶ 115 – Bright Data employs robots to collect (and sell) the data generated by those who do. *Id.* ¶ 145. That may make it a participant in the "Data" markets it later invents (a claim that fails for other reasons), *infra* Part I.B.2, but not the "Platform" markets it starts with. That defect is fatal. *See Synopsys, Inc. v. ATopTech, Inc.*, 2015 WL 4719048, at *8 (N.D. Cal. Aug. 7, 2015) (no antitrust standing when plaintiff "failed to show it is a participant in the [relevant] market").

Bright Data's injury allegations are also "too conclusory and speculative" to support antitrust standing in the Platform markets. *Feitelson v. Google, Inc.*, 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015). The anticompetitive conduct in these markets supposedly consists of X "throttling" links to "other Public Square Platforms" like Threads. CC ¶ 107. But Bright Data does not plausibly explain how it is harmed by X slowing down links from its site to other sites – an effect its source equates to a roughly 2.5 second delay[7] – when Bright Data itself does not even use X's platform (and does not allege it has accounts with any others). It suggests at most that, without this delay, other platforms might grow so meteorically that they could gain "sufficient scale" to meet Bright Data's "data needs" by allowing Bright Data to scrape from them. *Id.* ¶ 99. Such bald speculation about future platform growth does not support antitrust standing.[8]

More fundamentally, Bright Data never alleges that competing platforms (even were they to expand their scale) would allow Bright Data to scrape. *Id.* ¶¶ 142-46. On the contrary: it alleges that "third-party websites" maintain "Terms of Use similar to X's" to prevent scraping. *Id.* ¶ 19. And the competitors Bright Data identifies – including Threads, Mastodon, and Truth Social – already ban such scraping.[9] So even if they did grow, they would not plausibly supply Bright Data with the free data on which it grounds its claim of injury.

**b.** ***Market Definition and Market Power.*** Standing aside, Bright Data's Platform-market claims fail for lack of a plausible market definition. A "relevant market must include both a geographic market and a product market." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-21

---

[7] *Id.* ¶¶ 107-08 (incorporating *Twitter Is Still Throttling Competitors' Links—Check for Yourself*, The Markup (Sept. 15, 2023), https://perma.cc/MC3D-UNSA (2.5 seconds to load)).

[8] Bright Data also fails to allege any plausible facts showing that these other platforms lack "sufficient scale" to compete with X. Indeed, it elsewhere alleges that Threads "has a much larger installed base of account holders than X, given [its] connection to Instagram." CC ¶ 63.

[9] *See* Ex. 7 (Threads Terms of Use) at 4 (barring "crawler" or "scraper"); Ex. 8 (Mastodon Terms of Service) at 2 ("You may not automate access to the forum, or monitor the forum, such as with a web crawler, browser plug-in or add-on, or other computer program that is not a web browser."); Ex. 9 (Truth Social Terms of Service) at 6, 8 ("you agree not to" use "any spider, robot, cheat utility, scraper, or offline reader that accesses the Site, or using or launching any unauthorized script or other software."). This Court should take "judicial notice" of these terms' content "because they are publicly available webpages and their contents are not subject to reasonable dispute." *Zhang v. Twitter Inc.*, 2023 WL 5493823, at *3 (N.D. Cal. Aug. 23, 2023).

(9th Cir. 2018). A product market "must encompass the product at issue as well as all economic substitutes for the product." *Id.* A geographic market, for its part, requires "the careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). Bright Data alleges neither.

