JOSHUA D. BRANSON*
*jbranson@kellogghansen.com*
DANIEL V. DORRIS*
*ddorris@kellogghansen.com*
BETHAN R. JONES**
*bjones@kellogghansen.com*
MATTHEW D. READE*
*mreade@kellogghansen.com*
TIBERIUS T. DAVIS*
*tdavis@kellogghansen.com*
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
*Admitted Pro Hac Vice*

ADRIAN SAWYER, State Bar No. 203712
*sawyer@sawyerlabar.com*
SAWYER & LABAR LLP
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: (415) 262-3820

*Counsel for Plaintiff*
*X Corp.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X CORP., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>BRIGHT DATA LTD., an Israeli corporation,<br><br>Defendant. | Case No. 3:23-cv-03698-WHA<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**<br><br>Judge:    Hon. William H. Alsup<br>Date:     September 26, 2024<br>Time:     8:00 a.m.<br>Crtrm:    12, 19th Floor |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

    I.     X Has Cured Any Pleading Deficiencies In The Access-Based Claims .................. 2

           A.     X Has Cured Any Pleading Deficiency For Trespass To Chattels ................ 2

                1.     X Alleges Server Impairment And Deprivation ................................. 2

                2.     Bright Data's Remaining Arguments Still Lack Merit ...................... 4

           B.     X Has Cured Any Pleading Deficiency For The UCL Claim ....................... 6

           C.     X Has Cured Any Pleading Deficiency For The Contract-Based Claims ...................................................................................................... 8

    II.     The Copyright Act Does Not Preempt X's Amended Scraping Claims .................. 8

           A.     X's Claims Do not Obstruct The Copyright Act's Purposes ........................ 8

           B.     X's Claims Further Non-Copyright Interests .............................................. 11

           C.     X's claims Are Not Expressly Preempted .................................................. 12

           D.     X Properly Pleads Misappropriation of its Aggregated Data at Scale ......... 14

CONCLUSION ................................................................................................................... 15

i

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

**CASES**

4

*A.O.A. v. Rennert*,
5    2023 WL 346001 (E.D. Mo. Jan. 20, 2023) ............................................................................... 12

6 *Altera Corp. v. Clear Logic, Inc.*,
   424 F.3d 1079 (9th Cir. 2005) ................................................................................................. 13
7

8 *America Online, Inc. v. IMS*,
   24 F. Supp. 2d 548 (E.D. Va. 1998) ......................................................................................... 3
9

*Barclays Cap. Inc. v. Theflyonthewall.com, Inc.*,
10    650 F.3d 876 (2d Cir. 2011) ............................................................................................. 10, 13

11 *Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................................ 7, 8
12

13 *Bernkrant v. Fowler*,
   55 Cal. 2d 588 (1961) ............................................................................................................. 11
14

*Best Carpet Values, Inc. v. Google, LLC*,
15    90 F.4th 962 (9th Cir. 2024) ........................................................................................... 10, 13

16 *Bowers v. Baystate Techs., Inc.*,
17    320 F.3d 1317 (Fed. Cir. 2003) ............................................................................................... 9

18 *Bush v. Liberty Life Assurance Co. of Bos.*,
   130 F. Supp. 3d 1320 (N.D. Cal. 2015) ................................................................................. 15
19

20 *Civic W. Corp. v. Zila Indus., Inc.*,
   66 Cal. App. 3d 1 (1977) ...................................................................................................... 5, 6
21

22 *Compulife Software Inc. v. Newman*,
   959 F.3d 1288 (11th Cir. 2020) ............................................................................................. 14

23 *CompuServe Inc. v. Cyber Promotions, Inc.*,
24    962 F. Supp. 1015 (S.D. Ohio 1997) ....................................................................................... 3

25 *Coupons, Inc. v. Stottlemire*,
   2008 WL 3245006 (N.D. Cal. July 2, 2008) ........................................................................... 2
26

27 *Craigslist Inc. v. 3Taps Inc.*,
   942 F. Supp. 2d 962 (N.D. Cal. 2013) ................................................................................. 2, 9

28

*Davidson & Assocs. v. Jung*,
   422 F.3d 630 (8th Cir. 2005) ................................................................................................ 8, 9

*Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*,
   965 F.3d 365 (5th Cir. 2020) .................................................................................................. 14

*Downing v. Abercrombie & Fitch*,
   265 F.3d 994 (9th Cir. 2001) .................................................................................................... 9

*eBay, Inc. v. Bidder's Edge, Inc.*,
   100 F. Supp. 2d 1058 (N.D. Cal. 2000) ............................................................................... 3, 4

*Facebook, Inc. v. ConnectU LLC*,
   489 F. Supp. 2d 1087 (N.D. Cal. 2007) ................................................................................ 10

*Falcon v. City Univ. of N.Y.*,
   2016 WL 3920223 (E.D.N.Y. July 15, 2016) ....................................................................... 15

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991) .................................................................................................................. 9

*Gee v. Tenneco, Inc.*,
   615 F.2d 857 (9th Cir. 1980) .................................................................................................... 5

*Goldstein v. California*,
   412 U.S. 546 (1973) .................................................................................................................. 9

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ................................................................................................... 5

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   2021 WL 1531172 (N.D. Cal. Apr. 19, 2021) ....................................................... 2, 13, 14, 15

*Hotmail Corp. v. Van$ Money Pie, Inc.*,
   1998 WL 388389 (N.D. Cal. Apr. 16, 1998) ........................................................................... 3

*In re Jackson*,
   972 F.3d 25 (2d Cir. 2020) ................................................................................................ 8, 11

*In re Meta Healthcare Pixel Litigation*,
   -- F. Supp. 3d --, 2024 WL 333883 (N.D. Cal. Jan. 29, 2024) ................................................ 2

*Intel Corp. v. Hamidi*,
   71 P.3d 296 (Cal. 2003) ................................................................................................... 2, 3, 5

*Kewanee Oil Co. v. Bicron Corp.*,
   416 U.S. 470 (1974) ................................................................................................................ 12

iii

*Knight v. Jewett*,
   834 P.2d 696 (Cal. 1992) ........................................................................................... 5

