Colin R. Kass (*pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick (*pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

*Attorneys for Defendant Bright Data Ltd.*
*Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| X Corp., <br><br> Plaintiff, <br><br> v. <br><br> BRIGHT DATA LTD., <br><br> Defendant. | Case No.  23-cv-03698-WHA <br><br> Hon. William A. Alsup <br> Courtroom 12 – 19th Floor <br> March 13, 2025, 8:00 a.m. |

**BRIGHT DATA'S OPPOSITION TO**
**X'S MOTION TO DISMISS THE COUNTERCLAIM**

# TABLE OF CONTENTS

I.    INTRODUCTION. ................................................................................................ 1

II.   FACTUAL BACKGROUND. ............................................................................... 2

III.  BRIGHT DATA ALLEGES CLASSIC ANTICOMPETITIVE CONDUCT................... 5

      A.    X's Anti-Access and Scraping Provisions are Contracts in Restraint of
            Trade; Not Unilateral Refusals to Deal..................................................5

      B.    X's Terms Operate As *De Facto* Exclusive Dealing Provisions that
            Foreclose Competition From Nearly the Entire Market. ........................8

      C.    X's Liquidated Penalty Is Exclusionary Because It Interferes with
            Customer Relationships. ........................................................................9

      D.    X's Deceptive Efforts to Throttle Web Traffic to Competing Platforms Is
            Exclusionary Conduct, Not a Refusal to Deal with Competitors. .........11

      E.    X Has Unlawfully Leveraged Its Monopoly in The User Engagement
            Market to Monopolize or Attempt to Monopolize the Data Markets. ...................14

IV.   BRIGHT DATA ALLEGES RELEVANT ANTITRUST MARKETS. ......................... 15

V.    BRIGHT DATA ALLEGES MARKET POWER. ......................................... 18

VI.   BRIGHT DATA ALLEGES ANTITRUST INJURY AND STANDING. .................... 20

VII.  BRIGHT DATA'S NON-SHERMAN ACT CLAIMS ARE WELL-PLED................... 23

      A.    Bright Data States Claims under State Antitrust Laws..........................23

      B.    Bright Data States a UCL Claim...........................................................23

      C.    Bright Data States a Claim for Tortious Interference. ...........................25

VIII. CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES[1]

**Page(s)**

CASES

*AliveCor, Inc. v. Apple Inc.*,
    592 F. Supp. 3d 904 (N.D. Cal. 2022) ....................................................................13

*American Needle, Inc. v. NFL*,
    560 U.S. 183 (2010) ............................................................................................6

*Assoc. Gen. Contractors, Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)............................................................................................20

*Authenticom, Inc. v. CDK Glob., LLC*,
    874 F.3d 1019 (7th Cir. 2017) ............................................................................5

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465 (1982)............................................................................................22

*Brown Shoe Co. v. U.S.*,
    370 U.S. 294 (1962)............................................................................................16

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972)............................................................................................11

*Cascade Health Sols .v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ....................................................................12, 15

*Cel-Tech Commc'ns., Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ........................................................................................24

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)....................................................................................14, 20

*Conwood Co., L.P. v. United States Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) ............................................................................12

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984)............................................................................................5

*Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*,
    99 F.3d 937 (9th Cir. 1996) ........................................................................14, 15

---

[1] Unless otherwise specified, all emphasis added, capitalizations conformed without brackets, and internal citations and quotation marks omitted.

*CoStar Grp, Inc. v. Com. Real Estate Exch. Inc.*,
   619 F. Supp. 3d 983 (C.D. Cal. 2022) ...................................................................9

*Crowder v. LinkedIn Corp.*,
   2023 WL 2405335 (N.D. Cal. 2023) ...............................................................5, 7

*Crowder v. LinkedIn Corp.*,
   2024 WL 1221956 (N.D. Cal. 2024) ...................................................................7

*CVD, Inc. v. Raytheon Co.*,
   769 F.2d 842 (1st Cir. 1985) .............................................................................11

*Dairy, LLC v. Milk Moovement, Inc.*,
   2023 WL 3437426 (E.D. Cal. 2023) .................................................................14

*Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*,
   2023 WL 4562031 (S.D.N.Y. 2023) ...................................................................7

*Doe v. Abbott Labs.*,
   571 F.3d 930 (9th Cir. 2009) ............................................................................15

*Dominick v. Collectors Universe, Inc.*,
   2012 WL 4513548 (C.D. Cal. 2012) ............................................................19, 20

*Dream Big Media Inc. v. Alphabet Inc.*,
   2022 WL 16579322 (N.D. Cal. 2022) ...............................................................19

*E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) ..........................................................................................11

*Ellis v. Salt River Project Agric. Improvement & Power Dist.*,
   24 F.4th 1262 (9th Cir. 2022) ...........................................................................22

*Engalla v. Permanente Med. Grp., Inc.*,
   15 Cal. 4th 951 (1997) ......................................................................................24

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) .............................................................................23

*Facebook, Inc. v. Power Ventures, Inc.*,
   2010 WL 3291750 (N.D. Cal. 2010) .................................................................11

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
   852 F. Supp. 2d 1171 (N.D. Cal. 2012) ............................................................14

*FTC v. Amazon.com, Inc.*,
   2024 WL 4448815 (W.D. Wash. 2024) .............................................................13

*FTC v. Facebook, Inc.*,
   560 F. Supp. 3d 1 (D.D.C. 2021) ............................................................... *passim*

*FTC v. Facebook, Inc.*,
   581 F. Supp. 3d 34 (D.D.C. 2022) .......................................................................19

*FTC v. Indiana Fed'n of Dentists*,
   476 U.S. 447 (1986) .............................................................................................23

*FTC v. Meta Platforms, Inc.*,
   2024 WL 4772423 (D.D.C. 2024) ...............................................................16, 19

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) .................................................................6, 10, 12

*FTC v. Sperry & Hutchinson Co.*,
   405 U.S. 233 (1972) .............................................................................................23

*FTC v. Sysco Corp.*,
   113 F. Supp. 3d 1 (D.D.C. 2015) ........................................................................16

*FTC v. Tapestry, Inc.*,
   2024 WL 4647809 (S.D.N.Y. 2024) ...................................................................16

*Handgards, Inc. v. Ethicon, Inc.*,
   743 F.2d 1282 (9th Cir. 1984) ............................................................................11

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ............................................................................18

*High Tech. Careers v. San Jose Mercury News*,
   996 F.2d 987 (9th Cir. 1993) ..............................................................................16

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) .............................................................................24

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   485 F. Supp. 3d 1137 (N.D. Cal. 2020) .........................................................5, 17

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   273 F. Supp. 3d 1099 (N.D. Cal. 2017) .............................................................24

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ......................................................................14, 15

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
   2024 WL 4532937 (N.D. Cal. 2024) ..................................................................25

*Kinderstart.com LLC v. Google, Inc.*,
   2006 WL 3246596 (N.D. Cal. 2006) ..................................................................13

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ......................................................................................25

*Liveuniverse, Inc. v. Myspace, Inc.,*
   2007 WL 6865852 (C.D. Cal. 2007)................................................................13

*Morgan v. AT&T Wireless Servs., Inc.,*
   177 Cal. App. 4th 1235 (2009) .......................................................................25

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.,*
   2022 WL 2791201 (E.D. Cal. 2022)................................................................19

*New York v. Meta Platforms, Inc.,*
   66 F.4th 288 (D.C. Cir. 2023).........................................................................6

*Newcal Indus., Inc. v. Ikon Off. Sol.,*
   513 F.3d 1038 (9th Cir. 2008) ........................................................................16

*Novell, Inc. v. Microsoft Corp.,*
   731 F.3d 1064 (10th Cir. 2013) ......................................................................6

*Pac. Bell Tel. Co. v. linkLine Commc'ns., Inc.,*
   555 U.S. 438 (2009).......................................................................................6

*Parks v. Watson,*
   716 F.2d 646 (9th Cir. 1983) ..........................................................................21

*Paulus v. Bob Lynch Ford, Inc.,*
   139 Cal. App. 4th 659 (2006) .........................................................................23

*Pooler v. R.J. Reynolds Tobacco Co.,*
   2001 WL 403167 (Dist. Ct. Nev. 2001)..........................................................23

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC,*
   532 F.3d 963 (9th Cir. 2008) ..........................................................................19

*Schnall v. Hertz Corp.,*
   78 Cal. App. 4th 1144 (2000) .........................................................................25

