JOSHUA D. BRANSON*
jbranson@kellogghansen.com
ANDREW C. SHEN*
ashen@kellogghansen.com
DANIEL V. DORRIS*
ddorris@kellogghansen.com
MATTHEW D. READE*
mreade@kellogghansen.com
TIBERIUS T. DAVIS*
tdavis@kellogghansen.com
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
* Admitted Pro Hac Vice

ADRIAN SAWYER, State Bar No. 203712
sawyer@sawyerlabar.com
SAWYER & LABAR LLP
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: (415) 262-3820

Counsel for Plaintiff
X Corp.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X CORP., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>BRIGHT DATA LTD., an Israeli corporation,<br><br>Defendant. | Case No. 3:23-cv-03698-WHA<br><br>**PLAINTIFF X CORP.'S REPLY IN SUPPORT OF MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS**<br><br>Judge:    Hon. William H. Alsup<br>Date:    March 13, 2025<br>Time:    8:00 a.m.<br>Crtrm:    12, 19th Floor |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

I.     Bright Data Fails To Plead Any Plausible Sherman Act Claim (Counts I-III)...................2

     A.     Bright Data Fails To Allege Anticompetitive Conduct ........................................2

           1.     Contracts are not immune from duty-to-deal doctrine..............................2

           2.     Bright Data's other efforts to repackage its duty-to-deal theory fail ..........8

           3.     The alleged hyperlink "throttling" is not anticompetitive ..........................9

     B.     Bright Data Fails To Plead a Viable Market or Market Power............................11

     C.     Bright Data Lacks Antitrust Standing In The Platform Markets ..........................12

II.     The Other Claims Fail for the Same Reasons (Counts IV-VIII) .......................................14

CONCLUSION.......................................................................................................................15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016) ...................................................................3

*Aluminum Warehousing Antitrust Litig.*, *In re*,
   833 F.3d 151 (2d Cir. 2016)...............................................................13, 14

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
   190 F.3d 1051 (9th Cir. 1999) ..............................................................13

*Arcell v. Google LLC*,
   2025 WL 210877 (N.D. Cal. Jan. 16, 2025) ........................................12

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985)...........................................................................9, 10

*Beverage v. Apple, Inc.*,
   320 Cal. Rptr. 3d 427 (Ct. App. 2024)...................................................14

*Cargill, Inc. v. Monfort of Colo., Inc.*,
   479 U.S. 104 (1986)...............................................................................13

*CBC Cos. v. Equifax, Inc.*,
   561 F.3d 569 (6th Cir. 2009) ............................................................2-4, 8

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   973 P.2d 527 (Cal. 1999) .......................................................................14

*Coronavirus Rep. v. Apple Inc.*,
   2021 WL 5936910 (N.D. Cal. Nov. 30, 2021),
   *aff'd*, 85 F.4th 948 (9th Cir. 2023)......................................................11

*Coronavirus Rep. v. Apple Inc.*,
   85 F.4th 948 (9th Cir. 2023) .................................................................11

*CoStar Grp., Inc. v. Commercial Real Est. Exch. Inc.*,
   619 F. Supp. 3d 983 (C.D. Cal. 2022) ...............................................2-4, 7

*Crowder v. LinkedIn Corp.*,
   2023 WL 2405335 (N.D. Cal. Mar. 8, 2023) ("*Crowder I*") .................3-5, 7, 8

*Crowder v. LinkedIn Corp.*,
   2024 WL 1221956 (N.D. Cal. Mar. 21, 2024) ("*Crowder II*") ............................5

*Dinosaur Financial Group LLC v. S&P Global, Inc.*,
   2023 WL 4562031 (S.D.N.Y. July 14, 2023) ...................................................................6

*Doe v. Abbott Laboratories*,
   571 F.3d 930 (9th Cir. 2009) ....................................................................................8, 9

*Dominick v. Collectors Universe, Inc.*,
   2012 WL 4513548 (C.D. Cal. Oct. 1, 2012) ...............................................................12

*Dynamic Random Access Memory (Dram) Antitrust Litig., In re*,
   516 F. Supp. 2d 1072 (N.D. Cal. 2007),
   *aff'd*, 31 F.4th 1180 (9th Cir. 2022) ...........................................................................14

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) .......................................................................................15

*Estate ex rel. Saunders v. Comm'r*,
   745 F.3d 953 (9th Cir. 2014) .......................................................................................10

*Facebook, Inc. v. Brandtotal Ltd.*,
   2021 WL 2354751 (N.D. Cal. June 9, 2021) ...............................................................14

*Facebook, Inc. v. Power Ventures, Inc.*,
   2010 WL 3291750 (N.D. Cal. July 20, 2010) ................................................................3

*Feitelson v. Google Inc.*,
   80 F. Supp. 3d 1019 (N.D. Cal. 2015) ..................................................................13, 14

*FTC v. Amazon.com, Inc.*,
   2024 WL 4448815 (W.D. Wash. Sept. 30, 2024) ..........................................................10

*FTC v. Facebook, Inc.*,
   560 F. Supp. 3d 1 (D.D.C. 2021) ("*Facebook I*") ...................................................6, 12

*FTC v. Meta Platforms, Inc.*,
   2024 WL 4772423 (D.D.C. 2024) ("*Meta II*")............................................................11

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ...............................................................................6, 9, 12

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   273 F. Supp. 3d 1099 (N.D. Cal. 2017),
   *aff'd*, 31 F.4th 1180 (9th Cir. 2022)............................................................................14

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   485 F. Supp. 3d 1137 (N.D. Cal. 2020) ...............................................................3, 8, 15

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   639 F. Supp. 3d 944 (N.D. Cal. 2022) ........................................................................15

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ........................................................................9

*Intel Corp. v. Fortress Inv. Grp. LLC*,
    2020 WL 6390499 (N.D. Cal. July 15, 2020) ................................................13

*Kinderstart.com LLC v. Google, Inc.*,
    2006 WL 3246596 (N.D. Cal. July 13, 2006) ................................................10

*Klein v. Facebook, Inc.*,
    580 F. Supp. 3d 743 (N.D. Cal. 2022) ..........................................................11

