UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | |
|---|---|
| X Corp., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) **NO. 3:23-cv-03698-WHA** |
| | ) |
| BRIGHT DATA LTD., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

San Francisco, California
Thursday, March 27, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

          KELLOGG HANSEN PLLC
          1615 M St NW #400
          Washington, D.C. 20036
      BY:  **JOSHUA D. BRANSON, ATTORNEY AT LAW**
           **TIBERIUS T. DAVIS, ATTORNEY AT LAW**

For Defendant:

          PROSKAUER ROSE LLP
          1001 Pennsylvania Avenue NW, Suite 600 S
          Washington, D.C. 20004
      BY:  **COLLIN KASS, ATTORNEY AT LAW**
           **DAVID MUNKITTRICK, ATTORNEY AT LAW**
           **ERICA JONES, ATTORNEY AT LAW**

**REPORTED BY:** April Wood Brott, CSR No. 13782
                  **Official United States Reporter**

| | |
|---|---|
| **Thursday - March 27, 2025** | **7:59 A.M.** |

**P R O C E E D I N G S**

---o0o---

1   **Thursday - March 27, 2025**                              **7:59 A.M.**

2                          **P R O C E E D I N G S**

3                                ---o0o---

4          THE COURTROOM DEPUTY:  Calling Civil Action 23-3698, X

5   Corp. versus Bright Data Limited.

6          Counsel, please approach the podium and state your

7   appearances for the record, beginning with counsel for

8   Plaintiff.

9          MR. BRANSON:  Good morning, Your Honor.  Josh Branson

10   from Kellogg Hansen representing X Corp.  With me is my

11   colleague from Kellogg Hansen, Tiberius Davis.

12          THE COURT:  All right.  Thanks.

13          MR. KASS:  Good morning, Your Honor.  Collin Kass from

14   Proskauer Rose for Bright Data, and with me also from is David

15   Munkittrick and Erica Jones.

16          THE COURT:  Thank you.  Welcome to you.

17          All right.  We're here on -- Angie, this is reversed.  You

18   have these in reverse order.  That's because the jury is over

19   here.

20          THE COURTROOM DEPUTY:  I know.

21          THE COURT:  All right.  I can translate.

22          Your motion to dismiss?

23          MR. BRANSON:  Correct.

24          THE COURT:  Your counterclaim?

25          MR. KASS:  Correct.

1        THE COURT:  So what would help me -- I know it's your

2    motion, and we're going to let you have the -- but before that,

3    I want to hear no more than six minutes of the summary of your

4    counterclaim.  So sort of put in place in my mind your claims.

5    And then they get more than 6 minutes -- 20 minutes, whatever,

6    and then we'll come back and let you rebut it.

7        But let's start with -- you're the proponent of the

8    claims, so let's hear what you have to say of what the essence

9    is of your claims.  And I think I know it already, but I want

10    to hear it from you.

11        MR. KASS:  The essence of the claim is that Twitter,

12    or X, was an advertising company for most of its history.  What

13    it did was it attracted users to the platform, and then it sold

14    advertising.  As part of that, it collected a lot of data.  But

15    it did not have a monopoly over that data, and that data was

16    actually publicly available.

17        Anybody could access that data because it was not behind a

18    log-in, still isn't behind the log-in, and so there were

19    independent competitors in that marketplace for the data.

20    Bright Data, for example, can use its proxy network, scrape the

21    platform, and sell the data in competition with X or whoever

22    else would like the data.  X sold a little bit of data at that

23    time, but it really wasn't its focus.

24        In 2022, Elon Musk recognized that the world is

25    changing and that there is a market for this data, particularly

1   for artificial intelligence, because what public square data

2   is, the type of data that is on the X platform, is realtime,

3   up-to-the-minute data, almost conversational data between

4   people about current events.

5       So today if you want to search the internet, you go to

6   Google, and you get a series of links.  That's what you get

7   today.  The next generation of search is chatbot-based search,

8   where you get an answer.  And in order to get an answer, you

9   need realtime data.  The computer needs to know what actually

10  is going on in the world, and that is what X provides.  It

11  provides this real-time back and forth conversation in this

12  microblogging structure.

13      So Elon Musk recognized that they had this data that it

14  could then monetize, and it could monetize it in a couple of

15  ways.  One, it could have its own AI tool, now called Grok,

16  xAI.  So that's one thing it can do.  And the other thing it

17  can do is it can have this data, and it can license the data.

18      In order for that scheme to work -- I call it a scheme,

19  but in order for that plan to work, X had to have control of

20  that data.  And, again, this is publicly available data.  So X

21  had to find a way of taking it outside of the public domain and

22  being able to exclude others from using it.  It tried in a

23  couple of different ways to do that.

24      Number one, it put everything behind a log-in.  And again,

25  the law allows him to do that.  The CFAA, Computer Fraud and

1    Abuse Act, allows him to say, "I want to create a closed

2    system.  I want to create a walled garden, and so I'm going to

3    put everything behind a log-in."  And that's what he did.  He

4    did that in April of 2022.  But it didn't work because

5    competition would not allow him to do it.  Threads entered the

6    market, and Threads --

7             THE COURT:  Sorry?

8             MR. KASS:  Threads, which is a Meta/Facebook

9    affiliate.

10            THE COURT:  All right.  Okay.

11            MR. KASS:  So Threads did not exist at the time.  As

12   soon as Elon Musk put everything behind a log-in, Facebook came

13   out with a new product called Threads, which is basically a

14   look-alike to Twitter.  It's a public square microblogging

15   structure, just very similar to X.

16       And X was afraid that if its information was behind a

17   log-in, then people would just divert their attention over to

18   Threads.  So he took all that information that he had just put

19   behind a log-in and, a couple weeks later, made it publicly

20   available again, restoring the status quo.

21            THE COURT:  What happened to the log-in?

22            MR. KASS:  Most of the information is not behind a

23   log-in.  Some information now is still behind a log-in, but

24   most of it is not.

25            THE COURT:  Was there a point where all of it was?

1          MR. KASS:  For, like, a couple of days, and that was

2     it.

3          THE COURT:  All right.  So then for two days --

4          MR. KASS:  Yeah.

5          THE COURT:  -- it was behind a log-in.

6          MR. KASS:  Yeah.

7          THE COURT:  And then the log-in was removed except for

8     some slice of information?

9          MR. KASS:  Correct.

10         THE COURT:  All right.  Keep going.

11         MR. KASS:  Bright Data gets -- Bright Data scrapes the

12    slice.  That's --

13         THE COURT:  All right.  But you're --

14         MR. KASS:  That's --

15         THE COURT:  You're almost using up your six minutes.

16         MR. KASS:  Okay.  Sorry about that.

17         THE COURT:  So I'll give you a couple more minutes.

18         MR. KASS:  Okay.

19         THE COURT:  Go ahead.

20         MR. KASS:  So that's what happened.  So what X did is

21    it then revised the terms to say -- where before, automated

22    access was permissible, it said "Automated access is no longer

23    permissible," and it revised the terms, and it said, "As a

24    matter of contract law, I'm going to prevent everyone from

25    accessing or scraping the X website."  That is a restraint of

1    trade.  That is a contract in restraint of trade because

2    there's independent competition in the but-for world absent the

3    contract.  And the contract is taking -- is stripping away that

4    competition.  That is the essence of our claim, which is that X

5    is using contract to take away rights that would otherwise

6    exist.

7        That's the core of the claim.  There are other aspects of

8    the claim; for example, the liquidated damages provision, where

9    they basically fraudulently say, you know, "We have damages of

10   1.5 cents per tweet if you access our system using Bright Data

11   services or any other competitive service, and so we're going

12   to charge you 1.5 cents per tweet," which effectively is

13   threatening financial ruin.  That is also a contract in

14   restraint of trade.

15       So we have various different aspects of the --

16            THE COURT:  What was --

17            MR. KASS:  -- use of the contract.

18            THE COURT:  -- the first restraint of trade?

19            MR. KASS:  There are four provisions.  Number one is

20   the anti-access provision, the anti-scraping provision.  I

21   think the Court is aware of those.

22            THE COURT:  What is the anti-access?

23            MR. KASS:  The anti-access provision is actually the

24   one that is part of X's affirmative claims now.  It's actually

25   the case that effectively limited the anti-access provisions.

1    The anti-scraping provision says, "You shall not scrape."  The

2    anti-access provision says, "You shall not use automated

3    means," like bots, "to access X's system."

4         And so Bright Data and other scrapers use bots to scrape

5    the data.  The anti-scraping provision has now been knocked out

6    under copyright preemption, but the anti-access provision is

7    part of X's affirmative claims.  We are asserting that -- as

8    part of our counterclaim that the anti-access provision, as

9    well as the anti-scraping provision, that the anti-access

10   provision is a contract in restraint of trade, unreasonable

11   contract in restraint of trade.

12        THE COURT:  All right.  That's a good summary.

13        Now let's go to the motion to dismiss.

14        MR. BRANSON:  Your Honor, none of what Mr. Kass just

15   said supports an antitrust claim.  The Court should dismiss

16   these claims because X has no antitrust duty to allow data

17   scraping on its platform.  As Trinko and linkLine made clear

18   decades ago, even monopolists, which X is not, are under no

19   obligation to let would-be rivals free-ride on their

20   investment, and that's what Bright Data seeks here.

21        X is the one that created the platform, that attracted the

22   users, that stimulated the engagement, that centralized all of

23   this content that they want in one place.  And what Bright Data

24   wants to do is they want to simply take the benefit of all that

25   labor that X devoted to this endeavor without the cost of

1    creating anything new.

2         That's the opposite of competition, and it's why so many

3    courts have dismissed similar antitrust claims against other

4    platforms, including hiQ and Crowder in this district.  We

5    think those opinions are persuasive and the Court should follow

6    them.

