1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10
11
12

X CORP., INC.,

13

        Plaintiff,

No.  C 23-03698 WHA

14

    v.

**ORDER RE MOTION TO DISMISS
AND MOTION TO STAY
COUNTERCLAIMS**

15

BRIGHT DATA LTD.,

16

        Defendant.

17
18

**INTRODUCTION**

19

      In this data-scraping action, a social media platform complained that a data scraper

20

violated contract and other laws by scraping its platform.  The data scraper counterclaimed that

21

those same contracts violated the antitrust laws by preventing the scraper from selling data the

22

platform did not own and already had made public.  Now, the platform moves to dismiss the

23

scraper's counterclaims — or else to stay or bifurcate proceedings on those counterclaims.  For

24

reasons below, the scraper states plausible claims for relief.

25

**STATEMENT**

26

      Counter-plaintiff Bright Data, Ltd.'s counterclaims against counter-defendant X Corp.

27

stem from changes that X Corp. implemented after it acquired Twitter, a social media platform

28

now known as X.  Bright Data has long been in the business of scraping sites like X.  It uses

United States District Court
Northern District of California

computer automation to access webpages (it crawls), then extracts and copies data there (it scrapes). And, it sells tools so others can do the same. Twitter mostly sold ads. Now, X aims to sell mostly data instead, and it can sell more if it closes off customers from other sellers. Bright Data claims that X's Terms of Service now bar anyone who buys data on X, shares data with X, or just looks at data on X, from ever doing business with any company like Bright Data, which scrapes data X does not own from webpages X puts on public display. This allegedly hurts competition in the market for public-square data in the United States. Both Bright Data and X sell such data to businesses, academics, and others who use it to discern up-to-the-minute insights about current events. This order now recounts the alleged transformation from Twitter into X that provoked these counterclaims.

1.    THE FACTUAL ALLEGATIONS.

In 2006, Twitter was founded for people to share what's happening in the world and what people are talking about right now. As Bright Data alleges it, that focus on "public square user engagement" separated Twitter's platform from other social media platforms focused on making professional connections (like LinkedIn) or keeping friendships (Facebook). And, that "democratized" approach to creating, consuming, and re-sharing news separated Twitter also from news services.

Few alternative "public square platforms" arose to compete. Alternatives were limited by powerful network effects. As more users created more content on Twitter, they attracted more users who did more of the same (and advertisers, too), increasing the first platform's value beyond what a new entrant could reasonably achieve. Indeed, even now, alternative public-square platforms are site to just five percent of active public-square users, compared to 95 percent on Twitter (now X). The other platforms are primarily Mastodon, Truth Social, Bluesky, and Threads.

X Corp. acquired Twitter and renamed it X. The platform continued on as Twitter had but with some changes, starting with how it made money.

Just before acquisition, Twitter had made over 90 percent of its money from ads. It had attracted users to share content — free of charge. And, it had attracted companies to place ads

1   alongside that content — *for* a charge.  Yes, Twitter had used the public-square data to help its

2   platform moderate feeds and place ads, and so indirectly had profited from the data.  And,

3   Twitter had sold some of it directly (addressed next).  But Twitter had not prioritized selling

4   that data as a product for others.

5       Indeed, Twitter had provided an application programming interface (or API) so others

6   could tap into Twitter's data, charging only for select information or for large quantities.  And,

7   Twitter had freely let others crawl and scrape.  Twitter's Terms of Service expressly had let

8   people use computer automation to access Twitter's publicly displayed webpages.  And,

9   Twitter's corporate leadership "[k]new about it" and determined "[i]t was fine" to let others

10  copy the data on those pages — saying "[s]craping was the open secret of Twitter" (¶ 12).[1]

11      Bright Data had been one such scraper.  It had copied public data from Twitter and sold it

12  to Fortune 500 companies, academic institutions, and small businesses.

