JOSHUA D. BRANSON*
jbranson@kellogghansen.com
ANDREW C. SHEN*
ashen@kellogghansen.com
DANIEL V. DORRIS*
ddorris@kellogghansen.com
BETHAN R. JONES*
bjones@kellogghansen.com
MATTHEW D. READE*
mreade@kellogghansen.com
JORDAN R.G. GONZÁLEZ*
jgonzalez@kellogghansen.com
KALEB J. LEGORE*
klegore@kellogghansen.com
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
* Admitted Pro Hac Vice

ADRIAN SAWYER, State Bar No. 203712
sawyer@sawyerlabar.com
SAWYER & LABAR LLP
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: (415) 262-3820

Counsel for Plaintiff
X Corp.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| X CORP., a Nevada corporation, | Case No. 3:23-cv-03698-WHA |
| Plaintiff, | **PLAINTIFF X CORP.'S ANSWER TO BRIGHT DATA'S COUNTERCLAIM** |
| v. | **DEMAND FOR JURY TRIAL** |
| BRIGHT DATA LTD., an Israeli corporation, | |
| Defendant. | Hon. William H. Alsup |

Pursuant to Federal Rule of Civil Procedure 12(a), Plaintiff and Counter-Defendant X Corp. ("X"), by and through its undersigned counsel, submits its Answer and Defenses to Defendant Bright Data, Ltd.'s ("Bright Data") Counterclaim.  X reserves the right to amend and supplement its Answer as may be appropriate or necessary.

## ANSWER TO COUNTERCLAIM

Each paragraph below corresponds to the same-numbered paragraph in the Counterclaim. All allegations not expressly admitted are denied.  X does not interpret the headings in the Counterclaim as well-pleaded allegations to which any response is required.  To the extent a response is required to the headings, X denies all such allegations in the headings.  In repeating the headings as they appear in the Counterclaim, X does not endorse or admit to any of those headings.

## I.    NATURE OF THE ACTION

1.      X admits that non-party Elon Musk was involved with an acquisition of a company called Twitter, Inc. ("Twitter").  X admits that the total cost of the acquisition was approximately $44 billion.  X denies the remaining allegations in Paragraph 1.

2.      X denies the allegations in Paragraph 2.

3.      X admits that the quoted language appears in Twitter's cited Annual Report.  X respectfully refers the Court to the Annual Report for an accurate and complete statement of its contents.  X also admits that many of its users may post on the X platform, free of charge.  X lacks sufficient knowledge or information to admit or deny what unidentified "[p]eople think" and therefore denies that allegation on that basis.  X denies the remaining allegations in Paragraph 3.

4.      X lacks sufficient knowledge or information to admit or deny allegations regarding the internal thoughts of Twitter's founders, and X denies those allegations on that basis.  X similarly lacks knowledge or information sufficient to admit or deny "how newspapers in the days of old made their money" and denies that allegation on that basis.  X denies the remaining allegations in Paragraph 4.

5.      X admits that the quoted language attributed to Elon Musk appears in the Verified Counterclaim in *Twitter, Inc. v. Musk*, 2022-cv-0613 (Del. Ch. Aug. 4, 2022).  X respectfully refers the Court to that Verified Counterclaim for an accurate and complete statement of its contents.  X

1

lacks sufficient knowledge or information to admit or deny whether "[w]e live in the dawn of the information age" or that "the world is changing" and denies those allegations on that basis.  X admits that, upon information and belief, Mr. Musk is one of the founders of the company OpenAI.  X denies the remaining allegations in Paragraph 5.

6.      X lacks sufficient knowledge or information to admit or deny whether unidentified "AI-driven search engines need real-time information" and therefore denies that allegation on that basis.  X admits that the quoted material is excerpted from an interview given by Mr. Musk[1] and from the X platform.  X respectfully refers the Court to those sources for an accurate and complete statement of their contents.  X further admits that it uses servers to host information on the X platform, tracks certain user activity on the X platform, and that its users average hundreds of millions of posts a day on the X platform.  X denies the remaining allegations in Paragraph 6.

7.      X admits that xAI was created in March of 2023 and that the launch of xAI was announced in July 2023.  X admits that xAI's chatbot is called "Grok."  X further admits that xAI's chatbot is trained in part based on certain data collected from X's platform.  X denies the remaining allegations in Paragraph 7.

8.      X admits that, under its Terms of Service ("Terms"), users own their own content.[2]  X respectfully refers the Court to those Terms for an accurate and complete statement of their content.  X denies the remaining allegations in Paragraph 8.

9.      X admits that, around July 2023, X implemented a policy that decreased the visibility of certain content on the X platform to logged-out users.  X admits that its change in policy was lawful.  X admits that in July 2023, Meta Platforms announced its launch of the Threads app.  X denies the remaining allegations in Paragraph 9.

10.      X denies the allegations in Paragraph 10 except to the extent that X's Terms constitute contracts with users of the X platform.

---

[1] Lex Fridman Podcast, *Elon Musk on xAI*: *We will win.* (Aug. 5, 2024), https://perma.cc/N8YC-QCP5.

[2] X Terms (Nov. 15, 2024), https://perma.cc/HD8A-XW34.

11.     X denies the allegations in Paragraph 11 except insofar as X's Terms constitute contracts with the users of the X platform.  X admits that OpenAI had paid approximately $2 million per year for access to X's data and that Twitter terminated its contract with OpenAI.  X admits that the quoted language, "[l]awsuit time," was posted by the account @elonmusk on the X platform.  X respectfully refers the Court to that source material for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 11.

12.     X admits that the quoted language appears in the cited Terms.  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X admits that the quoted language attributed to Yoel Roth and @yoyoel appears at the cited source.  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X admits that the account @elonmusk posted the quoted language on the X platform.  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 12.

13.     X admits that it amended its Terms in September 2023.  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 13.

14.     X admits that a portion the quoted language appears in the cited Terms.  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X admits that another portion of the cited language appears in X's Second Amended Complaint.  X respectfully refers the Court to its Second Amended Complaint (ECF 170-1) for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 14.

15.     X admits that the excerpted language appears in the Court's May 9, 2024 Order, which speaks for itself.  X also admits that its Terms constitute contracts with users of the X platform.  X denies the remaining allegations in Paragraph 15.

16.     X admits that the Court issued a decision on May 9, 2024, which speaks for itself.  X denies the remaining allegations in Paragraph 16.

17.     X denies the allegations in Paragraph 17.

3

18.     X denies the allegations in Paragraph 18 except to the extent that X's currently effective Terms include a term for liquidated damages.[3]  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 18.

19.     X admits that, upon information and belief, xAI made one preliminary inquiry with Bright Data in May 2024 but denies that the inquiry meaningfully progressed and denies that xAI ever retained Bright Data for any purpose.  X also denies that X ever retained Bright Data for any purpose and denies that it ever approached Bright Data about any such arrangement   X admits that it sued Bright Data in July of 2023, and that its complaint contains the quoted language.  X respectfully refers the Court to the complaint (ECF 1) for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 19.

20.     X denies the allegations in Paragraph 20.

21.     X denies the allegations in Paragraph 21.

## II.    THE PARTIES

22.     X lacks sufficient information and knowledge to admit or deny that "Bright Data is a revolutionary internet company that has developed best-in-class technologies" and therefore denies the allegation on that basis.  X admits the remaining allegations in Paragraph 22 upon information and belief.

