JOSHUA D. BRANSON*
*jbranson@kellogghansen.com*
ANDREW C. SHEN*
*ashen@kellogghansen.com*
DANIEL V. DORRIS*
*ddorris@kellogghansen.com*
JORDAN R.G. GONZÁLEZ*
*jgonzalez@kellogghansen.com*
KALEB J. LEGORE*
*klegore@kellogghansen.com*
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
* *Admitted Pro Hac Vice*

ADRIAN SAWYER, State Bar No. 203712
*sawyer@sawyerlabar.com*
SAWYER & LABAR LLP
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: (415) 262-3820

Counsel for Plaintiff
X Corp.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X CORP., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>BRIGHT DATA LTD., an Israeli corporation,<br><br>Defendant. | Case No. 3:23-cv-03698-WHA<br><br>**X CORP.'S NOTICE OF MOTION AND MOTION FOR INTERLOCUTORY APPEAL AND FOR STAY PENDING ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Judge:   Hon. William H. Alsup<br>Date:   June 26, 2025<br>Time:   8:00 a.m.<br>Crtrm:   12, 19th Floor |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** the hearing on Plaintiff and Counterclaim-Defendant X Corp.'s ("X") Motion for Interlocutory Appeal and for Stay Pending Adjudication will take place on June 26, 2025 at 8:00 a.m. or as soon thereafter as the matter may be heard before the Honorable William H. Alsup, United States District Court Judge for the Northern District of California.

Plaintiff and Counterclaim-Defendant X moves this Court, pursuant to 28 U.S.C. § 1292(b), for certification of interlocutory appeal and for a stay pending adjudication.  The foregoing Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities set forth below, the other documents on file in this action, and any oral arguments of counsel at the hearing on the Motion.

## STATEMENT OF ISSUES TO BE DECIDED

1.    Whether the Court should certify, under 28 U.S.C. § 1292(b), an interlocutory appeal of the Court's Order (Dkt. 263) denying in part X's motion to dismiss Bright Data's counterclaims, which presents these controlling questions of law:

> a.    Whether it is plausibly anticompetitive for an online platform to adopt terms of service that bar its users from scraping or facilitating others' scraping of data on that platform.
>
> b.    Whether a plaintiff has antitrust standing to challenge an "overarching scheme" that it defines to include an alleged practice that occurs in a market where the plaintiff does not participate.

2.    Whether the Court should stay the counterclaims, or alternatively the entire case, pending adjudication of X's motion for interlocutory appeal.

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ......................................................................... i

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ................................................................................................1

ARGUMENT ....................................................................................................3

I.    The Court Should Certify its Order for Interlocutory Appeal .......................3

    A.    The Order Presents Two Controlling Questions of Antitrust Law .........................3

    B.    Substantial Grounds Exist To Disagree with the Order on Both Proposed Questions of Antitrust Law .........................................................................8

    C.    An Interlocutory Appeal Would Materially Advance the Litigation....................14

II.    The Court Should Enter a Stay Pending Adjudication of X's Interlocutory Appeal...18

CONCLUSION..................................................................................................20

ii

X Corp. Motion for Interlocutory Appeal and for Stay Pending Adjudication
Case No. 3:23-cv-03698-WHA

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Advanced Analogic Techs., Inc. v. Linear Tech. Corp.*,
2006 WL 2850017 (N.D. Cal. Oct. 4, 2006).................................................................12

*Am. Express Anti-Steering Rules Antitrust Litig., In re*,
343 F. Supp. 3d 94 (E.D.N.Y. 2018) ............................................................................13

*Apple Inc. App Store Simulated Casino-Style Games Litig., In re*,
625 F. Supp. 3d 971 (N.D. Cal. 2022) ...........................................................................3

*Arcell v. Google LLC*, 2025 WL 210877 (N.D. Cal. Jan. 16, 2025)..............................................12

*Arcell v. Google LLC*, 744 F. Supp. 3d 924 (N.D. Cal. 2024)........................................................12

*ASM Am., Inc. v. Genus, Inc.*, 2002 WL 24444 (N.D. Cal. Jan. 9, 2002)....................................19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..............................................................4, 14

*Best Carpet Values, Inc. v. Google LLC*, 2022 WL 22843012
(N.D. Cal. May 2, 2022) ............................................................................................3, 20

*Brickman v. Facebook, Inc.*, 2017 WL 1508719 (N.D. Cal. Apr. 27, 2017)...................3, 8, 12, 19

*Carrier IQ, Inc., In re*, 78 F. Supp. 3d 1051 (N.D. Cal. 2015)........................................................13

*Cement Antitrust Litig., In re*, 673 F.2d 1020 (9th Cir. 1982) ........................................................3

*Chocolate Confectionary Antitrust Litig., In re*, 607 F. Supp. 2d 701
(M.D. Pa. 2009) ............................................................................................................16

*CoStar Grp., Inc. v. Commercial Real Est. Exch. Inc.*,
619 F. Supp. 3d 983 (C.D. Cal. 2022) ......................................................................4 8-10

*Crowder v. LinkedIn Corp.*, 2023 WL 2405335 (N.D. Cal. Mar. 8, 2023) ....................... 2, 5, 8-10

*Dinosaur Financial Group LLC v. S&P Global, Inc.*, 2023 WL 4562031
(S.D.N.Y. July 14, 2023) ..............................................................................................11

*Doe v. Twitter, Inc.*, 2021 WL 12285614 (N.D. Cal. Oct. 26, 2021) ............................................3

*Doe 1 v. Github, Inc.*, 2024 WL 4336532 (N.D. Cal. Sept. 27, 2024)....................3, 11, 14, 18, 19

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
747 F.3d 145 (2d Cir. 2014)..........................................................................................16

*Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) .............................4, 5

*Dual-Deck Video Cassette Recorder Antitrust Litig., In re*, 1991 WL 425379
(D. Ariz. Jan. 7, 1991) *aff'd*, 11 F.3d 1460 (9th Cir. 1993)..........................................13

*Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust
Litig., In re*, 28 F.4th 42 (9th Cir. 2022) ..................................................................14-15

iii

*Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 2010 WL 3636256
  (D.N.J. Sept. 10, 2010) ...........................................................................................17

*Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750
  (N.D. Cal. July 20, 2010) .................................................................................4, 6, 8

*Fortyune v. City of Lomita*, 766 F.3d 1098 (9th Cir. 2014) ...........................................8

*Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd. of
  Culinary Workers*, 542 F.2d 1076 (9th Cir. 1976) ............................................15

*FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021) ............................................8

*Gen. Dynamics Corp. v. AT&T Co.*, 658 F. Supp. 417 (N.D. Ill. 1987) ......................17

*Grey v. Goldome*, 1995 WL 422265 (S.D.N.Y. July 17, 1995) .....................................5

*hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020) ...............4, 8

*KPH Healthcare Servs., Inc. v. Mylan N.V.*, 2022 WL 16551340
  (D. Kan. Oct. 31, 2022) ........................................................................................17

*Kuehner v. Dickinson & Co.*, 84 F.3d 316 (9th Cir. 1996) ..........................................16

*LDK Solar Sec. Litig., In re*, 584 F. Supp. 2d 1230 (N.D. Cal. 2008) ........................18

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
  140 F.3d 1228 (9th Cir. 1998) ..............................................................................13

*Mauia v. Petrochem Insulation, Inc.*, 2020 WL 1031911
  (N.D. Cal. Mar. 3, 2020) ......................................................................................19

*McShannock v. JP Morgan Chase Bank N.A.*, 2019 WL 955289
  (N.D. Cal. Feb. 27, 2019) ......................................................................................8

*Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009) ...........................................17

*NCAA v. Alston*, 594 U.S. 69 (2021) .....................................................................12, 18

*Netflix Antitrust Litig., In re*, 506 F. Supp. 2d 308 (N.D. Cal. 2007) ........................19

*New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) .............................10

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ..............4, 6, 8

*Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681 (9th Cir. 2011) .................................11

