Kellogg, Hansen, Todd, Figel & Frederick, p.l.l.c.

May 19, 2025

Re: *X Corp. v. Bright Data Ltd.*, 3:23-cv-03698-WHA (N.D. Cal.) – Antitrust Market Motion To Compel

Dear Special Master McElhinny:

Bright Data has brought sweeping antitrust claims alleging that X monopolized four "Public Square" markets for platforms and data. X believes those markets are gerrymandered and do not support a viable antitrust theory. Yet Bright Data is withholding the discovery X needs to litigate that question, by refusing to "produce information relating to the scraping of sites other than X." Ex. A at 3. That refusal is unjustified. If Bright Data wishes to pursue its "broad, time-consuming and expensive" antitrust claims, *In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 321 (N.D. Cal. 2007) (Alsup, J.), it must produce basic discovery about them.[1]

**1.    *Bright Data must produce documents about other platforms and data sources.***
For X's claims, discovery has mostly been limited to Bright Data's scraping of X's platform. 2/28/25 Tr. 26:10-31:10, 41:22-42:4. The antitrust counterclaims now change the calculus. Those claims are no longer just about X; they hinge instead on how X and Bright Data fit into four broader "Public Square" markets. Dkt. 168 ("CC") ¶¶ 112-41. And for those markets to be viable, they "must encompass the product at issue as well as all economic substitutes for the product." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-21 (9th Cir. 2018). In denying X's motion to dismiss, Judge Alsup called X's "objections" to those markets "well-taken, but premature." Dkt. 263 at 11. So the Court ordered "factual testing" of whether "other platforms or data are in fact closer substitutes (or more competitively disciplining) than contended." *Id*.

X needs discovery to conduct that factual testing. To that end, X's antitrust requests sought documents about Bright Data's scraping of other websites besides X. *See* Ex. A (requests and responses).[2] Among other things, X sought information from Bright Data's "CRM database" about its customers that scrape other platforms. Ex. B at 5-6.[3] X also sought basic volume and revenue data about Bright Data's scraping of other platforms, *id.* at 3, 6, which should be worked out in the parties' ongoing data-protocol discussions. *E.g.*, 4/17/25 Tr. 20:7-22:6. But Bright Data is refusing to provide *any* information specific to any platform besides X.

Bright Data's information about other platforms is relevant for several reasons. *First*, it is essential to test Bright Data's allegations about market definition and market power. Those allegations turn in part on whether X's data shares a "reasonable interchangeability of use" or

---

[1] The parties discussed these issues in May 5 (Ex. B) and May 14 (Ex. C) letters and on a May 16 telephonic meet-and-confer. X certifies that it met-and-conferred with Bright Data in good faith and that the parties are at impasse.

[2] This issue permeates Bright Data's position on virtually every counterclaim request, *see* Ex. A at 3 (¶ 4), but X moves specifically on RFPs 85, 87-88, 96, 98, 101-106, and 109-111.

[3] After Judge Alsup ordered it, *see* 2/28/25 Tr. 20-37, Bright Data represented it produced its full CRM database for the customers that scraped X's platform. But in light of the counterclaims, X has requested (Ex. B at 5-6) that Bright Data now produce the same information for the remaining customers that did *not* scrape X's platform.

1

"cross-elasticity of demand" with data from other platforms. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). To probe that issue, X needs documents about the other platforms it believes should be in the market. For example, if a Bright Data customer stopped scraping X after its Terms changed (Dkt. 263 at 4-5) and immediately started scraping Facebook instead, that would suggest the two are substitutes. But X cannot explore those issues if Bright Data withholds information about Facebook. In that way, this case resembles the FTC's antitrust case against Meta, which Bright Data cited (Dkt. 184 at 16) for its market definition. The parties there tested the market by taking discovery about the "various technology companies that comprise the commercial ecosystem for this dispute." *FTC v. Meta Platforms, Inc.*, 2025 WL 985530, at *1 (D.D.C. Apr. 2, 2025); *see* Dkt. 271 at 15-16 (explaining). Other antitrust courts have similarly ordered market discovery beyond the defendant.[4]

*Second*, other-platform documents bear on Bright Data's claimed antitrust injury in the "Platform" markets. CC ¶¶ 113-24. Its theory posits that, if X did not "throttle" hyperlinks from its platform to competing sites, *id.* ¶¶ 98-111, those "other platforms" would grow in size and allow "data scrapers [to] turn to them to supply their data needs," *id.* ¶ 99. To probe whether X is actually impeding Bright Data from scraping the "other platforms" it invokes, *id.*, X needs discovery bearing on Bright Data's interactions with those other platforms.

Bright Data is withholding (Ex. C at 1-2) this discovery because the parties earlier discussed a stipulation for X's affirmative claims, under which Bright Data could avoid discovery about other platforms if it admitted that its conduct toward X was the "same" as what it does "for other companies like Facebook." 2/28/25 Tr. 40:24-41:21; *see* Ex. B at 6; Ex. D; Ex. E. That stipulation, suggested by Judge Alsup but never executed, was meant to resolve disputes over X's initial requests to support its affirmative UCL claim. Dkt. 197 at 3; 2/28/25 Tr. 40:21-42:9. But the parties never discussed extending that stipulation to antitrust discovery, which was not at issue at the February 28 hearing nor in the motion to compel that precipitated it.

