
Proskauer Rose LLP | 1001 Pennsylvania Avenue, NW | Washington, DC 20004

Colin R. Kass
202-416-6890
ckass@proskauer.com

May 22, 2025

Re:    *X Corp. v. Bright Data*, 23-cv-03698 (N.D. Cal.)
       *Opposition to X's Motion to Compel Other Website Discovery (ECF 299)*[1]

Dear Special Master McElhinny:

Does the availability of a two-bedroom cabin in Arkansas on Airbnb compete with world news posted on X?

X says "yes."  It even lists Airbnb on its Initial Disclosures, alongside Amazon, Zillow, and scores of other seemingly irrelevant websites.  Ex. F.  It now seeks to compel discovery about virtually every website on the web, all under the pretense of challenging Bright Data's alleged markets.  X's demands are facially overbroad, and should be denied under the Standing Order and your Procedural Order.[2]

Despite X's sweeping requests, Bright Data did *not* refuse to respond.  Nor did it, as X *falsely* claims, limit its production to exclude all "information relating to the scraping of sites other than X."  *See* X Ltr. 1.[3]  In fact, Bright Data has been producing documents relating to the Discovery Markets, defined as documents relating to websites or internet platforms that discuss "(i) X; (ii) the competitors in the Alleged Relevant Markets as alleged in the Counterclaim (*i.e.*, *Threads*, *Mastodon*, *BlueSky*, and *Truth Social*); *or* (iii) competition or substitutability of any of the foregoing with the additional websites or platforms that X has identified in its Motion to Dismiss (*i.e.*, *Facebook*, *Instagram*, *LinkedIn*, *YouTube*, *Reddit*, *Substack*, *Google*, *TikTok*, and *Weibo*).  *See* Ex. A at 3, Ex. C at 2.  These are the very sites X identified in its Motion to Dismiss and its RFPs.  That is a reasonable limitation.[4]

X devotes most of its letter to reiterating the obvious:  that market definition is an element of an antitrust claim.  But that doesn't make every document about every website relevant.  To the contrary, "parties to antitrust litigation do not have unrestrained power to discover any potentially market-related fact…. [A defendant] cannot discover information on all potential products merely by disagreeing with [the plaintiff's] definition of the relevant market.  Rather, its discovery is limited by the market pled…." *Las Vegas Sun, Inc. v. Adelson*, 2024 WL 1377275, *3 (D. Nev. 2024).  Here, the market dispute is narrow.  Bright Data alleged that platforms like Facebook and

---

[1] Emphasis added, internal citations and quotation marks omitted, and capitalizations conformed without brackets. Exhibits A through E refer to the exhibits to X's letter; Exhibits F through H refer to additional exhibits attached here.

[2] During the meet and confer, X consistently demanded documents relating to all websites for all affirmative and counterclaim RFPs.  Having litigated and lost its motion to compel as to its affirmative claims, it cannot relitigate those issues now.  *See* Referral Order, ¶ 3.b (ECF 273).  Abandoning that, X now limits its motion to 16 Counterclaim RFPs.  *See* X Ltr. 1, 3, nn.2, 8.  Bright Data's response is likewise limited to those RFPs.

[3] X also incorrectly states that Bright Data only offered to produce the CRM database for X's customers "[a]fter Judge Alsup ordered it."  X Ltr. 1 n.3.  In fact, Bright Data had agreed to produce that information from the outset.  The February hearing only addressed X's *in-house counsel's* access to it.  *See* Ex. H (Feb. 28, 2025 Hrg. Tr. 20:21-37:2).

[4] While X now argues that traditional "news dond data organizations" are relevant, it didn't identify any such organization during the meet and confer, and its supplemental Initial Disclosures – served last week – only names Bloomberg.  Ex. F at 31.  Nor did X ever ask Bright Data to expand the Discovery Market definition to any other specific site.  And as some point, enough has to be enough.

**Proskauer»**

Page 2

LinkedIn fall outside the relevant market. *See* Counterclaim ¶ 124 (ECF 168). If X proves otherwise, Bright Data's market definition might fail. But if X cannot do so for the major social media platforms, the likelihood that Airbnb or Zillow will save the day is vanishingly small. If the rule of proportionality means anything, it means discovery should focus on the core competitors.[5]

During the meet and confer, X argued that this was too limiting because it had no clue who its own competitors were. It says the same thing now, claiming it "lacks visibility" into this question, so it needs Bright Data to tell X who X competes with. X Ltr. 2. That is neither reasonable nor credible. And accepting X's argument would exponentially increase discovery burdens. Bright Data has already produced over 150 gigabytes of data and hundreds of thousands of documents. The cost of replicating that for every website ever accessed by Bright Data or some customer – or even every Discovery Market competitor – would be astronomical.

Bright Data's approach strikes the right balance. For seven of the RFPs at issue (and almost half of all RFPs), the requests themselves name the Discovery Market competitors. *See* Ex. A (RFPs 84, 88, 89 102, 104, 106, 109). Indeed, Bright Data defined the Discovery Markets based on this list. The fact that X included an "including but not limited to" catchall should not justify blowing these requests out of all proportion. If X thought other sites were important, it should have said so. For five other RFPs, X omitted any limiting language, so Bright Data reasonably limited them to the same Discovery Markets. *See id*. (RFPs 85, 101, 103, 110, 111).[6] X never explains why the limitation to the Discovery Market competitors works for most of its requests, but not these. Indeed, it appears that X was just swinging for the fences, asking for the *same* information with and without limitation. *Compare* RFP 87 (unlimited) *with* RFP 88 (limited). But even if X had a reason for the disparate treatment, a limit is needed. Bright Data offers *non-scraping* services irrelevant to this case, and scraping services with no conceivable connection to this case. For instance, Bright Data's website describes how its scraping services can be used for e-commerce "SKU matching." Ex. G. That has no bearing here.

