Colin R. Kass (*pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick (*pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

*Attorneys for Defendant Bright Data Ltd.*
*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X CORP., | |
| Plaintiff-Counterclaim Defendant, | Case No. 23-CV-03698-WHA |
| v. | Hon. William A. Alsup |
| | Courtroom 12 – 19th Floor |
| BRIGHT DATA LTD., | June 26, 2025, 8:00 a.m. |
| Defendant-Counterclaim Plaintiff. | |

## BRIGHT DATA'S OPPOSITION TO X CORP.'S
## MOTION FOR INTERLOCUTORY APPEAL AND STAY

1

2

## TABLE OF CONTENTS

3

I.     INTRODUCTION ............................................................................................. 1

II.    X FAILS TO MEET THE REQUIREMENTS TO CERTIFY AN
       INTERLOCUTORY APPEAL. ................................................................... 4

       A.     X Does Not Identify Controlling Questions of Law Appropriate for
              Immediate Appeal. ..................................................................................5

              1.     X's Questions Are Fact-Bound, Not "Purely Legal".        5

              2.     Neither Question X Poses Is "Controlling."              12

       B.     There Are No Substantial Grounds for Disagreement Warranting Appeal. ..........13

       C.     Interlocutory Appeal Would Not Materially Advance the Litigation....................18

III.   A STAY IS UNWARRANTED. .................................................................. 22

IV.    CONCLUSION............................................................................................. 23

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES[1]

2

**Page(s)**

3

CASES

4

*Abramson v. AP Gas & Elec. (PA), LLC,*
5
　　2023 WL 2714340 (W.D. Pa. 2023) ..................................................................16

6

*Ahrenholz v. Bd. of Trustees of the Univ. of Ill.,*
7
　　219 F.3d 674 (7th Cir. 2000) ...........................................................................9

8

*Am. Needle, Inc. v. NFL,*
　　560 U.S. 183 (2010).........................................................................................6

9

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas,*
10
　　426 F. Supp. 2d 125 (S.D.N.Y. 2005) ..............................................................9

11

*Blue Shield of Virginia v. McCready,*
　　457 U.S. 465 (1982).......................................................................................11

12

*Bona Fide Conglomerate, Inc. v. SourceAmerica,*
13
　　2015 WL 12028458 (S.D. Cal. 2015) ...........................................................5, 6

14

*Brantley v. NBC Universal, Inc.,*
15
　　2008 WL 11342692 (C.D. Cal. 2008)..............................................................13

16

*Canadian Pac. Ry. Co. v. Keach,*
　　2017 WL 4845733 (D. Me. 2017) ...................................................................8

17

*Cave Consulting Grp., Inc. v. OptumInsight, Inc.,*
18
　　2016 WL 7475581 (N.D. Cal. 2016) ...............................................................21

19

*Coleman v. Sterling,*
20
　　2012 WL 12952831 (S.D. Cal. 2012)..............................................................21

21

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
　　370 U.S. 690 (1962).......................................................................................18

22

*Cornerstone Staffing Sols., Inc. v. James,*
23
　　2014 WL 1364993 (N.D. Cal. 2014) ...............................................................12

24

*CoStar Grp., Inc. v. Commercial Real Estate Exch.,*
25
　　2023 WL 2468742 (C.D. Cal. 2023), X............................................................15

26

27

---

[1] Unless otherwise specified, all emphasis added, initial capitalizations conformed without
28
brackets, and internal citations and quotation marks omitted.

*CoStar Grp., Inc. v. Commercial Real Estate Exch., Inc.*,
  619 F. Supp. 3d 983 (C.D. Cal. 2022) ...................................................................15

*Couch v. Telescope Inc.*,
  611 F.3d 629 (9th Cir. 2010) ............................................................4, 5, 14, 17

*Crowder v. Linkedin Corp.*,
  2022 WL 4747321 (N.D. Cal. 2022) .................................................................14

*Crowder v. LinkedIn Corp.*,
  2023 WL 2405335 (N.D. Cal. 2023) .............................................................9, 14

*Crowder v. LinkedIn Corp.*,
  2024 WL 1221956 (N.D. Cal. 2024) .................................................................14

*DeFrees v. Kirkland*,
  2012 WL 12885065 (C.D. Cal. 2012) ...............................................................21

*Delux Pub. Charter, LLC v. Cnty. of Orange*,
  2023 WL 2558784 (C.D. Cal. 2023)..............................................................7, 8

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
  747 F.3d 145 (2d Cir. 2014)...............................................................................19

*Ellis v. Salt River Project Agric. Improvement & Power Dist.*,
  24 F.4th 1262 (9th Cir. 2022) ............................................................................11

*Gerber v. Twitter, Inc.*,
  2025 WL 1359217 (N.D. Cal. 2025) .............................................................5, 8, 9

*Hansen Beverage Co. v. Innovation Ventures., LLC*,
  2010 WL 743750 (S.D. Cal. 2010)................................................................19, 20

*Haw. Ironworkers Annuity Tr. Fund v. Cole¸*
  2011 WL 1982714 (N.D. Ohio 2011) ...........................................................16, 17

*Heaton v. Soc. Fin., Inc.*,
  2016 WL 232433 (N.D. Cal. 2016) ...............................................................12, 19

*Henley v. Jacobs*,
  2019 WL 8333448 (N.D. Cal. 2019) ...........................................................4, 5, 8

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  485 F. Supp. 3d 1137 (N.D. Cal. 2020) ...............................................................9

*Hope Med. Enterprises, Inc. v. Fagron Compounding Servs., LLC*,
  2021 WL 6618726 (C.D. Cal. 2021).............................................................2, 16

*Ibrahim v. Dep't of Homeland Sec.*,
  2009 WL 10677242 (N.D. Cal. 2009) (Alsup, J).................................................5

*In re Aluminum Warehousing Antitrust Litig.*,
  2015 WL 4646822 (S.D.N.Y. 2015).........................................................11

*In re Cement Antitrust Litig.*,
  673 F.2d 1020 (9th Cir. 1982) ...........................................................4, 12

*J2 Glob. Commc'ns, Inc. v. Protus IP Solutions*,
  2009 WL 910701 (C.D. Cal. 2009)........................................................23

*Jackson-Jones v Epoch Everlasting Plan, LLC*,
  2024 WL 3221738 (C.D. Cal. 2024)..................................................14, 19

*James v. Price Stern Sloan, Inc.*,
  283 F.3d 1064 (9th Cir. 2002) ...............................................................4

*Ji v. Naver Corp.*,
  2024 WL 251402 (N.D. Cal. 2024) ..........................................................5

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*,
  233 F. Supp. 2d 16 (D.D.C. 2002).........................................................13

*KPH Healthcare Servs, Inc. v. Mylan N.V.*,
  2022 WL 16551340 (D. Kan. 2022) .......................................................21

*Las Vegas Sun, Inc. v. Adelson*,
  2021 WL 2169935 (D. Nev. 2021) .....................................................8, 11

*Matera v. Google Inc.*,
  2016 WL 8200619 (N.D. Cal. 2016) ...............................................8, 20, 21

*Meta Platforms, Inc. v. Bright Data Ltd.*,
  2024 WL 251406 (N.D. Cal. 2024).........................................................22

*Miller v. Boilermaker-Blacksmith Nat'l Pension Tr.*,
  2021 WL 2934590 (E.D. Wash. 2021) ...................................................22

*Nelson v. St. Catherine Univ.*,
  2024 WL 3898050 (D. Minn. 2024) .........................................................8

*Pac. Premier Bancorp, Inc. v. Zurich Am. Ins. Co.*,
  2022 WL 22835204 (C.D. Cal. 2022)......................................................13

*Parks v. Watson*,
  716 F.2d 646 (9th Cir. 1983) ...............................................................18

*Peterson v. Bestway Heating Co.*,
  2012 WL 5280937 (N.D. Ill. 2021) ..........................................................5