To start, the Platform markets are "not natural" because they arbitrarily "omit many economic substitutes." *Hicks*, 897 F.3d at 1121. To make it seem like X has market power in these made-up markets, Bright Data must define them narrowly to exclude many larger platforms like Facebook, YouTube, Instagram, and TikTok. CC ¶¶ 137-40. So it constricts the market to platforms "that focus on facilitating public conversation about real-time events" – a definition it says covers only X, Threads, Mastodon, BlueSky, and Truth Social. *Id.* ¶¶ 113, 139. But Bright Data does not plausibly dispute that many competing platforms it excludes (like Facebook or Reddit) also facilitate such public conversations. *See hiQ*, 485 F. Supp. 3d at 1148 (dismissing antitrust claim based on "people analytics market" that implausibly excluded Facebook and Google). At most, Bright Data asserts (CC ¶ 124) that these other platforms have some different features from X. But that conclusory allegation fails to move the needle, because economic substitutes need not have identical features or purposes. *See Honey Bum, LLC v. Fashion Nova, Inc.*, 2021 WL 4205618, at *6 (C.D. Cal. Mar. 26, 2021) (failing to include internet competitors).

Bright Data's own sourcing confirms the point. The very SEC filing it incorporates for its market definition (CC ¶ 113) states that X faces "significant competition" from other platforms that "offer products that enable everyone to create and share ideas, videos, and other content," including Facebook, Instagram, LinkedIn, TikTok, and more.[10] Moreover, the source Bright Data cites for its allegation that X "throttle[s] other Public Square Platforms," CC ¶ 107, lists Facebook, Instagram, and Substack as among X's "Competitors."[11] Such admissions in Bright Data's own sourcing are reason enough to reject its made-up markets. *See Med Vets Inc. v. VIP Petcare*

---

[10] *E.g.*, Twitter, Fiscal Year 2020 Annual Report, at 8 (Feb. 17, 2021), https://perma.cc/4HWX-DKKL.

[11] *Id.* ¶¶ 107-08 (incorporating *Twitter Is Still Throttling Competitors' Links—Check for Yourself*, The Markup (Sept. 15, 2023), https://perma.cc/MC3D-UNSA).

*Holdings, Inc.*, 2019 WL 1767335, at *3-5 (N.D. Cal. Apr. 22, 2019) (rejecting market where it "conflicts with various allegations" in the complaint, including incorporated FTC report).

Bright Data also fails to justify drawing a geographic market that covers "the United States and the world." CC ¶ 112; *see CoStar*, 619 F. Supp. 3d at 994 (dismissing antitrust case over internet data because geographic "allegation is essentially a placeholder that contains virtually no factual details"); *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1109 (N.D. Cal. 2022) (dismissing "worldwide" market definition when complaint lacked "allegations sufficient to support the global geographic scope"). The counterclaims do not, for instance, mention Weibo – a Chinese platform for "public self-expression in real time" that reports similar daily active users as X.[12] Nor does Bright Data explain why such a platform would fall outside the markets it invents. And without such an explanation, Bright Data can give this Court no way to reliably judge X's alleged market power. Its failure to consider obvious competitors like Weibo is fatal. *See Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (dismissing claim that "fails to mention other insurance companies or agents within [geographic] market.").[13]

**2. The Data Markets**

Bright Data likewise pleads no plausible claim concerning its two "Public Square Data" markets. CC ¶¶ 128-36. It defines "Public Square Data" as data collected from platforms that are "public, global, real-time, and multi-participant or conversational." *Id.* ¶ 128. It then alleges a "submarket" for "Publicly-Available Public Square Data" that is "freely available," by which it means platform data that is not behind a login screen. *Id.* ¶¶ 135-36. Neither is valid.

**a.** ***Antitrust standing***. Although Bright Data plausibly competes in the Data markets, it lacks antitrust standing because it pleads no "injury" in these markets that "flows from that

---

[12] *Compare* Weibo Corp., Rep. of Foreign Private Issues for Nov. 2024 (SEC Form 6-K) (Nov. 19, 2024) at 4, 7, https://perma.cc/BV9B-GM42 ("daily active users ("DAUs") were 257 million") *with* CC ¶ 113 ("facilitating public conversation about real-time events").