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
   629 F.3d 928 (9th Cir. 2010) ................................................................................... 13

*Miller v. NBC Co.*,
   187 Cal. App. 3d 1463 (1986) .................................................................................. 6

*ML Genius Holdings LLC v. Google LLC*,
   2022 WL 710744 (2d Cir. Mar. 10, 2022) ......................................................... 9, 10

*NBA v. Motorola, Inc.*,
   105 F.3d 841 (2d Cir. 1997) ............................................................................. 10, 13

*Pirozzi v. Apple, Inc.*,
   966 F. Supp. 2d 909 (N.D. Cal. 2013) ..................................................................... 6

*Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*,
   1996 WL 284940 (N.D. Ill. May 23, 1996) ............................................................ 7

*Pollstar v. Gigmania Ltd.*,
   170 F. Supp. 2d 974 (E.D. Cal. 2000) ................................................................... 14

*Ryan v. Editions Ltd. W., Inc.*,
   786 F.3d 754 (9th Cir. 2015) ............................................................................. 8, 11

*Sage Telecom Commc'ns, LLC v. Iretas Grp., LLC*,
   2015 WL 13919072 (C.D. Cal. Aug. 14, 2015) ..................................................... 12

*United States Golf Ass'n. v. Arroyo Software Corp.*,
   69 Cal. App. 4th 607 (1999) ............................................................................. 13, 15

*Verma v. Okev*,
   2013 WL 6887532 (E.D. Cal. Dec. 31, 2013) ........................................................ 15

*Waymo LLC v. Uber Techs., Inc.*,
   256 F. Supp. 3d 1059 (N.D. Cal. 2017) ................................................................. 15

*X17, Inc. v. Lavandeira*,
   563 F. Supp. 2d 1102 (C.D. Cal. 2007) ................................................................. 13

**STATUTES**

17 U.S.C. § 106 .............................................................................................................. 9

17 U.S.C. § 301(a) ........................................................................................................ 13

17 U.S.C. § 301(b)(1) ..................................................................................................... 9

Cal. Bus. & Prof. Code § 17043 ...................................................................................... 7

**RULES**

Federal Rule of Civil Procedure 12(g)(2) ...................................................................... 15

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 217 ............................................................................. 6

Restatement (Second) of Torts § 252 ............................................................................. 5

1

**INTRODUCTION**

2    Bright Data concedes that the Court should allow X to file the Second Amended Complaint

3 ("SAC") to add three new statutory claims.  That is reason enough to grant X's motion.  But Bright

4 Data contests whether X has cured the Court's criticisms of its previous claims.  It has.

5    For the access-based claims, the SAC details how data scraping has impaired X's servers.

6 Scraping has strained X's server capacity so much that X has had to spend more than $100 million

7 each year buying extra capacity to absorb the impact.  Bright Data now downplays that harm by

8 inventing a new "server failure" requirement.  According to Bright Data, a digital intruder can harm

9 its victim only if the victim's servers fail altogether.  That is not the law.  Harm in this context is

10 about *impairment*, not failure, and Bright Data cannot deny that X alleges the former in spades.  As

11 the SAC explains at length, scraping siphons server resources away from legitimate users and thus

12 degrades the experience on X's platform.  X did not need to let a catastrophic server failure happen

13 to bring a trespass claim against the party responsible for that impairment.  But even if X needed to

14 allege server failures, the SAC does that too.  Bright Data has no answer for those allegations, so it

15 simply disparages (at 3, 4, 6) them as "internet jargon" and "lawyer characterization."  Such

16 pejoratives provide no basis for rejecting factual allegations before discovery.

17    The SAC also shows that the Copyright Act does not impliedly preempt X's amended

18 scraping claims.  Although X respectfully disagrees with the Court's last ruling, the SAC engages

19 with the Court's framework and alleges enough facts to avoid preemption under it.  The amended

20 claims, the SAC clarifies, imperil no federal copyright objective.  But they do serve vital state

21 interests in user privacy and data security.  Bright Data's only answer is that privacy and security

22 are not literal elements of X's claims.  That is not the preemption test.  Conflict preemption hinges

23 on the facts, and on X's newly alleged facts, the claims promote ample non-copyright objectives.

24    Bright Data's assertion that state contract law does not focus on privacy per se thus misses

25 the point.  Contract law protects a contracting party's *expectations*, and X's expectations here arise

26 from a contract it designed to protect its users' privacy interests.  By breaching that contract, Bright

27 Data undermined those interests.  So the Copyright Act does not forbid state law from remedying

28 the breach.  Nor does it foreclose X's similar non-contract claims.  Leave to amend is warranted.

1

**ARGUMENT**

**I.      X Has Cured Any Pleading Deficiencies In The Access-Based Claims**

       **A.      X Has Cured Any Pleading Deficiency For Trespass To Chattels**

              **1.      X Alleges Server Impairment And Deprivation**

This Court's last order set forth the relevant test for X's new allegations about its trespass-to-chattels claim:  X must allege that Bright Data has "impair[ed] the servers or deprived X Corp. of their use."  Dkt. 83 ("MTD Op.") at 10; *see Intel Corp. v. Hamidi*, 71 P.3d 296, 304 (Cal. 2003) ("[T]he decisions finding electronic contact to be a trespass to computer systems have generally involved some actual or threatened interference with the computers' functioning.").  The amended allegations meet that test.  Bright Data is the "market leader" in data scraping, *see* Dkt. 117-4 ("SAC") ¶¶ 108-14, 129-32, and data scrapers consume so much of X's server capacity – that is, they deprive X of the servers' use – that X must spend hundreds of millions of dollars on excess capacity, *see id.* ¶¶ 82-91.  These allegations differ markedly from the ones this Court previously held conclusory.  *See* MTD Op. at 8-9 (addressing allegations at Dkt. 36 ¶¶ 96-102).