*Sidibe v. Sutter Health,*
   2013 WL 2422752 (N.D. Cal. 2013) ...............................................................21

*Simon & Simon, PC v. Align Tech., Inc.,*
   533 F. Supp. 3d 904 (N.D. Cal. 2021) .............................................................9

*Tele Atlas N.V. v. NAVTEQ Corp.,*
   2008 WL 4911230 (N.D. Cal. 2008) ...............................................................10

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.,*
   676 F.2d 1291 (9th Cir. 1982) ........................................................................10

*U.S. v. Colgate & Co.,*
   250 U.S. 300 (1919).......................................................................................12

*U.S. v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005)...................................................................................8

*U.S. v. Griffith*,
  334 U.S. 100 (1948)...........................................................................................14

*U.S. v. H&R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011)......................................................................16

*U.S. v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)..........................................................................8, 13

*Union Carbide v. Superior Court*,
  36 Cal.3d 15 (1984)............................................................................................23

*Verizon Commc'ns. Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004).............................................................................................6

*Williams v. Gerber Prods. Co.*,
  552 F.3d 934 (9th Cir. 2008)..............................................................................25

*Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*,
  951 F.2d 1158 (9th Cir. 1991)............................................................................22

*Yelp, Inc. v. ReviewVio, Inc.*,
  2024 WL 2883668 (N.D. Cal. 2024)...................................................................25

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012).................................................................................8

STATUTES

15 U.S.C. § 1........................................................................................... *passim*

15 U.S.C. § 2........................................................................................... *passim*

15 U.S.C. § 26...............................................................................................21

RULES

Fed. R. Civ. P. 12(b)(6)................................................................................16

OTHER AUTHORITIES

Areeda & Hovenkamp,
  ANTITRUST LAW (5th ed. 2016) ........................................................................12

Restatement (Second) of Contracts, § 186..................................................9

## I.    INTRODUCTION.

Three years ago, Elon Musk set in motion his plan to transform Twitter, an unprofitable advertising business, into X, a global information monopolist. It was no easy task. To succeed, X needed to yank information it did not own out of the public domain into its own exclusive control. After several failed attempts to do so lawfully, X turned to unlawful contracts in restraint of trade. Those restraints are embodied in X's revised Terms. The Counterclaim challenges those Terms.

X does not dispute the purpose or effect of the challenged Terms. It does not, for example, deny that they purport to eliminate all scraping, making X the sole source of information users post to the platform. Nor does X deny that the Terms were integral to its ability to jack up prices and extract tens of billions from its newfound monopoly. Instead, it says the allegations, "if true, may show that X has acted with sharp elbows," but that its jabs are not unlawful because the Terms are not *contracts* subject to the rule of reason, only mere "refusals to deal." X Br. 6. To state the defense is to refute it. Restrictive contracts are not refusals to deal; they are *affirmative acts* of exclusion and "contracts, combinations …, or conspiracies in restraint of trade." 15 U.S.C. § 1. Bright Data does not seek to force X to enter into contracts with anyone; to grant scrapers access to accounts; to prevent X from using technological means to restrict access; or to cooperate with data scrapers in any way, shape, or form. Bright Data merely seeks to strike contractual provisions purporting to strip the public of their lawful right to access and use the public internet.

X cannot evade scrutiny by touting its investment, bemoaning "free-riding," or pointing to some unfettered right to choose its business partners. These may or may not be pro-competitive justifications for which it carries the burden of proof. But they do not take the contract outside the purview of the antitrust laws. And they cannot be decided as a matter of law on the pleadings.

X's challenge to Bright Data's market definition is also premature. It says the markets should be broader than alleged. But antitrust laws are premised on the narrowest, not the broadest, market in which power can be exercised. The Counterclaim includes extensive factual allegations concerning consumer demand, barriers to entry, and commercial realities establishing proper markets under *Brown Shoe* and the hypothetical monopolist test. X offers nothing but *ipse dixit*

contradicting courts holding that X operates in different markets than other social media platforms.

Nor can X avoid scrutiny by challenging Bright Data's standing.  X advances a quixotic argument that its exclusionary conduct *benefits* Bright Data because the Terms do not apply to it. Were X bound by this statement, it would defeat its affirmative claims.  So X obviously does not believe what it says.  At bottom, a case or controversy exists as to whether the Terms apply to Bright Data.  That establishes standing.  But even that misses the point.  Bright Data's harm is not limited to its status as a purported contractual counterparty.  Its harm also flows from contractual restraints that interfere with its customer relationships.  This is quintessential antitrust injury. Ultimately, this Court's words in connection with its pre-emption ruling apply equally here:

> "X Corp. would yank into its private domain and hold for sale information open to all, exercising [an] owner's right to exclude where it has no such right.  We are not concerned here with an arm's length contract between two sophisticated parties.… We are instead concerned with a massive regime of adhesive terms imposed by X Corp. that stands to fundamentally alter the rights and privileges of the world at large."  ECF 83 at 20.

That concern is not limited to Copyright.  It is an equal, if not greater, concern to the antitrust laws, which, as the Magna Carta of the free enterprise system, protect the public's interest in unfettered competition.  X's motion should be denied.

## II.    FACTUAL BACKGROUND.

Before Elon Musk took over Twitter, it had "cemented itself as the go-to platform for breaking news and real-time updates."  ECF 168 ("CC"), ¶¶ 28, 31.  By 2022, the year Musk acquired control, "the company has surpassed 368 million active users, with over 500-700 million tweets *per day*."  *Id.* ¶ 33.  With over 95% market share of the public square social media market, X had "unparalleled access to real-time data about current events and public sentiment."  *Id.* ¶ 6.

But Twitter was not profitable.  *Id.* ¶ 4.  It believed it could make money by "offering advertisers access to interested eyeballs," but "the advertising market is … competitive," and Twitter "lost money almost every single year."  *Id.* ¶¶ 4, 34.  Musk had a different vision.  He thought the advertising "revenue model [was] dated" and "recognized that Twitter was actually in the data business and had ineffectively exploited its information monopoly."  *Id.* ¶¶ 5, 34.

1    "'Because it consists of billions of bidirectional interactions per day,' [he] tweeted, 'Twitter can

2    be thought of as a collective, cybernetic super-intelligence.'" *Id.* ¶ 6.  Seeing the data's value,

3    Musk believed "he could build an empire by taking control over the vast amounts of user content

4    generated on the platform." *Id.* ¶ 34.

5         "But Musk had a problem.  X did not own the data, and most of it – the valuable parts,

6    anyway – were in the public domain." *Id.* ¶ 8.  So, he devised a plan to "yank the information out

7    of the public domain." *Id.*  He first directed X to "lock users' data behind a log-in screen." *Id.* ¶

8    9.  But "days after X changed its log-in policy, Meta entered the market with Threads," forcing X

9    to "quietly rollback the log-in requirements," "once again ensuring that substantial amounts of

10   real-time data would be freely available for public use without a log-in." *Id.* ¶ 64.

11        "With competition forcing X to maintain its public nature, X turned to the only option it

12   had left – the illegal one – using contracts to wrest control over its users' data and eliminate

13   competition from data competitors." *Id.* ¶ 65.  Prior to Musk's take-over, "X's Terms did not

14   purport to prohibit crawling, or most automated access to X's currently available published

15   interfaces." *Id.* ¶ 68.  In fact, prior to July 2023, the Terms "expressly stated that 'crawling the

16   Services is permissible….'" *Id.* ¶¶ 12, 68.  Even X's most senior executives believed that scraping

17   was just "fine," and had structured employee compensation to incentivize it. *Id.* ¶¶ 12, 53, 68.

18        But because Musk was more interested in exploiting data than earning advertising revenue,

19   "within one month of acquiring Twitter," he tweeted that "'Twitter rules will evolve.'" *Id.* ¶ 12.