*LiveUniverse, Inc. v. MySpace, Inc.*,
    304 F. App'x 554 (9th Cir. 2008) ..................................................................10

*MGM Studios Inc. v. Grokster, Ltd.*,
    269 F. Supp. 2d 1213 (C.D. Cal. 2003) .........................................................14

*Miller v. Yokohama Tire Corp.*,
    358 F.3d 616 (9th Cir. 2004) ........................................................................15

*Morgan v. AT&T Wireless Servs., Inc.*,
    99 Cal. Rptr. 3d 768 (Ct. App. 2009)............................................................15

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
    2022 WL 2791201 (E.D. Cal. July 15, 2022) ................................................12

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021) ("*Facebook II*"),
    *aff'd sub nom. New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) .......................................................................10

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) ("*Meta I*")................................................7, 10

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ..................................................................4, 6

*O'Donnell v. Bank of Am., Nat'l Ass'n*,
    504 F. App'x 566 (9th Cir. 2013) ..................................................................14

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)............................................................................... 2-4, 10

*Sabol v. PayPal Holdings, Inc.*,
    2024 WL 3924686 (N.D. Cal. Aug. 23, 2024) ..............................................14

*Sambreel Holdings LLC v. Facebook, Inc.*,
    906 F. Supp. 2d 1070 (S.D. Cal. 2012)..................................................3, 5, 6, 8

*Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., In re*,
    2024 WL 4532937 (N.D. Cal. Oct. 15, 2024)..................................................15

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ........................................................7, 13

*Synopsys, Inc. v. ATopTech, Inc.*,
    2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) ..................................................13

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ....................................................9, 10

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..................................................2, 3, 6, 8, 9, 14

*Yelp, Inc. v. ReviewVio, Inc.*,
    2024 WL 2883668 (N.D. Cal. June 6, 2024) ..................................................15

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)..................................................9

*49er Chevrolet, Inc. v. General Motors Corp.*,
    803 F.2d 1463 (9th Cir. 1986) ....................................................2

**STATUTES AND RULES**

Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* ....................................................8

Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*: ..................................................1-3, 14

    § 1, 15 U.S.C. § 1....................................................2, 3

    § 2, 15 U.S.C. § 2..................................................2, 3, 9

Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.* ....................................................14

Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*..........................................14, 15

**OTHER MATERIALS**

CREXi's Opp. to CoStar's MTD CREXi's Counterclaims,
    *CoStar Grp., Inc. v. Commercial Real Est. Exch. Inc.*,
    No. 2:20-cv-08819-CBM-AS (C.D. Cal. Sept. 13, 2021), Dkt. 86....................................................4

Plf.'s Opp. to LinkedIn Corp.'s MTD,
  *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 3:17-cv-03301-EMC
  (N.D. Cal. June 12, 2020), Dkt. 142 ...................................................................4

Plf.'s Opp. to MTD, *Sambreel Holdings LLC v. Facebook, Inc.*,
  No. 3:12-cv-00668-CAB-KSC (S.D. Cal. June 8, 2012), Dkt. 34 .......................................4

**INTRODUCTION**

The antitrust laws do not require X to share with data scrapers. Quite the opposite: X has the right, like any company, to exclude rivals from its platform. That simple principle disposes of every counterclaim. As X showed, Dkt. 165 ("Mot."), all Bright Data alleges is X's lawful refusal to deal with scrapers exploiting its platform. That is why so many courts have dismissed antitrust claims just like these. And it is why Bright Data's opposition cites no case blessing such a claim.

In response, Bright Data offers semantics. It pretends this case is not about a "refusal to deal" because it involves "[r]estrictive contracts." Dkt. 184 ("Opp.") at 1. But many other antitrust plaintiffs have said the same thing. In fact, the plaintiffs in the other scraping cases made that very "contract" argument, often using nearly identical words. Yet courts repeatedly dismissed their claims anyway. This Court should, too. Put simply, there is nothing talismanic about a contract. What matters is the contract's function, and X's Terms here merely implement its lawful decision to bar scraping on its own platform. Contract or not, that is a lawful refusal to deal.

Any other rule would thwart the principles that the refusal-to-deal doctrine embodies. The Supreme Court adopted that doctrine to stop freeriding, and the freeriding here is glaring. X is the one that created the platform, attracted the users, stimulated the engagement, and centralized the valuable content that resulted. Bright Data did none of that. Yet it seeks the benefits: to reap the spoils of X's platform without the burdens of creating anything new. Refusal-to-deal doctrine exists to protect companies like X from such freeloading. Indeed, for all Bright Data's rhetoric about "competition," it does nothing to truly *compete* with X. All it does is break into X's systems and siphon away and sell the content X worked so hard to attract. That is the opposite of competition. Using antitrust law to shelter it would turn the Sherman Act on its head.

Bright Data's other arguments fare no better. Bright Data does not participate in the Platform markets, so it lacks standing to challenge the "throttling" practices in those markets. Its arbitrary market definitions gloss over obvious competitors. And its market-power theory never explains how daily active *users* plausibly measure power over *data*. The sole metric it cites excludes scrapers altogether, even though Bright Data describes them as X's biggest competitors. These flaws doom the antitrust and non-antitrust claims alike. They all should be dismissed.

## ARGUMENT

**I.    Bright Data Fails To Plead Any Plausible Sherman Act Claim (Counts I-III)**

    **A.    Bright Data Fails To Allege Anticompetitive Conduct**

Bright Data pleads no anticompetitive conduct because it alleges only X's lawful refusal to deal with data scrapers. As X has shown (at 5-15), the Sherman Act allows even monopolists to bar would-be rivals from dealing with them. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408-11 (2004). Bright Data therefore fails to state a claim. It says X's Terms are anticompetitive because they prohibit scrapers from crawling and siphoning away data from X's own platform. Dkt. 158 ("CC"), ¶¶ 70-97, 153, 162, 171. But X has an antitrust right to set the "prices, terms, and conditions" on which others may access that platform. *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). Bright Data's claims flout that principle.

Unable to escape *Trinko*, Bright Data tries to repackage its refusal-to-deal theory as something else. According to Bright Data (at 5), its allegations show not a "refusal to deal" but an "*affirmative* act to restrain trade through *contract*." Virtually every antitrust plaintiff with a flawed duty-to-deal theory says the same thing. Bright Data's reframing is no more persuasive.