7         Now, Mr. Kass just said that this case is different

8    because it involves restricted contracts, but that has been the

9    plaintiff's theory in virtually all of these antitrust cases

10   against platforms, and the courts have dismissed the claims

11   anyway.  And the reason is there's nothing talismanic about a

12   contract, Your Honor.

13        And here, Mr. Kass basically just admitted that what the

14   contract does is it implements X's policy of not allowing data

15   scraping or automated access to our own platform.  So if the

16   policy is lawful, so is the contract.

17        There were a couple of other points he made.  There is

18   this notion that Bright Data weaves throughout their brief that

19   they are a competitor to X in the market for data.  And Mr.

20   Kass just said that, and I just want to be clear about what

21   Bright Data actually says they're doing.

22        They're not competing with X in the sense that they're

23   selling a competing product.  They're not like Threads.

24   They're not like BlueSky.  They're not like Truth Social.

25   They're not like Mastodon.  These are other platforms that sell

1    public square data or that make it available, and X's terms do

2    not stop our users from buying those competing products.

3    Bright Data -- they're selling the same product.  They compete

4    with X in the sense that a household goods burglar competes

5    with CVS.

6         They are taking literally the same data off of X's

7    platform, and they're trying to resell it, and their notion of

8    competition is that they're undercutting X on price, which

9    they're able to do because their acquisition costs are low

10   because they're not the ones that had to invest in the

11   platform.  They haven't done anything other than invent a

12   clever way to get into our systems.  That's what they've done.

13        And what I think the cases in the other scraping antitrust

14   disputes demonstrate is that that's no basis for an antitrust

15   claim because the Sherman Act doesn't protect competitors.  It

16   protects competition.  And here, the logic of Trinko and the

17   logic of all the refusal to deal cases is that if you bless

18   this claim, you are discouraging the very sort of competition

19   and innovation that the Sherman Act is intended to promote.

20        Now, there's a lot of question about the log-in screen.

21   Your Honor, you asked about that.  The log-in screen doesn't

22   make a difference to the antitrust analysis.  That is a concept

23   that originates under the Computer Fraud and Abuse Act.  Your

24   Honor knows this from Ninth Circuit cases, including hiQ.  The

25   significance of the log-in stems from statutory analysis of the

1   text of the Computer Fraud and Authorization [sic] Act.

2        It doesn't have any talismanic significance under the

3   antitrust laws, and you can see that in hiQ and in Crowder.

4   Those were two scraping antitrust claims against LinkedIn.  The

5   so-called public information in those cases was also not behind

6   a log-in screen, but Judge Chen and Judge Gilliam still

7   dismissed the claim because the key is it's on X's platform.

8   And X is the one that's invested in the platform and getting

9   all of this content and attracting it and putting it in one

10  place.

11       The other key distinction, Judge Alsup, that I want to

12  make sure you're aware of, is that the terms don't actually bar

13  Bright Data from acquiring the content that they want because

14  users, individual users on our platform, retain the right under

15  our terms to sell their content to Bright Data, to give away

16  their content, to license it to Bright Data.

17       That is the their right under our terms.  Your Honor knows

18  this.  That was the predicate of your copyright preemption

19  ruling, that the copyright remains with the users.  So we're

20  not actually blocking anybody from seeking the content.  What

21  we're saying is you can't use our systems to come get it.

22       And Bright Data's complaint about that alternative is at

23  footnote 4 of their opposition brief, where they say the

24  transaction costs would be really burdensome, perhaps

25  prohibitive, for their business model.  Because we have a lot

1    of users, it will be very burdensome to go to each one and try

2    and negotiate a license.

3        That's exactly our point, is that their business model is

4    only feasible because X has innovated the platform that

5    amalgamates and centralizes the content all in one place.  And

6    so it's much cheaper for them to come just take it from our

7    system.  I acknowledge that, but that is no basis for an

8    antitrust claim, and the fact that the underlying content is

9    available -- and we have not restricted their ability to obtain

10   it from the users -- I think that's really important.

11       And you can see that in the Costar case, which is not in

12   this district.  It's the Central District, but I think it's a

13   very analogous case, where they're -- it was a real estate

14   listings platform at issue, and a plaintiff very much like

15   Bright Data basically wanted to scrape the real estate listings

16   from the platform called Costar and then compete with the

17   platform, and the terms of service said you can't do that.

18       And one of the points the Court made was that the

19   underlying information is still available from the individual

20   real estate brokers that put the listings up on the website.

21   You can go get it from them.  The plaintiff, much like Mr. Kass

22   here, said, "We don't want to do that.  That's too much work.

23   There's too many brokers.  We want to just take it from your

24   platform."

25       And the Court said, "No, that's exactly what Trinko

1    protects."  That is why this is a refusal to deal case.  So in

2    a sense, Judge Alsup, I think that your copyright preemption

3    ruling, really and of course we preserve our appellate rights

4    to disagree with that.  But taking that as law of the case -- I

5    think it undermines the antitrust claim here, because all X has

6    is a nonexclusive license to the content.  The content remains

7    available from the users.

8         Now, there's this theme that weaves throughout the briefs

9    that actually X doesn't own the content on the platform.

10   That's what Your Honor ruled, and so that must support the

11   antitrust claim, and I think that's wrong.  And I just want to

12   make clear that in hiQ, in Crowder and in Costar -- in all

13   three of those cases -- the defendant also had a nonexclusive

14   license to the content.  They didn't own it in the same way

15   that Your Honor held that X doesn't own it here.

16        And the reason that doesn't matter to the antitrust

17   analysis is you can see it in Trinko itself, the famous,

18   seminal case of the modern era that annunciated the refusal to

19   deal doctrine.  In Trinko, Verizon was under a statutory

20   obligation to share its network with competitive local exchange

21   carriers.

22        So Verizon had had its right to exclude competitors

23   stripped by Congress in the 1996 Telecommunications Act.  And

24   the plaintiff, much like Mr. Kass here, tried to turn that into

25   an antitrust theory and said when Verion nonetheless violated

1    those duties and said, "At&T, I'm not going to process your

2    orders across our network," the plaintiff tried to turn that

3    into an antitrust theory, and the Supreme Court said no.

4         So even though Verizon didn't have the right to exclude

5    under existing law, nonetheless, antitrust principles did not

6    allow it to be sued under this same refusal to deal theory.

7    And one of the points the Supreme Court made in that case, in

8    the last section of its opinion, was that when there is another

9    source of law that addresses the competitive dynamics of an

10   industry, courts should tread especially carefully before

11   grafting antitrust remedies on top.

12        And so I know, Your Honor, you referenced the concern in

13   your very first order of this case about information

14   monopolies.  You quoted the Ninth Circuit's hiQ case, and that

15   was one of, as I read it, the principles that Your Honor was

16   concerned about when you made your copyright preemption ruling.

17        So I think to the extent that is relevant at all here,

18   that undercuts Bright Data's Sherman Act claim because when

19   there is another source of law like the 1996 Telecommunications

20   Act in Trinko that is aimed at these issues, courts should not

21   recognize an antitrust remedy on top.

22        Now, on the --

23             THE COURT:  Let me ask you --

24             MR. BRANSON:  Sure.

25             THE COURT: -- a question or two.

1          MR. BRANSON:  Sure.

2          THE COURT:  I'm going to speak slowly here because I

3    have to think of what my question is.

4      Articulate for me what you think the other side is saying

5    the way in which competition is harmed, because you're right.

6    The antitrust laws protect competition, not competitors.  But

7    what would your opponent say is the way in which competition is

8    harmed?  And then I want to figure out what your answer to that

9    is.

10         MR. BRANSON:  So I think it's not really clear from

11   their brief --

12         THE COURT:  Well, do your best.

13         MR. BRANSON:  -- which is one of the problems.

14         THE COURT:  Come on.  Help me out.

15         MR. BRANSON:  Okay.  I'll help you out.  I think the

16   theory is they want to sell the data that we're selling for

17   less.  That's their theory.  I think their business model is

18   they want to take the data -- because just to be clear, Your

19   Honor knows this, and Mr. Kass said it.  We sell access to our

20   platform through an API connection, and we charge for that.  We

21   think we're certainly allowed to.  We have a nonexclusive

22   license to do it.

23     Bright Data's business model -- and I think charitably

24   read, their theory of competition is that by erecting these

25   contractual bars, they can't take the data from us and sell it

1   for less.  So I suppose you could come up with a theory -- and

2   this is somewhat in their complaint, although I don't think

3   it's at all adequately pleaded -- that X's prices are too high

4   for the data.  And so I think that is probably their theory of

5   competition in the data markets.

6       Our answer to that is in Trinko itself, where it says

7   there is nothing wrong -- indeed, it is an essential element of

8   the free market system, even for monopolists, which again, X is

9   not -- to charge monopoly prices at least for a time as the

10  reward for their innovation.  And so that's why I think the CVS

11  analogy I gave is how I think about this.  They are able to

12  compete on price because they don't have acquisition costs.

13  They are taking it from us and reselling it.

14      And that -- I think the line -- and you can see this in

15  linkLine as well, the other companion case in the Supreme

16  Court, that that is not an adequate theory of competition, of

17  harm to competition under the Sherman Act, because it would

18  discourage the very sort of investments and innovation that put

19  X, companies like X, in a position to be able to charge for the

20  pricing -- charge for the product in the first place.

21          THE COURT:  All right.  And this would be -- all

22  right.  Again, I'm focusing on what is the Section 1 theory --

23  or maybe Section 2.  What you just articulated -- how would you

24  characterize it, their theory, charitably read?