13      All that changed after X Corp. acquired Twitter.  Entrepreneur and Twitter user Elon

14  Musk led the acquisition.  He believed, it is alleged, that Twitter was frittering away its most

15  valuable asset — public-square data.  As a co-founder of OpenAI, Musk appreciated data's

16  value to artificial intelligence.  OpenAI itself had paid Twitter for data.  Such data would be

17  essential to a future AI service he envisioned answering questions about current events as part

18  of an "everything app."  "[B]uying Twitter," he tweeted, "probably accelerates [this project] by

19  3 to 5 years" (¶ 38).  Early in 2022, Musk offered $44 billion for Twitter.  Later that year, his

20  company X Corp. completed the acquisition and renamed Twitter "X."  And, in July 2023, he

21  founded xAI, a company that uses X's data to power an AI chatbot.

22      So, X Corp. now aimed to exclude scrapers like Bright Data from scraping X.

23      To be sure, X Corp. never tried to buy exclusive rights to the public-square data on X.  It

24  limited its liability (via the Communications Decency Act) by leaving data ownership with X's

25  users.  Instead, X Corp. first tried putting X's webpages behind logins and therefore beyond

26  scrapers.  But this caused user activity on X to crater.  Into this breach came Threads, a rival

27

28  ─────────────
    [1]  Citations to paragraphs are to the counterclaims (Dkt. No. 168), unless otherwise stated.

United States District Court
Northern District of California

that threatened to use public pages to prompt engagement.  X Corp. put X's pages back on public display.

So, X Corp. next changed X's Terms of Service.  That allegedly did the trick.  Bright Data now assails four unreasonable restraints in these terms (¶ 153).[2]

*First and Second*, the terms for crawling and scraping changed.  Recall that crawling was previously expressly permitted, and scraping previously consented to.  Now, both crawling and scraping became newly prohibited absent written consent not forthcoming.  To be specific, the terms changed:

- *from* "crawling the Services is permissible if done in accordance with the provisions of the robots.txt file, however, scraping the Services without our prior consent is expressly prohibited" (robots.txt permitted crawling logged-off pages) (*see* ¶ 68 (incorporating X's Terms of Service as of May 18, 2023); Br. Exh. 3 at 47 (exhibiting that version)),

- *to* "crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited" (*see* ¶ 69 (incorporating X's Terms of Service as of September 29, 2023); Br. Exh. 2 at 30 (exhibiting that version)).

*Third*, the above had impact also because of a newly stated term barring facilitation of any violation, and so barring facilitation of crawling and scraping.  It stated:

- "It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms" (¶ 92 (quoting X's Terms of Service); *see* Br. Exh. 2 at 30 (X's Terms of Service as of September 29, 2023) (containing term); Br. Exh. 1 at 11 (November 15, 2024) (same)).

*Fourth*, a new term was added imposing liquidated damages for any violation:

- "You further agree that, to the extent permitted by applicable law, if you violate the Terms, or you induce or facilitate others to do so, in addition to all other legal remedies available to us, you will be jointly and severally liable to us for liquidated damages as follows for requesting, viewing, or accessing more than 1,000,000 posts (including reply posts, video posts, image posts, and any other posts) in any 24-hour period - $15,000 USD per 1,000,000 posts. You agree that these amounts are (i) a reasonable estimate

---

[2]  Bright Data's counterclaims incorporate by reference X's Terms of Service in use at the various times cited.  Bright Data sometimes skips over phrases in the passages it excerpts.  Those phrases are included here for completeness, with citations to X Corp.'s exhibits being to the relevant version of X's terms and to the blue pagination imprinted by ECF (Dkt. No. 165-1 ("Br. Exhs.")).

United States District Court
Northern District of California

of our damages; (ii) not a penalty; and (iii) not otherwise limiting of our ability to recover from you or others under any legal or equitable theory or claim, including but not limited to statutory damages and/or equitable relief. You further agree that repeated violations of these Terms will irreparably harm and entitle us to injunctive and/or other equitable relief, in addition to monetary damages" (*see* ¶ 83 (incorporating X's Terms of Service as of November 15, 2024); Br. Exh. 1 at 13 (exhibiting that version)).