23.     X admits that it is incorporated in Nevada.  X admits that it previously maintained its principal place of business at 1355 Market Street, Suite 900, San Francisco, California 94104.  X admits that it moved its headquarters to Bastrop, Texas on or about September 13, 2024.  X admits that on or about November 15, 2024, X adopted new Terms of Service, which are governed by Texas law.  X denies the remaining allegations in Paragraph 23.

---

[3] X Terms (Nov. 15, 2024), https://perma.cc/HD8A-XW34.

III.    **JURISDICTION AND VENUE**

24.    X admits that Bright Data's Counterclaim purportedly arises under federal law.  X denies that Bright Data has stated a claim under any cause of action cited in Paragraph 24.  For the purposes of this action, X does not contest that this Court has jurisdiction over Bright Data's claims.

25.    X admits that Bright Data's Counterclaim purportedly asserts the cited state-law causes of action.  X denies that Bright Data has stated a claim under any cause of action cited in Paragraph 25.  For the purposes of the current action, X does not contest that this Court has diversity jurisdiction over this action.  And for the purposes of the current action, X does not contest that the Court has supplemental jurisdiction over Bright Data's state-law claims.

26.    For the purposes of the current action, X admits that this Court has personal jurisdiction over X.

27.    For the purposes of the current action, X admits that venue in this district is proper, though X reserves its rights to assert its rights as to any forum-selection clause.

IV.    **FACTUAL ALLEGATIONS**

    A.    ***X's Modest Beginnings to Global Powerhouse.***

28.    X admits the allegations in Paragraph 28.

29.    X lacks sufficient knowledge and information to admit or deny that "[e]arly adopters" of Twitter "were tech enthusiasts who marveled at its simplicity and immediacy" and denies the allegation on that basis.  X admits the remaining allegations in Paragraph 29.

30.    X lacks sufficient knowledge and information to admit or deny that "[t]he platform's first major breakout moment came during the 2007 South by Southwest (SXSW) festival" and denies the allegation on that basis.  X admits the remaining allegations in Paragraph 30.

31.    X lacks sufficient knowledge and information to admit or deny that "[b]y the late 2000s, Twitter had cemented itself as the go-to platform for breaking news and real-time updates" or that "[p]eople care about what celebrities or politicians tweet" and denies those allegations on that basis.  X admits the remaining allegations in Paragraph 31.

32.    X admits that Twitter users began the custom of using hashtags with their posts.  X lacks sufficient knowledge or information to admit or deny that Chris Messina invented the hashtag

in 2007 therefore denies that allegation on that basis. X admits that hashtags are sometimes used to promote social causes. X denies the remaining allegations in Paragraph 32.

33.     X admits that citizens, celebrities, politicians, brands, and businesses used the Twitter platform. X admits the cited statistics in Paragraph 33 appear in the news articles cited in footnotes 19 and 20. X respectfully refers the Court to those news articles for a complete and accurate statement of their contents. X denies the remaining allegations in Paragraph 33.

**B.      *Musk Takes Over and Transforms Twitter into a Data Monopolist.***

34.     X admits that Twitter sold advertising. X lacks sufficient knowledge and information to admit or deny whether unidentified members of "[m]anagement" at Twitter "believed Twitter was an advertising company" and denies the allegation on that basis. X denies the remaining allegations in Paragraph 34.

35.     X lacks sufficient knowledge and information to admit or deny what unidentified "people" did or did not "realize" at an unidentified "time" and denies that allegation on that basis. X also lacks sufficient information and knowledge to admit or deny what Mr. Musk "recognized" in 2015, or the sum of money Mr. Musk has separately invested in OpenAI, and denies those allegations on that basis. X denies the remaining allegations in Paragraph 35.

36.     X lacks sufficient knowledge and information to admit or deny future possibilities for OpenAI and denies those allegations on that basis. X denies the remaining allegations in Paragraph 36.

37.     X lacks sufficient knowledge and information to admit or deny facts going to Open AI's "resources" or plans and denies the allegations on that basis. X admits that OpenAI spent approximately $2 million annually on Twitter data during portions of the relevant period. X denies the remaining allegations in Paragraph 37.

38.     X admits that the quoted language was posted to the X platform by the account @elonmusk. X respectfully refers the Court to that source for an accurate and complete statement of its contents. X denies the remaining allegations in Paragraph 38.

39.     X admits that the quoted language was posted to the X platform by the account @elonmusk.  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 39.

40.     X admits that the quoted language was posted to the X platform by the account @ElonMuskNewsOrg.  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X admits that the acquisition price associated with Twitter was approximately $44 billion.  X denies the remaining allegations in Paragraph 40.

41.     X denies the allegations in Paragraph 41.

42.     X admits that Twitter earned most of its revenue from advertising prior to the acquisition.  X respectfully refers the Court to Twitter's Annual Report for an accurate and complete statement of its contents.  X denies that the quoted language appears in the filing in *X Corp. v. World Federation of Advertisers*, 7:24-cv-00114, ECF 62 at 24 (N.D. Tex. 2024).  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 42.

43.     X admits that, after the acquisition, Twitter was rebranded as "X."  X admits that the news article cited in footnote 27 contains the sentiments expressed in Paragraph 43.  X respectfully refers the Court to that news article for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 43.

44.     X admits that, following Mr. Musk's acquisition of Twitter, X terminated some former Twitter employees, some of whom had played roles in suppressing free speech on Twitter.  X also admits that, following Mr. Musk's acquisition of Twitter, some advertisers stopped advertising on the X platform.  X lacks sufficient knowledge and information to admit or deny any allegations as to the motivations of those advertisers and denies those allegations on that basis.  X denies the remaining allegations in Paragraph 44.

45.     X lacks sufficient information or knowledge to confirm or deny whether there is "an old saying that people flock to a free meal, but charge them a penny, and you will be eating alone" and denies that allegation on that basis.  X denies the remaining allegations in Paragraph 45.

46.    X admits that users have historically posted for free on the X platform.  X admits that it offers paid subscriptions and profile verifications.  X denies the remaining allegations in Paragraph 46.

47.    X lacks sufficient information or knowledge to admit or deny whether "they say" that "[c]ustomers were not buying it" and denies that allegation on that basis.  X admits that the account @elonmusk posted the excerpted picture on the X platform.  X denies the remaining allegations in Paragraph 47.

48.    X admits that the sources cited in footnote 30 contain the language cited in the parenthetical citations.  X denies the remaining allegations in Paragraph 48.

49.    X admits that the news article cited in footnote 31 contains the sentiments attributed to it in Paragraph 49.  X respectfully refers the Court to that news article for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 49.

50.    X admits that the quoted language was posted to the X platform by the account @elonmusk.  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X denies the remainder of the allegations in Paragraph 50.

51.    X denies the allegations in Paragraph 51.

52.    X denies the allegations in Paragraph 52.

53.    X admits that the cited Terms contain the quoted language.  X respectfully refers the Court to those Terms to an accurate and complete statement of their content.  X admits that the quoted language attributed to Yoel Roth and @yoyoel in footnote 34 appears at the cited source.  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X admits that the quoted language attributed to the Verified Counterclaim in *Twitter, Inc. v. Musk*, 2022-cv-0613 (Del. Ch. Aug. 4, 2022) appears in the Verified Counterclaim.  X respectfully refers the Court to that Verified Counterclaim for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 53.