*Ritz Camera & Image, LLC v. Sandisk Corp.*, 2011 WL 3957257
  (N.D. Cal. Sept. 7, 2011) .......................................................................................3

*Rollins v. Dignity Health*, 2014 WL 6693891 (N.D. Cal. Nov. 26, 2014) .....................8

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*,
  637 F.2d 1376 (9th Cir. 1981) ..............................................................................15

iv

*Roth v. Foris Ventures, LLC*, 2022 WL 21777087 (N.D. Cal. Aug. 19, 2022) ..............................3

*Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729 (9th Cir. 1987) ....................................19

*Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070
    (S.D. Cal. 2012) ..........................................................................................................8, 10

*Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013) ....................................................................7

*Sundance Land Corp. v. Community First Fed. Sav. & Loan Ass'n*,
    840 F.2d 653 (9th Cir. 1988) ..........................................................................................13

*Synopsys, Inc. v. ATopTech, Inc.*, 2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) .........................12

*Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286 (1st Cir. 2022) .........................................13

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..............................................................................................1, 4, 17

*Yelp Inc. v. Google LLC*, 2025 WL 1168900 (N.D. Cal. Apr. 22, 2025) ....................................12

**STATUTES**

Sherman Act, 15 U.S.C. § 1 *et seq*.................................................................................3, 4, 7, 8, 12

    Section 1, 15 U.S.C. § 1 ...................................................................................................4

    Section 2, 15 U.S.C. § 2 ...................................................................................................4

28 U.S.C. § 1292(b) ................................................................................................ i, 1, 3, 4, 8

**PLEADINGS**

*CoStar Grp., Inc. v. Commercial Real Est. Exch. Inc.*, No. 2:20-cv-08819-CBM-AS (C.D. Cal.):

    CREXi's Counterclaims (June 23, 2021), Dkt. 74.........................................................9
    Ex. B to CREXi's Counterclaims (June 23, 2021), Dkt. 74-2 ...........................................11
    CREXi's Opp. to CoStar's Mot. To Dismiss Counterclaims
    (Sept. 13, 2021), Dkt. 86....................................................................................10

*Crowder v. LinkedIn Corp.*, No. 22-cv-00237-HSG (N.D. Cal.):

    Pl.'s Opp. to LinkedIn's Mot. To Dismiss (May 6, 2022), Dkt. 38.........................2, 9, 11

*Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*, No. 1:22-cv-01860-KPF (S.D.N.Y. Sept. 14, 2023):

    Civil Case Management Plan and Scheduling Order (Sept. 14, 2023), Dkt. 116.............14
    Stipulation and Order Regarding Class Discovery (Mar. 21, 2025), Dkt. 198.................14

*FTC v. Amazon.com, Inc.*, No. 2:23-cv-01495-JHC (W.D. Wash.):

    Complaint (Sept. 26, 2023), Dkt. 1 .................................................................14
    Case Scheduling Order (Feb. 13, 2024), Dkt. 159...........................................................14

*FTC v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB (D.D.C.):

    Complaint for Injunctive and Other Equitable Relief (Dec. 9, 2020), Dkt. 3 ....................14
    Joint Scheduling Order (Mar. 3, 2022), Dkt. 103 ..............................................14
    Minute Order (June 8, 2023).................................................................14
    Decl. of M. Hansen Supp. Meta's Mot. for Summ. J.
    (Apr. 5, 2024), Dkt. 324-3 .........................................................15, 16
    Minute Order (Nov. 25, 2024) ...............................................................14
    Joint Status Report (Feb. 7, 2025), Dkt. 396 ................................................16

*FTC v. Qualcomm Inc.*, No. 5:17-cv-00220 (N.D. Cal.)

    Complaint for Equitable Relief (Jan. 17, 2017), Dkt. 1 ......................................14
    Case Management Order (Apr. 19, 2017), Dkt. 75 ...........................................14

*Klein v. Meta Platforms, Inc.*, No. 3:20-cv-08570-JD (N.D. Cal.):

    Class Action Complaint (Dec. 3, 2020), Dkt. 1 .............................................14
    Scheduling Order (Apr. 29, 2022), Dkt. 289 ................................................14
    Stipulated Order Modifying Schedule (Mar. 14, 2024), Dkt. 733 ...............................14
    Third Amended Scheduling Order for User Plaintiffs
    (Feb. 11, 2025), Dkt. 896 ................................................................14

*Rumble, Inc. v. Google LLC*, No. 4:21-cv-00229-HSG (N.D. Cal.):

    Complaint for Damages and Injunctive Relief (Jan. 11, 2021), Dkt. 1 ..........................14
    Scheduling Order (Sept. 16, 2022), Dkt. 64 .................................................14
    Second Amended Scheduling Order (Feb. 6, 2024), Dkt. 106 ..................................14

*United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C.):

    Complaint (Oct. 20, 2020), Dkt. 1 .........................................................14
    Scheduling and Case Management Order (Dec. 21, 2020), Dkt. 85 ............................14

## OTHER MATERIALS

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of
Antitrust Principles and Their Application* (5th ed. 2020) .................................13

Black's Law Dictionary (12th ed. 2024)...........................................................5

Bluesky, *Community Guidelines*, *Dev. Guidelines* (May 22, 2024),
    https://perma.cc/6UTF-78VS.............................................................18

Bluesky, *Terms of Service* (Feb. 7, 2025), https://perma.cc/B479-LUZF ..........................18

Discord, *Discord's Terms of Service* (Mar. 28, 2022), https://perma.cc/3ZLW-NYNP ..............17

eBay, *Customer Service, User Agreement* (eff. May 16, 2025),
    https://perma.cc/SX3Z-MQSQ ...........................................................18

Ltr. from Lina Khan *et al.* to Hon. Steny Hoyer (Jan. 17, 2025),
    https://perma.cc/C9K7-MHYT ...........................................................16

LinkedIn, *User Agreement* (Nov. 20, 2024), https://perma.cc/6SYS-79JW ..........................17

Meta, *Terms of Service* (Jan. 1, 2025), https://tinyurl.com/ydzdn8j6............................................17

Pinterest, *Policy, Terms of Service* (Apr. 30, 2025), https://perma.cc/R387-XNWM...................17

Reddit, *Reddit User Agreement* (Sept. 24, 2024), https://perma.cc/DF9X-KSHL .......................17

Snap Inc., *Snap Terms of Service* (Apr. 7, 2025), https://perma.cc/4JV4-YQX3 .........................17

TikTok, *U.S. Terms of Use* (Nov. 2023), https://perma.cc/T5JF-M2PN......................................18

Twitch, *Legal, Terms of Service* (Apr. 2, 2025), https://perma.cc/UAU5-U8SZ .........................17

YouTube, *Terms of Service* (Jan. 5, 2022), https://perma.cc/6QM6-YAFX ................................18

## INTRODUCTION

X respectfully asks the Court to certify for immediate appeal its order declining to dismiss Bright Data's counterclaims.  *See* Dkt. 263 ("Order").  If those counterclaims proceed as the Order allowed, they will derail this case.  Indeed, the parties will soon face protracted antitrust discovery all over the world, litigating everything from how to define the relevant product markets to whether Bright Data suffered antitrust injury in such markets.  It will, this Court observed, require a "massive undertaking."  3/25/25 Tr. 61:20-22.  Scores of subpoenas will issue to nonparty platforms, other data scrapers, Bright Data's customers, and AI companies, among other third parties.  Both sides will have to produce troves of new documents and witnesses.  A whole cast of expensive antitrust economists will testify.  And the relatively simple trial planned for X's claims will explode in length and complexity.  If experience from other antitrust cases is any guide, this could easily become one of the most protracted, expensive cases ever litigated in this Court.