    **2.** *Bright Data's "Discovery Markets" limitation is improper.* Even when Bright Data agreed to produce documents discussing platforms other than X, it limited its offer to its so-called "Discovery Markets." Ex. A at 2-3.[5] It defines those markets to include only the four other "Public Square" platforms it included in its own (made-up) product market, plus the nine other examples singled out in X's motion to dismiss. *Id*. That restriction is unjustified. Bright Data cannot gerrymander a market to suit its counterclaims, take that market as a given, and then stonewall requests for information about platforms that fall outside its self-serving definition.

Including the nine other examples singled out in X's motion to dismiss does not help, for two reasons. *First*, X lacks visibility into the universe of other potential "platforms or data

---

[4] *See, e.g.*, *In re Effexor Xr Antitrust Litig.*, 2019 WL 13535677, at *2-3 (D.N.J. May 23, 2019) (compelling "competing product discovery" that extended beyond defendant's product); *In re Suboxone Antitrust Litig.*, 325 F.R.D. 551, 556-57 (E.D. Pa. 2016) (compelling discovery to "explore" "forms of competition" inconsistent with antitrust plaintiff's theory); *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573-75 (D. Kan. 2009) (similar).

[5] X challenges this (or a similar) limitation for RFP 85 (Bright Data's competitors), 101 (value differences across platforms), 103 (comparing Bright Data to competitors), 104 (marketing of scraped data), 109 (logged-off versus logged-in data), 110 (measuring value of scraped data), 111 (measuring success versus competitors).

[sources]" that Bright Data's customers may consider substitutes for X's data. Dkt. 263 at 11. Indeed, Bright Data has refused even to divulge the list of other platforms or data sources it scrapes. So as things stand, X does not even understand what Bright Data's "Discovery Markets" are excluding. To solve that problem, X offered a compromise on the May 16 meet-and-confer: if Bright Data gave X the list of the other sources it (or its customers) scrape, the parties could confer about limiting the universe to some manageable subset. Bright Data refused. And without that information, X cannot craft a reasonable counterproposal. If Bright Data will not even divulge its list of other scraping targets, it must produce documents about them all.

*Second*, the examples in X's motion to dismiss were not exhaustive. For instance, Bright itself cites "real-time news sites" and "other news and data organizations" as relevant. CC ¶¶ 110, 134. Yet Bright Data's proposed "Discovery Markets" (Ex. A at 2-3) include no such news sites. Nor do they include many other platforms that Bright Data's own sources identify as competitors.[6] And a simple web search reveals still more platforms that commentators consider to be X's competitors.[7] Bright Data cannot exclude them all from discovery at the outset.

**3.    Bright Data cannot limit its production to documents that mention "X" or "Twitter."** In response to several requests, Bright Data is searching only for "documents concerning whether Bright Data or its customers consider data crawled or scraped from the X Platform to be a substitute for data scraped or crawled from other platforms or websites" in the Discovery Markets. *E.g.*, Ex. A (No. 89).[8] On the May 16 meet-and-confer, counsel explained that, for Bright Data to consider a document responsive, it must mention "X" or "Twitter" specifically. That restriction is improper. Many documents will bear on substitutability without identifying X by name. For example, if a document discussed a customer scraping Reddit to "power up-to-the-minute insights into current events," Dkt. 263 at 7, that would undermine Bright Data's attempt to exclude Reddit from the market. This is also why X needs information about Bright Data's customers that did not scrape X: if some customers scraped many other platforms but *not* X, they would be highly relevant to the assertion that X's data supplies a "unique input for customers." *Id*. More fundamentally, Bright Data's position flouts Judge Alsup's previous guidance about discovery on X's narrower affirmative claims. *See* 2/28/25 Tr. 39:4-8 ("It would be wrong to . . . refuse to produce documents unless they said 'X' on it . . . Or 'Twitter.' That would be wrong."). That guidance is even more apt here.

> Respectfully submitted,
> */s/ Joshua D. Branson*
> *Counsel for X Corp.*

---

[6] *See, e.g.*, CC ¶ 107 n.63 (citing https://perma.cc/MC3D-UNSA, which identifies Patreon as a competitor); *id*. ¶ 113 (citing https://perma.cc/4HWX-DKKL, which identifies Snapchat, WeChat, Kakao, and Line as other "social media and messaging companies" with which X "compete[s]").

[7] *See, e.g.*, Daniel Pereira, *Top 10 X (Twitter) Alternatives and Competitors*, The Business Model Analyst (Feb. 23, 2024), https://perma.cc/8X6A-7RVE (Discord and others); Agnieszka Wolanin, *X (Twitter) Alternatives: Top 8 Platforms You Should Try Out*, Brand24 (Sep. 2, 2024), https://perma.cc/NN43-PNKJ (Parler and others).

[8] X challenges this (or a similar) limitation for RFP 84 (substitutability of X data), 89 (comparing data across platforms), 101 (value differences across platforms), 102 (competitors' prices), 104 (marketing of scraped data), 106 (reactions to X's Terms), 109 (logged-off versus logged-in data), and 110 (measuring value of scraped data).

*X Corp. v. Bright Data Ltd.*, 3:23-cv-03698-WHA (N.D. Cal.)

Appendix: Exhibit Index to X Corp.'s Motion to Compel Discovery Markets

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Bright Data's Responses and Objections to X's Fourth Set of Document Requests (February 14, 2025) |
| B | X's May 5, 2025 letter regarding X's Fourth Set of Document Requests |
| C | Bright Data's May 14, 2025 letter regarding X's Fourth Set of Document Requests |
| D | Email thread ending April 22, 2025 between X and Bright Data |
| E | Bright Data's May 2, 2025 letter regarding proposed stipulation |