In proposing reasonable limits, Bright Data did not seek to exclude relevant evidence. For example, in response to X's request for "all documents … regarding any difference in value between Data collected or extracted from Public Square Platforms … versus … other platforms or websites," Bright Data agreed to produce all documents "comparing the substitutability, quality, or value … of data scraped or crawled on the X platform to … other platforms or websites in the Discovery Markets." Ex. A (RFP 101; RFP 89 (similar)). It is unclear what more X truly needs.

X claims that a list of all other scraped domains and customers will help it divine who its own competitors are. But let's be real. Data licensing is one of X's core businesses, worth

---

[5] X also argues that it needs *more* (*unspecified*) information about competitors *within* the Discovery Markets, citing to its own throttling of sites like BlueSky and Facebook or hypothetical expert analyses. But X did not meet and confer on these issues. Nor does it even now explain why Bright Data's extensive offers of production are inadequate. *See* Ex. A (RFPs 83, 84, 85, 86, 89, 90, 92, 101, 102, 103, 104, 109, 110, and 111).

[6] Bright Data objected to six RFPs on other grounds. For example, Bright Data offered aggregate revenues for RFPs 87-88 because it does not track domain-specific revenues. For RFPs 96-98, Bright Data objected because other websites' *unchallenged* Terms are irrelevant to X's Terms. For RFP 105, requests covering "China," "Russia," and "any other region" in the world are patently overbroad. X did not meet and confer on any of these issues.

**Proskauer** »

Page 3

hundreds of millions or billions of dollars.  It knows who it competes with.  It surely possesses troves of documents, which are presumably the most probative evidence, on the issue.  Nor is it clear how a list of all scraped domains helps X disprove Bright Data's market allegations.  If Bright Data's customers scraped every website, does that mean there is no market smaller than the entire Internet?  Of course not.  Scraping Amazon does not show *substitutability* with X.  X's logic is like saying that shoes and steak compete because people buy both.  Documents *comparing* products may be relevant, but the mere fact two products exist is not.  Bright Data accordingly agreed to produce the former, not the latter.

Nor is there merit to X's argument that "documents may bear on substitutability without identifying X by name."  X Ltr. 3.  What would such a nameless document even look like?  When you choose between two products, don't you have those products in mind?  So, too, comparative documents would likely reference the comparators.  But assuming X's hypothetical nameless documents exist, Bright Data is not a likely source for them.  It is a technology provider; it does not generally discuss what data competes with other data.  Asking Bright Data for this information is like asking Verizon what consumers think about the merits of London versus Paris as a vacation destination just because they use their phones to make travel arrangements.  Consumers may have preferences, but Verizon wouldn't know what they are.  Nor would Bright Data.  But even if it did, Bright Data agreed to search for "documents … identifying or describing X Corp.'s competitors," *without limitation to the Discovery Markets*.  Ex. A (RFP 86).  Notably, X does not move on this RFP.  Nor has Bright Data used search terms to cull its custodial files;  rather, it has made responsiveness determinations using its good faith judgment.  That is beyond reproach.

For this reason, there is no merit to X's accusation that "Bright Data's position flouts Judge Alsup's previous guidance."  *See* X Ltr. 3.  X misquotes the Judge, perhaps explaining why it didn't attach the transcript.  The discussion concerned how Bright Data's technology works.  X argued this required production of all documents relating to Bright Data's scraping of other sites.  Judge Alsup **rejected** that, stating X doesn't "have any business seeing" information relating to Facebook and that such documents are "***too attenuated***."  Ex. H (Feb. 28 Hrg. Tr. at 39:13-40:3).  That's why he proposed a stipulation barring discovery into other platforms.  The quote X cites refers to general architecture documents, which would not be expected to refer to X (or any website), and which Bright Data had already agreed to produce.  Judge Alsup's aside – that general architecture documents can be relevant even if they don't mention X – is hardly controversial or germane.  Here, X seeks *comparator* documents, so those documents likely would reference the comparison.  Those are the documents Bright Data agreed to produce.

Ultimately, X's motion is an overreach.  It has relentlessly tried to get discovery of ***all*** of Bright Data's customers and other businesses in every way it can think of since the case began—long before it had any inkling of a potential counterclaim.  Judge Alsup rejected its prior attempts.  The added market definition element does not open the floodgates, and certainly not to the extent X wants.  The Rule of Proportionality still governs.  It should be enforced.

Respectfully submitted,

*/s/ Colin R. Kass*
*Counsel for Bright Data, Ltd.*



Page 4

*X Corp. v. Bright Data Ltd., 23-cv-03698 (N.D. Cal.)*
*Bright Data's Opposition to X's Motion to Compel Other Website Discovery (ECF 299)*

**EXHIBIT APPENDIX**

| Exhibit | Exhibit Title |
|---------|---------------|
| F. | X's Fourth Supplemental Initial Disclosures, dated May 13, 2025 |
| G. | www.brightdata.com/products/insights |
| H. | February 28, 2025 Hearing Transcript |