*Porter v. Mabus*,
  2014 WL 669778 (E.D. Cal. 2014).........................................................7

*Ritz Camera & Image, LLC v. Sandisk Corp.*,
   2011 WL 3957257 (N.D. Cal. 2011) ...................................................................7

*Sateriale v. R.J. Reynolds Tobacco Co.*,
   2015 WL 3767424 (C.D. Cal. 2015)...........................................................9, 17

*Simmons v. Akanno*,
   2011 WL 1566583 (E.D. Cal. 2011) ..................................................................7

*Tele Atlas N.V. v. NAVTEQ Corp.*,
   2008 WL 4911230 (N.D. Cal. 2008) ................................................................11

*Tsyn v. Wells Fargo Advisors, LLC*,
   2016 WL 1718139 (N.D. Cal. 2016) ................................................................16

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
   676 F.2d 1291 (9th Cir. 1982) .............................................................2, 11, 17

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005)............................................................................17

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)....................................................................8, 17

*Vasquez v. Libre By Nexus, Inc.*,
   2018 WL 9868570 (N.D. Cal. 2018) ..................................................................8

*Williams v. Alameda Cnty.*,
   657 F. Supp. 3d 1250 (N.D. Cal. 2023) ............................................................5

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)................................................................8, 10, 17

**STATUTES**

28 U.S.C. § 1292(b) ......................................................................... *passim*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

Bright Data "states plausible claims for [antitrust] relief." So said the Court. Now, to avoid scrutiny, X says it should be able to take an immediate appeal of that decision because it intends to turn this case into the "most protracted, expensive case[] ever litigated in this Court." X Br. 1. It says it will take discovery of scores of customers and websites across the globe, from Airbnb to Zillow. And it asserts that every website in the world with Terms now faces antitrust risk as a result of Bright Data's Counterclaim. According to X, allowing Bright Data's Counterclaim to go forward would "upend the internet."

This case is not so special. It is narrow. It is about X's specific Terms, and X's pursuit of market control and elimination of competition through exclusionary contracts and other conduct. Nonetheless, X seeks to immediately appeal denial of its motion to dismiss—specifically asking whether Bright Data "plausibly" alleged anticompetitive conduct, and whether it plausibly alleged an "overarching scheme" causing antitrust injury. These commonplace, fact-based, threshold questions are not the sorts of "rare" and "exceptional" legal questions warranting piecemeal appeal. And they do not meet the three statutory requirements for § 1292(b) certification.

***No Controlling Question of Law.*** While X tries to artfully reframe its questions as pure issues of law, they are not. Its first question seeks re-assessment of the "plausibility" of Bright Data's allegations of *de facto* exclusive dealing and vertical foreclosure under the rule of reason. Of course, plausibility and rule of reason analysis are long-settled law. *Twombly* was 2007. *Chicago Board of Trade* was 1911. Nor does application of these standards generate pure legal questions that can be decided quickly and cleanly without reference to complicated facts. Certification is used to confront clean issues of unsettled law. Plausibility of factual allegations raising a rule of reason antitrust claim is far from that. It involves assessment of the facts alleged regarding X's changes to its Terms, the circumstances and motivations behind those changes (to control the market for public square data), and the competitive impact of those changes (insulating X from competition for publicly available data that it does not own but wishes to sell and use for its own purposes). The Court credited those factual allegations, weighed them, and found they

1  asserted a plausible antitrust claim.  X would ask the Ninth Circuit to conduct the same factual

2  assessment under the same settled plausibility and rule of reason standards.  That is not the purpose

3  of § 1292(b).

4        X wants to apply *Trinko* – a unilateral conduct case – to Bright Data's challenge to X's

5  exclusionary *contracts*.  But "just because counsel contends that one precedent rather than another

6  is controlling does not mean there is such a substantial difference of opinion as will support an

7  interlocutory appeal."  *Hope Med. Enterprises, Inc. v. Fagron Compounding Servs., LLC*, 2021

8  WL 6618726, *5 (C.D. Cal. 2021).  In any event, X's question of which antitrust analysis should

9  apply begins with the facts.  Do the alleged changes to X's Terms as part of its effort to exclude

10  competition for public square data raise issues of vertical foreclosure and exclusionary contracts,

11  as this Court found?  Or do they somehow raise issues of unilateral refusals to deal, as X contends?

12  The factual allegations control, not a controlling question of law.

13        X then reargues the same factually distinct cases it relied on in its Motion to Dismiss.  But

14  those factual distinctions underscore that X's issues are not a pure question of law.  Indeed, the

15  fact that X had to dig up underlying briefing in its two principal cases drives this home.

16        X's second question fares no better.  It asks whether Bright Data has antitrust standing to

17  challenge X's throttling of traffic from its platform to rivals as part of an "overarching"

18  anticompetitive scheme.  But this too is a fact-based question.  The law is settled: a plaintiff's

19  plausibly alleged overall scheme must be considered together, not dissected.  *E.g.*, *Twin City*

20  *Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1303 (9th Cir. 1982).  X does

21  not dispute that Bright Data has standing to challenge X's efforts to monopolize and foreclose

22  competition for public data.  The question then is whether Bright Data plausibly alleged that X's

23  throttling practices were part of its overarching anticompetitive scheme.  The Court found it did.

24  Again, that is not a question of law appropriate for immediate appeal.

25        Nor are these questions "controlling" within the meaning of § 1292(b).  As this Court

26  observed, discovery for the Counterclaim will "overlap[] with discovery on the affirmative

27  defenses and other issues in this case."  ECF 263 at 14.  Under X's claims and Bright Data's

28

affirmative defenses, there will be discovery into the impact of scraping on X's servers and the competitive effect of its Terms. Indeed, the last six months of discovery have largely focused on that issue. The only piece that is arguably new is market definition, but parties in merger challenges often handle discovery into that issue in a matter of months. In short, resolution of X's questions would not have the kind of "immediate effect" on the litigation that would render them "controlling" (even if they were proper legal questions). The only thing immediate appeal does is delay.

*No Substantial Grounds for Disagreement*. The Court applied established, rule-of-reason, vertical foreclosure principles to Bright Data's allegations. X does not identify any disagreement with those legal principles. Indeed, there is nothing controversial about the legal theory the Court applied—which simply recognizes the well-established principle that exclusionary contracts foreclosing a substantial share of the relevant market are actionably anticompetitive. Each basic element of this theory and its application to the facts is plainly and plausibly alleged, and there is no substantial ground to think otherwise. Instead, X doggedly repeats its *Trinko* "refusal to deal" framing, ignoring Bright Data's actual allegations and citing cases involving different allegations and issues. As this Court found, X's cases are distinguishable on numerous factual bases. Accordingly, they do not evidence the substantial grounds for disagreement required for certification. Throughout its motion, X repeats the mantra "reasonable jurists could disagree." It really means, "X disagrees." That does not suffice. Reasonable disagreement is an everyday occurrence. If every such disagreement were immediately appealable, the fundamental policy against piecemeal appeals would vanish.

*Certification Would Not Materially Advance the Litigation*. X argues that reversal would save it time and resources. It dedicates pages to hyperbolic doomsday scenarios of immense burdens, millions of documents, and a globe-trotting discovery regimen covering every website and customer imaginable. It threatens to turn this narrow, two-party challenge to contractual provisions and related conduct into the largest antitrust case ever seen this side of the Sierra Nevadas. If such histrionics could carry the day, courts would live in the land of vociferous

1    exaggeration.  This case is not a multi-party, multidistrict litigation.  It is not a class action.  It is

2    far nimbler.  There is one plaintiff, one defendant, and one alleged course of conduct.