[13] These flaws are even more apparent in Bright Data's Platform "User Engagement" market, for which Bright Data adds no new factual allegations. *Compare* CC ¶¶ 113, 115, 124 *with id.* ¶¶ 125-27; *see Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at *7-8 (N.D. Cal. Nov. 30, 2021) (dismissing multiple markets for being "unclear," "overlapping," and "undefined"). At best, Bright Data describes a set of "features" Platforms use to compete for users, not "markets for products." *Id.* at *12 (dismissing "iOS userbase" market as feature of the app store, not products).

which makes the conduct unlawful." *Somers*, 729 F.3d at 963. That is because its core allegation cuts the other way. Bright Data premises its injury on X's efforts "to enforce [the Terms] against other data scrapers." CC ¶ 84. But Terms that restrict Bright Data's competitors do not harm Bright Data. Quite the opposite: Bright Data's alleged theory (which X denies) is that Bright Data is now the only scraper in the market able to operate in violation of X's Terms. *Id.* ¶¶ 83-88. If true, that would *improve* Bright Data's position by obstructing other scrapers from competing with it. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 954-55 (N.D. Ill. 2018) (no antitrust injury because challenged conduct "would have *helped* [plaintiff] by eliminating its alleged competitors"). The allegations about X's data pricing drive home the point, asserting that X is able "to charge supra-competitive prices" in the Data markets. CC ¶ 143; *see id.* ¶ 141. An "increase in market prices" again "actually benefit[s] competitors" like Bright Data, giving them cover to raise prices themselves. *Reveal Chat*, 471 F. Supp. 3d at 997-98. Perhaps Bright Data would have standing to pursue this theory if it were a data customer. As a competitor, however, it has no injury "of the type the antitrust laws were intended to prevent." *Somers*, 729 F.3d at 963.

So Bright Data tries a workaround, speculating that the Terms depress "demand for Bright Data's services" by scaring away its customers. CC ¶ 97. Not only does Bright Data fail to allege that the Terms constrict those who merely buy data from Bright Data, *supra* p. 11 n.6, but it offers no concrete facts to support its speculation that the Terms have actually affected its customer base in any measurable way. Its bare conjecture "devoid of further factual enhancement" cannot create antitrust standing. *Reveal Chat*, 471 F. Supp. 3d at 997-98.

**b. *Market Definition.*** The Data markets suffer from the same definitional flaws that infect the Platform markets. *Supra* Part I.B.1.b. As before, Bright Data fails to plausibly explain why data gathered from platforms like Facebook or Weibo cannot substitute for X data. And while Bright Data admits that search engines like Google "index" the same data available on Public Square Platforms, it still excludes them from these markets because "the data is not originally generated on [the search engines]." CC ¶ 131. That exclusion is arbitrary because the alleged market contours turn on the nature of the data, not the original source from which the data derives. *Id.* ¶ 132 ("Want to know what people are saying about events around the world? Go to

X."); *see Psystar Corp.*, 586 F. Supp. 2d at 1199-200 (dismissing claim that "fails to explain why these 'competitor[s]' should be excluded from the definition of the relevant market."). In that way, Bright Data's theory again resembles the failed antitrust theory from *hiQ*. The scraper there similarly claimed that "publicly available" data from "Google and Facebook" were not substitutes for data from LinkedIn because, "*as a practical matter*, the only place to get publicly available data is LinkedIn." *hiQ*, 485 F. Supp. 3d at 1148-49. Judge Chen rejected that theory because "other sources" like Google were also "enlightening to the [data] analytics task" that the scraper elsewhere used to define the market. *Id.* at 1149. The same is true here.[14]