Such injury allegations exceed what other courts have upheld in allowing electronic trespass-to-chattels claims to proceed to discovery.  For example, in *hiQ Labs, Inc. v. LinkedIn Corp.*, 2021 WL 1531172 (N.D. Cal. Apr. 19, 2021), the court upheld allegations that scraping "burden[ed] LinkedIn's servers" and so forced "LinkedIn to invest more in capital and operational resources."  *Id.* at *10.  In *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962 (N.D. Cal. 2013), the court similarly upheld allegations that data scrapers, *see id.* at 966-67, had "reduce[d] craigslist's capacity to service its users because [the scraper] occupies and uses craigslist's resources."  *Id.* at 980-81.  And in *In re Meta Healthcare Pixel Litigation*, -- F. Supp. 3d --, 2024 WL 333883 (N.D. Cal. Jan. 29, 2024), the court agreed that placing a browser cookie on mobile phones was a "small" but "measurable" digital trespass.  *Id.* at *5-7; *see also Coupons, Inc. v. Stottlemire*, 2008 WL 3245006, at *6 (N.D. Cal. July 2, 2008) (software "wrongfully meddled with Coupons' server causing it to send more than the authorized number of coupons").  X's allegations are stronger.

Bright Data's contrary arguments lack merit.  To start, Bright Data does not contest that X sufficiently alleges that Bright Data (the "market leader" for scraping, SAC ¶ 111) bears

2

responsibility for X's scraping-driven injuries.  Opp. at 1.  Rather, Bright Data downplays (at 3-7) X's injury because it has not "identif[ied] any server failure."  But trespass does not demand a "server failure."  As the California Supreme Court explained, injury occurs where a defendant's digital trespass so taxes server resources that "those resources [are] unavailable" to serve legitimate users.  *Intel*, 71 P.3d at 304 (discussing cases).[1]  Server resources can become "unavailable" without the server failing completely.  That happened here:  Bright Data's scraping burdened X's existing servers so much – making them unavailable for human users – that X had to buy extra capacity to absorb the impact and *prevent* a catastrophic failure.  SAC ¶¶ 90-91.  California law does not require X to allow its servers to fail altogether before bringing a claim.

Relatedly, Bright Data argues (at 6-7) that X's purchase of additional server capacity bootstraps an injury where there is none – so-called "spending money to *prevent* a trespass."  As this Court held, "money spent attempting to restrict access cannot be 'bootstrapped into an injury'" because "otherwise, we can create injury for every supposed tort."  MTD Op. at 10 (quoting *Intel*, 71 P.3d at 308).  But there is no bootstrapping here.  X's purchase of server capacity was not "money spent attempting to *restrict access*," *id.* (emphasis added); it was money spent trying to mitigate *the impact* of Bright Data's unauthorized access.  The two are not the same.  Indeed, the huge amount of extra capacity X had to buy just shows the degree to which Bright Data was already impairing X's servers – the impairment is what compelled the purchase.

But if X needed to allege server failures, it does so.  As the SAC explains (¶ 89), X allocates specific server capacity to certain uses of its service.  Because data scrapers disproportionately target certain uses of X's service – with data scrapers accounting for up to 99 percent of some uses – the servers associated with those uses *do fail*.  SAC ¶¶ 87-89 ("intermittent server failures").

---

[1] *Intel* favorably cited several cases involving a digital-trespass injury.  *See eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1071 (N.D. Cal. 2000) ("us[ing] only a small amount of eBay's computer system capacity . . . deprive[s] eBay of the ability to use that portion of its personal property for its own purposes"); *America Online, Inc. v. IMS*, 24 F. Supp. 2d 548, 550 (E.D. Va. 1998) ("burdened their equipment"); *Hotmail Corp. v. Van$ Money Pie, Inc.*, 1998 WL 388389, at *7 (N.D. Cal. Apr. 16, 1998) ("threaten[ed] to damage Hotmail's ability to service its legitimate customers"); *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1022 (S.D. Ohio 1997) ("burden" on "disk space").  None required catastrophic server failure.

3

Bright Data disparages (at 3) these allegations as "internet jargon" but does not grapple with the facts they plead.  A "glitchy, lagged user experience" from an avalanche of automated requests constitutes concrete injury.  SAC ¶ 89.  Bright Data's factual quibbles are a matter for discovery.

Bright Data next argues (at 5) that the burden of data scraping is "de minimis" because "*[o]n average* 3-5%, of total X web traffic" is automated activity attributable to data scrapers. SAC ¶ 87 (emphasis added).  This matter of degree – whether 3 to 5% is truly "de minimis" – is a quintessential fact question.  In any event, 3-5% of total web traffic "on average" for a business that receives hundreds of billions of unique web requests per day, *id.* ¶ 87, amounts to a massive digital trespass that imposes a substantial injury in absolute terms.  *See eBay*, 100 F. Supp. 2d 1058 at 1063, 1071-72 (upholding trespass claim against data scraper that "use[d] valuable bandwidth and capacity" by sending 1.53% of requests and accounting for 1.10% of data transferred).

Bright Data's focus on "average" traffic is also misplaced.  X alleges that data scraping is highly concentrated at specific points in time.  In one incident in September 2023, half of all requests for posts were by scrapers; the next month, X at one point received 800,000 scraping requests per second; and in December 2023, there was an incident where 10 to 20 percent of all "Search" traffic came from scrapers.  SAC ¶ 88.  "Because X has a reputational and business imperative to be available 24/7 as the platform known for 'what's happening' moment to moment," X must buy enough capacity to absorb those traffic spikes – regardless of average load.  *Id.* ¶ 91. Bright Data's charge (at 5) that these statistics are "misleading" because they are for web and not mobile traffic fails for the same reason:  even if web traffic is only a portion of total traffic, Bright Data's scraping results in usage spikes that strain specific servers and impair X's service.  SAC ¶¶ 86-94.  And contrary to Bright Data's factual assertions (at 5), the SAC alleges that scraping is both quantitatively and qualitatively more burdensome than ordinary human use.  SAC ¶¶ 82-84.

### 2.    Bright Data's Remaining Arguments Still Lack Merit

Bright Data also repeats (at 7-11) two arguments from its prior briefing, which this Court did not accept in its dismissal order.  *See* Dkt. 42 at 23-25 (arguing X consented to scraping); *id.* at 25-27 (arguing lack of intentional interference).  Both arguments remain meritless.