20   In September 2023, X made good on that promise, amending its "Terms to state that 'crawling …

21   the Services in any form, for any purpose … is expressly prohibited.'" *Id.* ¶ 13.  The Terms also

22   purportedly require users to "relinquish" their right to scrape public portions of X's platform, and

23   their ability to do business with data scrapers. *Id.* ¶¶ 13, 77, 90-95.  These were important changes

24   because "no law on earth gives X the right to stop the public from searching the public web." *Id.*

25   If the Terms are enforceable, X would be the "sole source of … data" on the platform, and with

26   95% market share, these "*de facto* exclusive contracts" would cover nearly the entire market. *Id.*

27

28

X's anticompetitive scheme did not stop there.  Almost a year ago, this Court invalidated X's anti-scraping provision on preemption grounds.  *Id.* ¶ 15.  The "ruling was devastating" to X's ability to wrest control of the data.  *Id.* ¶ 16.  While, in *theory*, X's anti-access provision had not been nullified, X knew it was "wholly ineffective against data scrapers since X suffers no damage from automated access."  *Id.*  Without any "real burden in responding to scrapers' server requests," X was "left with no realistic way to enforce its anti-access provisions."  *Id.*

To address this problem, X "came up with a plan to scare scrapers into backing down."  *Id.* ¶ 17.  "The key was what X euphemistically calls a 'liquidated damages provision.'"  *Id.* ¶ 18.  But "it is an illegal penalty."  *Id.*  "X says anyone who … use[s] automated means to access X's platform will have to pay the equivalent of 1.5 cents per tweet viewed or accessed."  *Id.*  X's "statement that this is a 'reasonable estimate' of its actual damages [was] an intentional lie," "made with *scienter* and with the expectation that it be relied upon."  *Id.*  "At more than ***1400%*** above the price X charges its data subscribers, this fee bears no relation to X's actual costs or damages."  *Id.*  X knew this provision "would not hold up in court," and that its assertion was both "objectively and subjectively baseless."  *Id.* ¶¶ 18, 87.  But that did not matter, because X "simply wanted … to deter scrapers," and it knew that the threat of financial ruin would have its desired effect on the market "irrespective of the enforceability of the provision."  *Id.* ¶ 87.

Nor was X's anticompetitive scheme limited to the Terms.  X also employed "exclusionary and deceptive acts to prevent data scrapers from obtaining alternative sources of information."  *Id.* ¶ 20.  X "secretly interfered with users' right to traverse the World Wide Web, trapping them within X's platform, and causing them to abandon their efforts to establish a presence on competing websites."  *Id.*  It did this by "throttl[ing] web traffic to these other platforms, making it appear … that the other platform servers were dysfunctional."  *Id.*

Ultimately, "the scheme worked," "preventing data scraping companies, including Bright Data, from competing in the [data] markets," and "preventing other [platform] competitors from achieving sufficient scale … to meaningfully compete."  *Id.* ¶¶ 2, 142.  This allowed X to drastically raise data prices and reap ***tens of billions*** of dollars in profit.  *Id.* ¶¶ 2, 134.

III.    **BRIGHT DATA ALLEGES CLASSIC ANTICOMPETITIVE CONDUCT.**

    *A.    X's Anti-Access and Scraping Provisions are Contracts in Restraint of Trade; Not Unilateral Refusals to Deal.*

X grounds its motion on its belief that Bright Data alleged nothing more than "a lawful refusal to deal with data scrapers." X Br. 13. But X does not dispute that it seeks to "*strip*[] the public of its right to access and scrape public portions of the web." *Id.* at 10. That is no mere refusal to deal. It is an *affirmative act* to restrain trade through *contract*. It is anticompetitive.

A "refusal to deal" involves a refusal to enter into a contract, not the imposition of an unreasonable contractual restraint. Here, Bright Data does not assert that X has a duty to deal with anyone. Neither the word "duty" nor "refusal" – or any variation or synonym – appears in the Counterclaim. This is not artful pleading. Bright Data certainly is not trying to enter into a contractual relationship with X, having long-ago terminated its accounts. Nor does Bright Data seek to prevent X from engaging in *unilateral* conduct to restrict access to its site—it is perfectly free to use log-ins, passwords, or other technical measures to do so.[2] Indeed, the Counterclaim specifically alleges, X did ***not*** violate the law when it "tried to lock users' data behind a log-in screen" because the "law allowed [X] to do that." CC ¶ 9. It only crossed the line when, after competition forced X to reverse course, it resorted to *contracts* to "wrest control over users' data and eliminate competition from data competitors." *Id.* ¶ 65.

The challenge to those contracts falls squarely within Section 1 of the Sherman Act, which prohibits *any* "contract, combination …, or conspiracy, in restraint of trade." 15 U.S.C. § 1. As the Supreme Court has explained, "the Sherman Act contains a basic distinction between concerted and independent action." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767-79 (1984). Conduct "subject to § 1 is judged more ***sternly*** than unilateral activity under § 2," precisely because restrictive contracts "deprive[] the marketplace of the independent centers of decision-making that

---

[2] This distinguishes X's scraping cases. *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020), 2020 WL 13169304 (N.D. Cal. 2020) (First Am. Compl., alleging "self-help" consisting of "technological means" that "cut off hiQ's access to the public database."); *Crowder v. LinkedIn Corp.*, 2023 WL 2405335 (N.D. Cal. 2023) ("technological countermeasures"); *Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019 (7th Cir. 2017) ("closed system").

1    competition assumes and demands." *Id.*; *American Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010)

2    (same; "Congress treated concerted behavior more strictly than unilateral behavior.").

3       In its zeal to transform its restrictive Terms into a refusal to deal, X eviscerates this basic

4    distinction. But its principal case does not support the effort. In *Trinko*, the plaintiff alleged that

5    "Verizon denied interconnection services to rivals," a claim that arose, if "at all," under Section 2

6    because it was premised on the *absence* of an agreement. *Verizon Commc'ns. Inc. v. Trinko*, 540

7    U.S. 398, 407-08 (2004). Applying Section 2's more lenient standard, the Court noted it has been

8    "very cautious" about forcing competitors to cooperate because "compelling negotiation between

9    competitors may facilitate … collusion;" require "antitrust courts to act as central planners;" and

10    impinge on the "long recognized [qualified] right of a trader … to exercise his own independent

11    discretion as to parties with whom he will deal." *Id.*[3]

12       These concerns do not apply to *contract* challenges because "there is less risk of deterring

13    a firm's necessary conduct; courts need only examine discrete agreements; and such conduct may

14    be remedied simply through prohibition." *American Needle*, 560 U.S. at 190. Here, too, Bright

15    Data does not seek to forge new contractual relationships, force X to deal with competitors, require

16    the Court to become a central planner, or impinge on anyone's right to pick their business partners.

17    It only seeks to prohibit restrictive terms, leaving the parties to whatever rights and freedoms they

18    may enjoy in their absence.

19       In response, X says the distinction between unilateral refusals to deal and contractual

20    restraints are irrelevant because, as "owner of the platform," X has the "prerogative" to block

21    access "whether through contract terms or technological safeguards." X Br. 7-11. That is a false

22    equivalence. Technological measures are treated differently than contracts by statute and have

23    different *competitive* effects. Some measures – such as log-ins – create legally-enforceable rights

24

25    [3] None of X's cases involve contractual restraints. *See FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th

26    Cir. 2020) (refusal to license rival chip suppliers); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064
(10th Cir. 2013) (refusal to share software code); *Pac. Bell Tel. Co. v. linkLine Commc'ns., Inc.*,

27    555 U.S. 438 (2009) (refusal to offer "service at the wholesale prices"); *FTC v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021) (refusal to offer "API access"); *New York v. Meta Platforms,*

28    *Inc.*, 66 F.4th 288 (D.C. Cir. 2023) (allegations that "Facebook 'cut off' competitors").

independent of contract.  When they do, X may "set the terms by which others use X's platform." *Id.*  But if technological measures do not confer enforceable blocking rights, scrapers are *independent* sources of competition so far as the Sherman Act is concerned.

Here, scrapers have independent rights to scrape the public web.  "Standard Internet Protocols do not require specific consent from the website operators to use automated means to search, access or scrape" the ***public*** portions of X's platform, and no other "federal or state law require[s] that a person obtain such consent." CC ¶ 72.  As such, X is "not *enforcing* pre-existing, independent legal prohibitions," but "attempting to create a *new* legal right to restrain trade through contract." *Id*. ¶ 73.  Indeed, X's reliance on contract shows the contract was intended to create ***incremental*** rights, and, for purposes of this motion, X "accept[s]" the allegation that the Terms "strip[] the public of its right to access and scrape public portions of the web." X Br. 10.