    **1.    Contracts are not immune from duty-to-deal doctrine**

    **a.**    Bright Data's antitrust claims, as its brief frames them (at 5-7), rise and fall with its § 1 theory of "contractual restraints." Indeed, it all but abandons its § 2 claims (CC ¶¶ 158-75) about X's measures to stop scraping. For good reason: those claims run headlong into the principle that purported monopolists have a "long recognized right" under § 2 to "exercise [their] own independent discretion as to parties with whom [they] will deal." *Trinko*, 540 U.S. at 408. Bright Data says (at 1-2, 5-9) § 1 claims are different, but they are not. Refusal-to-deal doctrine is not so limited.

In the absence of some horizontal conspiracy (which Bright Does not allege), refusal-to-deal principles apply equally to § 1 claims. *See 49er Chevrolet, Inc. v. General Motors Corp.*, 803 F.2d 1463, 1468 (9th Cir. 1986) ("Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business"); *CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 572-73 (6th Cir. 2009) (applying *Trinko* to dismiss § 1 claim attacking "unilaterally imposed contractual restrictions"); *CoStar Grp., Inc. v.*

2

*Commercial Real Est. Exch. Inc.*, 619 F. Supp. 3d 983, 989-90 (C.D. Cal. 2022) (using "single analysis" to dismiss "Section 1" claim alongside "Section 2" claim under *Trinko*). That is because "[c]ontracts, *simpliciter*, are not illegal under the Sherman Act." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016). What matters is a contract's substance, and X's contracts here merely implement its lawful right to restrict use of its own platform. Mot. at 6-12.

Companies often use contracts to "choose" the "prices, terms, and conditions" on which they deal. *linkLine*, 555 U.S. at 448. In *CBC*, for example, a seller of credit data "demanded" that a reseller "sign an agreement" governing its data access, which the reseller attacked as a "contractual restriction[]" that "impair[ed] resellers' ability to compete." 561 F.3d at 571, 573. The Sixth Circuit held that *Trinko* foreclosed that challenge. *Id.* at 571-73. In *Aerotec*, a repair company similarly challenged a manufacturer's "business terms" for the sale of parts – memorialized in "spot contracts" the repair company was forced to sign – as a scheme to "squash independent firms" and funnel repair business to the manufacturer's affiliates. 836 F.3d at 1176, 1183. The Ninth Circuit rejected that challenge under *Trinko*, too. *Id.* at 1183-86. In both cases, the contracts simply memorialized the alleged monopolist's "independent decision" to dictate its "terms of dealing." *Id.* at 1184.

That principle dooms Bright Data's contract theory. X's opening brief cited (at 8-9 & n.5) a slew of cases applying *Trinko* to similar contract restrictions imposed by other platforms. Bright Data has no answer to those cases, so it pretends (at 5 & n.2) they involved only "technical measures" to block scraping. In fact, virtually all involved contracts.[1] *CoStar* is illustrative. A website operator imposed "contractual provisions" that barred competitors from "accessing public [real-estate] information on CoStar's own website." 619 F. Supp. 3d at 990. Like Bright Data here, a would-be rival challenged those "exclusionary contractual provisions." *Id.* at 989. But the court dismissed the challenge under *Trinko* because "the antitrust laws d[id] not compel CoStar to provide

---

[1] *See Crowder v. LinkedIn Corp.*, 2023 WL 2405335, at *5 (N.D. Cal. Mar. 8, 2023) ("*Crowder I*") ("API terms of use" memorialized in "agreements"); *CoStar*, 619 F. Supp. 3d at 989 ("exclusionary contractual provisions"); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1154 (N.D. Cal. 2020) ("concerted action between LinkedIn and its members"); *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1077 (S.D. Cal. 2012) ("agreements between Facebook and the Application Developers"); *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *12-13 (N.D. Cal. July 20, 2010) ("contractual limits on access").

such assistance to a competitor." *Id.* at 991.  Its use of "contractual provisions and technological measures" to exclude rivals from the site's "public" data was a lawful refusal to deal.  *Id.* at 990-91.

So too here.  X's contract restrictions impose conditions on which users may "access X's platform" or obtain "access to Twitter data" extracted from that same platform.  CC ¶¶ 37, 88.  Whether in a contract or not, such restrictions merely implement X's right to set the "prices, terms, and conditions" on which it allows others to use its systems.  *linkLine*, 555 U.S. at 448.  If X has a right to dictate the "terms" on which it will deal with would-be rivals, *id.*, it must have the right to memorialize those terms in contracts it asks those rivals to accept.  *See CBC*, 561 F.3d at 572-73.

Bright Data thus errs in insisting (at 5) that " '[a] refusal to deal' involves a refusal to enter into a contract, not the imposition of an unreasonable contractual restraint."  The plaintiff in nearly every refusal-to-deal case says the same thing – often using nearly identical words.  *Compare* CoStar Plf. Br. at 7, 9 (disclaiming "refusal to deal" theory because plaintiff had "not asked CoStar to enter into a contract" but instead challenged "exclusionary contractual terms" barring data access),[2] *with* Opp. at 5, 8 ("Bright Data certainly is not trying to enter into a contractual relationship with X," instead challenging "exclusionary contracts").  Yet courts routinely dismiss the claims anyway.  *See supra* n.1.  So Bright Data can omit (at 5) "the word 'duty' [or] 'refusal' " from its pleadings all it wants.  As in the many cases involving similar semantic tricks, "refusal to deal doctrine is not so easily evaded."  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1079 (10th Cir. 2013) (Gorsuch, J.).