25          MR. BRANSON:  Charitably to them?

1          THE COURT:  Yeah.

2          MR. BRANSON:  I would say charitably to them, it's a

3    Section 1 theory because there are contracts involved.  It's

4    our terms of service, and the way that we implement our refusal

5    to deal is by asking our users to agree to contracts that say

6    they can't scrape data from the platform and they can't

7    facilitate others scraping.  So essentially they can't do

8    indirectly what they can't do directly.

9          And so I think their lead theory, charitably read to them,

10   is a Section 1 claim and that the restraint of trade is that we

11   are not -- we are impeding trade in the data markets because

12   we're not allowing scrapers to take the data from us for free

13   and resell it.  We want to be paid for that access.  I think

14   that's the theory.

15         THE COURT:  All right.  So if -- so under the Klors,

16   K-L-O-R-S, case that came out of this court to the Supreme

17   Court long ago, how does our case differ?  That theory, how

18   does it differ from the Klors case?

19         MR. BRANSON:  Your Honor, I'm not immediately

20   remembering the Klors case.

21         THE COURT:  That was the case where -- refusal to

22   deal.  So you're setting up a series of contracts with your

23   regular customers that they will not deal with Bright Data.

24   That's their theory, and the Klors case is pretty close to

25   that.

1          MR. BRANSON:  Okay.  I'm now remembering the case.

2    Judge Alsup, I think it's important to stress that the

3    predicate of your question is wrong, and that's not actually

4    their theory.  We do not require our users not to deal with

5    Bright Data.  That runs throughout their brief.  They claim

6    that the terms say that our users can't do business with Bright

7    Data.  That's wrong.

8          Users can do business with Bright Data in at least three

9    ways:  First, users remain free to license their own content to

10   Bright Data; second, users remain free to hire Bright Data to

11   scrape other platforms like Threads, which Mr. Kass mentioned;

12   and third is users remain free to even work with Bright Data to

13   start a rival platform, so the thing that Judge Gilliam

14   addressed in Crowder too that sufficed the stated claim in that

15   case.

16         So those three are all things that they can do.  So unlike

17   in Klors and the kind of vertical boycott-type cases, which

18   that case stands for for that proposition, there's no required

19   boycott here, and that's what makes this a refusal to deal

20   case, is that the restraint only operates to restrict access to

21   the defendants to our own platform.

22         That is the key.  We're not affirmatively intervening in

23   the market and attempting to disrupt commercial relationships

24   that don't pertain to our platform.

25              THE COURT:  What is the alleged product marketed in

1    this case?  Is it X's data or --

2            MR. BRANSON:  No.

3            THE COURT:  Is it X's data plus Threads plus Reddit?

4    What is it?

5            MR. BRANSON:  So it's close to the latter thing.

6    Mr. Kass would try and exclude Reddit from his product

7    definition -- I don't think he should be able to -- but the

8    market is public square data.  That is how they defined it.  It

9    is not the market for X's data, and I think there is good

10   reason for that.

11       As Your Honor probably remembers from your Psystar case

12   years ago, single-brand markets are heavily disfavored in the

13   antitrust laws.  So I don't think they could, and they

14   certainly haven't, pleaded a single-brand market of X data

15   here.  So it is public square data.

16       They identify four competitors that they think participate

17   in this market.  We think they've gerrymandered the market

18   definition.  I'm happy to address that issue too.  But taking

19   their definition as pleaded, the other four are Threads,

20   Bluesky, Truth Social, and Mastodon.  So there's five

21   participants --

22           THE COURT:  Give me those again.  That was too fast.

23           MR. BRANSON:  Sorry.  Bluesky.

24           THE COURT:  Yeah.

25           MR. BRANSON:  Threads, which is operated by Facebook;

1    Truth Social, which is President Trump's social network; and

2    then Mastodon.

3            THE COURT:  Who?

4            MR. BRANSON:  Mastodon.

5            THE COURT:  Don't know that one.

6            MR. BRANSON:  I think it's named after a bird.  I

7    don't quite know.  It's in the pleadings.

8            THE COURT:  All right.  Okay.  So those four plus X?

9            MR. BRANSON:  That's how they've defined it.  Now, we

10   think that definition is arbitrary, and we can discuss that.

11   I'm happy to address that issue.

12           THE COURT:  Help me on this now.

13           MR. BRANSON:  Okay.

14           THE COURT:  Let's assume for the sake of argument that

15   that's correct, that is a product market.  What is the law on

16   whether -- how much would have to be restrained?  Is X the

17   biggest part of that, or is X half of that?  Is X a fifth of

18   that?  How do we -- what is alleged?

19           MR. BRANSON:  What is alleged is that X has a 95

20   percent share of daily active users.  This is at paragraph 139

21   in the counterclaim.

22           THE COURT:  Say that again.  95 percent --

23           MR. BRANSON:  Of daily activity users.  That's what's

24   alleged.

25           THE COURT:  The other five -- the other four sites

1    only have 5 percent?

2         MR. BRANSON:  That's according to their counterclaim,

3    which, you know, we're accepting that as true for this motion.

4    Of course we will dispute that.

5         THE COURT:  Let's say it's true.

6         MR. BRANSON:  Okay.

7         THE COURT:  What's the legal significance of that?

8         MR. BRANSON:  So the legal significance of that, Judge

9    Alsup -- I don't think that goes to the question we've been

10   discussing so far, which is whether what X did is

11   anticompetitive.  It doesn't go to that question.

12        And the reason is -- look at Trinko.  It was undisputed

13   that Verizon was a monopolist in that case.  Verizon had total

14   monopoly power over the New York local telephone market.  And

15   so the market power goes to a separate element.  Your Honor may

16   remember this from Psystar.  So in every relevant market, they

17   have to plead a proper product market, and they have to plead

18   market power.

19        So I think your question right now goes to the market

20   power element, which we've disputed.  And the reason is there's

21   two problems with their 95 percent number on the pleadings.

22   The first is that users don't plausibly measure power over

23   data, because users -- I mean, I can tell you the way I use

24   Twitter.

25        I go on, and I don't post anything.  I don't "like"

1    anything.  I don't repost.  I just passively view content.  So

2    I count as a daily active user, but I'm not generating any data

3    that has any value in the market.  So I think their complaint

4    has not plausibly alleged how users, which would matter if this

5    were an advertising market, but it's not -- how users measure

6    power over data.

7         The second problem with their 95 percent number is it

8    excludes data scrapers all together.  You just heard Mr. Kass

9    say -- and they say this in their brief -- that data scrapers

10   are X's biggest competitors in the data market.  That's what

11   they say.  They say that at page 8 of their brief.

12        But data scrapers don't even have any users.  So they're

13   categorically excluded from the rubric that the counterclaim

14   uses to try and allege market power.  And so we think the

15   market power allegations are --

16             THE COURT:  You're saying the 95 percent includes

17   scrapers?

18             MR. BRANSON:  No, it doesn't.  That's the problem.

19             THE COURT:  All right.  Okay.  I'm not following it

20   very well then.

21             MR. BRANSON:  Well --

22             THE COURT:  But let's -- I don't need to follow it.

23   Let's go back to the point you were making that even if --

24   let's assume X is a monopolist, which I think you don't

25   concede.  But maybe for purposes of this pleading, you have to.

1    Let's say that X is a monopolist over -- you've already said

2    it, but say it again.  What is your best argument?

3          MR. BRANSON:  The best argument is that you still have

4    to show anticompetitive conduct.  So merely being a monopolist

5    and having the market power doesn't violate the antitrust laws.

6    It doesn't violate Section 1, and it doesn't violate Section 2.

7    They have to show that X did something anticompetitive.

8          And here what we've been discussing are that that we have

9    contract terms for bidding data scraping on our own platform.

10   That is not anticompetitive as, a matter of law, under Trinko,

11   under linkLine, and the many cases I cited, including Crowder

12   and hiQ in this district that had --

13         THE COURT:  Well, wouldn't --

14         MR. BRANSON:  -- the same allegations --

15         THE COURT:  Okay.  Now wait.  Let me ask you a

16   question on that.

17         Wouldn't the other side say that X and Bright Data compete

18   as scrapers to sell the data, and you don't want them to use

19   your database that you spent all that money to set up, and

20   therefore, you have come up with contract terms, including the

21   liquidated damages provision, that will inhibit customers from

22   buying Bright Data's scraping services for fear of the

23   liquidated damages?

24         And therefore, there is a harm to competition between X

25   and Bright Data with respect to scraping services, so they

1    would say, yes, you are -- you have earned your monopoly

2    through foresight and skill.  No problem.  But now you're using

3    the monopoly to keep out the competition in an anticompetitive

4    way.  I think that's what their answer would be.  I'll let them

5    speak for themselves in a minute, but come to grips with that

6    point.

7         MR. BRANSON:  I think that's exactly their point.

8    You're right.  You said it well, Judge Alsup.  That is their

9    theory.

10        That just is not anticompetitive.  I agreed with basically

11   everything you said in your question except for the conclusion,

12   which is and that's anticompetitive conduct, because when the

13   restraint is merely restricting access to the defendant's own

14   product or platform in this case, it is not anticompetitive, no

15   matter what the harm is to competitors, and this goes back to

16   what we've been discussing, that the Sherman Act is about the

17   process of competition, not about protecting individual

18   competitors.

19        And this is the core message of Trinko, of linkLine, and

20   of the many cases in this district and this circuit that have

21   applied it to scraping antitrust cases, which is when the

22   restraint is saying, "You can't come take our data from our

23   platform," that is procompetitive.  It's not anticompetitive

24   because that is something that X has the right to do.

25        I mean, imagine, Judge Alsup, that what they had done is

1    they came to us and they said, "We want to buy this data

2    through your API."  They came to us as an API customer, and we

3    said, "No.  We don't want to sell to you.  We think you're a

4    bad company.  We're not going to deal with you."  Clearly, that

5    is not an antitrust problem.  That is essentially linkLine.