Bright Data alleges that this liquidated damages provision amounts to one cent and a half per post, or "1400% higher" than the about one-tenth of a cent per post that X charges its API customers. X Corp., it is alleged, knows the amount imposed departs wildly from any actual damages, and wields it as a "cudgel" (¶¶ 86–87).

Bright Data alleges the above terms restrain competition. X Corp. uses the terms and the threat of attempting to enforce them to frighten prospects and restrain customers from doing business with scrapers like Bright Data. And, "as a matter of commercial reality," that is enough to let X Corp. "effectively control prices, exclude competition, and exercise substantial monopoly power" in the public-square data market (¶ 96).

*Additionally*, Bright Data alleges that X Corp. has frustrated the growth of rival public-square platforms, and so the growth of alternative supplies for rival public-square data sellers like Bright Data. Whenever an X user clicks on a link appearing on X but pointing to a rival public-square platform (like Bluesky), X "throttles" the user's connection to that new page, prompting some users to give up and go back to X (some transfers take up to 60 times longer, and research shows one user gives up for every three in such a situation) (¶¶ 107–08). X also buries posts that include such links — so fewer users see them at all. The sole purpose is to stall competition.

## 2. THE LEGAL CLAIMS AND IMMEDIATE PROCEDURE.

From these factual allegations, Bright Data asserts various counterclaims.

Bright Data alleges the existence of product markets for public-square user engagement, public-square platforms, public-square data, and (as a submarket within the latter) publicly available public-square data (from publicly displayed webpages). But the allegations and this order focus on the public-square data market. Bright Data asserts geographic markets in the United States and worldwide.

5

For each of those markets, Bright Data then alleges unreasonable restraints of trade under the Sherman Act's Section 1 (Claim I) and monopolization or attempts under Section 2 (Claims II–III), as well as analogous claims under the antitrust laws of California and Texas (Claims IV, VII) and the still-broader trade practices laws of California and Nevada (Claims V–VI). Finally, Bright Data alleges tortious interference with customer relationships under the common laws of these various states (Claim VIII).

X Corp. moves to dismiss these counterclaims for failure to state a claim under Rule 12(b)(6). Alternatively, it moves to stay discovery or bifurcate proceedings related to them.

This order follows full briefing and argument.

## ANALYSIS

### 1. SHERMAN ACT SECTION 1.

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." The phrase "restraint of trade" means "unreasonable restraint." *Standard Oil Co. of N. J  v. United States*, 221 U.S. 1, 54, 60–62 (1911). Therefore,

> The true test of legality is whether the restraint imposed is such as merely regulates, and perhaps thereby promotes, competition, or whether it is such as may suppress or even destroy competition. To determine that question, the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse, but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918); *accord Twin City Sportserv., Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1303–04 & n.9 (9th Cir. 1982). Here, Bright Data alleges that X's Terms of Service — imposed on X's data buyers (and all X's users) — violate the rule of reason because they prevent all of X's customers from doing business with scrapers like Bright Data and so preempt competition for sales into a massive share of the market for public-square data in the United States.

United States District Court
Northern District of California

1    *First*, Bright Data alleges a plausible product and geographic market: sales of public-

2    square data in the United States. Not all data drives all engines. The data here emerges from

3    real-time, multi-sided, public conversations about current events, such as conversations on X.

4    Once that data is scraped and packaged for sale, it becomes a unique input for customers who

5    use it to power up-to-the-minute insights into current events and people's sentiments about

6    them. Fortune 500 companies pay for that data to drive decisions; artificial intelligence

7    companies pay for that data to drive services, like chatbots that answer questions about what's

8    happening (not all can). Other data is no substitute. Data from traditional news organizations

9    is not as social, for instance, while data from social networks serving professionals or friends is

10   not as newsy. Bright Data also plausibly alleges relevant geographic bounds. The supplies of

11   such public-square data and the uses to which buyers put it — and the places of sale —

12   plausibly cluster in political geographies, such as the United States.