54.    X admits that some content posted on X is "unique" to X.  X further admits that there are some "valuable uses" for the data that exists on X.  X admits that Grok is a chatbot launched by xAI.  X further admits that Grok was trained in part on certain portions of X's user-generated data,

although users could opt-out of having their data used for that purpose.  X denies the remaining

allegations in Paragraph 54.

**C.    *X Has Engaged in a Broad, Multifaceted Scheme to Acquire and Maintain a Monopoly Through Exclusionary and Deceptive Conduct.***

55.    X admits that it faces competition.  X denies the remaining allegations in Paragraph

55.

**1.    *X's Efforts to Wrest Control Over Data It Does Not Own.***

**i.    *X Eschews All Lawful Means of Controlling Access to User Generated Data.***

56.    X denies the allegations in Paragraph 56.

57.    X lacks sufficient knowledge and information to admit or deny whether it "could

have acquired ownership of its users' content" in a hypothetical situation and therefore denies the

allegation on that basis.  X similarly lacks sufficient knowledge and information to admit or deny

whether a "[c]ustomer backlash" would follow in response to hypothetical events and therefore

denies that allegation on that basis.  X denies the remaining allegations in Paragraph 57.

58.    X admits that, around July 2023, X implemented a policy that decreased the visibility

of certain content on the X platform to logged-out users.  X lacks sufficient knowledge and

information to admit or deny what "[o]ther social media platforms have done" and therefore denies

that allegation on that basis.  X lacks sufficient knowledge and information regarding Facebook's

internal strategies and therefore denies those allegations on that basis.  X denies the remaining

allegations in Paragraph 58.

59.    X admits that the quoted language appears in Twitter's Annual Report.  X

respectfully refers the Court to the Annual Report for an accurate and complete statement of its

contents.  X denies the remaining allegations in Paragraph 59.

60.    X admits that, around July 2023, X implemented a policy that decreased the visibility

of certain content on the X platform to logged-out users.  X denies the remaining allegations in

Paragraph 60.

61.    X admits that the quoted language was posted to the X platform by the account @elonmusk.  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 61.

62.    X lacks sufficient knowledge and information to admit or deny allegations concerning why unidentified individuals "depended" on the X platform, and whether "backlash" from those individuals was "immediate," and therefore denies those allegations on that basis.  X lacks sufficient knowledge and information to admit or deny Meta's reasons for launching the Threads product and denies the allegation on that basis.  X denies the remaining allegations in Paragraph 62.

63.    X lacks sufficient knowledge and information to admit or deny allegations about the Threads product and therefore denies those allegations on that basis.  X denies the remaining allegations in Paragraph 63.

64.    X admits that, around July of 2023, it altered its policy to render more (but not all) content viewable on the X platform to users who were not logged in.  X denies the remaining allegations in Paragraph 64.

### ii.    *X Uses Unlawful Exclusionary Contracts of Adhesion to Eliminate Competition.*

65.    X admits that the quoted language was posted to the X platform by the account @elonmusk.  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 65.

66.    X denies the allegations in Paragraph 66 except to the extent X's Terms constitute contracts with users of the X platform.

67.    X admits it filed its Complaint against Bright Data on July 26, 2023.  X denies the remaining allegations in Paragraph 67.

68.    X admits that the quoted language appears in the cited Terms.  X respectfully refers the Court to those Terms, and any previous versions of its Terms, for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 68.

69.     X admits that it updated its Terms on September 29, 2023.  X respectfully refers the Court to those Terms, and any previous versions of its Terms, for an accurate and complete statement of their contents.  X admits that it received a notice from Bright Data purporting to reject X's Terms.  X admits that the Court issued a decision on May 9, 2024, which speaks for itself.  X denies the remaining allegations in Paragraph 69.

70.     X admits that a portion of the language in quotations appears in the Court's May 9, 2024 Order, which speaks for itself.  X admits that the language cited in footnote 46 appears in the cited Terms.  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X admits that, with respect to footnote 48, the Court issued an Order on November 26, 2024, which speaks for itself.  X denies the remaining allegations in Paragraph 70.

71.     X admits that the quoted language appears in the cited Terms.  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 71.

72.     X denies the allegations in Paragraph 72.

73.     X admits the allegations in Paragraph 73 only insofar as its Terms create contracts with X's users.  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 73.

74.     X admits the allegations in Paragraph 74 only insofar as its Terms create contracts with X's users.  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 74.

75.     X admits the allegations in Paragraph 75 only insofar as its Terms create contracts with its users.  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X lacks sufficient knowledge and information to admit or deny what technologies or methods are used by unidentified scrapers to scrape information on X.  X denies the remaining allegations in Paragraph 75.

76.     X admits the allegations in Paragraph 76 only insofar as its Terms create contracts with X's users.  X respectfully refers the Court to its Terms for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 76.

77.     X denies the allegations in Paragraph 77.

78.     X denies the allegations in Paragraph 78.

79.     X admits that its Terms prohibit automated crawling and scraping of X's platform without prior written consent and that those provisions do not depend upon the volume of scraping. X respectfully refers the Court to its Terms for an accurate and complete statement of their contents. X denies the remaining allegations in Paragraph 79.

80.     X admits that it maintains 10-20% excess server capacity to absorb the impact of scraping on its systems. X denies the remaining allegations in Paragraph 80.

81.     X admits that the quoted language appears in the Court's May 9, 2024 Order, which speaks for itself. X denies the remaining allegations in Paragraph 81.

82.     X admits that its Second Amended Complaint contains the quoted language. X respectfully refers the Court to its Second Amended Complaint for an accurate statement of its contents. X admits that, with respect to footnote 54, the quoted excerpt appears in *Meta Platforms, Inc. v. Bright Data Ltd*., 2024 WL 251406, at *4 (N.D. Cal. Jan. 23, 2024). That decision speaks for itself, and all inconsistent allegations are denied. X admits that, with respect to footnote 55, the language "claims that >95% of daily active users are real, unique humans" was posted to the X platform by the account @elonmusk. X respectfully refers the Court to that source for an accurate and complete statement of its contents. X admits that, with respect to footnote 55, the language "false" and "misleading" appears in the pleadings cited from *Twitter, Inc. v. Musk*, 2022-cv-0613 (Del. Ch. Aug. 4, 2022). X respectfully refers the Court to those pleadings for an accurate and complete statement of their contents. X denies the remaining allegations in Paragraph 82.

83.     X admits that a portion of the quoted language appears in the cited Terms. X respectfully refers the Court to those Terms for an accurate and complete statement of their contents. X denies the remaining allegations in Paragraph 83.

84.     X lacks sufficient knowledge and information to admit or deny allegations about the decision-making process employed by data scrapers and denies those allegations in Paragraph 84. X admits it seeks to stop unauthorized data scraping on the X platform. X denies the remaining allegations in Paragraph 84.

85.     X admits the allegations in Paragraph 85 only insofar as its Terms contain a liquidated-damages provision.  X respectfully refers the Court to those Terms for an accurate and complete statement of its contents.  X admits that users post hundreds of millions of posts per day on the X platform.  X admits that the number of posts viewed or accessed each day is greater than the number of new posts each day on the X platform. X admits that it has processed approximately 400 billion events each day.  X denies the remaining allegations in Paragraph 85.