An immediate appeal could avoid all that expense and complexity.  Bright Data's counterclaims, X respectfully submits, fail at the threshold because X has no antitrust duty to allow data scraping on its own platform.  *See* Dkt. 165 ("Mot.") at 5-15.  In claiming otherwise, Bright Data's antitrust theory subverts the "important element of the free-market system" that allows even alleged monopolists to block would-be rivals from accessing their systems.  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  X recognizes, of course, that the Order rejected these arguments.  But if the Ninth Circuit agreed with X on this threshold legal dispute, its ruling could spare the parties and the Court from years of crushing antitrust litigation.

The Order presents two controlling questions of antitrust law that warrant the Ninth Circuit's immediate resolution.  Question 1 asks whether it is plausibly anticompetitive for an online platform to adopt terms of service barring its users from conducting or facilitating data scraping on that platform.  Question 2 asks whether an antitrust plaintiff may challenge an "overall scheme" that it defines to include a practice (here, X's alleged "throttling") that causes it no antitrust injury.  These questions meet all three requirements for interlocutory review.  *See* 28 U.S.C. § 1292(b).

*First*, both questions are "controlling" because they would allow the Ninth Circuit to dispose of Bright Data's counterclaims as a matter of law.  Bright Data's counterclaims each require a

1

showing that X's alleged conduct plausibly harms the competitive process. Antitrust courts often answer that question at the pleading stage, especially in cases against online platforms. If the Ninth Circuit agreed with X on these questions, Bright Data's counterclaims would fail at the threshold.

*Second*, the Order invites substantial grounds for disagreement. Reasonable jurists could hold that the antitrust laws permit online platforms to use terms of service to exclude data scrapers. Indeed, that principle led other courts in this circuit to dismiss similar antitrust claims against other platforms. One even involved a platform's anti-facilitation term – barring users from "facilitat[ing] the transfer of any [platform] content obtained through . . . scraping"[1] – that is materially identical to the language the Order addressed here. *See Crowder v. LinkedIn Corp.*, 2023 WL 2405335, at *4-5 (N.D. Cal. Mar. 8, 2023). True, the Court viewed that case as distinguishable. But reasonable jurists could disagree with the Court's distinctions. And neither Bright Data nor the Order cited any case on the other side of the ledger. At a minimum, the dearth of on-point authority blessing a legal theory like Bright Data's suggests that the issues are novel enough to warrant certification.

*Third*, an interlocutory appeal would materially advance the litigation. The mammoth antitrust-discovery burdens alone provide reason enough to grant an appeal. But the stakes also reach far beyond X. Anti-scraping and anti-facilitation terms of service abound across the internet: companies from Meta and Snap to LinkedIn and Reddit to TikTok and YouTube all impose similar restrictions on their platforms. Yet if the Order is right, all now face potentially crippling antitrust exposure. Before allowing data scrapers to upend the internet, this Court should give the Ninth Circuit the chance to evaluate whether Bright Data's antitrust theory is legally valid.

The same considerations support a stay pending X's interlocutory appeal. Allowing discovery (with all its attendant burdens) to proceed would defeat the main rationale for an appeal. So at a minimum, the Court should stay all counterclaim discovery for now. Alternatively, and in the interest of fairness, X would not oppose the Court staying this entire case – including X's own claims – pending an interlocutory appeal. Such a reciprocal stay would preserve judicial resources while ensuring that Bright Data suffers no prejudice. The motion should be granted.

---

[1] Pl.'s Opp. to LinkedIn's Mot. To Dismiss at 9, *Crowder v. LinkedIn Corp.*, No. 22-cv-00237-HSG (N.D. Cal. May 6, 2022), Dkt. 38 ("Crowder Opp.").

**ARGUMENT**

## I.    The Court Should Certify its Order for Interlocutory Appeal

Bright Data's antitrust counterclaims present "exceptional circumstances" that warrant an immediate appeal. *Ritz Camera & Image, LLC v. Sandisk Corp.*, 2011 WL 3957257, at *1, 3 (N.D. Cal. Sept. 7, 2011) (quoting *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982)). A district court may certify an order for interlocutory appeal if (1) the order involves "a controlling question of law," (2) "there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). All three criteria are met here. *See*, *e.g.*, *Ritz*, 2011 WL 3957257, at *3 (certifying for interlocutory appeal order denying in part motion to dismiss Sherman Act claims).

### A.    The Order Presents Two Controlling Questions of Antitrust Law

The Order raises controlling questions of antitrust law well-suited for the Ninth Circuit's immediate disposition.[2] "A 'controlling' question of law" is one whose resolution "'would avoid protracted and expensive litigation'" and thus "'materially affect the outcome of litigation.'" *Doe 1 v. Github, Inc.*, 2024 WL 4336532, at *1 (N.D. Cal. Sept. 27, 2024) (quoting *Cement Antitrust*, 673 F.2d at 1026). Such a question "generally" must be a "purely legal one that can be resolved quickly without delving into a particular case's facts." *Id*. Courts in this district have applied that principle to interlocutory orders denying motions to dismiss that raise important questions of law. *See*, *e.g.*, *Ritz*, 2011 WL 3957257, at *3 (certifying order addressing Sherman Act claims); *Doe v. Twitter, Inc.*, 2021 WL 12285614, at *1 (N.D. Cal. Oct. 26, 2021) (certifying order denying Twitter motion to dismiss on CDA § 230 grounds).[3] Two such questions exist here.

---

[2] Although X seeks interlocutory appeal on the two questions identified below, X respectfully disagrees with additional aspects of the Court's Order and preserves all other rights of appeal.

[3] *See also Best Carpet Values, Inc. v. Google LLC*, 2022 WL 22843012, at *1-3 (N.D. Cal. May 2, 2022) (copyright preemption); *Brickman v. Facebook, Inc.*, 2017 WL 1508719, at *1 (N.D. Cal. Apr. 27, 2017) (TCPA claims); *Roth v. Foris Ventures, LLC*, 2022 WL 21777087, at *1-2 (N.D. Cal. Aug. 19, 2022) (securities claims); *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 625 F. Supp. 3d 971, 996 (N.D. Cal. 2022) (CDA § 230 immunity from consumer-protection claims). All quotation marks, citations, brackets, and emphasis are omitted unless noted.

1.      The Order raises a fundamental question about how the antitrust laws apply to online platforms.  Bright Data's allegations that X's Terms of Service ("Terms") are anticompetitive, as with any antitrust theory, must support a "plausible entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  In blessing that theory, the Order raises this threshold question:  **Is it plausibly anticompetitive for an online platform to adopt terms of service that bar its users from scraping or facilitating others' scraping of data on that platform?**

That threshold question could dispose of Bright Data's counterclaims altogether.  Bright Data's counterclaims, whether arising under Sherman Act § 1 or § 2, demand plausible allegations that X "engaged in anticompetitive conduct."  *CoStar Grp., Inc. v. Commercial Real Est. Exch. Inc.*, 619 F. Supp. 3d 983, 989 (C.D. Cal. 2022).  And whether a "particular practice is anticompetitive" is a "question of law that may be determined by the Court" on the pleadings.  *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *14 (N.D. Cal. July 20, 2010); *see, e.g.*, *Trinko*, 540 U.S. at 407-11 (deciding "element of anticompetitive conduct" on a motion to dismiss); *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448-50 (2009) (similar); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022) (similar; affirming this Court's holding that Google's alleged practices were not "anticompetitive conduct").  Indeed, many courts in this district and elsewhere have dismissed similar antitrust claims at the threshold, holding that the alleged restrictions imposed by other platforms were not anticompetitive as a matter of law.  Mot. at 8-9 & n.5; Dkt. 186 ("Reply") at 2-5 & n.1 (collecting cases).  In this case, the Ninth Circuit should similarly have the chance to decide that threshold issue now.