3        Nor would immediate appeal truly save anything at this juncture.  There is significant

4    overlap in discovery with X's claims and Bright Data's affirmative defenses.  The only likely

5    outcome is delay.  Ninth Circuit civil appeals take 13 months, on average, to resolve.  By then, this

6    case would be nearing trial.  And even if the Ninth Circuit agrees with X, the likely result is remand

7    with leave to amend.  Though it asked for dismissal with prejudice, X has never argued that

8    amendment would be futile in the event Bright Data's allegations are found lacking.  And either

9    way, X will have to engage in the discovery it now seeks to avoid under its affirmative claims.

10   Thus, this is not a situation where certification will materially advance the litigation (or promote

11   judicial efficiency); quite the opposite.

12       X has failed to carry its heavy burden of demonstrating exceptional circumstances

13   warranting certification of an interlocutory appeal.  Nor, for the same reasons, is a stay justified.

14   X's motion should be denied.

## II.    X FAILS TO MEET THE REQUIREMENTS TO CERTIFY AN INTERLOCUTORY APPEAL.

17       Certification under 28 U.S.C. § 1292(b) is a "narrow exception" to the bedrock rule that

18   appeals must await final judgment.  *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010).

19   Congress intended § 1292(b) to be "applied sparingly and only in exceptional circumstances…."

20   *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982); *James v. Price Stern Sloan,*

21   *Inc.*, 283 F.3d 1064, 1067 n.6 (9th Cir. 2002) (interlocutory appeal reserved for "rare

22   circumstances").  X "has a heavy burden to show that 'exceptional circumstances justify a

23   departure from the basic policy of postponing appellate review until after the entry of a final

24   judgment."  *Henley v. Jacobs*, 2019 WL 8333448, *2 (N.D. Cal. 2019) (quoting *Coopers &*

25   *Lybrand v. Livesay*, 438 U.S. 463, 475 (1978)).

26       Accordingly, the statutory requirements for interlocutory appeal are stringent.  There are

27   three: (1) "a controlling question of law," (2) "substantial grounds for difference of opinion," and

28   (3) "that an immediate appeal may materially advance the ultimate termination of the litigation."

*Id.* While the absence of any one requirement bars certification, X cannot satisfy any. *Couch*, 611 F.3d at 633. And even where all three are satisfied, district judges have plenary discretion to deny certification. *See Ibrahim v. Dep't of Homeland Sec.*, 2009 WL 10677242, *2 (N.D. Cal. 2009) (Alsup, J).

### A.    X Does Not Identify Controlling Questions of Law Appropriate for Immediate Appeal.

As X concedes (X Br. 3), "[t]he controlling question of law in an interlocutory appeal is generally a purely legal issue that can be resolved quickly without delving into a particular case's facts." *Gerber v. Twitter, Inc.*, 2025 WL 1359217, *2 (N.D. Cal. 2025) (citing *Steering Comm. v. United States*, 6 F.3d 572, 575–76 (9th Cir. 1993)). For example, "the meaning of a statute" might qualify. *Peterson v. Bestway Heating Co.*, 2012 WL 5280937, *2 (N.D. Ill. 2021). But cases like this one presenting mixed questions of law and fact—for example, application of settled law to a particular set of facts—are "the **antithesis** of a proper § 1292(b) appeal." *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 2015 WL 12028458, *2 (S.D. Cal. 2015) (quoting *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004)); *see also, e.g.*, *Williams v. Alameda Cnty.*, 657 F. Supp. 3d 1250, 1257 (N.D. Cal. 2023) (declining to certify where there was only "a mixed question of law and fact, without a pure legal question to tether the appeal"). "That district courts may reach different conclusions when applying … standards to unique factual scenarios is unremarkable, and does not necessitate an immediate appeal." *Ji v. Naver Corp.*, 2024 WL 251402, *2 (N.D. Cal. 2024).

Here, X posits two questions. For each, X must show that the question is both "controlling" and a "purely legal issue." It fails both requirements.

### 1.    X's Questions Are Fact-Bound, Not "Purely Legal".

*X's Question #1.* X first asks whether "it [is] plausibly anticompetitive for an online platform to adopt terms of service that bar its users from scraping or facilitating others' scraping of data on that platform." X Br. 4. But this is the same as asking "whether [Bright Data's] mixed direct and circumstantial allegations in the [Counterclaim] state one or more Sherman Act" claims.

*Bona Fide Conglomerate*, 2015 WL 12028458, at *3 (no controlling question of law).  Or, as this Court put it, quoting Justice Brandeis:

> "The court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts."

ECF 263 at 6 (quoting *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)); *see also Am. Needle, Inc. v. NFL*, 560 U.S. 183, 203 n.10 (2010) (same).  X does not dispute this is the correct rule of reason analysis, nor does it deny that it is a fact-intensive one.

X's attempt to extract a pure legal issue from the relevant inquiry results in a question so broad it is stripped of substance and untethered from the case.  The question addressed by this Court was not whether it is anticompetitive for online platforms writ large to impose anti-scraping terms generally, but whether X's specific changes to its specific terms in the specific circumstances of its business and motivations plausibly state a claim.  Or stated more specifically, whether X's addition of a scraping prohibition, facilitation clause, and liquidated damages penalty to its Terms as part of its scheme to transform X from an advertising company into a data company and shield its use and sale of public data from competition, plausibly states a claim.  The Court answered yes. Re-analysis of those facts is not a proper issue for interlocutory appeal.

X's preoccupation with *Trinko* continues to be misguided.  X claims the Court's holding "rests on the disputed legal premise that X has a plausible antitrust duty to allow data scraping on its own platform."  X. Br. 4.  Not so.  As Bright Data has repeatedly explained, X could, for example, put all its information behind a log-in screen.  What it cannot do under the Sherman Act is impose on the world *de facto* exclusive dealing contracts that foreclose competition.  That is what the Court found Bright Data plausibly alleged, which depends on factual allegations regarding X's terms, their effect, and their intent.  X's motion does not address that holding.  Put most charitably, X's argument is that the wrong standard was applied, and the Court should have applied *Trinko*'s unilateral refusal to deal framework.  But determining which antitrust framework applies depends on the facts alleged.  Bright Data did not allege a unilateral refusal to deal.  It

1    alleged a widespread contractual regime that was intended to, and did, restrict competition for

2    public square data by prohibiting customers from doing business with Bright Data or other

3    scrapers. X's question cannot even be considered without first addressing all the facts of the

4    Counterclaim.

5        Nor do X's cases hold otherwise. *Ritz Camera* did not certify Sherman Act questions, as

6    X claims, but rather certified for appeal the legal issue of "*Walker Process* standing." *Ritz Camera*

7    *& Image, LLC v. Sandisk Corp.*, 2011 WL 3957257 (N.D. Cal. 2011). And *Facebook, Inc. v.*

8    *Power Ventures, Inc.* did not involve a certification motion and was not applying § 1292(b)'s

9    stringent "pure question of law" standard. 2010 WL 3291750 (N.D. Cal. 2010). Moreover, the

10   *Facebook* court was not presented with factual issues, because none were alleged. The

11   counterclaim there "merely assert[ed] that Facebook's actions are anticompetitive because

12   Defendants have alleged so" through "naked assertion[s] that Facebook's practices are predatory,"

13   which were "conclusions of law" that the Court was "not obligated to accept." *Id.* at *14.

14       Rather than raising a pure legal question, X instead asks whether the fact pleadings in the

15   Counterclaim "plausibly" allege an "anticompetitive" scheme to monopolize the alleged market

16   and restrain trade. That "depend[s] on the facts presented," and the Court's opinion denying X's

17   motion to dismiss is bound with those facts. *See Porter v. Mabus*, 2014 WL 669778, *4 (E.D. Cal.

18   2014). Because "reviewing this issue would essentially require a reassessment of [Bright Data's]

19   factual allegations," it "is not appropriate for certification." *Delux Pub. Charter, LLC v. Cnty. of*

20   *Orange*, 2023 WL 2558784, *2 (C.D. Cal. 2023); *Simmons v. Akanno*, 2011 WL 1566583, *3

21   (E.D. Cal. 2011) ("re-screening of [the] factual allegations … is the antithesis of a proper § 1292(b)

22   appeal").