**c. *Market Power.*** In any event, X does not plausibly have market power in the Data markets. A plaintiff may show market power directly or circumstantially. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). The direct route requires allegations of "restricted output" or "supercompetitive prices." *Id.* Bright Data alleges nothing like that: it makes no mention of restricted output, and its assertion that X "raise[d] prices above competitive levels" is conclusory. CC ¶ 141. Its only support for the latter is that X used to provide some data "through its API for free" while now charging "$60,000 per year for half the data." *Id.* That is inadequate because "increasing prices" can be "fully consistent with a free, competitive market," and Bright Data fails to substantiate its inference that $60,000 per year exceeds competitive levels. *Qualcomm*, 969 F.3d at 990; *see Dominick v. Collectors Universe, Inc.*, 2012 WL 4513548, at *7 (C.D. Cal. Oct. 1, 2012) (allegations failed to show that high prices were supracompetitive); *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, 2022 WL 2791201, at *7-8 (E.D. Cal. July 15, 2022) (dismissing antitrust claim because plaintiff failed to allege prices of competitors).

Bright Data's "circumstantial" case is no better. *Rebel Oil*, 51 F.3d at 1434. To plead circumstantial market power, Bright Data must allege that X holds a "dominant share" of the Data markets. *Id.* And the proffered markets are (at best) "idiosyncratically drawn," so the "Court must demand something more robust from Plaintiff's market-share allegations." *Facebook, Inc.*,

---

[14] Bright Data's final "submarket," "Publicly-Available Public Square Data," is even less defined and fails for the same reasons. CC ¶¶ 135-36. A submarket must be "economically distinct from the general product market" based on "practical indicia" like industry recognition. *Hicks*, 897 F.3d at 1121. With no plausible allegations drawing any such distinction, the submarket fails. *See id.*

560 F. Supp. 3d at 17-18 (addressing "personal social networking" market). Yet Bright Data's market-share theory is hardly robust. Although it claims (¶¶ 6, 20, 90, 138, 140) that X's market share is 95%, it derives that number from a single metric: "daily active users." *Id.* ¶ 139. Because Bright Data never justifies invoking daily active *users* to measure power in the *Data* markets, the Court should dismiss these allegations. *See Dream Big Media Inc. v. Alphabet Inc.*, 2022 WL 16579322, at *5 (N.D. Cal. Nov. 1, 2022) (dismissing for lack of market power because market share in one market cannot be applied to another without factual connections).

For a data market (rather than a platform market), it makes little sense to rely on metrics measuring platform users. After all, an "active" user may do no more than open X's app or passively view content – without posting, liking, or creating any data with value in the market. *See Facebook*, 560 F. Supp. 3d at 19 (rejecting market-share allegations based on "daily users or monthly users" that may "overstate or understate any one firm's market share"). X's raw share of users, without understanding the quantity or value of the data generated by those users, is thus uninformative. Indeed, Bright Data elsewhere highlights the importance of other metrics – like engagement or data volume – yet fails to allege X's market share based on those metrics.[15] That defect is especially glaring because scrapers themselves, which Bright Data says compete in the Data markets, have no active users. CC ¶¶ 132-33. Employing "daily active users" to measure power in a market whose participants *need not have users at all* is particularly illogical. *See Facebook*, 560 F. Supp. 3d at 19 (metric must relate to market definition to be plausible).

Bright Data seeks to plug that gap by asserting that other platforms "have data sales comparable to or below their respective shares" of daily active users in the "Public Square Platform Market." CC ¶ 140. But it supplies no facts to support that correlation: it cites no source, gives no metrics, and offers no explanation for why data sales necessarily track user counts. *See Dream Big*, 2022 WL 16579322, at *5 (refusing to rely on market-share allegations

---

[15] For example, Bright Data alleges X has 500 million posts per day, "363.6B daily user-seconds, 547.9M monthly active users, and 8.9B daily video views" (CC ¶ 137 n.72), and "400 billion" events a day (*id.* ¶ 85). Bright Data's source for its user statistics provides similar alternative metrics as well. *Id.* ¶ 138 n.73 (incorporating *X (Twitter) Statistics in 2024 for Social Media Managers to Know*, Metricool, (Apr. 19, 2024), https://perma.cc/7LQ3-R3ZC (time on app)).

about different market without plausible "facts suggesting that it is the same as the alleged relevant product markets"). Nor does Bright Data even define the "data sales" it is supposedly invoking. *See Facebook*, 560 F. Supp. 3d at 18 (similar theory deficient because "Plaintiff does not even allege what it is measuring"). Given Bright Data's "refusal to offer any clue as to how it calculated its noncommittal market-share number" about these unspecified data sales, it has failed to "nudge[] [its market power] claims across the line from conceivable to plausible." *Id.* at 20.