*First*, Bright Data is wrong (at 9) that X consented to scraping merely by "connect[ing] to the Internet."  As the Ninth Circuit has noted, many courts have held that "web scraping exceeding the scope of the website owner's consent gives rise to a common law tort for trespass to chattels." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 n.21 (9th Cir. 2022).  The California Supreme Court favorably discussed digital trespass claims in *Intel*, *see* 71 P.3d at 1350-60, and that "well-considered dicta" is probative in ascertaining California law, *see Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980).  This Court likewise has accepted that "sending requests to servers" may "support a trespass-to-chattels claim."  MTD Op. at 10.  Bright Data's argument contradicts all of these decisions, and it would immunize data scrapers from all digital trespass claims in all circumstances involving the internet.  Bright Data cites no case supporting that result.

X alleges that it did not consent to Bright Data's scraping.  SAC ¶¶ 29-34, 42, 59-79.  As this Court observed, X's Terms of Service forbade Bright Data's scraping, and Bright Data is a "sophisticated party" with "actual knowledge" of those Terms.  MTD Op. at 16.  Bright Data even enables scraping of password-protected content for which there was plainly no consent.  SAC ¶¶ 61-69, 79, 205.  Bright Data may later try to prove that norms of Internet usage imply consent to Bright Data's conduct – a defense X would vigorously dispute – but there is no basis to decide those issues now.  Indeed, Bright Data's principal authority, *Knight v. Jewett*, 834 P.2d 696 (Cal. 1992), was decided after discovery, and in any event was a personal injury (not trespass) case concerning implied consent to physical contact in "an informal game of touch football."  *Id.* at 300.  On the facts, that case is worlds away from this one, and it does not support dismissal where Bright Data had actual knowledge that X never consented to its conduct.  At any rate, the SAC explains how Bright Data's conduct deviates from ordinary internet use.  SAC ¶¶ 59-79, 83-84, 87-88, 93-95.  Those allegations further controvert Bright Data's unsupported claim of implied consent.

Bright Data also misstates the law of trespass in arguing (at 9-10) that X's consent to automated access by Google means it has consented to *all* automated access.  A property owner may allow some access to his property while forbidding others from entering.  *See Civic W. Corp. v. Zila Indus., Inc.*, 66 Cal. App. 3d 1, 17 (1977) (consent may be "limited as to purpose or place"); Restatement (Second) of Torts § 252 cmt. c ("A consent to dealing with a chattel which is restricted

5

1   to a specified time or place, or otherwise limits the extent or manner in which the chattel may be

2   dealt with, creates a privilege only in so far as the chattel is dealt with in accordance with the

3   limitation.").  A homeowner can invite friends to a dinner party while excluding strangers; merely

4   inviting *some* to enter – or, as Bright Data would have it, merely installing a door (the equivalent of

5   connecting to the internet) – does not consent to breaking-and-entering.  Here, X's consent to

6   automated access was limited and specifically excluded scrapers like Bright Data.  SAC ¶¶ 64, 75.

7   By "exceed[ing] those limits," Bright Data trespassed.  *Civic W.*, 66 Cal. App. 3d at 17.

8      *Second*, Bright Data argues (at 7, 11) there was no trespass because it "intended to

9   communicate with X's servers, not to degrade or impair them."  This mistakes motive – the reason

10  Bright Data chose to trespass – for intent.  A trespasser's motive is often to enjoy another's

11  property, not to harm the owner.  But so long as the trespassing act itself is not an accident, there is

12  a trespass.  *See Miller v. NBC Co.*, 187 Cal. App. 3d 1463, 1480 (1986) ("[T]he trespass was

13  intentional in the sense that the law understands and uses that word:  the defendants intended to

14  cross the threshold of the Miller home."); Restatement (Second) of Torts § 217 cmt. c ("Such an

15  intention is present when an act is done for the purpose of *using or otherwise intermeddling* with a

16  chattel *or with knowledge that such an intermeddling will, to a substantial certainty, result from the*

17  *act.*") (emphasis added).  Bright Data here intended to enter X's servers and went to great lengths

18  to bypass the safeguards X designed to keep it out.  SAC ¶¶ 105-36.  This was no mistake.

19        **B.     X Has Cured Any Pleading Deficiency For The UCL Claim**

20        X's proposed amendment to its UCL claim is not futile.  As X previously explained (at 9), it

21  has added new statutory violations to support a claim under the UCL's "unlawful" prong.  Bright

22  Data's opposition does not contest the new statutory claims.  Opp. at 12 & n.8.  Accordingly, the

23  Court should accept X's amended UCL claim at least under the "unlawful" prong.  *See Pirozzi v.*

24  *Apple, Inc*., 966 F. Supp. 2d 909, 922 (N.D. Cal. 2013) ("to the extent Plaintiff's [statutory] claims

25  survive, Plaintiff's 'unlawful' UCL claim does, too.").

26        The SAC also adds new allegations under the UCL's "unfair" and "fraudulent" prongs that

27  are not futile.  *First*, the SAC alleges that Bright Data circumvents X's technological restrictions

28  that protect users' privacy rights.  SAC ¶¶ 58-79.  That violates California's public policy of

6

protecting customer data.  Mot. at 9.  It also gives Bright Data an unfair advantage over other

businesses – including X and other social-media platforms – that limit their product offerings and

expend substantial sums to comply with the privacy laws that Bright Data flouts.  SAC ¶¶ 4, 36-

38, 48-53, 58, 178; *cf. Pivot Point Int'l, Inc. v. Charlene Prods., Inc*., 1996 WL 284940, at *3

(N.D. Ill. May 23, 1996) (jury could find party competed unfairly by "dodging U.S. Customs'

tariffs" to offer "lower prices made possible by illegal conduct"); Cal. Bus. & Prof. Code § 17043

(unfair trade practices include selling products at a lower price to injure competition).