Those incremental rights are subject to Sherman Act scrutiny, as illustrated by *Crowder v. LinkedIn Corp.*, a case X relies on.  There, the court *initially* dismissed a selective "duty to deal" claim alleging that LinkedIn entered into access agreements with "hand-selected partners" while refusing to do so with scrapers.  2023 WL 2405335, *4 (N.D. Cal. 2023).  While X latches onto this decision, it ignores what happened next.  After plaintiffs amended their complaint to allege that the "hand-selected partners" also "*promised* not to compete with LinkedIn," the court allowed the claim to proceed because it alleged the elimination of competition that would have existed "absent the non-compete agreements." 2024 WL 1221956, *2-5 (N.D. Cal. 2024).  This case is on all fours.  Bright Data does not allege a "selective" refusal to deal, but contracts requiring users to "relinquish their right to lawfully access and scrape the public web." CC ¶ 77; *see also Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*, 2023 WL 4562031, *13-15 (S.D.N.Y. 2023) ("Restrictive agreements" to "prevent any competitive uses of [public] CUSIP numbers" raise "antitrust concerns" and "do not fit the mold of a unilateral refusal to deal.").

Put simply, contractual restraints designed to eliminate competition constitute anticompetitive conduct under the Sherman Act, not mere refusals to deal.

**B.    X's Terms Operate As De Facto Exclusive Dealing Provisions that Foreclose Competition From Nearly the Entire Market.**

The Counterclaim alleges that X "enter[ed] into agreements with data scrapers' customers that purport to make X the exclusive source of data published on X's platform." CC ¶¶ 89-90.  In response, X does not deny the Terms' anti-facilitation provision works with the anti-access and scraping provisions to make X the "sole source" of public data posted to X.  *Id*.

Instead, X again insists this is just "a refusal to deal, not a ban on users dealing with competitors altogether." X Br. 11.  But as just discussed, X's *contracts* are not "refusals to deal;" they are exclusionary contracts.  Contracts they may be, X retorts, but they are not "exclusive" because they do not stop users from "dealing with other social-networking services." *Id*.  But total foreclosure is not required.

A "*de facto* exclusive" agreement is unlawful if the "effect of the agreement in the real world" is to "foreclose … a substantial share of the relevant market." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269-71 (3d Cir. 2012); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (substantial foreclosure even where contracts cover less than "40% or 50%" of the market).  Here, because X has 95% share of the relevant data market, its exclusive dealing provisions foreclose "nearly the entire market."  CC ¶ 14.  That the restraints do not extend to competing *platforms* is irrelevant because the competitive harm is in the **data** markets, where the *primary* competitors are data scrapers.  *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005) ("We are convinced that [an alternative distribution channel] is 'viable' only in the sense that it is 'possible,' not that it is practical or feasible in the market as it exists and functions.").[4]

X's reductionist argument misreads *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021), which involved different terms, markets, competitors, and customers.  There, platforms were the *only* competitors in the relevant market.  The challenged policy, however, did not prohibit third-parties from dealing with them; it merely prevented app developers from integrating apps *specifically* designed for Facebook with competing platforms.  They could still recreate the same

---

[4] For the same reason, X's argument – that Bright Data can contract with hundreds of millions of users to recreate their posts for Bright Data, *see* X Br. 11 – is not feasible, realistic, or a defense.

apps for other platforms.  This was not "exclusive dealing" – not because the policy was limited to Facebook *per se* or because the foreclosure was insubstantial – but because the policy did not "*interfere[] with the relationship between rivals and third parties.*"  *Id.* at 28.[5]

Here, X's Terms do just that.  Bright Data alleges – and X does not dispute – that the Terms purport to *categorically* preclude *users* from doing business with scrapers who provide data or scraping services on the X platform.  CC ¶¶ 14, 90.  As Bright Data framed the Counterclaim, the scrapers are the *competitors* in the relevant data markets, and X's users are the *customers*.  As such, unlike in *Facebook*, the Terms interfere with the relationship between rivals and customers. *Simon & Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 915 (N.D. Cal. 2021) ("exclusive dealing involves an agreement … where the buyer agrees to purchase only the seller's product and refrains from doing business with the seller's competition").

### C.    X's Liquidated Penalty Is Exclusionary Because It Interferes with Customer Relationships.

The Counterclaim also alleges that X employs a fraudulent liquidated damages provision to deter customers from doing business with Bright Data, threatening them with a penalty of 1.5 cents per tweet viewed, accessed, or obtained.  CC ¶¶ 83-88.  This is 1,400% higher than the price X charges when it sells the data itself, and the surcharge bears no relation to its actual harm.  *Id.* X does not dispute these facts.

Instead, it argues that contract law provides the sole remedy for anticompetitive restraints. If the provision "is not a reasonable estimate of X's actual damages," X says, "it would mean only that [it] is unenforceable … as a matter of contract, not antitrust law."  X Br. 13.  But unenforceable contracts are not exempt from the antitrust laws.  Every restraint of trade is *both* unenforceable under contract law *and* a violation of the Sherman Act.  *See* Restatement (Second) of Contracts, § 186; 15 U.S.C. § 1.  What triggers the antitrust laws is its anticompetitive effect.  Here, contrary to X's framing, the Counterclaim is not about an isolated skirmish between X and an individual

---

[5] *CoStar Grp, Inc. v. Com. Real Estate Exch. Inc.*, 619 F. Supp. 3d 983, 991 (C.D. Cal. 2022), is inapposite because CoStar refused to make "blocked" data available to "direct competitors."  The analog, here, would be X's prohibitions on logged-in access, which Bright Data does not challenge.

user about whether the provision is a penalty.  It concerns X's widespread use of the provision to interfere with data scrapers' *customer* relationships, eliminate competition from scrapers, and preserve X's data monopoly.  Antitrust law was designed to prevent that evil.[6]

X next argues that the provision isn't anticompetitive because it "applies only to those who 'violate the Terms.'"  X Br. 13.  Even draconian damages provisions, X says, do not create *additional* restraints, they merely enforce existing ones.  But the fact that X calls its provision a "damages" remedy does not immunize it.  Had X styled its 1.5 cents-per-tweet penalty as a "surcharge" for using a competing data scraper, its effect would be the same and clearly subject to challenge.  Nomenclature cannot save it.

More importantly, the fact that the penalty provision works in tandem with the anti-access and scraping provisions is a reason to condemn it, not immunize it.  Where two or more challenged provisions work together, their practical effect must be considered as a whole.  *See Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1303 (9th Cir. 1982) ("Defendants' aggregate pattern of allegedly illegal behavior" must be considered as a whole); *Tele Atlas N.V. v. NAVTEQ Corp.,* 2008 WL 4911230, *2 (N.D. Cal. 2008) (same).  Here, the penalty provision magnifies the anticompetitive effect of the other provisions.

Nor is the *effect* limited to contract violators.  It affects anyone who *conceivably* could be at *risk* of being held liable, even if their conduct is perfectly lawful.  Because of legal uncertainty, customers and scrapers will not *know* if they violated the Terms until after judicial resolution.  Indeed, X only adopted this provision after this Court invalidated its anti-scraping provision and placed its anti-access provision on shaky legal ground.  CC ¶¶ 15-18.  That would normally be expected to open the floodgates to new scraping activity.  But like plugging a dam, the penalty provision stemmed the tide by forcing users into a Hobson's choice—either immediately cease the conduct, or let the meter run and face financial ruin if they turn out to be wrong about their legal rights.  By *threatening* to put users into bankruptcy, X can deter perfectly *lawful* competition

---

[6] *Qualcomm*, 969 F.3d at 994, is inapposite because the court merely noted that the antitrust laws do not provide a supercharged remedy for the defendant's contract breaches.

without having to file suit.  That constitutes marketplace activity.

This is not, as X says, just an incidental byproduct of its efforts "to enforce[] the substantive restrictions imposed by the Terms."  X Br. 13 (citing *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750 (N.D. Cal. 2010)).  X does not assert judicial immunity.  Nor could it.  While adopting contractual provisions precedes courtroom enforcement, it is not *incidental* to it.  Unlike sending a cease-and-desist letter alerting an adversary of a potential legal claim as in *Power Ventures*, the penalty provision purports to create new rights and has independent market effects.

That is not petitioning.  As the Supreme Court explained, where conduct, "*ostensibly* directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor[,] … the application of the Sherman Act would be justified."  *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961).  That fits the facts here to a tee.  X did not adopt the penalty provision "to have courts uphold the fee and to collect on a judgment."  CC ¶ 87.  It wanted a "cudgel … to deter scrapers from continuing to access publicly available information, … irrespective of the enforceability of the provision."  *Id*.  That is not immune.