*Crowder I* shows why.  The plaintiffs there challenged LinkedIn's contract "terms" barring users from "getting *LinkedIn* data from third parties or through particular methods, such as scraping and crawling."  2023 WL 2405335, at *5.  Judge Gilliam dismissed that claim because LinkedIn had "no duty to deal" with scrapers seeking access to its platform.  *Id*. at *4-5.  For that reason, the

---

[2] CREXi's Opp. to CoStar's MTD CREXi's Counterclaims, *CoStar Grp., Inc. v. Commercial Real Est. Exch. Inc.*, No. 2:20-cv-08819-CBM-AS (C.D. Cal. Sept. 13, 2021), Dkt. 86 ("CoStar Plf. Br."); *see also* Plf.'s Opp. to LinkedIn Corp.'s MTD at 18, *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 3:17-cv-03301-EMC (N.D. Cal. June 12, 2020), Dkt. 142 ("refusal to deal standard . . . applies only to *unilateral* conduct," not "concerted action between LinkedIn and third parties" enforced by anti-scraping terms of service); Plf.'s Opp. to MTD at 11, *Sambreel Holdings LLC v. Facebook, Inc.*, No. 3:12-cv-00668-CAB-KSC (S.D. Cal. June 8, 2012), Dkt. 34 ("Sambreel is not asserting that Facebook has any obligation to do business with Sambreel" but instead challenges "Facebook's interference with business relationships that Sambreel has with third parties").

platform's anti-scraping "terms" in "API agreements" were not "anticompetitive." *Id*. at *5.

"[W]hat happened next" does not help Bright Data, either. Opp. at 7. True, after dismissing with leave to amend, Judge Gilliam allowed the plaintiffs to proceed on an amended claim. *See Crowder v. LinkedIn Corp*., 2024 WL 1221956 (N.D. Cal. Mar. 21, 2024) ("*Crowder II*"). But the amended claim bore no resemblance to the old one. In fact, the plaintiffs succeeded in *Crowder II* only because they *abandoned their scraping theory*. *Id.* at *2-6. Once the court rejected their initial theory about "scraping and crawling" terms of service, 2023 WL 2405335, at *5, the plaintiffs pivoted to something new: alleging "non-compete agreements" under which LinkedIn's API customers agreed not to "creat[e] a rival product," *Crowder II*, 2024 WL 1221956, at *3. The latter agreement had nothing to do with scraping, crawling, or data access. Instead, the plaintiffs alleged that LinkedIn's "API partners" were "potential competitors" who agreed to refrain from "enter[ing] the professional social networking market" via a competing platform. *Id.* at *4 n.2.

Bright Data does not allege that X's Terms contain anything similar. Nor could it: X's Terms nowhere bar users from "competing" with X by starting a rival social-media platform. *See* Mot. at 11-12 (describing Terms); Dkt. 165-1, Exs. 1-5 (attaching Terms). So Bright Data is left to attack the Terms for "purport[ing] to eliminate all scraping" on X's platform. Opp. at 1. That is the very theory *Crowder I* rejected and that the plaintiffs then abandoned. And tellingly, Bright Data cites no case ever blessing such a theory against any platform.[3] This case should not be the first.

Nor does Bright Data's "distinction" between "concerted" and "unilateral" action save its claim. Opp. at 5-6. Bright Data has not alleged any *concerted* action; it pleads no agreement between X and its "direct horizontal competitors" like Facebook. *Sambreel*, 906 F. Supp. 2d at 1077. Nor could it. Its allegations show the opposite: generally applicable contract terms that X "unilaterally imposes upon companies that utilize the [X] Platform." *Id.* Such unilateral contracts

---

[3] Bright Data misplaces reliance (at 7) on *Dinosaur Financial Group LLC v. S&P Global, Inc.*, 2023 WL 4562031, at *13-15 (S.D.N.Y. July 14, 2023). That case concerned restrictions on the use of "CUSIP numbers" – a security identifier in financial markets – that the defendants imposed to give themselves "detailed competitive insights into potential rivals' internal use of CUSIP numbers." *Id*. at *12. Those restrictions are unlike the anti-scraping restrictions here. The court was clear that the antitrust laws did not "require that Defendants give away access" to the "data for free." *Id*. Moreover, unlike with the restrictions in *Dinosaur*, users here retain the rights to their content under X's Terms and may provide or sell their own data to Bright Data and its customers.

implicate the same considerations as the purely "unilateral action" *Trinko* protects.  *Id.* at 1076-77.

**b.**     Bright Data's reframing also flouts core "considerations of antitrust policy."  *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 22 (D.D.C. 2021) ("*Facebook I*").  Refusal-to-deal doctrine, X explained (at 6-7), protects "important element[s] of the free-market system."  *Trinko*, 540 U.S. at 407.  One preserves "the incentive for the monopolist, the rival, or both" to invest in valuable "infrastructure."  *Id*. at 407-08.  If a firm like Bright Data could use antitrust doctrine to "piggyback on its larger rival" – profiting for free from the latter's investment – the monopolist's fear of being "forced to share" would "deter[]" it from innovating at all.  *Novell*, 731 F.3d at 1073.  That concern here is acute.  X devoted enormous sums to creating a "useful public forum" that "attract[s] content generated from or supplied by [its] users."  CC ¶ 115.  Bright Data did not.  Yet it still claims the right to take, for free, the content X worked so hard to attract.  Such freeriding would inhibit the sort of "risk taking" that spurred X to develop its platform in the first place.  *Trinko*, 540 U.S. at 407.

Bright Data's opposition highlights the problem.  It admits (at 8 n.4) that the content it wants is available elsewhere:  from the X users who own the copyrights.  Bright Data *could* approach those users to license their content; X's Terms would not stop it.  Mot. at 3, 11-12.  But Bright Data complains (at 8 n.4) it would not be "not feasible" or "realistic" to do that work for "hundreds of millions of users." Of course, Bright Data could start a social-media platform to attract the same users to its platform.  Instead, it seeks a shortcut:  centralized access to all the content X has already labored to attract, compile, and store in one place.  Letting Bright Data ransack X's platform to take that data at scale would hardly aid the "competitive *process*."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020).  It would merely let a free-rider usurp the benefits of someone else's innovation, reducing both sides' "incentive" to invest in valuable "infrastructure."  *Trinko*, 540 U.S. at 407-08.

**c.**     Nor can Bright Data salvage (at 8-9) its contract theory by characterizing X's Terms as "*de facto* exclusive dealing."  Mot. at 11-12.  Exclusive dealing requires at least "an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor."  *Qualcomm*, 969 F.3d at 1003.  But Bright Data admits (at 8 n.4) that X imposes no such limitation:  Bright Data *could* seek to obtain any X user post directly from the user who owns it.  It may be faster and cheaper for Bright Data to scrape those posts from X's platform, but that does not

mean X's contract terms blocking that route amount to exclusive dealing.  *See CoStar*, 619 F. Supp. 3d at 992 (same because brokers "expressly retain[ed] the rights to the original information").