6         So here, I think their theory is even worse than that

7    because really what they're saying is "We want to get access to

8    the data on your platform.  We just want the price to be zero.

9    We want to take it for free."

10        And the reason that that theory doesn't work, Judge Alsup

11    -- and this is explained again in Trinko, is that if you say

12    that is anticompetitive, that will chill the very innovation

13    and the very investment that spurred X to develop the platform

14    to begin with.

15        So I guess the part of your colloquy I would agree with is

16    you said, "Well, X is allowed to enjoy the fruits of its

17    monopoly because of the skill and innovation."  Their theory is

18    incompatible with that.  And I think that is why the claim in

19    hiQ failed, the claim in CoStar failed, and the claim in

20    Crowder failed.  It is because of this idea that X is the one

21    that is investing all of the labor on an ongoing basis too.

22        I mean, it is a lot of work and a lot of investment to

23    operate this platform and to attract all of this content in one

24    place, and they've basically admitted it at footnote 4, that

25    the alternative available to them in the market is to go to the

1     individual users and try and get the content.

2          They don't want to do it because that is more expensive.

3     And so if you use the Sherman Act to force X to basically give

4     away our data for free so they can undercut us on price, that

5     is depriving X of one of the core benefits of this platform

6     that we created.

7          And I think that is why -- I don't want to be a broken

8     record on this, but that's why all of the many cases we've

9     cited in our brief came out the way that they did.  And

10    Mr. Kass doesn't have a case.  He does not have a case against

11    any platform.

12         THE COURT:  Well, you've cited so many cases, it

13    confuses me.  Give me your single best analogous -- not two,

14    just one, and help me understand the facts of that.  What do

15    you think is the most analogous case to our case?

16         MR. BRANSON:  I think it is Crowder, Your Honor.

17         THE COURT:  Crowder.  Go through the facts of that

18    case.

19         MR. BRANSON:  So in Crowder, the defendant was

20    LinkedIn, and LinkedIn had a term in its agreements, both in

21    its terms of use and in its API agreements that said, "If

22    you're going to use our platform and participate in our API

23    program, you cannot acquire LinkedIn data from any other

24    source, including scraping, crawling.  You can't even buy it

25    from a scraper."

1    And it also had an anti-facilitation clause in there.

2    This was Section 3.1 of the API agreement that was litigated in

3    Crowder.  The plaintiff made pretty much the theory that

4    Mr. Kass is articulating here in their first complaint.  They

5    said anti-scraping provision -- that's anticompetitive because

6    you're leveraging your monopoly power over your platform to

7    deprive people of getting the data.

8    And Judge Gilliam said no, that's just Trinko, that

9    LinkedIn has every right.  It has the right of freedom to

10   control its own platform.  And I think what Judge Gilliam was

11   concerned about is if you bless that theory of antitrust

12   liability, it will wreak havoc on platforms across the internet

13   because virtually every platform has anti-scraping clauses in

14   their terms of service.

15   And if you say it is open season and it is an antitrust

16   Sherman Act violation to stop people from scraping your data,

17   it is going to undercut the notion of competition that the

18   Sherman Act seeks to protect.  So that's what happened in that

19   case.

20   The plaintiff then amended and survived a motion to

21   dismiss on an amended claim in Crowder too, and what's

22   important to note about that is they totally changed their

23   theory.  They abandoned their scraping theory, which didn't

24   work, and instead they came up with a new theory that what

25   LinkedIn had started doing was saying, "If you participate in

our API program, you can't compete with us in any sense.  You

can't enter the social media platform market."

So LinkedIn started telling its users, "You can't start a

rival platform if you use ours," and Judge Gilliam sustained

that claim on a motion to dismiss.  Now, candidly, you can read

the papers.  It doesn't seem like it's going to hold up at

summary judgment.  But at least on the motion to dismiss, he

sustained that claim.

Bright Data has not pleaded that latter claim here, nor

could they.  And you have the terms in front of you attached to

my declaration.  You can see very clearly that X does not

impose a noncompete requirement on our users.  What the

restraints do is it restricts access to our own platform.  That

is what makes it a refusal to deal, not any of the other sort

of theories that Mr. Kass articulated.

THE COURT:  All right.  I'm going to come back to you.

I want to let --

MR. BRANSON:  Sure.

THE COURT:  -- the other side have its say on what

I've just said.

Go ahead, please.

MR. KASS:  There's a very simple flaw in their

argument, which is that the but-for world, in the absence of a

contract in their world, is that there's no scraping.  The

but-for world in the absence of a contract in reality is that

there's scraping because X doesn't have any ability to prevent us from scraping the public web other than through contract.

That is different than all these other scraping cases. These other scraping cases they point to are cases where you're suing -- the plaintiff is suing to get access. It's saying, "Enter into a contract with me. Give me a contract. Give me an account so that I can scrape. Give me the log-in. Give me the password."

We are not asking for any of that. We are not saying you have to enter into a contract with us. We are not saying you can't use technological measures to prevent scraping. We're not saying that they can't do whatever they want to do unilaterally. What they can't do is take contract and eliminate competition that would exist in the but-for world.

In the but-for world, absent the terms, Bright Data can scrape. They are then using those contractual provisions -- both against us and against our customers -- to say, "Even though you have the right to use Bright Data's service," because Bright Data is an independent competitor, "by contract, you are agreeing not to do that." That is a contract in restraint of trade.

X says, "Oh, well, we created a platform. We should have immunity under the antitrust laws. Look at all this free riding." Free riding is an affirmative defense, and it's only an affirmative defense if there's a reasonable contract to

1    begin with.  It has to be ancillary to a reasonable contract.

2    We don't need a contract.  We're not asking for a contract.

3    It's not reasonably ancillary to anything.  And you can't

4    decide an affirmative defense if procompetitive justifications

5    are free riding on a motion to dismiss.

6        Now, X says, "Oh, well.  Look at Verizon."  It says two

7    cases.  "Look at Verizon, and look at Crowder."  Verizon was

8    not a Section 1 case.  Verizon did not involve any contract at

9    all.  In fact, the Supreme Court there said specifically,

10   "There's no contract here.  So the claim, if there is one at

11   all" -- at all is in quotes.  If there's a claim at all, it

12   arises under Section 2.  Okay?

13       Section 2 covers anticompetitive contracts.  That's one

14   aspect of it, if there's monopoly power.  But it also covers

15   unilateral conduct in the absence of a contract.  And Verizon

16   was in that little bucket over there.  That's where refusal to

17   deal law resides.  It resides in that little bucket of Section

18   2 liability that doesn't involve a contract.

19       The Supreme Court in American Needle distinguished Trinko,

20   and it said, "Yeah, there is a difference between a contract

21   under Section 1," which is basically it doesn't require the

22   Court to be a central planner, and it just looks at the terms

23   of the contract and says, "What would the but-for world look

24   like?  Does it restrain trade?"

25       And if it restrains trade, then it has to be analyzed

under the rule of reasonableness, and if it's analyzed under the rule of reasonableness, then the free riding argument, if it applies at all, is an affirmative defense. Okay? That's American Needle, where it says the refusal to deal doctrine does not apply.

So now what do they do? They say, "Oh, well, look at Crowder," Crowder/LinkedIn. "LinkedIn is a user -- you need a password. You need an account." They were suing to get access to the system. It wasn't challenging an anti-scraping provision. They were challenging technological measures, and they were saying that they wanted access to the system. But they were not saying that "Just leave us alone so that we can go and scrape." They were not seeking to enforce the anti-scraping provision as a matter of contract. That is the fundamental difference.

And what the Court said in Crowder 1 was "You're not challenging a contract. If you're not challenging a contract, it's just a pure refusal to deal. You're sitting over here in Section 2 land. And that's a refusal to deal, and you don't satisfy asking this piece, so you're done."

They amended the complaint, and they said okay. And the amended complaint says, "We are now challenging a contract. Not only are we challenging -- what we're challenging now is the fact that you're giving access to some people, and what you're doing as part of that contract, you have an ancillary

provision that says you won't compete. You will give up your right to independently compete." Okay? So that's even broader than what's at issue here.

But it says, "You will give up your right to independently compete." In the but-for world in Crowder 2, there would be independent competition, and what the Court said was Crowder 2 states a claim. And that's exactly what we have here. We have a situation where the but-for world in the absence of the anti-scraping provision and the anti-access provision is scraping.

X does not have the ability to prevent us from scraping the public web. And that's why X basically tries to shove to the side the distinction between logged in and logged off scraping. That distinction is critical, because logged in scraping, as they say, which requires an account and a password, is protected by the CFAA.

They don't need contract to prevent scraping. If it's public information, they do need a contract because the law doesn't give them any independent basis for preventing scraping. So without a log-in, Bright Data is an independent competitor in the marketplace, and the contract is eliminating that competition.

That is a Section 1 claim. It is as clear as day that that is a Section 1 claim analyzed under the rule of reason, and under the rule of reason, the question is does it restrain

1   trade, and is it reasonable, and any issue relating to free

2   riding or anything along those lines is an affirmative defense

3   and cannot be decided on a motion to dismiss.

4           THE COURT:  Is there a way when an incoming request

5   for information goes to X where X can tell it's an automated

6   system versus an individual, real person?

7           MR. KASS:  In some cases, they can; in some cases they

8   can't.  For Bright Data Services, at least some of it, they

9   have trouble doing that.

10          THE COURT:  Say it again.

11          MR. KASS:  They have trouble doing it.  They have

12  trouble making the distinction.

13          THE COURT:  Okay.  So that's how your company

14  succeeds?

15          MR. KASS:  Right.

16          THE COURT:  Is because sometimes you get past their

17  security measures?