13   *Second*, Bright Data alleges that X's exclusionary contracts plausibly foreclose

14   competition for selling into a substantial share of this market. Recall that, when Bright Data's

15   focus on selling data began, Twitter was focused on selling ads. No more. After the

16   acquisition, X Corp. shifted to selling data and sought to exclude scrapers from this market.

17   The main allegation is that X Corp. did so by transforming X's Terms of Service, foisting a

18   new exclusionary agreement upon nearly all prospective buyers of public-square data.

19   The agreement is exclusionary, as plausibly alleged. It contains an anti-"facilitation"

20   term that bars X's data customers (or any X user) from ever buying from a business that

21   scrapes the public-square data X does not own from the webpages X publicly displays. The

22   agreement also contains a "liquidated damages" term that threatens otherwise daring traders

23   into submission. It is plausible that no prospect browse-wrapped by such an agreement will

24   buy from Bright Data or from any other scraper according to the commercial realities

25   (examined further below) (¶ 95).

26   And, this exclusionary agreement forecloses customers across a substantial share of the

27   market, plausibly. Recall X's Terms purport to browsewrap all of X's users and data buyers.

28   Allegedly, nearly 100 percent of those who want to buy the kinds of public-square data that X

United States District Court
Northern District of California

and Bright Data offer — be they individuals, corporate entities, or otherwise — at some point visit X (or buy data from X) (¶ 90). So it is plausible that nearly 100 percent of any market measure is likewise covered by these agreements (by share of customers, data volumes, or dollars).

The contract's anticompetitive effects cannot be evaded by choosing not to scrape, either. An alleged 95 percent of public-square user engagement takes place on X, so a similar share of the public-square data emerging from such engagement is on X, too (¶¶ 137–40).

Nor can the effects be waited out. Customers cannot readily leave X's agreement. Those who want to keep using X just to tweet are stuck with it. And, those who more specifically want to buy data from the privately displayed pages (not available from scrapers) are stuck buying any data they want from the publicly displayed pages also from X (despite such data being available from other sellers). But there's a more fundamental reason none can escape the relevant provisions, purportedly: "For the avoidance of doubt, [X's] Terms survive the deactivation or termination of [any user's] account" (*see* Br. Exh. 1 at 11–12 (X's Terms of Service as of Nov. 15, 2024)). And, because of network effects and throttling, other spots for public-square engagement and data flowing from it will not appear to save the day, either.

In sum, these contracts impair the competitive process, or so it is plausibly alleged.

*Finally*, X Corp.'s proposed justification for the restraint is plausible, too, at least as argued by X Corp. That purported purpose is to prevent free riding on X's investment by allowing X alone to profit from the data it aggregates there. Perhaps so. But, at this stage, those asserted benefits cannot be said to justify the alleged harms to competition. For example, is the free ride on X's servers from scrapers like Bright Data a little burdensome or a lot? "X incurs no real burden in responding to scrapers' server requests" (¶ 16). We must credit that allegation here. We must also credit the allegations that Twitter built its platform in the main before X imagined this payout.

None of X Corp.'s more specific case citations or counterarguments persuade otherwise.

Indeed, in the case X Corp. represents as "most analogous to our case" (Mar. 27, 2025 Tr. 26), "there [we]re *no* allegations in the complaint to support [a vertical foreclosure] theory:

United States District Court
Northern District of California

1    the complaint d[id] not address or describe the API terms of use at all." *Crowder v. LinkedIn*

2    *Corp.*, No. 22-cv-00237-HSG, 2023 WL 2405335, at *5 (N.D. Cal. Mar. 8, 2023) (Judge

3    Haywood Gilliam, Jr.).  The district court went on to speculate about the terms only to guide

4    amendment.  In that context, it said the parties did not yet seem to "allege that the terms

5    prevent[ed] [data customers] from dealing with compet[ing data sellers]."  There was no clear

6    account for how limiting access to the data interfered with competitive mechanisms in any

7    market.