86.     X admits the allegations in Paragraph 86 insofar as its Terms contain a liquidated-damages provision.  X respectfully refers the Court to those Terms to an accurate and complete statement of their contents.  X lacks sufficient knowledge and information to admit or deny whether unidentified companies "committed fraud by purporting to pass on Xeroxing costs" to unknown persons or entities and denies that allegation on that basis.  X denies the remaining allegations in Paragraph 86.

87.     X denies the allegations in Paragraph 87.

88.     X lacks sufficient knowledge and information to admit or deny allegations about Bright Data's customer relationships and denies that allegation on that basis.  X denies the remaining allegations in Paragraph 88.

> **2.     *X Uses Exclusive Contracts to Ensure that It Is the Sole Source of Public Square Data.***

89.     X admits the allegations in Paragraph 89 only insofar as its Terms constitute contracts with its users.  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 89.

90.     X admits the allegations in Paragraph 90 only insofar as its Terms constitute contracts with its users.  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 90.

91.     X denies the allegations in Paragraph 91.

92.     X admits that the quoted language appears in the cited Terms.  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X lacks sufficient knowledge and information to admit or deny whether "website operators often employ

13

different terms to achieve the same ends" and therefore denies that allegation.  X denies the remaining allegations in Paragraph 92.

93.     X admits the allegations in Paragraph 93 only insofar as its Terms may create contracts with X's users.  X respectfully refers the Court to those Terms for an accurate and complete statement of their content.  X denies the remaining allegations in Paragraph 93.

94.     X denies the allegations in Paragraph 94.

95.     X admits the allegations in Paragraph 95 only insofar as its Terms may create contracts with X's users.  X respectfully refers the Court to those Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 95.

96.     X denies the allegations in Paragraph 96.

97.     X lacks sufficient information to admit or deny what might create "greater demand for Bright Data's services" and therefore denies that allegation on that basis.  X denies the remaining allegations in Paragraph 97.

### 3.     *X Employs Deceptive Throttling Technologies to Eliminate Users' Links to Competing Social Media Platforms.*

98.     X denies the allegations in Paragraph 98.

99.     X lacks sufficient knowledge or information to admit or deny whether unidentified "A.I. competitors" could "use data scrapers" to obtain information they "need" and therefore denies that allegation on that basis.  X denies the remaining allegations in Paragraph 99.

100.     X denies the allegations in Paragraph 100.

101.     X admits it faces competition from other platforms.  X denies the remaining allegations in Paragraph 101.

102.     X lacks sufficient knowledge or information to admit or deny allegations regarding the "dustbins of history" and therefore denies that allegation on that basis.  X lacks sufficient knowledge or information to admit or deny whether "MySpace, WordPerfect, AOL, and others" exercised monopoly power and therefore denies that allegation on that basis.  X denies the remaining allegations in Paragraph 102.

103.    X admits that it operates a platform that is accessible from the World Wide Web.  X admits that users may post hyperlinks from X's platform to other websites.  X denies the remaining allegations in Paragraph 103.

104.    X admits that users are able to click links on X, which will take them to the linked page.  X also admits that it has "historically complied with World Wide Web protocols."  X denies the remaining allegations in Paragraph 104.

105.    X admits that users on X are able to click to links which will allow them to traverse to other platforms.  X lacks sufficient knowledge and information to admit or deny what might lead "one newspaper" to "scoop another" and therefore denies that allegation on that basis.  X denies the remainder of the allegations in Paragraph 105.

106.    X denies the allegations in Paragraph 106.

107.    X admits that the quoted language appears in the cited news article in footnote 63.  X respectfully refers the Court to that news article for an accurate and complete statement of its contents.  X denies that the cited source provides an accurate or complete representation of X's practices.  X admits that it has increased the load times of certain links on its platform but denies the allegations characterizing that practice and denies the remaining allegations in Paragraph 107.

108.    X admits that the quoted language appears in the cited news article in footnote 64.  X respectfully refers the Court to that news article for an accurate and complete statement of its contents.  X denies that the cited source provides an accurate or complete representation of X's practices.  X lacks sufficient information or knowledge to admit or deny whether unidentified "users who are throttled" are more or less likely to access other websites and so denies that allegation on that basis.  X denies the remaining allegations in Paragraph 108.

109.    X denies the allegations in Paragraph 109.

110.    X admits that the quoted language was posted to the X platform by the account @elonmusk.  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 110.

111.    X denies the allegations in Paragraph 111.

**D.    *X's Conduct has Allowed it to Acquire, Maintain, and Enhance its Monopoly Power.***

     **1.    *The Relevant Markets.***

112.    X denies the allegations in Paragraph 112.

     ***i.    The Public Square Platform Market.***

113.    X admits that the quoted language attributed to Twitter's Annual Report appears in the Annual Report.  X respectfully refers the Court to the Annual Report for an accurate and complete statement of its contents.  X admits that the quoted language attributed to Elon Musk was posted to the X platform by the account @elonmusk.  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X admits that the language "digital town square where matters vital to the future of humanity are debated" appears in the Verified Counterclaim in *Twitter, Inc. v. Musk*, 2022-cv-0613 (Del. Ch. Aug. 4, 2022).  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 113.

114.    X admits that the phrase "multi-sided platform business" appears in its Second Amended Complaint.  X respectfully refers the Court to that source (ECF 170-1) for an accurate and complete statement of its contents.  X denies the remaining allegations in Paragraph 114.

115.    X denies the allegations in Paragraph 115.

116.    X admits the allegations in Paragraph 116 only insofar as, upon information and belief, "content viewers" are more likely to spend time on platforms that contain their "desired content."  X denies the remaining allegations in Paragraph 116.

117.    X denies the allegations in Paragraph 117.

118.    X denies the allegations in Paragraph 118.

119.    X denies the allegations in Paragraph 119.

120.    X denies the allegations in Paragraph 120.

121.    X denies the allegations in Paragraph 121.

122.    X admits the allegations in Paragraph 122 only insofar as, upon information and belief, certain advertisers wish to advertise to users online.  X denies the remaining allegations in Paragraph 122.

123.    X denies the allegations in Paragraph 123.

124.    X denies the allegations in Paragraph 124.

### ii.    The Public Square User Engagement Market.

125.    X denies the allegations in Paragraph 125.

126.    X denies the allegations in Paragraph 126.

127.    X denies the allegations in Paragraph 127.

### iii.    The Public Square Data Market.

128.    X denies the allegations in Paragraph 128.

129.    X admits that the quoted language was posted to the X platform by the account @elonmusk.  X respectfully refers the Court to that source for an accurate and complete statement of its content.  X denies the remaining allegations in Paragraph 129.

130.    X denies the allegations in Paragraph 130.

131.    X admits the allegations in Paragraph 131 only insofar as searching for an individual's X posts on Google may result in being shown X posts.  X denies the remaining allegations in Paragraph 131.

132.    X denies the allegations in Paragraph 132.

133.    X denies the allegations in Paragraph 133.

134.    X lacks sufficient knowledge and information to admit or deny what "other news and data organizations charge for their data" and therefore denies the allegation on that basis.  X denies the remaining allegations in Paragraph 134.