Question 1 "control[s]" whether Bright Data's counterclaims may proceed at all.  28 U.S.C. § 1292(b).  The Order characterized (at 7) X's Terms as "exclusionary contracts" that "plausibly foreclose competition" by "s[eeking] to exclude scrapers" from the market for public-square data.  That holding, X respectfully submits, rests on the disputed legal premise that X has a plausible antitrust duty to allow data scraping on its own platform.  If the Ninth Circuit agrees with X (and other district courts) that online platforms have no such duty under *Trinko* and its progeny, Bright Data's theory of anticompetitive conduct would fail as a matter of law.  *See, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1151 (N.D. Cal. 2020) (dismissing antitrust claims because it

was not plausibly anticompetitive for platform to "exclude[]" scraper "from access to information publicly available on [platform's] website"); *Crowder*, 2023 WL 2405335, at *4-5 (same holding for a virtually identical restriction on "the means of access to LinkedIn's own data" on its platform).

Question 1 thus controls whether the alleged conduct the Order identified (at 4-5, 7-8) permits a plausible inference of harm to competition. *See Dreamstime*, 54 F.4th at 1137, 1143 (antitrust claims suffer "fatal flaw" when allegations show no plausible harm to "competitive process as a whole"). In answering Question 1, the Ninth Circuit would decide whether contract terms that bar "crawling and scraping" (Order at 4) on a defendant's own platform are plausibly anticompetitive. *See* Mot. at 5-15 (arguing they are not). By the same token, the Ninth Circuit would decide whether terms similarly "barring facilitation of crawling and scraping" (Order at 4) on a defendant's own platform are plausibly anticompetitive. *See* Mot. at 11-12; Reply at 7-8 (arguing they are not). The same antitrust analysis should apply in both instances. If a platform's users lack an antitrust right to scrape the platform directly, they must also lack an antitrust right to scrape the platform indirectly by actively facilitating scraping by others. *See Crowder*, 2023 WL 2405335, at *5 (not "anticompetitive" for LinkedIn's anti-facilitation "terms of use" to bar users from acquiring platform data "from third parties" or through "scraping and crawling").

Question 1 would likewise allow the Ninth Circuit to address the Order's view (at 7) that X's "anti-'facilitation' term" harms competition by barring users "from ever buying from a business that scrapes the public-square data X does not own." X respectfully submits that this view – equating anti-facilitation with a total ban on "buying" from scrapers – is similarly mistaken. Bright Data does not allege that X has ever applied the Terms to users who passively buy already-scraped data. Mot. at 11 n.6, 22; Reply at 7-8. Indeed, a user does not *facilitate* scraping merely by *buying* already-scraped data.[4] Rather, a user *facilitates* scraping by proactively hiring a third party to scrape on its behalf, or by selling tools that aid and abet others' scraping. The ability to bar such

---

[4] Merely purchasing already-scraped data does not "facilitate or assist" (Order at 4) scrapers, because it does nothing "to make [scraping] easier or less difficult." *Grey v. Goldome*, 1995 WL 422265, at *3 (S.D.N.Y. July 17, 1995); *see* Facilitate & Assistance, Black's Law Dictionary (12th ed. 2024) (Facilitate: "To make the occurrence of (something) easier; to render less difficult"; Assistance: "The act of helping or aiding").

5

X Corp. Motion for Interlocutory Appeal and for Stay Pending Adjudication
Case No. 3:23-cv-03698-WHA

active facilitation – stopping users from doing indirectly what they cannot do directly – is core to X's freedom to set "the prices, terms, and conditions of [its] dealing." *linkLine*, 555 U.S. at 448. Under *Trinko*, X has the antitrust right to do just that. Mot. at 6-9; Reply at 7. So if the Ninth Circuit agrees with X on Question 1, Bright Data's anti-facilitation theory would fail.

For similar reasons, Question 1 controls the analysis of the "'liquidated damages' term" the Order cites (at 7). Those damages apply only if a user violates the Terms. Mot. at 13; Reply at 9. So if the Terms' anti-scraping and anti-facilitation restrictions do not plausibly violate the antitrust laws – as Question 1 asks – the damages term enforcing those restrictions cannot violate the antitrust laws, either. *See Power Ventures*, 2010 WL 3291750, at *14 ("If Facebook has the right to manage access to and use of its website, then there can be nothing anticompetitive about taking legal action to enforce that right."). The Order confirms that the same analysis applies to all these clauses: it reasoned (at 7) that the liquidated-damages clause is plausibly anticompetitive because it may "threaten[] otherwise daring traders into submission." Question 1 asks whether it is anticompetitive for X to seek precisely such "submission" – that is, compliance with X's anti-scraping Terms – by users that otherwise might scrape X's platform. If the Ninth Circuit agrees that X may bar such scraping (or its facilitation) under *Trinko*, the liquidated-damages clause seeking to enforce the same prohibition cannot support a plausible theory of antitrust liability.

**2.** The Order also raises a secondary question of antitrust law that warrants appellate review: **Does a plaintiff have antitrust standing to challenge an "overarching scheme" that it defines to include an alleged practice that occurs in a market where the plaintiff does not participate?**

This question is likewise controlling because it could dispose of Bright Data's "throttling" allegations. Dkt. 158 ("CC") ¶¶ 98-111. Although those allegations fail because throttling is not anticompetitive, *see* Mot. at 9-10; Reply at 9-10, they suffer from a more basic flaw: Bright Data lacks standing to challenge "throttling" in the first place. To surmount its lack of standing, Bright Data mashed the throttling together with X's anti-scraping terms into an "overarching scheme to monopolize the data markets." Dkt. 184 ("Opp.") at 14. The Order credited that framing, considering the "throttling" allegations as part of a broader scheme rather than as "some 'stand-

alone claim.'" Order at 12 (quoting Opp. at 14, 22 & n.16). So the Court declined to "discard" the throttling allegations "yet," even though it considered Bright Data's "standing" "suspect." *Id*.

Question 2 asks whether the Sherman Act permits such standing-by-combination pleading. Bright Data's standing to challenge the "throttling" on its own is not merely suspect; it is nonexistent. Mot. at 16-17; Reply at 12-14. That is because the "throttling" – slowing down links from X's site to competing sites – operates solely between platforms in Bright Data's "Platform" markets. CC ¶¶ 107-09, 113-27. And Bright Data is not a "consumer of [X's] goods or services or a competitor of [X] in [that] restrained market." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). So controlling precedent bars Bright Data from bringing a claim about that market. *See id*. Yet the Order allowed Bright Data to evade that principle by combining the throttling with a different restraint (the anti-scraping and anti-facilitation terms) in a different market (for data) and then mashing them all together into an "overarching scheme." Opp. at 14. X does not believe that antitrust doctrine permits such standing-by-combination pleading. *Infra* Part I.B.2. If the Ninth Circuit agreed, Bright Data's throttling allegations would fall out of the case entirely.

It may be unnecessary to reach this question. Because the Order (at 12) viewed the "throttling" claim as "bound up by th[e] same packaging" as the other claims, resolving Question 1 in X's favor should dispose of the throttling allegations, too. So the simplest path forward may be to address Question 1 alone. But because the throttling allegations' role in the case is unclear, an appeal to address Question 2 remains appropriate. Simply put, rejecting the throttling claims on standing grounds would leave no doubt that Bright Data's sole remaining theory of anticompetitive conduct rests on X's Terms. And Question 1 controls the resolution of that latter theory. For those reasons, deciding the two questions together could dispose of the need for the parties to litigate through discovery any of Bright Data's burdensome counterclaims.[5]

---

[5] As the Order recognizes (at 12-14), Bright Data's surviving state-law claims rise or fall with its Sherman Act claims. If the Ninth Circuit held that the Sherman Act claims fail, Bright Data's remaining counterclaims would fail for the same reason. *See* Order at 12 ("state-law antitrust claims . . . mirror[] the analysis under federal law"); *id*. (sustaining California UCL claim "[b]ecause Bright Data states a claim for a violation of the antitrust laws"); Mot. at 25 (explaining that tortious-interference claim fails for lack of unlawful conduct if Bright Data's other claims fail).

7

**B.    Substantial Grounds Exist To Disagree with the Order on Both Proposed Questions of Antitrust Law**

The Court should certify these questions for interlocutory review because "there is substantial ground for difference of opinion" on both.  28 U.S.C. § 1292(b).  A question invites substantial ground for disagreement when "reasonable jurists might disagree on [its] resolution." *Fortyune v. City of Lomita*, 766 F.3d 1098, 1101 n.2 (9th Cir. 2014).  That test is met here.