23       Indeed, while the Court found Bright Data plausibly alleged a claim, it noted areas where

24   further factual development will be required to fully assess the issue. For example, X argued the

25   restraint imposed by its Terms is justified "to prevent free riding on X's investment by allowing X

26   alone to profit from the data it aggregates there." ECF 263 at 8. Fact questions abound. For

27   example, is the server burden that X claims justifies its restraints "a little burdensome or a lot?"

28

1    *Id.* The parties have already begun digging into that issue in discovery. But as the Court rightly

2    held, these fact-based inquiries are not appropriate "at this stage." *Id.* Consequently, "an

3    interlocutory appeal prior to any discovery would deprive the appellate court of a factual record

4    that likely would aid its consideration of the legal questions presented." *Matera v. Google Inc.*,

5    2016 WL 8200619, *15 (N.D. Cal. 2016).

6         True, "sufficiency of a pleading is, in the broadest sense, 'a controlling question of law,'"

7    but "if [§] 1292(b) were interpreted this broadly, virtually every denial of a motion to dismiss

8    would be subject to interlocutory review." *Delux Pub. Charter*, 2023 WL 2558784, at *3. For

9    these reasons, courts deny certification of questions like X's that focus on application of settled

10   law to the particular facts.[2] Here, exclusionary contracts that foreclose a substantial share of the

11   relevant market are a well-established form of anticompetitive conduct. *See, e.g.*, *ZF Meritor, LLC

12   v. Eaton Corp.*, 696 F.3d 254, 269-71 (3d Cir. 2012); *United States v. Microsoft Corp.*, 253 F.3d

13   34, 70 (D.C. Cir. 2001). The question addressed by this Court, then, was whether X's Terms

14   comprise such an exclusionary contract. That is primarily a fact question.

15        X's cases bear this out. While X repeats the claim that "every court to consider antitrust

16   challenges to similar terms of service has dismissed them," (X Br. 8), this Court distinguished

17   those cases, not on the basis of legal disagreement, but on the specific facts alleged. *See, e.g.*, ECF

18   263 at 8-9 (distinguishing *Crowder v. LinkedIn Corp.*, 2023 WL 2405335, *5 (N.D. Cal. 2023),

19   because the complaint there failed to allege that the terms at issue prevented data customers from

20   dealing with competing data sellers); *id.* at 9 (distinguishing *hiQ Labs, Inc. v. LinkedIn Corp.*, 485

---

21
22   [2] *See, e.g.*, *Las Vegas Sun, Inc. v. Adelson*, 2021 WL 2169935, *4 (D. Nev. 2021) (question of
     whether antitrust claim was adequately pled "is not exclusively one of law") (quoting *In re*
23   *Petroleum Products Antitrust Litig.*, 928 F.2d 1136, 1136 (9th Cir. 1991)); *Twitter*, 2025 WL
     1359217, at *1-2; *Henley*, 2019 WL 8333448, at *2 ("the Court's application of the law to the
24   facts alleged in the pleadings" is "not appropriate for interlocutory certifications"); *Vasquez v.
     Libre By Nexus, Inc.*, 2018 WL 9868570 (N.D. Cal. 2018) (same); *Matera*, 2016 WL 8200619, at
25   *7 (same); *see also, e.g.*, *See, e.g.*, *Nelson v. St. Catherine Univ.*, 2024 WL 3898050, *3 (D. Minn.
     2024) ("A challenge to the Court's determination of the plausibility of a claim does not implicate
26   a 'controlling question of law' for purposes of § 1292(b) certification."); *Canadian Pac. Ry. Co.
     v. Keach*, 2017 WL 4845733, *6 (D. Me. 2017) ("A disagreement over the plausibility of certain
27   factual allegations is precisely the sort of 'garden variety legal argument' that does not meet the §
     1292(b) standard.").
28

1    F. Supp. 3d 1137, 1149 (N.D. Cal. 2020), because the complaint failed to explain how LinkedIn

2    allegedly coerced its members to boycott plaintiff's business).  "The cases cited by Defendant to

3    illustrate that there is a difference of opinion are factually distinct, rendering this not a situation in

4    which a question of law can be resolved without delving into the facts of this case[,]" and therefore

5    inappropriate for certification.  *Twitter*, 2025 WL 1359217, at *2.

6         Unable to find a "purely legal issue" in the application of established antitrust law to Bright

7    Data's allegations, X turns to contract interpretation.  It asserts, for the first time, that its anti-

8    facilitation terms do not harm competition because it does not interpret them to bar the purchase

9    of datasets from a scraper.  X Br. 5-6.  But a party's "disagreement with the Court's construction

10   of the terms of [an agreement] is not the sort of abstract legal issue that merits invocation of the

11   narrow exception to the final judgment rule embodied in § 1292(b)."  *Sateriale v. R.J. Reynolds*

12   *Tobacco Co.*, 2015 WL 3767424, *3 (C.D. Cal. 2015); *see also Ahrenholz v. Bd. of Trustees of the*

13   *Univ. of Ill.*, 219 F.3d 674, 676-77 (7th Cir. 2000) ("The question of the meaning of a contract …

14   is not what the framers of section 1292(b) had in mind."); *Aristocrat Leisure Ltd. v. Deutsche Bank*

15   *Tr. Co. Americas*, 426 F. Supp. 2d 125, 128 (S.D.N.Y. 2005) (same).

16        Even the question of whether X has in fact taken the position that data purchasers are not

17   subject to the anti-facilitation clause is a fact question.  Nor is it clear what X means.  Is a customer

18   facilitating scraping when it hires Bright Data to create a custom data set?  Is a customer that uses

19   Bright Data's tools to scrape public data from X facilitating scraping?  Or is Bright Data

20   facilitating?  Or neither?  Even if X's new, non-binding, litigation-driven position (whatever it is)

21   is accepted, it does not change Bright Data's allegations, or this Court's finding that X's terms as

22   drafted are exclusionary by barring "X's data customers (or any X user) from ever buying from a

23   business the scrapes the public-square data X does not own from the webpages X publicly

24   displays."  ECF 263 at 7.

25        As Bright Data alleged, this competitive restraint is not limited to customers that would

26   buy already completed data sets, but also includes customers that would engage scraping services

27   to access publicly available public-square data on X.  *See, e.g.*, CC ¶¶ 90, 93 ("X claims that its

28

1    Terms contractually bind 100% of customers in the market for such data, prohibiting any of them

2    from purchasing data from data scrapers *or companies that provide scraping tools or services*….

3    X takes the position that, through this provision, there is no distinction between the person or entity

4    that does the scraping and the person or entity that receives the fruits of such data scraping.").  Nor

5    do the Terms' anticompetitive effect depend on X's belated, litigation-driven interpretation.  What

6    matters, and what this Court held, is that their very "existence … creates legal risk sufficient to

7    dissuade customers from purchasing the data from competing sources."  CC ¶ 95; ECF 263 at 7

8    ("It is plausible that no prospect browse-wrapped by such an agreement will buy from Bright Data

9    or from any other scraper…."); *see also ZF Meritor*, 696 F.3d at 270 (courts confronting alleged

10   exclusionary contracts must "look past the terms of the contract to ascertain the relationship

11   between the parties and the effect of the agreement in the real world").

12       So too for X's "liquidated damages" penalty provision that, in the Court's words, "threatens

13   otherwise daring traders into submission."  ECF 263 at 7.  Bright Data's factual allegations

14   regarding the context, intent behind, and market effect of the provision made the Counterclaim

15   plausible.  This plausibility is not a pure legal question appropriate for interlocutory appeal.