That leads to a final problem: Bright Data's market-share metric (CC ¶¶ 138-39) ignores scrapers like Bright Data altogether. *Id.* ¶¶ 132-33, 140-44; *see Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008) (dismissal where metric ignored a category of competitors). With no specifics, Bright Data simply says that scrapers' "market shares are small." CC ¶ 140. That is far too vague to state a claim. *See Facebook*, 560 F. Supp. 3d at 18 (allegation that "no other social network of comparable scale exists . . . falls short").

## II. Bright Data Fails to Plead Plausible State Antitrust Claims (Counts IV, VI, VII)

The Court should dismiss the state antitrust claims for the same reasons. The analysis under the Cartwright Act (Count IV) "mirrors the analysis under federal law." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); *see, e.g.*, *Breakdown Servs., Ltd. v. Now Casting, Inc.*, 550 F. Supp. 2d 1123, 1139 (C.D. Cal. 2007) (dismissing Cartwright Act claims under *Trinko*). Similarly, the Nevada (Count VI) [16] and Texas (Count VII)[17] statutes incorporate federal antitrust law and thus impose the same requirements.

## III. Bright Data Fails to Plead a Plausible UCL Claim (Count V)

Bright Data's UCL claim (Count V) fails. The "unlawful" claim (CC ¶ 189) rises and falls with Bright Data's other counterclaims. *See Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074,

---

[16] *See* Nev. Rev. Stat. § 598A.050 ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."); *AIDS Healthcare Found., Inc. v. Gilead Scis., Inc.*, 2016 WL 3648623, at *8 (N.D. Cal. July 6, 2016) (Alsup, J.) (dismissing federal, Nevada, and California antitrust claims for failure to plead a market).

[17] *See* Tex. Bus. & Com. Code § 15.04 (the law "shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes"); *ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*, 137 F. App'x 694, 698-99 n.7 (5th Cir. 2005) (dismissing federal and Texas antitrust claims under *Trinko*).

1105 (N.D. Cal. 2017) (dismissing UCL claim along with other predicate causes of action). Similarly, Bright Data's claim under the "unfair" prong (CC ¶ 190) rests on, and thus fails with, its other claims. *See, e.g.*, *Sabol v. PayPal Holdings, Inc.*, 2024 WL 3924686, at *4 (N.D. Cal. Aug. 23, 2024) ("Plaintiffs fail to state a claim under the 'unfair' prong because a UCL claim sounding in antitrust rises and falls with the antitrust claim, even if it is asserted as an 'unfairness' claim.").

The Court should likewise dismiss Bright Data's claim under the "fraudulent" prong. Bright Data identifies only two allegedly fraudulent practices: (1) X's alleged representation "that the Liquidated Damages provision of the Terms is not a penalty"; and (2) its practice of "secretly throttling web traffic" to competing platforms. CC ¶ 193. Neither violates the UCL. Whether the liquidated-damages clause is an "unenforceable contractual penalty," *id.* ¶ 18, is a legal question, not a misrepresentation of fact likely to deceive members of the public. *E.g.*, *Nazemi v. Specialized Loan Servicing, LLC*, 637 F. Supp. 3d 856, 863 (C.D. Cal. 2022) (dismissing UCL claim because it was "unlikely that Defendants' allegedly false Forms 1099-C would deceive members of the public"). Nor is X's alleged "throttling" of traffic to other websites deceptive. *See Kinderstart.com*, 2006 WL 3246596, at *11 (dismissing UCL claim because "removal" of links from search results or "devaluation" in search rankings was not "a deceptive business practice"). Bright Data identifies no statement X made about its connection speeds to other sites, much less with the particularity Rule 9(b) requires. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (noting Rule 9(b) applies to UCL claims grounded in fraud). And Bright Data fails to allege that X had any duty to disclose its alleged "throttling" practices either. *See Buller v. Sutter Health*, 160 Cal. App. 4th 981, 987 (2008) ("[a]bsent a duty to disclose, the failure to do so does not support a claim under the fraudulent prong of the UCL").