*Second*, the SAC alleges that Bright Data and its customers have gained access to password-

protected data using proxy servers and fake accounts, even for scrapers that X had blocked –

allegations this Court already held could state a misrepresentation under the UCL's "fraudulent"

prong.  Mot. at 9; MTD Op. at 13.  Bright Data disputes (at 12) these allegations on the merits, but

that is no basis to deny leave to amend.  While Bright Data says X has not "identified any scraped

data that 'is solely accessible to X users logged in to registered accounts or was otherwise

password-protected,'" Opp. at 12 (quoting Mot. at 4), the SAC includes many allegations detailing

exactly that, *e.g.*, SAC ¶¶ 3, 61-69, 87, 104, 116, 120, 122, 205-208.  And Bright Data's "product

descriptions," which supposedly "make clear" that its tools scrape only "public information," Opp.

at 13, are hardly a basis for rejecting those allegations.  Whether Bright Data's self-serving

materials accurately describe its conduct is not something this Court can resolve on the pleadings.

For similar reasons, the Court should reject Bright Data's proffered (at 13-14) "obvious

alternative explanation," Opp. at 14 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567

(2007)), about its tools circumventing X's IP rate limits.  Circumventing X's IP rate limits still

involves a misrepresentation.  Although the Court previously held otherwise based on a factual

belief that "X users with registered accounts can access X and send [data] requests *without logging*

*in* to their registered accounts," MTD Op. at 12, the SAC remedies that concern.  It clarifies that

"Bright Data could not have obtained the high volume of data it sells" without logging in,

"because of the stringent limits X places on the amount of data that can be accessed *before being*

*required to login or create an account.*"  SAC ¶ 120 (emphasis added).  The SAC also clarifies

that Bright Data's "deceptive proxy services also impede X's efforts to ban requests by individual

7

IPs because, as soon as one IP is banned, Bright Data's software automatically routes the request through a series of new IPs." *Id.* ¶ 132. Bright Data ignores this allegation. In any event, X alleges that it "limits user access to X content even once logged in" and that "the only way to data scrape X is to circumvent these rate limits by creating large numbers of bot accounts." *Id.* ¶¶ 71-72. The Court should accept these allegations as true. *Twombly* does not require X to definitively disprove every other possible scraping mechanism now, especially because Bright Data goes to great lengths to conceal its conduct and anonymize its customers. Mot. at 5 (citing authority).

### C.    X Has Cured Any Pleading Deficiency For The Contract-Based Claims

The SAC sufficiently alleges harm for the contract-based claims for the same reasons. For these claims, X also alleges another form of injury to which Bright Data has no counter: Bright Data's unlawful access enables it and others to avoid using X's API, thus depriving X of revenue. Mot. at 8 (citing SAC ¶¶ 47, 58-59). Bright Data's only response is that this harm arises from "scraping" and not "access." Opp. at 14. But the *access* Bright Data enables is what allows Bright Data and its customers to avoid paying for *access* through X's API. SAC ¶¶ 43-51, 58-59, 107.

## II.    The Copyright Act Does Not Preempt X's Amended Scraping Claims

The SAC also addresses the concerns that led the Court to find the prior scraping-based claims preempted. Mot. at 9-19. Conflict preemption must "balance[]" (1) any "obstacle[s] to the accomplishment and execution of the full purposes and objectives of Congress," with (2) the "substantial state interests" served. *In re Jackson*, 972 F.3d 25, 34-37, 39 (2d Cir. 2020) (cleaned up). X's amended claims do not impair federal copyright policy, while they do further substantial state interests. Bright Data's counterarguments (at 15-23) are unpersuasive.

### A.    X's Claims Do not Obstruct The Copyright Act's Purposes

The conflict analysis is the simplest for X's contract claims. As X showed, its breach-of-contract and tortious-interference claims do not conflict with the Copyright Act. Mot. at 11-12. In fact, the only two courts of appeals to address conflict preemption of contract claims held them *not* preempted. *See Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 760 (9th Cir. 2015); *Davidson & Assocs. v. Jung*, 422 F.3d 630, 639 (8th Cir. 2005). Bright Data responds (at 17) that there is no categorical rule shielding contract claims from *ever* being preempted. But no such rule is needed to

1  sustain X's claims.  Perhaps the Copyright Act would expressly preempt a contract claim that

2  merely duplicated a copyright claim – like if a contract just repeated the rights available under 17

3  U.S.C. § 106.  But it does not impliedly preempt such claims whenever a contract's terms deviate

4  from the statute.  Quite the opposite:  the Copyright Act allows parties to bargain around its default

5  rules, and contracts that do so are not preempted.  Mot. at 11-12.  For that reason, Bright Data can

6  muster only a handful of cases that even contemplate preemption of contract claims.  Opp. at 17

7  n.14.  And its principal case is an unpublished summary order dismissing claims that the complaint

8  itself had framed as merely targeting "the copying and reproduction" of copyrighted "[c]ontent."

9  *ML Genius Holdings LLC v. Google LLC*, 2022 WL 710744, at *4 (2d Cir. Mar. 10, 2022).

10      X's amended claims are different.  The SAC clarifies that X seeks neither to bar anyone

11  from merely reproducing copyrighted posts nor to stop users from exploiting their own exclusive

12  rights as they wish.  Mot. at 12 (citing SAC ¶ 42).  Rather, X seeks to prevent Bright Data from

13  reneging on its agreement not to exploit X's platform to vacuum up its aggregate data at scale –

14  the very type of "use"-based contract claim Bright Data concedes (at 17-18) is not preempted.  *See*

15  *Davidson*, 422 F.3d at 639 (no preemption of claim enforcing restriction on reverse engineering

16  "use" even though that restriction limited copying); *Bowers v. Baystate Techs., Inc.*, 320 F.3d

17  1317, 1327-28 (Fed. Cir. 2003) (similar); *Craigslist*, 942 F. Supp. 2d at 966-67, 977 (similar).