And even if X's purpose was to shore up its legal standing in court, its *fraudulent* misrepresentations strip it of any possible immunity.  *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1294 (9th Cir. 1984) (bad faith assertion of patent rights violates the Sherman Act); *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir. 1985) (asserting a contract "claim in bad faith … can be a violation of antitrust laws"); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972) ("Misrepresentations … not immunized when used in the adjudicatory process.").

### D.    *X's Deceptive Efforts to Throttle Web Traffic to Competing Platforms Is Exclusionary Conduct, Not a Refusal to Deal with Competitors.*

To monopolize the data markets, X not only needed to control access to its own platform; it needed to choke off scrapers' alternative sources of supply.  It did this by throttling network traffic to competing platforms, introducing extreme latency, and causing users to abandon efforts to establish a presence on those platforms.  "The clear, intended, and foreseeable result was that these platforms and the data scrapers who help them synthesize and distribute the data, all in *direct*

1    competition with X, are deprived of the data needed to do so." CC ¶ 20.

2        X does not challenge the plausibility of these allegations or attempt to justify its conduct.

3    Instead, it again argues, this is just another "lawful refusal[] to deal." X Br. 1. But the "refusal to

4    deal" doctrine does not give X the right to hold users hostage once they visit X's site.

5        X confuses "unilateral" conduct with "refusals to deal." Sure, throttling traffic is

6    "unilateral," which is why Bright Data challenges that conduct under Section 2. But not all

7    unilateral conduct is a refusal to deal. The doctrine only applies to refusals to deal directly with a

8    competitor, in recognition of the "long-recognized right of a trader [to] freely" choose its business

9    partners. *U.S. v. Colgate & Co.*, 250 U.S. 300, 307 (1919). But X is not choosing its business

10   *partners* when users click on links or when it throttles traffic. Internet communications do not

11   involve privity of contract, technical integration, or cooperation between sites.[7]

12        Throttling is intentional interference with *customers'* or *users'* ability to deal with X's

13   competitors. That is governed by a different rule, which subjects *monopolists* to a higher standard

14   than firms who lack such power. Areeda & Hovenkamp, Antitrust Law ¶ 651i (5th ed. 2016)

15   (otherwise lawful conduct may violate "§ 2 when committed by a dominant firm"). Unlike smaller

16   firms, monopolists are prohibited from engaging in conduct "that tends to impair the opportunities

17   of rivals and either does not further competition on the merits or does so in an unnecessarily

18   restrictive way." *Cascade Health Sol. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). This

19   test, rather than the specific refusal to deal test, governs most unilateral conduct cases because

20   "anticompetitive conduct can come in too many forms, and is too dependent upon context, for any

21   court or commentator to ever have enumerated all the varieties." *Conwood Co., L.P. v. U.S.*

22   *Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002).

23

24   [7] Even if the refusal to deal doctrine applied, the right is not unqualified. Under *Aspen Skiing*,
     refusals to deal violate Section 2 if (1) a monopolist "unilaterally terminates a voluntary … course
25   of dealing," (2) its only "purpose is to sacrifice short-term benefits … to obtain higher profits in
     the long run from the exclusion of competition," and (3) the "refusal to deal involves products that
26   the defendant already sells [to] similarly situated customers." *Qualcomm*, 969 F.3d at 993-94.
     Here, all three elements are satisfied. X recently made the change; it sacrifices short term benefits
27   by degrading the user experience for the "sole purpose" of excluding competitors; and it
     discriminates between links to competitive and non-competitive sites. CC ¶¶ 107-111.
28

X does not deny that its conduct would be condemned under this test. Instead, it says the test should not apply because it "need not link to other websites at all." X Br. 9. But whether true or not, that is not what X did. Most likely, it did not do so because *overtly* disabling links would have the opposite of its intended effect—driving users away in droves, rather than the reverse. But regardless of its reasons, it is not the path X chose. And the fact that X could have chosen a different path does not absolve it of liability for what it actually did.

In any event, X distorts the difference between throttling and delinking. When X removes competitive links, it is making a design choice affecting the appearance and features of the site. Not so when X throttles network traffic. That interferes with *users'* ability to traverse the web. By clicking on a link, *users* create a constellation of connections in cyberspace between themselves, the host platform, the target site, and a series of intermediate service providers. When X surreptitiously gums up those connections for anticompetitive purposes, that is not a *refusal* to deal; it is an *affirmative* anticompetitive act.[8]

Nor can X defend its conduct – at least at the motion to dismiss stage – by claiming that it is just making internal server design decisions. Courts may give greater deference to companies' design choices than to their agreements, but "that does not mean that a monopolist's product design decisions are *per se* lawful." *Microsoft*, 253 F.3d at 65 (Section 2 violated by "design[ing] Windows 98 [to] have unpleasant consequences for users" of competing browser); *FTC v. Amazon.com, Inc.*, 2024 WL 4448815, *6 (W.D. Wash. 2024) (design choices, such as "taking away a seller's access to Amazon's Buy Box" or "demoting [competitors] in search results," are subject to Section 2). It may be that X will be able to produce *non-pretextual* evidence of some benefit for selectively throttling web traffic other than its desire to prevent competing sites from attaining viable scale. But that is an affirmative defense, and dismissal will have to wait to see if it can follow through. *Id.*[9] For now, Bright Data properly alleged that X throttled traffic "for the

---

[8] As such, X's delinking cases are inapposite. *Liveuniverse, Inc. v. Myspace, Inc.*, 2007 WL 6865852 (C.D. Cal. 2007); *Kinderstart.com LLC v. Google, Inc.*, 2006 WL 3246596 (N.D. Cal. 2006).

[9] *Compare AliveCor, Inc. v. Apple Inc.*, 592 F. Supp. 3d 904, 911, 919 (N.D. Cal. 2022) (changes to Apple's Smartwatch that "created technical problems" for competing apps "plausibly establish"

1    sole purpose of maintaining its monopoly power." CC ¶¶ 108-109.  That suffices.

2        Moreover, even if the Court disagreed, it could not dismiss these *allegations*.  Bright Data

3    is not bringing a stand-alone claim for throttling.  The allegations form part of an overarching

4    scheme to monopolize the data markets.  The Counterclaim details how throttling inhibits

5    competition from scrapers.  At a minimum, these allegations are evidence of X's motive and the

6    effects of X's scheme.  *Cont'l Ore Co. v. Union Carbide & Carbon Corp*, 370 U.S. 690, 699

7    (1962) ("Plaintiffs should be given the full benefit of their proof without tightly

8    compartmentalizing the various factual components and wiping the slate clean after scrutiny of

9    each."); *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012).

10       **E.    X Has Unlawfully Leveraged Its Monopoly in The User Engagement Market to Monopolize or Attempt to Monopolize the Data Markets.**

11

12       By "requiring registered users to relinquish their right to lawfully access and scrape the

13   *public* web," X has unlawfully leveraged its monopoly power in the upstream platform and user

14   engagement markets to obtain a monopoly in the downstream data markets.  CC ¶¶ 77-79, 125.

15   That constitutes exclusionary conduct.

16       Courts have long recognized the dangers of extending a monopoly to adjacent markets.  As

17   the Supreme Court explained, "if monopoly power can be used to beget monopoly, the Act

18   becomes a feeble instrument indeed."  *U.S. v. Griffith*, 334 U.S. 100, 108 (1948); *Image Tech.*

19   *Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208-12 (9th Cir. 1997) (defendant leveraged

20   monopoly across markets through refusals to deal); *Cost Mgmt. Servs., Inc. v. Washington Nat.*

21   *Gas Co.*, 99 F.3d 937, 952 (9th Cir. 1996) (upholding monopoly leveraging claim); *Dairy, LLC v.*

22   *Milk Moovement, Inc.*, 2023 WL 3437426, *13 (E.D. Cal. 2023) (same).

23       Though courts have scaled back this theory to require that the conduct (i) be exclusionary,

24   and (ii) create at least a "dangerous probability" of attaining monopoly power in the secondary

25   market, "monopoly leveraging … remains a viable theory under Section 2."  *Cost Mgmt.*, 99 F.3d

26   at 951-52.  In its motion, X does not dispute that monopoly leveraging remains a stand-alone theory

27   _____

28   a Section 2 violation), *with* 2024 WL 591864, *15 (N.D. Cal. 2024) (granting summary judgement
     because evidence showed product improvement).

of antitrust liability if there is a "refusal to deal or some other exclusionary practice" used to extend a monopoly from one market to another. X Br. 12 (parentheses omitted).