Nor do the Terms "*categorically* preclude *users* from doing business with scrapers."  Opp. at 9.  True, the Terms bar users from scraping X's platform or facilitating others doing so.  Mot. at 2-3, 11-12; Dkt. 165-1, Exs. 1-5.  But users remain free to "do business" with Bright Data in many other ways:  they can license their own posts to Bright Data; hire Bright Data to scrape other platforms; or even work with Bright Data to start a rival platform.  As in *Crowder I*, those alternatives show that X has not asked users to "refrain[] from doing business with [X]'s competition."  2023 WL 2405335, at *4; *see New York v. Meta Platforms, Inc.*, 66 F.4th 288, 304 (D.C. Cir. 2023) ("*Meta I*") (policy not "exclusive" because developers were "free to develop applications for Facebook's competitors").

Bright Data contends otherwise because X supposedly "relies on its anti-facilitation provision to contractually prevent customers from *purchasing* scraped datasets."  Opp. at 21 (quoting CC ¶ 95).  The Court should disregard that conclusory allegation.  Bright Data alleges no facts to suggest that X applies the Terms to those who merely "buy pre-scraped data" without actively facilitating the scraping.  *Id.*; *see* Mot. at 11 n.6, 20.  Nor does Bright Data cite any language in the Terms that it claims would apply to mere data buyers.  *Cf.* CC ¶ 94 (alleging the opposite).  Bright Data cannot make out an exclusive-dealing claim based on bare assertions its own allegations refute. *See Somers v. Apple, Inc.*, 729 F.3d 953, 966 (9th Cir. 2013) (courts "insist[] on specificity of facts"). In any event, even if the Terms did bar users from buying scraped X data, that still would not be exclusive dealing.  *See Crowder I*, 2023 WL 2405335, at *5 (rejecting same theory about "terms" that "prohibit API users from getting *LinkedIn* data from third parties").  If rivals have no antitrust right to scrape X's platform directly, they cannot do so indirectly by soliciting someone else to scrape the platform for them.  The Terms' anti-facilitation clause simply implements that principle: it ensures that rivals cannot circumvent X's refusal to deal by enlisting a third party to deal for them.

All this reveals the core flaw with Bright Data's theory:  X's Terms govern only access to "data published on X's platform."  CC ¶ 89.  Bright Data cites no case upholding an exclusive-dealing theory like that.  After all, this is not a case in which a seller forces a buyer to refrain from

buying a competing product;[4] X does not prevent users from buying "Public Square Data" sourced from Threads, BlueSky, Mastodon, or TruthSocial.  Instead, the Terms at most make X the "exclusive" source of *its own product*:  the aggregated data hosted on X's platform.  CC ¶¶ 18, 37, 89-90.  But every firm has a "natural monopoly . . . over its own product."  *Sambreel*, 906 F. Supp. 2d at 1082.  Verizon was the sole supplier of "interconnection services" from Verizon, *Trinko*, 540 U.S. at 407; Equifax was the "only source" of credit data from Equifax, *CBC*, 561 F.3d at 573; and LinkedIn was the exclusive source of "*LinkedIn* data," *Crowder I*, 2023 WL 2405335, at *5.  X is no different.  Using contracts to restrict unfettered access to X's own product is not exclusive dealing.

### 2.    Bright Data's other efforts to repackage its duty-to-deal theory fail

Bright Data's remaining efforts (at 9-15) to reframe its refusal-to-deal theory fare no better:

***"Public" data.***  Bright Data gets nowhere by saying (at 1) that X "strip[s] the public of their lawful right to access and use the public internet."  Bright Data is not *the public*; it is a data scraper improperly accessing X's platform at scale.  Even if the posts it scraped were "public" in the sense of not being behind a login, X still would have no antitrust duty to let scrapers take those posts from its platform.  *See hiQ*, 485 F. Supp. 3d at 1151 (same for "public" data on LinkedIn); Mot. at 11 (citing other cases dismissing antitrust claims for "public" data).  True, this Court held that X cannot "yank" such information "into its private domain" under the Copyright Act.  Dkt. 83 at 20.  But that hardly shows that X has some *antitrust* duty to deal.  Quite the opposite:  the existence of copyright remedies undercuts any need for "antitrust enforcement" on top.  *Trinko*, 540 U.S. at 412.

***Monopoly leveraging.***  Bright Data also argues (at 14) that X "leveraged" its power in the "platform and user engagement markets" to monopolize the "data market[]."  But a "leveraging theory" still requires "anticompetitive conduct."  *hiQ*, 485 F. Supp. 3d at 1155.  And the alleged leveraging here was just X's implementation of anti-scraping Terms.  Bright Data cannot challenge those Terms by morphing its refusal-to-deal theory into a "derivative" leveraging claim.  *Id.*

*Doe v. Abbott Laboratories*, 571 F.3d 930 (9th Cir. 2009), is on-point.  The Ninth Circuit there invoked *Trinko*, dismissed a refusal-to-deal claim, and then held that no standalone

---

[4] Bright Data's exclusive-dealing cases fit this mold.  *Cf. ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 283-84 (3d Cir. 2012); *United States v. Microsoft Corp.*, 253 F.3d 34, 68 (D.C. Cir. 2001).

"leveraging" claim could remain. *Id*. at 934-35. Bright Data misreads (at 15) *Abbott* to suggest that even lawful refusals to deal can constitute monopoly leveraging. But the "refusal[s] to deal" the Ninth Circuit said might support a leveraging claim are the narrow sort (as in *Aspen Skiing*) that the antitrust laws independently condemn. *Abbott*, 571 F.3d at 935.[5] Indeed, *Abbott* dismissed the leveraging claim there because the defendant had "no antitrust duty to deal" with its rivals under *Trinko* and *linkLine*. *Id*. at 934. Bright Data's leveraging claim fails for the same reason.