18          MR. KASS:  It's a rate limiter.  It is not a password.

19  It is not protected by anything else.  Basically what they do

20  is they say, "If you use the same device over and over again,

21  we're going to assume it's a bot."  And Bright Data uses

22  multiple devices so they don't think that it's a bot.

23      And it's patented technology, which is why Bright Data is

24  different than all these other scrapers.  Bright Data has

25  patented technology that makes its network different, that

1    makes it uniquely suited for scraping publicly available

2    information.  That's what Bright Data -- that's Bright Data's

3    -- that is Bright Data's business.  That's why, when you're

4    looking at other scraping cases, they don't have that

5    technology.  They're going behind the log-in --

6            THE COURT:  U.S. patents?

7            MR. KASS:  -- passwords.

8            THE COURT:  U.S. patents?

9            MR. KASS:  U.S. patents.

10           THE COURT:  So you agree -- or do you agree that if --

11   let's say that X and all their engineers figured out a way to

12   block Bright Data without blocking the other customers.  You

13   would say that's legal?

14           MR. KASS:  We say that expressly in our counterclaim,

15   yes.  They can use technological measures.  They can use

16   log-ins.  They can do a lot of things.  What they can't use is

17   contracts.

18           THE COURT:  I'm just amazed that the engineers aren't

19   smart enough to figure that one out.  I certainly couldn't

20   figure it out, but I have seen so many advanced things in this

21   job, it seems like one of your engineers could easily solve.

22   But maybe I'm wrong.

23       All right.  You said a lot.  I need to make sure I've got

24   it.  What was the very first point you made about the but-for

25   world and you're not asking for them to give you a contract?

1      Go through that again.  I want to hear it again.

2              MR. KASS:  Yeah.  So the Sherman Act prohibits

3      unreasonable restraints of trade.  So the question is what

4      competition would exist in the absence of the contract?  Okay?

5      What's the but-for world?

6              THE COURT:  What about the liquidated damages?

7              MR. KASS:  Hmm?

8              THE COURT:  The liquidated damages?

9              MR. KASS:  Well, the liquidated damages is one

10     provision and one way that they deal with -- but even aside

11     from the liquidated damages issue, this is not a damages issue.

12     The but-for world in the absence of a contract is that Bright

13     Data and its customers -- Bright Data can scrape, and customers

14     are free to use Bright Data's services because X does not have

15     any ability to prevent, any legal ability to prevent Bright

16     Data from scraping.

17         We are an independent center of decision-making.  That's

18     the language from American Needle.  If you are an independent

19     center of decision-making, a contract that eliminates that

20     independent center of decision-making is an unlawful restraint.

21     At least it is a restraint, right?  So if it's a restraint,

22     then you go through the rule of reason analysis.  Is it

23     unreasonable, and are there procompetitive justifications?

24         So here, in the absence of a contract, in the absence of

25     the anti-scraping terms, anti-access terms and

1    anti-facilitation and liquidated damages provisions, Bright

2    Data can scrape, its customers can use Bright Data's services,

3    and that is the but-for world.

4        The contract that -- the terms that X is seeking to

5    eliminate --

6        THE COURT:  Okay.  Bright Data can scrape as long as

7    it can outsmart the --

8        MR. KASS:  Correct.

9        THE COURT:  -- security measures?

10       MR. KASS:  It's a cat-and-mouse game, and it has been

11   for decades.

12       THE COURT:  So okay.  All right.  So in the but-for

13   world, Bright Data can scrape if it can outsmart the security,

14   but because of these contracts, the contracts restrain that

15   ability?

16       MR. KASS:  Correct.

17       THE COURT:  Now, what is the harm to competition?

18       MR. KASS:  The harm to competition is that in the

19   but-for world, customers that want data have multiple sources

20   of getting it.  They can get it from X and pay a fortune, or

21   they can get it from Bright Data and other scrapers.  And it

22   used to be -- X used to actually give away their own data.  I

23   mean, it was only until the Musk acquisition where they started

24   jacking up the prices.

25       So the scheme of using contracts to prevent scraping had a

1    direct anticompetitive effect in causing prices to increase,

2    you know, thousandfold.  They got rid of their free tier, and

3    they jacked up the prices, and a lot of people that wanted this

4    data -- universities, academics, other people that wanted this

5    data -- could have gotten it for free from X before.  Could

6    have gotten it from Bright Data before, and now because of the

7    contracts, they can't.

8         That is an anticompetitive effect on the marketplace, on

9    customers, and on Bright Data as a foreclosed competitor.  It

10   is one of the foreclosed competitors.  There are other

11   foreclosed competitors.  But that is the anticompetitive

12   effect.

13             THE COURT:  And the market is, again, what?

14             MR. KASS:  The market that we've defined is what we're

15   calling it, and this is based on language that X uses in its

16   own documents.  It's public square data.  Public square data

17   platforms and public square data.  This is data that is

18   basically called a microblogging structure relating to realtime

19   current events.  And, you know, we quote Elon Musk's tweets.

20   We quote Twitter's documents in the complaint.

21        But that is the market.  So the market is -- includes, you

22   know, the information on X's platform, and it has 95 percent of

23   the market based on publicly available information.  It looks

24   like X has 95 percent of that market.  There are four other

25   competitors, so five total that we've identified.  But still,

1    it has 95 percent of that market.

2        Even if we were to define the market solely on data that's

3    on X's platform -- and remember, this is not X's data.  This is

4    user data.  It just has -- it just is the gatekeeper.  It's on

5    its platform, so it is a gatekeeper.  Okay?  And as the

6    gatekeeper, even if we were to define the market based on the

7    information within X's gatekeeping role, it would have 100

8    percent of the market.  That would still be a market for

9    antitrust purposes.  We didn't allege that one.  We alleged --

10   we went broader, and we included all public square platforms

11   and public square data.  But still, X has 95 percent of the

12   market.

13       X then complains about some of the market statistics and

14   says, "Well, those aren't good enough.  That's a Daubert

15   challenge.  That's a matter for expert testimony."  In no case

16   does it claim that X does not have a dominant share of the

17   market that we alleged.

18           THE COURT:  All right.  I'll give you the same

19   question I asked the other side.  What is the single best

20   decision in an antitrust case -- I suppose it would be under

21   Section 1 -- that is analogous to what is going on here?

22           MR. KASS:  We think that the closest case -- it's not

23   a scraping case.  And again, because most scraping cases

24   involve logged-in behavior, so this is not a scraping case

25   because it doesn't involve logged-in behavior.  But it's the

1    Dinosaur Financial Group against S&P.

2          THE COURT:  Which one?

3          MR. KASS:  Dinosaur Financial Group versus S&P.  And

4    in that case, what S&P did is S&P had a database of public

5    information relating to investments.  It's called CUSIP codes,

6    which are basically just codes for various investments.  And

7    they had access to those codes, but it didn't have copyright in

8    it, and it didn't own that information.

9          And what it did is it went to data brokers, the equivalent

10   of scrapers in our scenario.  It went to data brokers, and it

11   said, "What you have to do, data broker, is you have to require

12   that all of your users enter into a contract, enter into a

13   license between the end user and S&P so S&P can contractually

14   charge for that information."

15         And so what the defendant argued in that case on a motion

16   to dismiss was, "Oh, this is just a refusal to deal.  We're

17   just not going to deal with data brokers that don't impose

18   these contracts on us, on end users."

19         And the Court said, "No.  What you're doing is you're

20   going beyond a pure, unilateral refusal to deal.  What you are

21   doing is you're using contract," and contract is subject to a

22   different standard under the antitrust laws.  Every contract in

23   the world is subject to review for reasonableness that's under

24   the Sherman Act, every single contract.

25         Now, there are some rules that say sometimes -- you know,

sometimes you can decide in a blink of an eye. You can say "Oh, you don't have market power." Okay. Well, then the contract isn't going to be unreasonable. But here, there's market power.

And so now the question is does it restrain trade? "Oh, it restrains trade, but it's okay because we own the platform. We get immunity because we own the platform." Just imagine how dangerous that rule is. That rule says just because I own and operate a website, I'm immune from the antitrust laws. I can do anything as long as it relates to my platform.

That's not what the law is. The law is if you use contracts to enhance your monopoly power to prevent competition that would exist in the absence of that contract, that is illegal. That's why --

THE COURT: That's not quite the argument. Their argument is "We spent all this money to build a platform, and the data has value, and now Bright Data wants a free ride" -- that's the key phrase, "free ride" -- so that you can undercut their prices.

MR. KASS: Imagine a world where, you know, I have a house, and I create a beautiful front yard, and I put all this money in, and people walk by, and they want to look at my yard, and I say -- I'm not going to put up a gate because I don't own the land on the sidewalk. I can't put up a gate, and instead of putting up a gate, I'm going to say, "You're now by contract

1    not to look at my yard."  Right?

2        No.  That's not a claim.  That's what they're doing.  Did

3    I free ride on all their gardening efforts?  Sure.  But that

4    has no consequence under the antitrust laws.

5        THE COURT:  What do you say to that point?  It is true

6    that I have some neighbors who spend a lot more time in their

7    gardens than I do, and their yards are beautiful, and I enjoy

8    seeing them.  And I get a free ride off of their beautiful

9    gardens, and yet no one complains about that.  So you have all

10   this data that you can't figure out a smart way to keep them

11   off, so they're able to outsmart your engineers and get in

12   there and scrape, and so too bad for you.  So what do you say

13   to that?

14       MR. BRANSON:  Well, I say, Your Honor, we're not here

15   on an affirmative claim against them saying, "Free riding is

16   bad.  Free riding violates the law."  They're suing us on this

17   posture, trying to invalidate our contractual restrictions to

18   say, "You can't do that."

19       And this is why refusal to deal doctrine exists.  I didn't

20   make up the free riding principle.  This wasn't something I

21   just dreamed up as a matter of antitrust policy.  This is the

22   Supreme Court.  This is the reason that refusals to deal are

23   protected under the antitrust law.