8        The case X Corp. points to as its next best offers no better guidance.  Put aside that the

9    plaintiff there failed to effectively allege a product market.  *hiQ Labs, Inc. v. LinkedIn Corp.*,

10   485 F. Supp. 3d 1137, 1149 (N.D. Cal. 2020) (Judge Edward Chen).  The plaintiff furthermore

11   "failed to explain *how* LinkedIn was able to coerce its members" — through contracts or

12   hijinks — "to boycott hiQ's or other companies' people analytics services."  *Id.* at 1154.  Our

13   counterclaims do not suffer these defects.  (Arguments about the sufficiency of the markets

14   alleged here are addressed below in the part on Section 2.)

15       Other cases X Corp. relies on to attack the above allegations suffer the same defects as

16   these first two cases.  Some involved a failure to allege the purported anticompetitive terms at

17   issue.  *E.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016)

18   ("Aerotec failed to provide any significant details about the repair agreements between

19   Honeywell and the airlines.").  Others involved a failure to explain how the incumbent, beyond

20   blocking its members from competing with it, was able to coerce its members from doing

21   business with competitors.  *E.g.*, CREXi's Opp., *CoStar Grp. v. Com. Real Est. Exch. Inc.*, No.

22   CV 20-8819-CBM(ASx) (C.D. Cal. Sept. 13, 2021), Dkt. No. 86 (CREXi argued that "CoStar

23   conditions access to its websites, and brokers' own [CoStar]-hosted websites, on [CoStar's]

24   users' agreement not to compete with CoStar," not on their agreement not to buy from

25   CoStar's competitors); *CoStar Grp.*, 619 F. Supp. 3d 983, 991 (C.D. Cal. 2022) (Judge

26   Consuelo Marshall) ("CoStar blocking CREXi from [CoStar's] websites does not forbid

27   brokers from hiring CREXi"); *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d

28   1070, 1078 (S.D. Cal. 2012) (Judge Cathy Ann Bencivengo) ("[T]he Complaint lacks

1  factually-supported allegations that implicate the impact of Facebook's actions with respect to

2  anything that occurs outside of Facebook . . . ."); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1002–

3  05 (9th Cir. 2020) (no license, no chips, but no coercion — and same for volume discounting).

4      Finally, X Corp. emphasizes that it may refuse to deal with anyone, any way it chooses.

5  But X Corp. is doing more than merely refusing to deal with scrapers.  X Corp. is forcing its

6  own customers not to deal with scrapers, in perpetuity, a much different problem under the

7  Sherman Act.  Relatedly, X Corp. argues that the Supreme Court in *Trinko* held that "when

8  there is another source of law that addresses the competitive concerns at issue, courts should

9  tread carefully before grafting antitrust remedies on top," X Corp. proposes that the Copyright

10  Act is a source of law that already addresses the anticompetitive concerns at issue here because

11  it preempts enforcement under state law of "anti-[copy]ing restrictions" as to material for

12  which X lacks copyright, and X Corp. therefore concludes "that our contract[ ] trying to restrict

13  people from stealing [what we do not own under copyright] is [not] an antitrust violation"

14  (Mar. 27, 2025 Tr. 47–48).  But this takes *Trinko* too far.  Of course the antitrust laws still

15  apply to anticompetitive conduct and self-help in the shadows of the Copyright Act.  *E.g.*,

16  *Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 464 (1941).  To the extent copyright-

17  related concerns come into play at all in our antitrust counterclaims, those concerns will be

18  factually sensitive, and under the rule of reason we cannot now decide they overtake or

19  outweigh the alleged harms to competition.

20      X Corp.'s motion to dismiss Bright Data's Section 1 counterclaim is **DENIED.**

21      **2.    SHERMAN ACT SECTION 2.**

22      For similar reasons, Bright Data's counterclaims also state a plausible claim for relief

23  from monopolization and monopoly attempts.  Indeed, even where vertical foreclosure theories

24  have not prevailed under Section 1, monopolization theories involving the same conduct have

25  on occasion been sustained under Section 2.  *E.g.*, *United States v. Dentsply Int'l, Inc.*, 399

26  F.3d 181, 197 (3d Cir. 2005).  It is too soon to reject these out of hand here.

27      X Corp.'s insistence that Bright Data must allege the relevant market more specifically to

28  establish market power is well-taken, but it demands too much for purposes of pleading.