### iv.    The Publicly-Available Public Square Data Market.

135.    X denies the allegations in Paragraph 135.

136.    X denies the allegations in Paragraph 136.

### 2.    X Possesses Market Power, Monopoly Power, and a Dangerous Probability of Obtaining Monopoly Power in Each of the Alleged Markets.

137.    X admits that the quoted language from the X platform appears in the cited "Compliance Firehose API" page.  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X admits that the quoted language attributed to Elon Musk was

17

posted to the X platform by the account @elonmusk.  X respectfully refers the Court to that source for an accurate and complete statement of its contents.  X admits it has hundreds of millions of daily active users, who collectively post hundreds of millions of posts per day.  X denies the remaining allegations in Paragraph 137.

138.    X denies the allegations in Paragraph 138.

139.    X admits the allegations in Paragraph 139 only insofar as X faces competition, including from (but not limited to) the platforms mentioned in Paragraph 139.  X denies the remaining allegations in Paragraph 139.

140.    X denies the allegations in Paragraph 140.

141.    X admits that it changed its API policy in 2023.  X denies the remaining allegations in Paragraph 141.

### E.    *X's Conduct Has Caused and Threatens to Cause Significant and Irreparable Antitrust Injury.*

142.    X denies the allegations in Paragraph 142.

143.    X denies the allegations in Paragraph 143.

144.    X denies the allegations in Paragraph 144.

145.    X denies the allegations in Paragraph 145.

146.    X denies the allegations in Paragraph 146.

## V.    COUNTS

### A.    *Count I:  Section 1 of the Sherman Act, 15 U.S.C. § 1.*

147.    X incorporates all other paragraphs of this Answer as if fully set forth herein.

148.    X denies the allegations in Paragraph 148.

149.    X denies the allegations in Paragraph 149.

150.    X denies the allegations in Paragraph 150.

151.    X denies the allegations in Paragraph 151 except insofar as its Terms create contracts with its users.

152.    X denies the allegations in Paragraph 152 except insofar as its Terms create contracts with its users.

153.    X denies the allegations of Paragraph 153 except insofar as its Terms create contracts with its users.

154.    X denies the allegations in Paragraph 154.

155.    X denies the allegations in Paragraph 155.

156.    Paragraph 156 contains legal conclusions to which no response is required.  To the extent a response is required, X admits the allegations in Paragraph 156.

157.    X denies the allegations in Paragraph 157.

**B.    *Count II:  Monopolization Under Section 2 of the Sherman Act, 15 U.S.C. § 2.***

158.    X incorporates all other paragraphs of this Answer as if fully set forth herein.

159.    X denies the allegations in Paragraph 159.

160.    X denies the allegations in Paragraph 160.

161.    X denies the allegations in Paragraph 161.

162.    X denies the allegations in Paragraph 162 except insofar as its Terms create contracts with its users.

163.    X denies the allegations in Paragraph 163.

164.    X denies the allegations in Paragraph 164.

165.    Paragraph 165 contains legal conclusions to which no response is required.  To the extent a response is required, X admits the allegations in Paragraph 165.

166.    X denies the allegations in Paragraph 166.

**C.    *Count III:  Attempted Monopolization Under Section 2 of the Sherman Act, 15 U.S.C. § 2.***

167.    X incorporates all other paragraphs of this Answer as if fully set forth herein.

168.    X denies the allegations in Paragraph 168.

169.    X denies the allegations in Paragraph 169.

170.    X denies the allegations in Paragraph 170.

171.    X denies the allegations in Paragraph 171 except insofar as its Terms may constitute contracts.  X denies the remaining allegations in Paragraph 171.

172.    X denies the allegations in Paragraph 172.

19

173. X denies the allegations in Paragraph 173.

174. Paragraph 174 contains legal conclusions to which no response is required. To the extent a response is required, X admits the allegations in Paragraph 174.

175. X denies the allegations in Paragraph 175.

**D.      Count IV:  California Cartwright Act, Cal. Bus. & Prof. Code, § 16720, et seq.**

176. X incorporates all other paragraphs of this Answer as if fully set forth herein.

177. X denies the allegations in Paragraph 177.

178. X denies the allegations in Paragraph 178.

179. X denies the allegations in Paragraph 179.

180. X denies the allegations in Paragraph 180 except insofar as its Terms may constitute contracts. X denies the remaining allegations in Paragraph 180.

181. X denies the allegations in Paragraph 181.

182. X denies the allegations in Paragraph 182 except insofar as its Terms may constitute contracts. X denies the remaining allegations in Paragraph 182.

183. X denies the allegations in Paragraph 183.

184. X denies the allegations in Paragraph 184.

185. Paragraph 185 contains legal conclusions to which no response is required. To the extent a response is required, X denies the allegations in Paragraph 185.

186. X denies the allegations in Paragraph 186.

**E.      Count V: California Unfair Competition Act, Cal. Bus. & Prof. Code § 17200 et seq.**

187. X incorporates all other paragraphs of this Answer as if fully set forth herein.

188. X denies the allegations in Paragraph 188.

189. X denies the allegations in Paragraph 189.

190. X denies the allegations in Paragraph 190 except insofar as its Terms may constitute contracts. X respectfully refers the Court to its Terms for an accurate and complete statement of their contents. X denies the remaining allegations in Paragraph 190.

191. X denies the allegations in Paragraph 191.

192.    X denies the allegations in Paragraph 192.

193.    X denies the allegations in Paragraph 193.

194.    Paragraph 194 contains legal conclusions to which no response is required.  To the extent a response is required, X denies the allegations in Paragraph 194.

195.    X denies the allegations in Paragraph 195.

**F.    *Count VI: Nevada Unfair Trade Practice Act (UTPA) – NRS 598A.060.***

196.    X incorporates all other paragraphs of this Answer as if fully set forth herein.

197.    X denies the allegations in Paragraph 197.

198.    X denies the allegations in Paragraph 198.

199.    X denies the allegations in Paragraph 199.

200.    X denies the allegations in Paragraph 200 except insofar as its Terms may constitute contracts.  X respectfully refers the Court to its Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 200.

201.    X denies the allegations in Paragraph 201 except insofar as its Terms may constitute contracts.  X respectfully refers the Court to its Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 201.

202.    X denies the allegations in Paragraph 202.

203.    X denies the allegations in Paragraph 203.

204.    Paragraph 204 contains legal conclusions to which no response is required.  To the extent a response is required, X denies the allegations in Paragraph 204.

205.    X denies the allegations in Paragraph 205.

**G.    *Count VII: Texas Free Enterprise & Antitrust Act – Tex. Bus. Comm. Code 15.05(a), (b).***

206.    X incorporates all other paragraphs of this Answer as if fully set forth herein.

207.    X denies the allegations in Paragraph 207.

208.    X denies the allegations in Paragraph 208.

209.    X denies the allegations in Paragraph 209.

210.    X denies the allegations in Paragraph 210 except insofar as its Terms may constitute contracts.  X respectfully refers the Court to its Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 210.

211.    X denies the allegations in Paragraph 211 except insofar as its Terms may constitute contracts.  X respectfully refers the Court to its Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 211.

212.    X denies the allegations in Paragraph 212.

213.    X denies the allegations of Paragraph 213.

214.    Paragraph 214 contains legal conclusions to which no response is required.  To the extent a response is required, X denies the allegations in Paragraph 214.