**1.**    The Sherman Act allows even monopolists (which X is not) the "free[dom] to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448-50.  Reasonable jurists could apply that principle to shield X's Terms from antitrust challenge.  Mot. at 5-15.  In fact, every court to consider antitrust challenges to similar terms of service has dismissed them.[6]  Such disagreement warrants an interlocutory appeal. *See McShannock v. JP Morgan Chase Bank N.A.*, 2019 WL 955289, at *1 (N.D. Cal. Feb. 27, 2019) ("substantial ground for difference of opinion may be found where there is . . . an intra-district split"); *Brickman*, 2017 WL 1508719, at *3 ("substantial grounds" exist where "courts in this Circuit have reached conflicting interpretations"); *Rollins v. Dignity Health*, 2014 WL 6693891, at *3 (N.D. Cal. Nov. 26, 2014) ("One of the best indications that there are substantial grounds for disagreement on a question of law is that other courts have, in fact, disagreed.").

True, the Order viewed (at 8) Bright Data's counterclaims as distinguishable from X's "case citations."  But even if some distinctions lurked at the margins of these cases, reasonable jurists could view the core legal question as the same:  whether a platform's "terms of use" barring "scraping and crawling" is plausibly anticompetitive.  *Crowder*, 2023 WL 2405335, at *5.  After

---

[6] *See, e.g.*, *Crowder*, 2023 WL 2405335, at *4-5 (LinkedIn's "API terms of use" barring "scraping and crawling"); *hiQ Labs*, 485 F. Supp. 3d at 1151 (terms denying scrapers' "access to information publicly available on LinkedIn's website"); *CoStar*, 619 F. Supp. 3d at 990 ("contractual provisions" that "block[ed] competitors" from "accessing public . . . information" on the website); *Power Ventures*, 2010 WL 3291750, at *12-13 ("contractual limits on access" barring "users from running automated scripts to retrieve their own data from the Facebook site"); *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1076-77 (S.D. Cal. 2012) ("Facebook's terms of use" barring app developers from linking to competing advertisers); *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 24-26 (D.D.C. 2021) (Meta "policy" of withholding "API access [from] competitors" to deter "third-party apps" from "including features" to "compete with Facebook").

all, the operative contract language in *Crowder* was nearly identical to the contract language here. As pasted into the *Crowder* plaintiffs' motion-to-dismiss brief, the API terms of use provided that users could not "access, store, display, ***or facilitate the transfer of any LinkedIn content*** obtained through the following methods: ***scraping, crawling***, spidering or using any other technology or software to access LinkedIn content outside the APIs." Crowder Opp. at 9 (emphases added).

Based on those anti-scraping and anti-facilitation terms, the *Crowder* plaintiffs advanced an antitrust theory virtually identical to the one the Court blessed here. Calling LinkedIn's terms "exclusionary" and "aimed at preventing rivals or competitors from entering the relevant market," the plaintiffs argued that the terms harmed competition by barring users from "***obtain[ing] additional data***" from "third-party competitors or would-be entrants, including those that ***scrape LinkedIn***." *Id.* (emphases added). Yet Judge Gilliam, citing that page of the plaintiffs' brief, discerned no plausible theory of "anticompetitive conduct." *Crowder*, 2023 WL 2405335, at *5. To be sure, the *Crowder* court addressed the facilitation theory as a way to "guide amendment," given that the plaintiffs had not yet attached the terms to their complaint. Order at 9. But Judge Gilliam's observation – opining that LinkedIn's terms "as currently described in the opposition" were not anticompetitive, *Crowder*, 2023 WL 2405335, at *5 – shows that reasonable jurists could disagree with this Court's view of the virtually identical language in X's Terms here.

*CoStar* reinforces the point. CoStar "impose[d] exclusionary contractual provisions" that "block[ed] competitors from accessing public [real-estate] information on CoStar's own website." 619 F. Supp. 3d at 990. Those terms not only forbade "direct or indirect competitor[s]" from extracting information from CoStar's website, but also barred all users from "provid[ing], disclos[ing], or transmit[ting] any portion" of such information "to any direct or indirect competitor of CoStar."[7] Like Bright Data here, the *CoStar* antitrust counterclaimant attacked those terms as "vertical input restraints" that "choke[d] off competitors' access to public [real-estate] listing

---

[7] CREXi's Counterclaims ¶ 134, *CoStar Grp., Inc. v. Commercial Real Est. Exch. Inc.*, No. 2:20-cv-08819-CBM-AS (C.D. Cal. June 23, 2021) ("*CoStar v. CREXi*"), Dkt. 74.

9

information that CoStar does not own."[8]  But the court dismissed that theory under *Trinko*, holding that CoStar's use of "contractual provisions and technological measures" to exclude rivals from its platform was a lawful refusal to deal.  *CoStar*, 619 F. Supp. 3d at 990-91.

The Order distinguished (at 9) *CoStar* by highlighting the court's conclusion there that "CoStar blocking CREXi from [CoStar's] websites does not forbid brokers from hiring CREXi." *CoStar*, 619 F. Supp. 3d at 991.  But reasonable jurists could draw that very same distinction here. As X explained, X's Terms leave users free to "hire" Bright Data in many ways:  they can (among other things) license their own content to Bright Data; retain Bright Data to scrape competing sites; or work with Bright Data to start a rival platform.  Reply at 6-8; 3/27/25 Tr. 18:1-24.  A reasonable jurist could decide that those alternatives make this case just like *CoStar*.  Much as the real-estate brokers in *CoStar* were free to "shar[e] the exact same information to both CREXi and CoStar," X's users are free to share the same content with both X and Bright Data (or any other platform) – they simply cannot facilitate data scraping on "[X's] own website[]."  *CoStar*, 619 F. Supp. 3d at 991.

All this shows why the Ninth Circuit could reasonably disagree with the Court's view (Order at 10) that "X Corp. is forcing its own customers not to deal with scrapers."  X's customers are free to "deal" with scrapers in many ways; they just cannot hire scrapers to extract data from *X's own platform*.  Reply at 6-8.  That narrow restriction – applying to the specific "data published on X's platform" but leaving users and scrapers free to access alternatives, CC ¶ 89 – is just the sort of conduct *Trinko* protects.  Indeed, when a restraint applies only to conduct targeting a defendant's own platform, courts have refused to equate it with a broader ban on "dealing with competitors altogether."  *Crowder*, 2023 WL 2405335, at *5; *see Sambreel*, 906 F. Supp. 2d at 1078 (plaintiff was free to "develop[] products on other websites"); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 304 (D.C. Cir. 2023) (Meta developers were "free to develop applications for Facebook's competitors").  The Ninth Circuit could reach the same conclusion about X's Terms.

The Court's view of X's "anti-'facilitation term'" does not suggest otherwise.  Order at 7. As noted above, X's Terms do not stop users merely from "buying" from a scraper that already

---

[8] CREXi's Opp. to CoStar's Mot. To Dismiss Counterclaims at 8, *CoStar v. CREXi* (Sept. 13, 2021), Dkt. 86.

extracted the data from X's platform.  *Id*.  That sort of passive-buying restriction is not plausibly alleged; it conflicts with the ordinary meaning of the word "facilitate"; and X has disclaimed any such reading of its Terms.  *Supra* p. 5 & n.4.  So the Court's view (at 9) of *CoStar* – that the terms there imposed no "agreement not to buy from CoStar's competitors" – is no distinction at all.  But even if the Court reads X's Terms differently, substantial ground for disagreement would remain.  *CoStar* itself involved terms requiring that users "shall not use any information obtained from the Service for further distribution" and that they "***shall not . . . facilitate*** any of these activities in any way."[9]  Under the Court's logic here, a CoStar user that bought scraped data from a CoStar competitor would violate that restriction.  And the parallels with *Crowder* are even more direct:  the contract there flatly barred users from "facilitat[ing] the transfer of any LinkedIn content obtained through . . . scraping [or] crawling."  Crowder Opp. at 9.  If such language did not support a plausible antitrust theory in *Crowder*, a reasonable jurist could reach the same conclusion here.