16       In short, X's focus on *its* interpretation of its terms versus this Court's or Bright Data's or

17   even potential customers' is not the kind of legal question subject to § 1292(b) appeal.

18       ***X's Question #2.***    X next seeks to appeal whether "a plaintiff ha[s] antitrust standing to

19   challenge an 'overarching scheme' that it defines to include an alleged practice that occurs in a

20   market where the plaintiff does not participate."  X Br. 6.  On its face, this question depends on

21   facts alleged regarding the "overarching scheme," market, injury, and standing.  Once again, courts

22   decline to certify such fact-dependent questions.

23       Though X reductively describes Bright Data's throttling pleadings as "mashed … together

24   with X's anti-scraping terms" to make out an "overarching scheme to monopolize the data

25   markets" (X Br. 6), X does not deny that Bright Data alleges an overarching scheme to monopolize

26   the market, and exclude competition, for public square data.  Nor does X deny that Bright Data

27   alleges resulting injury in the downstream data markets.  But the fact that Bright Data's injuries

28

1    stem from downstream effects does not immunize other components of X's scheme.  *See, e.g.,*

2    *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 483-84 (1982) (standing satisfied where injury

3    was "inextricably intertwined" with the success of the scheme); *Ellis v. Salt River Project Agric.*

4    *Improvement & Power Dist.*, 24 F.4th 1262, 1275 (9th Cir. 2022) (same).  Nor can X pick apart

5    the overall scheme as alleged.  It must be considered as a whole.  *Twin City Sportservice, Inc. v.*

6    *Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1303 (9th Cir. 1982) ("Defendants' aggregate

7    pattern of allegedly illegal behavior" must be considered together); *Tele Atlas N.V. v. NAVTEQ*

8    *Corp.*, 2008 WL 4911230, *2 (N.D. Cal. 2008) (same).

9            It is not a simple "legal" question of whether an antitrust plaintiff has standing to challenge

10   all aspects of an alleged overarching scheme (it does), but whether the alleged injury is

11   "inextricably intertwined" with the scheme as alleged, and whether Bright Data plausibly alleged

12   such a scheme.  This Court correctly explained how these allegations fit together.[3]  Namely,

13   throttling hurts competition in the user engagement market, effectively concentrating X's power

14   in the downstream data markets in which Bright Data competes.  *See* ECF 263 at 8; *see also* ECF

15   84 at 22.  Assessing the role and relevance of the throttling allegations to X's overarching scheme

16   depends on the alleged facts.  As the court in *Las Vegas Sun* explained, "the ultimate issue of

17   whether [plaintiff] has alleged standing is premised upon a factual finding."  2021 WL 2169935,

18   at *5 (denying certification); *see also In re Aluminum Warehousing Antitrust Litig.*, 2015 WL

19   4646822, *1 (S.D.N.Y. 2015) ("The Court determined that plaintiffs have pled sufficient facts to

20   support standing. … It cannot be that all decisions on contested antitrust standing can be subject

21   to interlocutory review.").

22           Bright Data's standing to challenge X's overarching anticompetitive scheme is not a "pure"

23   legal question subject to immediate appeal.

24

25

26   [3] X mischaracterizes the Court's Order as considering Bright Data's standing "suspect."  X Br. 7.
     In fact, the Court recognized that Bright Data's throttling allegations are part of its broader theory,
27   and were "*not brought* as some stand-alone claim for which its standing *would be* suspect."  ECF
     263 at 12.
28

1

2.    *Neither Question X Poses Is "Controlling."*

2        Nor are X's questions "controlling" within the meaning of § 1292(b).  A question is

3    "controlling" if "resolution of the issue on appeal could materially affect the outcome of the

4    litigation in the district court." *Cement Litig.*, 673 F.2d at 1026.  To do so, the question must "at

5    a minimum … have some ***immediate*** effect on the course of litigation…." *Cornerstone Staffing*

6    *Sols., Inc. v. James*, 2014 WL 1364993, *2 (N.D. Cal. 2014).  "Questions of law that are considered

7    'controlling' are usually fundamental issues, such as who are proper parties, whether a court has

8    jurisdiction, and whether state or federal law should apply." *Heaton v. Soc. Fin., Inc.*, 2016 WL

9    232433, *3 (N.D. Cal. 2016).  X's questions are not that.

10        Obviously, a complete reversal on Bright Data's counterclaims will not dispose of the suit.

11    X's claims, and Bright Data's defenses to them, will remain.  X's throttling question cannot even

12    go that far, as reversal on that question would do nothing but remove the throttling allegations

13    from the case.  Thus, even if "the Ninth Circuit ruled in [X's] favor, the litigation would not end;

14    the scope of the upcoming trial would merely" change. *Cornerstone Staffing*, 2014 WL 1364993,

15    at *2.  Here, as in *Cornerstone Staffing*, "there is no risk that in the absence of interlocutory review

16    the court might proceed with a trial that never should have been held in the first place." *Id.*  And

17    "if anything, interlocutory review would further delay the upcoming trial…." *Id.*  This all counsels

18    against immediate appeal.

19        X does not dispute any of this, but instead cries Chicken Little.  As X tells it, Bright Data's

20    counterclaim, challenging the legality of X's Terms and throttling practices, will bring the sky

21    down over the entire Internet.  This case will "easily become one of the most protracted, expensive

22    cases ***ever litigated*** in this Court," X says.  X Br. 1.  X's hyperbole is just that—rhetoric.  It knows

23    it can financially weather a protracted multi-jurisdictional litigation far better than Bright Data.

24    But there is no need for it.  This is not a complex, multi-party action.  Nor is this a class action.  It

25    is a focused, single-party action directed at specific contractual terms and conduct.  The parties are

26    already six months into discovery.  Most of the issues overlap between X's and Bright Data's

27    claims, including X's Terms, their impact and rationale, and the impact, if any, of scraping on X's

28

servers.  As this Court noted, counterclaim discovery will "overlap[] with discovery on the affirmative defenses and other issues in this case."  ECF 263 at 14.

Moreover, "[e]ven if the Court of Appeals were to reverse this Court and find that the [Counterclaim] did not properly allege a claim for relief, there is little doubt that leave to amend would be granted…." *Brantley v. NBC Universal, Inc.*, 2008 WL 11342692, *2 (C.D. Cal. 2008).  X has never argued that amendment would be futile.  Thus, "interlocutory appellate review of the sufficiency of the complaint would not definitively move the case towards final resolution.  Instead, it would, at best, generate another round of amendments…." *Id.*

Under these circumstances, X's proposed appeal will not "materially affect the outcome" of this case; it will merely add cost and delay.

*       *       *

In sum, X's purported controlling questions of law are neither controlling nor purely legal.  They will not meaningfully affect the course of litigation, and they cannot be "decide[d] quickly and cleanly without having to study the record[,]" instead requiring the Ninth Circuit "to become familiar with the pleadings [and] perform[] the same fact-bound analysis this Court performed." *Pac. Premier Bancorp, Inc. v. Zurich Am. Ins. Co.*, 2022 WL 22835204, *3-4 (C.D. Cal. 2022).  X thus fails at the threshold to carry its burden of demonstrating the exceptional circumstances necessary to warrant § 1292(b) certification.

The Court could stop here, but X fails the remaining requirements of § 1292(b) as well.