Independently, the Court should dismiss Bright Data's UCL claim for lack of standing. To satisfy the UCL's standing requirements, a plaintiff must plead with particularity both reliance and that its "economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959, 985 (E.D. Cal. 2018); *see I.B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1012 (N.D. Cal. 2012) (dismiss UCL claim for plaintiff's failure to "plead actual reliance with the

specificity required by Rule 9(b)"). Bright Data pleads neither. It cannot allege that it relied on the Liquidated Damages provision, given that it continues to scrape data in violation of X's Terms. *Supra* pp. 2-3. Nor does Bright Data even use X's platform, so it has suffered no cognizable harm from X's practices linking to competing social-media platforms. *Supra* Part I.B.1.

## IV. Bright Data Fails to Plead a Plausible Tortious-Interference Claim (Count VIII)

The Court should dismiss the remaining tortious-inference claim. CC ¶¶ 216-23. To start, the conduct underlying a tortious interference must be independently unlawful – it must be "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd.*, 71 Cal. App. 5th 528, 538 (2021). As shown above, Bright Data's claims about the unlawfulness of X's conduct fail. *Supra* Parts I-III. So Bright Data's tortious-interference claim fails alongside them.

Further, Bright Data must allege with specificity "an actual economic relationship or a protected expectancy with a third person" with which X has interfered. *Soil Retention Prods., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 961 (S.D. Cal. 2021); *see R Power Biofuels, LLC v. Chemex LLC*, 2016 WL 6663002, at *17 (N.D. Cal. Nov. 11, 2016) (dismissing claim where plaintiff "solely allege[d] that it ha[d] an economic relationship with 'major consumers of biodiesel' and [did] not provide details about 'specific' companies," making it "impossible to even tell how many such relationships existed"). In *Soil Retention*, for example, the plaintiff failed to specify "which entities, if any, it was negotiating with, what the terms were, when the contracts were being negotiated (*e.g.*, whether those contracts fell through before, during, or after Defendant's alleged negligent acts), and how much money, if any, Plaintiff lost as a result." 521 F. Supp. 3d at 962. Bright Data is similar. It merely alludes to undescribed "existing and prospective economic relationships with customers interested in accessing, scraping, or purchasing publicly-available data hosted on the X platform." CC ¶ 218. That is not specific enough. Bright Data presumably knows its own actual and potential customers and the nature of its interactions with them. Its failure to pinpoint any specific relationship that X affected speaks volumes.

## CONCLUSION

The Court should dismiss Bright Data's counterclaims with prejudice.

DATED: January 14, 2025

Respectfully submitted,

**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**

By: /s/ *Joshua D. Branson*

JOSHUA D. BRANSON*
jbranson@kellogghansen.com
DANIEL V. DORRIS*
ddorris@kellogghansen.com
BETHAN R. JONES*
bjones@kellogghansen.com
MATTHEW D. READE*
mreade@kellogghansen.com
TIBERIUS T. DAVIS*
tdavis@kellogghansen.com
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: 202.326.7900
* *Admitted Pro Hac Vice*

Adrian Sawyer, State Bar No. 203712
SAWYER & LABAR LLP
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: 415.262.3820
sawyer@sawyerlabar.com

*Attorneys for Plaintiff X Corp.*