18  This Court can therefore hold Bright Data to its bargain without thwarting any federal policy.

19      Nor is the SAC's misappropriation claim preempted.  Much of the information at issue is

20  not even copyrightable.  SAC ¶¶ 39-41.  The Copyright Act does not preempt claims over such

21  information.  Mot. at 13-14.  Bright Data now inverts that principle, arguing (at 18-19) that the

22  Copyright Act forever bars states from regulating non-copyrightable data because Congress

23  "intended" it all to remain "free from restraint."  *Goldstein v. California*, 412 U.S. 546, 559

24  (1973).  But the Copyright Act does not reflect some deliberate choice to "eschew all protection"

25  of such data.  *Id*.  It reflects the opposite, by disclaiming preemption over things that "do[] not

26  come within the subject matter of copyright."  17 U.S.C. § 301(b)(1).  That disclaimer respects the

27  constitutional limits on Congress's copyright authority.  *See Feist Publ'ns, Inc. v. Rural Tel. Serv.*

28  *Co.*, 499 U.S. 340, 351, 358-61 (1991) (originality required); *Downing v. Abercrombie & Fitch*,

9

265 F.3d 994, 1003-04 (9th Cir. 2001) (publicity claim not preempted because persona was "not copyrightable" under "the copyright clause") (cleaned up).  And because this is *copyright* preemption, Congress's theoretical "Commerce Clause authority" to "protect[] pure facts and figures" is irrelevant.  Opp. at 20 n.19.  Bright Data's cases (at 19 n.18) do not show otherwise.[2]

It is no answer that "X's site is indisputably copyrightable."  Opp. at 19.  X does not claim that Bright Data copied its website.  X instead claims that Bright Data unlawfully extracted and sold the underlying data that the website displays.  SAC ¶¶ 39-42.  Non-copyrighted data – such as user likes, short posts, or follower lists – do not create conflict preemption just because X puts them on a copyrighted website.  *See Facebook, Inc. v. ConnectU LLC*, 489 F. Supp. 2d 1087, 1092-93 (N.D. Cal. 2007) (no preemption of a claim alleging scraping of non-copyrighted emails, even though other parts of the site were copyrightable).  Were it otherwise, copyright preemption would envelop every conceivable piece of information on the internet, no matter how divorced from copyright law's traditional concerns.  The Copyright Act does not extend so far.  Nor does it matter that a "work need not consist *entirely* of copyrightable material" to warrant *express* preemption under § 301(a).  Opp. at 19 (quoting *Best Carpet Values, Inc. v. Google, LLC*, 90 F.4th 962, 971 (9th Cir. 2024)).  That principle might help Bright Data if X were "challeng[ing] the manner" in which Bright Data "displayed [X's] websites."  *Best Carpet*, 90 F.4th at 972.  But it has no bearing on claims about Bright Data's theft of the underlying non-copyrighted data.

In any event, the SAC now disclaims any exclusive right in its users' creative works, and clarifies that users remain free (or not) to assert their copyrights against Bright Data.  SAC ¶¶ 39-42.  These clarifications, as X explained (Mot. at 13-15), resolve any conflict with the Copyright Act's treatment of fair use or public-domain works.  Contrary to Bright Data's assertion (at 18),

---

[2] Bright Data's cases mostly involve extracting uncopyrighted pieces from broader copyrighted works, in which case courts may still find preemption because it "is often difficult or impossible to separate the fixed copyrightable work from the underlying uncopyrightable events." *NBA v. Motorola, Inc.*, 105 F.3d 841, 849 (2d Cir. 1997) (broadcasts of games are copyrighted even if underlying facts like scores are not); *see Barclays Cap. Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 892-93 (2d Cir. 2011) (similar).  X does not allege that Bright Data here copied some unified copyrighted work like a television broadcast.  Bright Data's remaining cases either discuss this issue in unexplained dicta, *see ML Genius Holdings LLC*, 2022 WL 710744, at *2, or never grapple with the constitutional constraints on copyright preemption.

1    Congress did not "determine[]" that all the information on X's platform should be "freely

2    available for public use."  On the facts alleged, Bright Data neither exploits public-domain works

3    nor makes fair use of them; it simply steals and sells the data from X's platform.  SAC ¶¶ 119-20.

4    The Copyright Act contains no indication that Congress meant to shelter such behavior.  So it

5    makes no difference whether the "'fair use' exception" is a "defense to the state law claims," Opp.

6    at 18, because Bright Data could not plausibly have invoked that defense anyway.

7         **B.    X's Claims Further Non-Copyright Interests**

8         X's state-law claims also promote non-copyright interests.  The "more substantial the state

9    law interest involved in the suit, the stronger the case to allow that right to exist" despite any

10   conflict with federal policy.  *Jackson*, 972 F.3d at 37-38.  The interests served by X's amended

11   claims are substantial.  As previously explained, those claims advance non-copyright interests – all

12   important to California law – in privacy, security, and consumer protection.  Mot. at 15-19.

13        Bright Data does not deny that these interests are substantial.  Instead, it argues (at 20-22)

14   that the "elements" of X's claims were not "designed" with those exact interests in mind.  Its focus

15   is far too narrow.  Unlike express preemption, implied preemption does not hinge on a claim's

16   formal elements.  *See Ryan*, 786 F.3d at 761-62 (evaluating express preemption by focusing on

17   claim's "extra element," but implied preemption by focusing on broader state interests).  Courts

18   instead evaluate a state's interests holistically in light of the facts.  *See id*. at 762 (analyzing

19   conflict by noting defendant factually "knew of [plaintiff's] rights with regard to her artwork").

20        The claims here serve strong state interests.  True, "contract law" does not hinge on any

21   given contract's "subject matter," Opp. at 21, but California has a broader interest in "enforc[ing]

22   lawful contracts" and "protecting its residents and their reasonable expectations" in all their forms.

23   *Bernkrant v. Fowler*, 55 Cal. 2d 588, 596 (1961).  The particular expectations X seeks to vindicate

24   in this case arise from its interests in user privacy and data security.  SAC ¶¶ 48-59, 135-36.

25   Bright Data's breach of contract upsets those expectations and thus subverts the interests they

26   reflect.  The law of contracts surely serves other goals too, but that hardly lessens the overriding

27   state interest in remedying Bright Data's privacy-destroying breach on these specific facts.  *Cf.*

28   *Jackson*, 972 F.3d at 37 (recognizing common-law claims can serve multiple interests at once).