Instead, X says there has been no exclusionary conduct. But the extraction of an *agreement* not to use a competing service is exclusionary. And even if it were just a refusal to deal – as X spends most of its brief arguing – that suffices. *See Kodak Co.*, 125 F.3d at 1210-12 (defendant improperly leveraged its monopoly across adjacent markets through a unilateral refusal to deal); *Doe v. Abbott Labs.* 571 F.3d 930, 935 (9th Cir. 2009) (*Kodak* properly found liability because it "involved a refusal to deal.").[10] Nor must the refusal independently satisfy *Aspen Skiing*'s changed practices test, as X argues. Such a requirement would read monopoly leveraging claims out of the Sherman Act. It is also inconsistent with swaths of antitrust law involving the linking of two separate markets—input foreclosure, essential facilities, bundling, and tying, are all species of anticompetitive monopoly leveraging, none of which must satisfy *Aspen Skiing* or be independently unlawful to be exclusionary.

The proper test for a monopoly leveraging claim is the general anticompetitive conduct test: whether the conduct tends to "impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade*, 515 F.3d at 894. Here, X's effort to force users to relinquish their right to scrape the *public* web (or purchase pre-scraped data) as a condition of using X's platform for unrelated purposes, or even visiting X.com, satisfies this test at the pleading stage.

## IV.    BRIGHT DATA ALLEGES RELEVANT ANTITRUST MARKETS.

Bright Data alleges four relevant markets: a "Public Square Platform" market, a "Public Square User Engagement market," a "Public Square Data market," and a "Publicly-Available Public Square Data market." CC ¶¶ 112-136. For each, it alleges supporting facts relating to the nature of the market, consumer demand, industry recognition, barriers to entry, and pricing effects. *Id.* In its motion, X attacks the "plausibility" of these markets, without challenging the plausibility

---

[10] The facts of *Abbott* do not support X, since the conduct concerned pricing governed by the Supreme Court's pricing cases. *Abbott*, 571 F.3d at 933 (noting that *Linkline*, not *Kodak*, governs).

of those supporting factual allegations.  In essence, X's argument boils down to its opinion that the markets should be broader and include more competitors.

X's argument has no merit.  Courts have already rejected the contention that X and other social media networks, such as Facebook and Instagram, belong in the same antitrust market.  *FTC v. Meta Platforms, Inc.*, 2024 WL 4772423, *10-17 (D.D.C. 2024).  More generally, X fails to recognize that antitrust markets are based, not on the largest possible market, but the narrowest one in which anticompetitive effects can occur.  *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 26 (D.D.C. 2015) ("market definition is guided by the 'narrowest market' principle"); *FTC v. Tapestry, Inc.*, 2024 WL 4647809, *8 (S.D.N.Y. 2024) (same; collecting cases).  As the Supreme Court explained, "within [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962).

Here, the Counterclaim defines each market under the hypothetical monopolist test and the *Brown Shoe* factors, the two primary methods for defining markets.  *U.S. v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51-52 (D.D.C. 2011) (noting the two methods).  That satisfies Bright Data's pleading obligations.  "An antitrust complaint … survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a ***fatal legal defect***." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) ("defining the relevant market is a factual inquiry"); *Facebook*, 560 F. Supp. 3d at 16 (plaintiff need only allege facts showing that its proposed definition is "theoretically rational.").

***The Downstream Public Square Data Markets***.  X attacks the data markets based on its faulty belief that "data is data:" it is all the same and it is all interchangeable.  But Bright Data alleged that "the data on X is unique, reflecting real-time current events and the cultural zeitgeist of the world as it exists at any point in time."  CC ¶¶ 54, 128-29.  This makes Public Square Data uniquely valuable.

> "As Musk explained, 'what's useful [about X's data] is the fact that it is up to the second.'  It is a multi-lateral conversation, not a one-sided monologue.  The bi-lateral, or multi-lateral, nature of this information makes it particularly valuable for certain end-use data applications, such as chat-bots.  Chat bots are designed to mimic real conversations, so they need to be trained on real conversations, the type

that occurs on Public Square Platforms, but not other social media websites." *Id*.

X does not deny this. Nor does X support its *assumption* that all data is fungible. That obviously

is not true. A Facebook page sharing photos from a family reunion is certainly not the same as up-

to-the minute posts on X from celebrities, politicians, and reporters about world events. As the

Counterclaim alleges, there is distinct demand for such data, and no reasonable substitutes for it,

which has allowed X to raise prices above competitive levels. *Id.* ¶¶ 6, 124, 134, 141.[11]

Nor is there merit to X's alternative argument that the market should include Google

because since it scrapes X, scrapers could get the data second-hand from Google.com. X Br. 20-

21. But X confuses market power with market definition. Product definition focuses on the nature

of the product, not the identity of the competitors. If it turns out that Google actually sells second-

hand public square data, then perhaps those sales should be included in the market share

calculations. But X points to no facts demonstrating that Google does this, and even if it did, it

would not change the definition of the market. X Br. 21.[12]

**The Upstream Public Square User Engagement Market**. Bright Data alleged a distinct

market for public square user engagement, where users and visitors of public square platforms turn

to "for real-time public discourse about current events." CC ¶¶ 125-127. This "is an input market"

because "Public Square Platforms compete for user engagement, which they then seek to

monetize." *Id*. In a footnote, X challenges this market definition as "unclear." X Br. 19 n.13. But

the market does not become unclear just because a plaintiff alleges the features of the product that

make it unique. Bright Data identified the specific competitors and products in the market, and

---

[11] Bright Data's allegations are a far cry from the allegations in *hiQ*, where the market allegations were "vague," making it "not clear what substitutes" were included or excluded from plaintiff's market definition of a "people analytics market." *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1148-49 (N.D. Cal. 2020); *cf.* CC ¶¶ 131-32 (explaining why "social media," "search engines," and "messaging apps" are not substitutable). Moreover, in *hiQ*, the alleged data market included just a single supplier: LinkedIn. Here, the data markets include all public square data, including data posted on X, Threads, BlueSky, Mastodon, and Truth Social. CC ¶ 139.

[12] X's footnote attack on the Publicly-Available Public Square Data market is unavailing. Bright Data specifically alleged that the most valuable public square data is publicly available, and so, a hypothetical monopolist of it could profitably raise prices for it. CC ¶ 136.

1    explained how the market satisfies the *Brown Shoe* factors.  CC ¶¶ 115-118, 125-137, 139.  That

2    suffices at the pleading stage.

3         ***The Public Square Platform Market***.  Bright Data also alleges a public square platform

4    market, with upstream user engagement and downstream data sides.  Adding economic rigor to

5    X's self-description as a "multi-sided" platform, the Counterclaim describes how consumers,

6    advertisers, and data customers interact with the platform; how it is protected by network effects;

7    and why other platforms are no substitute.  CC ¶¶ 113-124.  This is the type of evidence the

8    *Facebook* court relied on to place X and Facebook in different markets.  560 F. Supp. 3d at 16-17.

9         X says this market is implausible, relying on *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th

10   Cir. 2018).  But *Hicks* involved a very different market.  There, caddies complained that they could

11   not display their own sponsors on their uniforms at golf games, and tried to limit the market to

12   advertising at such events.  But they offered no supporting facts and ignored obvious sponsorship

13   channels.  Here, the Counterclaim does not ignore other internet platforms.  It details how

14   customers and competitors perceived the market and how they behaved.  X may not agree with

15   Bright Data's definition, and perhaps someday it will present some contrary evidence.  But the fact

16   that X views the market differently does not mean Bright Data's definition suffers a fatal defect.

17        X also challenges the platform market's geographic scope, identifying a single Chinese

18   competitor.  X Br. 19.  But that has nothing to do with Bright Data's alleged United States market,

19   for which X has no criticisms.  And, whether a Chinese language competitor must be included in

20   the global market (a question of market power, not definition) will depend on what discovery

21   shows about its competitive significance.  That issue cannot be resolved on a motion to dismiss.