    ***Liquidated Damages.*** Bright Data also argues (at 9-11) that the Terms' liquidated-damages clause is anticompetitive. But that clause violates no antitrust duty because the substantive restrictions it enforces violate no such duty. Mot. at 13. Bright Data's analogy (at 10) to a "1.5 cents-per-tweet" "surcharge" confirms the point. X is well within its rights to charge for access to the data on its platform: that is core to its "free[dom]" to set "the prices, terms, and conditions" of its dealing. *linkLine*, 555 U.S. at 448. By the same token, X may impose a surcharge on those who attempt to take that data in violation of X's Terms. Bright Data may not like the "price," but that is no basis for an antitrust claim when the underlying restrictions are lawful. *Id.* at 449-50.

    If Bright Data were correct about this clause, users may have "remedies available under contract . . . law." *Qualcomm*, 969 F.3d at 997. But antitrust doctrine has no role to play. Indeed, the sole "anticompetitive effect" Bright Data attributes (at 9-10) to the liquidated-damages clause is that it will "deter" scraping. X has an antitrust right to stop such scraping, as explained above.

### 3. The alleged hyperlink "throttling" is not anticompetitive

    Bright Data's "throttling" theory (at 11-14) is similarly flawed. Under *Trinko*, X has no duty to provide fast hyperlinks directing users away from its platform and onto competing sites. Mot. at 9-10. Bright Data accepts (at 12-13) that principle but invents a distinction between "delisting" (disabling such links altogether) and "throttling" (slowing them down). The law does not recognize any such distinction. *See Kinderstart.com LLC v. Google, Inc*., 2006 WL 3246596, at *3,

---

[5] *Abbott*'s example was *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997), a case that predated *Trinko* and must be "read in that context and in light of *Linkline*." *Abbott*, 571 F.3d at 935. *Image Technical* held that "*Aspen Skiing* applies" to a "situation in which a monopolist made a conscious choice to change an established pattern of distribution." 125 F.3d at 1211. Nothing similar is alleged here, and X has shown (at 13-15) that *Aspen Skiing* – which is "at or near the outer boundary of § 2 liability," *Trinko*, 540 U.S. at 409 – is inapplicable.

*10 (N.D. Cal. July 13, 2006) (dismissing challenge to Google's "Blockage," which included *both* "delisting" websites *and* "reduc[ing]" their "PageRank").[6]  Whether a link on X's platform is slowed or disabled altogether, affected users "remain free" to navigate to competing sites through a "web browser" or a "search engine."  *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008).  X need not assist those sites by providing fast links from its platform to theirs.  *Id.*

Bright Data cannot avoid (at 12) that principle by framing throttling as "interference with *customers'* or *users'* ability to deal with X's competitors."  The cases X cited (at 9-10) involved similar user-facing restrictions, yet they all applied the refusal-to-deal framework.  *See*, *e.g.*, *Kinderstart.com*, 2006 WL 3246596, at *3.  And Bright Data's distinction (at 13) between throttling and a "design choice affecting the [site's] appearance" is likewise inapt.  Facebook had a similar policy barring third-party apps "on Facebook from providing a link to a different social-networking platform."  *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 33 (D.D.C. 2021) ("*Facebook II*"), *aff'd sub nom. Meta I*, 66 F.4th 288.  That policy was not apparent to users, who would have attributed the dearth of competing links to the third-party app providers rather than to Facebook itself.  Yet the court upheld the policy as a lawful refusal to deal.  *Id.* at 30-32.  The minor 2.5-second "throttling" Bright Data alleges here – far less onerous than disabling links – is even less anticompetitive.

Nor can Bright Data save its throttling theory by framing it (at 14) as "part of an overarching scheme."  Combining two faulty theories does not make a viable one.  *See Facebook II*, 549 F. Supp. 3d at 47-48.  To hold otherwise would make it "far too easy for plaintiffs to advance their otherwise nonviable claims" by simply "repackaging" multiple refusals to deal "as part of a larger scheme."  *Id.*  Bright Data's theories each fail on their own, so they fail together as well.[7]

---

[6] Bright Data's cases (at 13) are off-point.  *See Microsoft Corp.*, 253 F.3d at 65 (addressing Microsoft's "design[]" of "Windows 98," an operating system, to create "unpleasant consequences" for users using a non-Microsoft *web browser*; analysis focused on forced "integration" of two separate products, not refusal to deal); *FTC v. Amazon.com, Inc.*, 2024 WL 4448815, at *6 (W.D. Wash. Sept. 30, 2024) ("anti-discounting tactics" that deterred "price competition").

[7] Bright Data also cites (at 12 n.7) *Aspen Skiing* in a footnote, which is not enough to preserve the point.  *See Estate ex rel. Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014).  At any rate, Bright Data fails to allege (among other things) that X's throttling practices singled out any competing platform for special treatment.  Mot. at 13-15 (addressing *Aspen Skiing*'s requirements).

10

**B.    Bright Data Fails To Plead a Viable Market or Market Power**

**1.**    Bright Data's gerrymandered markets arbitrarily exclude key X competitors.  Mot. at 18-21.  Bright Data disparages (at 15-18) these arguments as factual nitpicks, but they reflect a core flaw in Bright Data's legal theory.  *See* Mot. at 18-19 (citing cases that dismissed market definitions).  A proper market, even at the pleading stage, must plausibly account for "reasonably interchangeable" services.  *Coronavirus Rep. v. Apple Inc*., 85 F.4th 948, 955 (9th Cir. 2023).