24       And I think Judge Boasberg in the Facebook cases out in

25   D.C. explains the policy considerations of this very well.  I

1   think then-Judge Gorsuch in the Novell case in the Tenth

2   Circuit that we also cite also explains this very well, that if

3   you adopt this rule, the reason that free riding matters is

4   that that is not competition under the Sherman Act.

5        And so the concern is if -- and again, we're not the ones

6   in this posture suing them.  They're saying that the antitrust

7   laws prohibit us from using contracts to protect the fruits of

8   our labor.  And if that is the rule, that will hinder

9   competition by discouraging both X from creating the platform

10  in the first place, but it also discourages companies like

11  Bright Data from trying to innovate and start their own

12  platform, because it's much easier to just free ride.

13       And, you know, that's of course the way that they're

14  getting into our platform, and that's what our affirmative

15  claims are about, and we're talking discovery on that, and

16  we're going to have a lot to say about what exactly it is

17  they're doing.  But from an antitrust perspective, that's not

18  aiding the competitive process.  That's the key point.

19       Now, on the but-for world point, Judge Alsup, we've quoted

20  these other cases in footnote 2 of my reply brief.  We went

21  through these other antitrust platform cases that we cite, and

22  we quoted the briefs from the plaintiffs in those cases where

23  they made almost identical arguments.  I mean, it's a dead

24  ringer for what Mr. Kass just said.

25       You know, the plaintiff in Costar came and said, "We're

1    not alleging" -- "We don't want a contract with you.  We're

2    saying we don't want a contract with you.  We have a Section 1

3    claim, so Trinko doesn't apply."  I mean, that was literally

4    the argument nearly verbatim, and the Court rejected it.

5         Mr. Kass keeps saying -- I think he must be misspeaking,

6    but he keeps saying that in the LinkedIn cases, the data was

7    behind a log-in.  Of course it wasn't.  I mean, the whole

8    notion -- this canonical Computer Fraud and Abuse Act holding

9    we've been talking about -- that was the hiQ case.

10        The data was not behind a log-in, and Judge Chen addressed

11   literally this distinction.  The plaintiff in hiQ was a data

12   scraper.  They said, "This is public.  You didn't put it behind

13   a log-in.  I want your public information," and Judge Chen

14   dismissed the antitrust claims anyway under Trinko.

15        So a lot of the cases that we have cited involved this

16   same sort of use of contracts to safeguard a platform.  Whether

17   considered under Section 1 or under Section 2, the ultimate

18   test is the same for is it anticompetitive or is it not, and

19   it's not.

20        Now the, CUSIP case they cited, the Dinosaur case -- look,

21   just hearing the facts of that case, you can see how different

22   it is.  It's not a scraping case.  It doesn't involve a social

23   media platform.  It involves a CUSIP identifier.  But there, it

24   wasn't an anti-scraping restriction.  It wasn't just the

25   defendant saying, "We don't want you to take the data from our

1    platform."

2        It was the defendant trying to affirmatively intervene in

3    the market and do things -- for example, one of the things the

4    judge was concerned about is that the terms required potential

5    downstream resellers to disclose to the defendant how they were

6    using the data, and the idea was that would give the defendant

7    competitive insight to try and make them -- you know, stop them

8    from competing essentially by creating a rival product.

9        And that's not alleged here.  What is alleged is that X is

10   simply stopping people from accessing the platform because

11   ultimately we want to be paid.  That's one of the reasons.

12   Your Honor is well aware of that from your copyright preemption

13   ruling.  And we're allowed to do that.

14       And the judge in the CUSIP case that Mr. Kass was citing

15   even made very clear that "I'm not saying that the defendant

16   has to allow this data to travel away for free."  That's

17   exactly what Bright Data's theory is here, is that the price

18   needs to be zero because "That's our business model.  It

19   depends on zero acquisition costs."  That is not a business

20   model that the Sherman Act protects.

21       I guess I just finally would note that this notion of free

22   riding is an affirmative defense.  It wasn't adjudicated as an

23   affirmative defense in any of these other scraping cases that

24   I've cited.  Those were all resolved on a motion to dismiss,

25   just like Trinko was, and I acknowledge the point that Trinko

1   was a Section 2 case.  I do.  I acknowledge that.

2       But what the later courts have done is they have said

3   Trinko's rationale for its holding applies when the contract is

4   a unilateral contract on a social media platform, and that's

5   what's key.  Most of the Section 1 cases -- Klors, we talked

6   about already.

7       The American Needle case, that was about the NFL.  So the

8   conspiracy there was between competing NFL teams.  It was a

9   horizontal combination, and of course that's subject to a

10  different scrutiny.  Those are arguably per se illegal under

11  the antitrust laws.  But that's not what we have here.  They

12  characterize it at paragraph 10 of their counterclaim as

13  "unilateral contracts of adhesion."

14      So yes, they're contracts, absolutely, and they're

15  clickwrap and browsewrap, as Your Honor has addressed, but this

16  is not some conspiracy where X is -- has an agreement with

17  Facebook or has an agreement with Truth Social.  It is

18  contracts that enforce a refusal to deal on our own platform.

19  And that -- there are just a lot of cases that say that is

20  protected under the antitrust laws.

21          THE COURT:  There was an analogous point regarding all

22  the money that X invested.  It was a decision in the copyright

23  area by the Supreme Court about 30 or 40 years ago.  I believe

24  it was the phone book.  Do you know the one I'm talking about?

25          MR. BRANSON:  Yeah.  Feist, right?

1      THE COURT:  Yes.  That's it.  Where the Supreme Court

2   said that -- somebody had compiled the phone book and had

3   invested lots of time and effort, and the Supreme Court said,

4   "Too bad.  The information in there is not yours."  There are

5   some rules about compilation, but the Supreme Court -- I think

6   it was Harry Blackmun -- went to some trouble to say, "Too bad.

7   Just because you spent a lot of money and effort does not give

8   you extra rights."

9      Am I remembering that case correctly?  Tell me what you

10   remember about it.

11      MR. BRANSON:  I think Your Honor is remembering the

12   case correctly, and I painfully remember the case because Your

13   Honor, of course, featured that heavily in your copyright

14   preemption ruling here, and that was the reason I understand

15   that Your Honor held that our scraping terms of service are

16   preempted.

17      But here's the point about Feist, Your Honor:  I think

18   there is no world in which, if the defendant in Feist had sued

19   the phone book person for an antitrust violation, that that

20   claim would have been sustained by the Supreme Court.  There's

21   no way.

22      And this goes back to my Trinko point, and I just want to

23   repeat this to make sure it's clear.  Verizon did not have the

24   right to exclude competitors in Trinko.  Congress had enacted

25   the 1996 Telecommunications Act, which forced Verizon, as a

1    matter of federal law, to share its network with AT&T and other

2    competitive local exchange carriers.

3         So Verizon did not have the right to exclude in that case,

4    and that was the plaintiff's theory.  I mean, they didn't cite

5    Feist, I don't think, but that was essentially the theory, that

6    "Verizon, you don't have the right to exclude us.  You're under

7    a statutory regime.  It says Congress wanted to promote

8    competition, and you're just thumbing your those at them.  That

9    is an antitrust violation because you're a monopolist."

10        And the Supreme Court went to some length to say, "Yes.

11   Okay.  Maybe they're violating the 1996 Telecommunications Act

12   in the same way that Your Honor has held that you think our

13   anti-scraping restrictions arguably conflict with -- well, Your

14   Honor says they do conflict with the Copyright Act.

15        Okay.  That doesn't mean that they're an antitrust

16   violation.  Quite the opposite.  The Supreme Court said -- and

17   this is the last section of its opinion -- that when there is

18   another source of law that addresses the competitive concerns

19   at issue, courts should tread carefully before grafting

20   antitrust remedies on top.

21        And so I think, taking Your Honor's question -- and I

22   understand where you're coming from.  Feist and your own

23   ruling, I agree.  I agree Your Honor has held that X doesn't

24   own the compilation.

25        That doesn't mean that our contract's trying to restrict

1    people from stealing it is an antitrust violation, because we

2    do have a nonexclusive right to it.  We have the right to sell

3    it.  And I just want to reiterate that the trilogy of cases I

4    keep coming back to --

5            THE COURT:  All right.  I have a different question.

6            MR. BRANSON:  Okay.

7            THE COURT:  Thank you for that, helping me remember.

8    I want to switch over to about the year 1890.  I'm giving you a

9    hypothetical.

10        Let's say there's a railroad that goes from Saint Louis to

11   San Francisco, and that's the big railroad.  And then a smaller

12   railroad that wants to compete is underway and being built, but

13   it is only from Saint Louis to someplace, X, in Kansas, and

14   then it picks up again in Wyoming, Colorado, and continues on.

15   So there's a gap, and anyone who ships on the small railroad

16   for that gap has to ship on the big railroad for the gap, and

17   then so the small railroad is trying to compete.

18        So the big railroad says, "We don't like this.  We will

19   have a contract with our customers that says, 'If you use the

20   small railroad for anything, you can't use us for anything.'"

21        Now, wouldn't that be illegal under Section 1, or maybe

22   even Section 2?

23           MR. BRANSON:  I think it would be a problem, Judge

24   Alsup.  I don't -- look, I imagine --

25           THE COURT:  All right.  All right.

1         MR. BRANSON:  -- you could have a --

2         THE COURT:  I know you see the problem.  So how is our

3    case different?  Because I keep thinking about why the

4    antitrust laws were enacted in the first place.  What do you

5    say to that point?