United States District Court
Northern District of California

1    For one thing, Bright Data alleges direct evidence of X Corp.'s power over price (¶ 133–

2  34, 141).  X Corp.'s arguments about the failure to define the market needed to establish

3  circumstantial evidence of the same thing thus lack force.

4    For another thing, Bright Data does allege circumstantial evidence supporting a market

5  and the shares within it.  X Corp.'s main counterargument in this connection is that scrapers

6  compose some material portion of those selling public-square data, and thus that X's share of

7  that marketplace is much smaller than supposed (Br. 23).  But this, too, misses key allegations.

8  Again, accepting the allegations as true, the relevant metric is that X's exclusionary contracts

9  blanket nearly the entire base of customers that any rival could sell to — which plausibly

10  creates a dangerous possibility of monopolization of the public-square data market even if the

11  starting share in the market is more modest than Bright Data's allegations make it seem (which

12  we must credit as true here).  X Corp.'s broader counters in this connection also fail.  That X

13  competes with companies "that enable people to create and share ideas" — ultimately with all

14  companies that require "people's attention and [ ] advertiser's budgets" — tells us little about

15  the narrowest plausibly drawn market that matters for antitrust purposes at the pleading stage.[3]

16  Bright Data has plausibly alleged that *public-square platforms* are not reasonably

17  interchangeable with all social media platforms (nor all news sites), and also that the *public-*

18  *square data* aggregated there is not reasonably interchangeable with other data.  If other

19  platforms or data are in fact closer substitutes (or more competitively disciplining) than

20  contended, such "factual testing [will be] by summary judgment or trial."  *Newcal Indus., Inc.*

21  *v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

22    Recall Bright Data alleges two other markets.  X Corp.'s objections as to both are well-

23  taken, but premature.  *Regarding the public-square user engagement market*, which is alleged

24  to be for the user inputs into public-square platforms, X Corp. argues that "no factual

25  allegations distinguish" that market from the public-square platform market (Reply 11 n.8).

26

27  [3]   The quotes come from a Twitter securities filing pre-dating the alleged conduct that X Corp.
   cites to support that X competes in broad markets (Br. 18–19), and that Bright Data's

28  counterclaims cited to support that X has narrower characteristics (¶ 113).  Twitter, Inc., Annual
   Report (Form 10-K), at 8 (Feb. 17, 2021).

United States District Court
Northern District of California

Not quite. Bright Data alleges a market for the input side and for the output side, as well as factually alleged reasons why firms that compete on both fronts at once may be disciplined most effectively, if at all, by others doing the same (including because of cross-side effects and cost structure). Whether these market contours in fact matter for competition, specifically with regard to the conduct alleged here, is better assessed on a factual record. *And, regarding the publicly available public-square data market*, X Corp. tries the same argument (Br. 21 n.14). But here X Corp. itself readily recognizes (at 19) a factual allegation distinguishing the proposed submarket. And, at least some of Bright Data's claims again plausibly allege how that distinction makes a difference in the competitive dynamics. *See Newcal Indus.*, 513 F.3d at 1045 (stating factors including distinct production, vendors, and price sensitivities).

Also recall Bright Data alleged other theories of anticompetitive conduct. X Corp. contends, however, that, whether characterized as exclusive dealing or monopoly leveraging or something else, the allegations amount to the same thing "repackaged" (Br. 12). If so, that critique is not fatal here. And, because Bright Data's allegations about X's throttling are bound up by that same packaging, not brought as some "stand-alone claim" for which its standing would be suspect, this order will not discard them yet (*see* Opp. 14, 22 & n.16).

X Corp.'s motion to dismiss Bright Data's Section 2 counterclaims is **DENIED**.

### 3. STATE ANTITRUST LAWS.

X Corp. offers no other reason to dismiss the state-law antitrust claims (Br. 23) — conceding they "mirror[ ] the analysis under federal law." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001). While this order questions the wisdom of Bright Data pressing multiple, parallel theories where it seems one will do and resources (on all sides) are limited, X Corp.'s motion to dismiss Bright Data's state-law counterclaims is **DENIED**.