215.    X denies the allegations in Paragraph 215.

**H.       Count VIII:  Tortious Interference With Prospective Customer Relationships.**

216.    X incorporates all other paragraphs of this Answer as if fully set forth herein.

217.    X denies the allegations in Paragraph 217.

218.    X lacks sufficient knowledge and information to affirm or deny whether "Bright Data has existing and prospective economic relationships" with unidentified customers and denies the allegation on that basis.  X denies the remaining allegations in Paragraph 218.

219.    X denies the allegations in Paragraph 219.

220.    X denies the allegations in Paragraph 220 except insofar as its Terms may constitute contracts.  X respectfully refers the Court to its Terms for an accurate and complete statement of their contents.  X denies the remaining allegations in Paragraph 220.

221.    X denies the allegations in Paragraph 221.

222.    X denies the allegations in Paragraph 222.

223.    X denies the allegations in Paragraph 223.

**VI.    JURY DEMAND**

224.    The jury trial demand does not constitute an averment of fact, and therefore no response is required.

**PRAYER FOR RELIEF**

X denies the allegations contained in Bright Data's Prayer for Relief and denies that Bright Data is entitled to any relief whatsoever.

**GENERAL DENIAL**

X denies each and every allegation in the Counterclaim not specifically and expressly admitted above.

**AFFIRMATIVE DEFENSES**

In addition to the above, X sets forth below its affirmative defenses.  Each defense is asserted as to all claims for relief against X, except where otherwise noted.  By setting forth these defenses, X does not assume the burden of proving any fact, issue, or element of a cause of action properly belongs to Bright Data.  Moreover, nothing stated herein is intended or shall be construed as an acknowledgment that any particular issue or subject matter necessarily is relevant to Bright Data's allegations.

**FIRST DEFENSE – Procompetitive Justification**

225.    Bright Data's claims are barred, in whole or in part, because there are procompetitive justifications for X's alleged conduct.

226.    Scraping can cause intermittent but individualized internal server failures.  ECF 170-1, ¶ 89.  Although X has several contingencies aimed at preventing negative effects from such scraping, even isolated failures lead to a glitchy, lagged user experience.  *Id.*  Measures that deter scraping therefore are beneficial to the user experience on X.

227.    Unlawful data scraping requires X to spend hundreds of millions of dollars per year buying excess server capacity to absorb the millions of unwanted scraping requests with which Bright Data (and other scrapers) bombard its servers.  ECF 170-1, ¶ 4.  Measures that deter scraping free up resources that can be spent developing other features that are beneficial to users.

228.    X's API program is beneficial to users because it contains guardrails to protect users' interests.  For example, X does not allow API access originating from IPs in certain high-risk jurisdictions, such as those that might promote terrorism.  ECF 170-1, ¶ 49.  Instead, X's API blacklists IPs from those geographic locations, with the goal of preventing malign actors from

23

gaining unfettered access to X's or its users' data.  *Id.*  X also does not allow API access to any governments, to reduce the risk of government surveillance of X's users.  *Id.*  Requiring entities that seek user data to do so through X's approved API process is therefore beneficial to users.

229.    X requires each developer using its API to agree to X's Developer Agreement, which further protects users' privacy and other interests.  ECF 170-1, ¶ 51.  The Developer Agreement requires developers to delete user data from their databases when that content is deleted on X – for example, revenge-porn content.  *Id.*  The Developer Agreement also requires developers not to use the X data to create spam, X bot accounts, or automate processes on the X user side such as bulk X user following.  *Id.*  Requiring developers to agree to X's Developer Agreement as a condition of providing developers data from the X platform, therefore, further benefits users.  Scraping vitiates those interests by siphoning data away from the controlled environment of X's API program and allowing scrapers to sell or give the data to whomever they please – all without the safeguards that X has built into its Developer Agreement.

230.    X's alleged conduct is also procompetitive because it deters free-riding on X's innovation.  X invested substantial time, money, and ingenuity in creating a state-of-the-art social-media platform that attracts users, stimulates engagement, and centralizes the valuable content that they create.  As the innovator who created the product, X has the competitive right to reap the product's benefits by (among other things) selling access to the data hosted on X's platform.  X's anti-scraping contract provisions are vital to protect the fruits of X's labor.  Bright Data's claims – seeking to force X to allow data scrapers to siphon off the spoils of X's investment – undermine the competitive incentives that led to the creation of X and many of its competitors.

231.    Additional procompetitive justifications associated with barring Bright Data's scraping can be found in X's Second Amended Complaint (ECF 170-1) and Motion To Dismiss (ECF 165).  The above facts therefore are not an exhaustive list of procompetitive justifications.  X reserves its rights to amend its Answer to add additional facts in support of this defense, should it be necessary to do so.

24

### SECOND DEFENSE – Legitimate Business Purpose

232.    Bright Data's California Unfair Competition Law and tortious interference claims are barred, in whole or in part, because there are legitimate business purposes for the alleged conduct.

233.    As noted above, scraping can cause intermittent but individualized server failures. ECF 170-1, ¶ 89.  Although X has several contingencies aimed at preventing negative effects from such scraping, even isolated failures lead to a glitchy, lagged user experience.  *Id.*  X therefore has a legitimate business purpose in seeking to bar scraping on the X platform by scrapers such as Bright Data.

234.    X spends hundreds of millions of dollars per year buying excess server capacity to absorb the millions of unwanted scraping requests with which Bright Data (and other scrapers) bombards X's servers.  ECF 170-1, ¶ 4.  X has a legitimate business purpose in wishing to preserve those resources, so it may spend those resources improving its products and innovating to create new products.

235.    X's API program is beneficial to users because it contains guardrails to protect users' interests.  For example, X does not allow API access originating from IPs in certain high-risk jurisdictions, such as those that might promote terrorism.  ECF 170-1, ¶ 49.  Instead, X's API blacklists IPs from those geographic locations, with the goal of preventing malign actors from gaining unfettered access to X's or its users' data.  *Id.*  X also does not allow API access to any governments, to reduce the risk of government surveillance of X's users.  *Id.*  X has a legitimate business purpose in seeking to protect its users.

236.    X requires each developer using its API to agree to X's Developer Agreement, which further protects users' privacy and other interests.  ECF 170-1, ¶ 51.  The Developer Agreement requires developers to delete user data from their databases when that content is deleted on X – for example, revenge-porn content.  *Id.*  The Developer Agreement also requires developers not to use the X data to create spam, X bot accounts or automate processes on the X user side such as bulk X user following.  *Id.*  X has a legitimate business purpose in seeking to protect its users.  Scraping violates those interests by siphoning data away from the controlled environment of X's API program

1  and allowing scrapers to sell or give the data to whomever they please — all without the safeguards

2  that X has built into its Developer Agreement.

3       237.    X's alleged conduct also reflects a legitimate business purpose because it deters free-

4  riding on X's innovation.  X invested substantial time, money, and ingenuity in creating a state-of-

5  the-art social-media platform that attracts users, stimulates engagement, and centralizes the valuable

6  content that they create.  As the innovator who created the product, X has the competitive right to

7  reap the product's benefits by (among other things) selling access to the data hosted on X's platform.