In any event, even if X's cited cases were distinguishable, Bright Data's theory would remain sufficiently "novel and difficult" to warrant certification.  *Github*, 2024 WL 4336532, at *2; *see Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011) ("a novel issue may be certified for interlocutory appeal without first awaiting development of contradictory precedent").  While this Court viewed (Order at 9) X's authorities as offering poor "guidance" for this case, it identified no other case sustaining an antitrust claim like Bright Data's.  In fact, when the Court asked Bright Data at oral argument for its "single best decision" sustaining an "analogous" claim, Bright Data cited *Dinosaur Financial Group LLC v. S&P Global, Inc.*, 2023 WL 4562031 (S.D.N.Y. July 14, 2023).  3/27/25 Tr. 38:18-39:1.  Yet the Order did not even cite *Dinosaur*.  For good reason:  that case had nothing to do with scraping, crawling, or social-media platforms.  *Id*. at 43:20-44:20.  Nor did the Order cite any other supportive case that did.

The lack of settled authority supporting Bright Data's theory shows that the counterclaims at least raise "difficult questions of first impression" warranting certification.  *Github*, 2024 WL 4336532, at *2.  As the Supreme Court observed, "even under the best of circumstances, applying

---

[9] Ex. B to CREXi's Counterclaims at 4, *CoStar v. CREXi* (June 23, 2021), Dkt. 74-2 (emphasis added).

11

X Corp. Motion for Interlocutory Appeal and for Stay Pending Adjudication
Case No. 3:23-cv-03698-WHA

the antitrust laws can be difficult – and mistaken condemnations of legitimate business arrangements are especially costly." *NCAA v. Alston*, 594 U.S. 69, 99 (2021).  Those concerns are especially acute when an antitrust theory breaks new ground.  Even if there were a total dearth of authority on either side of Bright Data's theory, that would pose no bar to interlocutory review in these circumstances.  *See*, *e.g.*, *Advanced Analogic Techs., Inc. v. Linear Tech. Corp.*, 2006 WL 2850017, at *2 (N.D. Cal. Oct. 4, 2006) (certifying appeal despite lack of "any authority addressing th[e] specific issue").  Indeed, similar anti-scraping terms of service exist across the internet, *see infra* pp. 17-18 (surveying them), yet X knows of no prior court that has ever blessed an antitrust theory like this.  The importance of that question – and the lack of clear authority about it – counsels in favor of an immediate appeal.  *See Brickman*, 2017 WL 1508719, at *3 ("level of uncertainty required . . . should be adjusted to meet the importance of the question").

 **2.** On Question 2, reasonable jurists could hold that Bright Data cannot manufacture antitrust standing by packaging its throttling allegations with separate allegations about X's Terms.  As X explained (Mot. at 16-17; Reply at 12-14), the alleged throttling causes Bright Data no antitrust injury.  *See Synopsys, Inc. v. ATopTech, Inc.*, 2015 WL 4719048, at *8 (N.D. Cal. Aug. 7, 2015) (no antitrust standing when plaintiff "failed to show it is a participant in the [relevant] market").  Bright Data's counterclaim pleaded the throttling as an independent anticompetitive practice (CC ¶¶ 98-111) that occurred in different markets (CC ¶¶ 113-27) for which it tried to claim standing as a "consumer" (CC ¶ 146).  Yet the Order declined (at 12) to "discard" the throttling allegations at this stage.  A reasonable jurist could decide that Bright Data's maneuver – contriving antitrust injury by packaging the "throttling" with a different restraint (anti-scraping terms) in a different market (for data) – vitiates standing's role as "a threshold requirement" for all Sherman Act claims.  *Arcell v. Google LLC*, 744 F. Supp. 3d 924, 930 (N.D. Cal. 2024).  Indeed, Bright Data's theory flouts the principle that "[a]ntitrust violations must be judged on a market-by-market basis."  *Arcell v. Google LLC*, 2025 WL 210877, at *2 (N.D. Cal. Jan. 16, 2025).

 The Ninth Circuit could decide that Bright Data's standing-by-combination theory reflects an end-run around these constraints.  *See Yelp Inc. v. Google LLC*, 2025 WL 1168900, at *17 (N.D. Cal. Apr. 22, 2025) ("it is a common-sense principle[] that a party cannot evade the dismissal of a

12

claim by packaging it together with other more meritorious claims").  Allowing Bright Data to bolster its antitrust claims with throttling allegations it cannot advance independently conflicts with basic standing principles that apply throughout the law.  *Cf. In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1064-65 (N.D. Cal. 2015) (noting that Article III standing is "claim- and relief-specific" and requires a plaintiff to establish standing "for each of her claims and for each form of relief sought").  It also conflicts with the "more demanding standard" applicable to antitrust plaintiffs.  *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998); *see In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 1991 WL 425379, at *9 (D. Ariz. Jan. 7, 1991) (antitrust standing demands injury for "each" of "several activities" that were "part of one conspiracy"), *aff'd*, 11 F.3d 1460 (9th Cir. 1993); *cf. In re Am. Express Anti-Steering Rules Antitrust Litig.*, 343 F. Supp. 3d 94, 100 (E.D.N.Y. 2018) (antitrust plaintiff "bringing multiple claims under one legal cause of action cannot simply collapse all of his distinct claims into one central 'count,' thereby proofing his complaint from a partial motion to dismiss").

Bright Data's standing-by-combination approach likewise subverts the policy interests that antitrust-standing doctrine protects.  For Bright Data's throttling theory, the "objects of the restraint in trade" are the competing platforms (like Meta) to which links are supposedly slowed down.  *Sundance Land Corp. v. Community First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 660 (9th Cir. 1988).  If anyone has antitrust standing, it is those rival platforms.  Allowing a different, non-injured party like Bright Data to challenge the same conduct impermissibly raises a "spectre of duplicative recovery and complex apportionment of damages."  *Id.*; *see Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 293 (1st Cir. 2022) ("purpose of the antitrust standing doctrine is to avoid overdeterrence"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 335c3 (5th ed. 2020) (allowing "damages for all 'remote' plaintiffs" goes further "than necessary to deter illegal conduct and may overdeter").  Merely packaging that conduct into a broader scheme – the rest of which restrains different parties in different markets – does nothing to lessen that concern.  By allowing Bright Data to challenge (and presumably seek a remedy for) a practice that applies to others but causes Bright Data itself no cognizable injury, the Order risks the very overdeterrence that standing doctrine aims to prevent.

13

### C.    An Interlocutory Appeal Would Materially Advance the Litigation

**1.**    An appeal is also warranted because Bright Data's sprawling antitrust counterclaims threaten to derail this case.  An appeal to decide the validity of Bright Data's antitrust theory "sooner, rather than later" would "save the courts and the litigants unnecessary trouble and expense." *Github*, 2024 WL 4336532, at *2.  That is because an immediate appeal could dispose of the counterclaims altogether, avoiding the spectacular burdens antitrust discovery would entail.