### B.     There Are No Substantial Grounds for Disagreement Warranting Appeal.

X also fails to show substantial grounds for disagreement.  This requirement assesses the extent to which "controlling law is unclear."  The "threshold … is a high one." *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 233 F. Supp. 2d 16, 19 (D.D.C. 2002); *Jackson-Jones v Epoch Everlasting Plan, LLC*, 2024 WL 3221738 (C.D. Cal. 2024); *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010).  To make this showing, X must demonstrate "the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point," "complicated questions arise under foreign law," or "novel and difficult questions of first

1    impression are presented." *Couch*, 611 F.3d at 633. "A party's strong disagreement with the

2    Court's ruling is not sufficient…." *Id.* Similarly, "[t]hat settled law might be applied differently

3    does not establish a substantial ground for difference of opinion." *Id.*

4         ***X's Question #1.*** As to X's first question, X relies entirely on the same cases from its

5    motion to dismiss. But as X notes, this Court (rightly) found "Bright Data's counterclaims" to be

6    "distinguishable from X's 'case citations.'" X Br. 8 (quoting ECF 263 at 8). None of X's cases

7    involved a challenge to a ubiquitous *contract of adhesion* including anti-facilitation and liquidated

8    damages provisions imposed to prevent competition in data markets. X's "most analogous" case

9    involved "*no* allegations … to support [a vertical foreclosure] theory" and "the complaint did not

10   address or describe the API terms of use at all." ECF 263 at 8-9 (distinguishing *Crowder*, 2023

11   WL 2405335, at *5 (N.D. Cal. 2023)). "There was no clear account for how limiting access to the

12   data interfered with competitive mechanisms in any market." ECF 263 at 8-9. Nor was *Crowder*

13   a vertical foreclosure case to begin with. The allegedly excluded competitors there were rival

14   platforms, not scrapers. Crowder Opp., *Crowder v. Linkedin Corp.*, 2022 WL 4747321, *1-2, 5-6

15   (N.D. Cal. 2022). These are not mere "distinctions lurk[ing] at the margins," as X claims (X Br.

16   8); these are fundamental differences in allegations.

17        X does not explain how the *Crowder* complaint, with almost no reference to terms of use,

18   could create substantial grounds for disagreement, when the Counterclaim here specifies chapter

19   and verse the changes in X's Terms and their effect on competition. Once the *Crowder* plaintiffs

20   added such factual allegations—of agreements "not to compete with LinkedIn"—the complaint

21   survived. *Crowder v. LinkedIn Corp.*, 2024 WL 1221956, *2-5 (N.D. Cal. 2024). That is a basis

22   of agreement with this Court's holding, not disagreement. When a complaint sufficiently alleges

23   contractual agreements that restrain trade and foreclose competition, the claim survives.

24        As it did on its motion to dismiss, X next turns to *CoStar Grp., Inc. v. Commercial Real*

25   *Estate Exch., Inc.*, 619 F. Supp. 3d 983 (C.D. Cal. 2022). It fares no better this time around. The

26   Court correctly distinguished *CoStar* because it did not involve an explicit, *de facto* exclusive

27   dealing provision. *Compare* ECF 263 at 9 ("CoStar blocking CREXi from [CoStar's] website

28

does not forbid brokers from hiring CREXi") (quoting *CoStar Grp.*, 619 F. Supp. 3d at 991) *with id.* at 10 ("X Corp. is forcing its own customers not to deal with scrapers, in perpetuity, a much different problem under the Sherman Act.") *and* CC ¶¶ 89-90 (X "enter[ed] into agreements with data scrapers' customers that purport to make X the exclusive source of data published on X's platform."). *CoStar* reinforced this distinction in discussing CREXi's Amended Counterclaim, noting "the terms of use only pertain to [certain] images … not the brokers' website … nor original images maintained by brokers, [so] if CREXi wishes to do business with brokers, CREXi can advise brokers to use their own images…." *CoStar Grp., Inc. v. Commercial Real Estate Exch.*, 2023 WL 2468742, *3 (C.D. Cal. 2023).[4]

X's only response is that "reasonable jurists could draw the same distinction here." X Br. 10. But Bright Data alleges X's restrictions are far more draconian. "With 95% market share," X "is currently the only viable source of real-time [public square] data on such platforms." CC ¶ 20. *CoStar* did not involve allegations of a concentrated market for real estate information or listings. While data scrapers like Bright Data compete in the public square data market, X's Terms prohibit users from even hiring Bright Data to access or scrape public data on X. X concedes as much. X Br. 10 (users "cannot hire scrapers to extract data from X's own platform").[5] The fact that X users can interact with Bright Data in other ways outside the public square data market is irrelevant.

This all underscores the *factual* distinctions with X's cases. Such fact distinctions do not create substantial grounds for disagreement on a legal issue for purposes of § 1292(b).[6] In *Hope*

---

[4] X does not cite this later opinion, which is currently on appeal (from a Rule 54(b) partial final judgment) and pending decision from the Ninth Circuit. *See* Appeal No. 23-55662 (9th Cir. July 27, 2023).

[5] X again tries to sanitize its Terms with its new litigation-driven interpretation of "facilitate." But X does not deny that its Terms prohibit any user from using Bright Data to access or scrape public square data on X. That is the point, and the unavoidable distinction with X's cases.

[6] X's other cases, *see* X Br. at 8 n.6, are equally inapposite. X cites them for the broad (and incorrect) proposition that "every court to consider antitrust challenges to similar terms of service has dismissed them." But each case dealt with different terms in different circumstances, and alleged restraints in different markets. They were factually distinguishable on X's motion to dismiss, and they remain so here. None show jurists taking differing opinions on the issues in this case.

1    *Med. Enterprise*, for example, "defendants [similarly] rel[ied] heavily on the disagreement

2    between this Court and" another. 2021 WL 6618726, *5. But the other "cases [we]re

3    distinguishable," so there were no grounds for interlocutory appeal. *Id*; *see also, e.g.*, *Tsyn v. Wells*

4    *Fargo Advisors, LLC*, 2016 WL 1718139, *4 (N.D. Cal. 2016) ("It would not warrant a § 1292(b)

5    appeal simply because another district court reached a different decision in a broadly similar

6    case."). Thus, reliance "on nonbinding cases that are readily distinguishable from the facts

7    alleged" does not suffice. *Abramson v. AP Gas & Elec. (PA), LLC*, 2023 WL 2714340, *3 (W.D.

8    Pa. 2023); *see also, e.g.*, *Haw. Ironworkers Annuity Tr. Fund v. Cole¸* 2011 WL 1982714, *2 (N.D.

9    Ohio 2011) (denying appeal where "the factual circumstances of this case, as alleged in the

10    complaint, distinguish the defendants' conduct…."). And "the fact that one other district court has

11    reached a contrary conclusion … is insufficient for finding a substantial difference of opinion."

12    *Hope Med. Enterprises*, 2021 WL 6618726, at *5 ("Just because counsel contends that one

13    precedent rather than another is controlling does not mean there is such a substantial difference of

14    opinion as will support an interlocutory appeal.") (quoting *Couch*, 611 F.3d at 633).

15          But even if "reasonable jurists could disagree" on the law, that is not enough. Reasonable

16    disagreements occur every day in the law. Such routine "disagreement does not rise to the level

17    required by Section 1292(b)." *Hope Med. Enterprises*, 2021 WL 6618726, at *5. Even a "close

18    case … is not enough to certify a decision for interlocutory appeal." *Haw. Ironworkers Annuity*,

19    2011 WL 1982714, at *2. If it were otherwise, "such appeals would be, contrary to the

20    fundamental principles of appellate review, commonplace," particularly given that "many, many

21    motions to dismiss raise issues purely of law, and often that law is far from entirely clear." *Id.*

22    While "allowing interlocutory review" might be "tempting," doing so "is not without its price."

23    *Id*. Work stops. Time is lost. Except in "rare," "extraordinary circumstances," interlocutory

24    appeal is not worth the price, particularly where appellate review would be better served with a

25    developed factual record. That is true here. As this Court observed, X's concerns—including

26    those under *Trinko*—"will be factually sensitive … under the rule of reason." ECF 263 at 10.