                                         11

1  A similar point refutes Bright Data's attempt (at 21) to cleave the misappropriation tort

2  from the user-privacy and other interests the SAC alleges. Misappropriation may be about "the

3  *plaintiff's* property," Opp. at 21, but X's interests here extend to protecting its users. *See Kewanee*

4  *Oil Co. v. Bicron Corp*., 416 U.S. 470, 487 (1974) (patent law did not preempt common-law trade-

5  secret that furthered not only economic efficiency but also privacy interests); *Sage Telecom*

6  *Commc'ns, LLC v. Iretas Grp., LLC*, 2015 WL 13919072, at *7 (C.D. Cal. Aug. 14, 2015) (noting

7  that "[m]isappropriation of Plaintiffs' confidential customer information would go against the

8  public interest, specifically the customers' privacy interests"). Simply put, happy users are good

9  for X's platform. That is why X's Terms impose an array of contract terms and technological

10  measures to safeguard its users' privacy, its platform's security, and its consumer experience.

11  SAC ¶¶ 23-38, 48-51, 61-79, 93-95, 135. Through these measures, X seeks to protect *both* its

12  users *and* itself. Their interests are aligned, and X's state-law claims protect them both.

13  Whether California has banned scraping by statute is irrelevant. *Cf.* Opp. at 20-22. The

14  point of common-law torts is to remedy harms the legislature has not addressed. Indeed, X's

15  claims involve "an area of 'traditional competence' for state regulation—tort law," which holds

16  "citizens accountable for the harm they cause to others." *A.O.A. v. Rennert*, 2023 WL 346001, at

17  *28 (E.D. Mo. Jan. 20, 2023) (cleaned up) (no implied preemption under foreign-affairs doctrine).

18  The absence of an on-point statute does not lessen California's interest in its common law.

19  Bright Data last denies (at 20-22 & n.21) that scraping invades user privacy, speculating

20  that X might also violate its users' privacy or sell their data to terrorists. These factual disputes

21  are no basis for denying leave to amend. The SAC details X's extensive measures to protect its

22  users and shield its data from malign actors, SAC ¶¶ 48-57, 95, 119 – and alleges that Bright Data

23  does the opposite, *id*. ¶¶ 135-36. These detailed allegations refute Bright Data's assertion (at 20)

24  that everything on X is intrinsically "public information" that must belong to the world.

25  **C.    X's claims Are Not Expressly Preempted**

26  Unable to defend conflict preemption, Bright Data also tries (at 21-22) to revive express

27  preemption. But this Court viewed conflict preemption as "the more appropriate consideration"

28  here. MTD Op. at 21. Indeed, the "rights created by contract law" – which X's breach-of-contract

1   and tortious-interference claims vindicate – "are not 'equivalent' to [the] rights created by

2   copyright law." *Id.* at 22 (quoting 17 U.S.C. § 301(a)).  The latter conclusion remains correct.

3       A claim is not expressly preempted if it includes an "'extra element' that makes the right

4   asserted qualitatively different from those protected under the Copyright Act."  *Altera Corp. v.*

5   *Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th Cir. 2005).  Contract rights typically "are not

6   equivalent to the exclusive rights of copyright," because they include the distinct elements of offer

7   and acceptance.  *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 957 (9th Cir. 2010); *see*

8   Mot. at 11 & n.1.  This case is no exception, for the reasons above.[3]

9       X's claims for misappropriation and unjust enrichment are similar.  A California court has

10  described the misappropriation tort as *not* equivalent to copyright.  *See United States Golf Ass'n. v.*

11  *Arroyo Software Corp.*, 69 Cal. App. 4th 607, 623 (1999) (no preemption for injunction against

12  "use" of golf formula).  Relying on that case, Judge Chen explained that "the whole point of such a

13  [misappropriation] claim is to protect a property right 'not otherwise covered by patent or copyright

14  law.'"  *hiQ Labs*, 2021 WL 1531172, at *9 (quoting *Id.* at 618) (finding no preemption under

15  CUTSA).  That logic applies here.  Indeed, courts have held misappropriation claims not preempted

16  – typically in cases involving so-called "hot news" – when the misappropriated information was

17  costly to create and raised concerns about a defendant "free-riding" on the plaintiff's investment.

18  *NBA*, 105 F.3d at 853; *see X17, Inc. v. Lavandeira*, 563 F. Supp. 2d 1102, 1109 (C.D. Cal. 2007)

19  (applying that principle to find no preemption of a California misappropriation claim).  The key is

20  whether the misappropriation "amounts to an unauthorized interference with the normal operation

21  of complainant's legitimate business precisely at the point where the profit is to be reaped, in order

22  to divert a material portion of the profit from those who have earned it to those who have not."

23  *Barclays Cap.*, 650 F.3d at 895 (cleaned up).

24  _____

25      [3] *Best Carpet*, 90 F.4th 962, the only case Bright Data cites (at 22), is inapposite.  The
    plaintiffs there challenged the way Google displayed their websites in its search results.  *See id.* at

26  966.  The court found plaintiffs' implied-in-law contract and unjust-enrichment claims concerned
    only rights within the scope of the Copyright Act – displaying and reproducing a copyrighted

27  website – and did not require plaintiffs to prove anything "materially different from a claim for
    copyright infringement."  *Id.* at 974.  X's proof here will bear no resemblance to that of a plaintiff

28  suing Bright Data for copyright infringement.