22   **V.    BRIGHT DATA ALLEGES MARKET POWER.**

23        X does not dispute its market power in the Public Square Platform Market or the

24   Engagement Market, nor can it.  X Br. 17-19; CC ¶¶ 138-140 (allegations of 95% market share

25   based on Daily Active Users).  As to the data markets, the Counterclaim provides a reasonable

26   estimate of X's approximate market share.  CC ¶¶ 89-91, 95-96, 128-136.  Bright Data also alleges

27

28

direct evidence of market power, including X's successful efforts to raise prices as a direct result of its exclusionary conduct. *Id.* ¶¶ 134, 141.[13]

In response, X challenges Bright Data's market share metrics. But its attack confuses a Motion to Dismiss with a *Daubert* motion. At this stage, Bright Data's market share estimates are plausible, since they are based on actual data and a rational explanation of why the statistics relating to upstream user engagement are closely correlated with the associated downstream data markets. *Id.* ¶¶ 138-140; *cf. Meta Platforms*, 2024 WL 4772423, at *19 (DAUs are an appropriate indicator of market share). While X may not agree, that dispute must await further factual development. For now, it is enough that Bright Data plausibly alleges both direct and circumstantial evidence of market power, and that it did not ignore obvious alternatives.[14]

X's attack on Bright Data's direct evidence allegations are similarly misplaced. X first says that not all price increases are anticompetitive. That may be true, but it does not mean that none are. Bright Data alleged facts explaining how the conduct had the requisite anticompetitive effect, and how price increases would not have occurred absent X's attainment of monopoly power and exclusion of data competitors. CC ¶¶ 2, 78. X next says direct proof of monopoly power requires evidence of increases above other *competitors'* prices. But that cannot be the rule since it would imply that 100% monopolists (who do not have competitors) lack monopoly power. In any event, Bright Data alleged that X's scheme allowed it to raise prices above what other "news and data organizations charge for their data." *Id.* ¶¶ 134. That suffices.[15]

---

[13] X relies on an initial decision in *FTC v. Facebook, Inc.* finding an "offhand[]" reference to percent of "daily users" insufficient. X Br. 22 (citing 560 F. Supp. 3d 1, 19 (D.D.C. 2021)). The FTC cured the deficiency by doing what Bright Data does: alleging specific "market share[s] of daily average users" based on published data. 581 F. Supp. 3d 34, 46 (D.D.C. 2022).

[14] None of X's cases contain allegations as detailed as the Counterclaim. *See Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008) ("no specific allegations [of] market power"); *Dominick v. Collectors Universe, Inc.*, 2012 WL 4513548, *7 (C.D. Cal. 2012) (failing to allege that "Defendants control a substantial share of the market"); *Dream Big Media Inc. v. Alphabet Inc.*, 2022 WL 16579322, *5 (N.D. Cal. 2022) (secondary market was "undefined"); *Facebook*, 560 F. Supp. 3d at 18 (no "estimated actual figure").

[15] X's cases are inapposite because they do not involve elevated prices, increases tied to the conduct, or higher prices compared to benchmarks. *See Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, 2022 WL 2791201, *7 (E.D. Cal. 2022) (no allegation that defendant actually charged "higher

1    **VI.    BRIGHT DATA ALLEGES ANTITRUST INJURY AND STANDING.**

2        The Counterclaim details how X's conduct caused Bright Data to suffer actual and

3    threatened antitrust injury.  CC ¶¶ 20-21, 67, 97, 133, 142-46.  As a direct competitor in the data

4    markets, Bright Data has been foreclosed, or is threatened with foreclosure, from those markets.

5    Bright Data also alleged injury as a customer in those markets.  In the platform market, Bright

6    Data alleged injuries inextricably intertwined with X's ability to obtain monopoly power.

7        In response, X tries to divide and conquer, treating Bright Data's claims market-by-market.

8    But just as liability allegations should not be "tightly compartmentaliz[ed]," neither should the

9    injury allegations.  *Cont'l Ore*, 370 U.S. at 699.  Bright Data does not need to show that it suffered

10   antitrust injury from every overt act in furtherance of X's scheme or in every market impacted by

11   it.  It is enough that Bright Data suffered some antitrust injury and has standing to pursue a remedy

12   for it.  The scope of that remedy must await another day.  But even if the Court deconstructs Bright

13   Data's injury allegations by market, X's challenge still fails.

14       ***Bright Data Has Standing in the Data Markets***.  X does not claim Bright Data's injuries

15   are too remote to satisfy the *AGC* factors.  *Assoc. Gen. Contractors, Inc. v. Cal. State Council of*

16   *Carpenters*, 459 U.S. 519 (1983).  Nor can it since Bright Data is a direct competitor and a target

17   of X's conduct.  Instead, X attacks the antitrust injury requirement, because, X says, Bright Data

18   supposedly *benefits* from X's exclusionary conduct.  X Br. 20.  It does not.

19       X grounds its argument on the view that Bright Data is not bound by the Terms, and thus

20   is "now the only scraper in the market able to operate in violation of X's Terms."  *Id*.  "If true,"

21   the argument goes, X's exclusionary conduct "would *improve* Bright Data's position by

22   obstructing other scrapers form competing with it."  *Id*.  Though perhaps creative, it twice fails.

23   *First*, X does not contest Bright Data's antitrust injury or standing as competitor and customer if

24   the Terms apply.  Since X's affirmative claims seek to bind Bright Data to the Terms, unless X is

25   abandoning those claims, the existence of that case or controversy establishes *threatened* antitrust

26

27   ───────────────
     dollar amount[s] … post-acquisition."); *Dominick*, 2012 WL 4513548, at *7 (no allegation of

28   higher prices relative to competitors).

injury. *Second*, even if Bright Data were the "only data scraper able" to compete against X, it still suffers antitrust injury because the Terms interfere with Bright Data's customer base. CC ¶ 14 ("X's Terms … prevent millions of people and businesses not just from accessing or scraping X's platform, but from doing business with X's competitors…."). Bright Data's challenge to X's anti-facilitation provision, *de facto* exclusivity, and liquidated penalty provisions – and its monopoly leveraging and throttling claims – do not depend on Bright Data being bound by the Terms.

In response, X argues that "Bright Data fail[ed] to allege that the Terms constrict those who merely buy data from Bright Data." X Br. 20. But Bright Data alleges that X "relies on its anti-facilitation provision to contractually prevent customers from *purchasing* scraped datasets from anyone, making X the sole source of such data." CC ¶ 95. X does nothing to disabuse the notion. X's interference is not limited to customers who buy pre-scraped data but extends to customers using Bright Data's proxy network and scraping tools. X does not dispute that Bright Data's harm flows from such restraints.

Nor is there merit to X's argument that Bright Data alleges "no concrete facts" that the Terms have "actually affected its customer base in any *measurable* way." X Br. 20. X's argument rests on the faulty premise that customers ignore its Terms, and so, in the but-for world, Bright Data would not have any additional customers. That is a factual question, and, in any event, would only relate to the amount of damages, not the availability of injunctive relief to prevent ongoing or future customer interference.

**Bright Data Has Standing in the Platform Market**. X limits its attack on platform market standing to remoteness. But remoteness considerations do not apply to Bright Data's request for injunctive relief, since the "standing requirements of section 16 [of the Clayton Act] are broader than those of section 4." *Parks v. Watson*, 716 F.2d 646, 662 (9th Cir. 1983). Factors such as the injury's directness, speculative nature, duplication, and apportionment do not apply to injunctive claims. *Sidibe v. Sutter Health*, 2013 WL 2422752, *11 (N.D. Cal. 2013). Instead, Bright Data only needs to show "*threatened* loss or injury … *proximately* resulting from the alleged antitrust violation." *Parks*, 716 F.2d at 662. It has done so.

X further limits its standing challenge to the throttling allegations.  X Br. 17.  But this ignores the bulk of the Counterclaim, which focuses on how X's Terms eliminate competition from scrapers.  This alone warrants rejection of X's standing challenge.

Even as to the throttling allegations, X focuses on the wrong side of the market.[16]  X says Bright Data lacks standing because it does not "seek out a public forum for engaging in conversation and exchang[ing] thoughts."  X Br. 16.  But this relates to the upstream user engagement market, not the downstream data side where the money is made.  Bright Data's downstream injuries suffice to establish antitrust standing as a foreclosed competitor because the injury is "inextricably intertwined with X's ability to acquire or maintain monopoly power in that market."  CC ¶ 146; *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 483-84 (1982) (standing satisfied where injury was "inextricably intertwined" with the success of the scheme); *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1275 (9th Cir. 2022) (same).