Bight Data's made-up markets do not plausibly account for obvious competitors like Facebook, Instagram, TikTok, Reddit, or Weibo.  It discounts (at 18) Weibo solely because it is outside the "United States" but never justifies that arbitrary geographic restriction.  Mot. at 19-21.  As for Facebook, Bright Data says (at 16, 18) that *FTC v. Meta Platforms, Inc.*, 2024 WL 4772423 (D.D.C. 2024) ("*Meta II*"), accepted a market that included Facebook and Instagram while excluding X.  But that was a different market:  one for "personal social networking" defined by "maintaining relationships and sharing with friends and family."  *Id.* at *9-10.  The court stressed that Facebook competes in other markets, too, by offering "far more than just friends-and-family sharing."  *Id.* at *15.  So Bright Data's "narrowest market" principle (at 16) undercuts its own distinction.  That Facebook may *also* offer things beyond "Public Square" services does not lessen the "head-to-head competition" it provides X in the narrower market Bright Data asserts.  *Meta II*, 2024 WL 4772423, at *15.  Indeed, another court in this district included Facebook and X in a "Social Media Market" in which X had "less than 3.5% market share."  *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 772-73, 779 (N.D. Cal. 2022).  Bright Data's allegations do not show otherwise.[8]

**2.**    Bright Data's market-power allegations are equally flawed.  That defect is especially glaring for the Data markets – the only ones in which Bright Data participates, *infra* Part I.C – because "daily active users" are a nonsensical way to measure power in those markets.  Mot. at 21-23.  Bright Data responds (at 18-19) that its metric provides "a reasonable estimate of X's approximate market share."  But *user* counts do not plausibly approximate power over *data*.  Mot.

---

[8] Bright Data's assertion (at 17-19 & n.13) of distinct User Engagement and Public Data Markets fail because no factual allegations distinguish them.  Mot. at 19 n.13, 21 n.14.  In addition, the User Engagement Market is not a "market[] for products" at all but a set of "features" that Platforms use to compete.  *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at *12 (N.D. Cal. Nov. 30, 2021).

11

at 22-23.  And user counts ignore data scrapers altogether, which Bright Data insists (at 8) are X's "primary competitors."  Bright Data never justifies measuring market power through "user" metrics that categorically exclude such competitors.  CC ¶¶ 132-33, 137-42.  Nor does Bright Data allege any metric (even an approximate one) about the volume of X's data sales or X's percentage of the market for such sales.  Those defects warrant dismissal.  *See Facebook I*, 560 F. Supp. 3d at 18-20.

Bright Data's theory (at 19) of "price increases" also lacks merit.  Even "'artificially high' prices cannot be equated to supracompetitive prices" without more facts.  *Dominick v. Collectors Universe, Inc.*, 2012 WL 4513548, at *7 (C.D. Cal. Oct. 1, 2012).  And there are none alleged here: all Bright Data says (at 19) is that X charges more than some unidentified "news and data organizations."  That is inadequate.  *See Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, 2022 WL 2791201, at *7-8 (E.D. Cal. July 15, 2022) (dismissal for want of specific price comparators).

### C.     Bright Data Lacks Antitrust Standing In The Platform Markets

Bright Data's claims challenge two distinct restraints:  (1) X's Terms restricting scraping in the Data markets; and (2) the alleged "throttling" of links from X's platform to other sites in the Platform markets.  Mot. at 15-20.  The Court should dismiss the latter theory because Bright Data does not participate in the Platform markets in which the "throttling" occurs.  *Id*. at 15-17.[9]

Bright Data argues (at 20-22) it can manufacture standing in the aggregate rather than by showing injury in each discrete market it proffers.  That is not how antitrust standing works.  "Antitrust violations must be judged on a market-by-market basis."  *Arcell v. Google LLC*, 2025 WL 210877, at *2 (N.D. Cal. Jan. 16, 2025).  The same is true for antitrust injury, which must occur "in the market where competition is . . . being restrained."  *Qualcomm*, 969 F.3d at 992.

That principle is fatal to Bright Data's claim about the Platform markets.  Bright Data nowhere alleges that it competes in those markets.  Mot. at 16.  It also abandons its theory – the only one it tried to plead – that it has standing as a Platform "consumer."  CC ¶ 146; *compare* Mot. at 16, *with* Opp. at 22.  Instead, it pivots to a new theory (at 22):  that X's "upstream" conduct in the Platform market "foreclose[s]" Bright Data's "sales" in the "downstream data markets."  But that is

---

[9] X stands on its opening brief (at 20-21) addressing standing in the Data markets.  X's point was not that "the Terms do not apply" to Bright Data, Opp. at 2, but that Bright Data continues to scrape despite the Terms.  So any injury it has suffered is too speculative for antitrust standing.

just another way of saying that Bright Data's injury occurs in a different market (for *data*) from the alleged restraint (between *platforms*). Indeed, X's "throttling" of hyperlinks does not restrict trade in the Data markets at all; that is why Bright Data had to plead the separate Platform markets to begin with. CC ¶¶ 113-24. It cannot use a purported injury in the former to fabricate standing in the latter. *See Synopsys, Inc. v. ATopTech, Inc.*, 2015 WL 4719048, at *8 (N.D. Cal. Aug. 7, 2015).

Bright Data maintains (at 22) that it can conflate the Data and Platform markets for standing purposes because the two are "inextricably intertwined." But that principle is "exceedingly narrow" and "requires that the plaintiff's injury" in the first market (Data) be a "necessary part of the anticompetitive scheme" in the second (Platform). *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1028 (N.D. Cal. 2015). Bright Data does not even try to make that showing here. It nowhere alleges that its injury in the Data markets – lost access to X user data – supplied the "means," "fulcrum," or "conduit" necessary "to injure competitors" through *link throttling* in the Platform markets. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 160-63 (2d Cir. 2016).

In any event, any injury from throttling is pure conjecture: it assumes that, without the throttling, other platforms would grow and then let Bright Data scrape all the data it needs. Mot. at 17. But those other platforms already ban scraping (Mot. at 17 n.8), to which Bright Data offers no substantive response (Opp. at 22 n.16). Bright Data's failure to explain how those other platforms would help it shows that any injury is too "speculative." *Feitelson*, 80 F. Supp. 3d at 1029.

Bright Data errs in asserting (at 21) that these standing arguments "do not apply" to "injunctive relief." Antitrust standing involves five factors, one of which is antitrust injury. *See Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054-55 (9th Cir. 1999). Although some of the standing factors do not apply to injunctions, an "antitrust injury is necessary" in all cases. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110-12 nn.5-6 (1986). Such an injury demands that a plaintiff be "either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Somers*, 729 F.3d at 963. That test applies to injunctions, too. *See id.* at 966-67 (so applying it); *Intel Corp. v. Fortress Inv. Grp. LLC*, 2020 WL 6390499, at *11-12, 25 (N.D. Cal. July 15, 2020) (similar); *Aluminum Warehousing*, 833 F.3d at 158 (similar). And while the injury need only be "threatened" for injunctive relief, it still

13

1   cannot be "too conclusory and speculative." *Feitelson*, 80 F. Supp. 3d at 1029.  Here, it is both.