6         MR. BRANSON:  Right.  So, again, because the restraint

7    here, unlike in your hypothetical, is only operating to

8    restrict people's use of our own product.  We are not

9    conditioning use of X on people not doing business with Bright

10   Data.  That's not what we're doing.  As I said before, users

11   remain free to use Bright Data for plenty of other things.

12   They can scrape Threads.  They can license their own content.

13        So there's not a -- what you would think of as an

14   exclusive dealing provision saying, "You can't even use Bright

15   Data."

16        THE COURT:  Well, you're saying, "You can't use Bright

17   Data to scrape."

18        MR. BRANSON:  To scrape -- no, no.  To scrape our

19   platform specifically.

20        THE COURT:  Correct.

21        MR. BRANSON:  That is the pivotal distinction.  So in

22   your hypothetical, Judge Alsup, the difference is that that

23   gap -- when a customer of the big railroad wanted to use the

24   competing railroad for other things, right, to kind of travel

25   on a competing line, preventing them from doing that was no

1    longer restricting access to the big railroad's product.  It

2    was saying it was permanently intervening in the market and

3    saying, "Customer, you can't even go on to this competing

4    railroad to use their line for something else."

5         So I think the better hypothetical would be what if a

6    small railroad came to the big one and said, "We want to use

7    your track for the gap.  We want our customers to be able to

8    get on your track in order to complete," you know, "the

9    connection between Kansas and Wyoming"?

10        And the big railroad said, "No.  You're a competitor.

11   We're not going to let you use our track."  That case would be

12   dismissed, and I think that's the difference.

13        THE COURT:  Okay.  We've been at it an hour and eight

14   minutes.  I want to give each of you a chance to make your --

15   any other important point you wish to make, and then it will be

16   under submission.

17        So we'll go over to the other side.  You get to go first.

18        MR. KASS:  I really just want to respond to that

19   hypothetical.  We are not asking to use the track.  We are not

20   suing for access.  In all of the scraping cases, they are

21   actually bringing a refusal to deal claim.  They're saying,

22   "Give me access.  Give me access."  They're asking for a

23   contract.

24        We are not asking for a contract.  They have a contractual

25   restraint that they are seeking to enforce, and that

1    contractual restraint is a restraint of trade and is illegal

2    under the Sherman Act.  It is very different from the LinkedIn

3    situation and the Costar situation.  In Costar, it was a

4    subscription model.  You needed access to the password to get

5    the information.  They sued because they wanted access to the

6    information, and they wanted to prevent the use of

7    technological measures to prevent access.

8         That is not our claim.  We are not saying that X can't try

9    to block Bright Data.  Of course it can.  What it can't do is

10   use contract to do that, and that's because in the but-for

11   world -- and the Court has to keep in mind the but-for world.

12   The but-for world in the absence of the contract is that there

13   will be scraping by Bright Data.  Okay?

14        If X has some other law that it wants to enforce that

15   prohibits Bright Data from scraping, then it has a claim under

16   other law, and it can enforce that law.  But it doesn't, and

17   that's why it's resorting to contract.  If it could rely on the

18   CFAA, it would sue under the CFAA.  It did.  It's going to --

19   you know, it has that issue.  But it's saying, "That's not

20   enough."

21        The law, the existing law, does not ban scraping of public

22   information.  It just doesn't.  And so they need contract in

23   order to prevent us from competing in the marketplace.  That is

24   the essence of an antitrust violation.  It couldn't be any more

25   clear that that is an antitrust violation.

1    Trinko did not involve a contract.  It didn't involve a

2    contract.  It didn't involve the enforcement of a contractual

3    right.  What it said was "Actually, integrate with me.  I'm a

4    competitor of Verizon.  Integrate with me.  Give me

5    information.  Plug in my lines into your lines."

6    In your hypothetical, it would be -- I mean in his

7    hypothetical, it would be as though we were asking to run on

8    their tracks.  We are not asking to run on their tracks.  We

9    are not asking them to integrate with us.  We are not asking

10   them to do anything at all.

11   We are asking to be left alone.  If we are left alone, we

12   are independent sources of competitors, and our customers are

13   free to do business with us, and if they don't like it, then

14   they may sue under some other law, but they can't use contract

15   to eliminate that competition.

16        THE COURT:  All right.  Your ten minutes.  I'm sorry.

17   Your important point.

18        MR. BRANSON:  I'll stick with the railroad, Your

19   Honor, because I think that may be helpful in helping you think

20   through this.

21   They are asking for access to our platform.  That's what

22   they want.  They are -- the terms only restrict data scraping,

23   which, again, we've defined as using robots to go onto our

24   platform and take the information.  They are saying we cannot

25   use a contract to ban that.

1      So I don't know if they have some distinction in their

2   mind between forced integration and access, but you can read

3   the terms.  What we ban is scrapers accessing our platform to

4   get the content.  This goes back to a point I've made several

5   times this morning, which is if they want to get the content

6   from our users directly, they can do that.  We don't block

7   that.  The only things our contracts restrict is accessing the

8   content through our platform.

9      So it very much is, I think, like the railroad analogy

10  that I gave.  And I think what Bright Data is saying is, "Oh,

11  you can post a security guard outside your railroad track, but

12  if we find a clever way to fool him and get by and get our

13  trains onto your track, tough luck for you.  You can't use a

14  contract to ban that."

15     I think obviously that's not true.  And if Your Honor

16  conceives of this, as you should, as allegations that scrapers

17  are attempting to use our systems to access the content they

18  want, then it is clearly protected under the antitrust laws.

19     And in terms of, you know, "We're not asking for a

20  contract.  All the other cases were," I would just encourage

21  Your Honor to read footnote 1 and footnote 2 of my reply brief,

22  where we went through the other cases, and we quoted the places

23  where the Court said there's an exclusionary contract -- that's

24  the theory -- and where Plaintiffs in their briefs made the

25  same argument.

1    So I really just don't think that distinction works once

2  Your Honor reads those materials.

3         THE COURT:  All right.  You had a motion to stay as

4  well?

5         MR. BRANSON:  I did.

6         THE COURT:  So summarize that motion.

7         MR. BRANSON:  So the motion to stay rests on the

8  premise that antitrust discovery is enormously expensive and

9  burdensome, and allowing discovery to proceed on an antitrust

10  claim when there's a pending motion to dismiss would defeat one

11  of the rationales of Twombly.  I'm basically quoting Your Honor

12  from your graphics processing units case in 2007.  I think Your

13  Honor was right on.  If you allow --

14         THE COURT:  What did I say?

15         MR. BRANSON:  You said that -- you stayed discovery on

16  an antitrust case, and you said that allowing antitrust

17  discovery to proceed, pending an antitrust motion to dismiss,

18  would defeat one of the rationales of Twombly.  That's

19  basically a quote, and I think that's right on.

20    And that's why so many cases in this district routinely

21  grant stays of discovery in antitrust cases, because if you

22  allow discovery to go forward on these theories, it is going to

23  explode the scope of this case.  It is going to derail the

24  schedule.  And I worry it's going to inflict massive burdens on

25  us, on them, on you, and on potentially hundreds of third

1    parties.

2         We've pointed Your Honor in our brief to a single-market

3    antitrust case against Meta that's going to trial next month

4    that my firm is doing.  In that case, one market, personal

5    social networking market, there were 140 nonparty subpoenas

6    that were issued.  There were 66 nonparty depositions.  There

7    were 27 million pages of documents produced by Meta.  There

8    were 60 company witnesses that were forced to be produced for

9    depositions.  And that was a one-market case.

10        If we have to adjudicate these made up markets, these

11   public square markets, we're going to have to be subpoenaing

12   half the companies in the United States and the world.  We

13   pointed out in our brief, Your Honor, that we think -- there's

14   a Chinese public square platform called Weibo that does the

15   same thing as Twitter, competes with us, has equivalent daily

16   active users.

17        Mr. Kass's response to that at page 18 was "That's a fact

18   question.  You have to take discovery from Weibo."  So that's

19   the type of thing we're going to be doing for the next probably

20   several years if Your Honor lets discovery go forward.

21        And look, I acknowledge if Your Honor finds that they have

22   pleaded a claim, so be it.  We've got to do it.  But if Your

23   Honor is going to dismiss this case or is seriously thinking

24   about it, as I certainly think you should, you should stay

25   discovery because it's going to be unmanageable and

1   astronomically expensive.

2          THE COURT:  If I dismiss the counterclaim, there would

3   be no discovery on the counterclaim.  I don't understand your

4   point.

5          MR. BRANSON:  I'm sorry.  When I said "the case," I

6   meant the counterclaim.  But I imagine it's going to take Your

7   Honor some time to issue an opinion, and so what we're

8   asking --

9          THE COURT:  No.  I was going to say, you know, right

10  now, but actually, I'm not really -- I don't know the answer.

11  It will take me some time, but it's not going to take weeks.

12  It might take two or three weeks.  That guy right over there --

13  he's listening intently.  He's going to help me write a good

14  order.

15         MR. BRANSON:  Well, I think --

16         THE COURT:  I don't know which way it's going to come

17  out yet.

18         MR. BRANSON:  Well, I --

19         THE COURT:  But is there some immediate need to stop

20  discovery on antitrust?

21         MR. BRANSON:  I think so, Your Honor.  They've served

22  82 document requests on us about antitrust.  We attached that

23  to our stay motion.  One of the requests says they want all

24  documents relating to competition in any market in which X

25  operates.

THE COURT:  Well, how do we deal with this problem:
There's also an antitrust affirmative defense.  So if we go to
trial, what do we do with that if they don't have the discovery
on that affirmative -- how would you propose to deal with the
affirmative defense?

MR. BRANSON:  I want to address -- I think it's going
to depend on Your Honor's order on this motion to dismiss.  If
Your Honor rules the way I think you should and the way we've
advocated in our briefs, I think the affirmative defense will
need to be struck.  But --

THE COURT:  Well, let's say that I leave it in, and
then we go to trial.  What's the best way to deal with -- if we
didn't have the affirmative defense, how long will this trial
be?