### 4. CALIFORNIA SECTION 17200.

Because Bright Data states a claim for a violation of the antitrust laws, it states a claim for unlawful and unfair competition under California's Section 17200. *Cel-Tech Commc'ns., Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 539–40, 544 (Cal. 1999).

1      Bright Data further alleges a claim for fraudulent competition under California's Section

2   17200.  That claim is premised on two possible fraudulent courses of conduct.

3      *First*, it is premised on X Corp.'s alleged misrepresentations about how well its platform

4   spirits users away to anywhere, even to its rivals' platforms — when really it stops them in

5   their tracks whenever users click on a link to rival platforms.  But assuming such

6   misrepresentations were made, it is not clear how those misrepresentations were directly relied

7   upon by Bright Data or Bright Data's customers sufficiently to establish standing under the

8   demanding standards of Section 17200 in the wake of *Kwikset Corp. v. Superior Ct.*, 246 P.3d

9   877 (Cal. 2011).

10     *Second*, it is alternatively premised on X Corp.'s alleged misrepresentations about the

11  enforceability of the liquidated damages clause.  This clause may (or may not) end up doing

12  much work in the antitrust context.  There, as alleged, it plausibly raises rivals' costs even if no

13  customer believes it enforceable because frivolous threats still create commercial frictions.

14  But it is hard to see how this term alone can shoulder a claim under the fraudulent conduct

15  provision of Section 17200 — because, as alleged, this facially improper term would not

16  plausibly deceive the sophisticated buyers of the data at issue.  *Lavie v. Procter & Gamble Co.*,

17  105 Cal. App. 4th 496, 512 (2003).  And, to the extent it still deceives the broader public that

18  does not go on to buy from Bright Data, the above standing point again applies.

19     In sum, Bright Data's counterclaims for relief from unlawful and unfair competition

20  under Section 17200 are sustained.  The motion to dismiss as to them is **DENIED.**  But Bright

21  Data's counterclaims for relief from fraudulent competition cannot be sustained, and the

22  motion to dismiss as to them is **GRANTED.**

23     **5.    TORTIOUS INTERFERENCE.**

24     The alleged facts, accepted as true, make reasonably probable that more than one

25  prospective economic advantage would have been realized by Bright Data but for X Corp.'s

26  interference.  *See Soil Retention Prods., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929,

27  961 (S.D. Cal. 2021) (Judge Roger Benitez).

28

1    X Corp. argues Bright Data should have alleged which of its specific customer contracts

2    X Corp.'s alleged conduct has affected.  When X Corp. itself brought the same claim against

3    Bright Data, it identified its affected customers as, for example, "paying customers [who]

4    lawfully access certain categories of X data" (Dkt. No. 36 ¶ 48).  And, it argued those

5    pleadings sufficed to "describe[ ] the contracts" and the "group of people who were parties to

6    them" (Dkt. No. 48 at 20 (quoting *Byton N. Am. Co. v. Breitfeld*, No. CV 19-10563-DMG

7    (JEMx), 2020 WL 3802700, at *6 (C.D. Cal. Apr. 28, 2020) (Judge Dolly Gee)).  Recognizing

8    the problem here, X Corp. now proposes that Bright Data should not benefit from the same

9    standard because Bright Data knows its own customers.  That was true for X Corp., too.

10    X Corp.'s motion to dismiss Bright Data's tortious interference counterclaim is **DENIED.**

11    **6.    MOTION TO STAY OR BIFURCATE.**

12    X Corp.'s motion to stay or bifurcate discovery on the counterclaims, which overlaps

13    with discovery on the affirmative defenses and other issues in this case, is **DENIED.**

**CONCLUSION**

15    The counterclaims are sustained, except for the claim of fraudulent competition under

16    California's Section 17200.

17    **IT IS SO ORDERED.**

19    Dated:  April 18, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

*United States District Court*
*Northern District of California*

14