8  X's anti-scraping contract provisions are vital to protect the fruits of X's labor.  Bright Data's claims

9  – seeking to force X to allow data scrapers to siphon off the spoils of X's investment – undermine

10 the competitive incentives that spurred the creation of X and many of its competitors.

11      238.    Additional legitimate business purposes associated with barring Bright Data's

12 scraping can be found in X's Second Amended Complaint (ECF 170-1) and Motion To Dismiss

13 (ECF 165).  The above facts are therefore not an exhaustive list of legitimate business purposes.  X

14 reserves its rights to amend its Answer to add additional facts in support of this defense, should it be

15 necessary to do so.

16                   **THIRD DEFENSE – Claims Barred by Contract**

17      239.    Bright Data's claims are barred, in whole or in part, by contract.  Bright Data is

18 bound by X's Terms, which prevent it from bringing the actions it pleads in its Counterclaim.

19      240.    X's Terms provide that, by "using" X's Services, one "agree[s] to be bound by the

20 revised Terms" (and any other applicable versions of X's Terms).[4]  Each time Bright Data has used

21 the X platform to scrape user data, it has agreed to be bound by X's Terms.

22      241.    Bright Data is therefore bound by the provision which states that it "must initiate any

23 proceeding or action within one (1) year of the date of the occurrence of the event or facts giving

24 rise to a dispute that is arising out of or related to these Terms."[5]  The conduct Bright Data

25 complains of begins in September 2023.  *See* Counterclaim ¶¶ 13, 69.  Further, since 2009, X (then-

26 _____

27      [4] X Terms (Nov. 15, 2024), https://perma.cc/HD8A-XW34.

28      [5] *Id.*

Twitter's) Terms have "expressly prohibited" scraping without "prior consent."[6]  Bright Data has therefore waived its ability to file its claims.

242.    Nevertheless, Bright Data waited until December 2024 to assert its claims.

243.    The "limitation of liability" clause in X's Terms is likewise binding on Bright Data. That clause provides in relevant part that "to the maximum extent permitted by applicable law, the X entities shall not be liable for any indirect, incidental, special, consequential or punitive damages, reliance or any loss of profits or revenues, whether incurred directly or indirectly, or any loss of data, use, goodwill, or other intangible losses, resulting from . . . your access to or use of or inability to access or use the services."[7]  This provision bars Bright Data from seeking its alleged damages in connection with its use of the X platform.

244.    The Terms likewise provide that "[i]n no event shall the aggregate liability of the X entities exceed the greater of one hundred U.S. dollars (U.S. $100.00) or the amount you paid [X], if any, in the past six months for the services giving rise to the claim."[8]  Bright Data has therefore agreed to waive any liability for X, and to a maximum sum of $100.00 in damages.

**FOURTH DEFENSE – Intervening or Superseding Acts**

245.    Bright Data's claims are barred, in whole or in part, because the alleged damages, if any, were the result of one or more intervening or superseding causes or caused by the acts and/or omissions of persons other than X.

246.    Notwithstanding X's express prohibition on Bright Data's automated crawling and scraping the X platform, Bright Data continues to crawl and scrape the X platform, while selling and/or transferring user data to unidentified domestic and international sources.

247.    Although Bright Data continues to scrape on the X platform, it brings this Counterclaim alleging that it has suffered harm in connection with its ability to scrape user data on the X platform.

---

[6] X Terms, v.2 (Sept. 10, 2009), https://perma.cc/4NS4-MAS3.

[7] X Terms (Nov. 15, 2024), https://perma.cc/HD8A-XW34.

[8] *Id.*

248.     To the extent Bright Data has alleged any injury or harm – which X denies – that injury is caused by an unidentified intervening or superseding act.  X cannot be the source of Bright Data's harm, if Bright Data's scraping behavior remains unaltered by any actions X has taken.

### FIFTH DEFENSE – Adequate Remedy at Law

249.     Bright Data has not identified any prospective harm for which equitable relief is appropriate.

250.     Bright Data's Counterclaim does not allege any prospective harm that Bright Data will suffer, absent prospective injunctive relief from the Court.

251.     Notwithstanding X's express prohibition on Bright Data's automated crawling and scraping of the X platform, Bright Data continues to crawl and scrape the X platform, while selling and/or transferring user data to unidentified domestic and international sources.

252.     Bright Data identifies no specific customer relationships with which X's conduct interferes, and instead continues to scrape the X platform, notwithstanding X's efforts to bar the scraping.

253.     In light of the ongoing scraping on X's platform, Bright Data fails to identify any prospective harm for which injunctive relief would be an appropriate remedy.

### SIXTH DEFENSE – Unjust Enrichment

254.     Bright Data's claims are barred by the doctrine of unjust enrichment.

255.     Bright Data's continued scraping of the X platform violates state and federal law, as set out in great detail in X's Second Amended Complaint (ECF 170-1).

256.     By way of example only, Bright Data advertises that it "avoids" and "bypasses" the technological measures X has deployed to protect and control access to data on the X platform – in direct contravention of the Digital Millennium Copyright Act ("DMCA") and the Computer Fraud and Abuse Act ("CFAA").  *See* ECF 170-1, ¶¶ 189-211.

257.     Bright Data is also bound by X's Terms.  Those Terms prohibit Bright Data's automated crawling and scraping of the X platform, which Bright Data does without X's consent. Bright Data therefore violates X's Terms by crawling and scraping data on the X platform without consent from X.  *See* ECF 170-1, ¶¶ 137-149.

258.    To permit Bright Data to recover damages from X on its Counterclaim, when Bright Data itself is violating the law with its continued unauthorized crawling and scraping of the X Platform, would constitute unjust enrichment.

259.    Bright Data has continued to scrape the X platform without interruption for the whole of the relevant period.  Bright Data has therefore suffered no damages as a result of the conduct it challenges.

260.    Bright Data already receives benefits in the form of profits from its unauthorized scraping data from the X platform.  Bright Data's retention of the profits it has already derived from its unauthorized scraping, are themselves unjust.

261.    To permit Bright Data to recover damages from X on its Counterclaim, when Bright Data has already enriched itself by free-riding on the X platform, would constitute unjust enrichment.

**SEVENTH DEFENSE – In Pari Delicto**

262.    Bright Data's claims should be barred, in whole or in part, because it bears equal responsibility for the alleged conduct for which it seeks redress.

263.    Bright Data claims it is harmed by the liquidated damages provision in X's Terms, and that it is harmed by X's efforts to curtail Bright Data's scraping on the X platform.

264.    Bright Data continues to crawl and scrape data on the X platform, knowing that the liquidated damages provision applies and bars its conduct.  However, because any damages resulting from the liquidated damages provision would be the result of Bright Data's continued unlawful scraping, Bright Data bears equal responsibility for the alleged harm for which it seeks redress as to that provision.

**EIGHTH DEFENSE – Laches**

265.    Since September 2009, X (then-Twitter's) Terms have "expressly prohibited" scraping "without prior consent."[9]

---

[9] X Terms, v.2 (Sept. 10, 2009), https://perma.cc/4NS4-MAS3.

266.    Notwithstanding that Bright Data's conduct has been expressly prohibited on X (or Twitter) for well over a decade, Bright Data has waited until now to file its Counterclaim, contending that this provision is unlawful.