This Court recognized that Bright Data's counterclaims will require "a massive undertaking" across many years.  3/27/25 Tr. 61:20-23.  If this were to become "an antitrust case," the Court opined, "I won't even be here by the time this case goes to trial." *Id*. at 61:14-15.  The Court was right that Bright Data's antitrust theories will likely take *years* to litigate.  One ongoing antitrust case in this district against Google well illustrates the years'-long schedule antitrust cases often demand.  *See Rumble, Inc. v. Google LLC*, No. 4:21-cv-00229-HSG (N.D. Cal.), Dkts. 1, 64, 106, 214 (24-month discovery period; 54 months from complaint to trial).  The FTC's one-market antitrust case against Meta, which Bright Data cited (Opp. at 16) for its market definition, has been similarly protracted.  *See FTC v. Meta Platforms, Inc.*, No. 1:20-cv-03590-JEB (D.D.C.) ("*FTC v. Meta*"), Dkts. 3, 103, 6/8/23 Minute Order, 11/25/24 Minute Entry (23-month discovery period; 52 months to trial).  And in Bright Data's "closest" case, 3/27/25 Tr. 38:22-39:1, the parties conducted 18 months of fact discovery alone – with expert discovery to come.  *See Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*, No. 1:22-cv-01860-KPF (S.D.N.Y. Sept. 14, 2023), Dkts. 116, 198.  It is hard to imagine completing similar discovery here in less than "a year and a half."  3/27/25 Tr. 61:14-21.[10]

An interlocutory appeal could also save more than just time.  It could likewise avoid the "unusually high cost of discovery in antitrust cases." *Twombly*, 550 U.S. at 558; *see In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 47 (9th Cir.

---

[10] *See also*, *e.g.*, *Klein v. Meta Platforms, Inc.*, No. 3:20-cv-08570-JD (N.D. Cal.), Dkts. 1, 289, 733, 896 (23-month discovery period; 59 months from complaint to forthcoming trial); *FTC v. Amazon.com, Inc.*, No. 2:23-cv-01495-JHC (W.D. Wash.), Dkts. 1, 159 (24-month discovery period; 36 months from complaint to forthcoming trial); *United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C.), Dkts. 1, 85 (21-month discovery period; 34 months to trial); *FTC v. Qualcomm Inc.*, No. 5:17-cv-00220 (N.D. Cal.), Dkts. 1, 75 (15-month discovery period; 24 months to trial).

14

2022) (antitrust "discovery frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case"); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*, 637 F.2d 1376, 1381 (9th Cir. 1981) (noting "great deal of expensive and time consuming discovery and trial work" in antitrust cases); *Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1082 (9th Cir. 1976) ("Particularly in antitrust litigation, the drawn out process of discovery can be both harassing and expensive."). Given the unique burdens of antitrust cases, deferring appellate review until after the parties have conducted years of discovery would be costly and inefficient.

Bright Data's theory well illustrates why antitrust discovery is so expensive. Bright Data has propounded at least 83 document requests (many with multiple parts) related to its antitrust claims. These requests demand "all documents" (a phrase used 75 times) covering a wide range of topics, from "any market or business in which X operates" and X's "actual or potential entry in any market or any business in which X operates," to "competition for user engagement" or the "monetization of X's users." Dkt. 166-1 at Ex. 1 (Nos. 2, 3, 4, 5, 6, 7, 18, 22). If Bright Data's discovery requests were enforced as written, it could result in tens of millions of pages of responsive documents.[11] In the FTC's case against Meta, for instance, Meta produced more than "27 million pages" of documents and proffered more than 60 employees for deposition. Decl. of M. Hansen in Supp. of Meta Platforms, Inc.'s Mot. for Summ. J. ¶ 4, *FTC v. Meta* (Apr. 5, 2024), Dkt. 324-3 ("Hansen Decl."). Here, given the extensive antitrust discovery that X will need from Bright Data (unlike with Meta and the FTC), party discovery could be even more expensive.

The nonparty discovery required to litigate Bright Data's proposed antitrust markets will reach further still. The Order requires (at 11) "factual testing" of whether "other platforms or data are in fact closer substitutes (or more competitively disciplining) than contended." The only way to properly conduct that testing is by conducting nonparty discovery of other platforms and data sources. In the FTC's *one-market* case against Meta, for instance, the parties tested the market

---

[11] Although Bright Data has since nominally offered to limit certain of these requests, its offers do not narrow them in any meaningful way. Bright Data's requests are still so capacious that they appear to target essentially every document in X's possession.

15

X Corp. Motion for Interlocutory Appeal and for Stay Pending Adjudication
Case No. 3:23-cv-03698-WHA

definition by subpoenaing "more than 522,000 documents" from "139 nonparties" and taking "66 nonparty depositions." Hansen Decl. ¶ 6. The discovery needed to evaluate Bright Data's four interrelated markets could be even more complex. It will require (among other things) extensive discovery of Bright Data's customers all over the world, plus "international discovery" of other platforms, data sources, and AI companies. 3/27/25 Tr. 61:20. Such a "massive undertaking," *id.* at 61:20-21, will likely spawn a wave of discovery disputes with nonparties, many of whom may resist producing their confidential business information to rivals. The motion practice to overcome that reluctance could needlessly create significant headaches for the parties and the Court alike.

The expert discovery will be equally onerous. Antitrust cases are notoriously expert intensive, with both sides typically retaining a whole cast of expensive economists to opine on market definition, market power, damages, and other issues. Again, using the pending *Meta* case as an example, the parties have disclosed 17 experts that they may call during trial. Joint Status Report at 2, *FTC v. Meta* (Feb. 7, 2025), Dkt. 396. That is not unusual for an antitrust case. As former FTC Chair Lina Khan observed, "a single monopolization case can cost well over 25 million dollars in fees for outside experts."[12] Testing Bright Data's claims across its four proposed antitrust markets could entail expert fees that stretch even higher than Chair Khan's estimate.

**2.**    An interlocutory appeal could avoid all those costs. Because a favorable appellate decision could short-circuit years of burdensome antitrust litigation, certification is warranted. *See Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319 (9th Cir. 1996) (accepting interlocutory appeal to avoid "needless expense and delay"). Indeed, other courts have certified antitrust questions for appeal in light of antitrust litigation's unique burdens. *See In re Chocolate Confectionary Antitrust Litig.*, 607 F. Supp. 2d 701, 708 (M.D. Pa. 2009) (certifying appeal of denial of motion to dismiss in antitrust case because "[a]ppellate review of the motions to dismiss could eliminate the need for th[e] period of prolonged and costly discovery"); *see also DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 150 (2d Cir. 2014) ("In view of the time and expense that a potentially needless antitrust trial would take, the [District] Court sensibly certified its ruling for

---

[12] Ltr. from Lina Khan *et al.* to Hon. Steny Hoyer at 1 (Jan. 17, 2025), https://perma.cc/C9K7-MHYT.

interlocutory appeal."); *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 2010 WL 3636256, at \*3-4 (D.N.J. Sept. 10, 2010) (certifying appeal and staying case after denying motion to dismiss on antitrust-standing grounds); *KPH Healthcare Servs., Inc. v. Mylan N.V.*, 2022 WL 16551340, at \*3-4 (D. Kan. Oct. 31, 2022) (certifying appeal in antitrust case in part to avoid "extensive and expensive discovery on the antitrust claims"); *Gen. Dynamics Corp. v. AT&T Co.*, 658 F. Supp. 417, 419 (N.D. Ill. 1987) (certifying interlocutory appeal due to "possibility that this complex antitrust action will result in lengthy proceedings").  This Court should take a similar approach here.

The "special consequence" of these antitrust questions also supports interlocutory review. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009).  X has spent nearly two decades and billions of dollars developing its platform.  Bright Data's legal theory – asking to take for free the fruits of that investment – strikes at the heart of "the free-market system."  *Trinko*, 540 U.S. at 407. But the consequences also threaten to extend beyond X.  Indeed, virtually every similar platform on the internet has barred data scraping, typically through terms of service that mirror X's.  *See, e.g.*, Meta Terms of Service[13] § 3.2(3) (barring users from "facilitat[ing]" violations of the terms, which include "access[ing] or collect[ing] data . . . using automated means"); Snap Terms of Service[14] § 8 (barring users from "enabl[ing]" or "encourag[ing]" any "crawler, scraper"); Discord Terms of Service[15] § 9 ("Do not do, try to do, or encourage or help others to . . . scrap[e] us"); LinkedIn User Agreement[16] § 8.2(2) ("You agree that you will not . . . support or use . . . any [] means or process . . . to scrape"); Pinterest Terms of Service[17] § 2(a) ("You agree not to scrape"); Reddit User Agreement[18] § 7 ("scraping . . . is prohibited"); Twitch Terms of Service[19] § 10(xi) (barring access

---

[13] Meta, *Terms of Service* (Jan. 1, 2025), https://tinyurl.com/ydzdn8j6.