27          Unable to demonstrate substantial grounds for disagreement on legal issues, X argues the

28

1    issues are so "novel and difficult" that they warrant immediate appeal. X Br. 11. As the Ninth

2    Circuit has admonished, however, "just because a court is the first to rule on a particular question

3    …. does not mean there is such a substantial difference of opinion as will support an interlocutory

4    appeal." *Couch*, 611 F.3d at 633. "[T]he mere presence of a disputed issue that is a question of

5    first impression, standing alone, is insufficient…." *Id.* at 634. Put simply, "a dearth of cases does

6    not give rise to a substantial ground for difference of opinion." *Id.*

7            Nor does the notion that Bright Data is applying established antitrust law to a new set of

8    facts support an appeal. "That settled law might be applied differently does not establish a

9    substantial ground for difference of opinion." *Sateriale*, 2015 WL 3767424, at *3-4 (denying

10    certification where "the question reflects a disagreement with the Court's *application* of clear-cut

11    law to the facts"). Here, Bright Data's claim sits firmly in settled law of vertical foreclosure,

12    exclusive dealing, and exclusionary contracts. *See, e.g.*, *Twin City Sportservice, Inc. v. Charles*

13    *O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982) (applying established rule of reason analysis to

14    alleged exclusive dealing arrangements) (citing *Tampa Electric Co. v. Nashville Coal Co.*, 365

15    U.S. 320 (1961)); *see also, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269-71 (3d Cir.

16    2012); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001); *United States v.*

17    *Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005). As this Court correctly held, Bright Data

18    plausibly pled anticompetitive conduct by alleging that X's Terms of Service bar all users from

19    dealing in public-square data with Bright Data or other X-competitors in the public-square data

20    market. Interlocutory review is inappropriate.

21            ***X's Question #2.*** X's second question regarding throttling suffers the same fate. The entire

22    question is built on a fundamental mischaracterization of Bright Data's allegations. As the Court

23    recognized (ECF 263 at 12), Bright Data did not bring a standalone throttling claim, as X suggests

24    (X Br. 12), but rather alleged an overall scheme to restrain and monopolize the market through

25    anticompetitive conduct *including*, but not limited to, throttling. Bright Data has always been clear

26    on that, in its Counterclaim and in opposition to X's motion to dismiss. It said, "Bright Data is not

27    bringing a stand-alone claim for throttling. The allegations form part of an overarching scheme to

28

monopolize the data markets." ECF 184 at 14. Accordingly, the Court ruled that "because Bright Data's allegations about X's throttling are bound up by [Bright Data's monopolization theory], not brought as some 'stand-alone claim' for which standing would be suspect, this order will not discard them yet." ECF 263 at 12.

Thus, X's cases observing that standing is a claim-specific inquiry do not move the needle or create grounds for disagreement (X Br. 13), as Bright Data does not bring a stand-alone throttling claim. X does not dispute Bright Data's standing to challenge X's anticompetitive scheme; and, as noted, it cannot pick apart the alleged scheme to carve bits and pieces out of the case. *See, e.g.*, *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("Plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."). Standing is not a test applied to each individual line in a complaint.

Nor is there any danger of "duplicative recovery" or overdeterrence. X Br. 13. Bright Data's damages are Bright Data's, not Meta's or anyone else's. Bright Data is entitled to seek damages for the harm it suffered, as well as injunctive relief to prevent X's anticompetitive scheme. Indeed, as Bright Data explained, "[f]actors such as the injury's directness, speculative nature, duplication, and apportionment do not apply to injunctive claims." ECF 184 at 21 (citing *Sidibe v. Sutter Health*, 2013 WL 2422752, *11 (N.D. Cal. 2013)). Instead, Bright Data need only show "*threatened* loss or injury … *proximately* resulting from the alleged antitrust violation." *Parks v. Watson*, 716 F.2d 646, 662 (9th Cir. 1983). Bright Data did this. It alleged that through its throttling practices, X discourages customer defection to competitors in the user engagement market, thereby securing and maintaining its market power in the downstream public square data market. CC ¶¶ 107-11. At a minimum, these allegations are evidence of X's motive and the effect of X's scheme. X does not cite any case disagreeing with that.

### C.   Interlocutory Appeal Would Not Materially Advance the Litigation.

X fails to demonstrate that an interlocutory appeal would materially advance this litigation. To make this showing, X must demonstrate that certification would "facilitate disposition of the

1    action by getting a final decision on a controlling legal issue sooner, rather than later in order to

2    save the courts and the litigants unnecessary trouble and expense." *Jackson-Jones v. Epoch*

3    *Everlasting Plan, LLC*, 2024 WL 3221738, *4 (C.D. Cal. 2024). Where, as here, "a substantial

4    amount of litigation remains in the case regardless of the correctness of the Court's ruling …

5    arguments that interlocutory appeal would advance the resolution of the litigation are

6    unpersuasive." *Heaton v. Soc. Fin., Inc.*, 2016 WL 232433, *6-7 (N.D. Cal. 2016). Thus, "cases

7    where courts find the third Section 1292(b) factor often are large, multi-district litigation cases

8    where Ninth Circuit review and resolution of an issue would clarify the issue for not only the

9    instant case, but also other cases already pending before the Court or in other courts." *Id.*

10   Similarly, "[w]hen litigation will be conducted in substantially the same manner regardless of [the

11   appellate court's] decision, the appeal cannot be said to materially advance the ultimate

12   termination of the litigation." *Hansen Beverage Co. v. Innovation Ventures., LLC*, 2010 WL

13   743750, *4 (S.D. Cal. 2010).

14        While X trots out a parade of horribles of the discovery it will take if the Counterclaim

15   proceeds (X Br. 2, 14-18), it ignores the particulars of *this* case. This is neither class action nor

16   multi-party, multi-district litigation. There is no alleged overarching conspiracy spread across

17   multiple defendants spanning an entire industry.[7] This is a two-party case disputing the validity

18   and application of a few provisions of X's Terms to scraping of public data, and efforts to prevent

19   competition for such data. There is no reason to credit X's alarmism. As Bright Data noted in its

20   opposition and proposed alternative to X's extension motion, antitrust discovery is routinely

21   completed in far less time, often in a matter of months. ECF 279 at 3-4.

22        Nor would the (unlikely) elimination of Bright Data's Counterclaim significantly change

23

24   ─────────────────────
     [7] This distinguishes X's cases. *In re Chocolate Confectionary Antitrust Litigation* was an MDL
     involving an alleged multi-year price fixing conspiracy against half a dozen defendants in the U.S.
25   and Canada, when the *Twombly* standard was still "in its infancy." 607 F. Supp. 2d 701 (M.D. Pa.
     2009). *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145 (2d Cir. 2014) was
26   part of the sprawling *In re Air Cargo Shipping Services Antitrust Litigation* MDL involving dozens
     of defendants across the world. The issue for appeal there was not the sufficiency of the
27   allegations, but the discrete legal question of whether claims against a particular defendant were
     discharged in bankruptcy.
28

the scope of discovery.  The vast majority of the issues overlap with X's claims.  *See* ECF 263 at

14.  Both focus on X's July 2023 change to its Terms to prohibit scraping.  Both seek to adduce

the degree of public availability of data on X.  Both focus on the operation of X's servers and

various functions on the platform, and both will require evidence on the impact of scraping on X's

systems.  X suggests antitrust discovery "has not yet begun."  X Br. 19.  False.  Discovery into

these overlap issues is well under way.  And, as Bright Data asserts an unreasonable restraint-of-

trade affirmative defense (ECF 168 at 140), discovery into competition issues and X's restraints

will continue with or without the Counterclaim.  Thus, an appeal will not alleviate the "unique

burdens of antitrust cases" X complains of.  X Br. 15.  Given that the case "will be conducted in

substantially the same manner regardless of [the appellate court's] decision," certification is not

appropriate.  *Hansen Beverage*, 210 WL 743750, at *4.

Immediate appeal will not save anything at this juncture.  The only sure consequence of an

appeal now is "delay[ed] resolution of this case."  *Matera v. Google Inc.*, 2016 WL 8200619, *15

(N.D. Cal. 2016).  Even if the Ninth Circuit finds that some of Bright Data's allegations somehow

fall short of a plausible claim, the most likely consequence would be remand with leave to amend.