                                        13

1   That is true here.  X invested time and money developing its platform and aggregating

2   valuable data at scale.  SAC ¶¶ 39-41, 80-81; *see Pollstar v. Gigmania Ltd.*, 170 F. Supp. 2d 974,

3   979-80 (E.D. Cal. 2000) (holding common-law misappropriation not preempted where defendant

4   free-rode by taking concert information from plaintiff's site even if information was not "highly

5   time sensitive").  When Bright Data siphons off all that data for itself, it free rides on X's work

6   creating its platform and discourages future investment.  That extra component – the ingenuity X

7   devoted to compiling the user data at scale – distinguishes the claim from copyright.[4]

8   **D.      X Properly Pleads Misappropriation of its Aggregated Data at Scale**

9   The SAC sufficiently pleads that Bright Data misappropriated the data on X's platform.

10   SAC ¶¶ 153-58.  Bright Data incorrectly asserts (at 23) that X's claims fail because it has no

11   "independent property right to prevent Bright Data from searching and making use of the public

12   web."  Judge Chen rejected a similar argument, reasoning that LinkedIn had at least a "quasi

13   property" interest in user data even if the users retained ownership.  *hiQ Labs*, 2021 WL 1531172,

14   at *6-9.  It is the aggregated data at scale, not individual "user content," in which X has the

15   property interest that Bright Data usurped.  SAC ¶¶ 55-67, 153-58.  X expended significant time,

16   effort, and resources aggregating the information Bright Data is stealing.  That suffices.

17   Bright Data mischaracterizes X as seeking to restrict access to public information despite

18   consenting to general web searches, Opp. at 20-23, and that "the law draws no such distinction"

19   between individual searches and scraping at scale, *id*. at 23.  The Eleventh Circuit rejected a similar

20   public-access argument in a misappropriation case.  *See Compulife Software Inc. v. Newman*, 959

21   F.3d 1288 (11th Cir. 2020).  The court reasoned that while the plaintiff had "given the world

22   implicit permission to access as many quotes as is *humanly* possible, a robot can collect more

23   quotes than any human practicably could."  *Id.* at 1314 (emphasis in original).  That logic controls

24   here.  Mot. at 13-14 (citing *Compulife* and *hiQ Labs*, 2021 WL 1531172, at *7).  Indeed, X's

---

25   [4] Similarly, X's unjust enrichment claim is not preempted because it is pleaded in the
26   alternative to the contract claims and involves Bright Data taking "undue advantage" of X and its
users.  SAC ¶¶ 159-65; *see Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*, 965 F.3d
27   365, 379-80 (5th Cir. 2020) (unjust enrichment claim not preempted because a scraping company
took "undue advantage" by spurring third parties to violate their terms of use).  X properly pleads
28   this claim for the reasons previously explained.  Dkt. 48 at 24-26.

14

1    claims are even stronger, because X guarded its platform through rate limits and other

2    technological measures that Bright Data circumvented.  SAC ¶¶ 22, 56-79.

3           Bright Data then pivots (at 23) to challenge X's misappropriation claim by arguing for the

4    first time that the California Uniform Trade Secrets Act precludes it.  But X pleaded a

5    misappropriation claim in its First Amended Complaint (Dkt. 23 ¶¶ 107-12), and Bright Data never

6    argued it was foreclosed by CUTSA.  This brand-new defense, which could have been raised in

7    Bright Data's original motion, is waived under Federal Rule of Civil Procedure 12(g)(2).  *See Bush*

8    *v. Liberty Life Assurance Co. of Bos.*, 130 F. Supp. 3d 1320, 1325-26 (N.D. Cal. 2015) (defense

9    waived after amended complaint because it raised "identical issues" that could have been raised

10   earlier); *Falcon v. City Univ. of N.Y.*, 2016 WL 3920223, at *14 (E.D.N.Y. July 15, 2016) (similar).

11          But if the Court reaches the new defense, it should reject it.  Judge Chen again rejected this

12   very argument, "because the whole point of such a [misappropriation] claim is to protect a property

13   right 'not otherwise covered by patent or copyright law, trade secret law, breach of confidential

14   relationship, or some other form of unfair competition.'"  *hiQ Labs*, 2021 WL 1531172, at *9

15   (quoting *Golf Ass'n.*, 69 Cal. App. 4th at 618).  Indeed, "[o]nly misappropriation of trade secrets, as

16   opposed to misappropriation of assets generally," are preempted.  *Verma v. Okev*, 2013 WL

17   6887532, at *9 (E.D. Cal. Dec. 31, 2013) (finding no preemption of misappropriation of assets).

18   As Bright Data itself argues, "X has not brought a trade secret claim."  Opp. at 23-24 n.22.  Unlike

19   in the cases Bright Data cites,[5] X does not claim that user posts are themselves "confidential or not

20   generally known to the public . . . Rather, the property right it is claiming is based on the labor,

21   skill, money, etc. that it put into developing" its platform.  *hiQ Labs*, 2021 WL 1531172, at *9.  To

22   hold those claims preempted would foreclose all misappropriation claims.

23                                      **CONCLUSION**

24          For the foregoing reasons, X Corp. respectfully requests that the Court grant X's Motion

25   for Leave To File a Second Amended Complaint.

26   _____

27          [5] Bright Data's cases involve "confidential information" akin to trade secrets.  *See, e.g.*,
     *Waymo LLC v. Uber Techs., Inc.*, 256 F. Supp. 3d 1059, 1064 (N.D. Cal. 2017) ("only property
28   interest Waymo could have in its 'confidential information' arises under trade secret law").

DATED:  September 6, 2024

Respectfully submitted,

**KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.**

By:  /s/ Joshua D. Branson
     JOSHUA D. BRANSON*
     jbranson@kellogghansen.com
     DANIEL V. DORRIS*
     ddorris@kellogghansen.com
     BETHAN R. JONES*
     bjones@kellogghansen.com
     MATTHEW D. READE*
     mreade@kellogghansen.com
     TIBERIUS T. DAVIS*
     tdavis@kellogghansen.com
     1615 M Street, N.W., Suite 400
     Washington, D.C. 20036
     Telephone: 202.326.7900
     * Admitted Pro Hac Vice

     Adrian Sawyer, State Bar No. 203712
     SAWYER & LABAR LLP
     1700 Montgomery Street, Suite 108
     San Francisco, California 94111
     Telephone: 415.262.3820
     sawyer@sawyerlabar.com

     *Attorneys for Plaintiff X Corp.*

PL.'S REPLY ISO MTN. FOR LEAVE TO FILE SAC
Case No. 3:23-cv-03698-WHA