Nor can X defeat standing just because Bright Data does not own a platform.  A foreclosed competitor need not replicate the defendant's offering feature-by-feature.  It is enough that the foreclosed competitor has the "actual or potential ability to deprive [the defendant] of significant levels of business."  *Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*, 951 F.2d 1158, 1162 (9th Cir. 1991).  Nothing about a "platform" market changes this.  There may be some markets where *only* platforms can deprive other platforms of sales, but this is not one of them.  As Bright Data alleges, the platform market "is not a two-sided transaction market," and so, it "operates more like a traditional market with inputs and outputs."  CC ¶ 114.  Because X monetizes the platform market via the downstream data markets, where Bright Data is a direct competitor, it is directly foreclosed.  Indeed, data scrapers are the competitors *most* directly injured by the Terms' restraints on data scraping.

---

[16] X says that throttling has only a small effect on a competing platform's viability, and that "even were they to expand their scale," there is no evidence they would "allow Bright Data to scrape [them]."  X Br. 17.  These are factual questions that contradict the Counterclaim's well-pled allegations, which establishes that throttling has a significant effect, and limits the amounts of public information available for scraping.  CC ¶¶ 107-111.

1

## VII.    BRIGHT DATA'S NON-SHERMAN ACT CLAIMS ARE WELL-PLED.

2

### A.    Bright Data States Claims under State Antitrust Laws.

3

X concedes that the state antitrust claims "impose the same requirements" as the federal claims.  X Br. 23.  So, they will survive if the federal claims do.  But the California and Nevada claims can also survive even if the Sherman Act claims are dismissed for lack of standing, since both allow indirect purchasers' suits.  *Union Carbide v. Superior Court*, 36 Cal.3d 15, 20 (1984); *Pooler v. R.J. Reynolds Tobacco Co.*, 2001 WL 403167, *1 (Dist. Ct. Nev. 2001).

8

### B.    Bright Data States a UCL Claim.

9

X argues that the "unlawful" prong of the UCL claim "rises and falls with Bright Data's other counterclaims."  X Br. 23.  That is incorrect because Bright Data also alleges that X's conduct violates the FTC Act, even though Bright Data lacks an independent claim under that Act.  *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659, 681 (2006) ("Virtually any law or regulation … can serve as a predicate for a [UCL] 'unlawful' violation.").  Because the FTC Act is broader than the Sherman Act and reaches conduct that violates the spirit of antitrust law, a claim under the "unlawful" prong survives even if the Court finds X's conduct constitutes an otherwise lawful "refusal to deal."  *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972); *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454-55 (1986).

X is also wrong that the UCL's "unfair" competition prong "fails with [the] other claims."  X Br. 24.  The "unfair prong is intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023) (finding UCL liability where there was none under federal antitrust law).  In *Epic*, the court held that a plaintiff need not even allege a relevant market, even where market definition was an indispensable element of a parallel federal antitrust claim.  Similarly, in *Cel-Tech*, the California Supreme Court held that, a UCL "unfairness" claim need only be "tethered" to some "***incipient*** violation of the antitrust laws" or conduct that "violates the ***policy*** or ***spirit*** of … those laws because its effects are comparable."  *Cel-Tech Commc'ns., Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163,

186-87 (1999).  There, the defendant attempted to leverage its monopoly in cellular services to "threaten the ability of [another] company … to compete" in the adjacent telephone *equipment* market.  *Id.* at 189-90.  Such leveraging, the court held, could constitute "unfair" competition, even though the mechanism – below-cost pricing – would not state an antitrust claim absent recoupment of losses.  *Id.*; *see also hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1117 (N.D. Cal. 2017) (granting preliminary injunction where LinkedIn was "unfairly leveraging its power" in one market to secure a competitive advantage in another market because the UCL is "not limited to actual antitrust violations"), *aff'd*, 31 F.4th 1180 (9th Cir. 2022).  As these cases demonstrate, X's arguments about standing, refusals to deal, monopoly leveraging, and market definition do not apply to, and cannot preclude, Bright Data's UCL counterclaim.

As to the "fraudulent" prong, X repeats the argument that its liquidated damages provision is a matter solely for contract law.  But even if the provision is unenforceable as a matter of contract law, that does not mean its anticompetitive effects are immune from challenge under the UCL.  X's only argument is that the "damages" amount is so ridiculous that it is not "likely to deceive members of the public," and so, would have no effect.  X Br. 24.  That is no defense, but even if it were, it is inappropriate for a motion to dismiss.  *See Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 975-76 (1997) (fraudulently induced arbitration provision can be challenged under the UCL's "unfair competition" prong).

There is also no merit to X's argument that Bright Data failed to allege fraudulent *conduct* in connection with X's secret throttling.  X does not deny that Bright Data's *allegations* of such conduct were pled with particularity.  Instead, it says that there is no affirmative *verbal* or *written* misrepresentation accompanying the deceptive throttling.  But, unlike common law fraud, the UCL only requires conduct that is "likely to deceive" members of the public, which is "evaluated from the vantage of a reasonable consumer."  *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1170 (2000) ("Allegations that [defendant] confuses and misleads customers" sufficient).  This too is a fact question.  Here, X's throttling limited informed choice by dissuading potential users from switching platforms by

1    providing an artificially worse user experience.  CC ¶¶ 107-108.  The fact that X hides its throttling

2    is a reason to find liability, not a basis to escape it.  *In re Soc. Media Adolescent Addiction/Pers.*

3    *Inj. Prods. Liab. Litig.*, 2024 WL 4532937, *26 (N.D. Cal. 2024) (Meta's failure to enforce under-

4    13 policy constitutes UCL deceptive conduct); *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal.

5    App. 4th 1235, 1255-57 (2009) (undisclosed degradation of phone network was deceptive).

6        Nor is there merit to X's standing arguments, since Bright Data has clearly alleged that

7    *users* are deceived by X's deceptive conduct, and that Bright Data was proximately injured by the

8    effects of such deception, even if Bright Data did not itself rely upon the omission.  *Yelp, Inc. v.*

9    *ReviewVio, Inc.*, 2024 WL 2883668, *9 (N.D. Cal. 2024) (Alsup, J.) ("reliance can be a third

10   party's, at least when the third party is plaintiff's potential customer.").

###    *C.    Bright Data States a Claim for Tortious Interference.*

12       Bright Data sufficiently alleges that X tortiously interfered with its "existing and

13   prospective economic relationship with customers interested in accessing, scraping, or purchasing

14   publicly-available data hosted on the X platform."  CC ¶ 218; *Korea Supply Co. v. Lockheed*

15   *Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (listing elements).  In response, X argues that Bright

16   Data failed to allege that X's conduct is independently unlawful.  The seven counts preceding the

17   tortious interference count prove otherwise, and the allegations of deception, fraud, and

18   unconscionability are clearly tortious.  Nor is there merit to X's argument that Bright Data did not

19   identify the "third party group" with whom X interfered.  The Counterclaim identified tortious

20   conduct aimed at users bound to the Terms, and injury to Bright Data from the deterred subset of

21   customers "interested in accessing, scraping, or purchasing publicly-available data hosted on the

22   X platform."  CC ¶¶ 218-220.  That is enough.  As X concedes, at "the pleading stage, the central

23   inquiry … is 'not whether the pleading specifically identifies the third parties, but whether it

24   sufficiently indicates the contractual rights that are at issue.'"  ECF 48 at 20.

## VIII.    CONCLUSION.

26       For the foregoing reasons, the Court should deny X's motion.

Dated: February 4, 2025

Respectfully submitted,

*/s/ Colin Kass*

Colin Kass*
Erica T. Jones*
Proskauer Rose LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com
ejones@proskauer.com

David A. Munkittrick*
Reut N. Samuels*
Timothy E. Burroughs*
Michael R. Clifford Beckwith*
Peter C. Angelica*
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com
rsamuels@proskauer.com
tburroughs@proskauer.com
mbeckwith@proskauer.com
pangelica@proskauer.com

Sehreen Ladak (Bar No. 307895)
Briana Seyarto Flores (Bar No. 342002)
Proskauer Rose LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
(310) 284-5652
sladak@proskauer.com
bseyartoflores@proskauer.com

Robert C. Goodman (Bar No. 111554)
Lauren Kramer Sujeeth (Bar No. 259821)
Rogers Joseph O'Donnell, PC
311 California Street, 10th Floor
San Francisco, CA 94104
(415) 956-2828
rgoodman@rjo.com
lsujeeth@rjo.com

*Attorneys for Defendant Bright Data, Ltd.*
*\*Admitted pro hac vice*