2   **II.      The Other Claims Fail for the Same Reasons (Counts IV-VIII)**

3         **A.      State antitrust claims.**  The state antitrust claims fail with the federal ones.  Mot. at

4   23.  Bright Data says (at 23) the California and Nevada statutes allow "indirect purchasers' suits."

5   But Bright Data does not buy platform services indirectly, such as through a reseller.  On the

6   contrary:  Bright Data does not consume services in the Platform markets at all – directly or

7   otherwise.  *Supra* Part I.C.  The indirect-purchaser exception does not excuse that defect.[10]

8         **B.      UCL claims.**  The UCL "unlawful" and "unfair" claims likewise fail with the

9   antitrust claims.  Mot. at 23-24.  For the unlawful prong, Bright Data says (at 23) it also invokes

10  "the FTC Act."  But the Ninth Circuit rejected that very use of the FTC Act because "the federal

11  statute doesn't create a private right of action . . . and plaintiffs can't use California law to engineer

12  one."  *O'Donnell v. Bank of Am., Nat'l Ass'n*, 504 F. App'x 566, 568 (9th Cir. 2013).

13        For the unfair prong, Bright Data "base[s] [its] UCL claim on the same allegations as [its]

14  Sherman Act claim," so they fall together.  *Sabol v. PayPal Holdings, Inc.*, 2024 WL 3924686, at

15  *4 (N.D. Cal. Aug. 23, 2024).  The point is not that a UCL plaintiff must establish a violation of the

16  Sherman Act; it is that Bright Data's refusal-to-deal theories comport with neither the text nor the

17  "policy or spirit" of the antitrust laws.  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d

18  527, 544-45 (Cal. 1999).  Indeed, when conduct is "immune from antitrust liability" because it is a

19  lawful refusal to deal under *Trinko*, "logic dictates that there can be no harm to consumers under the

20  UCL" either.  *Beverage v. Apple, Inc.*, 320 Cal. Rptr. 3d 427, 442 (Ct. App. 2024); *see Facebook,*

21  *Inc. v. Brandtotal Ltd.*, 2021 WL 2354751, at *14-16 (N.D. Cal. June 9, 2021) (dismissing similar

22  "unfair" UCL claim for that reason).[11]  Further, the UCL's "unfair" prong (like the Sherman Act)

23  _____

24  [10] *See MGM Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1224 (C.D. Cal. 2003)
    (Cartwright Act claim failed when plaintiff did not "participate" in market); *In re Dynamic Random*
25  *Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal. 2007) (similar).

26  [11] Bright Data misplaces reliance (at 24) on *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099,
    1117 (N.D. Cal. 2017).  That opinion accepted UCL claims in the preliminary-injunction context,
27  before hiQ had even asserted an antitrust claim.  *Id.* at 1117-18.  So LinkedIn did not raise – and the
    court did not consider – the antitrust arguments X makes here.  When hiQ later did bring an antitrust
28  claim, the court dismissed it for the very reasons X raises here.  *See hiQ*, 485 F. Supp. 3d at 1151-

requires a plaintiff to be a competitor or consumer in the restrained market. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023). In the Platform markets, Bright Data is neither.

The Court should also dismiss the claim under the "fraudulent" prong. Mot. at 24-25. Bright Data's opposition does not explain how the legal classification of the "liquidated damages provision" (whether an enforceable damages clause or an unenforceable penalty) could deceive members of the public. Mot. at 24; *see Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004) ("as a general rule . . . fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law"). As for the other supposed deception based on X "secretly thrott[ling] web traffic," CC ¶ 193, Bright Data pleads no actionable misstatement or omission that X made, much less one on which Bright Data relied.[12] Mot. at 25. The "third-party standing" rule this Court has adopted does not solve that problem. *Yelp, Inc. v. ReviewVio, Inc*., 2024 WL 2883668, at *9-10 (N.D. Cal. June 6, 2024). The alleged throttling at most harmed other platforms, not Bright Data's "potential customers." *Id*. at *10; *see* Mot. at 16-17. And Bright Data also fails to allege with particularity that any potential customer relied on X's liquidated-damages clause.

**C.    Tortious interference.** Bright Data concedes (at 25) its tortious-interference claim fails if the other claims do. It also fails because Bright Data does not pinpoint any customers with whom X interfered. Mot. at 25. Pointing to X's own tortious-interference claim, Bright Data says (at 25) it need only invoke some "deterred subset of customers." But the situations were different: X could not identify such customers at the pleading stage because X "would not have had access to Bright Data customer information." Dkt. 83 at 14. Bright Data does have that access.

## <u>CONCLUSION</u>

The Court should dismiss Bright Data's counterclaims with prejudice.

---

52. The Court then never needed to revisit the UCL claim, because it rejected it on other grounds. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 968 (N.D. Cal. 2022).

[12] Bright Data's failure to allege any affirmative statement distinguishes its cases. *See In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 2024 WL 4532937, at *26 (N.D. Cal. Oct. 15, 2024) (defendant lied about complying with policies); *Morgan v. AT&T Wireless Servs., Inc.*, 99 Cal. Rptr. 3d 768, 785-86 (Ct. App. 2009) (defendant touted fake product improvements).

15

DATED: February 11, 2025

Respectfully submitted,

**KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.**

By: */s/ Joshua D. Branson*
    JOSHUA D. BRANSON*
    jbranson@kellogghansen.com
    ANDREW C. SHEN*
    ashen@kellogghansen.com
    DANIEL V. DORRIS*
    ddorris@kellogghansen.com
    MATTHEW D. READE*
    mreade@kellogghansen.com
    TIBERIUS T. DAVIS*
    tdavis@kellogghansen.com
    1615 M Street, N.W., Suite 400
    Washington, D.C. 20036
    Telephone: 202.326.7900
    * *Admitted Pro Hac Vice*

Adrian Sawyer, State Bar No. 203712
SAWYER & LABAR LLP
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: 415.262.3820
sawyer@sawyerlabar.com

*Attorneys for Plaintiff*
*X Corp.*