MR. BRANSON:  I think Your Honor has set it for --
actually, I don't know if Your Honor has set a schedule, but
probably under two weeks, I think.  I don't think this is going
to be --

THE COURT:  How long --

MR. BRANSON:  -- a long trial.

THE COURT:  -- will it be if we have the antitrust
issues there?

MR. BRANSON:  I mean, the trial in front of Judge
Boasberg that's going to happen next month is two months.  The
trial in front of Judge Mehta in the Google search monopoly

1    case, which Your Honor may have followed in the news, was nine

2    weeks.  I think it's going to be many months at a minimum.  The

3    idea that we're going to litigate the validity of these made-up

4    antitrust markets -- you know, there's going to be just reams

5    of nonparties.  There's going to be economists.  It's going to

6    really derail the case.

7         So I think that's why, if Your Honor rules on the motion

8    to dismiss the way that I'm urging you to, we'll just move to

9    strike the affirmative defense.  I think it will need to be

10   struck.  If Your Honor doesn't do that, I think our suggestion

11   in the second half of our stay motion was that you should

12   bifurcate.

13        So you should bifurcate the antitrust issues and deal with

14   that after the liability case on our affirmative claims is

15   involved.  And we have a case where Judge Breyer basically did

16   that in the 3Taps Craigslist scraping case where he bifurcated

17   the antitrust issues under rule 42.  And in our opinion, that

18   would make it more manageable because I do think -- I mean, you

19   can tell from Mr. Kass's presentation today part of the

20   premise --

21             THE COURT:  Well, let's pause on that now.

22             MR. BRANSON:  Yeah.  Sorry.  Go ahead.

23             THE COURT:  Is your case a jury case?  I think it is.

24             MR. BRANSON:  Yes, it is.

25             THE COURT:  All right.  So let's say your case goes to

1    the jury.  I bifurcate.  Your case goes to the jury, and you

2    win.  But there's still the antitrust affirmative defense, and

3    so then we go to trial with jury number two, or do you propose

4    that we would still have -- there would be such a long delay

5    with the discovery, you'd have to have a second jury?

6        So the second jury comes in, and let's say they rule for

7    the antitrust claim.  And then you would be saying what?  I can

8    see it now because I've heard this record before.  You would be

9    saying, "Judge, the jury ruled for us.  How can you take it

10   away now" --

11       MR. BRANSON:  Well --

12       THE COURT:  -- "with this crazy antitrust theory?  How

13   can you take it away?  The jury ruled for us.  This is

14   topsy-turvy."  But it's because you asked for it to be

15   bifurcated.

16       MR. BRANSON:  If I asked for it to be bifurcated, I

17   don't think I could come later and complain that you

18   bifurcated.

19       I do think how it's all going to work is going to depend

20   on a lot -- which claims end up going to the jury?  Which

21   claims do we win on?  I don't think at all, Judge Alsup, that

22   it's clear that the Sherman Act is a defense at all to a DMCA

23   claim, for example, or a Computer Fraud and Abuse Act claim.

24   So I think just on this record, it's difficult to run through

25   all the permutations of how it might work.

1          THE COURT:  Granted, there are permutations, but one

2     of the permutations and probably the main permutation of a

3     bifurcation would be that a second jury would have to hear all

4     the antitrust part.  And do we tell the second jury, "By the

5     way, the reason we're here is jury number one found in favor of

6     X, but that's not binding on you for the purposes of the issues

7     that you have here"?

8          MR. BRANSON:  I do think it would be something like

9     that, Judge Alsup.  I mean, I think you could instruct the

10    second jury that X has prevailed on the elements of its

11    affirmative claim --

12         THE COURT:  Well, maybe what I would say is -- I don't

13    know.  There's not an easy way to say that to a jury.  But on

14    the other hand, they'll start wondering "Why are we here if

15    this is an affirmative defense?"

16         MR. BRANSON:  I do think you would probably need to

17    give them that context.

18         THE COURT:  Let's make sure.  I want to see.

19         MR. BRANSON:  Okay.

20         THE COURT:  On your side -- and this could be

21    important -- are you going to be arguing, "Hey, jury number 2

22    does not get to know what jury number 1 decided?"

23         MR. KASS:  I don't think they would need to know.

24    They just need to know that we are scraping public information

25    and they're trying to use contract to prevent us, and that's

1    illegal, and the jury would -- if they rule in our favor, then

2    the contract is by definition void, and the first jury's

3    verdict has to go out the window.

4        I don't think any of that should be decided now as to

5    whether we need one or two juries.  You know, the standard for

6    a second jury is jury confusion.  There's going to be no jury

7    confusion by having it all tried together.  Most of the

8    conduct, the actual conduct, is -- you know, is overlapping.

9    What Bright Data's --

10           THE COURT:  Well, could we agree now that if the --

11   there will be no more than 50 document requests and no more

12   than 10 depositions of all parties?  I don't think you would

13   agree to that.  I know that counsel is right.

14       If this is an antitrust case, we're going to be -- I won't

15   even be here by the time this case goes to trial.  I will be

16   retired totally.  I'm going to be 80 years old in a few weeks.

17   I can't stay on forever.  It's possible I could try this case

18   if it's this year.  But you're talking about a case that would

19   be at least a year and a half away from now, and it would be

20   international discovery, all kinds of stuff.  It's a massive

21   undertaking to add this antitrust thing in there.

22       So that is a big deal.  It is a big deal.  It's not a

23   small consideration.

24           MR. KASS:  In a lot of antitrust cases, there's a lot

25   of discovery that has to relate to the underlying conduct.

1    What was the underlying conduct?  Was it exclusionary?  Was it

2    anticompetitive?  That is all overlapping -- most of that is

3    overlapping with the affirmative claims.  The market effect,

4    you know, what do the business documents show?  You know, yeah.

5    They have to collect some business documents.

6        Market definition -- does it require some expert

7    testimony?  It does.  But reasonable limits can be placed on

8    depositions.  Reasonable limits can be placed on other things.

9    And I don't -- you know, we've already been delayed by a couple

10   months as a result of the stay, but otherwise, we probably

11   could have -- we probably could have lived with the Court's

12   deadlines.

13       I actually don't think we're going to live with the

14   Court's deadlines -- you know, I mean, we have to get leave,

15   but we're having trouble, I think, in getting all the data

16   that's required even for the affirmative claims.  You know, the

17   September deadline, I think, is going to be very difficult,

18   even under the affirmative claims.

19       But those two things can happen in parallel, and to say

20   that the antitrust claims, the market -- the documents relating

21   to, you know, how does X sell its data, which is relevant to

22   the actual -- to X's actual claims too, should be produced.

23   There's no reason to stay that production.  There's no reason

24   to stay discovery.

25           THE COURT:  I'm going to make one last comment.  I

1    felt at the end of the round of briefing on the complaint and

2    amended complaint that the single most important issue was the

3    extent to which scraping prejudices your server, and you have

4    new allegations in your amended complaint that your server was

5    compromised.  Has there been discovery on that?

6         MR. BRANSON:  There is discovery occurring in both

7    directions on that.  It's involved a lot of data on both sides.

8    We produced some documents.  Mr. Kass has produced some

9    documents.

10        Our dilemma on that issue, Judge Alsup, is to do the

11   analysis on our end, fist we have to identify with some degree

12   of precision how much and when was Bright Data scraping,

13   because as we've talked about, they hide what they're doing.

14   So we can't tell that without discovery, and so we've been

15   working to get that log from them --

16        THE COURT:  Well, if you don't cooperate, I'm going to

17   throw your case out.

18        MR. KASS:  We've produced --

19        THE COURT:  You had better cooperate on discovery if

20   you want discovery from them.

21        MR. KASS:  We have.  What we're -- the issue now is

22   getting information from X.  It's not us giving information to

23   them.  It's the opposite.

24        THE COURT:  Well, both of you better get to the bottom

25   of it because that was your best point, and if you're not

1    cooperating on it, I'm going to throw that one out.

2         Listen.  This is the U.S. District Court.  You do not play

3    games here.  You better be honest, truthful, and turn over

4    the -- even the bad documents.

5              MR. KASS:  Your Honor, Bright Data is a minuscule,

6    minuscule --

7              THE COURT:  I don't believe it.

8              MR. KASS:  -- scraper.

9              THE COURT:  I don't believe it.  I don't believe it.

10   I believe scraping probably has some impact.  Maybe it's 1

11   percent.  Maybe it's half a percent.  Maybe it's 10 percent.  I

12   don't know.  But we've got to know the truth of that, and if

13   you have to disclose your gimmicks to get around their

14   security, God bless you, you've got to do it.  Got to do it.

15             MR. KASS:  We're disclosing everything, Your Honor.

16             THE COURT:  All right.  That's good.

17        Now, you don't get to tell your in-house people what their

18   secrets are.  You have to do that through your experts.  But

19   this is an important issue, at least for me.  When summary

20   judgement comes, that's something I'm going to look at.

21        All right.  Who's my court reporter today?

22             THE REPORTER:  April.  April Brott, Your Honor.

23             THE COURT:  April, thank you for keeping up with all

24   the talking.

25        All right, Counsel.  It's under submission.  Thank you.

1                (The proceedings concluded at 9:27 A.M.)

2                        ---o0o---

3

4                     **CERTIFICATE OF REPORTER**

5      I certify that the foregoing is a correct transcript from

6  the record of proceedings in the above-entitled matter.

7

8  DATE:  Monday, March 31, 2025

9

10               *April Wood Brott*
              _____

11            April Wood Brott, CSR No. 13782

12

13

14

15

16

17

18

19

20

21

22

23

24

25