267.    X is prejudiced by Bright Data's tardy Counterclaim.  Bright Data files its antitrust and other counterclaims, only in reaction to X's affirmative lawsuit which seeks to stop Bright Data's free-riding and unlawful behavior.  X is prejudiced by Bright Data's eleventh-hour claims, as X must now spend resources defending counterclaims that, by Bright Data's own logic, could have been brought as of Bright Data's inception.

**NINTH DEFENSE – Improper Forum**

268.    On November 15, 2024, X amended its Terms of Service.

269.    X's current Terms of Service contain the following language:  "All disputes related to these Terms or the Services, including without limitation disputes related to or arising from other users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, will be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas, United States, and you consent to personal jurisdiction in those forums and waive any objection as to inconvenient forum."[10]

270.    Bright Data's counterclaims, unlike X's affirmative claims, hinge on the current version of the Terms of Service, as amended to include the forum-selection clause identified above. In light of that language, the appropriate forum for Bright Data's Counterclaim is the Northern District of Texas.

**TENTH DEFENSE – Choice of Law**

271.    On or about September 13, 2024, X moved its headquarters to Bastrop, Texas.

272.    On November 15, 2024, X amended its Terms of Service.

273.    X's current Terms of Service contain the following language:  "The laws of the State of Texas, excluding its choice of law provisions, will govern these Terms and any dispute that arises

---

[10] *Id.*

between you and us, notwithstanding any other agreement between you and us to the contrary."[11] In light of that language, Texas law governs Bright Data's Counterclaim.  Any state-law causes of action that do not arise from Texas law, therefore, must be dismissed.

### ELEVENTH DEFENSE – Preemption

274.    Bright Data's state-law claims are barred, in whole or in part, by the doctrine of federal preemption.

275.    For the reasons set out above and in greater detail in X's Second Amended Complaint, Bright Data's scraping conduct violates both the DMCA and the CFAA.  *See* ECF 170-1, ¶¶ 189-211.

276.    To the extent Bright Data's conduct violates those statutes or any other federal law, a state statute cannot render the same conduct lawful.

277.    Similarly, for the reasons explained in X's Motion To Dismiss (ECF 165), its alleged conduct is procompetitive under the Sherman Act and the principles set forth in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).  To the extent the Court finds that X's conduct serves the Sherman Act purposes, Bright Data's state-law claims to the contrary would be preempted under the doctrine of conflict preemption.

### TWELFTH DEFENSE – Failure To Mitigate Damages

278.    Bright Data's state-law claims are barred, in whole or in part, by its failure to mitigate damages.

279.    Bright Data has built no product to attract users, from which it could extract user data.  Instead, Bright Data's model is based on free-riding on other businesses (like X, Meta, and Google), who have built products to attract users.

280.    Bright Data could have mitigated its damages by building a product to attract users, and could have conditioned use of that product on granting Bright Data a limited license to a users' data (just as X has done).

---

[11] *Id.*

31

281.    Bright Data also could have mitigated its damages by scraping from other platforms, or by approaching X's users to license their content directly.

282.    Bright Data therefore failed to mitigate its damages by failing to develop any affirmative value to users that would entice users to make their data available to Bright Data.

### THIRTEENTH DEFENSE – Unclean Hands

283.    Bright Data's claims are barred, in whole or in part, by the doctrine of unclean hands.

284.    By way of example only, Bright Data advertises that it "avoids" and "bypasses" the technological measures X has deployed to protect and control access to data on the X platform – in direct contravention of the DMCA and the CFAA.  *See* ECF 170-1, ¶¶ 189-211.

285.    Bright Data is bound by X's Terms.  Those Terms prohibit Bright Data's automated crawling and scraping of the X platform, which Bright Data does without X's consent.  Bright Data therefore violates X's Terms by crawling and scraping data on the X platform without consent from X.  *See* ECF 170-1, ¶¶ 137-149.

286.    By violating the law and causing harm to X through its crawling and scraping of the X platform, Bright Data acts with unclean hands in bringing its Counterclaim.

### FOURTEENTH DEFENSE – Statute of Limitations

287.    The Counterclaim is barred, in whole or in part, by the applicable statute of limitations.

288.    X's prohibition on scraping without consent has been a feature of its Terms since 2009.

289.    To the extent Bright Data's causes of action accrue as of that date, the applicable statute of limitations has run with respect to each such cause of action.

### FIFTEENTH DEFENSE – Antitrust Standing

290.    Bright Data has failed to allege antitrust standing.

291.    Bright Data does not participate in the alleged "Public Square Platform" market or the "Public Square User Engagement" market, Counterclaim ¶¶ 113-127, and it therefore lacks antitrust standing in those markets as a matter of law.  Any injury to Bright Data from those markets

32

– which rests on the speculation that other platforms would grow and allow Bright Data to scrape – is also too speculative to support antitrust standing.

292.    Bright Data pleads no injury in the remaining "Public Square Data" or "Publicly-Available Public Square Data" markets and therefore lacks antitrust standing in those markets as a matter of law.  As to these markets, Bright Data's theory (which X denies) is that Bright Data is now the only scraper in the market able to operate in violation of X's Terms.  Counterclaim ¶¶ 83-88.  Bright Data therefore pleads no injury in the data markets it alleges.

### SIXTEENTH DEFENSE – Standing

293.    Bright Data has continued to crawl and scrape data on the X platform, notwithstanding X's attempts to stop Bright Data's unlawful scraping.

294.    Bright Data has identified no customer relationship that has been disrupted by X's alleged conduct.

295.    Because Bright Data has identified no injury it has sustained because of X's alleged conduct, it has failed to allege standing.

### SEVENTEENTH DEFENSE – Treble Damages Unlawful

296.    Treble damages are unlawful in these circumstances, where Bright Data is not entitled to relief in light of any one of the affirmative defenses set out above.

### DEFENSES RESERVED

X hereby gives notice that it intends to rely upon any other defense that may become available or appear during the discovery proceedings in the case and hereby reserves the right to amend this Answer to assert any such defense.  X also reserves the right to assert other and related defenses as may become available upon a determination of the law applicable to the action or any part thereof or claim therein.

### PRAYER FOR RELIEF

WHEREFORE, having stated its answer, affirmative defenses, and other defenses, Plaintiff X prays for relief as follows:

1.    That judgment be entered in favor of X and against Defendant on each and every counterclaim set forth in Bright Data's Counterclaim;

2.      For attorneys' fees and costs as permitted by law; and

3.      For such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

X demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: May 2, 2025                    Respectfully submitted,

**KELLOGG, HANSEN, TODD,**
**FIGEL & FREDERICK, P.L.L.C.**

By:        */s/ Joshua D. Branson*
JOSHUA D. BRANSON*
jbranson@kellogghansen.com
ANDREW C. SHEN*
ashen@kellogghansen.com
DANIEL V. DORRIS*
ddorris@kellogghansen.com
BETHAN R. JONES*
bjones@kellogghansen.com
MATTHEW D. READE*
mreade@kellogghansen.com
JORDAN R.G. GONZÁLEZ*
jgonzalez@kellogghansen.com
KALEB J. LEGORE*
klegore@kellogghansen.com
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: 202.326.7900
* *Admitted Pro Hac Vice*

Adrian Sawyer, State Bar No. 203712
SAWYER & LABAR LLP
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: 415.262.3820
sawyer@sawyerlabar.com

*Attorneys for Plaintiff*
*X Corp.*