[14] Snap Inc., *Snap Terms of Service* (Apr. 7, 2025), https://perma.cc/4JV4-YQX3.

[15] Discord, *Discord's Terms of Service* (Mar. 28, 2022), https://perma.cc/3ZLW-NYNP.

[16] LinkedIn, *User Agreement* (Nov. 20, 2024), https://perma.cc/6SYS-79JW.

[17] Pinterest, *Policy, Terms of Service* (Apr. 30, 2025), https://perma.cc/R387-XNWM.

[18] Reddit, *Reddit User Agreement* (Sept. 24, 2024), https://perma.cc/DF9X-KSHL.

[19] Twitch, *Legal, Terms of Service* (Apr. 2, 2025), https://perma.cc/UAU5-U8SZ.

17

X Corp. Motion for Interlocutory Appeal and for Stay Pending Adjudication
Case No. 3:23-cv-03698-WHA

by "scraper, crawler"); YouTube Terms of Service[20] ("You are not allowed to . . . us[e] any . . . scrapers"); TikTok Terms of Use[21] (prohibiting "use [of] automated scripts to collect information"); eBay User Agreement[22] § 3 (prohibiting use of any "scraper").  That also includes the very "Public Square" platforms that Bright Data places (CC ¶ 139) within its alleged antitrust market.  *See* Dkt. 165 at 17 n.9 (citing anti-scraping language in Threads, Truth Social, and Mastodon terms of service); Bluesky Terms of Service[23] § 3(A) (users "must not do, try to do, or encourage others to" violate the terms, including scraping).  Yet if the Order is right, all these platforms now could face potentially crippling antitrust exposure.  Such broad exposure for companies across the internet – and the risks of "mistaken condemnations" that would follow if Bright Data's theory spreads, *Alston*, 594 U.S. at 99 – reinforces the need for immediate appellate review.[24]

## II.   The Court Should Enter a Stay Pending Adjudication of X's Interlocutory Appeal

If the Court certifies the Order for interlocutory appeal, it should also enter a stay.  When a court certifies an interlocutory appeal, it may grant a stay after considering "(1) the possible damage which may result from the granting of a stay; (2) the hardship or inequity which a party may suffer [if the case is allowed] to go forward; and (3) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay."  *Github*, 2024 WL 4336532, at *2.  All three factors support a stay here.

---

[20] YouTube, *Terms of Service* (Jan. 5, 2022), https://perma.cc/6QM6-YAFX.

[21] TikTok, *U.S. Terms of Use* (Nov. 2023), https://perma.cc/T5JF-M2PN.

[22] eBay, *Customer Service, User Agreement* (eff. May 16, 2025), https://perma.cc/SX3Z-MQSQ.

[23] Bluesky, *Terms of Service* (Feb. 7, 2025), https://perma.cc/B479-LUZF.  The Terms incorporate the Community Guidelines, which prohibit, among other things, "[e]vading rate limits."  Bluesky, *Community Guidelines*, *Dev. Guidelines* § 1(D) (May 22, 2024), https://perma.cc/6UTF-78VS.

[24] In the alternative, the Court may wish to construe this motion as one seeking leave to move for reconsideration under Civil Local Rule 7-9.  X acknowledges that it opposed Bright Data's previous interlocutory-appeal motion based in part on Bright Data's failure "to seek reconsideration."  Dkt. 74 at 7.  But X is also mindful of the Court's resources and does not wish to file a reconsideration motion about issues the Court has already considered.  *Cf. In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008) (Alsup, J.).  If the Court believes that seeking reconsideration is a necessary precondition to an interlocutory appeal, X respectfully submits that reconsideration is warranted here to correct the errors of antitrust law outlined in Part I.B above.

18

*First*, no damage will result from a stay because the "parties are still in the early stages of discovery" on Bright Data's counterclaims. *Id.* Although the parties have made some preliminary progress negotiating antitrust discovery, most of their efforts to date have focused on X's affirmative claims. Production of antitrust-specific documents has not yet begun. Because of the unique burdens associated with antitrust discovery, *supra* Part I.C, staying counterclaim discovery pending appeal thus is proper. *See*, *e.g.*, *In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 321 (N.D. Cal. 2007) (Alsup, J.) ("the Supreme Court has recognized that staying discovery may be particularly appropriate in antitrust cases, where discovery tends to be broad, time-consuming and expensive"). Alternatively, X would not object to staying the entire case, including X's claims, if the Ninth Circuit accepts this appeal. And if the Court stayed both sides' claims pending X's appeal on the antitrust issues, Bright Data could not credibly complain of any prejudice.

*Second*, a stay is warranted to avoid the hardship of discovery pending an appeal. *See Github*, 2024 WL 4336532, at *2 (granting stay to save "significant and potentially unnecessary resources"); *Brickman*, 2017 WL 1508719, at *4 (stay to "streamline the proceedings"); *Mauia v. Petrochem Insulation, Inc.*, 2020 WL 1031911, at *1, 4-5 (N.D. Cal. Mar. 3, 2020) (stay to "preserve significant resources of the Court and counsel" pending appeal). Those concerns are especially acute in the antitrust context. *See Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) (stay "especially makes sense" in "antitrust cases" because "costs of discovery in such actions are prohibitive"); *Netflix*, 506 F. Supp. 2d at 321 ("staying discovery may be particularly appropriate in antitrust cases"); *ASM Am., Inc. v. Genus, Inc.*, 2002 WL 24444, at *6 (N.D. Cal. Jan. 9, 2002) (describing "common practice" in patent cases "to stay antitrust counterclaims"). Indeed, the cost of antitrust discovery supplies the core reason for allowing an interlocutory appeal in the first place. Letting discovery proceed in the interim would defeat the point. *See Mauia*, 2020 WL 1031911, at *1, 4-5 (certification "becomes illogical if the parties continue to litigate" claims that "would be subject to dismissal if the Ninth Circuit reverses").

*Third*, certification of the controlling questions of law would necessarily "provide substantial guidance," including whether Bright Data's claims may survive and whether antitrust discovery is required at all. *Github*, 2024 WL 4336532, at *2; *see supra* Part I.A (explaining why

19

these questions are controlling); *cf. Best Carpet Values*, 2022 WL 22843012, at *3 ("even an

affirmance [on interlocutory review] may provide useful guidance before the parties engage in

potentially wide-ranging and expensive discovery").  Accordingly, this factor too supports a stay.

## CONCLUSION

The Court should grant X's motion and certify the Order for immediate interlocutory appeal.

It should also stay antitrust discovery, or alternatively the entire case, pending that appeal.

DATED:  May 9, 2025                     Respectfully submitted,

                                        **KELLOGG, HANSEN, TODD,**
                                        **FIGEL & FREDERICK, P.L.L.C.**

                                        By:      */s/ Joshua D. Branson*
                                        JOSHUA D. BRANSON*
                                        jbranson@kellogghansen.com
                                        ANDREW C. SHEN*
                                        ashen@kellogghansen.com
                                        DANIEL V. DORRIS*
                                        ddorris@kellogghansen.com
                                        JORDAN R.G. GONZÁLEZ*
                                        jgonzalez@kellogghansen.com
                                        KALEB J. LEGORE*
                                        klegore@kellogghansen.com
                                        1615 M Street, N.W., Suite 400
                                        Washington, D.C. 20036
                                        Telephone: 202.326.7900
                                        * *Admitted Pro Hac Vice*

                                        Adrian Sawyer, State Bar No. 203712
                                        SAWYER & LABAR LLP
                                        1700 Montgomery Street, Suite 108
                                        San Francisco, California 94111
                                        Telephone: 415.262.3820
                                        sawyer@sawyerlabar.com

                                        *Attorneys for Plaintiff*
                                        *X Corp.*