And given that it takes the Ninth Circuit about 13 months, on average, to try a civil appeal, the

case would otherwise be nearly ready for trial in the time it would take for an appeal.[8]  Even if X

ultimately prevails "on the issue[s] for which [it] seeks certification," its claims still "will need to

be litigated" and "require the parties to engage in very similar discovery."  *Id.*[9]

And discovery can be managed.  X says it has "millions of pages of responsive documents"

---

[8] *See* Table B-4A, U.S. Courts of Appeals—Median Time Intervals in Months for Civil and
Criminal Appeals Terminated on the Merits During the 12-Month Period Ending September 30,
2023, *available at* https://www.uscourts.gov/sites/default/files/data_tables/jb_b4a_0930.2023
.pdf.

[9] This is in contrast to *KPH Healthcare Servs, Inc. v. Mylan N.V.*, 2022 WL 16551340 (D. Kan.
2022), where the court denied a motion to dismiss as to one defendant but granted as to the other
on the legal question of indirect purchaser standing.  Thus, if that dismissal was reversed, the
parties would face "duplicate … discovery efforts" absent immediate appeal, and the parties did
not dispute the third requirement of § 1292(b) for that reason.  No such duplication is possible
here.

to produce (X Br. 15), but the parties have agreed on technological means to reduce the burdens of document discovery. X says it has no choice but to blanket the world in subpoenas, all in the name of market definition, but its own recently amended disclosures reveal the farce behind the threat. It says it will conduct discovery of Airbnb and Zillow, for example. There is no rational basis to think this case requires discovery of online real estate listings. The reality is, parties – particularly in merger cases – often litigate market definition in months, not years.

Also weighing against certification is the prospect that some claims on either side could resolve before trial—for example, at summary judgment—on a more complete factual record. As the Court recognized, many aspects of Bright Data's claims will be fact dependent—from market definition, to harm to competition, to whether X's proffered pro-competitive justification outweighs the anticompetitive effects, to the specific harm arising from throttling and other alleged anticompetitive measures. Any of these issues could conceivably be decided on summary judgment. If there is to be an appeal, the Ninth Circuit should have the benefit of that factual development.

X lodges a final argument based on a supposed "special consequence" of the Counterclaim, referencing other websites purporting to have anti-scraping terms of use. X Br. 17 (citing *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009)). Putting aside the fact that the "special consequence" doctrine is generally only applied to privilege issues,[10] X's "special consequence" is manufactured. Denial of X's motion to dismiss does not implicate any of the other websites X references. Bright Data's Counterclaim is about X's terms and X's conduct in the market that X dominates. While other websites might have terms of use, no two sets of terms are exactly alike. For example, while Meta purported to ban all scraping through its terms, their specific language did not apply to logged-out scraping. *Meta Platforms, Inc. v. Bright Data Ltd.*, 2024 WL 251406,

---

[10] *See, e.g.*, *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, 2016 WL 7475581, *3 (N.D. Cal. 2016) ("effect of a corporate merger on the scope of waiver of attorney-client privilege"); *DeFrees v. Kirkland*, 2012 WL 12885065, *4 (C.D. Cal. 2012) ("a privilege question of special consequence"); *Coleman v. Sterling*, 2012 WL 12952831, *4 (S.D. Cal. 2012) ("privilege orders"); *Miller v. Boilermaker-Blacksmith Nat'l Pension Tr.*, 2021 WL 2934590 (E.D. Wash. 2021) ("joint defense privileged communications").

1    *11 (N.D. Cal. 2024) ("It is reasonable to interpret the Terms such that Bright Data did not 'use'

2    Facebook and Instagram when it engaged in public logged-off data scraping.").  Any potential

3    antitrust liability other platforms may face will depend on the specifics of their terms, their

4    circumstances, their conduct, and the markets in which they operate.  That X employed

5    exclusionary terms and anticompetitive conduct is not a "special circumstance."

6         As to X's platitude about free riding scrapers (X Br. at 17), accessing public data is not

7    free riding.  Competitors utilize public information, data, and resources all the time.  But X could

8    avoid it by simply putting the data behind a login.  By attempting to control and restrict access to,

9    and competition in the market for, public data through universal contracts of adhesion, it is X's

10   conduct that "strikes at the heart of 'the free-market system.'"  X Br. 17.

11   **III.    A STAY IS UNWARRANTED.**

12        Bright Data opposes any stay.  In (again) arguing for one, X recycles its protestations about

13   the cost of antitrust discovery.  They did not warrant a stay before, and they do not warrant a stay

14   now.

15        *First*, a one-sided stay affecting only Bright Data's Counterclaim would be grossly unfair

16   and inefficient, particularly given the significant overlap between X's claims and the

17   Counterclaim.  A stay would prejudice Bright Data and should be denied for the same reasons this

18   Court denied X's motion to bifurcate.  ECF 263 at 14.  For instance, delaying discovery on Bright

19   Data's Counterclaim will cause the loss of evidence through passage of time.  A one-sided stay

20   will also compromise the ability to have a single trial on the predominantly overlapping, highly

21   technical issues presented by X's claims and Bright Data's counterclaims, all potentially at great

22   cost to the parties and the Court (and increased risk of confusion to the jury).  *See J2 Glob.*

23   *Commc'ns, Inc. v. Protus IP Solutions*, 2009 WL 910701, *3 (C.D. Cal. 2009) ("Having one trier

24   of fact likely will avoid duplicative time and effort, and will serve the jury's understanding by

25   giving the jury fuller context.").  X's motion for a one-sided stay of Bright Data's discovery

26   pending appeal should therefore be denied.

27        *Second*, Bright Data is likewise opposed to a full stay pending appeal.  The same time delay

28

concerns apply—with discovery on all issues awaiting appeal, recollections growing stale, and documents facing an increased chance of loss.

In the event, however, that the Court grants § 1292(b) certification, *and* the Ninth Circuit accepts it, *and* a stay is issued, Bright Data believes that any stay should fully stay the entire case.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny X's motion for certification under 28 U.S.C. § 1292(b) and its request for a stay.

Dated: May 23, 2025                                     Respectfully submitted,

                                                        */s/ Colin R. Kass*

Robert C. Goodman (Bar No. 111554)                      Colin R. Kass*
Lauren Kramer Sujeeth (Bar No. 259821)                  Erica T. Jones*
ROGERS JOSEPH O'DONNELL, PC                             PROSKAUER ROSE LLP
311 California Street, 10th Floor                       1001 Pennsylvania Ave., N.W.
San Francisco, CA 94104                                 Washington, D.C. 20004
(415) 956-2828                                          (202) 416-6890
rgoodman@rjo.com                                        ckass@proskauer.com
lsujeeth@rjo.com                                        ejones@proskauer.com

Sehreen Ladak (Bar No. 307895)                          David A. Munkittrick*
PROSKAUER ROSE LLP                                      Reut N. Samuels*
2029 Century Park East, Suite 2400                      Timothy E. Burroughs*
Los Angeles, CA 90067-3010                              Michael R. Clifford Beckwith*
(310) 284-5652                                          Peter C. Angelica*
sladak@proskauer.com                                    PROSKAUER ROSE LLP
                                                        Eleven Times Square
Genesis Sanchez Tavarez*                                New York, New York 10036
PROSKAUER ROSE LLP                                      (212) 969-3000
One International Place                                 dmunkittrick@proskauer.com
Boston, MA 02110                                        rsamuels@proskauer.com
(617) 526-9675                                          tburroughs@proskauer.com
gsancheztavarez@proskauer.com                           mbeckwith@proskauer.com
                                                        pangelica@proskauer.com

*Attorneys for Defendant Bright Data, Ltd.*
*\*Admitted pro hac vice*